# MOSES & SINGER LLP

The Chrysler Building
405 Lexington Avenue, NY, NY 10174-1299
Tel: 212.554.7800  Fax: 212.554.7700
www.mosessinger.com

Devika Kewalramani
Direct: 212.554.7832  Fax: 917.206.4332
dkewalramani@mosessinger.com

July 23, 2014

<u>VIA EXPRESS MAIL</u>

**Received and Filed 10.19.16**

Hon. Carol Bagley Amon
Chief Judge, United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:    <u>Disciplinary Complaint Against Richard E. Lerner, Esq.</u>

Dear Judge Amon:

    We represent Felix H. Sater, and submit this disciplinary complaint on his behalf against New York attorney Richard E. Lerner, pursuant to Local Civil Rule 1.5. As counsel for another attorney, Frederick M. Oberlander, and as co-counsel with Oberlander for serial plaintiff Jody Kriss, Lerner has engaged in a relentless campaign to extort a settlement from Sater and others by publicly releasing documents that had been sealed by a federal court to protect Sater from life-threatening danger. To further that campaign, Lerner willfully and deliberately defied the orders of three different judges in the Southern and Eastern Districts of New York as well as the Second Circuit Court of Appeals, and filed a slew of frivolous motions and non-meritorious lawsuits. Worse, Lerner repeatedly accused the courts of illegal and fraudulent conduct and intentionally violated their explicit and unambiguous orders. We describe below Lerner's outrageous behavior, which, in our view, violates multiple Rules of Professional Conduct,

reflects adversely on his fitness to practice law, and makes him a continued danger to Sater and to the public.

Lerner was originally hired by Oberlander in July 2010 as his own attorney, but soon thereafter the two became co-counsel for Kriss in all subsequent motions and lawsuits. While the initial misconduct was Oberlander's, once Lerner joined forces with Oberlander he adopted, ratified, and extended that misconduct (to the extent of being expelled from his law firm, as discussed below). Accordingly, to provide the necessary background and context for Lerner's professional misconduct, we describe below many of the events and actions involving Oberlander that led up to Lerner's involvement and which set the stage for Lerner's unethical behavior that continues unabated.

The Eastern District of New York has previously held disbarment an appropriate sanction when a lawyer is guilty of "serious professional misconduct," including repeated failure to comply with court orders and filing frivolous and vexatious lawsuits to harass, threaten and coerce those made subject to them. Nothing less is appropriate here, where Lerner – wholly without regard to Oberlander's own separate ethical violations – has violated at least the following New York Rules of Professional Conduct: Rule 3.1 (by filing multiple frivolous motions and suits which have no reasonable purpose other than to harass and maliciously injure), Rule 3.2 (by engaging in improper dilatory tactics and practices which have no substantial purpose other than to delay or cause needless expense), Rule 3.3 (by engaging in discourteous conduct towards the courts), Rule 3.4 (by knowingly engaging in unlawful conduct by contravening court orders, disclosing sealed documents and information, and attempting to extort

a settlement by threatening further illegal conduct), and Rule 8.4(a), (b), (d) and (h) (by violating multiple Rules of Professional Conduct and knowingly assisting Oberlander to do so, by engaging in illegal conduct that adversely reflects on his fitness as a lawyer, by engaging in conduct that is prejudicial to the administration of justice, and by engaging in conduct that reflects adversely on fitness to practice law).

Background on Sater

Sater was the subject of criminal proceedings in the Eastern District of New York, Case No. 98-CR-1101, which concluded in October 2009 (the "Criminal Case"). Judge I. Leo Glasser presided over the Criminal Case. Sater ultimately entered a guilty plea and became a significant cooperating witness, providing the government with, among other things, information related to matters of national security. The government and the Court were convinced that if the nature and extent of Sater's cooperation became public, he would be in grave danger. Accordingly, Judge Glasser sealed the docket and filings in the Criminal Case, including a Cooperation Agreement dated December 10, 1998, a United States Department of Justice Financial Statement dated December 10, 1998, and a Pre-sentence Investigation Report dated June 18, 2004 (the "PSR") (together, the "Sealed Materials"). Sater is referred to throughout the Criminal Case as "John Doe."

Sater was formerly affiliated with a real estate development firm known as Bayrock Group LLC ("Bayrock"). Jody Kriss was employed by Bayrock as Director of Finance from 2003 to 2008, when he was terminated by the company. Joshua Bernstein was employed by Bayrock from November 2006 to September 2008, when he was terminated by the company.

During his employment at Bayrock, Bernstein maintained a back-up copy of all Bayrock files from its servers, including emails. Bernstein's back-up hard drive contained the Sealed Materials, which Sater's attorneys had sent to him at his Bayrock email account, as well as Bayrock's privileged communications with its counsel.

In late 2008, Kriss commenced an action in the Delaware Chancery Court against, inter alia, Sater, certain Bayrock entities and certain employees of Bayrock entities (the "Delaware Action"). In the Delaware Action, Kriss was represented by several attorneys, including Oberlander, who would ultimately bring in Lerner as co-counsel. In that action, Kriss alleged that the Bayrock entities engaged in fraud and breach of fiduciary duty, violated the securities laws, and that he had been denied certain economic benefits to which he was entitled based on his employment at Bayrock. On February 19, 2010, the Delaware court dismissed the Delaware Action, finding that Kriss's disputes with Bayrock and the other defendants were subject to an arbitration agreement. The court directed Kriss to file an arbitration and, in the event the arbitrator determined that the claims were not arbitrable, to file an action in a New York court.

<u>Bernstein Steals the Sealed Materials And Gives Them to Oberlander</u>

When Bernstein left Bayrock, he removed the back-up hard drive from his office computer and took it with him. Bayrock requested that he return all company property in his possession, including the back-up hard drive, but Bernstein kept it anyway because he believed Bayrock had not reimbursed all of his outstanding business expenses.

In or about February 2009, Bernstein sued Bayrock in New York State Supreme Court, Westchester County (the "Westchester Action"). Bernstein learned that Kriss was also suing

# Moses & Singer LLP

Bayrock in Delaware. Bernstein told Kriss that he possessed Bayrock's back-up hard drive, which Kriss asked him to share with his attorney, Oberlander, who then asked to review the back-up hard drive and offered to represent Bernstein, without charge, in the Westchester Action.

Sometime between February 28, 2010 and March 1, 2010, Oberlander met Bernstein at Bernstein's apartment in Manhattan. At that meeting, Bernstein provided Oberlander with unfettered access to the back-up hard drive. Oberlander sat at Bernstein's computer and searched for several hours, printing documents and emailing files. Some of the search terms Oberlander used were names of law firms. During his searches, Oberlander discovered the Sealed Materials as well as Bayrock's communications with its lawyers (for which he had purposely searched). After hearing testimony from Oberlander regarding the circumstances by which he obtained the Sealed Materials, Judge Glasser found that those documents had been "wrongfully taken" by Bernstein, who had "no legal right to those documents." (Tr. of 7/20/10 oral argument, attached hereto as Exhibit A, at 19:9-18).

On March 4, 2010, Oberlander sent an email to Bernstein and his father, Arnold Bernstein, indicating his intent to commit extortion against Sater and others using the information he had discovered on the back-up hard drive: "I am so not kidding this is not a game this is not a $150,000 case anymore and DO NOT READ THIS WRONG this is a team and my job is to shake the living daylights out of them and it starts NOW… as I said stolen emails are admissible, period. end of story. I mean admissible into evidence let alone discovery. and these aren't stolen." (Exhibit B).

Oberlander Files Complaint in the Southern District of New York

On May 10, 2010, Oberlander filed the action captioned, *Kriss, et al. v. Bayrock Group, LLC, et al.*, Case No. 10-CV-3959 ("Kriss I"), in the Southern District of New York. The complaint filed in the Southern District ("SDNY Complaint") names Sater and many others as defendants and contains allegations similar to those in the Delaware Action, but Oberlander and Kriss never filed an arbitration, as ordered by the Delaware court. The SDNY Complaint also includes RICO allegations. The Southern District case was assigned to Judge Naomi Reice Buchwald. Oberlander annexed to the complaint and publicly filed Sater's PSR, his Cooperation Agreement, and two proffer agreements. Oberlander knew that the PSR and the Cooperation Agreement had been sealed by order of the court in the Criminal Case, and that revealing them would put Sater's life in danger. The SDNY Complaint was subsequently made available to the public for download through a paid online news service, "Courthouse News."

On May 12, 2010, Oberlander wrote an email directed to Julius Schwarz at Bayrock, threatening to file the SDNY Complaint publicly rather than under seal if Bayrock did not agree to a monetary settlement. (Exhibit C). A copy was later forwarded to Sater. Upon learning of the filing, Sater's attorneys spoke with Judge Buchwald, who immediately issued an order that no further dissemination of the SDNY Complaint and the exhibits be made pending further order of the Court. Judge Buchwald also issued a second order sealing the original SDNY Complaint and ordering Oberlander to file a redacted version, without any sealed documents or references to sealed documents, by May 19, 2010. Sater's attorneys also contacted Oberlander, who refused to disclose how he received the Sealed Materials or to return them.

Courthouse News ran a news story disclosing information from the SDNY Complaint on May 17, 2010. At the request of Sater's attorneys, the story was taken down, but it exposed Sater to danger because the sealed information was disseminated before the story was removed.

### Judge Glasser Enjoins Oberlander From Further Dissemination of the PSR; Lerner Retained

On May 18, 2010, Sater filed, by way of order to show cause, a motion for preliminary injunction before Judge Glasser, requesting that Oberlander and his clients return the Sealed Materials to Sater, as well as a hearing to determine how they obtained those materials. Judge Glasser signed the order to show cause the same day. As part of that order, he issued a TRO restraining Oberlander and his clients from disseminating the Sealed Materials pending a hearing.

By this point, Oberlander had retained Lerner, and his law firm, Wilson Elser Moskowitz Edelman & Dicker LLP, where he was a partner, to represent him in litigation concerning his intentional and illegal disclosure of sealed information. Lerner would ultimately join Oberlander in his relentless campaign of vilifying the courts, continuing to disclose sealed and privileged information, and extorting Sater for a billion dollars. As a result, Lerner was asked to leave his firm, Wilson Elser.

On June 11, 14 and 21, 2010, Judge Glasser held hearings on the order to show cause. Judge Glasser found that the sealed documents "if divulged ... may seriously jeopardize not only the life of the person who was the subject of those documents. In this case it might also significantly affect matters of national interest." (Tr. of 6/14/10 proceeding, attached hereto as Exhibit D, at 4:4-9). He further found, "given a document which is plainly indicated on its face,

filed under seal, that comes into the hands of a lawyer, at the very least that lawyer should have very serious doubt about doing anything with that document without first making appropriate inquiry about whether disclosing this document that was sealed is appropriate and should an order of unsealing or permission to use it be obtained." *Id.* at 7:17-24. Finally, Judge Glasser held that "there's no doubt that [Oberlander] was aware of the fact that these documents were sealed. There's no order that needs to be addressed to [Oberlander] and say, [Oberlander], this is a sealed document, don't publicize it. It's obvious." *Id.* 8:1-4.

Oberlander and Sater testified at the hearing. At the conclusion of the hearing, Judge Glasser issued a permanent injunction against the dissemination of the PSR and its contents, and directed Oberlander to return the PSR to the U.S. Attorney's Office. With respect to the Cooperation Agreement and other sealed or confidential materials, Judge Glasser extended the TRO until July 20, 2010 and requested additional briefing. Since Lerner was representing Oberlander in these proceedings, he was fully aware of the gravity of disclosing Sater's sealed information and was privy to the Court's findings on the consequences of this disclosure.

Oberlander States His Intention to Violate Court Orders

Nevertheless, in a signed declaration submitted in opposition to the TRO, Oberlander informed the Court of his intent to ignore the Court's orders: "I will not be silenced ... there is nothing that the court can do to me ... Well, your honor, I will not be gagged." (Declaration dated July 16, 2010, attached hereto as Exhibit E, ¶¶ 4, 6, 11). Oberlander also initiated what would turn out to be an extended pattern of insulting the judges before whom he appeared. In his Declaration, Oberlander referred to the Court as a "star chamber" that issued "a patently

unconstitutional prior restraint TRO," accused the Court of "covertly maintain[ing]" the Criminal Case as a "super sealed" case, and "unconstitutionally concealing the docket and surreptitiously dispensing whatever justice, or lack thereof, as the court sees fit." *Id.*, ¶¶ 1-3. Finally, he concluded by asking Judge Glasser, in language borrowed almost verbatim from the Army-McCarthy hearings, "*You have done enough. Have you no sense of decency sir, at long last? Have you no sense of decency?*" *Id.*, ¶ 20 (emphasis in original).

<u>Judge Glasser Reaffirms Permanent Injunction and Extends TRO</u>

Judge Glasser held oral argument on July 20, 2010. During that argument, the Court made several factual findings, including that both Bernstein and Oberlander are converters, and that there may be disciplinary rules or ethical principles that should have precluded Oberlander from using those documents. The Court stated, "something bad was done, something very bad and perhaps despicable was done by the use of those documents annexed to a complaint in the Southern District, in a civil case...." (Exhibit A at 20:20-23). During the oral argument, Lerner and Oberlander took the frivolous position that the permanent injunction with respect to the PSR applied only to the original PSR and did not apply to copies. *Id.* at 15. Then, in a submission to Judge Buchwald around the same time, Lerner and Oberlander took the position that some or all of Judge Glasser's orders applied only to Lerner and Oberlander and not to their clients. Lerner and Oberlander filed several Notices of Appeal in the Second Circuit with respect to the TRO and the permanent injunction as to the PSR.

<u>Lerner and Oberlander Continue Their Extortion Campaign: "Judge Buchwald Will Be Presiding Over World War III"</u>

Oberlander never complied with Judge Buchwald's order to file a redacted complaint. For the remainder of 2010, Lerner and Oberlander continued to demand money from Sater and the other defendants in the Southern District case and to threaten "dissemination" of sealed information if they did not get it. In a letter to Sater's attorney dated October 18, 2010 (Exhibit F), Lerner and Oberlander wrote,

> [M]y clients are indifferent as to which Defendants write the checks, and if your client can get out of this without paying much, if anything, that's fine with them. They are also well aware that your client lacks the means to pay what is demanded, and thus are proposing he pay at least in very principal part with his cooperation, something he no doubt will understand.

Oberlander also asserted,

> [M]y clients ... simply demand [sic] what they are entitled to: 1 billion dimes ... At this time, plaintiffs will very favorably consider settling the entirety of all claims known and unknown for their actual damages of $35,000,000 ... It is the least amount which plaintiffs would be willing to accept for a quick settlement that avoids the dissemination.

On November 9, 2010, Oberlander sent another letter to Sater's counsel (Exhibit G), which included numerous extortive threats:

> If you wish Mr. Sater's activities lawfully kept quiet to any extent, stand still, stop filing motions and get out of the way so Plaintiffs can try to resolve the case before everything uploads to PACER and goes public. The only way to try to prevent worldwide notoriety will be a globally stipulated sealed confidentiality order accompanying a global settlement.
>
> [W]hen Judge Buchwald orders this public and your client finds this on the front pages everywhere, including New York, Iceland,

> Turkey, and Kazakhstan, and all the other plaintiffs worldwide ... join the party.
>
> I can with confidence predict from the settlement discussions I've had that all the defendants will be delighted to keep this quiet...
>
> If this case is not settled quickly, it will surely go viral. If you obstruct a settlement instead of helping get there, everything will go public with clockwork inevitability. This is not a threat, it is mathematics. And it is certain.
>
> No power on this earth will much longer prevent as much lawful and legal worldwide dissemination of this Complaint and every document attached thereto or referenced therein as the public and press doing the dissemination think its value justifies. You already saw what *Courthouse News* thought of it, and everything else I file ... entirely without my or my client's involvement. Only a stipulated sealed confidential settlement agreement Plaintiffs find acceptable, executed very soon, can stop that.

Finally, Oberlander threatened in the letter that if he saw any motions to stop his plan, Bayrock and Sater "will get the inevitable, concomitant global public news and media coverage of everything everywhere .... Judge Buchwald will be presiding over World War III with coverage likely on the front page of the New York Law Journal."

The Second Circuit Enjoins Lerner and Oberlander From Revealing Documents Subject to Judge Glasser's Sealing Orders

On February 14, 2011, the Second Circuit heard oral argument on Lerner's and Oberlander's appeal and two related applications. To further protect Sater's identity, Oberlander is referred to in the appeal and subsequent Criminal Case proceedings as "Richard Roe." The Court of Appeals promptly issued a Summary Order temporarily enjoining Lerner, Oberlander and anyone acting in concert with them from publicly distributing or revealing in any way any documents or contents thereof subject to sealing orders in the appellate proceedings or in any

related proceedings before the District Courts for the Eastern and Southern Districts of New York. (Exhibit H).

The Second Circuit further ordered that the Chief Judge of the Eastern District assign a District Judge from that Court "with the limited mandate of implementing and overseeing compliance with our orders and the orders previously entered by Judge Glasser." *Id.* at 5. That such action was necessary underscores the Circuit Court's recognition of Lerner's and Oberlander's willful noncompliance with prior orders. The Court specifically noted the difficulties Lerner and Oberlander had caused for Judge Glasser: "Of course, Judge Glasser, an experienced and able jurist who has shown admirable patience and forbearance in the face of extraordinary provocations, shall retain jurisdiction over the underlying (and long-lived) criminal proceeding." *Id.* Accordingly, then-Chief Judge Raymond J. Dearie referred the case to Judge Brian M. Cogan for the purpose of enforcing the Circuit Court's and the Eastern District's prior orders.

Judge Cogan Warns Lerner and Oberlander That They Will Be Held In Criminal Contempt

At a hearing on April 1, 2011, Judge Cogan learned that Lerner and Oberlander still possessed the sealed documents that Judge Glasser had ordered them to return. Judge Cogan immediately ordered Lerner and Oberlander to destroy electronic copies and to return any photocopies, and threatened that if they did not, he would hold them both in contempt. Judge Cogan also found that Lerner's and Oberlander's position that Judge Glasser had not actually ordered them to destroy or return copies had no merit: "No, it's absolutely clear on its face Judge Glasser intended you to destroy electronic copies and to return any photocopies." (Tr. of

4/1/11 hearing, attached hereto as Exhibit I, at 14:3-5). The following month, in denying Lerner's and Oberlander's request to make certain sealed information public, Judge Cogan determined that Lerner and Oberlander were "seeking to fatally undermine the purpose of the injunctions by publishing information that would render them ineffective." (5/13/11 Order, attached hereto as Exhibit J, at 4). Thus, at this point, both Lerner and Oberlander had violated Judge Glasser's 8 month-old order to return all of Sater's sealed documents. *See* Exhibit J.

<u>In Flagrant Violation of the Courts' Orders, Lerner and Oberlander Disclose Sealed Information to *The New York Times* and *The Miami Herald*</u>

Despite the court's injunctions, in early February 2012, Lerner and Oberlander embarked on a campaign to further reveal Sater's sealed information. They disclosed Oberlander's true name and identity to a *New York Times* reporter, and posed for a half page photo together. On February 6, 2012, *The New York Times* ran the article, entitled "By Revealing Man's Past, Lawyer Tests Court Secrecy." By revealing his true name and identity, Oberlander directly violated the Second Circuit's February 14, 2011 order, which expressly enjoined Lerner and Oberlander from disclosing Richard Roe's true identity "because the disclosure of his true identity in this litigation context may, for the time being, lead to the improper disclosure of the materials at issue." (Exhibit H at 2).

On February 10, 2012, Sater filed an order to show cause why Lerner and Oberlander should not be held in civil contempt of the Court of Appeals' February 14, 2011 order for their disclosure of sealed information. Judge Cogan signed the order to show cause and scheduled a hearing. In response, Lerner and Oberlander filed a motion to quash or vacate the order to show

cause (Exhibit K). Their motion is notable for the flurry of baseless and scurrilous insults directed at Judge Cogan, the entire Eastern District, and the Second Circuit, *e.g.*:

> Judge Cogan's signing of the order to show cause was "illegal and unlawful;"
>
> Judge Cogan "maint[ains] an inaccurate docket" in a totally unrelated matter and should recuse himself "from further involvement;"
>
> The Eastern District has taken "unlawful and unethical measures to cover up … illegal sentencing schemes;"
>
> The Second Circuit's orders evidence "lawlessness" and "sedition" and constitute a scheme to "defraud victims of untold millions of dollars;"
>
> The Circuit has "falsifi[ed] judicial records;" and
>
> The Eastern District and Second Circuit are "hid[ing] an entire covert justice system operating devoid of constitutional legitimacy."

Before Judge Cogan had an opportunity to address either the order to show cause or Lerner's and Oberlander's motion, additional news articles evidencing further disclosures of sealed information by Lerner and Oberlander began to surface. *The Miami Herald* published an article disclosing John Doe's true identity and displaying a photograph of him, connecting him to all the sealed proceedings, and – most egregiously – discussing the contents of the sealed documents that the Second Circuit ordered to remain under seal. It is undisputed that Lerner, Oberlander or their agents gave *The Miami Herald* the information for this article, as the article quotes Paul Cassell, a member of their legal team who was copied on correspondence in the sealing litigation. Sater's attorneys sought Judge Cogan's permission to supplement their application for an order to show cause to include information regarding the *Miami Herald* article.

On February 27, 2012, Judge Cogan referred Lerner and Oberlander to the U.S. Attorney's Office to investigate whether they should be held in criminal contempt for their actions. (Tr. of proceedings attached hereto as Exhibit L). When discussing their defense to the illegal disclosure of Sater's sealed information in violation of multiple court orders, both Lerner and Oberlander indicated that they would be taking the Fifth Amendment and would not testify in their own defense. *Id.* at 4: 1-3. That investigation remains pending.

Lerner and Oberlander Continue To Engage In "Vexatious" and "Oppressive" Litigation Tactics

On November 13, 2012, Judge Glasser ordered Lerner and Oberlander to show cause why they should not be sanctioned for flooding the court with a "vexatious" and "oppressive" 742-page documentary stew that had "no relevance to the very discrete issue pending before the Court." (Exhibit M at 3, 4). In response, Lerner and Oberlander moved to recuse Judge Glasser, asserting that Judge Glasser was part of a conspiracy, along with the U.S. government and Sater's counsel, to conceal Sater's conviction: "...your honor presides over this and related matters in violation of 28 U.S.C. § 455(a) and (b)(1), having failed to disqualify yourself despite Congressional mandate you do so because of, respectively, your appearance of bias and lack of impartiality, palpably obvious to, let alone reasonably questioned by, an objective, informed observer;" "...**that observer cannot rationally conclude but that your honor appears to be in criminal conspiracy with *at least* [ ] Sater's lawyers, to deprive us and our clients of our rights.**" (Omnibus Motion dated November 19, 2012, attached hereto as Exhibit N, at 2) (emphasis in original).

Lerner and Oberlander then went on to file two new frivolous actions in March and May of 2013. The March action, *Estate of Ernest Gottdiener, et al. v. Sater, et al.,* Case No. 13-CV-1824 (LGS), was dismissed in its entirety on Sater's motion. In disregard of the Second Circuit's prior warning to refrain from frivolous filings, Lerner and Oberlander filed an unmeritorious motion for reconsideration, and upon losing that motion, noticed an appeal. The frivolousness of the May Action, *Kriss, et al. v. Bayrock Group LLC, et al.,* Case No. 13-CV-3905 (LGS) ("Kriss II"), is apparent on its face: Lerner and Oberlander name Sater's attorneys as defendants along with numerous prestigious law firms, including Akerman Senterfitt LLP, Duval Stachenfeld LLP, Nixon Peabody LLP, Roberts & Holland LLP, Satterlee Stephens Burke & Burke LLP, Morgan Lewis & Bockius LLP, and even an Assistant United States Attorney. They accuse these defendants, in addition to numerous others, of participating in a massive civil RICO conspiracy. They seek damages of $1 Billion.

On May 9, 2013, one day before filing Kriss II, Lerner sent an email to Bayrock's counsel admitting that their litigation efforts were designed to wage a war of attrition against innocent parties:

> "[Our prior litigation efforts against co-defendant Sater] should convince you that this side of the equation has an unlimited ability to sustain the cost of a high stakes litigation, and great patience for a long fight. Your client will not possibly be able to long withstand it."

With their frivolous filings, Lerner and Oberlander ignored the Second Circuit's explicit warning, as outlined in their June 29, 2011 order, that "the Court's patience has been exhausted by [their] filing of 6 separate notices of appeal regarding the same principal legal dispute…and

that any further attempts to re-litigate the issues decided by this order or other frivolous filings of a frivolous nature, may result in sanctions, including the imposition of leave-to-file restrictions, requirements of notice to other federal courts, and monetary penalties." (Exhibit O at 9.) The Second Circuit also noted that Sater's sealed information which Lerner and Oberlander were leaking to the press (much of it contained in the PSR) "is of dubious utility in the civil case except as a tool to intimidate and harass Sater by *subjecting him to danger*." (Exhibit O at 7).

Lerner and Oberlander Continue to Defy the Courts

Lerner and Oberlander also continue their assault on the judiciary. In Kriss II, Lerner and Oberlander filed a letter accusing Chief Magistrate Judge Frank Maas of having entered an "illegal and invalid" sealing order. (Exhibit P). Their pattern of intentionally disobeying court orders has gone unstopped. For example, Lerner and Oberlander have refused to meet and confer as ordered by Judge Lorna Schofield, who now presides over Kriss I and Kriss II, and have refused to provide Sater with a copy of his pleading, which was also ordered by Judge Schofield. It is apparent that there is no end in sight to any of Lerner's and Oberlander's improper litigation tactics, despite the numerous warnings they have received from the courts.

Lerner's Egregious Conduct Warrants A Disciplinary Investigation And Sanctions

Based upon the foregoing, we believe it is clear that Lerner has engaged in a protracted pattern of serious professional misconduct, in violation of numerous Rules of Professional Conduct. As documented herein and in the attached exhibits, multiple federal courts have made repeated findings of professional misconduct on Lerner's part. As Lerner's filing of frivolous lawsuits and dissemination of sealed information are both ongoing and escalating, warranting

# MOSES & SINGER LLP

expedited action to protect Sater and the public, we submit that the Committee on Grievances should consider suspending Mr. Lerner from practice before this Court pending hearing, pursuant to Local Civil Rule 1.5(d).

In support of our conclusion above, and in considering disciplinary sanctions against Mr. Lerner, we urge the Committee to rely on this Court's prior disbarment of a New York-admitted lawyer named George Sassower, who engaged in similar professional misconduct. The United States District Court for the Eastern District of New York disbarred Mr. Sassower from the practice of law before this Court[1] based on the New York State Supreme Court, Appellate Division, Second Department's disbarment of Sassower due to his "serious professional misconduct," including various repeated failure to comply with court orders, failure to cooperate with the Grievance Committee during its investigation, engaging in conduct prejudicial to the administration of justice, and filing frivolous and vexatious lawsuits against litigants, judges, referees, attorneys, public officials and other parties in litigations which Sassower conducted for the purpose of harassing, threatening, coercing and maliciously injuring those made subject to it.[2]

Following the Second Department's disbarment of Sassower, he was also separately disbarred by the U.S. Supreme Court, the U.S. Court of Appeals for the Second Circuit, and the U.S. District Court for the Southern District of New York.[3] The Eastern District held that, "[t]here is nothing . . . to suggest that there was an infirmity in the proof of his misconduct or

---

[1] *Matter of Sassower*, 700 F. Supp. 100 (E.D.N.Y. 1988) aff'd, 875 F.2d 856 (2d Cir. 1989).

[2] *Matter of George Sassower*, 125 A.D.2d 52 (2d Dep't 1987).

[3] See *In re Disbarment of Sassower*, 481 U.S. 1045 (1987); *Matter of Sassower*, 700 F. Supp. 100 (E.D.N.Y. 1988) aff'd, 875 F.2d 856 (2nd Cir. 1989).

that he was deprived of procedural due process or that a grave injustice would result by the imposition of discipline by this court. Absent those conditions, the judgment of the state court disbarring Mr. Sassower should be recognized. Indeed, it is the duty of this court to give effect to the findings of the state court."[4]

Prior to his disbarment, Sassower had been sanctioned and enjoined for filing frivolous actions, including those barred by the doctrines of *res judicata* and collateral estoppel.[5] When those proved insufficient, his disbarment followed. The same should occur here.

Therefore, at a minimum, we respectfully submit that Lerner has violated the following Rules of Professional Conduct:

Rule 3.1, by filing multiple frivolous motions and instituting numerous non-meritorious lawsuits which have no reasonable purpose other than to harass and maliciously injure;

Rule 3.2, by engaging in improper dilatory tactics and practices which have no substantial purpose other than to delay or cause needless expense;

Rule 3.3, by engaging in undignified and discourteous conduct towards the courts which offends the dignity and decorum of proceedings;

---

[4] *Matter of Sassower*, 700 F. Supp. 100, 103 (E.D.N.Y. 1988) aff'd, 875 F.2d 856 (2d Cir. 1989).

[5] See e.g., *Raffe v. John Doe*, 619 F. Supp. 891, 894 (S.D.N.Y. 1985) ("any measure short of an injunction will be ineffective in preventing . . . Sassower from using the federal courts as vehicles for harassment"); See also, *In re Sassower*, 338 B.R. 212 (Bankr. S.D.N.Y. 2006), after recounting Sassower's "long and tortured history of vexatious litigation," the court enjoined Sassower from filing further civil actions in the Second Circuit without prior leave from the Chief Judge).

# MOSES & SINGER LLP

Hon. Carol Bagley Amon
July 23, 2014
Page 20

Rule 3.4, by knowingly engaging in illegal conduct by contravening court orders, disclosing sealed documents and information, and attempting to extort a settlement by threatening further unlawful conduct; and

Rule 8.4(a) (by violating multiple Rules of Professional Conduct and knowingly assisting Oberlander to do so), Rule 8.4(b) (by engaging in illegal conduct that adversely reflects on his fitness as a lawyer), Rule 8.4(d) (by engaging in conduct that is prejudicial to the administration of justice), and Rule 8.4(h) (by engaging in conduct that reflects adversely on fitness to practice law).

We appreciate the Committee's attention to this submission. If we can be of any further assistance or provide any additional information, please do not hesitate to contact us.

Respectfully submitted,

MOSES & SINGER LLP

Devika Kewalramani

Robert S. Wolf

Attachments

1033537v2 014140.0100