Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - X

IN RE:   JOHN DOE,

CV 98-1101

United States Courthouse

Brooklyn, New York,

July 20, 2010
- - - - X   10:30 o'clock a.m.

TRANSCRIPT OF ORAL ARGUMENT
BEFORE THE HONORABLE I. LEO GLASSER
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | MORGAN LEWIS & BOCKIUS, LLP |
| | 101 Park Avenue |
| | New York, N. Y. |
| | BY:  KELLY MOORE, ESQ. |
| | LESLIE R. CALDWELL, ESQ. |
| | DAVID A. SNIDER, ESQ. |
| | BRIAN A. HERMAN, ESQ. |
| For the Defendant: | WILSON ELSER MOSKOWITZ EDELMAN |
| | & DICKER, LLP |
| | 150 East 42nd Street |
| | New York, N. Y. 10017 |
| | BY:  RICHARD LERNER, ESQ. |
| | LAUREN J. ROCKLIN, ESQ. |
| court Reporter: | Henry R. Shapiro |
| | 225 Cadman Plaza East |
| | Brooklyn, New York |
| | 718-613-2509 |

Proceedings recorded by mechanical stenography, transcript produced by

HENRY SHAPIRO      OFFICIAL COURT REPORTER

1

2          THE CLERK:   Criminal cause for oral arguments,  '98

3    CR 1101,  United States versus John Doe.

4          State your names for the record

5          MS. MOORE:  Kelly Moore, Leslie Caldwell, Brian

6    Herman and David Snider for John Doe

7          MS. LERNER:  Richard Lerner of Wilson, Elser,

8    Moskowitz, Edelman & Dicker for respondent Frederick M.

9    Oberlander

10          MS. MOORE:  Your Honor, with respect to the relief

11    we seek, we rely on our brief, the arguments contained

12    therein and the authority contained therein.

13          Specifically Judge Jones' decision in the Visa case

14    and Judge Weinstein's decision in the Zyprexa case.

15          If anything, the facts of this case are mOre

16    compelling than those cases.  Visa and Zyprexa involved

17    sealed documents in civil litigation, which involved possible

18    cornmercial or economic harm to a business entity.

19          This casE, as the Court is aware, involves potential

20    physical harm or death to an individual. With respect to the

21    First Amendment arguments, at the last court appearance the

22    Court did not ask us to specifically address that in our

23    briefs. We would like the opportuni.ty to supplement: our brief

24    with more detailed First Amendment analysis if that is okay

25    with the Court.

HENRY SHAPIRO        OFFICIAL COURT REPORTER

1    In the meantime, I would just note that the first

2  amendment is not absolute.  The facts of this case in no way

3  support the conduct of the respondent and the respondent's

4  First Amendment; protection.  The respondents are not the

5  media, they are not a news gathering organization seeKIng to

6  write articles and publish them

7    Mr. Oberlander is an attorney.  As such, he has

8  additional ethical obligations to not disseminate or use

9  information that is secret, private and confidential, that

10  comes into his possession.

11    Moreover, in this case, the documents at issue were

12  clearly stolen and Mr, Oberlander, who represented the thief,

13  knew that they were stolen,

14    As the agent of a thief, receiving those stolen

15  documents, he doesn't deserve any greater protection-- First

16  Amendment protection-- than the thief himself would,

17    Additionally, the respondent knew that some of the

18  documents were sealed, as is clearly evident from paragraph

19  95 of the complaint in the Southern District.

20    As an attorney, once again, Mr. Oberlander knew what

21  that meant. He knew that documents don't seal themselves,

22  they are sealed only pursuant to court order,  And there are

23  also unsealed only pursuant to court order.

24    He was also aware of the Southern District

25  electronic filing rules, which compelled him to exercise

1    caution and care with respect to disseminating information

2    about cooperators. That rule applies to all cooperators,

3    even those who testify publicly. In this case the

4    cooperation and the cooperation agreement were sealed. Mr.

5    Oberlander certainly should have exercised greater care.

6    The intended use of it in this case doesn't support

7    compelling First Amendment interest. I don't know if the

B    Court had the opportunity to review the Southern District

9    Civil RICO complaint. But the information about my client's

10    criminal case in no way supports any claims contained in that

11    case, and it's clearly being used to harass, embarrass,

12    intimidate and ooeroe my client.

13    Finally, as I mentioned before, this case unlike any

14    of the cases cited by the respondents involving potential

15    danger to human life. Under the facts of this case the First

16    Amendment simply possess no bar to the imposition of the

17    relief we're seeking.

18    With respect to Mr. Oberlander's declaration filed

19    last Friday, I would note that the respondents throughout

20    this proceeding have engaged in a number of dubious

21    litigation tactics, that are arranged in an intentional

22    misinterpretation of the Court's order, without seeking

23    clarification along the lines of claiming that they didn't

24    know. He contacted Mr. Bernstein for an affidavit that said

25    they didn't know the lawyers could review the documents in

1    question in connection with represent      the clients.

2            And a previous meritless allegation of misconduct

3    against me.   It was withdrawn, but nevertheless made and it

4    was intended clearly to get me to do something that would

5    have been unethical, to put my own interests ahead of my

6    client's by accepting a settlement that wouldn't have been

7    favorable to my client, just to get the unpleasant

8    allegations against myself withdrawn.

9            The declaration of Mr. Oberlander, in which he

10   accuses this Court of unconstitutional conduct and makes

11   application for recusal, is clearly in the same vain of that

12   litigation at that particular time.   It is clearly intended

13   to get the Court to do one of two things:   To either recuse

14   itself on the basis of a completely meritless application or

15   in the alternatively to get the Court to pUll its punches, to

16   bend over backwards, to demonstrate a lack of bias, to issue

17   a ruling that would be favorable to the respondents than if

18   they had not made such a meritless unsupported application.

19           Those litigation tactics should be seen for what

20   they are and respondents and litigants engaging in them

21   should not be rewarded.

22           I thought long and hard about responding to some of

23   the other allegations and arguments contained in this

24   Oberlander declaration, the allegation that this Court has no

25   decency, that somehow it is beyond the authority of a fede

1   jUdge, upon application of United states Attorney's office,

2   to seal documents or files when doing so is in the interest

3   of protecting human life or national security, or that

4   somehow has a greater First Amendment       to put a man's

5   life in danger by publishing stolen and sealed confidential

6   documents then if he walked into a crowded theatre and

7   shouted fire.

8          In rereading Mr. Oberlander's declaration, however,

9   I was reminded of a comment that a former colleague of mine

10  used to make from time to time, which is that there really is

11  no percentage in arguing with crazy people, and so upon the

12  advise of another wise man I once got, I think, I will let

13  discretion be the greater part of valor and not dignify that

14  declaration or the rants contained therein with a response.

15         If the Court has no additional questions for us, we

16  will rest on our papers, but we would like to supplement them

17  with an additional First amendment analysis.

18         rHE COURT:  I will come back to you.

19         Let me hear from Mr. Lerner.

20         MS. LERNER:  Your Honor has now had an opportunity

21  to read the caso law

22         THE COURT:  Before we qet to ther, I am not

23  altogether clear as to what Mr. Oberlander's notice of appeal

24  is all about. I do not quite understand what is it.

25         MS. LERNER:  It's a protective notice of appeal.  He

```
1    reserve his right to argue.   There is yet to be a formal
2    permanent injunction or that a TRO   there is possibly a gap
3    period where it could be argued that the TRO lapsed and
4    became a permanent injunction.   It's merely protective.
5         THE COURT:  What does that mean, a protective notice
6    of appeal?
7         MS. LERNER:   If the TRO could be deemed converted to
8    a permanent injunction, we will appeal from that.
9         THE COURT:  Is not that kind of premature?  Is there
10   anything that prevents him from filing a notice of appeal
11   when that event occurs?
12        MS. LERNER:   If a permanent injunction is issued we
13   shall file a further notice of appeal.
14        THE COURT:  What's the purpose of a protective
15   notice of appeal?  Is that to preserve some limitation
16   period?
17        MS. LERNER:   Frankly, your Honor, the case law --
18        THE COURT:  To be perfectly candid --
19        MS. LERNER:   Candidly the TRO itself is appealable
20   because it restrains Mr. Oberlander's free speech rights.
21        THE COURT:  Then he could file a notice of appeal
22   with respect to what he believes is an order, which is
23   properly appealable.
24        MS. LERNER:  Yes.
25        THE COURT:  I don't understand what a protective
```

1  notice of appeal is.  I'm frank to say, I have never

2  encountered it before.

3      It may be that my knowledge of this process is a

4  little wanting, but I do not understand what It IB.

5      MS. LERNER:  First of all, on June 21st your Honor

6  stated that there was a permanent injunction vis-a-vis the

7  PSR and ordered it returned. That is appealable.  The notice

8  of appeal refers to that.

9      But since your Honor stated further evidence would

10  be taken after it was stated that it's our position it could

11  fairly be argued that the Court did not actually render a

12  final determination as to that document.  If it did --

13      THE COURT:  The reason I am asking, Mr. Lerner, is

14  that it is very clearly established law that it may be that a

15  filing of a notice of appeal deprives this Court of

16  jurisdiction with respect to continuing in a matter.

17      I do not know whether a notice of appeal, if filed,

18  would have that effect here with respect to injunctive

J9  relief.  I think that is something that is questionable.

20      But, in any event, it was that issue which caused me

21  to wonder what is this document about, is it in some way

22  affecting my continuing exercise of jurisdiction in this

23  matter?

24      MS. LERNER:  As we stated in the notice of appeal

25  itself, we reserve all of our rights.

HENRY SHAPIRO      OFFICIAL COURT REPORTER

1    THE COURT:  Neither here nor there.

2    Go ahead.

3    MS. LERNER:  Your Honor has read the case law,

4    presume, that was cited in our papers and would perhaps now

5    agree that the arguments that we have been making are not

6    specious, which is the word that your Honor used at the first

7    hearing.  Perhaps your Honor having now read Bartnicki will

8    agree that the analogy to a misdirected check is inapt.

9    In Bartnicki the Court stated quite clearly that

10   while the interceptor of the phone call maybe guilty of a

11   crime, it by know means follows from that that puni.shl nq

12   disclosures lawfully obtained and in the pUblic interest by

13   one not involved in the initial illegality is an acceptable

14   means of serving those ends.

15   You cannot punish someone who merely receives

16   allegedly stolen information.  It would be quite remarkable

17   if the United States Supreme Court continued to hold speech

18   by a law-abiding possessor of information can be suppressed

19   in order to deter conduct of a non-law-abiding third-party,

20   thus if Mr. Bernstein broke the law, you cannot punish

21   Mr. Oberlander for that.

22   Mr. Oberlander has independent free speak rights.

23   Your Honor, sealing the court file, I submit, was

24   unconstitutional in this case, because there is no signed

25

1    Hartford says there must be a court order. If your

2  Honor did sign an order, there is nothing In the docket

3  sheet, as far as we can tell, to indicate that prior notice

4  appearing was given prior to the sealing of the court file.

5    We have not had an opportunity to see that docket

6  sheet, therefore, we cannot note whether this case was

7  properly sealed. If notice was given --

8    THE COURT: Excuse me.

9    If you went to the docket you would find that this

10  case is under seal, correct?

11    MS. LERNER: Yes.

12    THE COURT: And in order to obtain documents, whIch

13  are part and parcel of that case, you would have to make an

14  application to a court to unseal that file. That is what the

15  sealing order says.

16    MS. LERNER: And if the sealing order was not signed

17  by your Honor and the requisite findings were not made, is

18  unconstitutional, and we have been deprived of the

19  opportunity to see the docket sheet and the United States

20  Supreme Court in Amldao held we cannot presume what is in the

21  docket sheet if we canIt see it. If notice was giverl, we

22  canIt know that because the Court has declined to allow us to

23  see the docket sheet as stated in Hartford. We cannot make

24  any presumption about what it says. The appellate court can

25  make no presumption and we cannot. Therefore, we cannot

1    presume the documents were properly sealed, your Honor.

2        There was nothing on the record that the sealing

3        THE COURT:  Excuse me.  Just a minute.  Is there

4    some presumption that an order -- assuming that there is an

5    order and you do not know whether the order was or was not

6    signed -- what you do know by looking at the docket sheet is

7    that this is a sealed file, sealed by order of the court.

8        Is there some presumption that the order is invalid

9    because it was not signed, is that what I'm hearing?

10       MS. LERNER:  I'm referring to the Hartford case--.

11       THE COURT:  Mr. Lerner, I am asking you what I am

12   understanding, is there is a presumption of the invalidity of

13   an order?

14       MS. LERNER:  I think, your Honor stated on the

15   record that this is just matter of factly and indicated as

16   recall it wasn't even signed, it's docket said is sealed.  If

17   there is a signed order, let us see it, because without a

18   signed order this proceeding is unconstitutional.

19       THE COURT:  It may be, Mr. Lerner, that you are

20   correct.  You are not answering the question.

21       MS. LERNER:  I don't have to make any presumption.

22   The United States Supreme court has held the appellate courts

23   do not have to presume there is a signed order in the file

24   when there is--.

25       THE COURT:  If there is an order or docket entry

HENRY SHAPIRO     OFFICIAL COURT REPORTER

1   that says this has been sealed by order of the court, any

2   person is free to ignore that order and if by some chance,

3   some document in that file becomes available to any person,

4   that person is free to assume that the order has no efficacy?

5        MS. LERNER: First of all, the docket here is

6   sealed, therefore, Mr. Oberlander could not see any order in

7   the file and the answer to your question is, yes, anybody may

8   do it, whatever he wants with that document. It is free to

9   be distributed, if itls a public of interest, criminal

10   proceeding are per se of public interest.

11        THE COURT: Itls true that criminal proceeding are a

12   matter of public interest.

13        Doesn't folLow that every document that has been

14   created in the course of a criminal proceeding is a matter of

15   public interest available to the public upon request.

16        That is particularly true, as I'm sure you know

17   Mr. Lerner --

18        MS. LERNER: 1 apologize for that interruption.

19        THE COURT: I understand your passion in connection

20   with this matter.

21        Let us talk one at a time. Okay.

22        I take it you read Charmer Industries.

23        MS. LERNER: Yes.

24        THE COURT: And I take it that having read Charmer

25   Industries, you would agree that a presentence report is a

1   document which has some very specific confidentiality

2   concerns.

3       MS. LERNER:" Your Honor, of course, I agree with

4   that.   But the premise, you have asked whether a document

5   could be used for any purpose -- if it's from a criminal

6   trial   criminal proceeding even if it's sealed, the

7   question is was it stolen from the court file.   Was it stolen

8   or inappropriately unauthorized taken from the Court file as

9   in Charmer?

10      The answer    the Court can order its return.   If

11  it's obtained from other means, your Honor, has no

12  jurisdiction to stop    You can not issue a prior restraint

13  order.

14      If I may continue?

15      THE COURT:   Please.

16      MS. LERNER:   There is nothing in the record, that we

17  are aware of, because we cannot see the docket sheet or the

18  sealing order.   There is nothing on the order finding a more

19  fundamental interest in the First Amendment would be served

20  by sealing this court file.   There is nothing on the record

21  finding this was the least restrictive alternative.

22      Your Honor, granting -- now we turn to the TRO

23  itself, as the Court granted a TRO, which constitutes a prior

24  restraint on speech without conducting any inquiry as to

25  whether the respondent's First Amendment rights would be

1  infringed.

2       Now, your Honor, ordered -- the order itself signed

3  by your Honor incorporates Ms. Moore's arguments and it says

4  for the reasons stated, but that is constitutionally

5  insufficient according to Amadao, you must make independent

6  findings to support a prior restraint.

7       It must be the order itself. The TRO is a nullity.

8  Failing to make the requisite findings in the order to show

9  cause, in as much it constitutes a prior restraint, renders

10  that prior restraint unconstitutional.

11       Your Honor failed to disclose to us on the docket

12  sheet that we requested, we cannot know whether these

13  documents are properly sealed

14       THE COURT:  Have you made application to the Court?

15       MS. LERNER:  We requested it.

16       THE COURT:  Have you made application to me to

17  unseal whatever document you wanted?  That docket sheet

18  indicated there were, I think, four or five numbered

19  dockets -- docket entries which were sealed which were

20  unsealed and, I think, made available to you.

21       MS. LERNER:  They were not.  They were not.  Having

22  a dual docket sheet, your Honor stated at the second

23  appearance that there were thirteen items on the docket sheet

24  and six were sealed.

25       Your Honor, that is improper.

1    THE COURT: What was improper?

2    US. LERNER: Your Honoy, you sealed the entire

3    docket, yet you indicated there are thirteen items in the

4    docket, six of which are sealed, which means there are others

5    which are not sealed and yet the entire file has been sealed.

6    Your Honor, if the Court goes beyond the relief

7    sought in the order to show cause there will be a further

8    violation of Mr. Oberlander's constitutional rights for the

9    order to show cause did not seek permanent injunction, did

10   not seek a gag order, there is no basis for such leave.  He

11   cannot be gagged.

12   He returned, your honor, the original document that

13   he obtained from Mr. Ber"nstein.

14   Now, it may not be so clear in the record that he --

15   those were actually the originals obtained from Mr.

16   Bernstein.  If the Court would like a representation from Mr.

17   Oberlander to that effect, I would ask that he give it. But

18   those were the originals.

19   Your Honor can do nothing to stop the dissemination

20   of photocopies or electronic copies and the selective

21   enforcement or selective gag order directed only at Mr.

22   Oberlander and not, for example, Business Week, which as we

23   noted in our papers, has on its website an article which

24   states that it has a copy of the criminal -- the sealed

criminal complaint in t.his matter.

1    Your Honor, cannot selectively enforce a gag order

2  against Mr. Oberlander.   You cannot gag him and not gag

3  Business Week.

4    If you're going to take on a little guy you have to

5  take on a big guy.  He'll not sit here and accept that,

6  neither will I.  We will fight this to the end.  A permanent

7  injunction cannot be granted.

8    Thank you, your Honor.

9    THE COURT:  Do you want to respond?

10    MS. MOORE:  Yes, your Honor.

11    I would note we'd like to sort of supplement our

12  brief with an additional Fifth Amendment analysis.

13    THE COURT:  Your application is granted to file a

14  supplemental brief.

15    There are a number of things, which are troublesome

16  in this case.  Going back to the original order to show

17  cause, that document was troublesome because it just said

18  that there was a significant breach in the processes of this

19  Court with respect to criminal dockets.

20    There was, as I think, indicated on that occasion, I

21  was very concerned about the integrity of the record of this

22  Court and that file.  It turns out that the first document on

23  that docket sheet is a notification by an assistant United

24  States attorney of the filing of an information, which

25  eventually evolved into an indictment.

1      There is no indication, that is docket number one,

2    which I obtained or had the clerk obtain from Kansas City or

3    wherever these files are shipped, because it was no longer

4    available in the courthouse.    There is not any indication in

5    that document or in a subsequent document that an application

6    was made or request was made in that document to seal that

7    file.    Nor have I been able to find any order signed by me,

8    which directed that this file be sealed.

9      Criminal cases such as the John Doe case and cases

10   in which by virtue of cooperation agreements and variety of

11   other matters either national interest, security interest, or

12   significant interest that one may have in his own safety,

13   which may be at risk.    Criminal files are sealed where that

14   is a significant consideration.

15     Let us assume for the moment that an order was

16   signed by me somewhere along the line, as it may have been,

     directing that the file in this case be sealed.    That order

18   is directed to whom?    Who is bound by it?    That order, it

19   would appear, is directed to the clerk of the court who is

20   informed that this document or this file is sealed and is not

21   to be made available, except upon an order of the Court

22   unsealing it.

23     When the order to show cause was first brought into

24   this Court, it was a very serious concern as to whether

25   somebody in this courthouse unsealed that file or made

1   document which were sealed available to third parties. That

2   was a very significant concern.

3       A hearing, which we held some weeks ago, makes it

4   plain and, I think, it is beyond dispute that these documents

5   were not removed by John Doe, he properly had them. The

6   cooperation agreement was a document which was in the

7   possession of his then attorney. His attorney had a perfect

8   right, as did John Doe, to have a copy of that cooperation

9   agreement, had a perfect right to have whatever document

10   pertained to his case, which may have been part of the file.

11       Assume that John Doe decided to make the cooperation

12   agreement, the proffer agreement available to a third-party,

13   would an order have been violated? The answer is clearly,

14   no. John Doe had these documents, so the testimony has thus

15   far revealed, Mr. Bernstein has not submitted an affidavit

16   nor has he testified. You cannot find him for the purpose of

17   serving the subpoena.

18       What we have on the record is the testimony by John

19   Dee that he did not give those documents to Mr. Bernstein,

20   which gives rise to the legitimate inference that Mr.

21   Bernstein may have stolen them, may have improperly obtained

22   those documents.

23       What order of the Court was violated by that event?

24   Those documents then came into the hands of Mr. Oberlander.

25   Mr. Oberlander knew that those documents were sealed

1   documents, contained very, very serious information and his

2   assertion or testimony that, well, it wasn't his words, it

3   was his client's words, is remarkable for itls disingenuous.

4   To say that I am not a criminal lawyer and I donlt know what

5   it meant, I have a sealed document, is preposterous.

6   Particularly, since he had the electronic filing information

7   from the Southern District that said if it's a cooperation

8   ag.reement, be very, very careful before you use it.

9        Now, wnat happened, assuming that the documents were

10   in John Doe's cabinet or in his desk, as they had a perfect

11   right to be, they were his documents, and the documents were

12   then wrongfully taken by Mr. Bernstein. Mr. Bernstei.n is a

13   converter, Mr. Bernstein has no title to those documents, no

14   legal right to those documents, to that tangible document

15   whether it would be a piece of paper, whether it be a gold

16   ring or whatever it is, it was a tangible item which was

17   converted, given the testimony that I have by Mr.

18   Bernstein--.

19        MS. LERNER: John *Doc*, I believe. Bernstein did not

20   testify.

21        THE COURT: I am saying based on the testimony. Mr.

22   Bernstein then analogizing these events to the fundamental

23   principle of conversion, or larceny, if you will, past it

24   onto Mr. Oberlander.

25        Mr. Oberlander had no better right to those

1   documents than Mr. Bernstein had. If we were to describe

2   this change of events in terms of property rights, title, Mr.

3   Bernstein had no title and he had no title to give to Mr.

4   Oberlander.

5           Mr. Oberlander even if he were an innocent purchaser

6   for value, would not have acquired title to those documents,

7   because Mr. Bernstein had no title to give him. If requests

8   were made of Mr. Oberlander to return those documents and Mr.

9   Oberlander refused! it may be that an action for conversion

10   may be available against Mr. Oberlander.

11           It may be that there is some disciplinary rule,

12   which might be applicable to Mr. Oberlander, who had

13   documents which he knew or perhaps should have known may have

14   been improperly obtained by Bernste'in and passed orrt.o him.

15           It may be that there is some ethical principle,

16   which should have precluded Mr. Oberlander from using those

17   documents. Because the sensitivity of those documents would

18   have been apparent to any reasonable person, particularly one

19   who is trained in the law ostensibly.

20           So the question is, yes, something bad was done,

21   something very bad and perhaps despicable was done by the use

22   of those documents annexed to a complaint in the Southern

23   District, in a civil case, but the question is what order was

24   violated?

25           You can certainty submit briefs on the First

1 Amendment issue. 1 have some question about whether tne

2 First Amendment is applicable here. There was an opinion by

3 Judge Kahn in the Western District-- ᴛ did not bring my file

4 down. I thought this was on for 11:30. What is the name of

5 the town -- I will be more than happy to give it to you.

6 LAW CLERK: It was a Northern district case.

7 THE COURT: Yes! it was by Judge Kahn, in whi ch ne

8 has a very interesting discussion in a case, which is [lot

9 this, but analogous in the sense that it involved a

10 confidentiality order that was part of a potential settlement

11 stipulation and that the documents in that confidentiality

12 agreement became available or was sought to be made available

13 to a newspaper upstate by the reporter of that newspaper and

14 the First Amendment argument was made in that case as weLl.

15 Judge Kahn didn't think it was applicable for a

16 variety of reasons. I think, his reasoning might be quite

17 persuasive when dealing wi th a presentence report and

18 certainly Charmer', I think, leaves very little doubt that a

19 presentence report has a very, very special status. ,So there

20 we are.

21 You want an opportunity to submit the supplemental

22 brief and I will give you that opportunity. I just received

23 Mr. Lerner's document this morni.nq. It was FAX'D or ECF'd at

24 four something last night. You don't request an adjournment

25 at 4:00 o'clock on the eve of a hearing. If you look at my

HENRY SHARTRO    OFFICIAL COURT REPORTER

1   local rules it require 48 hours notice for purposes of

2   adjourning a schedule hearing or a conference.

3          So I didn't get around to reading it because I left

4   before that document arrived and I looked at it this morning.

5          Ms. Moore called, τ think, shortly after that

6   document was received, so my law clerk tells me, and asked

7   for an adjournment to respond to that letter.   I was not able

8   to respond to that because I was not here.   But I did call

9   her this morning and I asked her if she wanted to adjourn.

10  You indicated that you saw no purpose for this conference as

11  well, but she preferred to go ahead and make application for

12  a supplemental brief.

13         What I have just declared is not to be understood at

14  this moment as a determination that injunctive relief may not

15  be appropriate, but 1 am troubled by the issues as I have

16  outlined them as to whether an order signed by a judge on one

17  of those sealing envelopes, which says, not to be unsealed

18  except by order of the Court, is binding upon any third-party

19  person, is binding or is the procedure, which is intended by

20  that procedure, which informs any third-party who has notice

21  or will have notice by looking at a docket sheet, looking at

22  the ECF, this is a case under seal -- under sealed or filed

23  under seal-- make application to the Court to unseal the

24  document.

25         Whether having knowledge that the case was one,

1     which has been filed under seal, whether an order was issued

2     or not, it is a case which is filed under seal, and clearly

3     indicates the content of that sealed file is not to be

4     disclosed, except upon order of the Court, whether that can

5     be ignored, whether that is presumptively meaningless and has

6     no binding effect upon anybody.

7        It is an interesting question, Mr. Lerner. Judge

8     Kennedy who I think you were quoting with all due respect,

9     may not have faced this specific issue at any given time, but

10     it is obviously an issue which is quite troublesome. It is

11     quite troublesome in so far as Mr. Oberlander's use of that

12     document, which he knew was sealed, knew contained very

13     sensitive information. It may be some other relief may be

14     available against Mr. Oberlander. 1 am not Sure.

15        In so far as injunctions are concerned, there is an

16     interesting observation in Charmer as well, if you read it

17     carefully, Mr. Lerner, and I'm sure that you have. Normally

18     was is required, and Ms. Moore indicates what is normally

19     required before injunctive relief is obtained-- and by the

20     way in so far as the TRO is concerned-- I do not recall there

21     was any objection ever raised by you to the issuance of the

22     TRO.

23        It is my sense that you were consenting to it at

24     every stage of the TRO as it was initially issued and

25     renewed. We will leave that go for the moment.

1      MS. LERNER: r can respond --

2      THE COURT: I said, leave that go for the moment.

3 But normally, before a TRO-- injunctive relief, more

4 specifically should be issued, there are three prerequisites.

5 The leading case in this circuit is Jackson Dairy versus H.B.

6 Hood, I think, it is 570 2d or there abouts. You have to

7 show irreparable alarm, likelihood of irreparable harm,

8 likelihood of success on the merits, or reasonable issues

9 going to the merits with the balance of hardships tipping in

10 favor of the movant.

11      [n Charmer, you may recall-- it may be Judge Kearse

12 who said that the burden should not be on the person seeking

13 the injunctive relief, where the presentence report is the

14 document at issue, the burden should be upon the Attorney

15 General, the person who has that presentence report to

16 establish an overriding need for the use or possession of

17 that document.

18      The burden should be on the other side, not on the

19 movant, but the person seeking to be enjoined.

20      Having said all of that I will await further

21 briefing. I do not think there is anything further that you

22 want to submit, Mr. Lerner.

23      MS. LERNER: There are two cases I would like to

24 cite and just --

25      THE COURT: Why don1t you submit them to me.

```
 1              MS. LERNER:  I don't have copies for --

 2              THE COURT:  When I say submit them, submit

 3    citations to them.

 4              MR. LERNER:  DiPietro against the United States of

 5    America.

 6              THE COURT:  I'm sorry --

 7              MS. LERNER:  DIP lET R O.

 8         It is a Lexus cite, 2009, U.S. District --

 9              THE COURT:  What are the names of the parties?

10              MS. LERNER:  DiPietro against the United States of

11    America.

12              THE COURT:  DiPietro is the plaintiff?

13              MS. LERNER:  Petitioner for the unsealing of the

14    Court file.  2009, US District, Lexus 30010.

15              THE COURT:  What court was it.

16              MS. LERNER:  Southern District.

17         And the second Case is Nycomeds against Glen Parker

18    Generics, 2110 U.S. district, Laxus 20788.

19         It is a magistrate decision , Eastern District of

20    New York, Magistrate Mann.

21              THE COURT:  You want a week?

22              MS. MOORE:  Yes, your Honor.

23              THE COURT:  You are responding to Mr. Lerner's last

24    submission and I don't think any further submissions are

25    necessary.
```

1  　　　　MS. MOORE:  Your Honor, in light of Mr. Lerner's

2  last submission, I would seek clariticetion with respect to

3  the PSR that it's clear --

4  　　　　THE COURT:  Before you get to that.  Am I correct

5  that the documents/ at least Mr. Lerner's last submission

6  says this whole proceeding now is moot because the documents

7  have been surrendered, turned over to you, is that correct?

8  　　　　MS. MOORE:  Not that I know of.  I think, as I

9  understand his position, which I don't agree with, hels

10  entitled to keep all copies of the documents, as long as he

11  returned the originals, so, I believe, in his letter he

12  states that if at the court proceeding he marked as exhibits

13  the original versions of those documents, but his client has

14  maintained both electronic and hard copies, so clearly the

15  intent was not to give back, as Judge Jones ordered in Visa,

16  all copies as well.  It doesn't get the originals back and

17  are free to disseminating copies.

18  　　　　THE COURT:  I think, I indicated Mr. Oberlander

19  should not do that.  I think it was in the form of an order

20  and that order, I believe, if I have not done so, 1 am doing

21  it now and if you wanr it In writing until I resolve this

22  issue.

23  　　　　MR. LERNER:  You are issuing a further TRO?

24  　　　　THE COURT:  Yes, I am.

25  　　　　1¹ᵐ issuing a further TRO for the reasons that ₁

1  have indicated.

2       I think there is irreparable harm, which is imminent

3  to Mr. John Doe, those documents contained information which

4  is highly, highly sensitive and if disseminated it is

5  discriminatively to a person that should not get the

6  information.

7       I think, it would put Mr. John Doe's safety at risk.

8  The likelihood of success is or is not present. Again, if

9  Charmer Industies is being read correctly by me and, I think,

10  it is, I think, the burden with respect to whether or not

11  there is some need to maintain those documents or to keep

12  thorn should be shifted to you. Until next week, okay.

13       I do not think we need any further hearing. You will

14  submit the briefs and I will make my determination. The TRO

15  is continued for another ten days.

16       Is there anything further?

17       MS. MOORE: No, your Honor.

18       THE COURT: Thank you.

19       MS. MOORE: I do have one last application. With

20  respect to the transcript to have my client's name replaced

21  with John ooo.

22       THE COURT: Yes.

23       MS. MOORE: Thank you.

24             *******

25

J

Exhibit B

| from | fred55@aol.com |
|---|---|
| to | joshsemall@gmail.com, |
| | lenslaw@aol.com, |
| | arnoldbernstein@gmail.com |
| date | Thu, Mar 4, 2010 at 7:13 PM |
| subject | further clarity |
| mailed-by | aol.com |

all i want is the minimal possible answer which is

"felix satter"

i will mark and introduce them tmw. if martin objects
i will go right up his butt with every federal crime that
the emails are evidence of (not all of them) and the
privilege exceptions and waivers get it all down on that
transcript on the record

i am so not kidding this is not a game this is not a $150,000
case anymore and DO NOT READ THIS WRONG this is a team
and my job is to shake the living daylights out of them and it
starts NOW

as i said stolen emails are admissible, period. end of story.
i mean admissible into evidence let alone discovery.

and these arent stolen.

Exhibit C

**From:** fred55@aol.com [mailto:fred55@aol.com]
**Sent:** Wednesday, May 12, 2010 12:33 PM
**To:** Kriss, Ronald (Sh-Mia); Kriss, Ronald (Sh-Mia)
**Subject:** Fwd: complaint, sdny, salomon, weinrich, & salomon & co.

Ron --

I recommend you forward this to Julius with the comment from me that
there are three alternatives here:

(a) I file publicly today.

(b) I file under seal today.

(c) He arrange a tolling agreement with EVERY defendant but nixon peabody.

I don't care how many people he has to get on the phone and how fast
he has to work. He had years to give back the money and now it's over.
He can get Brian Halberg to help him.

I believe it's possible to get this in under seal if Bayrock joins in a joint motion
in part 1 to seal the complaint pending a redaction agreement with the
assignedm judge. but there are never any guarantees.

Thanks,

FMO

Exhibit D

1          UNITED STATES DISTRICT COURT
2          EASTERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - X

     UNITED STATES OF AMERICA,        :    98-CR-1101
4
                    v.                :    U.S. Courthouse
5                                          Brooklyn, New York
     JOHN DOE,                        :
6                                          June 14, 2010
                         Defendant.   :    12:00 o'clock p.m.
7
     - - - - - - - - - - - - - - - - - X
8

9              TRANSCRIPT OF MOTION HEARING
               BEFORE THE HONORABLE I. LEO GLASSER
10             UNITED STATES SENIOR JUDGE

11
     APPEARANCES:
12

13   For the Movant:            KELLY MOORE, ESQ.
                                BRIAN HERMAN, ESQ.
14
     For the Respondent:        RICHARD E. LERNER, ESQ.
15                              LAUREN ROCKLIN, ESQ.

16   For Non-Party Movant:      STAMATIOS STAMOULIS, ESQ.

17
     Court Reporter:            Anthony M. Mancuso
18                              225 Cadman Plaza East
                                Brooklyn, New York 11201
19                              (718) 613-2419

20

21

22
     Proceedings recorded by mechanical stenography, transcript
23   produced by CAT.

24

25

        ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1           (Case called; both sides ready.)

2           MS. MOORE:  Kelly Moore and Brian Herman for the

3    movant, John Doe.

4           MR. LERNER:  Richard Lerner of Wilson Elser and

5    Lauren Rocklin for nonparty respondent Frederick Oberlander.

6           MR. STAMOULIS:  Stamatios Stamoulis for Jody Kriss

7    and Michael Ejekam, nonparty movants.

8           MS. MOORE:  Your Honor, we have received the letter

9    of this morning written by Mr. Lerner accusing me of an

10   ethical violation, based on a conversation that I had with

11   Mr. Stamoulis.  As an initial matter, I completely disagree

12   with the characterization of the description of that

13   conversation to which Mr. Lerner was not a party and I believe

14   that if the court were to inquire of Mr. Stamoulis he would

15   advise the court that that description is completely

16   inaccurate.  No threats whatsoever, implicit or explicitly,

17   were made during the course of that conversation.

18           THE COURT:  All right.

19           MR. LERNER:  I will withdraw it based on Ms. Moore's

20   representation to the court.

21           THE COURT:  What was the basis for making that

22   representation to begin with?

23           MS. MOORE:  An e-mail to me which indicated that

24   Ms. Moore had stated to Mr. Stamoulis that the Eastern

25   District attorney was watching this case and that quote there

1  may be indictments and coupled with the settlement proposal

2  offered by Ms. Moore.

3          MR. STAMOULIS:  Your Honor, if may speak to that?

4  I'm Mr. Stamoulis.  I had a very friendly conversation with

5  Ms. Moore that I initiated on behalf of my clients, Mr. Ejekam

6  and Mr. Kriss.  Actually, the reason why I called her is to

7  advise her that Mr. Ejekam was in Africa and there not be any

8  surprise that he was not going to be present to give any

9  testimony here today.

10          That led to a conversation and during that

11  conversation Ms. Moore just gave me information.  When I put

12  the information that she gave me into an e-mail, the tenor and

13  the tone of the conversation didn't translate and I can see

14  why my e-mail could have been misconstrued and it lacked the

15  context.

16          MR. LERNER:  So I apologize to Ms. Moore and the

17  court.

18          THE COURT:  Let me tell you, Mr. Lerner, I read your

19  letter.  I came in rather late this morning, after attending a

20  funeral.  But my recollection is that I have alerted the

21  United States Attorney to this proceeding.  I don't know

22  whether Ms. Moore did or didn't, although I have a

23  recollection of saying cc to Mr. Kaminsky who is an Assistant

24  United States Attorney because I was concerned with the

25  integrity of documents which were sealed and having read some

1   of the things which were annexed to the complaint which
2   clearly reflected that portions of presentence report was
3   divulged, that a cooperation agreement, portions of which may
4   have been divulged.  Those two documents, among others, which
5   were sealed, were documents which if divulged, that is the
6   contents, may seriously jeopardize not only the life of the
7   person who was the subject of those documents.  In this case
8   it might also significantly affect matters of national
9   interest.
10          Now, I received a letter from you on Friday.  It was
11  rather late in the afternoon.  I think it was approaching four
12  o'clock.  I didn't want to respond to you ex parte and I
13  wasn't about to sit down and start writing letters.  I tried
14  to communicate or had my law clerk try and reach Ms. Moore so
15  we could have a conference and that didn't happen.
16          Again, just as I was a little nonplused with the
17  first letter that I received from you, which I made some
18  comment about on Friday.  I don't think there's anything in my
19  order, that is, the Temporary Restraining Order, the order to
20  show cause, which would or could preclude a party to whom an
21  order to show cause was addressed from conferring with his
22  lawyer.  Nothing in my order which would even hint at
23  precluding Mr. Oberlander, or anybody else to whom that order
24  to show cause was addressed, from conferring with his lawyer.
25  The Sixth Amendment, whether it's applicable or isn't

1 applicable, is irrelevant. I don't know whether there would

2 have been any doubt about whether Mr. Oberlander can consult

3 with you and show you whatever it is that was relevant to the

4 order to show cause and that why you would need my consent for

5 that.

6      Now, with respect to your inquiries as to the order

7 which may have been issued, there is no formal order which I

8 believe is not issued by virtually any judge in this

9 courthouse with respect to sealing. I notice the letter I got

10 from you says facsimile under seal and to the extent that I so

11 ordered it, I have tacitly approved it.

12      What happened in this case from the very first

13 document that was filed, it was filed clearly indicating a

14 sealed case. And documents which are submitted to the court

15 from time to time are submitted in a white envelope and in

16 that envelope it says ordered sealed and placed in the clerk's

17 office and may not be unsealed unless ordered by the court.

18      The documents which are submitted to the court and

19 then placed in one of these envelopes are documents which by

20 virtue of their very content are documents which either affect

21 matters of national interest or would seriously endanger the

22 life of the object or subject of that communication or

23 significantly impede a significant criminal investigation.

24      So there is no formal order, and to the extent that

25 you want to know what that order said and to whom it was

1    addressed It's a request which has no merit.  I can't make an
2    order sealing a document and saying this document is sealed
3    and not to be looked at by Mr. Lerner, Mr. Stamoulis.  It's a
4    document which is placed under seal.  It's filed under seal.
5    And if anybody wants to see what it is that has been filed
6    under seal, the procedure is to make an application to the
7    court to unseal it.

8            I have applications such as that presented to me
9    from time to time but I have never had an application asking
10   me specifically to file this document under seal beyond the
11   sealed letter envelope in which it comes, which clearly says
12   .it's filed under seal.

13           This case was filed under seal from the very first
14   day it came into this courthouse.  You can't look at the
15   docket sheet on ECF because it's sealed.  I can look at it
16   because I'm an exception.  So I can look at that docket sheet
17   and I looked at that docket sheet on Friday and the first
18   thing I saw was United States vs. John Doe, sealed case in
19   bold capital letters.

20           And then I looked down the docket sheet and I saw
21   about six docket entries which said these documents have been
22   docketed under seal.  They were docket numbers five through
23   eight, eleven, thirteen, sixteen and seventeen.  Filed under
24   seal.  I don't know as I talk to you what those documents say.
25   I undoubtedly knew about it at the time because a copy of it

1   must have been provided to me.  And to the extent that I agree
2   that it should be filed under seal I tacitly, implicitly
3   ordered it.  But all of that is irrelevant.
4          The documents which were annexed to that complaint
5   clearly reflected that they were sealed.  And by the way, your
6   reading of Charmer Industries leaves a little bit to be
7   desired, with all due respect.  You're correct in that Charmer
8   Industries dealt with a probation officer who sent a
9   Presentence Report with I believe the tacit approval of Judge
10  Sifton at the time, who was the judge in that case.  But if
11  you read United States vs. Charmer through to its conclusion
12  it would have been perfectly clear that Rule 32,
13  notwithstanding, the court of appeals very clearly said
14  presentence reports are not to be disclosed to anybody,
15  besides the defendant, for reasons which are very fully
16  explained in United States vs. Charmer.
17         All that aside, given a document which is plainly
18  indicated on its face, filed under seal, that comes into the
19  hands of a lawyer, at the very least that lawyer should have
20  very serious doubt about doing anything with that document
21  without first making appropriate inquiry about whether
22  disclosing this document that was sealed is appropriate and
23  should an order of unsealing or permission to use it be
24  obtained.
25         Now, as I read what was annexed to that complaint,

1 there's no doubt that Mr. Oberlander was aware of the fact

2 that these documents were sealed. There's no order that needs

3 to be addressed to Mr. Oberlander and say, Mr. Oberlander,

4 this is a sealed document, don't publicize it. It's obvious.

5 And the mere fact that the contents of those documents,

6 presentence report, cooperation agreement -- have you ever

7 seen the cooperation agreement?

8         MR. LERNER: I have now, your Honor.

9         THE COURT: You have now.

10         And looking at that cooperation agreement and having

11 looked at it now there's an awful lot of information in that

12 cooperation agreement which is very sensitive, isn't there?

13         MR. LERNER: Yes, there is, your Honor.

14         THE COURT: And you would have some serious concern

15 if you were the defendant -- if you were Mr. Doe, you would

16 have some serious concern about having the information in that

17 document sent out at large for anybody to see, wouldn't you?

18         And if you've ever have seen a presentence report --

19

20         And you would have only if you were representing a

21 defendant in a criminal case. You would have no occasion to

22 have seen it otherwise, unless the defendant voluntarily

23 showed it to you.

24         -- you would know that that presentence report

25 contains an awful lot of information which is very sensitive

ANTHONY M. MANCUSO, CSR OFFICIAL COURT REPORTER

1   and shouldn't be disclosed by anybody.

2           So when your letter asks me to show you what order

3   is directed to Mr. Oberlander, there isn't any. What was

4   directed to Mr. Oberlander was a clear declaration in writing

5   this document is sealed, just as you filed this under seal and

6   this will be filed under seal. It will be placed in the vault

7   of the clerk's office and nobody will see that unless an order

8   is submitted to me for signature unsealing it.

9           Okay. I hope that answers some of the questions

10  that you've asked in your letters.

11          MR. LERNER: May I address that, your Honor?

12          THE COURT: I beg your pardon.

13          MR. LERNER: May I address your Honor?

14          THE COURT: By all means.

15          MR. LERNER: We have obviously spent a long time

16  discussing this and we would like to now agree to the relief

17  sought in the order to show cause, which is identify from whom

18  he received the documents and to whom he gave the documents.

19  He will agree to return them. And that is the only relief

20  sought and we will consent to it.

21          THE COURT: He will now.

22          MS. MOORE: I believe we sought more relief than

23  that. We sought a hearing to get a better understanding of

24  exactly from whom he got them, what his understanding was

25  about where that person got them from. Everything else under

1  oath.  Where they came from.  Everything we can do to further

2  plug up this hole and trace down who else may have these

3  documents.

4  I believe we also asked for attorneys' fees in

5  connection with having to make this motion in the first

6  instance.  But we do want an opportunity to question

7  Mr. Oberlander and the other respondents under oath to get a

8  better understanding of just how this happened to make sure it

9  doesn't repeat itself.

10  Our concern is for the life of our client and for

11  his safety.  We have a very murky picture right now and it may

12  require the court or us with a court order to subpoena

13  Mr. Bernstein so he can appear and take the stand and explain

14  how he obtained the documents.

15  I'm also concerned with the phrasing of Mr. Lerner's

16  comments just now in that I am concerned that Mr. Oberlander

17  fully intends to use the information contained in those

18  documents, even if he doesn't use the documents.

19  So I want to make it clear that our application also

20  includes information that was in those sealed documents that

21  also should not be further disseminated or used in any way

22  that we think could hurt our client.

23  MR. LERNER:  May I respond?

24  There's no request in this order to show cause on

25  the face of the order to show cause for attorneys' fees.  If

1 attorneys' fees are pursued, I simply cannot consent to that.

2 Mr. Oberlander certainly doesn't have the money to pay

3 Ms. Moore's attorneys' fees.

4         As far as use, I would suggest we take a short break

5 and discuss with Ms. Moore the issue that she's presented.

6         THE COURT: I think I should take a minute,

7 Mr. Lerner, to emphasize how seriously I regarded what brought

8 this matter before me. When Mr. Doe appeared before me for

9 sentencing, appearing before me also at that time on his

10 behalf were fairly significantly placed members of a national

11 law enforcement security agency. I should say agencies

12 plural. The disclosure of the information annexed to that

13 complaint was a disclosure of information which was reckless

14 and significantly endangered the life of the person to whom

15 that information related and that disturbed me no end because

16 it behooved any lawyer -- forgetting about a lawyer -- anybody

17 looking at a document which was clearly, clearly designed to

18 be kept very confidential, to be very, very careful with not

19 making that information and letting it float at large. I want

20 to emphasize why it is that I have regarded and do regard this

21 very seriously.

22         I'll give you a couple of minutes to talk to

23 Ms. Moore.

24         (Recess.)

25         MS. MOORE: Your Honor, I don't believe we're going

1  to reach a resolution short of a hearing that we initially
2  requested and we still would like to have the respondent
3  testify.  We would also like to have Mr. Bernstein directed to
4  appear in court to testify so that we can get to the full
5  bottom of where these documents came from and who exactly has
6  them and who else may have them.
7          THE COURT:  Okay.
8          MR. LERNER:  We have no objection to Mr. Oberlander
9  testifying as to the items set forth in the order to show
10  cause, that is, where he got the documents from and to whom
11  they were given.  Beyond that we will object as no further
12  inquiry is relevant in our opinion, your Honor.
13          THE COURT:  Are you ready to proceed today or do you
14  need an adjournment for that purpose?
15          MS. MOORE:  Your Honor, I would prefer to do it all
16  at once so we get Mr. Bernstein as well, on Friday, if
17  possible.
18          THE COURT:  I suppose you will issue a subpoena for
19  Mr. Bernstein.
20          MS. MOORE:  Yes, we will present one for the court.
21          THE COURT:  Do you have another date in mind?
22          MS. MOORE:  Friday would work for us.
23          THE COURT:  Does that work for you, Mr. Lerner?
24          MR. LERNER:  May I check my calendar?  I know it's
25  the court's preference to do it all at once, and Ms. Moore's,

1   Mr. Oberlander is prepared to testify right now. His

2   testimony would be very brief, in accordance with what was

3   ordered.

4           THE COURT:  Why don't we do it all at once.

5           MR. LERNER:  Allow me to check my calendar.

6           MR. STAMOULIS:  I will say that I have trial in

7   Delaware on Friday.  I'm admitted to the Eastern District but

8   I practice primarily in Delaware.  Though my clients,

9   Mr. Ejekam and Mr. Kriss, it's going to be clear that they

10  were not the ones that obtained these documents or gave them

11  to Mr. Oberlander.  And to the extent that they even saw them

12  it was only in connection with the complaint, after it was

13  written.

14          I don't know if movant is going to seek to have

15  testimony from my clients or if we can settle that with an

16  interview and affidavits, especially for Mr. Ejekam who is in

17  Africa and will not be able to be here for a hearing.

18          THE COURT:  Why don't you work that out with

19  Ms. Moore.  There's nothing for me to address in that regard.

20  If their testimony is not necessary, if they can provide the

21  information you need by affidavit, I don't have any problem.

22          MR. LERNER:  My calendar is clear on Friday.

23          MR. STAMOULIS:  I have trial on Friday.

24          MR. LERNER:  Monday.

25          MR. STAMOULIS:  If you insist on Mr. Kriss

1    testifying?

2          MS. MOORE:   I certainly insist on Mr. Kriss

3    testifying and, depending on affidavits, I may also insist on

4    Mr. Ejekam testifying.  But Mr. Kriss is here, I do want him

5    to testify.  There seems to be a conflict in footnote two of

6    the letter that Mr. Lerner said.  Basically, what he's saying,

7    it was your client who was behind the documents being

8    published and we need to resolve that conflict.

9          MR. LERNER:   Ms. Moore is confusing who

10   Mr. Stamoulis represents.  Mr. Bernstein is not represented by

11   Mr. Stamoulis.

12         MR. STAMOULIS:   Let me get my calendar.

13         MS. MOORE:   Footnote two of the letter we just

14   received states:  Doe harps on a portion of the racketeering

15   complaint brought against him that Mr. Oberlander admitted the

16   documents are sealed.  The relevant allegation in the

17   complaint states no such thing as to the present or recent

18   past, but in any event the complaint is not Mr. Oberlander's

19   statement, it is his clients' statement.  It is a statement of

20   their allegations, not his, and if they are judicial

21   admissions they are theirs, not his.

22         Those clients referred to in footnote two are

23   Mr. Kriss and Mr. Ejekam.

24         THE COURT:   What letter are you referring to?

25         MS. MOORE:   The letter we received this morning

1  accusing me of misconduct.

2  THE COURT: The letter dated June 14?

3  MS. MOORE: Yes, your Honor.

4  THE COURT: Reading from footnote two?

5  MS. MOORE: Yes, your Honor.

6  THE COURT: All right. We have Monday.

7  MR. STAMOULIS: Your Honor, I am available on

8  Monday. I could be here.

9  THE COURT: Ms. Francis.

10  THE CLERK: 10:30 works.

11  THE COURT: The 21st.

12  MR. LERNER: Thank you, your Honor. He.

13  MS. MOORE: Your Honor, we assume that the temporary

14  restraining order is still in place.

15  THE COURT: Yes, it is.

16  MR. LERNER: Can we address the contingency, if

17  Mr. Bernstein is not available via subpoena what we then do?

18  MS. MOORE: We'll contact the court if we need to do

19  anything at that point. We're hoping he is available. We may

20  go forward without him. We'll figure it out.

21  THE COURT: There's nothing about these proceedings

22  I don't believe that requires the record of these proceedings

23  to be sealed, unless there's something I'm missing.

24  MS. MOORE: Your Honor, his name is used. If we can

25  substitute John Doe for his name throughout, then there's no

1   need.  I'm sensitive at this point to unsealing them until we
2   can possibly redact it or change it to make sure it's John Doe
3   throughout.
4           THE COURT:  Mr. Lerner.
5           MR. LERNER:  No objection as to referring to him as
6   Mr. Doe.
7           THE COURT:  So ordered.  Thank you.
8           MR. STAMOULIS:  Thank you, your Honor.
9                       ooooooOoooooo
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Exhibit *E*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA | 98 CR 1101 (ILG) |
| Plaintiffs, | |
| v. | |
| FELIX SATER aka FELIX SATTER, | |
| Defendant, | |

FREDERICK M. OBERLANDER, ESQ. et al.
Non-Party Respondents

### Declaration of Frederick M. Oberlander

I, Frederick M. Oberlander, declare under penalty of perjury, pursuant to 28

U.S.C. 1746, that the factual statements set forth herein are true, based upon my personal

knowledge, and my knowledge derived from my review of the materials maintained by

me for the prosecution of the matter of Kriss v. Bayrock, and the defense of myself in this

proceeding as to which I am a non-party respondent.

### Introduction

1. On May 18, 2010, in response to movant's *ex parte* petition, Exh. A,

without notice and a hearing, this court, sitting as a star chamber, issued, undocketed and

under seal, a patently unconstitutional prior restraint TRO against me and the co-

respondents, enjoining us from disseminating truthful information, lawfully obtained, of

public concern, *viz.* documents evidencing movant's federal racketeering conviction, plea

4062160.1

bargain and sentencing, portions of which respondents included in a civil racketeering

complaint they filed against movant *et al.* on May 10, 2010 in the Southern District of

New York.

     2.     If this were the court's only transgression, I might have charitably

considered it to be constitutional amnesia, and reacted with measured restraint.

     3.     But this gag order was the least of it. I have discovered, and the documents

reveal, that – despite thirty years of binding precedent – for over a decade this court has

covertly maintained movant's criminal docket as a "super sealed" case, which is patently

unconstitutional, and the court is unconstitutionally concealing the docket and

surreptitiously dispensing whatever justice, or lack thereof, as the court sees fit.

     4.     Since it was accompanied by the implied threat of criminal prosecution, I

believe the gag order was meant to chill me into silence. I will not be silenced. The court

has concocted a system of private justice without public accountability. This is not just

constitutional amnesia. This is a constitutional crisis.

     5.     With no evidentiary hearings, no on-the-record findings, no due process of

any kind whatsoever, this court maintains that, somehow, revealing even one word

contained in any one of these documents would be a clear and present danger to national

security, basing this on facts that the court alone claims to know from extra-judicial

sources, which facts it apparently refuses to share with the respondents.

2

4062160.1

6.      Interestingly, twelve years ago in November 1998, shortly after this court sealed the file on this action, *Business Week* got hold of the complaint – a plain vanilla criminal complaint charging the movant and co-defendant Gennady Klotsman with RICO violations, etc., and wrote about it, Exh. B. Notwithstanding that I stand in the same position as *Business Week*, and the article remains on its website, this court has not brought *Business Week* into these proceedings. Perhaps the court does not wish to pick a fight with someone who buys ink by the gallon. The *Business Week* article states that the criminal complaint came from a court file. So what is the court going to do about it? Nothing – because obviously there is nothing, constitutionally, that the court can do. And there is nothing that the court can do to me.

7.      Notwithstanding the court's feelings about national security, the *Business Week* article remains on the website – and has been there for years, apparently – and our Union stands as she stood, rock-bottomed and copper-sheathed, one and indivisible.

8.      Many other persons, law firms, insurance companies, etc. – for example McGraw Hill, Akerman Senterfitt, Wilson Elser, Morgan Lewis, *Courthouse News*, Nixon Peabody, Roberts & Holland, Duval & Stachenfeld, Salomon & Company, the Bayrock Organization, Zurich, and CIGNA – have had access to some or all of these documents. Yet the Union stands as she stood, rock-bottomed and copper-sheathed, one and indivisible. If disclosure of these documents are such a clear and present danger, why aren't we all dead yet? More to the point, why hasn't the court held hearings 24x7,

3

4062160.1

haling all these persons before it; why out of all these persons are only these respondents singled out to be gagged? Surely if these documents contained hydrogen bomb secrets, the FBI would be all over this; why not now in this case?

9.    The answer is obvious. There is no threat to national security. The only threat is that the court feels that there has been an affront to its honor and the integrity of the process – yet the only threat is that this proceeding will reveal that the court has maintained a constitutionally illegal super-sealed docket system of private justice. Regrettably, this court's sense of super-patriotism may explain why it has allowed itself to be used by the movant as an instrument of, and shield against liability for, his past and ongoing crimes.

10.    The scope of the TRO is breathtaking, globally gagging everyone in the world, everywhere, who ever received these documents. But the TRO was undocketed and issued under seal, and only the respondents have been served. The court has ignored that others are within its scope, yet have not been placed on actual notice of these proceedings – viz., *Business Week,* and the defendants and their insurers in the *Kriss v. Bayrock* action – so that they could know that while they went to sleep in America, they woke up in Amerika, secretly gagged.

11.    The signers of the Declaration of Independence mutually pledged to each other their lives, their fortunes, and their sacred honor. They proclaimed this publicly. This court, however, hides what it does, and no one can doubt the reason is pusillanimous

4

fear. The court knows if it tries to gag *Business Week* or a law firm, they will respond not with measured restraint but with righteous constitutional outrage. The court perhaps did not expect that I would respond with indignation, or that I would sign a declaration such as this. Nor did the court expect that in seeking to gag me, I would reveal that the court has selected who may speak the truth, and who may not, based on which speaker it thinks can't, or won't, fight back. This court would dole out First Amendment protection only to a favored speakers it fears are too big to gag. Well, your honor, I will not be gagged.

12. Two hundred years ago in *Marbury v. Madison*, Justice Marshall said it is emphatically the province and duty of the judiciary to say what the law is. Today, this court would extend that to include the right to say who may speak about it and who may not. To this, I object.

13. Similarly, two hundred years earlier, in *Dr. Bonham's Case*, Justice Coke invalidated a statute of Parliament enabling the London College of Physicians to levy fines against anyone who violated their rules, finding that their statutory powers violated "common right or reason" because "no person should be a judge in his own case." I agree.

14. *This court has made this case its own.* No court may do that. Men have understood this not just for two hundred years, but for two thousand, from when Roman praetor Ulpian wrote,

5

4062160.1

Iudex tunc litem suam facere intellegitur, *cum dolo malo* in *fraudem* legis *sentientiam* dixerit dolo malo autem videtur hoc facere, si evidens arguatur eius vel inimicitia vel etiam sordes.

A judge makes the case his own when with wrongful intent, whether the bias be due to friendship, hatred, or corruption, he gives a fraudulent judgment.

15.    Times change. Technology changes. The evils that men do, do not. I well believe this court has departed from its duty to judge impartially and issued *fraudes sentientiae* – that is, judgments tainted or cheated of honest and impartial deliberation, *cum dolo malo.*

16.    This court must deem itself disqualified, because it is a witness to what it purportedly sealed and what its order stated, but will not reveal that order to me. Or this court will have to recuse itself, when I move on July 19th to unseal this case and all of the unconstitutionally sealed cases in this courthouse. This unconstitutional sealing process in this case, with no hearings, findings, or notice, from its inception, is and has been not just a stain on the constitution and the judiciary, but invalid *ab initio*, and thus each and every item in the secret docket must be not only re-docketed in public, but released to the world immediately and in its entirety, with all deliberate speed.

17.    My application will be far broader than just seeking the unsealing of this one case. Under Second Circuit precedent, I may demand – and I will demand – the unsealing of every secretly sealed docket in this court house. Based upon representations by this court, I believe the court has admitted that this courthouse maintains a dual docket of "super sealed" cases, surreptitiously dispensing hidden process to favored defendants,

6

and so on July 19th I will move for the immediate release to the world of the nature and description of each and every such case, and the immediate reconstruction of public docket sheets in each and every such case, and their release as well.

18.     There is no possibility that this court can, let alone appear to, impartially sit in judgment of itself and its years of constitutional transgressions, and so it will have to recuse itself immediately.

19.     Moreover, by refusing to share its extra-judicial, non-evidentiary knowledge of what, if any, documents were ever sealed and not just unlawfully vaulted away out of sight, and in accordance with what orders or decrees, if any, and upon what constitutionally required hearings and findings, if any, and what corresponding decretory language exists, if any, all of which are matters of materially disputed fact, this court has disqualified itself.

20.     Finally, I would ask of this court one question: *You have done enough. Have you no sense of decency sir, at long last? Have you left no sense of decency?* For the only threat to our Union is that a judicial system that would self-justify and rationalize how it could ever dare operate in secret.

**Summary**

21.     The movant's motion, brought by TRO did not seek, as requested relief, a *permanent* injunction against dissemination of the information contained in the documents at issue. It sought a **temporary** restraining order against the dissemination of purportedly sealed and confidential materials. The *permanent* relief sought was an order

7

directing the respondents to testify as to whom they got the documents from and who they gave them to. The TRO was itself an illegal prior restraint, in violation of the First Amendment. Nonetheless, I have testified as to how I got the documents, and to whom I gave them. So this entire star-chamber proceeding should now be ended. Case over.

22. But somehow, this matter has been converted into a motion to restrain my free speech rights, via a request for a return of the purportedly sealed documents that were given to me, and a permanent injunction against my using any information that I obtained from them. Since it appears that the court wishes to go down this road, I will respond zealously, as it is my absolute right to do. My zeal will include, as noted above, a motion to unseal[1].

---

[1]Make no mistake, this is a case of prior restraint. In *Procter & Gamble v. Bankers Trust*, 78 F.3d 219 (6th Cir. 1996), the court held an injunction prohibiting a news magazine from publishing *civil* litigation filings was an impermissible infringement on First Amendment rights. *A fortiori*, in this case, where the Documents are litigation filings or other judicial documents or played a significant role in the performance of Article III functions in a *criminal* case (see *Amodeo, infra* at fn.13), an injunction prohibiting Respondents from publishing them would be unthinkable prior restraint. Movant's reliance on *Zyprexa* is thus misplaced, as *Zyprexa* involved an injunction against commercial documents passed between the parties in discovery and which played no role in the performance of Article III functions (*Amodeo*). Furthermore, although irrelevant to this case, the Zyprexa court noted that the non-judicial commercial documents in that case had been properly sealed and that the sealing order itself had been violated; in this case no documents have been properly sealed, because the entire sealing process was constitutionally corrupt, there having been no requisite hearings or findings, apparently everything simply shoveled into the vault without even a formal sealing order, assuming anything at all, including any of these documents, was actually sealed to begin with, since the Court refuses access to those records and thus there is no record evidence anything was ever sealed, and Respondents deny anything was sealed (and maintain that if

8

**The Documents**

23.     The evidence has shown that in March 2010, I received unsolicited from

Joshua Bernstein, then a client, five documents[2]: (i) a proffer; (ii) a cooperation

agreement; (iii) a presentencing investigation report (PSR); (iv) a criminal complaint; and

(v) a draft information (collectively, the "Documents"). I was given (i), (ii), and (iii) in

both printed and electronic form, and (iv) and (v) in electronic form only.

24.     I received them passively and so for First Amendment purposes lawfully[3].

---

anything was, it was sealed unconstitutionally, corruptly, and illegally), and in any event
even if this Court had decided to uphold the Constitution and properly sealed any of the
Documents, that sealing order would have never been violated because Respondents
obtained the documents without involvement of the Court files or Court process [*Roman
Catholic Diocese of Lexington v. Noble*, 92 S.W.3d 740 (Ky. 2002), refusing to hold
newspaper in contempt for publishing documents which were sealed; sealing order
merely restricts access to the documents in the custody of the court through the court or
its process, not access to copies of the documents or the same information obtained other
than through the Court: "An order sealing a record or part thereof should not be read as
creating a prior restraint on publication of the contents of the sealed material, unless the
order expressly says so."]. And movant never claimed the proffer was never sealed at all.
And of course *Zyprexa* is not authority to begin with. To the extent the *Zyprexa* court felt
entitled to enjoin individuals but not the media on the implicit basis that individuals'
rights of free speech are less than those of the media, the court was in error, for that is not
the law here or anywhere else in this country. *Huminski v. Corsones*, 396 F.3d 53 (2nd
Cir. 2004). Some or all of these same points are true of movants other misrelied-on cases
FRCP 26 commercial discovery cases, and this Court may disregard them as well.

[2] In the form I received them from Bernstein, the cooperation agreement had appended to
it a Department of Justice financial statement. So from my perspective there are five
documents at issue, whereas from the movant's perspective there are six, since the
movant considers the financial statement to be a separate document.

[3] *Bartnicki v. Vopper*, 532 U.S. 514 (2001), holding that where a person is a passive
recipient of information of public concern his dissemination thereof is protected against

9

25.     The documents are judicial documents related to or part of the federal
charge, adjudication, and disposition of criminal racketeering charges brought against the
movant in 1998, the adjudication occurring before this same court and with this same
case number, 98-CR-1101.

### The Return of the Documents

26.     Insofar as the "return" of those documents means the return of the
original, printed versions that I was given, I have no objection to delivering them to the
court to do with as the court sees fit. However, insofar as the "return" of those documents
means the destruction of all copies thereof, physical or electronic, in my possession, I
object on the grounds that such a "return" is a *de facto* prior restraint, as discussed
immediately next.

### The Injunction

27.     A permanent injunction would continue the patently unconstitutional prior
restraint under which this court placed the respondents on May 18, 2010. I object.

### There is a Presumptive Right of Access to Most Criminal Documents

28.     In this and the immediately following section, "Right of Access" refers
only to the right of a person to obtain access from the court itself (or as the case may be,
the executive branch).

---

penalty by the First Amendment regardless whether the person giving it to him acquired
it illegally and regardless whether, if such were the case, he knew or should have known.

10

29.     Respondents, and everyone else, enjoy presumptive First Amendment and common-law rights of access to court procedures and documents. The authority for this includes decisions of the United States Supreme Court and the Second Circuit Court of Appeals. It is well understood that the reason for these presumptive rights are the protection of society's interest in having its citizens able to see or learn for themselves what goes on in their courts and engage in the marketplace of ideas by discussion of what they have seen or learned (and in the case of criminal proceedings to protect the defendant's rights to an open trial so he may feel safe that the court or prosecutors will not trample on his constitutional rights in secret).

30.     Yes, these presumptive rights of access are qualified, but that only means that they are not absolute and at times when a person seeks access to a court process or documents the court may engage in a balancing test, weighing these rights of access and society's interest in protecting them against the countervailing interest asserted by the person objecting to that access.

31.     In particular, when the court proceedings or documents in question are criminal in nature, the right of access is founded both in the First Amendment (and Sixth) and common law, and is of paramount societal importance, such that only a showing of a compelling interest can justify restricting it, and then only to the degree necessary.[4]

---

[4] By contrast, in civil proceedings, in the case of garden-variety commercial documents exchanged during discovery, there is a common-law right of access, but it is less

11

Within this category of criminal proceedings or documents, the presumptive First
Amendment and common-law rights of access are ranked according to the proceeding or
document to which access is requested.

32.     In this circuit, the most open documents in criminal proceedings (that is,
the documents to which the presumption of access is most protected and most strong) are
docket sheets, for the obvious reason that without access to those docket sheets no one
could know what other documents he might want to access. **This circuit has found an
almost overwhelming First Amendment right of access to criminal dockets** (and,
though not relevant to this case, has found the same right of access to civil dockets as
well).

33.     Almost, if not as, subject to this presumptive right of access are those
documents known as "judicial documents," which in this circuit means those documents
which played a role in the adjudicative decision itself.

**There is no Presumptive Right of Access to Presentence Investigation Reports**

34,     Pursuant ot F.R.Crim.P 6, there is no presumptive right of access to grand
jury minutes, while maintained under secrecy; however, even this secrecy is not absolute,
and upon sufficient showing of need the public may be allowed access.

---

protected and thus more readily overcome by a showing of need to keep the documents
from public view.

12

35.     Presentence investigation reports have also been historically not open from ready access, but the source of that protection is not statutory, as is the case with grand jury minutes, but by judicial common law, and again their secrecy is not absolute. Although not definitive or clear in its application, this court has said in dictum that it considers such reports to be similar in this sense to grand jury minutes.

**There Is a Presumptive Right of Access[5] to Most Criminal Judicial Records**

36.     Respondents, like everyone else, enjoy presumptive First Amendment and common law rights of access to court procedures and documents. The authority for this includes decisions of the United States Supreme Court[6] and the Second Circuit Court of Appeals.[7]

37.     It is well understood that the *raison d'etre* of these presumptive rights is the protection of society's interest in having its citizens able to see or learn for themselves what goes on in their courts and to be able engage in the marketplace of ideas by discussion of what they have seen or learned [8] (and in the case of criminal proceedings

---

[5] In this and the immediately following section concerning PSRs, "Right of Access" refers only to the right of a person to obtain access from the court itself (or as the case may be, the executive branch) when either is in possession "in the normal course", and not to any other right of access from any person other than the court or executive branch.

[6] *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980); *Press-Enterprise Co. v. Superior Court of California* 464 U.S. 501 (1984); *Press-Enterprise Co. v. Superior Court of California*, 478 U.S. 1 (1986).

[7] *Hartford Courant v. Pellegrino*, 380 F.3d83 (2004); *United States v. Amodeo*, 44 F.3d 141 (2d Cir. 1995).

[8] *Huminski v. Corsones*, 396 F.3d 53 (2d Cir. 2004).

13

also to protect the defendant's rights to an open trial so he may be safe that the court or prosecutors will not trample on his rights in secrecy).

38. The right of access of an individual citizen, and his right to engage in that marketplace of ideas, is as strong, and as strongly protected, as is the right of access of the largest media outlet.[9]

39. Yes, these presumptive rights of access are qualified, but that only means that they are not absolute and at times when a person seeks access to a court process or documents, the court may engage in a balancing test, weighing these rights of access and society's interest in protecting them against the countervailing interest asserted by the person objecting to that access.[10]

39. In particular, when the court proceedings or documents in question are criminal in nature, the right of access is founded both in the First Amendment (and Sixth) and common law, and is of paramount societal importance, such that only a showing of a compelling interest can justify restricting it, and then only to the degree necessary.[11] (By contrast, in civil proceedings, in the case of garden variety commercial documents exchanged during discovery, there is a common law right of access, but it is less

---

[9] *Id.* ("Rights accorded by the First Amendment provide quintessential protection for the individual.")

[10] *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980); *Press-Enterprise Co. v. Superior Court of California* 464 U.S. 501 (1984); *Press-Enterprise Co. v. Superior Court of California*, 478 U.S. 1 (1986).

[11] *Id.*

14

4062160.1

protected and thus more readily overcome by a showing of need to keep the documents from public view).

40.     Within this category of criminal proceedings or documents, the presumptive First Amendment and common law rights of access are ranked according to the proceeding or document to which access is requested.

41.     In this circuit, the most open documents in criminal proceedings (that is, the documents to which the presumption of access is most protected and most strong) are docket sheets, for the obvious reason that without access to those docket sheets no one could know what other documents he might want to access. This circuit has found an almost overwhelming First Amendment right of access to criminal dockets (and, though not relevant to this case, has found the same right of access to civil dockets as well), which may be restricted only upon a due process finding of compelling interest. [12] Almost, if not equally, open to access are those documents generally referred to for this purpose as "judicial records," which in this circuit means those documents which played a role in the adjudicative decision itself.[13]

### The Proffer, Cooperation, Complaint, and Information Are Criminal Judicial Records; They and the Information in Them Are Matters of Public Concern

42.     Within this category of criminal proceedings or documents, the

---

[12] *Hartford Courant v. Pellegrino*, 380 F.3d 83 (2004).

[13] *United States v. Amodeo*, 44 F.3d 141 (2nd Cir. 1995). Respondents cite this case solely for the definition of judicial records, and not for any relevance to the issue(s) of prior restraint.

15

presumptive First Amendment and common law rights of access are ranked according to the proceeding or document to which access is requested.

--     **Per Se**

43.     Given the abundant decisional law establishing the existence of First Amendment and common-law rights of access to these documents because of the fundamental, bedrock policy of allowing citizens to disseminate them throughout the marketplace of ideas, it is axiomatic that they are matters of public concern per se, given that their public concern is what creates these rights of access in the first place.


--     **In the Specific Facts of This Case**

44.     The record reflects that the movant is a violent recidivist felon with prior convictions for assault with a deadly weapon and for violation of federal racketeering law. On that basis alone the facts of his criminal racketeering adjudication in this court are matters of public concern. This isn't a parking ticket.

45.     Apparently, in spite of the massive racketeering scheme for which he was convicted in this court, the movant received no prison term and no order of restitution, even though he and his co-criminals, including Mafia and Mafiya mobsters, stole over $40,000,000. On that basis, these documents are matters of public concern, as sentencing dispositions always are.

46.     Even while awaiting sentencing, the movant began racketeering crimes at

16

4062160.1

Bayrock, some of which relate back horizontally to the sentencing process itself. Specifically, movant began skimming almost $1,000,000 a year, year after year, unreported, from Bayrock in 2003. On that basis, these documents are matters of public concern.



48.     Finally, in hearings before this court on June 21, 2010, in an episode not likely to wind up in her career highlights tape, counsel for the movant allowed him to take the stand. One can imagine how excited she, and movant, must have been to imagine how he would make a big splash. One can also imagine how he felt when he jumped off

17

the high board only to realize moments later that the respondents had drained the water

out of the pool. For movant perjured himself when he testified that he was a member

(owner) of Bayrock, and then backtracked and said he was not ███████████████████

████████████████████████ He not only committed another predicate crime,

which the respondents will supplement to their SDNY RICO complaint, but did so within

10 years of the first such lie, and thus is now subject to racketeering liability for operating

an enterprise (courtroom 8B, EDNY) through a pattern of racketeering (perjury and

obstruction of justice). On that basis, these documents are matters of public concern.


--      **There Is a Non-Presumptive Right of Access to Presentence
        Investigation Reports**

49.     Pursuant to Fed. R. Crim. P. 6, there is no presumptive right of access to

grand jury minutes, while maintained under secrecy; however, even this secrecy is not

absolute, and upon sufficient showing of need the public may be allowed access, as

*Charmer* states. Presentence investigation reports have also been historically not open to

ready access, though the source of that protection is not statutory, with grand jury

minutes, but rather is decisional law, and again their secrecy is not absolute, and upon

sufficient showing of need the public may be allowed access, as *Charmer* states.

Although not definitive or clear in its application, this court has said in dictum that it

considers such reports to be similar in this sense to grand jury minutes.

50.     However, the fact that grand jury minutes and PSRs are not readily

18

4062160.1

accessible does not make them not matters of public concern. In this case, the PSR is a matter of public concern for the reasons cited above; viz. it is the evidence that the movant lied to the Probation Officer, a predicate racketeering crime, and that the Probation Officer failed to detect it, both of which are matters of public concern.

51.    *Charmer* never addressed First Amendment issues of free speech or prior restraint. There is however federal authority on that point, and therefore the respondents end this argument by citing appellate authority that, read with *New York Times* and *Bartnicki*, allows them to disseminate not only the four judicial records, but the PSR as well.

52.    In *United States v. Smith*, 123 F.3d 140 (3rd Cir. 1997), the court was addressed the question whether it could impose a prior restraint on a newspaper which had lawfully come into possession of a sentencing memorandum which contained grand jury material (it had been leaked by the executive branch). The court sealed the sentencing memorandum after the leak had been detected, on the ground that F.R.Crim.P 6(e) material was implicated, and ordered briefing on the extent to which the sentencing memorandum was sourced in secret grand jury material. The court held that the newspapers, which already had the sentencing memorandum and wanted access to those briefs and an associated hearing, had no First Amendment right of access to those briefs or the associated hearing, but then observed as to the sentencing memorandum they already possessed, which contained much of the same material as would the briefs and

19

the hearing:

> The order entered by the district court in this case cannot effectively bar further dissemination of any potential grand jury secrets by members of the public who possess the sentencing memorandum. Nor could the court enter an order barring parties in possession of the sentencing memorandum from passing the memorandum onto other parties. Under prior restraint law, orders prohibiting the media from publishing information already in its possession are strongly disfavored. Although the district court could not prevent the newspapers from publishing the sentencing memorandum once they came into possession of it, the court properly prevented further government disclosures of theputative grand jury secrets contained in the sentencing memorandum to additional parties. Even if the dissemination by members of the public continues, the order barring further disclosure of any secret grand jury material will at least narrow that dissemination.

53.     The court so held even though it noted that the sentencing memorandum disclosed, and would disclose, certain sensitive information that Rule 32 required probation officers to exclude from PSRs and disclosed, or would disclose PSR material in violation of Rule 32(b)(6).

54.     This is a resounding trifecta of First Amendment freedom: The court held that newspapers and members of the public already in possession of a sentencing memorandum containing not only secret grand jury material but also PSR material and even material too sensitive for a PSR could not be enjoined from disseminating it at will because they enjoyed a First Amendment right to do so and could not be made to suffer prior restraint.

55.     Neither may respondents be enjoined, from disseminating the PSR or any

20

of the other Documents. This is still the United States of America, not Soviet Russia.[14]

Dated:    Suffolk County, New York
          July 16, 2010

                                        *Frederick M. Oberlander* (signature)

                                        Frederick M. Oberlander

---

[14] This court should note that in *United States v. Watkins*, 623 F.Supp.2d 514, SDNY, the
court ruled that where a plaintiff in a civil case attempted to take a position in that case
about his financial condition ten years earlier which was materially different from what
he had told the Probation Officer and court at the time during his federal sentencing for a
drug crime, as evidenced by the PSR, the revelation of that fraud was sufficient need
under *Charmer* to justify unsealing the PSR sections that related to his financial condition
and other records as well. Clearly, in this case movant is in worse position if he attempts
to argue that his PSR should be protected (and this is beside the issue of prior restraint),
because even if Respondents didn't already have the PSR *Watkins* would entitled them to
get it on motion. Obviously, *Watkins* also confirms that the PSR in this case is a matter of
public concern *for New York Times* and *Bartnicki* purposes.

21

4062160.1

Exhibit F

# LAW OFFICE OF FREDERICK M. OBERLANDER

FREDERICK M. OBERLANDER
ATTORNEY-AT-LAW

fred55@aol.com

28 SYCAMORE LANE (PO BOX 1870)
MONTAUK, NEW YORK 11954
TELEPHONE 212.826.0357
FAX 212.202.7624

October 18, 2010

Brian Herman, Esq.
Morgan Lewis
(by Fedex)

Re: *Kriss et al. v. Bayrock Group LLC et al.*     <u>PLAINTIFFS' DEMAND FOR THE PAYMENT OF $105,000,000</u>
   SDNY 10 CIV 3959      <u>COMMUNICATION IN CONTEMPLATION OF SETTLEMENT</u>

Dear Mr. Herman:

Enclosed is the original complaint with certain changes made to facilitate settlement prior to public notoriety and the unstoppable national and international scandal that will result. However, before I address our agreement to try to cooperate in good faith:

## <u>PLAINTIFFS' DEMAND FOR THE PAYMENT OF DAMAGES OF $105,000,000</u>

Plaintiffs have pled and will well present a case for the jury award of damages of approximately $105,000,000, exclusive of prejudgment interest and attorneys fees and exclusive of other legal and equitable remedy. This includes trebling as provided by 18 USC §1964(c). Your client will be jointly and severally liable for all of the damages, and there are no considerations of causality.

This is based on our estimate of actual damages of $35,000,000 and includes assumptions as to available abatements of certain potential penalties and interest. We will provide a statement of damages on request or at the first settlement meeting, but for now understand that this figure of actual damages in very large part, other than as to those penalties and interest, represents the value of Plaintiffs' interests in Bayrock in 2007 at the time they were, in a word, stolen as part of the racketeering and state law wrongs. They are based on Plaintiffs' entitled share of the projected proceeds of Bayrock as Bayrock itself computed and disseminated in 2007. Your client has given deposition testimony in March that he was instrumental in the preparation of those estimates in 2007 and that they were plausible at the time, and plausibility is the legal standard.

I should refer you to the Arizona case *Rhue* with the comment that the state law is essentially identical in New York, including the plausibility standard and the measuring date prospective as of the date of the theft, and Arizona RICO is substantially the same as federal RICO.

Moreover, Arizona law will control as to Bayrock Camelback in any event. It is clear Restatement doctrine, and New York doctrine, that the law of the state of incorporation governs the internal affairs thereof, including without limitation the obligations of managers, owners, and officers to and among each other.

But your takeaway from *Rhue* should be focused on two points: First, <u>even though the projects went bankrupt subsequent to the theft from plaintiffs, since at the time of the theft the partnership had circulated financing documents claiming a large profit was expected, they were hung with that</u>; and second, <u>not only were the damages trebled under punitive damage law, they were again trebled, doubly, under RICO</u>. In contrast, Plaintiffs here demand only a single trebling.

## THE STANDSTILL AGREEMENT AND REDACTED COMPLAINT

Plaintiffs have observed this agreement in good faith. The attached redacted "complaint" is for immediate dissemination, not service, upon all defendants to incent them into settlement discussions without the necessity for blowing this all up publicly.

First, allegations which quote from or describe the contents of the PSR, complaint, proffer, information, or cooperation agreement will be blacked out in standard redaction typeface. For your review, they are shown now as strike-through gray highlighted font.

While I was redacting it for this purpose, I took the opportunity to add additional allegations which well relate the human trafficking of minors and the bribery of Kazakh government officials to the racketeering. As you will see, they allege Bayrock or Arif or both owned most or all of Rixos, which along with the *Savarona* was the *situs* of the forced sexual servitude of the underage girls, reportedly videotaped; that Arif was known as part of the racketeering to embezzle money from Bayrock, such money itself the proceeds of racketeering crimes, to send to Fettah in Turkey in support of this, and that at least one Kazakh official received substantial money from Bayrock in 2007 for an ostensible "energy project" which disappeared off the face of the earth. The redacted version alleges this all relates per *Daidone*, and alleges violations of the Foreign Corrupt Practices Act which are either themselves RICO predicates or at least violate Travel Act predicates (in addition, of course, human trafficking and sexual exploitation of minors are RICO predicates, as are using vessels at sea for human servitude). These additions are in magenta highlight.

In other words, your client, and the other defendants, is(are) now alleged to have aggregate RICO liability to Plaintiffs and now others for not only the financial crimes already alleged but for international bribery, human trafficking, and the involuntary servitude and sexual exploitation of children. There is no allegation that your client personally participated in these predicate trafficking and exploitation acts (but of course overt participation is not a requirement for substantive or vicarious RICO or state law liability therefor).

I might add almost everything alleged is an extraditable offense pursuant to 32 UST 3111, the United States bilateral extradition treaty with Turkey. Of course Mr. Arif is already there, so this may or may not matter.

But for the rest of this letter I want to concentrate on your client's prior racketeering conviction and our standstill agreement and what must happen next.

### *Reasoning by Induction and Deduction from the Transcripts and Other Public Documents*

As you know, all transcripts of all hearings in the OSC you brought are matters of public record. They are not sealed, nor could they have been without prior noticed public hearings and on the record factfinding, but in any event my counsel requested, and received on the record affirmation that they are not sealed.

As a result, the identity of your client is public record, because forever and through today, the case number, CR-98-1101, which you have captioned as "John Doe", nevertheless has shown all this time on PACER as captioned "United States of America vs. Felix Sater" (and in any event Judge Glasser declined to order anyone not to state that John Doe is your client).

As a result, the existence of his PSR, cooperation, information, complaint, and proffer are matters of public record because they were discussed in open court.

As a result, your client's conviction can be presumed, and certainly alleged, because he wouldn't have a PSR if he hadn't been convicted.

As a result, your client's conviction for violation of federal RICO predicated on securities fraud and money laundering can be presumed, and certainly alleged, because that's what most of his co-defendants were (publicly) convicted of.

As the PACER and physical (court storage) docket sheets are completely empty, one can presume, and certainly allege, that your client was not ordered to pay restitution, as that, and any other aspect of sentencing, would have had to have a docket entry, pursuant to *Hartford Courant*.

As the December 2007 New York Times article your colleague believes so credible relates, Mr. Klotsman, your client's co-defendant, was at the time in 2007 paying $625 per month restitution.

As the applicable restitution provisions, §3663A for example, and §5 of USGS, state that restitution may be ordered paid over time, but must be paid within 5 years of sentencing, one can presume that Mr. Klotsman's conviction, and your client's, occurred no earlier than December 2002.

As that is within the 10 year period of FRE 609, this will all be admissible (notwithstanding the size of the loss would justify an exemption in any event[1].

As the press accounts, congressional hearings, and other public documents show, the White Rock and State Street crimes extended through 1996 and into 1997, and one can presume, and certainly allege, that your client's racketeering charges cover that period.

As the MVRA (Mandatory Victims Restitution Act) applies to convictions for covered offenses which occurred after April 24, 1996, it would apply to your client's conviction for racketeering straddling that date, so long as racketeering (i) is a covered offense; (ii) is a continuous crime and thus there is no *ex post facto* implication; and (iii) *Booker* does not apply to the MVRA.

As the 2nd Circuit has ruled in *Cataggio* that pump and dump securities fraud racketeering convictions are covered offenses, the first leg is satisfied.

As the 2nd Circuit's rulings in *Butler* and *Samet* provide that racketeering is a continuous crime and that racketeering activity which straddles April 24, 1996 is covered by the MVRA, the second leg is satisfied.

As the 2nd Circuit has ruled in *Reiffler* that *Booker* does not apply to the MVRA, the third leg is satisfied.

As all three legs are satisfied, your client should have been ordered to pay restitution in the full amount of the loss, which can well be alleged from public records to have been at least $40,000,000. See §3663A.

As the other co-defendants who were convicted were ordered to pay restitution, we can presume, and certainly allege, (i) that the mandatory nature of the restitution was apparent to the Court at the time, else why would everyone but your client be ordered to make restitution (again, this is all well supported by inductive and deductive reasoning without recourse to the PSR); and (ii) that the Court found the administrative burden exclusions inapplicable.

As your client took about $8,000,000 or so from Bayrock, plus whatever he took from Michael Samuels directly or indirectly through the FL deal (ask him to explain this), and from Mirax (ask him to explain this too), and almost all of this occurred by the end of 2007, possibly some in 2008, we can certainly presume and allege that, given the presumptive earliest possible date of his conviction as December 2002, had $40,000,000 restitution been ordered, the victims would have actually received a very substantial amount within the 5 year window, certainly $10,000,000 or more can be alleged.

All the above can be alleged without reference to the PSR. Of course, as you well know, the PSR is absolutely damning, but I can allege the above, in the following context, without violating any existing or possible court order or standstill agreement:

---

[1] When asked by Mr. Bernsteins counsel of record (in other words, not me) during his March 2010 deposition if he had been convicted of any crime other than assault with a deadly weapon, your client was kind enough not only to decline to answer on 5th Amendment grounds, but to state that in doing so he was relying on your firm's advice that he could so decline. In other words, he waives privilege.

*Pretext and Face Saving*

Your initial attempt to conceal all this was predicated, to the extent any legal basis was stated or discernible, on some concept of *in rem* jurisdiction or global gag orders or some nonsense that somehow dissemination of information of public concern contained in lawfully obtained documents can be prior restrained when inconvenient for your client.

When that failed, you and Judge Glasser decided that the "danger" to your client of revealing his "cooperation" justified prior restraint. This is pretext. And it is shameful.

It is shameful because there is ample federal court precedent supporting a First Amendment right to disclose the names of undercover police operatives and undercover informants, some of which I cited in prior letters to the Court. But it's worse than that.

It is shameful because no one bothered offering any actual evidence of any threat, nor was any finding made of substantial likelihood of success (in fact Judge Glasser went out of his way to say that the probability of success was there, or it wasn't).

It is shameful because it's all pretext. What my clients believe happened here is simple.

They believe Judge Glasser had a predisposition to "reward" informants, as well reported in the media, for example in the case of Sammy Gravano, who was sentenced in 1994 without any order of restitution and allowed to keep his millions of dollars he took as a Gambino underboss for, *inter alia*, dozens of contract killings (which would itself support an allegation that Sater was also allowed to keep millions), which was then up to the trial judge's discretion. In fact, such failures to award restitution was what prompted Congress to pass the MVRA to remove it from the judge's discretion and make the order mandatory.

They believe that your client was rewarded for his cooperation by being allowed to keep the millions of dollars he admitted taking from the White Rock racketeering enterprise and by being allowed to evade what was then mandatory restitution, *inter alia* concealing by "super sealing" his entire criminal process.

The PSR as you well know is a roadmap to all this, which is why there is no chance you will withstand First Amendment scrutiny of the public interest attendant to disclosure of all this and the PSR.

Fortunately for your client's thousands of victims, the Supreme Court just this June ruled in *Dolan* that the 90 day time limit for a judge to order restitution is not a barrier to, and that a judge retains the right to, order restitution at any time, so when all this becomes public any of them can petition Judge Glasser for restitution orders, notwithstanding this is 15 years after the offense.

But wait. There's more.

Your client was convicted of racketeering predicated on securities fraud. Not only the conviction, but the entire criminal proceeding against him, was covered up. No victim was told. No victim was informed. No victim could have found out had they gone looking, and for all we know some or all of them did.

Of particular interest here is §1964(c), the civil damage section of RICO, particularly insofar as the PSLRA limited the use of predicate acts of securities fraud in civil RICO actions (emphasis added).

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that **no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.**

You see, your client's victims were deprived of their right to sue him in RICO for treble damages because his conviction, a substantive element of his civil liability, was wrongfully and intentionally concealed.

Or in alternate terms, your client's victims were deprived of, and continue to be deprived of, since concealment is a continuing offense, their knowledge of, and thus their right to, a chose in action.

And interestingly, the 2nd Circuit ruled 20 years ago, in *Porcelli*, that depriving someone of a chose in action by wrongfully concealing it from them states a cause of action in RICO (assuming jurisdictionally significant use of mail and wire).

I'm telling you that your client remains liable for continuing, related racketeering offenses, to his victims, and not only by the doctrine of continuous concealment as a continuing RICO predicate, but by any concept of equitable tolling[2].

Since you know the PSR shows his responsibility can be as much as $80,000,000, not just $40,000,000, that makes him potentially liable for $240,000,000.

But wait. There's more.

The leading cases on the issue, in SDNY, *Bingham*, and in EDNY, *Chubb*, state that prejudgment interest is available in RICO in exceptional cases, such as where the defendant is responsible for delaying justice. I think it's clear this would be such a case.

That makes him potentially liable for something in the vicinity of $600,000,000. Exclusive of counsel fees.

It also makes liable anyone else who conspired with him or participated with him in this racketeering, substantively or vicariously, based on combinations of relatedness and causation, and outside of RICO makes liable everyone involved in the fraudulent conveyance, conversion, or transfer of his assets, as a matter of state law, insofar as these claimants are and remain creditors under New York law.

### NEXT STEPS

This was never about some purported threat to his safety. As I said in my last letter to Judge Buchwald, these would have to be the most stupid criminals in the history of crime if they haven't figured out that Sater cooperated. We're supposed to believe that none of his co-defendants noticed that he was testifying against them, and none of them noticed that they (those who did) went to jail and he didn't?

This is a cover-up of his evasion of restitution and liability for his racketeering crimes, part of the obvious result of the super-sealing of the criminal proceedings.

So long as I have no obligation to disclose these facts, and my clients have no obligation to disclose them, and Judge Buchwald with full disclosure signs off on this as appropriate, we will cooperate with this avoidance of liability for his racketeering in the 1990's. But in return he cannot evade liability for his racketeering in the 2000's, at least to Plaintiffs and those to whom they owe duties.

In return you will, as a threshold act to show good faith, cooperate by immediately executing a companion tolling agreement, a stipulation of further extension of time to serve, an agreement to accept service on Mr. Sater's behalf, will join in all concomitant requests to Judge Buchwald, and will otherwise acting with all deliberate speed to get every other defendant tolling, stipulating, and joining, and then "in there" negotiating while this is all tolled and sealed and gagged.

---

[2] Which in the federal context applies to the government as well as to private litigants, per *Irwin*.

That includes Mr. Samuel, whom we have sued personally and against whom we will amend to include RICO conspiracy liability.

Although you don't know of it, I know of (but it is work product and my client's control whether I can disclose it) multi-million dollar cross-claims your client has against at least some of these Defendants. Perhaps that will further incent him to cooperate.

On which note, as I already told you, my clients are indifferent as to which Defendants write the checks, and if your client can get out of this without paying much, if anything, that's fine with them. They are also well aware that your client lacks the means to pay what is demanded, and thus are proposing he pay at least in very principal part with his cooperation, something he no doubt will understand.

Start working the phones. Based on our negotiations with Mr. Schwarz and counsel, my clients and I are relatively certain Bayrock Group LLC and Mr. Schwarz (trust me, Mr. Halberg, too), will be very eager to go along and help, as will Akerman Senterfitt. I suspect Mr. Sater will convince Mr. Samuel as well.

I remind you my clients are not interested in one dime they are not entitled to by law and this is no extortion or improper threat. They simply demand for what they are entitled to: one billion dimes[3].


### ANTI-SPOLIATION AND DEMAND FOR TURNOVER

You and your client are on notice to preserve all books and records, regardless of claim of privilege, whether in your client's possession and control or yours, and if such whether or not work product, for purposes of this litigation and for presumptive demand by federal, state, and local agencies and Interpol.


Sincerely yours,

Frederick M. Oberlander
Attorney-at-Law

---

[3] At this time, plaintiffs will very favorably consider settling the entirety of all claims known and unknown for their actual damages of $35,000,000. This is not an offer at common law or for purposes of FRCP 68. It is the least amount which plaintiffs would be willing to accept for a quick settlement that avoids the dissemination. Please note this or any settlement may be subject to judicial approval.

Exhibit G

# LAW OFFICE OF FREDERICK M. OBERLANDER

FREDERICK M. OBERLANDER
ATTORNEY-AT-LAW

fred55@aol.com

28 SYCAMORE LANE (PO BOX 1870)
MONTAUK, NEW YORK 11954
TELEPHONE 212.826.0357
FAX 212.202.7624

November 9, 2010

**CANCELLATION OF STIPULATED STANDSTILL**
**COMMUNICATION IN CONTEMPLATION OF SETTLEMENT**

Brian Herman, Esq.
Morgan Lewis
(by email, facsimile, and Fedex)

Re: *Kriss et al. v. Bayrock Group LLC et al.*      SDNY 10 CIV 3959
    *United States v. John Doe*      EDNY 98 CR 1101

Dear Mr. Herman:

Please take note that I myself in my own behalf, and as counsel for and in behalf of my clients Mr. Kriss and Mr. Ejekam, declare the stipulated standstill agreement of August 12, 2010 in re EDNY 98 CR 1101 to be cancelled as to all three of us, as of right, such cancellation to be effective Tuesday, November 16, 2010. I and my clients reserve all other rights thereunder, including without limitation all other rights to cancellation as may exist.

As you know, Plaintiffs have determined that dozens of copies of the complaint and exhibits were sent out by third parties acting on their own, primarily by Mr. Schwarz, prior to any court ever ruling on anything, and then circulated by them and those who received them. There isn't anything you can do about it. There is no legal recourse to anyone.

If you wish Mr. Sater's activities lawfully kept quiet to any extent, stand still, stop filing motions and get out of the way so Plaintiffs can try to resolve the case before everything uploads to PACER and goes public. The only way to try to prevent worldwide notoriety will be a globally stipulated sealed confidentiality order accompanying a global settlement. No prior restraint ever was possible and thanks to your litigation in EDNY and what it revealed and the transcripts thereof, all you have accomplished now is to guarantee massive public interest in the cover-up not only of the Sater conviction but the super sealed files and the evasion of mandatory restitution of the $10,000,000 (give or take) that Plaintiffs can allege Mr. Sater took out of Bayrock and the wrongful concealment of the $600,000,000 RICO chose in action available against Mr. Sater, concealments themselves RICO predicates, which by definition make all these matters of public interest so beyond any First Amendment threshold as to make silly any attempt to enjoin.

I am sending separately a litigation standstill agreement for the SDNY matter, which is in everyone's interest and which matches in substance and duration the standstill the Bayrock defendants (including Mr. Schwarz) all signed two weeks ago. It includes a stipulation as to serving the original complaint as filed.

If you don't stipulate I'll get it so ordered anyway because (as Judge Glaser himself pointed out) the issue of dissemination is moot, but you'll have wasted more time and be that much closer to the time when Judge Buchwald orders this public and your client finds this on the front pages everywhere, including New York, Iceland, Turkey, and Kazakhstan, and all the other plaintiffs worldwide, including Glitnir (which already knows of the EDNY criminal matter from public filings but not yet about your client), join the party.

I can with confidence predict from the settlement discussions I've had that all the defendants will be delighted to keep this quiet, if it is in Plaintiffs' interests to ask them to do so and if such can be done while allowing Judge Buchwald to respect the presumptive common law right of access to civil litigation filings.

You have two friends, Plaintiffs and the Second Circuit, where it is Holy Grail to protect sealed and stipulated confidential civil settlement agreements even against grand jury subpoena. But first there has to be such a settlement agreement. And that lies in the discretion of Plaintiffs. If this case is not settled quickly, it will surely go viral. If you obstruct a settlement instead of helping get there, everything will go public with clockwork inevitability. This is not a threat, it is mathematics. And it is certain.

No power on this earth will much longer prevent as much lawful and legal worldwide dissemination of this Complaint and every document attached thereto or referenced therein as the public and press doing the dissemination think its value justifies. You already saw what *Courthouse News* thought of it, and everything else I file about Bayrock, entirely without my or my clients' involvement. Only a stipulated sealed confidential settlement agreement Plaintiffs find acceptable, executed very soon, can stop that.

You claim to be worried about Mr. Sater's notoriety yet all you managed to do is get back to where we were in May with the decidedly non-trivial addition of a preclusive judicial determination that I and my clients did nothing wrong and can disseminate at will. You've handed my clients preclusive judicial affirmation of what they already had, the First Amendment right to disseminate, created worldwide front page news value based on what was revealed about what went on here, and intentionally interfered with their ability to settle the case by adopting the ridiculous argument that serving a complaint on someone who already had it was wrongful, as a result practically guaranteeing loss of time needed to settle and an ensuing public disaster for your client who by your own admission is the most exposed to publicity of all.

You say his safety is threatened. My clients are not endangering it. They are endangering his economics. Ask the Sapirs and iStar how happy they'll be when Trump SoHo sales are shut down, the money refunded, and the offering plan voided and they possibly face bar from further development in New York because your client was concealed from disclosure in the offering documents. I think they have $120,000,000 in the project behind iStar, which has $300,000,000. That's $420,000,000 riding on a project worth now I think $240,000,000. And I believe the Sapirs guaranteed at least some of the loan. Kramer Levin will be overjoyed, all the more since Steptoe already found their connection with FL while litigating FL's fraud on Glitnir depositors and would love to connect your client, all of which is in the Complaint (ask him about his dealings with Kramer Levin), and you better believe if this blows up I'm inviting them in through their counsel, as well as all the buyers now suing before Judge Wood, who will be delighted to know that while they don't have securities fraud, they have RICO, with far bigger value. I look forward to your client's testimony that he didn't own much of Bayrock, owned no membership interests, while he tries to explain why Akerman Senterfitt drafted a trust for his wife and children for the express, stated purpose of assigning his Bayrock membership interests to the trust, which my clients alleged he executed as part of the cover-up.

He's going to be an awfully popular fellow. Always remember, if I can't settle this in time now, you will have brought this about by your decisions, taking the tactical nuclear device I filed in SDNY and enhancing it beyond what even I could have, magnifying its yield to that of a strategic thermonuclear weapon by dragging in EDNY and that disaster. You say you did this to protect Mr. Sater? I don't get it. I really don't.

**Sign the litigation standstill and get out of the way.** You have seven days to seek further relief from Judge Glasser. If you do, if you don't standstill, if you continue to interfere with service or dissemination, if I see letters, motions, or anything else, I will instruct counsel to seek emergency relief. And I'll get it. And you'll get the inevitable, concomitant global public news and media coverage of everything everywhere.

You and Ms. Moore may meet with me any time this week. Do not mistake the tone of this letter. It is not arrogant. It is, "What were they thinking?" Listen to me. I see legal ways out for your client which are in my clients' interests to facilitate. You won't see them. You need my help. Take it. Fast. Or Judge Buchwald will be presiding over World War III with coverage likely on the front page of the New York Law Journal.

Sincerely yours,

Frederick M. Oberlander
Attorney-at-Law

Exhibit H

# MANDATE

1  10-2905-cr, 11-479-cr
2  USA v. Doe
3
4              UNITED STATES COURT OF APPEALS
5                 FOR THE SECOND CIRCUIT
6
7                      SUMMARY ORDER
8
9        Rulings by summary order do not have precedential effect. Citation to summary orders
10  filed on or after January 1, 2007, is permitted and is governed by Federal Rule of Appellate
11  Procedure 32.1 and this court's Local Rule 32.1.1. When citing a summary order in a document
12  filed with this court, a party must cite either the Federal Appendix or an electronic database
13  (with the notation "summary order"). A party citing a summary order must serve a copy of it
14  on any party not represented by counsel.
15
16        At a stated term of the United States Court of Appeals for the Second Circuit, held at the
17  Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York,
18  on the ____14th____ day of February two thousand and eleven.
19
20  PRESENT:
21
22       JOSE A. CABRANES,
23       ROSEMARY S. POOLER,
24       DENNY CHIN,
25              Circuit Judges.
26
27  ------------------------------------------------x
28  RICHARD ROE,
29
30              Appellant,
31
32              v.                              Nos. 10-2905-cr, 11-479-cr
33
34  UNITED STATES OF AMERICA,
35
36              Appellee,
37
38  JOHN DOE,
39
40              Defendant-Appellee.
41  ------------------------------------------------x
42
43  FOR RICHARD ROE:          RICHARD E. LERNER, Wilson, Elser, Moskowitz,
44                            Edelman & Dicker LLP, New York, NY.
45
46  FOR APPELLEE:             TODD KAMINSKY, Assistant United States Attorney,
47                            United States Attorney's Office for the Eastern District
48                            of New York, Brooklyn, NY.

UNITED STATES COURT OF APPEALS
FILED
FEB 14 2011
SECOND CIRCUIT

2:45 pm

MANDATE ISSUED ON 02/14/2011

FOR DEFENDANT-APPELLEE:     KELLY ANNE MOORE, Morgan, Lewis & Bockius LLP, New York, NY.

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, following a hearing on the record on February 14, 2011, that an injunction *pendente lite* shall enter to prevent the dissemination by any party, their officers, servants, employees and attorneys, and all who are in active concert or participation with them, of materials placed under seal by orders of this Court or of the United States District Court for the Eastern District of New York (I. Leo Glasser, *Judge*).

Richard Roe ("Roe") is an attorney at law whose identity is known to all participants in this litigation and who has been given the name "Richard Roe" as a legal placeholder because the disclosure of his true identity in this litigation context may, for the time being, lead to the improper disclosure of the materials at issue here.

Roe appeals from orders of the District Court permanently enjoining distribution of a Presentence Investigation Report ("PSR") prepared for sentencing purposes in a criminal proceeding before Judge Glasser and temporarily enjoining Roe and his clients from further disseminating other sealed documents filed in Doe's criminal proceedings before the District Court (Docket No. 10-2905-cr).

We also have before us a separately docketed but consolidated petition for a writ of mandamus directing the District Court to make public the docket of the criminal case in question (Docket No. 11-479-cr). In turn, the United States (the "government") seeks a temporary injunction, pending the disposition of this appeal, to restrain Roe and his counsel and clients, and all persons acting in concert with them, from the threatened dissemination of the sealed materials at issue here by (1) filing and pursuing civil actions in other federal or state courts in which the sealed materials are annexed to pleadings or otherwise referred to or made public, and (2) by conveying copies of these materials or the contents thereof to third-parties, including the media.

We assume the parties' familiarity with the remaining facts and procedural history of the case

1                                          (i)

2           We turn first to Roe's petition for a writ of mandamus. The All Writs Act empowers us to

3   "issue all writs necessary or appropriate in aid of [our] respective jurisdiction[ ] and agreeable to the

4   usages and principles of law." 28 U.S.C. § 1651(a). One such writ is the writ of mandamus, an

5   "extraordinary remedy" that has been used "both at common law and in the federal courts . . . to

6   confine the court against which mandamus is sought to a lawful exercise of its prescribed jurisdiction."

7   *Cheney v. U.S. Dist. Crt. for Dist. of Columbia*, 542 U.S. 367, 380 (2004) (brackets and internal quotation

8   marks omitted). We issue a writ of mandamus only in "exceptional circumstances amounting to a

9   judicial 'usurpation of power' or a 'clear abuse of discretion.'" *Id.* (citations and some internal quotation

10  marks omitted); *see also Sims v. Blot*, 534 F.3d 117, 132 (2d Cir.2008) ("A district court has abused its

11  discretion if it [has] based its ruling on an erroneous view of the law or on a clearly erroneous

12  assessment of the evidence or [has] rendered a decision that cannot be located within the range of

13  permissible decisions." (brackets, citations, and internal quotation marks omitted)).

14          Roe falls well short of his heavy burden to secure a writ of mandamus directed to the District

15  Court. Here, the District Court reviewed the sealed documents and the voluminous submissions by the

16  parties, conducted four days of hearings inquiring into how Roe had obtained the documents and how

17  he intended to use them, and explained in detail and on the record its well-reasoned decision to issue a

18  permanent injunction against further distribution of the PSR and a temporary injunction against further

19  distribution of the other sealed documents. Under the circumstances, we see no basis upon which to

20  conclude that the District Court in any way usurped its power or clearly abused its discretion. *See Cheney*,

21  542 U.S. at 380. Accordingly, the petition for a writ of mandamus (Docket No. 11-479-cr) is DENIED.

22          Our decision to deny the petition for a writ of mandamus may be further elaborated in due

23  course in a published opinion.

24          The docket in this proceedings (Docket No. 11-479-cr) and all documents referenced therein

25  shall remain SEALED until further order of this Court.

26

27

1
2
3        Pending a full review of the merits of Roe's appeal by a panel of this Court, the government, by

4  a sealed motion of January 26, 2010 and accompanying affidavit, requests a temporary stay of the

5  unsealing of Docket No. 10-2905-cr and of the materials placed under seal by Judge Glasser pending the

6  appeal of this matter. In light of the serious, indeed grave, concerns expressed by the United States

7  regarding the possible consequences of unsealing these documents, and the absence of any sufficiently

8  persuasive countervailing considerations expressed by Roe, the government's motion is hereby

9  GRANTED.

10       Accordingly, pursuant to this order and to our orders of January 28, 2011 (granting

11  government's motion for an emergency stay of unsealing the docket in No. 10-2905); February 9, 2011

12  (granting government's motion for an emergency stay of unsealing the docket in No. 11-479 and

13  ordering Roe not to publicly file any additional documents or cases that referred to matters subject to

14  sealing orders in Nos. 10-2905-cr and 11-479-cr); February 10, 2011 (re-emphasizing, *inter alia*, that Roe

15  was not to reveal or distribute sealed documents, nor contents thereof, to any third-parties, including

16  members of the public or the media); and February 11, 2011 (re-emphasizing, *inter alia*, that all previous

17  orders of this Court and of the United States District Court for the Eastern District of New York with

18  respect to the documents at issue remained in full force and effect until further order of this Court), we

19  hereby ORDER that ALL PARTIES, THEIR OFFICERS, AGENTS, SERVANTS, EMPLOYEES,

20  AND ATTORNEYS, AND ALL OTHER PERSONS WHO ARE IN ACTIVE CONCERT OR

21  PARTICIPATION WITH THEM, *see* Fed. R. Civ. P. 65(d)(2), are TEMPORARILY—and WITHOUT

22  PREJUDICE to any claims or arguments that may be asserted by the parties on the merits of these

23  appeals or on the orders in effect during the consideration of the appeals—ENJOINED from publicly

24  distributing or revealing in any way, to any person, or in any court, proceeding or forum, except to those

25  persons directly involved in the parties' own legal representation, any documents or contents thereof

26  subject to sealing orders in Docket No. 10-2905-cr or in any related proceedings before the District

27  Courts for the Eastern District of New York and Southern District of New York.

28       For the purpose of enforcing this Court's orders and those of the District Court for the Eastern

29  District of New York during the panel's consideration and adjudication of the pending appeal, we

1  REMAND the cause (Docker No. 10-2905-cr) to the District Court for the Eastern District of New

2  York with instructions to the Chief Judge of that Court to assign a United States District Judge from

3  that Court with the limited mandate of implementing and overseeing compliance with our orders and

4  the orders previously entered by Judge Glasser. Of course, Judge Glasser, an experienced and able jurist

5  who has shown admirable patience and forbearance in the face of extraordinary provocations, shall

6  retain jurisdiction over the underlying (and long-lived) criminal proceeding involving John Doe.

7       Furthermore, in all other respects and pursuant to *United States v. Jacobson*, 15 F.3d 19 (2d Cir.

8  1994), this panel shall retain jurisdiction over (1) the pending appeal, both for the disposition of the

9  appeal on the merits as well as with respect to any further motions practice; (2) any other appeals from

10  the District Court's order granting the permanent and temporary injunctions at issue; and (3) any

11  appeals arising from any further proceedings in the District Court, including any further petitions for

12  extraordinary writs, including the writ of mandamus.

13

14                                      (iii)

15       Without in any way limiting the effect of this summary order and the Court's previous orders,

16  we further ORDER:

17       (1) This appeal (Docket No. 10-2905-cr) will be EXPEDITED.

18       (2) The briefing schedule will be as follows:

19            a. Roe's opening brief shall be filed no later than Monday, February 28, 2011.

20            b. The government's opening brief shall be filed no later than Monday, March

21            14, 2011.

22            c. Roe's reply brief shall be filed no later than Monday, March 21, 2011.

23            d. The government's sur-reply brief shall be filed no later than Thursday, March

24            24, 2011.

25

                                      5

## CONCLUSION

To summarize:

(1) the petition for a writ of mandamus in Docket No. 11-479 is DENIED, and the docket of that case shall remain SEALED pending further order of our Court;

(2) the government's motion for a temporary stay of unsealing of the docket in No. 10-2905-cr pending full review of the merits of Roe's appeal is GRANTED;

(3) the parties and all who are in active concert or participation with them are TEMPORARILY ENJOINED, pursuant to the terms of the order stated above;

(4) we REMAND the cause to the United States District Court for the Eastern District of New York for a limited purpose and under the terms noted above.

The limited mandate described above shall issue forthwith.

FOR THE COURT,

Catherine O'Hagan Wolfe, Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

Exhibit I

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2
    - - - - - - - - - - - - - - X
 3
    UNITED STATES OF AMERICA     :      98-CR-1101
 4
        -against-                       U.S. Courthouse
 5                                :      Brooklyn, New York
    JOHN DOE,
 6
            DEFENDANT,            :
 7                                       April 1, 2011
    - - - - - - - - - - - - - - X       11:00 o'clock a.m.
 8
            TRANSCRIPT OF HEARING
 9          BEFORE THE HONORABLE BRIAN M. COGAN
            UNITED STATES DISTRICT JUDGE
10

11
    APPEARANCES:
12
    For the Government:       LORETTA LYNCH
13                            United States Attorney
                              147 Pierrepont Street
14                            Brooklyn, New York  11201
                              BY:  TODD KAMINSKY
15                            Assistant U.S. Attorney

16
    For John Doe:             MICHAEL BEYS, ESQ.
17                            NADER MOBARGHA, ESQ.

18  For Mr. Roe:              RICHARD LERNER, ESQ.
                              DAVID SCHULZ, ESQ.
19

20
21  Court Reporter:           SHELDON SILVERMAN
                              Official Court Reporter
22                            225 Cadman Plaza East
                              Brooklyn, New York 11201
23                            (718) 613-2537

24
25  Proceedings recorded by mechanical stenography. Transcript
    Produced By Computer Aided Transcription.
```

1       THE CLERK:  United States versus John Doe.

2       (Appearances noted).

3       THE COURT:  Good morning.

4       THE COURT:  Who is in the back?

5       MR. KAMINSKY:   Kevin Lee, an intern in the Columbia

6 Law School, intern law program assisting with this case.

7       THE COURT:  I'll note the record of these

8 proceedings will remain sealed, although depending on what's

9 discussed, I or the circuit may choose to unseal it after.

10      I've reviewed all the papers.

11      Does anyone have anything they want to add to the

12 papers?

13      MR. BEYS:  Yes, your Honor.  There are two matters,

14 one of which the court may already have on behalf of John Doe.

15 Judge Glasser's scheduling order dated March 23rdrd, I'll pass

16 a copy to your Honor's deputy and also a case we did not cite

17 but is virtually tracking the language of Judge Glasser's

18 order.  It's In Re criminal contempt proceedings against

19 Gerald Crawford, Second Circuit 2003 case; the cite, 329 F.3d

20 131, stands for the proposition under the collateral bar

21 doctrine, a party may not challenge a district court's order

22 by violating it, which is closely related to what Judge

23 Glasser stated in his order.  I pass that to your Honor's

24 deputy as well.

25      THE COURT:  Anything else?

1          MR. LERNER:   This decision was just handed up.

2          THE COURT:   I haven't read it anymore than you

3     have.  You dispute the fact that he cannot challenge a sealing

4     order by violating it?

5          MR. LERNER:   I denied the premise there is a

6     sealing order --

7          THE COURT:   I didn't ask you that, sir.  If there

8     is a sealing order, do you think you can challenge it by

9     violating it?

10          MR. LERNER:   A sealing order is binding on the

11    court staff.

12          THE COURT:   You're just not going to answer my

13    question, are you?

14          Is it your position a sealing order can be

15    challenged by the party who is enjoined from violating it to

16    violate?

17          MR. LERNER:   As stated, the answer is no.

18    However --

19          THE COURT:   That's all I'm asking you.

20          MR. LERNER:   I would like to ask your Honor if

21    you've seen the government's letter of March 17th that was

22    directed to Judge Glasser which moves for the unsealing of the

23    docket.

24          THE COURT:   That's the one with the grid that

25    refers to certain documents, a chart or grid?

1    MR. KAMINSKY:  Yes, two letters that Mr. Roe did
2 not receive the grid that actually reveals what they are, but
3 received the overall argument in terms of what would be in the
4 grid.

5    THE COURT:  Yes, I've seen that.

6    Let me start with that.  I don't think you can do
7 that.  The circuit has entered an order.  It's on appeal.
8 Judge Glasser's decision is on appeal.  I don't think he has
9 jurisdiction to go ahead, modify now.  I'm sure if you want to
10 unseal certain documents and you have the agreement of
11 Mr. Doe's counsel and, Mr. Learner, I can't imagine why he
12 objects to any unsealing, do a consent motion to the circuit,
13 refer to me --  they may decide it themselves but the notion
14 suggested in a footnote in your letter Judge Glasser still has
15 jurisdiction to modify his orders that are on appeal, he'll
16 determine that ultimately.

17    MR. KAMINSKY:  That's fine.  It was important to
18 the government that it alert --

19    THE COURT:  Appear reasonable in saying certain
20 things don't have to be sealed?

21    MR. KAMINSKY:  Yes.

22    THE COURT:  I understand that.  You have to do it
23 the right way.

24    MR. KAMINSKY:  We appreciate that, your Honor.
25 It's certainly we take what you say to heart, also let you

1    know we did not cavalierly send the letter to whatever judge

2    was closest. We talked about it and after our understanding

3    of how the case unfolded, we did think it was appropriate,

4    although certainly after speaking with Mr. Doe's counsel, we

5    understand there are arguments against that.

6            One of the reasons we forwarded to your Honor

7    yesterday our letter to the Second Circuit was a bit more of

8    an explanation as to why we did what we did. Of course,

9    hopefully, now the Second Circuit and we would be happy if it

10   were the case, would tell us, the government to hold your

11   horses, you'll get to the unsealing when we say you do.

12           THE COURT: As I say, I suspect without knowing if

13   everyone is consenting, the circuit will allow modification of

14   its order or Judge Glasser's order. You're divested by the

15   notice of appeal if Judge Glasser's injunction and interim

16   injunction from the circuit. I don't think there's power of

17   the district court to go ahead and decide that.

18           The other point I will dispose of quickly. With

19   regard to Mr. Beys's argument, one of the things the circuit

20   intended me to do was to remedy or conduct hearings on prior

21   violations. I don't see that at all. That is not part of the

22   implementation directive I see from the circuit. That I think

23   is not going to happen as to past violations until the circuit

24   resolves the appeal. If you feel differently, you want my

25   mandate to be expanded, you could make a motion to the circuit

1  to do that and the circuit will determine that how far it

2  thinks best.

3         Mr. Beys?

4         MR. BEYS:   Nothing, thank you.

5         THE COURT:   With regard to Mr. Lerner's

6  application, there are two problems.   Number one, still much

7  too amorphous to lead me to any other conclusion you're

8  looking advisory opinions that could be used to gradually wear

9  away at the injunctive orders in place.   No need to bother to

10  deny that.   I will tell you it is sufficiently vague that I'm

11  unable to give you the advice you're looking for.

12         Mr. Roe says he's going to commence a lawsuit.   I

13  won't know whether it violates the injunction the circuit has

14  entered until he goes ahead and commences that lawsuit.   I

15  think there's a very good chance, depending on what he puts in

16  there, that it will.

17         There are numerous, very vague references to matters

18  in the public record.   Some of the public record, you tell me

19  matters are discussed.   They're not discussed.   The press

20  release, for example that was issued in 2000, at least the

21  copy I've been given does not refer by name to Mr. Doe at all,

22  anyone.

23         MR. LERNER:   It does.

24         THE COURT:   My copy doesn't.   I'll tell you, I've

25  been through it with a fine-toothed comb.   Maybe I have a

1 redacted copy.

2      MR. LERNER:   Footnote, if you're looking at the

3 press release, JA1153, footnote number 2 on the bottom of that

4 page.

5      THE COURT:   The press release had footnotes?

6      MR. KAMINSKY:   The government can concur with that

7 fact.

8      MR. BEYS:   As does Doe, your Honor.

9      MR. LERNER:   Doe's counsel agreed in their letter

10 that Roe has the knowledge in his letter that Roe may

11 disseminate documents that are already in the public domain.

12 Therefore, we would like a declaration by this court that he

13 may do so.

14      MR. BEYS:   We would object, Judge.

15      THE COURT:   I'm not doing that. What you can do,

16 if you want me to make a ruling, to give me specifically the

17 documents that you say are in the public domain and then we'll

18 have a hearing as to whether everyone agrees those are in the

19 public domain.

20      MR. LERNER:   Your Honor, I provided the court with

21 the joint appendix with tabbed documents that we contend are

22 already in the public domain.

23      THE COURT:   Your request was not phrased just in

24 terms of distributing those documents. It was phrased in

25 terms of extrapolating from it, allowed that possibility. I'm

1  not going to allow you to extrapolate from that. What you're

2  going to have to do, if you want any kind of advisory opinion

3  from me, is to get preclearance of exactly what it is you're

4  going to say.

5      What I suggest to you, you submit a chart. The

6  chart has a left column of single-sentenced statements. It

7  has a right column of where those statements are in the public

8  domain. If that's the case, then I may approve that.

9      Mr. Beys, why would I not approve that?

10      MR. BEYS: We would like the opportunity to speak

11  to the question of inadvertent disclosure. What we said in

12  our papers, we don't think we can stop Mr. Roe from talking

13  about or disseminating what's already out there. We could be

14  wrong. The Second Circuit could have a different view of it

15  and, moreover, we would like the opportunity to brief the

16  issue of whether the government did it inadvertently 11 years

17  ago when it spent 13 years trying to conceal that fact.

18      THE COURT: But if it's in the public domain, isn't

19  it already out there?

20      MR. BEYS: Like I said, your Honor, we think that's

21  the case. We wrote that. We could be wrong. But yes, it's

22  already out there, names Mr. Sater by name in one line.

23      THE COURT: Right. That's what I'm concerned about

24  the tone and nature of Mr. Learner's paper, that you will take

25  one small reference, combine it with other things you know

1   from documents that were not in the public domain and give
2   that public domain statement of a minor nature a whole new
3   life and that you will not be permitted to do.

4           I'll be glad to consider specific statements that
5   you wanted to make with sources and then I'll determine if you
6   can make those statements.

7           I also have to tell you, Mr. Learner, I thought your
8   papers were absurd.  It was like a comic book characterization
9   of what legal papers are supposed to look like.  When you have
10  Mr. Roe talking about engineering decompensation, I just can't
11  imagine any federal judge finding that the least bit
12  persuasive.  I'm looking for facts in here.  I've got an
13  affidavit, reads similarly to some of the pro se affidavits I
14  get.  I don't understand what you're trying to achieve.

15          Is this the way you write in all your cases?

16          MR. LERNER:  This is not an ordinary case.  We felt
17  it was warranted.

18          THE COURT:  I think it's not.  No case is ordinary.
19  Every case is entitled to particular special attention and
20  effective advocacy is effective advocacy no matter what the
21  context is.  If you want to get to me, at least, or any other
22  judge that's going to touch this case, let's do legal papers
23  the way legal papers are normally done, not like a comic book.

24          Anything further?

25          MR. BEYS:  One question.  This is what I meant to

1 ask before, your Honor.  Regarding our contempt motion, in

2 addition to writing to the Second Circuit for clarification,

3 would your Honor have a problem with us bringing an order to

4 show cause to Judge Glasser who does still retain jurisdiction

5 over the underlying case?  We believe, as we've written --

6          THE COURT:  Don't you want to wait for the circuit

7 to affirm or reject those injunctions?

8          Why do you need to do that now?

9          MR. BEYS:  For one reason, your Honor.  There is a

10 statement that he's going to file a lawsuit in state court.

11          THE COURT:  That won't be addressed.  If he does

12 that and he has to be put in jail because he does something

13 like that, that will not be addressed by your order to show

14 cause for past violations.

15          MR. BEYS:  That's true.  That is our one concern.

16          THE COURT:  As I said, I'm not advisory opinions.

17 The next thing Mr. Roe may hear from me is why he shouldn't be

18 put in the MDC for violating the Second Circuit's injunction.

19 That's all there is to it.  There's nothing more that we can

20 do at this point.

21          MR. BEYS:  Thank you.

22          THE COURT:  I will tell you, Mr. Learner, the

23 threats, they fall on deaf ears.  I have no investment in this

24 case.  If Mr. Roe doesn't violate the injunction, I don't have

25 anything to do.  If he does, I have something to do.  That's

1   it.

2          Anything else?

3          MR. BEYS:   No, your Honor, thank you.

4          THE COURT:   Mr. Kaminsky?

5          MR. KAMINSKY:   Very briefly.  The Second Circuit

6   mandate does specifically entrust your Honor with enforcing

7   the district court's orders.  One such order that still has

8   not been complied with -- it is baffling -- they still

9   maintain the very orders that are subject to the injunction

10  and the TRO.  The case that was handed up to your Honor

11  earlier before by Mr. Beys, the in re contempt proceedings of

12  Gerald Crawford, specifically state that a litigant does not

13  have the ability to say "I'm going to violate the order, hold

14  on to this stuff and wait for the circuit to prove I'm right."

15  He must hand over and/or place those documents in some type of

16  transitory place and wait for the circuit to rule, but he

17  still has them, in direct contravention of the court's order

18  saying give them back, give them to the U.S. Attorney's

19  Office.  No one gave anything.

20         THE COURT:   The directive to give them back is in

21  Judge Glasser's order, not the circuit, right?

22         MR. KAMINSKY:   Right.

23         MR. LERNER:   I would like to object to that

24  statement, your Honor.  There is no order directing the

25  destruction of electronic copies or return of photocopies.

1    The original that was provided to Mr. Roe by Mr. Bernstein,

2    lawfully, at that, was handed up to court. It is in the

3    court's possession. It was stated at the hearings that the

4    original has been returned. Therefore, there is no further

5    original to be returned and there are only electronic copies.

6          THE COURT: Mr. Kaminsky, quote for me the portion

7    of the order upon which you are relying. Direct me to that.

8          MR. KAMINSKY: The Second Circuit mandate of yours

9    or Judge Glasser's order to them?

10         THE COURT: I assume you will agree with me the

11    Second Circuit's order in and of itself does not require the

12    return of either originals or copies, right? It incorporates

13    Judge Glasser's orders?

14         MR. KAMINSKY: That's correct. It says you have

15    the limited mandate of implementing and overseeing compliance

16    with our orders and the previous orders entered by Judge

17    Glasser. That's a quote. One of those orders, your Honor,

18    because I'm currently immersed in drafting the appeal, I have

19    two hearings singed into my head and at the end of the

20    July 20th proceeding, Mr. Doe's counsel at the time,

21    Ms. Moore, says specifically to Judge Glasser we would like

22    you to include in the TRO copies of the documents because

23    although Mr. Roe is telling you he's given them back to you,

24    what good is that if he has the copies? The judge said I

25    agree. Mr. Learner's response is are you issuing a further

1  TRO?  The judge says I am.

2      THE COURT:  I need to see that.  I'm sure you're

3  not misrepresenting that but I need to see it.

4      MR. LERNER:  There's no specific directive by the

5  court --

6      THE COURT:  I'll look at it and then I'll see.

7      MR. BEYS:  If the government doesn't submit it,

8  we'll gladly submit it to your Honor.

9      THE COURT:  Does anybody have it here?

10     MR. BEYS:  We don't have the transcript here.  We

11  have a joint appendix.

12     MR. KAMINSKY:  I point you to, beginning on line 4

13  of page 706 of the transcript.

14     THE COURT:  Mr. Learner, you want to respond to

15  what the transcript says?

16     MR. LERNER:  May I take my copy?

17     THE COURT:  Sure.  That's our copy but you can look

18  at ours or we can trade, whichever you prefer.

19     (Pause.)

20     MR. LERNER:  Page 706 of the joint appendix?

21     THE COURT:  Correct, line 4.

22     (Pause.)

23     MR. LERNER:  There's no specific directive by Judge

24  Glasser to destroy the electronic copies of the document and

25  there's been no dissemination of the document.  Therefore,

1    there's been no violation of any TRO and we would request

2    further briefing before you wish to entertain this issue.

3            THE COURT:   No, it's absolutely clear on its face

4    Judge Glasser intended you to destroy electronic copies and to

5    return any photocopies.  If that is not done by the end of

6    Monday, I will hold your client in contempt.

7            MR. LERNER:   We would need to brief that.  I would

8    like the court to be aware it is actually impossible to purge

9    electronic files.

10           THE COURT:   I understand.  They can always be dug

11   up by a technician, that the most you can do is overwrite

12   them.  You can also remove from the first level of the

13   recording media those documents so that they cannot be

14   accessed by anyone but a technician.  That's fairly easy to

15   do.

16           Mr. Learner, are you playing games with me?

17           MR. LERNER:   No.

18           THE COURT:   You think I don't know how these things

19   work?

20           MR. LERNER:   No, I don't know what your Honor

21   knows.

22           THE COURT:   They're stored on files, on the

23   C drive.  You find the copies, you delete them.  I understand

24   that doesn't mean a technician couldn't unpeel the layers of

25   data written over them and find them at some point.  I'm not

1    requiring you to do that at this point but I am requiring you

2    to delete them. Don't tell me that can't be done, sir.

3              MR. LERNER:   Your Honor, these files are backed up

4    every night on the computers. They're on an off-site service.

5    That is the problem.

6              THE COURT:   The backups?

7              MR. LERNER:   Yes.

8              THE COURT:   Mr. Kaminsky, what's your view as to

9    backup tapes?

10             MR. KAMINSKY:   Your Honor, I'm actually trying to

11   process this. I think, programs -- the best thing to do is to

12   possibly get an affirmation from someone that works at the

13   company that that backup will be kept in a certain place by a

14   certain proprietor, will not be able to be accessed.

15             There is the possibility the circuit will disagree

16   with Judge Glasser and then that document may need to be

17   accessed. We just don't think they should have access to it

18   at this time.

19             THE COURT:   I think, for that reason, it's good

20   enough for now to have no accessible copies from any desktop

21   computer. The fact that they're in backup tapes, we might

22   require a purging of those later, but we will not require it

23   now. If they're on backup tapes, that's fine. I don't want

24   anyone with access to the network that your client uses to be

25   able to get into that network from a desktop or laptop

1  computer and access those documents, but solely resident on

2  the backup tapes.

3       Anything else?

4       (No response.)

5       THE COURT:   Thank you all.

6       This transcript is available to both sides if they

7  wish to order it.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SS     OCR     CM     CRR     CSR

Exhibit J

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------- X

UNITED STATES OF AMERICA,

              Plaintiff,

       - against -

JOHN DOE,

              Defendant.

------------------------------------------------- X

**<u>ORDER</u>**

98 Cr. 1101 (ILG)

FILED
IN CLERK ... FICE
U.S. DISTRIC ... RT E.D.N.Y

★ MAY 13 2011 ★

... KLYN OFFICE

Richard Roe is an attorney who seeks to use documents and information from this sealed criminal case against John Doe in public discourse and unrelated civil litigation. Judge Glasser, who presided in the underlying criminal case which culminated in a 2009 sentencing of John Doe, has permanently enjoined Roe from possessing, distributing, or using in any way the Presentence Investigation Report ("PSR") and other documents prepared for this case (the "sealed documents"). Roe has filed several civil cases alleging Doe's involvement in fraudulent business practices, and objects to the continued sealing of Doe's criminal case. The Government has asserted that maintenance of the sealing orders for at least part of the criminal docket is necessary to maintain the personal safety of Doe and national interests in law enforcement and security.

On February 14, 2011, the Second Circuit issued an order addressing Richard Roe's appeal from Judge Glasser's injunction, Roe's petition for a writ of mandamus directing Judge Glasser to allow public access to the case docket, and the Government's request for a temporary injunction to restrain Roe from dissemination of any sealed materials. The Circuit denied Roe's petition and granted the Government's motion for an emergency stay in unsealing the docket and

a temporary injunction prohibiting Roe from "distributing or revealing in any way . . . any documents or contents thereof" from this case or any related sealed cases. Roe's appeal of Judge Glasser's injunction is pending.

In connection with the February 14 Order, the Circuit remanded the case to the Eastern District with instructions for the Chief Judge to assign a District Judge "with the limited mandate of implementing and overseeing compliance with our orders and the orders previously entered by Judge Glasser." By Order of February 15, 2011, then-Chief Judge Dearie referred the case to me for enforcement of this limited mandate.

In the exercise of my limited jurisdiction, I held a hearing on April 1, 2011, to address Roe's request for clarification of the Second Circuit's Order. This Memorandum Decision and Order addresses his question as to whether he may disseminate information available in public records. Roe has brought to the Court's attention several instances of publication of information contained in the sealed documents at issue, including newspaper and magazine articles describing Doe's past and particulars of the case, and a press release from the U.S. Attorney stating that Doe had pleaded guilty to RICO charges.

At the April 1 hearing, I opined that information available to the public was not covered by the Second Circuit's injunction, but emphasized that extrapolation from sealed documents would not be permitted because it could easily be combined with and thereby tainted by Roe's knowledge of non-public, sealed information. I suggested that insofar as Roe sought a more specific interpretation of the Second Circuit's orders, he might submit a chart that listed single sentence statements juxtaposed with their sources, which he has done. Doe has objected to the use each of the three proposed statements, and I evaluate them in turn.

2

The first fact upon which Roe has requested clarification is: "98-CR-1101 is . . . [the] criminal case [of John Doe's real name] and John Doe is [John Doe's real name]." The specific sources listed for this statement are that the caption for the case once included John Doe's real name rather than "Doe," a magazine article, more than a decade old, which noted that a "sealed" complaint existed, and a newspaper article, nearly five years old. Roe also cites an unsealed recent hearing associated with the case's docket number.

Roe lists no source that refers to "Doe" by his real name and includes docket number 98-CR-1011. Roe argues that because the case was once accessible on PACER under the caption that included Doe's real name along with the docket number, the information is in the public domain. The Second Circuit's Order does not permit dissemination of such material because Roe has not pointed to a source currently available to the public that contains the same information.

The remaining public sources cited in support of this statement simply do not link John Doe, by his real name, with the docket number. Instead, in making the statement, Roe adds his knowledge of the docket number to public information that a sealed case exists, which is exactly what the injunction seeks to prevent. Roe makes the frivolous argument that because Judge Glasser did not explicitly reiterate the prohibition on disclosing Doe's real name at this unsealed hearing, Doe's name may be made public. However, Doe's real name was intentionally never mentioned at the hearing. Thus, just as in the instant Order, the prohibition against revealing Doe's real name is implicit based on the sealing of the case as a whole and the use of "Doe" at that hearing. Doe's identity cannot be discerned from that hearing and the Second Circuit's Order staying an unsealing of the docket enjoins Roe from revealing such information.

The second statement combines the public information that Doe was convicted of RICO charges – accessible to the public in a press release published by the U.S. Attorney – with non-public information regarding the nature of the predicate acts underlying the RICO charges. It does not appear that the names and descriptions of the predicate acts are publicly available from any source other than a letter in a related case that Roe downloaded from PACER in 2010, but is now under seal and thus subject to the Second Circuit's injunction. Roe's distribution or revelation of the information contained in the letter would violate court orders.

Finally, Roe seeks to make a third statement: "On October, 23, 2009," John Doe, by his real name, "was sentenced to probation and a $25,000 fine." The Government's request to unseal certain information about Doe's sentence is currently pending before Judge Glasser. Unless and until Judge Glasser orders this information unsealed, it remains subject to the Second Circuit's injunction.

It seems obvious that Roe is seeking to fatally undermine the purpose of the injunctions by publicizing information that would render them ineffective. Roe therefore may not issue any of the three statements submitted in his April 14 letter.

**SO ORDERED.**

S/BMC
U.S.D.J.

Dated: Brooklyn, New York
      May 13, 2011

4

Exhibit K

| UNITED STATES DISTRICT COURT EASTERN DISTRICT OF NEW YORK | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>-against-<br><br>"JOHN DOE,"<br><br>Defendant. | 08 Civ. 1101 (ILG)<br><br>To: Hon. Brian Cogan |

### Notice of Motion of Richard E. Lerner (pro se) and Non-Party Respondent Richard Roe to Quash or Vacate the Order Show Cause of February 13, 2012 and the February 15, 2012 Amended Version of that Order.

Please take notice that upon the annexed memorandum of Richard E. Lerner, dated the 17th day of February 2012, and upon all the pleadings and proceeding heretofore had herein, Richard E. Lerner (pro se) and non-party respondent "Richard Roe," by and through his attorneys Wilson, Elser, Moskowitz, Edelman & Dicker LLP, hereby moves for an order immediately quashing or vacating this court's order of February 13, 2012 and the February 15, 2012 amendment of the same order.

Dated:  New York, New York
February 17, 2012

Respectfully submitted,

WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP

By: ___/s/_____
Richard E. Lerner
Pro se and as attorney for non-party respondent
"Richard Roe"
150 East 42nd Street
New York, New York 10017-5639
(212) 490-3000
File No. 07765.00155

4935949v.1

To:     (Via email, and U.S. mail).

        Nader Mobargha, Esq.
        Beys, Stein & Mobargha
        The Chrysler Building
        405 Lexington Ave.
        New York, New York 10174
        212-387-8200
        nmobargha@bsmlegal.net

        Todd Kaminsky, Esq.
        United States Attorney
        Eastern District of New York
        271 Cadman Plaza East
        Brooklyn, New York 11201
        212-254-6367
        Todd.Kaminsky@usdoj.gov


        (Via fax only)
        Hon. I. Leo Glasser

| | |
|---|---|
| UNITED STATES DISTRICT COURT EASTERN DISTRICT OF NEW YORK | |
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> -against- <br><br> "JOHN DOE," <br><br> Defendant. | 08 Civ. 1101 (ILG) <br><br> To: Hon. Brian Cogan |

### Memorandum of Law in Support of Motion of Richard E. Lerner (pro se) and Non-Party Respondent "Richard Roe" to Quash or Vacate the Order Show Cause of February 13, 2012 and the February 15, 2012 Amended Version of that Order.

### Summary

I submit this *pro se* and in behalf of my client, Frederick M. Oberlander, formerly known as Richard Roe. [1] We respectfully demand emergency relief from the violations of our Constitutional rights occasioned by your illegal and unlawful execution of that certain February 13, 2012 order to show cause, which must be immediately ruled void *ab initio* and stricken from the docket as:

> ➤ The form of the petition is fatally flawed. We demand strict compliance with statutory and constitutional requirements.

> ➤ Regardless of form, statutory and constitutional jurisdictional restrictions require petitioner's contempt petition to have been made directly to the Second Circuit. You were devoid of all authority to execute it. Doing so was jurisdictionally barred, the order *pro tanto brutum fulmen*.

---

[1] Richard Roe's identity is, and has been for some time, a matter of public record, well before the *New York Times* story, through no action of his. The court can have no constitutionally cognizable interest in attempting to pretend otherwise.

4935949v.1

> We respectfully demand you order said order to show cause to have been void *ab initio* for want of jurisdiction, then recuse yourself from further involvement pursuant to 28 USC 455(a) and troubling questions about your maintenance of an inaccurate docket in *U.S. v. Saracino*, 10-CR-00173.

> Nevertheless if you proceed to implement it in any way or otherwise give the slightest legal cognizance to it you will be confirming that you intended to and did commence criminal process against us without requisite, in fact any, due process.

> This transmission is to be interpreted as a "special appearance" and in no way is a waiver of any of the above and in addition is not a waiver of testimonial privilege nor may it or anything in relation thereto be considered such.

One year ago I submitted my client's affidavit predicting that this case was inexorably headed into, what he called, "decompensation collapse." He cautioned that the unlawful, and unethical measures taken to cover up the illegal sentencing schemes in the Eastern District would inevitably require more and more adaptive measures that it would collapse, spectacularly so. That day has come.

## AS A PURPORTED REQUEST FOR "CIVIL" CONTEMPT ADJUDICATION, PETITIONER'S PAPERS ARE FATALLY DEFECTIVE

Petitioner styles his papers as requesting civil contempt proceedings. While it is a matter of constitutional indifference how they are styled, as they request criminal contempt proceedings, nevertheless if this court disagrees and deems them civil, they are in violation of EDNY Local Rule 83.6:

Local Civil Rule 83.6. Contempt Proceedings in Civil Cases [formerly Local Civil Rule 83.9]

(a) A proceeding to adjudicate a person in civil contempt ... shall be commenced by the service of a notice of motion or order to show cause. *The **affidavit** upon which such notice of motion or order to show cause is based* shall set out with particularity the misconduct complained of, the claim, if any, for damages occasioned thereby and such evidence as to the amount of damages as may be available to the moving party...

b) If the alleged contemnor puts in issue his or her alleged misconduct or the damages thereby occasioned, said person shall upon demand be entitled to have oral evidence taken, either before the Court ... appointed by the Court. When by law such alleged contemnor is entitled to a trial by jury, said person shall make written demand before the beginning of the hearing on the application...

(c) If the alleged contemnor is found to be in contempt of court, an order shall be entered (1) reciting or referring to the verdict or findings of fact upon which the adjudication is based; (2) setting forth the amount of damages, if any, to which the complainant is entitled; (3) fixing the fine, if any, imposed by the Court, which fine shall include the damages found and naming the person to whom such fine shall be payable; (4) stating any other conditions, the performance of which will operate to purge the contempt; and (5) directing, where appropriate, the arrest of the contemnor by the United States marshal and confinement until the performance of the condition fixed in the order and the payment of the fine, or until the contemnor be otherwise discharged pursuant to law. A certified copy of the order committing the contemnor shall be sufficient warrant to the marshal for the arrest and confinement of the contemnor...

We suggest your honor may prefer to simply strike petitioner's papers and the order to show cause, ruling it to have been void *ab initio* on grounds of fatal defect in form, ***for failure to include an affidavit***.

* * *

If your honor feels that it needs further reasons than that — as if the procedural defect itself were not enough of a basis to quash or vacate the order to show cause —you should turn to the next page.

4935949v.1

In light of petitioner's failure to disclose to the court that *it was petitioner himself or counsel who confirmed the identity of Richard Roe online to the world and any act of contempt in doing so was his*, an affidavit subjecting him and counsel to charges of obstruction for such omission is particularly appropriate.

I refer to the public docket of the RICO case 10-CV-3959, Item 15, which has been downloadable on PACER for 6 months, has been widely circulated online outside of PACER and is in the hands of countless persons in and out of the media. The endorsed letter written by Doe's counsel follows, after a screenshot of the docket information in 10-CV-3959, which identifies "Frederick Martin Oberlander" as plaintiffs' counsel.



AUG 12 2011
UNITED STATES COURT JUDGE

**VIA FACSIMILE (212) 805-7927**

The Honorable Naomi Reice Buchwald
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re: Kriss, et al. v. Bayrock Group, LLC, et al., 10 Civ. 3959 (NRB)

Dear Judge Buchwald:

We represent defendant John Doe in the above-captioned matter, for which "there is no operative complaint" as of yet, and for which the deadline to file a complaint was August 10, 2011. We write to respectfully request notice of any further adjournment requests by plaintiff's counsel, Richard Roe, and to request that the Court impose a deadline on when Roe must file a redacted complaint.

*Application denied without prejudice. b. Indicated*

Finally, we also request that Roe be given a deadline to file a redacted complaint. The Court of Appeals recently denied all of Roe's appeals in their entirety, effectively rejecting his numerous attempts to disclose Doe's sealed and confidential information. See Ex. 2, Summary Order, dated June 29, 2011. Accordingly, all sealed and confidential information concerning Doe must remain sealed, and by extension, Roe cannot disclose any of it in a publicly filed complaint as he has sought to do since May 2010. Without any legal recourse left (except to file an appeal to the Supreme Court, a tactic that has already attempted), Roe now must file a redacted complaint omitting all references to

– 6 –

Read that again please. It shows that in a docket wherein Mr. Oberlander was identified as counsel of record, John Doe's counsel identified him by his a/k/a "Richard Roe." That is, the identity of "Richard Roe" was outed by John Doe.[2]

The orders of the Second Circuit are also all over the internet, and the June 29th summary order itself discloses who Richard Roe is, because this is the only RICO case shown in court records as having been filed in the Southern District on May 10, 2010. It takes but a few minutes to figure out who is who by searching Google, with the words RICO, "May 10 2010," and Buchwald, all of which terms were in the June 29th order of the Second Circuit, and then looking at what is publicly available on Pacer. So it is actually the Second Circuit that outed "Richard Roe."

## YOUR HONOR HAD NO AUTHORITY
## TO EXECUTE THE ORDER TO SHOW CAUSE
## (WHETHER IT BE CIVIL OR CRIMINAL)
## THE ORDER THUS *PRO TANTO BRUTUM FULMEN*

### ·· If the Proceedings Requested Be Criminal

By express statutory restriction, you lacked the authority to sign that order to show cause because the alleged underlying order was not yours to vindicate. It belonged to another court. By 18 USC § 401,[3] Congress stripped lower courts of any authority they might have otherwise had to adjudicate a criminal contempt of the orders of any other court but their own. This is jurisdictional. The Second Circuit cannot give you the authority, nor can you claim as inherent the authority, that Congress has expressly forbidden you.[4]

---

[2] Additionally, in a complaint filed by John Doe in a related proceeding before Judge Buchwald (docket number 10-CV-9658, see the docketed complaint) Oberlander was identified by name as the person who was given documents by Bernstein, the documents identified by the Second Circuit as being at issue. That complaint publicly identified Oberlander.

[3] "A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of *its authority, and none other*, as ... (3) Disobedience or resistance to *its* lawful writ, process, order, rule, decree, or command." [Emph. Added]

[4] *Marbury v. Madison* 5 US (1 Cranch) 137 (1803). In contempt proceedings in the Court of Appeals in respect of appellate orders issued pursuant to a statutory grant of authority ("administrative" appellate proceedings), the Second Circuit has delegated fact-finding, *see NLRB v. Giannasca*, 119 F.2d 756, (2d Cir. 1941), *NLRB v. Remington Rand, Inc.*, 130 F.2d 919 (2d Cir. 1942), but it has never delegated (or even considered the issue) fact-finding in contempt proceedings related to its own orders issued in cases reaching it by normal appeals coming up from courts below, and, in any event, it cannot delegate its sole

Nor can it give you the authority it may not even have itself. It is an open question — one we intend to litigate thoroughly — whether absent an express Congressional grant of authority a Court of Appeals has the authority to enforce its own orders by criminal contempt.[5] Were you to proceed, you — a district court judge — would be in the untenable position of adjudicating the scope of the Article III jurisdiction of a superior court. It is impossible and jurisdictionally barred, the functional equivalent of an appellate court certifying an interlocutory (or final) question of its own authority to a district court instead of to the Supreme Court.

### If the Proceedings Requested Be Civil

As civil contempt is by definition coercive, the invalidity, whether procedural, constitutional, or otherwise, of any order alleged to have been violated is a defense. We intend to defend vigorously on the ground, *inter alia*, that the entirety of all orders issued, at the least by the Second Circuit, are unconstitutional, in particular, and without limitation, in that they were issued for an unconstitutional purpose, that is, the continuing concealment of systemic judicial and executive branch lawlessness. We will contend that such lawlessness has been deemed to fall within the scope of the term "sedition" (see addendum), such sedition constituting high crimes and misdemeanors, including the conspiracy to and actual accomplishment of the falsification of judicial records and repudiation of mandatory sentencing and victims rights laws and the defrauding of victims of untold millions of dollars.

As petitioner points out, the Second Circuit said (but did not order) that using the name Roe was to prevent the public from finding the truth, and no amount of pretense or handwaving will erase its own admission that it was part of an overall scheme existing for no lawful purpose: While protecting the safety of a cooperator may justify sealing, it cannot justify unlawful misconduct in willfully and intentionally defying mandatory sentencing laws.

This court would be enlightened, we believe, by the Supreme Court's unanimous decision in *Ex Parte United States*, 242 US 27 (1916). When your honor reads it, you should think very carefully about the restitution illegally kept from John Doe's victims. This court should also keep in mind what the Supreme Court noted in *Dolan* (2010), that the obligation to impose a sentence of restitution is paramount above any other law of the United States.

---

authority whether to proceed to begin with. Moreover, any substantive and most procedural issues are mixed issues of law and fact and so cannot be fully, if at all, delegated.

[5] Black, Douglas joining, in dissent in *United States v. Barnett*, 376 US 681, 724 (1964). "For many reasons I cannot agree with the Court's opinion. In the first place, Congress has never expressly given the Federal Courts of Appeals jurisdiction to try and punish people for criminal contempt of court, and I am unwilling to hold that such a power exists in these courts in the absence of a clear and unequivocal congressional grant." The court's opinion did not address the issue.

We do not litigate the issue here, but merely outline it to show that you cannot have the authority to preside, other than possibly as a fact finding master, if at all, over a civil contempt proceeding which must inevitably adjudicate the validity, including the constitutionality, of orders of a superior court. That is an appellate function, and (outside of bankruptcy appeals to a district court) district courts lack authority to pass upon the constitutionality (here the unconstitutionality) of an appellate order. Appellate orders don't get appealed down, they get appealed up, even then only where Congress has created such rights.

As it happens, what Judge Glasser and the Second Circuit have done, in concert with your own prior orders, is to hide an entire covert justice system operating devoid of constitutional legitimacy. It is so repellent to our Constitutional system that it is not merely invalid by reason of unconstitutionality. It and the orders attempting to conceal it (including the disgrace of purporting to order a United States citizen not to report judicial unlawfulness to Congress) are and were at all times jurisdictionally barred. No federal court may enjoin anyone from revealing its own misconduct, ever, such injunction again *pro tanto brutum fulmen*.[6]

### THE COURT MISAPPREHENDS THE COLLATERAL BAR RULE AND THE DIFFERENCE BETWEEN "MERE" ERROR AND JURISDICTIONAL BAR (AND THE RELATED CONCEPT OF TRANSPARENT INVALIDITY)

Space does not permit full exegesis of this complex equity jurisdiction topic, but we believe the court's misunderstanding can be seen in the following excerpt from the transcripts of hearings before the court on April 1, 2011:

MR. BEYS: Yes, your Honor. There are two matters, one of which the court may already have on behalf of John Doe. Judge Glasser's scheduling order dated March 23rdrd, I'll pass a copy to your Honor's deputy and also a case we did not cite but is virtually tracking the language of Judge Glasser's order. It's In Re criminal contempt proceedings against Gerald Crawford, Second Circuit 2003 case; the cite, 329 F.3d 131, stands for the proposition under the collateral bar

---

[6] The last time a judge issued an opinion purporting to legitimize barring citizens from petitioning for redress of grievances, one Judge North, that judge, and the attorney general, were impeached by Parliament, in 1679. The affair led to the adoption of the English Bill of Rights, shortly thereafter, upon which our Bill of Rights, specifically the right to petition for redress of grievances, is based.

doctrine, a party may not challenge a district court's order by violating it, which is closely related to what Judge Glasser stated in his order. I pass that to your honor's deputy as well.

THE COURT: Anything else?

MR. LERNER: This decision was just handed up.

THE COURT: I haven't read it anymore than you have. You dispute the fact that he cannot challenge a sealing order by violating it?

MR. LERNER: I denied the premise there is a sealing order ··

THE COURT: I didn't ask you that, sir. If there is a sealing order, do you think you can challenge it by violating it?

This is error. The issue in a contempt proceeding is not "challenging" an order, it is whether the order entered (i) bound the alleged contemnor; (ii) was not jurisdictionally barred; (iii) was violated with the requisite scienter; and (iv) in the case of civil contempt, was valid, including constitutionally.

It is the interplay of (ii) and (iv) that this court misapprehends.[7] In this context, *invalidity* refers to unconstitutionality by reason of "mere" error, while *jurisdictionally barred* refers to an order so clearly outside the authority of a court that it transcends error and is void, a nothing, an abuse of (no actual) authority, as Judge Learned Hand wrote in *Alemite*, 42 F.2d 832 (2d Cir. 1930), *pro tanto brutum fulmen*, freely ignored with impunity.

And yes, a sealing order that actually exists and in its written terms (that is, terms written in actual, not invisible, ink), purports to restrain "any of the parties and any other persons with actual notice of this order" from disseminating materials no matter obtained outside court process is, as to such other non-party persons, *a nothing*. As to such other persons, it may be used for lining a birdcage or wrapping a fish, but it may not be used to impose upon them any duties of any kind whatsoever. We wouldn't expect you to just take our word for it. So we'll cite Supreme Court authority. In citing *Alemite* with approval in *Chase v. City of Norwalk*, 291 US 431 (1934) wrote:

> Independently of the prohibition of Judicial Code, the decree entered by the District Court was clearly erroneous in so far as it enjoined 'all persons to whom notice of the order of injunction should come from taking any steps or action of any kind to cause the enforcement of the ouster in the state court.' The city alone was named as defendant. No person other than the city was served with process. None came otherwise before the court. The prayer of the bill sought relief solely

---

[7] In the interest of time, I do not address transparent invalidity, which can be understood as occupying a middle ground between *invalidity* and *jurisdictional bar*.

against the city and 'its officers, officials, agents, employees and representatives.' It is true that persons not technically agents or employees may be specifically enjoined from knowingly aiding a defendant in performing a prohibited act if their relation is that of associate or confederate. Since such persons are legally identified with the defendant and privy to his contempt, the provision merely makes explicit as to them that which the law already implies. See *Ex parte Lennon*, 166 U.S. 548, 17 S.Ct. 658. *But by extending the injunction to 'all persons to whom notice of the injunction should come,' the District Court assumed to make punishable as a contempt the conduct of persons who act independently and whose rights have not been adjudged according to law.* See *Alemite Mfg. Co. v. Staff* (C.C.A.) 42 F.(2d) 832. Under the clause inserted in the decree, officials of the state of Ohio might be proceeded against for contempt, if they should apply to the state court to enforce its judgment, although acting solely in the performance of their official duty. To subject them to such peril violates established principles of equity jurisdiction and procedure. *Scott v. Donald*, 165 U.S. 107, 117 , 17 S.Ct. 262; *Hitchman Coal & Coke Co. v. Mitchell*, 245 U.S. 229, 234 , 38 S.Ct. 65, L.R.A. 1918C, 497, Ann.Cas. 1918B, 461.4 *Those principles require that the clause be limited to confederates or associates of the defendant.*

Then add that a sealing order (as it is being tortured into existence here) has been twisted into a prior restraint, and the Supreme Court's holding in *Carroll v. Princess Anne*, 393 US 175 (1968), that a prior restraint may not issue without full adversarial due process provided the person to be restrained, then, Yes, your honor, a *legitimate* sealing order (let alone Judge Glasser's fabricated one) expressly directed at anyone who comes in contact with documents outside court process and restraining their dissemination of same *may be freely ignored*. Period.

(Incidentally, assuming they ever correctly read a case, Mr. Doe's lawyers will find that it is legally impossible to base a contempt proceeding on the violation of an unwritten order where the decretal language is not available. *United States v. David Cooper*. 333 F3d 161 (2d Cir. 2003). Even the government agreed with that proposition in that case.)

The point is not to revisit sealing orders. The point is that it is error to believe that every order must be obeyed at risk of contempt. It is clear error. And the point is that certain orders are so outside the pale, so clearly abusive, that such illegality is always a defense to contempt, civil or criminal. Other terms for illegality would be without authority, unlawful, or *jurisdictionally barred*.

- 11 -

So for example, an order of this court compelling a state to pay money damages in a suit brought by a citizen would violate the 11th Amendment and as such would be so clearly without Article III authority as to be freely ignored, as opposed to an order compelling a state to take certain actions where such order was merely erroneous, but not jurisdictionally barred.

And we repeat that the collective orders here, issued to prevent a citizen from revealing to the world, to 300,000,000 other citizens, to 50,000,000 registered voters, and to 535 members of Congress that the courts have debased themselves by hiding convictions, by hiding from crime victims their right to restitution (contra the laws of Congress and Supreme Court precedent), are such orders, and such is a proper defense both to civil and criminal contempt.

A defense you may not preside over at any rate, not just because of the presence of the Second Circuit's orders, as argued previously, but because of our need to examine pursuant to our Sixth Amendment rights, see next, issues involving an apparently incomplete docket for one Sebastiano Saracino, your case number 10-CR-00173, where a motion to close a courtroom was made and discussed in public proceedings on December 2, 2010, then never heard from again and never docketed upon your honor's ejection from the courtroom of reporters from the Daily News and New York Post (who should have moved to stay their ejectment while contacting counsel, but that's their problem). We will also call Salvatore Gieoeli, who is publishing online allegations that the Eastern District makes illegal deals with cooperators which, *inter alia*, unlawfully evade restitution, as he reports on his blog.

We will know what he knows and why he knows it, and from whom, and why with every web site and blog within 200 miles, including Mr. Gieoli himself, discussing that Saracino was a cooperator, it was not a threat to Saracino's safety to disclose his guilty plea to immigration fraud, but was such a threat (if press reports are correct) to disclose his guilty plea to murder.

## PETITIONER'S PAPERS REQUEST
## CRIMINAL CONTEPT PROCEEDINGS

In the interest of brevity, as we have briefed the court in mid-2011 on the constitutional impermissibility of pretending that criminal contempt proceedings are civil, such papers incorporated by reference, we summarize why the character and purpose of the alleged contempt are criminal.[8]

---

[8] See *United Mine Workers of America v. Bagwell*, 512 U.S. 821 (1994).

- ➤ The alleged contempt is backward looking. It is a completed act in the past (allegedly) violating a court order. It is not ongoing. It is not a continuing refusal to act.

- ➤ The petition requests sanctions.

- ➤ The alleged contempt cannot be purged and so the monetary relief requested cannot be avoided.

## THEREFORE FULL CRIMINAL DUE PROCESS
## RIGHTS WOULD ATTACH (IN THE APPROPRIATE FORUM)

And this presents another illustration of the difference between orders which are so clearly illegal, unlawful, *ultra vires*, without authority, abusive, jurisdictionally barred, etc. and those that are "merely" in error (remember again that "merely" in error is still a defense in civil contempt).

We are aware of no specific form requirement for a person, party or otherwise, to request that the court commence criminal contempt proceedings (which in this district, at least as far as another district court judge has ruled, can only be brought by judicial decree, not by grand jury), but it is quite clear that the court can only grant the request and commence those proceedings pursuant to Fed. Rule Crim. Proc. 42, which *inter alia* requires the charging instrument be read aloud in open court.

However, we believe, but do not concede, that the better view is that the court would still have the power, though not the right, to order commencement of criminal contempt proceedings by other means which violate Rule 42; that is, that an order of commencement that is, perhaps only technically, not in compliance is not a nullity freely ignored, but is an error.

(Again, we do not concede the point whatsoever and retain the right to argue otherwise at such time as someone does something who actually has the constitutional authority to do it, see next).

Were the order to show cause in relation to an allegedly violation of one of this court's own orders, we believe we would argue – again that is not the case so this is supposition not argument by which estoppel would lie – the order is valid but flawed and we have the right to demand its emendation. Again it's possible that we would argue the order is a nullity, but we do not reach the point now.

– 13 –

And that's because, as argued above, your honor has no authority to do anything as to the order allegedly violated other than "monitor compliance with it," certainly no authority to adjudicate contempt of it or decide whether to do so.

Therefore, and for that reason only, and before we ignore anything on grounds of jurisdictional bar, we request your honor confirm that he indeed lacked all authority to sign the order to show cause (civil or criminal) and order it stricken as the legal nullity it is).

While that request is pending, we will maintain the position that, as it is a legal nullity, it has not actually triggered criminal process, or anything, and therefore will abstain from the actions we would otherwise need to take in self defense, if it were the intent of this court to proceed anyway in the absence of authority to try this proceeding.

However, in the interest of time, we request that this court stay all process of every kind in this instant matter while it decides whether it has the authority to adjudicate the alleged contempt. This authority, to stay the *status quo ante*, is clearly within your authority, it is called the jurisdiction to decide jurisdiction. See *United States v. Shipp*, 203 US 563 (1906). However, it is a temporally limited authority, and exists only insofar as is necessary to preserve the status quo.

If however the court believes it had the authority to sign that order, we request being so advised immediately and an immediate 1292(b) certification and stay.[9] In the unhappy event the court refuses that, and insists on proceeding with this, then we will deem the court's refusal to provide criminal due process rights, beginning with the announcement of the contempt charges in open court, including the right to demand a jury, and to have the entire proceeding in open court, and to call witnesses, and so on, to be an action so clearly devoid of authority that it may be ignored with impunity.

## We Demand a Separate Docket

On a related note, whatever you decide, we demand that you docket this proceeding, commencing with the filing of the petition separately, on its own miscellaneous or criminal docket.

On this point we respectfully advise the court that any conceivable notion that you have the authority to repudiate the Bill of Rights, including the Sixth Amendment guarantee to public contempt proceedings – *which in this Circuit includes even civil contempt proceedings, In Re Rosahn*, 671 F2d 690 – to "protect Mr. Doe" would not withstand even the mildest scrutiny.

---

[9] *Independent Drivers v. Skinner*, 931 F2d 582 (9th Cir. 1991) (where issue was whether sole authority resided with appellate court, 1292(b) certification was correctly issued).

4935949v.1

Your honor is well aware that were this, as it should have been, separately docketed, you would be required to hold public hearings on whether anything, let alone the whole proceeding, could be hidden, and those proceedings would not be adjudicated merely by the qualified First Amendment right of access, but by our Sixth Amendment rights to have the public present and aware, and in particular in the case of criminal contempt where one judge combines all functions together, with no check and balance, the idea that you could simply avoid all of this, including a *Brandenburg v. Ohio* particularized finding of imminent grave harm that could be avoided no other way, simply by docketing it inside Judge Glasser's long dead and illegally empty docket, is simply unsustainable as anything other than participation in the conspiracy of secret courts.

Your honor simply cannot believe that by making an administrative (non)decision to let this stay (un)docketed on someone else's long dead criminal docket, the entirety of the Sixth as well as First Amendment may be ignored by incorporation of what Judge Glasser never legally did to begin with. Nothing in Doe's counsel's unsworn letter, save for few easily redactable words, was not already made a matter of public record by the Second Circuit itself, and by Doe himself, by his letter to Judge Buchwald identifying the "plaintiff's counsel" in the SDNY action as "Richard Roe." That is, there is nothing that is not already public, and yet you reflexively (i.e., unconstitutionally) sealed Doe's application.

- 15 -

* * *

Because this "special appearance" letter motion requests relief which is inconsistent with a response on the merits to the underlying petition and order to show cause, we do not at this time, but reserve all rights to, submit additional responses including jury demands and other assertions of First, Fourth, Fifth, and Sixth amendment rights.

We submit this under seal, but over objection, and demand its immediate unsealing.

Dated:    New York, New York
          February 17, 2012

Respectfully submitted,

WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP

By:     /s/
        Richard E. Lerner
Pro se and as attorney for non-party respondent
"Richard Roe"
150 East 42nd Street
New York, New York 10017-5639
(212) 490-3000
File No. 07765.00155

4935949v.1

# Addendum

We use the term sedition with precision. It is correct, at least as would have been understood by the Framers, in the context of Article III, impeachment, and the period from 1769 through 1798.

As defined in the Alien and Sedition Acts of July 14, 1798, entitled: "An act for the punishment of certain crimes against the United States," sedition includes:

> *That if any persons shall unlawfully combine or conspire together, with intent to oppose any measure or measures of the government of the United States, which are or shall be directed by proper authority, or to impede the operation of any law of the United States...he or they shall be deemed guilty of a high misdemeanor...*

In today's usage this would be similar to conspiracy to obstruct; however, in the context in which we use it we disclaim this or any statutory criminal interpretation and use the term sedition in its context, by definition, of a *political* crime.

As Blackstone understood the term "high misdemeanor" in his 1769 volume, and commented, it most typically referred to maladministration in official office, and indeed had no commonly understood meaning in English criminal law at the time, outside of such wrongful acts of officials. Thus, we use it accurately to describe a conspiracy to violate the mandatory sentencing laws of the United States (in the same way Suffolk was impeached in 1450 for repudiating victims rights and restitution laws) and – as did our forbears – we call it "sedition," *per se* impeachable. Whether the acts comprising it be statutory or common law crimes or not is of no concern to us.

Federal judges cannot operate in secret, alone or in combination with probation officers and officials of the Department of Justice, to evade mandatory restitution laws or any other mandatory sentencing laws. It's seditious.

Your honor understands the difference between motive and intent. Protecting personal safety (if a legitimate, non-pretextual concern) is an admirable motive. Doing so by concealing convictions, repudiating mandatory restitution sentencing laws, and also in this case concealing the victims' civil RICO choses in action which *per* 18 USC 1964 do not lie until entry of judgment (where, as here, the predicate acts may be dealt with as securities fraud) is evading the laws of Congress with the specific intent to cause an illegal result. That the result is illegal is made clear by *Ex Parte United States*, 242 US 27 (1916), a unanimous decision of the Supreme Court that when a judge violates a mandatory sentencing law he does so illegally and unlawfully, and no argument of inherent or implied authority will be heard. It is made illegal by *United States v. Dolan*, (2010), wherein the Supreme Court affirmed the Congressional mandate to sentence criminals to restitution is above any other law whatsoever.

Orders intended to restrain a citizen from revealing this are *per se* jurisdictionally barred, unless this court believes a court can *de facto* enjoin its own impeachment, self evidently an act devoid of Article III authority, as impeachment is the ultimate political, thus non-justiciable, question. *See Nixon v. US*, 506 US 224 (1993).

Exhibit L

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | : Criminal Action<br>: No. 98CR01101 |
| | : |
| —against— | : February 27, 2012<br>: 10:13 a.m. |
| | : |
| JOHN DOE, | : Brooklyn, New York |
| Defendant. | : |

. . . . . . . . . . . . . . . . . . . . . . . . . :

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE BRIAN M. COGAN
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Government: | LORETTA LYNCH, United States Attorney<br>Eastern District of New York<br>271 Cadman Plaza East<br>Brooklyn, New York 11201<br>BY:  TODD KAMINSKY, Esq.<br>     EVAN NORRIS, Esq.<br>     LISA KRAMER, Esq.<br>Assistant United States Attorneys |
| For the Defendant:<br>(John Doe) | MICHAEL P. BEYS, Esq.<br>JASON BERLAND, Esq.<br>NADER MOBARGHA, Esq. |
| For Richard Roe: | RICHARD E. LERNER, Esq. |
| Court Reporter: | Lisa Schwam, CSR, CRR, RMR<br>225 Cadman Plaza East, Room N373<br>Brooklyn, New York 11201<br>(718) 613-2268 |

Proceedings reported by machine stenography, transcript
produced by Computer-Aided Transcription.

```
 1            THE COURTROOM DEPUTY:  Roe v. Doe, Docket No. 98CR1101.
 2            Counsel, please state your appearances, starting with
 3     the government.
 4            MR. KAMINSKY:  For the United States, Todd Kaminsky,
 5     Lisa Kramer, and Evan Norris.  Good morning, Your Honor.
 6            THE COURT:  Good morning.
 7            MR. BEYS:  Good morning, Your Honor.  For John Doe,
 8     Michael Beys, Jason Berland, and Nader Mobargha from the firm of
 9     Beys, Stein & Mobargha.  Good morning.
10            THE COURT:  Good morning.
11            MR. LERNER:  Good morning.  I'm Richard Lerner.  I'm
12     appearing for Richard Roe.
13            THE COURT:  Good morning.
14            MR. ROE:  I am appearing for Richard Lerner.  Your
15     Honor asked me to identify myself.
16            THE COURT:  I'm sorry; say that again.
17            MR. ROE:  I'm appearing for Mr. Lerner.  Do you wish me
18     to use my name as I'm admitted in this Court or do you wish me
19     to use the --
20            THE COURT:  What do you mean you're appearing for
21     Mr. Lerner?  He is not a party here.
22            MR. ROE:  He is indeed.  This is a response to an
23     application to hold both of us in contempt.
24            THE COURT:  I see.  And so you're appearing --
25            MR. ROE:  I'm representing him in this application.
```

1        THE COURT:  And you have no conflict of interest in

2  doing that?

3        MR. ROE:  If we do, you may assume on our

4  representation mutually that it has been waived to our mutual

5  satisfaction.

6        THE COURT:  Well, sir, it's not entirely up to you.  As

7  I understand it, there are two parties whom contempt is sought

8  against.  You're telling me each of you is representing the

9  other, even though I could find that either one of you is in

10  contempt.  Each of you have an incentive to exonerate yourself

11  and, to that extent, you're united in interest.  And each of you

12  have an incentive, to the extent you are not exonerated, to pin

13  responsibility on your client.

14        Why is that not a conflict of interest?

15        MR. ROE:  Well, first of all, as a practical matter --

16        THE COURT:  No.  Let's talk about what the rules

17  require.

18        MR. ROE:  I expect that both of us will take

19  testimonial privilege and, therefore, I don't think it's going

20  to be a problem.  I doubt that either one of us will be

21  testifying.

22        THE COURT:  You're -- I'm sorry; I don't understand

23  what you just said.

24        What do you mean, "testimonial privilege"?

25        MR. ROE:  I mean, that I believe, although the issue

1    hasn't come up yet, that Mr. Lerner will assert Fifth Amendment,

2    whether this be civil or criminal, and so will I, in which case

3    there isn't going to be testimony from either one of us.

4          THE COURT:  Is there going to be argument from either

5    one of you?

6          MR. ROE:  Yes.

7          THE COURT:  Then the conflict is present, sir.

8          MR. LERNER:  Our arguments are going --

9          THE COURT:  Who are you speaking for now, Mr. Lerner;

10   yourself or your client?

11         MR. LERNER:  I'm speaking for Richard Roe.

12         THE COURT:  All right.  Go ahead.

13         MR. LERNER:  There will not be a conflict because we

14   will be presenting -- our arguments will be parallel, similar

15   arguments, same position.  We are not going to be pointing

16   fingers at each other.  And we're both going to -- neither of us

17   will be testifying.

18         MR. ROE:  If I may, if Your Honor would give me 30

19   seconds, we have a motion before the Court to declare that it

20   lacks subject-matter jurisdiction.

21         THE COURT:  Yes.  That motion is denied.  I have

22   subject-matter jurisdiction.

23         MR. ROE:  May I request, then, a 1292(b) certification

24   on the issue?

25         THE COURT:  You may request it.  It is denied.

```
1        MR. ROE:  All right.  May I request a stay pending a
2   writ of prohibition?

3        THE COURT:  You may request it.  It is denied.

4        MR. ROE:  All right.  Thank you.

5        THE COURT:  Let me hear from the other parties as to
6   whether there is an objection to proceeding with two alleged
7   contemnors, each representing the other.

8        MR. KAMINSKY:  Your Honor, may I very quickly point out
9   that prior to coming here today, based on the notice of motion
10  filed before Your Honor, it says, "Notice of motion, Richard
11  Lerner, pro se."

12       THE COURT:  Right.  That was my understanding.

13       MR. ROE:  I was only admitted today.  He couldn't have
14  put anything else on there until I got admitted.  Nobody was
15  trying to fool the Court.  I became admitted today for this
16  purpose.

17       THE COURT:  Who admitted you today?

18       MR. ROE:  I waived in.  I got a Certificate of Good
19  Standing from Southern District at 9 o'clock.  Brought it here,
20  paid the money, swore in, and I'm admitted in Eastern District
21  as of 9:45.

22       THE COURT:  Did you disclose when you got your
23  certificate that you were the subject of a contempt motion?

24       MR. ROE:  When I got the certificate from Southern
25  District?
```

```
 1          THE COURT:   No.  In the Eastern District.

 2          MR. ROE:   When I came in here and swore in?

 3          THE COURT:   Yes.

 4          MR. ROE:   I just did it half an hour ago, and there was

 5     nothing that says are you the subject of any disciplinary -- if

 6     I did it wrong, I apologize, but I haven't been found or

 7     adjudged in contempt; and particularly since this is, no matter

 8     how they label it, likely a criminal contempt proceeding, I

 9     presume incorrectly -- and I'll apologize if I'm wrong -- that

10     presumption of innocence applies.

11          THE COURT:   Let me return to my original question.

12          MR. KAMINSKY:   Yes, Your Honor.  With the caveat, Your

13     Honor, that I'm not exactly certain what Your Honor was planning

14     on going forward with this morning, there is obviously a big

15     problem that counsel is not adequately represented in that there

16     are conflict issues that are obviously present.  Should there be

17     anything later that would need to have a standing record that

18     everyone could support, and that would be obviously legitimate,

19     there is clearly a problem right now that the government is

20     loath to continue in this current situation.

21          MR. BEYS:   Judge, if I may, I'd also like to add

22     something to Your Honor's point that Mr. Lerner and Mr. Roe have

23     an incentive to put liability on each other.  I would note for

24     the Court a February 10th fax to Judge Glasser which Mr. Lerner

25     writes on behalf of Mr. Roe, basically accusing Judge Glasser of
```

1    willfully participating in a scheme to defraud Doe's victims in

2    whatever it is they've been claiming all along.

3         I just want to quote the language because it shows

4    exactly what Your Honor is concerned about, which is the finger

5    pointing and the distancing from each other.  Mr. Lerner is very

6    careful to say, "My client maintains that such acts constitute

7    the willful depravation of and indeed the defrauding of

8    Mr. Doe's crime victims of their property rights."  And later on

9    again he is careful to say, "My client."

10        It's exactly what Your Honor is concerned with, and

11   it's a very real concern.

12        THE COURT:  Okay.  Then I take it that both of the

13   proponents of the contempt order see a difficulty in the

14   exchange of representations which I've been advised of for the

15   first time this morning.

16        All right.  We're going to adjourn till Friday at

17   11:00.  I want an exchange of letters from the parties by

18   Thursday morning as to why this proposed representation is or is

19   not proper.

20        Yes, Mr. Beys?

21        MR. BEYS:  Judge, unfortunately, Mr. Berland and I will

22   be in Miami for the White Collar Conference.  I don't know if

23   anyone from the government will be there.

24        Could I ask for Monday?

25        MR. ROE:  I have no problem, Your Honor.

```
1          MR. LERNER:  No problem here.

2          THE COURT:  Monday at 10 o'clock a.m.  Now, let me say

3     a couple of things just to clarify.  I've already made some

4     rulings.

5          Mr. Lerner -- and I'm speaking to you as Mr. Roe's

6     counsel -- you are pressing the motion to recuse that's stated

7     in your papers?

8          MR. LERNER:  Yes, we are.

9          THE COURT:  All right.  That motion is denied.  No

10    reasonably objective person could see any conflict here.

11          Now, let me also note that what we have here is very

12    clearly a civil contempt.  I am not at all sure it works as a

13    civil contempt.  The only provision that's been pointed out to

14    me as to which there may be a contempt is the second paragraph

15    in the Court of Appeals summary order filed February 14th, 2011,

16    which simply notes that the Court is referring to Richard Roe as

17    Richard Roe because the disclosure of his true identity might

18    lead to the improper disclosure of materials here at issue.

19          That is not a decretal paragraph; it is simply a

20    statement of the reason why the Court of Appeals is using a

21    pseudonym.  That is not to say that the disclosure of Roe's true

22    identity may not be contemptuous.  One inference that could

23    possibly -- although I am not presently drawing any such

24    inference -- but one inference that could be drawn is that there

25    is a scheme between Mr. Lerner and Mr. Roe, or either one of
```

1  them, to undermine the injunctive orders that have been

2  previously issued, and one means of undermining those injunctive

3  orders would be the disclosure of the true identity of Richard

4  Roe.

5      That fact, combined with others, both public and

6  nonpublic, might well lead to the harm which the injunctive

7  provisions entered by the Second Circuit and Judge Glasser

8  expressly sought to prevent. But that theory has not been made

9  before me on this motion. I've only been pointed to that first

10  recital paragraph in the Second Circuit's order. And as I say,

11  it is not a decretal paragraph.

12      I also think there are limitations in the context of

13  civil contempt with regard to the remedy sought. It is true

14  that if there is a civil contempt, the movant is entitled to

15  recover their attorneys' fees, but so what. If what is being

16  sought here is to stop violations, I think we can all be

17  assured, based upon the conduct of Mr. Roe and Mr. Lerner, that

18  the attorneys' fees incurred on this motion aren't going to do

19  anything.

20      Because it is entirely possible, although I have formed

21  no conclusion, that there has indeed been a criminal contempt

22  here, I am referring the matter for criminal prosecution to the

23  United States Attorney. That, to me, is the proper mechanism

24  for adjudicating whether a contempt of the injunctive provisions

25  themselves, not mere background recitals, has occurred.

1    I will also note that I think it's very unusual that
2    the government is allowing a party that the government might
3    seek to protect to protect himself. I know the U.S. Attorney's
4    Office is quite busy. I have not yet met an Assistant that
5    doesn't work really hard, but I will say I can't think of
6    anything going on there that is more important than letting
7    actual and potential witnesses know that the government will
8    protect them.

9        That's why I'm referring this for prosecution. It is,
10   of course, the U.S. Attorney's decision whether to prosecute or
11   not. If the U.S. Attorney declines, then it will be up to me to
12   determine whether to appoint someone to prosecute privately. I
13   would recommend that if there is going to be such a prosecution
14   based upon appropriate charges, that the relief sought be
15   limited to $5,000 and six months imprisonment, but, again,
16   that's the U.S. Attorney's decision.

17       Now, I want the movants, particularly Mr. Beys, but
18   obviously he is consulting with the government, to determine
19   before this hearing on Monday if we are in the proper forum here
20   based upon what I've said or whether there are other or no
21   actions that should be taken; because if all I've got here is
22   Richard Roe told somebody who he was, I am not sure at all that
23   I can find that, by itself, is a per se violation of any of the
24   injunctive provisions.

25       So I will see you all Monday at 10:00 a.m. Let me

```
 1    check one more thing.  I want to make sure there's no more open
 2    issues from the emergency motion that Mr. Lerner filed.
 3              MR. ROE:  With respect, there are, Your Honor.
 4              THE COURT:  Let me hear from Mr. Lerner.  He is the
 5    attorney who filed it.
 6              What's left, Mr. Lerner?
 7              MR. LERNER:  Well, first I'd like to note that this
 8    matter is not on the Court's public schedule today.  We'd ask
 9    that any further proceedings in this court be publicly
10    documented and the proceedings take place in an open courtroom.
11              THE COURT:  I have not sealed this courtroom.  Is it
12    anyone's understanding that this transcript is sealed?
13              Your request is denied as moot.  Is there anything you
14    want that you're not getting?
15              MR. LERNER:  Well, Your Honor, the public has a right
16    to advanced public notice of court hearings.  This was not
17    posted.
18              MR. ROE:  1 believe my client would press that Your
19    Honor docket --
20              THE COURT:  Excuse me.  I'm not recognizing you as his
21    attorney until the conflict issue is resolved.  I'm recognizing
22    him as the attorney who filed the motion for relief before me,
23    and I will hear only from him.
24              MR. LERNER:  Fine, Your Honor.  We've requested that
25    this be docketed under a separate index number.
```

```
 1          THE COURT:  Well, I'm not going to do that.  I might

 2    open this matter; I'll think about that.  You can both address

 3    that further in the letter I'm going to get on Wednesday.

 4          Anything else in your motion I didn't cover,

 5    Mr. Lerner?

 6          MR. LERNER:  We'll be moving to disqualify the

 7    government.  There's ample precedent that the government

 8    cannot --

 9          THE COURT:  I'm asking what's in your motion.  I'm not

10    hearing new motions.

11          Is there anything else in your motion?

12          MR. LERNER:  No, Your Honor.

13          THE COURT:  All right.  Then I'll see you on Monday.

14    Thank you.

15          (Time noted:  10:31 a.m.)

16          (End of proceedings.)

17

18

19

20

21

22

23

24

25
```

Exhibit M

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------x
In the Matter of the Motion to Unseal
Docket No. 98-1101
----------------------------------------------------x

ORDER
12 MC 150 (ILG)

GLASSER, United States District Judge:

  Motions were made in United States v. John Doe, 98 CR 1101, a case that was

sealed at its inception on December 10, 1998, to unseal the docket sheet and the

documents indexed on it. The history of events which led up to those motions are, by

now, assumed to be known and for purposes of this motion need not be retold. A

separate caption, as noted above, and a separate docket number, 12 MC 150, was created

to be the repository of all filings relevant to those motions in the interests of judicial and

administrative expediency. Those motions are currently pending before the Court.

  In an Order issued on August 27, 2012, familiarity with which is assumed, Dkt.

#42, I granted the motion to unseal the docket sheet only and scheduled a future

hearing to determine whether unsealing any sealed document is required by a

compelling interest that overrides the qualified First Amendment and common law

rights of access. The first hearing was held on October 9, 2012 in a courtroom closed to

the public and the press. In re The Herald Company, 734 F.3d 293 (2d Cir. 1984);

United States v. John Doe, 63 F.3d 121 (2d Cir. 1995). The second hearing was held on

October 23, 2012 and given the volume of documents required to be examined, at least

one and perhaps two more hearings will be required to complete the process. The

record of those hearings and the documents to remain sealed will be available for

appellate review. Thus, it bears noting that the only issue for determination pending

before the Court is the propriety of keeping documents sealed.

On October 23, 2012, Richard Lerner ("Lerner") and Frederick M. Oberlander ("Oberlander"), on behalf of their respective clients, filed under this docket number a "Joint Request for Judicial Notice," attached to which were 17 exhibits totaling 742 pages. Among them are a presentence report of another defendant (Ex. F); a letter from yet another defendant objecting to statements in his presentence report (Ex. E); assorted letters from defense counsel and Assistant United States Attorneys in other criminal cases; a 309 page House of Representatives Committee Report (Ex. P), and a 285 page House of Representatives Hearing (Ex. Q). That Request for Judicial Notice and the attachments to it bespeak an indifference to their irrelevance to the discrete pending issue of document sealing.

## Discussion

I. Fed. R. Evid. 201 provides for the taking of judicial notice of adjudicative facts. Commentators and precedent agree that the specified fact to be judicially noticed must be relevant and lawyers should specify precisely the fact to be noticed. 21B Charles A. Wright & Kenneth W. Graham, Federal Practice and Procedure: Evidence § 5104(2d ed. 2005); United States v. Byrnes, 644 F.2d 107, 112 (2d Cir. 1981) (trial judge did not abuse his discretion in refusing to take judicial notice of a document of minimal relevance); Whiting v. A.A.R.P., 637 F.3d 355, 364 (D.C. Cir. 2011) (material generated by Congressional investigation not relevant); Trans-Sterling, Inc. v. Bible, 804 F.2d 525, 528 (9th Cir. 1986) (judicial notice need not be taken of facts irrelevant to decision); United States v. Burlington N. & Santa Fe R. Co., 520 F.3d 918, 930 n.2 (9th Cir. 2008) (judicial notice declined of E.P.A. proceedings that "do not have a direct relation to main issue.") United States v. Falcon, 957 F. Supp. 1572, 1585 (S.D. Fla. 1997) (A court may

refuse to take judicial notice of facts that are irrelevant to the proceedings.) That limitation of relevance on judicial notice compels the denial of their Request.

II.      28 U.S.C. § 1927 provides in relevant part that "Any attorney . . . admitted to conduct cases in any court of the United States . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the Court to satisfy personally the . . . costs, expenses and attorney's fees reasonably incurred because of such conduct.

A district court may authorize sanctions pursuant to that statute when three conditions are met: (1) "the attorney's actions are so completely without merit as to require the conclusion that they must have been taken for some improper purpose; (2) the attorney engages in conduct constituting or akin to bad faith, and (3) the Court satisfies the procedural requirement of notice and an opportunity to be heard." Gollomp v. Spitzer, 568 F.3d 355, 358 (2d Cir. 2009). The filed Request for Judicial Notice satisfies all three sanction prerequisites. I am driven to conclude that Fed. R. of Evid. 201 was seized upon as providing the pretext for filing a documentary stew.

Sanctions may also be imposed to make manifest the inherent power of the Court "when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons . . . so that the very temple of justice has been defiled." Chambers v. NASCO, Inc., 501 U.S. 32, 46 (1991). As a pre-condition to the exercise of that power, the Court must find that the filed "Request" was without a colorable basis, asserted in bad faith for improper purposes Schlaifer Nance & Co. v. Estate of Warhol, 194 F.3d 323, 336 (2d Cir. 1999). A filing of 742 pages of requests for judicial notice having no relevance to the very discrete issue pending before the Court drives the Court to conclude that those pre-conditions

3

are satisfied.

Based on the foregoing explication of the power of the Court, Lerner and Oberlander are here by directed to show cause at 4:00 p.m. on November 19th, 2012, why sanctions should not be imposed for the vexatious, oppressive "Request for Judicial Notice" filed in 12 MC 150 on October 23, 2012.

SO ORDERED.

Dated:     Brooklyn, New York
           November 13th, 2012.

I. Leo Glasser

4

Exhibit N

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------)
*IN RE* UNSEALING THE DOCKET AND CONTENTS          12-MC-150 (ILG)
THEREOF OF U.S. v. SATER, 98-CR-1101 (EDNY)
------------------------------------------------------------------)

### OMNIBUS MOTION

1.  For disqualification of Federal Judge I. Leo Glasser pursuant to 28 U.S.C. §455;

2.  For immediate disclosure of all *ex parte* communications in this and related matters;

3.  For referral to the United States Attorney, NDNY, for the criminal investigation of the following attorneys for their participation in racketeering enterprise corruption and criminal conspiracy in connection with this and underlying and related matters;

| *At Mobargha, Stein, Beys* | *At Morgan Lewis Bockius* | *At the U.S. Attorney* |
|---|---|---|
| Nader Mobargha | Kelly Moore | Todd Kaminsky |
| Michael Beys | Leslie Caldwell | |
| | Brian Herman | |

4.  For the disqualification of Mobargha, Beys, and Kaminsky, for their participation in the aforesaid racketeering enterprise corruption and criminal conspiracy;

5.  For expedited discovery and subsequent full due process adversarial hearing in connection with the above requests, for the determination, *inter alia*, whether the aforesaid racketeering enterprise corruption and conspiracy so infect the Eastern District that its disqualification in the entirety is required in the interests of justice;

6.  For the immediate disclosure of Sater's 2004 and later PSRs in the interests of justice;

7.  For the immediate disclosure of all documents and transcripts in this and all related matters within this court's jurisdiction on account of the constitutionally insurmountable public interest in knowing all that has gone on in such matters.

8.  For stay *sine die* of the Rule 11 order to show cause pending resolution of the above.

Frederick M. Oberlander
Counsel for Lorienton Palmer
28 Sycamore Lane (PO Box 1870)
Montauk, NY 11954
212-826-0357 phone
212-202-7624 fax
fred55@aol.com

## PRELIMINARY STATEMENT

The accumulation of events now makes inarguable the conclusion that AUSAs, defense attorneys, and probation officers have committed and conspired to commit multiple, related crimes, engaging in enterprise corruption in common, coordinated zeal to bring about and cover up Sater's illegally concealed racketeering conviction, his use of that concealment to commit further crime, and their roles in its misprision, aid, and abettance. They have forfeited the right to continue in this and related proceedings, and, we aver, to practice law, for that matter to remain at large in society without being called upon to stand and deliver, to answer for their crimes.

The same accumulation of events also makes inarguable that your honor presides over this and related matters in violation of 28 U.S.C. §455(a) and (b)(1), having failed to disqualify yourself despite Congressional mandate you do so because of, respectively, your appearance of bias and lack of impartiality, palpably obvious to, let alone reasonably questioned by, an objective, informed observer; and (2) your knowledge of disputed evidentiary facts you obtained outside this proceeding, or *ex parte*, *a fortiori* facts which you have wrongfully withheld from us.

Now, given what must appear to that objective observer to be intentionally chilling, retributive, *in terrorem* threats to sanction us for exercising our First and Fifth Amendment rights - rights no court may deny - to introduce relevant evidence in support of meritorious argument, <u>and in particular in light of the documentary evidence we now proffer</u>, that observer cannot rationally conclude but that your honor appears to be in criminal conspiracy with *at least* Nader Mobargha and Michael Beys, Sater's lawyers, to deprive us and our clients of our rights. Our and our clients' interests thus align with those of Sater's apparently still uninformed victims (many of whose identities we now know are known or available to you) in respectfully demanding you leave the bench in these matters forthwith.

## ARGUMENT

On September 10, 2012, the Second Circuit upheld a sentence of 8 years and $25,000,000 in fines given Myron Gushlak for his conviction, on plea, for securities fraud. The court expressly held that Judge Garaufis committed no error in fixing such a huge fine and refusing to credit for acceptance of responsibility because Gushlak, who had, like Sater, cooperated in return for keeping his conviction secret for years, just as this court kept Sater's conviction secret for years[1], spent most of the "secrecy years" defrauding others, starting with his own business partners, from whom he illegally, fraudulently, concealed his secret plea to securities fraud, and from new victims to whom they sold securities but, again, from whom he illegally withheld the fact of his secret conviction, the court finding no error in the trial court's conclusion that this denial of reality, this concealment fraud especially in the presence of a duty to disclose, marked Gushlak as a recidivist fraudfeasor who deserved to have the book thrown at him. This is from Judge Garaufis's comments during Gushlak's sentencing proceeding 03-CR-00833:

> [D]efendant was far from a model cooperator. There are substantial and troubling indications that defendant regarded the secrecy of his cooperation not as a necessary protection of his future usefulness to the government but as a license to continue to deceive those with whom he conducted business.
>
> * * *
>
> The court can only infer from this behavior that defendant was less concerned with this court's sentencing decision than he was with presenting himself from being outed as a convicted felon and fraudster because of the obvious negative impact that information would have on his business activities.
>
> While defendant argues that he lied to [his business partner] because he believed he was obligated to do so by his cooperation agreement, he freely admits that he did not at any time seek the government's advice on how to handle the inquiry which prompted his lie.

---

[1] There is no way to know whether keeping Gushlak's conviction secret was plausibly legal, because Judge Garaufis still has not docketed the transcript of his plea hearing even after almost a decade now. We can reasonably conclude it was illegal given that it would have to have been a secret blanket sealing order and as we have argued in our underlying motion to unseal and as is currently before the Supreme Court, even a real (as in actually existing) blanket sealing order is facially unconstitutional, as it eliminates the court's obligation to continue to make individual closure decisions. Note again this is another EDNY case where way after sentencing things are still hidden.

> Indeed, defendant's sentencing submissions indicate that keeping secret the fraudulent schemes
> that are the basis for this conviction has always been a central goal of defendant's cooperation.
>
> * * *
>
> [D]efendant earned a fortune speculating on penny energy stocks mere months after telling the
> government that he lacked the means to pay a relatively small forfeiture judgment, but failed to
> tell the government this until after he funneled what now amounts to $50 million into an
> irrevocable trust he established for the benefit of his children.
>
> **Defendant admitted to the court that even though he knew he would be subject to a fine and
> an order of restitution as a result of a guilty plea, defendant did not consult with the
> government before placing these substantial assets into a trust which is potentially beyond
> the reach of this court's legal process. Defendant never approached the government to ask
> how he might use his sudden wealth to pay restitution to the victims of his criminal conduct.**

The Second Circuit and Judge Garaufis know a serial securities fraudfeasor and mobster who corruptly takes advantage of "sealing orders" to defraud people when they see one. They saw one. We presume this court does as well; for example, it had one in the witness box on June 21, 2010 when Sater testified before it, and was looking right at him.

The Second Circuit didn't think that Gushlak was justified in committing these concealment frauds[2] and hiding his money from what he knew would be an inevitable fine and order of restitution. Perhaps Gushlak's cooperation agreement required him to turn over all his assets to fulfill any restitution order[3].

After all, Sater, like Gushlak, hid wealth from what he knew would be inevitable orders of restitution, including hiding $8,000,000 in partnership distributions from Bayrock by

---

[2] Perhaps they would have if Gushlak had argued his safety was at risk if he didn't steal the money? You know, like Sater argues, "I had to commit all these concealment frauds at Bayrock by hiding my conviction or my life would be in danger, really, I only participated in hundreds of millions of dollars of notional concealment fraud to protect my family, I swear, I had to do it..."

[3] For that matter, perhaps Sater's cooperation agreement requires the same and Sater and those protecting him and their culpability in the coverup would do anything to avoid revealing that. Of course, this court can't unseal what isn't on its docket to begin with, **which is why counsels, knowing cooperation and plea agreements are not kept in judicial files, requested the court take notice of the absence from its own docket of the cooperation,** upon which notice we would move for an explanation why court papers have been filed left and right for years claiming Sater's plea agreement and cooperation are "sealed" when they aren't even in court.

pretending they were "loans" (if correctly accounted for as distributions they would have been subject to charging order liens in favor of any victim with a restitution order) and lied to his probation officer that he had no money, which the officer duly reported in his PSR, notwithstanding Sater was living in an $11,000/month rental mansion, about to buy a $1,800,000 home, and skimming nearly $1,000,000 a year from the firm.

Of course, we can only make public that all that and more are revealed in Sater's 2004 PSR because the Supreme Court of the United States gave us the right to do so. **If it had been up to this court, no one would ever know of the criminal corruption of the probation officer and DOJ (but see *infra* for yet more), at least not from us, because this court gagged us from telling anyone without even hearing any argument as to prior restraint, core speech or anything else. The First Amendment simply didn't exist in Brooklyn for this court[4].**

And of course because we can make public that those admissions against penal interest (as to the probation officer), of his knowing participation in what Judge Garaufis and the Second Circuit have confirmed is aggravated felony fraud, it follows we can make public the inescapable conclusion that this court knew perfectly well what was going on with Sater, or was willfully blind to it, unless this court would have us believe it doesn't read PSR's, even when it's issuing prior restraints it doesn't read them, or at least didn't read Sater's, and didn't read the allegations in the RICO complaint it has had for almost three years now.

And still this court did nothing to unseal anything for years, ignoring all our requests to do so, ignoring everything until the accident that let it out.

---

[4] Charmer industries never reached the First Amendment issue, presumably because no court has ever held that state law enforcement agencies enjoy the same First Amendment rights as do Mr. Oberlander, Mr. Kriss, Mr. Ejekam, and everyone else this court ordered not to tell of its apparemt involvement in this corruption.

6

Nor is this just Gushlak. We call the court's attention to the Ageloff restitution matter, just argued weeks ago before the Second Circuit. One issue there is whether Judge Dearie properly ordered Ageloff, a fellow fraudfeasor who often worked in cooperation with Sater, Ageloff at Genovese-controlled Hanover Sterling and Sater at Genovese-controlled White Rock, properly ordered Ageloff to pay some $200,000,000 in restitution in 2011, fully 13 years after he pleaded guilty, roughly at the same time Sater did to substantially similar underlying facts.

One thing we do know is that Ageloff wasn't in the court that day to hear argument, because he's serving time in federal prison in Florida. His crime? Hiding his wealth, including in trusts he set up for his wife and children, to evade what he knew would be inevitable fines and restitution (and presumably extrinsic civil liability, though that itself wasn't charged).

So let's see:

When Gushlak takes advantage of his "sealed" secret fraud conviction to perpetrate concealment fraud against his business partners and new victims, and hides the millions he earned to keep such from his victims, including by family trusts, he gets slammed with 8 years in federal prison for securities fraud and a total of $42,000,000 in restitution and fines.

When Ageloff hides his millions to keep it from his victims, including by family tursts, he gets five years in federal prison for money laundering and a $200,000,000 restitution order.

When Sater hides his millions (if the court look carefully it will find – wait for it – that in 2008, Sater funded what we'll call an "EDNY Special" family trust for, you guessed it, his wife and children by transferring his membership interests in Bayrock to the trust, which then flipped it right back to Bayrock for approximately $1,500,000; why be surprised, hiding wealth in trusts is the "thing to do" among EDNY felons who want to evade all responsibility to their victims)...

When Sater hides his millions – <u>including the millions he received for surrendering the membership interest in Bayrock by trust which proves his felony perjury when he testified before this court on June 21, 2010 that he was never a member, perjury for which his probation could have been revoked and he resentenced to nearly 20 years in prison on the RICO charges</u> – the only thing that happens is that those who find out about it are threatened with imprisonment if they tell anyone on a claim that it's necessary "to protect his safety" yet are barred from introducing any evidence anywhere that such claims are at least now, and for years have been, utterly false, fraudulent and pretextual, *infra.*

(Parenthetically, given the request of Sater's lawyers this morning that the court rule the RICO complaint utterly without merit [of course it has no jurisdiction to rule anyway, as the complaint is not before it, but before Judge Engelmayer of Southern District[5]], the court should consider itself hopelessly conflicted as a ruling that the complaint, which as the whole world now knows contains such or similar allegations of Sater's concealment frauds, nevertheless states no cause of action under any plausible theory of existing or even new law, it's open season for cooperators now, even more than usual in the Eastern District, claims by the Gushlak victims [we understand there are quite a few in Germany alleging he defrauded them of huge sums while hiding his conviction] must fail. In the alternative, if the court finds the complaint states meritorious claims, it will – and ought to – have much to answer for in gagging this up for years. No court can credibly rule in such a situation in which it effectively indicts itself if it finds – as it must – that somewhere inside a 168-page 800 paragraph complaint written with the benefit of the finest legal thought in the country in the substantive law is not devoid of merit.

---

[5] Mr. Sater and Bayrock Group Inc., a money laundering artifice he created to hide still more money he took from Bayrock, have waived service of the complaint and as to them issue has been joined. They are certainly free to move before Judge Engelmayer for whatever relief they can get.

Back to Gushlak. Recall that Judge Garaufis said,

> While defendant argues that he lied to [his business partner] because he believed he was obligated
> to do so by his cooperation agreement, **he freely admits that he did not at any time seek the
> government's advice on how to handle the inquiry which prompted his lie.**

Now, anyone with an IQ above wood would know that, just as it's been said that "One

may have a First Amendment right to free speech, but one doesn't have a First Amendment right

to be a postman," even a cooperation agreement doesn't mean you can put yourself in harm's

way by, you know, taking a partnership in a firm issuing securities and borrowing billions of

dollars and having to report about and disclose its principals' prior fraud convictions. There are

plenty of other jobs one can take that don't require stealing money from new victims and

defrauding your partners in breach of fiduciary duty.

(If Sater/Gushlak had been a lawyer, would this court have minded if he continued to

argue before it after his conviction, hiding it from the bar? We're curious. Doctors hiding their

convictions from medical licensing boards? Teaches hiding convictions from schools?)

But all this pales behind certain events which occurred in April and May 2011, which

began what now with this court's order to show cause force our hand and compel we move to

recuse for the appearance of bias based on collusion and criminal conspiracy.

In late April 2011 Mobargha and Beys approached Richard Lerner and said that the

EDNY United States Attorneys Office was twisting their arm to force a settlement because, they

said, the AUSA's were terrified that the Second Circuit would uphold our First Amendment right

to reveal what we knew from the PSR and other documents as to all this apparent corruption.

Attached hereto is the settlement proposal they came up with. It is notable for several

things, but most notable for the fact that, first, we would have to withdraw our First Amendment

arguments and never make such again; second, Sater would admit the truth, but only in secret, sealed RICO proceedings before Judge Buchwald, apparently again the hell with his victims; and third, and most important, Sater would testify (and so presumably not perjure himself) that the government told him to hide his conviction, even from Bayrock

The government told him to do what Judge Garaufis and the Second Circuit deem serial recidivist crime and repetitive criminal fraud.

**For the sake of those involved, they had better hope they have and will produce upon subpoena a very high-level DOJ authorization for that, specifically noting that Sater was authorized to participate in multi-billion dollar notional frauds as a top echelon level informant – and as concealment fraud and conspiracy are ongoing crimes they had better hope that's open-ended, as it should be self-evident that if it's a crime to hide your conviction and misuse the sealing to facilitate it, it's a crime to conspire to do so or to aid and abet it or act to conceal it (ask the Mayer Brown partner just convicted of securities fraud for helping REFCO hide its corrupt books) and operation of an association in fact pursuant to a scheme to do so, a single scheme, let alone the others we're uncovering in the Eastern District, see supplement, creates a cause of action in enterprise corruption).**

But this court doesn't belong to the executive. This court has no luxury to refuse to enforce the laws as written. Not. Once. Not. Ever. Not. Ever. *Ex Parte United States* (1916).

Admittedly, were we to base a motion for recusal on grounds of this court's apparent bias, stating the above and more, listing every ruling devoid of legal merit, claiming the appearance of bias in the court's desire to facilitate and participate in this cover-up, we would be subject to counter-argument that all this was just a (improbably consistently one-sided) series of appealable error, that we had made a merits-based argument, though this court well knows that

merits based arguments in egregious cases like this can satisfy the appearance standard of §455(a). No, something else happened that put this over the top, viz. the Rule 11 motion.

**Attached hereto is the email cover letter from Mobargha and Beys which says, in a nutshell, Mr. Oberlander, Mr. Lerner, take this offer, because this is rigged, don't you know if Judge Glasser ever does hold a hearing to decide whether to unseal any of the documents, he will ignore all your arguments, appeals, and evidence.**

You're doing exactly that, aren't you. **Aren't you.**

Now ask yourself how it is that they knew you would do it and warned us you would do it over a year and a half ago and, mirabile dictum, you're doing it.

Perhaps they reached such an agreement with you to throw the case against us in one of the many secret ex parte proceedings we've just found out about. Perhaps they didn't. It doesn't matter, because if you wish to testify they did not, you are a fact witness and off the bench; and in any event, no sane person, let alone objective, informed person, would believe anything other than the *apparent* possibility of this court's active, collusive, criminal participation in what our coming amendment hereto will detail more fully is enterprise corruption, including its cover-up, the only question how far and to what extent it suffuses the Eastern District and the former AUSA's there now in private practice.

That's the test, whether there is apparent corruption based bias.

Fail on that.

Pending amendment and supplementation, we briefly outline the legal basis for our conclusion that this court has, *de facto, in terrorem*, and *de jure*, decided to ignore all our arguments just as Mobargha and Beys warned you would.

<u>DENIAL OF FUNDAMENTAL RIGHTS</u>

*Semble* that it is among the inalienable, fundamental rights of every citizen to participate in court proceedings free of not only actual bias, prejudice, and corruption but also free of the appearance thereof, and to have the opportunity to present legal argument and proffer factual evidence in support thereof. These are fundamental rights, rights not created by the Constitution but by natural law, rights the protection of which we the people have delegated to the government for so long as we choose to allow that government to exist and serve at our pleasure.

As stated, these are our inalienable, fundamental rights. Apparently just not in this court[6].

No other conclusion is possible. Movants have requested Article III relief, *viz.* the "unsealing" of those documents which are (or at least are supposed to be) listed on the docket of *U.S. v. Sater*, 98-CR-1101 EDNY (Glasser, J.). What is the applicable legal standard?

**Right of Access**. As to the 20% or so of the roughly 200 documents the contents of which are unknown to movants, the standard is one of a right of access.

Where the right of access is founded in the First Amendment, for example where access would be had to transcripts of plea and sentencing proceedings, access may only be denied in the presence of a compelling interest threatening immediate, irreparable near certain harm of

---

[6] As stated in the main text, the court is *apparently* predisposed to engage in mind-reading and ascribe to counsels pretextual, nefarious motives to our legal arguments. We respectfully alert the court that we are scrupulously adhering to the standards of §455(a) and requesting you step down because of the *appearance* of bias and prejudice founded in corruption and criminal conspiracy. We are not here accusing the court of actually engaging in corruption and criminal conspiracy; indeed, *whether, when, where, why, or how, and if so to what degree the court has or has not done so are properly by our choice matters of indifference to this motion.* We may, depending on what is revealed in the disclosure of the *ex parte* communications and disclosure demanded, move pursuant to §455(b) or §144 and claim actual bias, in the latter case with party affidavits in support thereof, and we reserve our right to do so, but we do not do so now. We understand the court's likely displeasure at being shown to have *apparently* engaged in despicable acts. We can only suggest the court take up with Mobargha and Beys, perhaps in one of those *ex parte* meetings, but preferably by referral to the United States Attorney for investigation (but not, of course, the United States Attorney for the Eastern District), exactly why they thought it was a good idea to write that letter.

nationally significant consequence, and only where there are no less restrictive means available to protect against that harm, and only to the least degree of restriction necessary. *Press Enterprise, In re Herald.*Where the right of access is founded in the common law, then access may only be denied upon a substantially similar balancing test depending in part on the nature of the document. *Amodeo I, II.*

Procedurally, in either case factual findings must be met and in this circuit whether the access claim be in First Amendment or common law the burden of proof (thus obviously of production) is on the person who would maintain the closure, sealing, or, in this case, "sealing."

And where the right of access claim is founded in the First Amendment, as the Second Circuit has just affirmed in *Gupta*[7], there must be an evidentiary hearing and record factual findings capable of *de novo* appellate factual review. No case has ever held that such hearing may be held and findings made in the involuntary, court-ordered absence of the movant.

No case could ever hold that. It is antithetical to any concept of due process that a party to a case may have his rights adjudicated in secret without participation by him or his counsel. We are unable to find any example of such reported anywhere, going back to the Star Chambers. There is no precedent, and no Article III authority, by which a court can purport to resolve a case or controversy minus the participation of one party to the case or controversy, let alone when he

---

[7] November 8, 2012. The 2nd Circuit held it presumptive structural error where a court closed a *voir dire*, access to which is founded in the First Amendment (thus access to transcripts of which are founded in the First Amendment, *Herald*), without satisfying substantive and procedural due process, the latter by holding an evidentiary hearing to establish documented, on the record evidence substantiating the compelling interest and lack of alternative. Notably, *Gupta* continues the Supreme Court's conflation as sufficiently identical, if not coextensive, the Sixth Amendment and First Amendment rights of open courts; indeed the *Waller* test for closure under the Sixth Amendment was explicitly adopted by the Supreme Court as the equal of the *Press Enterprise* test for closure under the First Amendment.

objects; otherwise a court would be legislating, not adjudicating, asserting "jurisdiction" over the party in name only but not in any practical sense of actually letting him function as a party.

**Right of Free Speech**. But, as to the other 80% or so of the roughly 200 documents the contents of which are known to movants, *a fortiori* as to the 155 documents authored by Oberlander and Lerner and others working with or for them, the rules changed.

Where someone is in possession of information, *a fortiori* that which is core, protected speech, a fortissimo where it has all been obtained outside of court process, then any restriction is a prior restraint and this court is well aware and needs no recitation of the substantive law that it may not be enjoined or restricted in any way absent the strictest scrutiny and in particular absent full adjudicative due process hearings establishing the requisite facts to clear and convincing evidentiary standard. Carroll v. *Princess Anne*.

For example, in this case, there are documents filed on 98-CR-1101 by Mobargha and Beys in the contempt issue which are false or misleading and which, because they contain their self-confessed admissions against penal interest that they filed such with other federal officials, not just this court, are evidence of federal felonies, including substantive and conspiracy violations of §1001 and obstruction statutes[8], beside evidence that they are, like their client, taking advantage of (again, non-existent and illegal) "sealing" orders to perpetrate crime.

Prohibiting us from revealing these crimes is outside any authority this court could possibly claim under Article III, but even if it could claim the authority it could only prohibit it, whether it calls the prohibition "sealing" or "prior restraint," upon full adversarial due process.

---

[8] We are lawfully in possession of executive branch documentation of statements made by Sater's counsel to non-judiciary government officials which demonstrate that claims of threat or perceived threat to or by Sater are fraud and we respectfully demand this court properly docket everything as to the contempt proceedings that Mr. Oberlander in his October 5, 2012 request and Judge Cogan in his October 18, 2012 docket "order" said was within your jurisdiction to docket and "unseal," not his.

14

And obviously as to what we ourselves wrote, full prior restraint analysis must be had.

Yet this court now holds secret hearings as to which we are told we may not know what the arguments are, we may not know what the factual issues are, and if we try to introduce evidence on motion we'll be charged with the equivalent of contempt for "knowingly" ignoring

That's not a chill, that's a freeze.

That's the smoking gun which completes the portrait of a court *apparently* engaged in secret and collusive deals with Sater's lawyers to, just as they said, ignore all our argument, evidence, and appeals exactly the way it is doing, de facto, in terrorem, and de jure.

That's cause for you to step down. Forthwith.

### Conclusion

This court must recuse itself due to apparent bias. We reserve the right to amend this given the court's refusal to provide enough time and notice pursuant to the Fifth Amendment let alone local rules as to motion practice. It was necessary to file quickly to forestall a claim that we filed only in response to an adverse result in the Rule 11 hearing.

We join in and adopt and ratify as if our own the motion filed by Lerner in behalf of Oberlander and the motion filed by ThomsonReuters.

Dated: New York, New York
       November 19, 2012

       /s/ Frederick M. Oberlander
       Counsel for Lorienton Palmer

Exhibit O

10-2905-cr
Roe v. United States

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

# SUMMARY ORDER

Rulings by summary order do not have precedential effect. Citation to summary orders filed on or after January 1, 2007, is permitted and is governed by Federal Rule of Appellate Procedure 32.1 and this court's Local Rule 32.1.1. When citing a summary order in a document filed with this court, a party must cite either the Federal Appendix or an electronic database (with the notation "summary order"). A party citing a summary order must serve a copy of it on any party not represented by counsel.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 29th day of June, two thousand eleven.

PRESENT:

> JOSÉ A. CABRANES,
> ROSEMARY S. POOLER,
> DENNY CHIN,
> > *Circuit Judges.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

RICHARD ROE, an attorney,

> *Appellant,*

JANE DOE AND JOHN DOE II, clients of Richard Roe,

> *Pro Se Appellants,*

v.

UNITED STATES OF AMERICA,

> *Appellee,*

JOHN DOE,

> *Defendant-Appellee.*

Nos. 10-2905-cr, 11-479-cr, 11-1408-cr, 11-1411-cr, 11-1666-cr, 11-1906-cr, 11-2425-cr

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

FOR APPELLANT RICHARD ROE:

Richard E. Lerner, Wilson Elser Moskowitz Edelman & Dicker LLP (David A. Schulz and Jacob P. Goldstein, Levine Sullivan Koch & Schulz LLP; Paul G. Cassell, S.J. Quinney College of Law at the University of Utah, *on the brief*), New York, NY and Salt Lake City, UT.

1

**FOR APPELLEE UNITED STATES OF AMERICA:**   Todd Kaminsky, Assistant United States Attorney (Peter A. Norling and Elizabeth J. Kramer, Assistant United States Attorneys; Loretta E. Lynch, United States Attorney, *on the brief*), United States Attorney's Office for the Eastern District of New York, Brooklyn, NY.

**FOR DEFENDANT-APPELLEE JOHN DOE:**   Nader Mobargha, Beys, Stein & Mobargha LLP, New York, NY.*

Appeal from a May 18, 2010 temporary restraining order, a June 21, 2010 permanent injunction, a July 20, 2010 temporary restraining order, and a March 23, 2011 scheduling order issued by the United States District Court for the Eastern District of New York (I. Leo Glasser, *Judge*); appeal also from orders of April 1, 2011, April 4, 2011, and May 13, 2011 of the United States District Court for the Eastern District of New York (Brian M. Cogan, *Judge*).

UPON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of the District Court permanently enjoining the dissemination of John Doe's Pre-Sentence Report is AFFIRMED.

The appeal in Docket No. 10-2905-cr is DISMISSED in part, and the appeal in Docket No. 11-1408-cr is DISMISSED in full, insofar as they challenge the District Court's temporary restraining orders of May 18, 2010 and July 20, 2010 and insofar as they challenge any related orders that may have been entered or re-affirmed on May 28, June 11, June 14, or June 21, 2010.

The appeal in Docket No. 11-1411-cr is DISMISSED because appellant has waived his opportunity to challenge Judge Brian M. Cogan's orders of April 1, 2011 and April 4, 2011.

The appeal in Docket No. 11-1906-cr is DISMISSED for want of jurisdiction.

With respect to Docket No. 11-2425-cr, the order of Judge Cogan is AFFIRMED.

The appeal in Docket No. 11-1666-cr by *pro se* appellants is DISMISSED in all respects except insofar as it challenges the District Court's permanent injunction against the dissemination of Doe's PSR; with respect to that claim, the judgment of the District Court is AFFIRMED.

The Clerk of Court is DIRECTED to close Docket Nos. 11-1408-cr, 11-1411-cr, 11-1906-cr, and 11-2425-cr upon entry of this order. The Clerk of Court is also DIRECTED to close Docket No. 11-479-cr to the extent it was not already closed upon entry of our February 14, 2011 order. *See* Order, *Roe v. United States*, Docket Nos. 10-2905-cr, 11-479-cr (2d Cir. Feb. 14, 2011).

The remainder of this cause (Docket Nos. 10-2905-cr, 11-1666-cr) is REMANDED to the District Court (I. Leo Glasser, *Judge*) for proceedings consistent with this order and with instructions (i) to rule upon the government's unsealing motion of March 17, 2011, (ii) to issue a final determination regarding whether the dissemination of the other (non-PSR) sealed documents in John Doe's criminal case, particularly those that refer to Doe's cooperation, should be enjoined, and (iii) in the event that a final determination regarding

---

* Pursuant to our order of February 14, 2011, John Doe was not invited to brief this appeal, nor has he moved to submit a brief. However, Doe has filed various letters and opposition papers in response to Roe's motions throughout the course of the appeal.

the dissemination of the other sealed documents does not result in an injunction against the dissemination of documents referring to Doe's cooperation, to enter an order temporarily staying the unsealing of any documents referring to Doe's cooperation pending an appeal by the government to our Court. In the event that the government elects not to appeal the unsealing of any documents that may be unsealed by the District Court, the government is **ORDERED** to notify the District Court and our Court of its decision not to pursue the appeal within the otherwise applicable time for taking the appeal.

It is further **ORDERED** that, pursuant to *United States v. Jacobson*, 15 F.3d 19 (2d Cir. 1994), this panel shall retain jurisdiction over any further appeals from proceedings in the District Court, including any further petitions for extraordinary writs.

It is hereby **ORDERED** that Judge Cogan shall retain jurisdiction for the limited purpose of enforcing our February 14, 2011 mandate—that is, to ensure the parties' compliance with the orders of this Court and any that have been, or may hereafter be, entered by Judge Glasser. Our panel retains jurisdiction pursuant to *United States v. Jacobson*, 15 F.3d 19 (2d Cir. 1994), over any appeals from any orders or judgments entered by Judge Cogan.

Finally, it is **ORDERED** that appellant Richard Roe is hereby warned that the Court's patience has been exhausted by his filing of six separate notices of appeal regarding the same principal legal dispute—including the filing of an appeal from a March 23, 2011 scheduling order that obviously was not a final order nor subject to any of the exceptions to the "final judgment rule," *see* Part (iv), *post*—and that any further attempts to re-litigate the issues decided by this order, or other future filings of a frivolous nature, may result in sanctions, including the imposition of leave-to-file restrictions, requirements of notice to other federal courts, and monetary penalties.

The Clerk of Court is **DIRECTED** to transmit a copy of this order to Judge Cogan.

## INTRODUCTION

Appellant Richard Roe ("Roe"), an attorney, and two of his clients, *pro se*, appeal from a May 18, 2010 temporary restraining order, a June 21, 2010 permanent injunction, a July 20, 2010 temporary restraining order, and a March 23, 2011 scheduling order entered by Judge Glasser. Because the *pro se* appellants incorporate Roe's arguments as their own and make no other independent legal claims, our legal conclusions apply to all appellants, though our order refers principally to Roe.

## BACKGROUND

### A. The SDNY Complaint and Judge Glasser's Initial Rulings

On May 10, 2010, Richard Roe publicly filed a civil RICO complaint against John Doe ("Doe") and other defendants in the United States District Court for the Southern District of New York (Naomi Reice Buchwald, *Judge*). Attached to the complaint were exhibits that included sealed materials from Doe's criminal case in the Eastern District of New York. The complaint itself explicitly referenced the confidential information in the exhibits, including the fact that Doe had cooperated with the government.

On May 18, 2010, upon an application by Doe, Judge Glasser issued an order to show cause why a preliminary injunction should not be entered against Roe's dissemination of the sealed materials from Doe's criminal case. He also temporarily restrained Roe and his clients from "disseminating the Sealed and Confidential Materials or [the] information therein." The materials in Roe's possession included a 2004 Pre-Sentence Report ("PSR"), two proffer agreements, Doe's cooperation agreement, a criminal complaint, and a criminal information. The TRO was later extended multiple times without objection (and, on some occasions, at Roe's request) until a hearing could be held on June 21, 2010.

3

At the June 21, 2010 hearing, Judge Glasser heard testimony from Roe before issuing a permanent injunction against dissemination of the 2004 PSR, pursuant to *United States v. Charmer Industries, Inc.*, 711 F.2d 1164 (2d Cir. 1983). He also directed Roe to return the PSR to the United States Attorney's Office (Roe eventually returned the PSR directly to the court). With respect to the other sealed documents, Judge Glasser extended his temporary restraining order until July 20, 2010, with Roe's consent, and requested that the parties brief whether the court had the authority to permanently enjoin the dissemination of those documents.

On July 9, 2010, Roe filed a notice of appeal concerning Judge Glasser's May 18, 2010 and June 21, 2010 orders.

On July 20, 2010, Judge Glasser held another hearing at which he recited his factual findings, including: (1) that Roe knew the documents at issue were sealed prior to his public filing of those documents; (2) that one of Roe's clients had "wrongfully taken" and had "no legal right to those documents"; and (3) that dissemination of the documents would cause "irreparable harm, which is imminent to Mr. John Doe . . . [and] would put Mr. John Doe's safety at risk." Over Roe's objection, Judge Glasser re-affirmed his ruling of June 21, 2010 regarding the permanent injunction against dissemination of the PSR and extended his TRO with respect to the other sealed documents for another 10 days. He further ordered that the permanent injunction and TRO should cover all copies of the documents at issue, and that all originals and copies of such documents were to be returned or destroyed until Roe met his "burden with respect to whether or not there is some need to maintain those documents or to keep them." The TRO was subsequently extended to August 13, 2010, by request of the parties, while they negotiated a possible settlement.

On August 10, 2010, Roe filed a notice of appeal concerning the July 20, 2010 order that re-affirmed the permanent injunction and extended the TRO.[1] Judge Glasser has not since issued a final ruling regarding the disclosure of the non-PSR sealed documents.

**B. Our February 14, 2011 Order and Judge Cogan's Assignment to Enforce Our Mandate**

On February 14, 2011, we heard oral argument on the government's motion for a temporary stay of the unsealing of the appeal. In an order issued that day orally and later in written form, we granted the government's request to keep the appeal under seal and temporarily enjoined Roe and his associates from distributing or revealing in any way any documents or contents thereof subject to sealing orders in Doe's criminal case or on appeal. *See* Order, *Roe v. United States*, Docket Nos. 10-2905-cr, 11-479-cr (2d Cir. Feb. 14, 2011). We also remanded the cause to the District Court for the Eastern District of New York for the limited purpose of allowing the Chief Judge to assign a District Judge to "implement[ ] and oversee[ ] compliance with our orders and the orders previously entered by Judge Glasser." *Id.* Pursuant to our order, then-Chief Judge Dearie referred the case to Judge Brian M. Cogan for enforcement of this limited mandate.

---

[1] On February 7, 2011, Roe also filed a petition for a writ of mandamus requesting that we order the District Court to withdraw its various injunctive and temporary restraining orders and publicly docket Doe's criminal case. We denied this petition in our order of February 14, 2011. *See* Order, *Roe v. United States*, Docket Nos. 10-2905-cr, 11-479-cr (2d Cir. Feb. 14, 2011).

On March 1, 2011, Roe submitted a letter requesting "clarification" from Judge Cogan that, notwithstanding our order of February 14, 2011, he was permitted to disseminate certain information within the sealed documents because that information was allegedly public knowledge. On April 1, 2011, Judge Cogan held a hearing regarding Roe's request. At that hearing Judge Cogan learned that Roe had not yet destroyed or returned certain electronic and paper copies of the original PSR and other sealed documents, in violation of Judge Glasser's July 20, 2010 order. Accordingly, by oral order on April 1, 2011, and by a subsequent written order of April 4, 2011, Judge Cogan ordered Roe to destroy or return any remaining electronic or paper copies of the PSR and other sealed documents, without prejudice to his ability to seek the documents if any of the various sealing orders were vacated by our Court. *See* Order, *United States v. Doe* (E.D.N.Y. Apr. 4, 2011).

On April 8, 2011, Roe filed a notice of appeal with respect to Judge Cogan's orders of April 1 and April 4, 2011.

On May 13, 2011, Judge Cogan issued a written order denying Roe's March 1, 2011 request to release certain information contained within the sealed documents. After opining that information "available to the public" was not covered by our injunction, Judge Cogan nevertheless ordered that Roe could not "extrapolate from sealed documents . . . [which] could easily be combined with and thereby tainted by Roe's knowledge of non-public sealed information." Order, *United States v. Doe* (E.D.N.Y. May 13, 2011). Upon a review of the specific statements and information that Roe intended to release, Judge Cogan further concluded that "[i]t seems obvious that Roe is seeking to fatally undermine the purpose of the injunctions by publicizing information that would render them ineffective." *Id.*

On June 15, 2011, Roe filed a notice of appeal with respect to Judge Cogan's order of May 13, 2011.

## C. Recent Events before Judge Glasser

On March 17, 2011, after learning that Doe's criminal conviction had been disclosed in a press release by the U.S. Attorney's Office for the Eastern District of New York, the government moved before Judge Glasser for a limited unsealing of the docket and certain documents in Doe's underlying criminal case. The government explicitly sought to unseal only those docket entries and documents that did <u>not</u> refer to Doe's cooperation with the government.

On March 23, 2011, Judge Glasser issued a scheduling order in which he stated that he was "uncertain of [his] continuing jurisdiction to address the controversy presented by [Roe's February 4, 2011 'demand' that the case be docketed and the government's March 17, 2011 motion for a limited unsealing of the case]." Scheduling Order, *United States v. Doe* (E.D.N.Y. March 23, 2011). Accordingly, he requested that "the government, Richard Roe and John Doe [] brief the issue of the Court's jurisdiction and submit their briefs simultaneously on April 8th, 2011." *Id.*

In addition to setting the briefing schedule, the order reflected Judge Glasser's factual finding that Roe had "knowingly and intentionally flouted a Court order" by "unilaterally deciding" to disclose information in Doe's sealed criminal case. *Id.*

On May 11, 2011, Roe filed a notice of appeal concerning Judge Glasser's March 23, 2011 order.

On April 19, 2011, upon requests from both Roe and the government, we issued an order confirming that Judge Glasser retained jurisdiction "to decide the government's motion to unseal, as well as to decide any other pending or future motions to unseal that would not result in the public disclosure of docket entries or underlying documents that reference John Doe's cooperation with the government." Order, *Roe v. United States*, Docket Nos. 10-2905-cr, 11-479-cr (2d Cir. Apr. 19, 2011) (emphasis in original).

Judge Glasser has not yet acted on the government's March 17, 2011 motion to unseal.

We assume the parties' familiarity with the remaining facts and procedural history of the case.

## DISCUSSION
### (i)

On appeal, Roe argues that the District Court violated his First Amendment rights in permanently enjoining the dissemination of Doe's PSR and requiring him to return it to the government. We review a district court's grant of a permanent injunction for abuse of discretion. *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006); *see also Sims v. Blot*, 534 F.3d 117, 132 (2d Cir. 2008) (explaining "abuse of discretion").

Under *United States v. Charmer Industries, Inc.*, 711 F.2d 1164 (2d Cir. 1983), third parties must satisfy a heightened standard in order to obtain access to a PSR, which is a sealed "court document designed and treated principally as an aid to the court in sentencing." *Id.* at 1176. Specifically, a third party seeking access to a PSR bears the burden of making a "compelling demonstration that disclosure of the report is required to meet the ends of justice." *Charmer Indus., Inc.*, 711 F.2d at 1175.

Here, Judge Glasser, who had presided over Doe's criminal case and was therefore familiar with the extent of Doe's cooperation and his assistance in obtaining the convictions of myriad violent criminals, explicitly entered a finding that releasing proof of Doe's cooperation would cause him irreparable harm and would put his safety at risk.

Judge Glasser also found that Roe had improperly refused to submit an application to the Court to unseal the report, despite his knowledge that the report was sealed and came from a sealed criminal case. *See id.* at 1170 ("[T]he presentence report is a court document and is to be used by nonjudicial federal agencies and others *only with the permission of the court.*" (emphasis supplied)); *see also In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 417 (E.D.N.Y. 2007) (enforcing a preliminary injunction requiring the return of sealed documents pursuant to the court's "inherent authority to enforce [its] orders"), *aff'd*, 617 F.3d 186 (2d Cir. 2010). Judge Glasser found, instead, that Roe had determined unilaterally that he was entitled to publicly disclose the report.

Judge Glasser balanced his findings of physical danger to Doe and the intentional defiance of a sealing order by Roe—findings that we hold were not clearly erroneous—against Roe's asserted need to use the PSR in the SDNY civil case to establish that Doe had defrauded investors and others by not revealing his

6

conviction. Because proof of Doe's conviction (as opposed to his cooperation) remains available from other public documents—including a press release by the United States Attorney's Office for the Eastern District of New York—and because the PSR is an incomplete and ultimately inadmissible document to which neither Doe nor the government will ever have the opportunity to object, *see Charmer Indus., Inc.,* 711 F.2d at 1170-71, the PSR is of dubious utility in the civil case except as a tool to intimidate and harass Doe by subjecting him to danger. Accordingly and in sum, disclosure of the report is not "required to meet the ends of justice," *id.* at 1175—indeed, quite the opposite. The District Court did not err, much less abuse its discretion, in imposing a permanent injunction against dissemination of the PSR. *See, e.g., United States v. Charmer Indus., Inc.,* 711 F.2d at 1177 (stating that a "central element in the showing required of a third person seeking disclosure is the degree to which the information in the [PSR] cannot be obtained from other sources").

(ii)

Doe argues that the District Court violated his First Amendment rights by temporarily restraining his continued possession and dissemination of the other sealed documents from Doe's criminal case.

A TRO, which is appropriate when "speed is needed . . . to prevent irreparable harm," *Garcia v. Yonkers Sch. Dist.,* 561 F.3d 97, 106 (2d Cir. 2009) (internal quotation marks omitted), is not a final judgment and is not ordinarily appealable. *See Gen. Motors Corp. v. Gibron Chem. & Oil Corp.,* 786 F.2d 105, 108 (2d Cir. 1986). To the extent we may, in our discretion, exercise pendent jurisdiction over the order pursuant to *Swint v. Chambers Cnty. Comm'n,* 514 U.S. 35, 45 (1995), we decline to do so here. Accordingly, Roe's appeal is dismissed insofar as it challenges the District Court's temporary restraining orders of May 18, 2010 and July 20, 2010.

(iii)

On April 8, 2011, Roe filed a notice of appeal with respect to Judge Cogan's orders of April 1 and April 4, 2011. Roe did not raise any arguments with respect to that appeal in his reply brief of April 18, 2011, nor has he filed a motion for leave to submit supplemental briefing.[2] Accordingly, we hold that Roe has waived his right to challenge Judge Cogan's orders of April 1 and April 4, 2011. *See, e.g., In re Wireless Data, Inc.,* 547 F.3d 484, 492 (2d Cir. 2008) (deeming arguments not raised on appeal waived).

His appeal from those orders is hereby dismissed.

(iv)

Roe appeals from Judge Glasser's scheduling order of March 23, 2011, insofar as it reflects Judge Glasser's factual finding that Roe "knowingly and intentionally flouted" a court order. Scheduling Order, *United States v. Doe* (E.D.N.Y. Mar. 23, 2011).

---

[2] Although arguments raised for the first time in a reply brief are generally deemed waived, *see Connecticut Bar Ass'n v. United States,* 620 F.3d 81, 91 n.13 (2d Cir. 2010), Roe's opening brief was filed on March 28, 2011, and therefore could not have raised any arguments with respect to Judge Cogan's orders of April 1 and April 4, 2011. Accordingly, we do not base our finding of waiver on Roe's failure to discuss Judge Cogan's orders in his opening brief; rather, our holding is based on his failure to discuss them in his reply brief or in a motion for leave to submit supplemental briefing.

We do not have jurisdiction over Roe's claim because the March 23, 2011 order was not a final order pursuant to 28 U.S.C. § 1291, nor are any of the exceptions to the "final judgment rule" applicable in the circumstances presented. *See generally Reiss v. Societe Centrale Du Gruope Des Assurances Nationales*, 235 F.3d 738, 745 (2d Cir. 2000) (discussing the "final judgment rule" and its exceptions).

Accordingly, Roe's appeal from the March 23, 2011 order is dismissed.

(v)

On June 15, 2011, Roe filed a notice of appeal with respect to Judge Cogan's order of May 13, 2011. We review Judge Cogan's interpretation of our February 14, 2011 order and his interpretation of the sealing orders of Judge Glasser *de novo*.

After an item-by-item review of the specific information that Roe wished to publicly release—including (a) John Doe's real name, linked with his criminal docket number, (b) the specific nature of the predicate acts leading to his criminal conviction, and (c) the sentence imposed by the District Court—Judge Cogan concluded that the information either was not public at all or was not public to the extent and with the level of detail that Roe intended to disclose. Accordingly, he denied Roe's request for permission to release the information. Order, *United States v. Doe* (E.D.N.Y. May 13, 2011). Upon our own independent review, we agree with Judge Cogan that Roe's proposed disclosures would have violated our temporary injunction of February 14, 2011 and the sealing orders of Judge Glasser. Judge Cogan's order of May 13, 2011 is affirmed.

## CONCLUSION

To summarize:

(1) The judgment of the District Court permanently enjoining the dissemination of John Doe's Pre-Sentence Report is **AFFIRMED**.

(2) The appeal in Docket No. 10-2905-cr is **DISMISSED** in part, and the appeal in Docket No. 11-1408-cr is **DISMISSED** in full, insofar as they challenge the District Court's temporary restraining orders of May 18, 2010 and July 20, 2010 and insofar as they challenge any related orders that may have been entered or re-affirmed on May 28, June 11, June 14, or June 21, 2010.

(3) The appeal in Docket No. 11-1411-cr is **DISMISSED** because Roe has waived his opportunity to challenge Judge Brian M. Cogan's orders of April 1, 2011 and April 4, 2011.

(4) The appeal in Docket No. 11-1906-cr is **DISMISSED** for want of jurisdiction.

(5) With respect to Docket No. 11-2425-cr, the order of Judge Cogan is **AFFIRMED**.

(6) The appeal in Docket No. 11-1666-cr by *pro se* appellants is **DISMISSED** in all respects except insofar as it challenges the District Court's permanent injunction against the dissemination of Doe's PSR; with respect to that claim, the judgment of the District Court is **AFFIRMED**.

(7) The Clerk of Court is **DIRECTED** to close Docket Nos. 11-1408-cr, 11-1411-cr, 11-1906-cr, and 11-2425-cr upon entry of this order. The Clerk of Court is also **DIRECTED** to close Docket No. 11-479-cr to the extent it was not already closed upon entry of our February 14, 2011 order. *See* Order, *Roe v. United States*, Docket Nos. 10-2905-cr, 11-479-cr (2d Cir. Feb. 14, 2011).

(8) The remainder of this cause (Docket Nos. 10-2905-cr, 11-1666-cr) is **REMANDED** to the

District Court (I. Leo Glasser, *Judge*) for proceedings consistent with this order and with instructions (i) to rule upon the government's unsealing motion of March 17, 2011, (ii) to issue a final determination regarding whether the dissemination of the other (non-PSR) sealed documents in John Doe's criminal case, particularly those that refer to Doe's cooperation, should be enjoined, and (iii) in the event that a final determination regarding the dissemination of the other sealed documents does <u>not</u> result in an injunction against the dissemination of documents referring to Doe's cooperation, to enter an order temporarily staying the unsealing of any documents referring to Doe's cooperation pending an appeal by the government to our Court. In the event that the government elects not to appeal the unsealing of any documents that may be unsealed by the District Court, the government is **ORDERED** to notify the District Court and our Court of its decision not to pursue the appeal within the otherwise applicable time for taking the appeal.

(9) It is further **ORDERED** that, pursuant to *United States v. Jacobson*, 15 F.3d 19 (2d Cir. 1994), this panel shall retain jurisdiction over any further appeals from proceedings in the District Court, including any further petitions for extraordinary writs.

(10) It is hereby **ORDERED** that Judge Cogan shall retain jurisdiction for the limited purpose of enforcing our February 14, 2011 mandate—that is, to ensure the parties' compliance with the orders of this Court and any that have been, or may hereafter be, entered by Judge Glasser. Our panel retains jurisdiction pursuant to *United States v. Jacobson*, 15 F.3d 19 (2d Cir. 1994), over any appeals from any orders or judgments entered by Judge Cogan.

(11) Finally, it is **ORDERED** that appellant Richard Roe is hereby warned that the Court's patience has been exhausted by his filing of six separate notices of appeal regarding the same principal legal dispute—including the filing of an appeal from a March 23, 2011 scheduling order that obviously was not a final order nor subject to any of the exceptions to the "final judgment rule," *see* Part (iv), *ante*—and that any further attempts to re-litigate the issues decided by this order, or other future filings of a frivolous nature, may result in sanctions, including the imposition of leave-to-file restrictions, requirements of notice to other federal courts, and monetary penalties.

(12) The Clerk of Court is **DIRECTED** to transmit a copy of this order to Judge Cogan.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk



9

Exhibit P

June 3, 2014

The Hon. Lorna G. Schofield
Federal District Judge
Southern District of New York

Re Kriss v. Bayrock 13 cv 3905
   Status Conference Matters

We ask the court forgive the informality of this letter. Counsel has suffered a death in the family and the funeral is occurring as this is written. We will be shut for two days for bereavement but will amplify this letter by Friday at the latest, more formally. At the moment we have no access to a computer and may not be able to get this on ECF.

On April 23 counsel filed the initiating complaint in this matter, manually as per standing SDNY orders. It was subsequently put onto ECF and thus most defendants know of its filing and those who cared to could download it. Counsel for Sater and counsel for Bayrock absolutely do have a copy.

On May 21 counsel, pursuant to this courts directive, filed a superseding complaint.

That directive also ordered a status conference for June 10 and ordered a joint submission in respect thereof.

No defendant has been served. No defendant has made a general appearance (removal is a special, not a general appearance), and we have no evidence that any defendant has even made a special appearance since then other than "co-counsel" for Mr. Sater but even there its impossible to know who is his attorney of record. And in any event it is axiomatic that even a general appearance is not a waiver of service.

By itself that would make compliance with the pre conference directive effectively impossible, or very nearly so.

However, last week, on may 29, Magistrate Judge Maas ordered the April 23 complaint sealed entirely and further ordered us not to disseminate any information having anything much to do with Bayrock. Every expert to look at it concurs that that order is illegal and invalid both but nevertheless at this point today until that may be resolved we cannot meaningfully comply with any of the requests in the pro forma preconference order. Obviously for example we cannot describe the case, as is required, and obviously cannot do much of anything else again until the issue of that order is resolved.

Moreover we can do nothing with any new complaint either and note that we stamped it in pursuant to standing sdny rules but beyond that are stuck. We do note that Judge Maas said orders would be forthcoming as to that.

Given the above, any thought that there has been any bad faith is facially nonsensical. On that note it is equally nonsensical to ask, as counsel for Sater has said he will in a letter to us last Friday, that the court order we not be allowed to amend further, such order, aside from anything else, ultra vires as the court cannot suspend the federal rules of procedure which here provide for one coming amendment as of right and amendments thereafter freely as justice requires which in this circuit means that in the absence of futility or prejudice it is abuse of discretion not to allow.

But then they have also in the same letter to us last Friday said they both object to not having received the new pleading from us but at the same time have no intention of answering it other than by moving for sanctions even though, again, they admit they haven't seen it, nor can they.

Sincerely yours,

/s/ Richard E. Lerner
/s/ Frederick M. Oberlander

Counsels for Plaintiffs