ABV:JSS:jss
F. #
KLOTSMAN.COM

**98- 754M**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

GENNADY KLOTSMAN, also known as
    "Gene Klotsman," "Elliot Smith"
    and "E. Smith," and
FELIX SATER, also known as
    "Paul Stewart" and
    "P. Stewart,"

          Defendant.

- - - - - - - - - - - - - - - - -X

COMPLAINT AND
AFFIDAVIT IN SUPPORT
OF ARREST WARRANTS

(T. 15, U.S.C.,
§§ 78j(b) and 78ff;
T. 18, U.S.C., §§
1956(a)(1)(B)(I) and
2)

       LEO TADDEO, being duly sworn, deposes and says that he is a Special Agent of the Federal Bureau of Investigation, duly appointed according to law and acting as such.

       In or about and between March 1994 and December 1995, within the Eastern District of New York and elsewhere, the defendants GENNADY KLOTSMAN, also known as "Gene Klotsman," "Elliot Smith" and "E. Smith," FELIX SATER, also known as "Paul Stewart" and "P. Stewart," and others, did knowingly and willfully use and employ manipulative and deceptive devices and contrivances and, directly and indirectly, did (a) employ devices, schemes and artifices to defraud; (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engage in acts, practices and courses of business which would and

2

did operate as a fraud and deceit upon members of the investing public and other securities firms, in connection with purchases and sales of the securities of Holly Products, Inc., by use of instruments of communication in interstate commerce and the mails, in violation of Rule 10b-5 of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Section 2).

In or about and between March 1994 and December 1995, within the Eastern District of New York and elsewhere, the defendant GENNADY KLOTSMAN, also known as "Gene Klotsman," "Elliot Smith" and "E. Smith," FELIX SATER, also known as "Paul Stewart" and "P. Stewart," and others, knowing that the property involved in a financial transaction represented the proceeds of unlawful activity, did knowingly and intentionally conduct and attempt to conduct financial transactions which in fact involved the proceeds of unlawful activity, to wit, securities fraud, knowing that the transaction was designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds.

(Title 18, United States Code, Sections 1956(a)(1)(B)(I) and 2).

The source of your deponent's information and the grounds for his belief are as follows:

3

1. I have been an agent of the Federal Bureau of Investigation for approximately three years and have been assigned to the squad investigating Russian organized crime for about two years. In this capacity I have been responsible for investigations of securities fraud and money laundering and have become familiar with the laws and regulations governing securities dealings and with the practices of individuals involved in securities fraud.

2. I have learned the facts contained in this affidavit through, among other sources, interviews and meetings with officials of the National Association of Securities Dealers ("NASD"), the New York City Police Department ("NYPD") and the confidential sources described below. I have also reviewed documents pertaining to the transactions referenced in this affidavit, including but not limited to bank and brokerage records and a cache of documents abandoned in a leased private storage area.

3. Because this affidavit is being submitted for the limited purpose of seeking a warrant for the arrest of the defendant, I have included only certain facts relevant to the determination of probable cause. I have not set forth all of the facts known to me concerning the defendant's unlawful conduct for which he is under investigation. Further, to the extent that this affidavit contains statements by the defendant, confidential sources and others, these statements are set forth only in part and in substance.

## Introduction

4. The present investigation has revealed that the defendants GENNADY KLOTSMAN and FELIX SATER used the brokerage firm White Rock Partners & Co., Inc. ("White Rock") as a vehicle to commit securities fraud in 1994 and 1995. KLOTSMAN, a licensed stock broker, was listed with the NASD as a principal of White Rock during the relevant period, and SATER was a licensed stock broker at White Rock until his disqualification by the NASD. The disqualification resulted from SATER's conviction on a New York State charge of assault with intent to cause physical injury. According to a confidential informant who worked at White Rock (identified as CI-1 below), upon being released from prison in or about October 1994, SATER continued to take an active part in the business affairs of White Rock, including giving direction as to when to sell securities and where to transfer the proceeds. According to CI-1, to evade SATER'S NASD disqualification, White Rock leased and paid for an office space for SATER in the same building occupied by White Rock at 17 State Street, New York, New York.

5. The securities frauds conducted through White Rock, commonly referred to as "pump and dump" schemes, went essentially as follows. KLOTSMAN and SATER secretly acquired large blocks of stock of publicly traded companies, including Holly Products Inc. ("Holly Products"). To control this stock, KLOTSMAN and SATER put shares in the brokerage accounts of foreign corporations whose activities the two men directed using

the false names "Elliot Smith" and "Paul Stewart." KLOTSMAN and SATER then used White Rock to underwrite initial public offerings for Holly Products and enlisted brokers at White Rock and other firms to hype the stock to retail customers. To inflate the demand, KLOTSMAN and SATER made secret payoffs (in cash or securities) to brokers at White Rock and other firms based on the sales they generated. As brokers generated demand for the stock, KLOTSMAN and SATER sold the shares they secretly controlled, generating more than $10 million in profits, which were then laundered through various offshore and domestic accounts.

### The Defendants' Secret Control of Stock Held By Foreign Corporations

#### Confidential Information

6. I have debriefed a confidential informant (CI-1) who worked closely with KLOTSMAN and SATER at White Rock and was directly familiar with much of the business activities of White Rock. CI-1 will not be prosecuted in return for his/her cooperation. Except where noted, the following is a summary of certain information provided by CI-1, which has been corroborated by documents and other evidence, as described below.

7. KLOTSMAN and SATER managed the securities operations at White Rock. As noted above, SATER took part in White Rock's business despite having been disqualified by the NASD after a New York state assault conviction. Retail brokers pitched stocks for which White Rock underwrote initial public offerings, including the stock at issue here: Holly Products.

As the public bought the stock pitched by brokers, large blocks of stock were sold out of White Rock brokerage accounts held in the name of several foreign companies, chiefly, Suresteps Corporation N.V. ("Suresteps"), China Gaming Corporation N.V. ("China Gaming"), and Corporation Ceiba S.A. ("Ceiba"). KLOTSMAN was the listed broker for the Suresteps, China Gaming and Ceiba accounts, and he and SATER decided when stock was sold out of these accounts. In effect, the demand generated by White Rock brokers was satisfied by the sales directed by KLOTSMAN and SATER.

8. As the cash proceeds of stock sales built up in the Suresteps, China Gaming and Ceiba brokerage accounts, KLOTSMAN and SATER arranged for the money to be wired to bank accounts for the three foreign companies in Curacao, Netherlands Antilles. To transfer funds, KLOTSMAN and SATER directed an employee of White Rock to send written wire instructions to foreign corporate services firms, chiefly Holland Intertrust (Antilles) N.V. ("Holland Intertrust") in the Netherlands Antilles, and Intertrust Management S.A. (Geneva Branch) ("Intertrust Management") in Switzerland. Employees of these firms served as officers and directors of Suresteps, China Gaming and Ceiba and prepared necessary documentation for conducting the business affairs of these companies. Upon receipt of the wire instructions, an employee of Holland Intertrust or Intertrust Management transferred the funds and faxed a confirmation to White Rock. The confirmations were given to KLOTSMAN or SATER.

As with the sale of stock, KLOTSMAN and SATER directed the transfer of cash proceeds in the Suresteps, China Gaming and Ceiba accounts.

9. Holland Intertrust and Intertrust Management typically sent confirmations of wire transfers and other correspondence to White Rock in the name of "Paul Stewart" (or "P. Stewart") or "Elliot Smith" ("E. Smith"). Documents addressed to Paul Stewart were typically given to SATER for review; documents addressed to Elliot Smith were typically given to KLOTSMAN for review. After receiving and reviewing documents directed to Elliot Smith, KLOTSMAN and SATER often shredded them in the White Rock office. In addition, when documents were faxed from White Rock to the corporate services firms, they were went in the names of Paul Stewart or Elliot Smith. The only individuals who sent or received documents in these names were KLOTSMAN and SATER. No individuals with these names worked at or for White Rock. According to NASD records, neither Paul Stewart nor Elliot Smith were listed as being affiliated with White Rock. In sum, CI-1 understood that KLOTSMAN and SATER used the names "Elliot Smith" and "Paul Stewart" when dealing with Holland Intertrust and Intertrust Management.

10. Further evidencing their control over the Suresteps, China Gaming and Ceiba accounts, KLOTSMAN and SATER not only directed wire transfers of funds to these companies' foreign bank accounts, but also directed transfers from these accounts to a wide variety of other bank accounts in Israel, the

8

United States, Switzerland and other countries. Indeed, my review of bank records reveals that more than $5 million was directed to one numbered bank account in Switzerland, and more than $3 million was directed to one numbered bank account in Israel.

11. To effect the transfers from the foreign companies' bank accounts to third party accounts, KLOTSMAN and SATER followed the same routine they used for transfers into the Suresteps, China Gaming and Ceiba bank accounts: wire instructions were sent to Holland Intertrust and Intertrust Management, and confirmations were received at White Rock addressed to Paul Stewart or Elliot Smith, after which they were reviewed by KLOTSMAN or SATER and often shredded. In sum, KLOTSMAN and SATER controlled the flow of stock proceeds into and out of the foreign bank accounts.

12. Based on my experience, whereas a stock broker may routinely transfer funds from a brokerage account to a client's bank account, a broker's transfer of funds from a client's bank account to third party accounts -- including the foreign numbered accounts mentioned above -- is not consistent with a legitimate broker's role. Such transfers here indicate that White Rock, and KLOTSMAN and SATER specifically, acted not so much as brokers but as beneficial owners of the Suresteps, China Gaming and Ceiba accounts.

### The Cache of Abandoned Documents

13. I have been advised that in January 1998, NYPD officers responded to a telephone call from the manager of Manhattan Mini-Storage, located at 260 Spring Street, New York, New York ("Mini-Storage"), a business that rents storage areas to the public. The manager told the officers that he had opened a storage bin rented by "Marina Shap" because Shap had failed to pay rent for more than three months or answer several delinquency notices. The manager called the police because inside the bin he found three firearms (two Tech-9 nine-millimeter pistols and one 12-gauge shotgun). He also found various documents in a box and gym bag. A short time later, I spoke with NYPD officers and took possession of the abandoned documents found in the storage bin. I have since reviewed the documents.

14. The documents extensively corroborate the information provided by CI-1. They reveal, among other things, that KLOTSMAN and SATER, using the names "Elliot Smith" and "Paul Stewart," paid Holland Intertrust and Intertrust Management for the creation and/or servicing of more than 30 foreign shell companies and corresponding bank accounts in Switzerland, Luxembourg, the Netherlands, Ireland, the Channel Islands and the Netherlands Antilles -- including Suresteps, China Gaming and Ceiba.[1] The documents further confirm that in addition to

---

[1] The abandoned records indicate that Corporation Ceiba was incorporated at KLOTSMAN's direction in Panama in or about February 1993 with the assistance of a Panamanian attorney. In contrast, Suresteps and China Gaming were incorporated by Holland

creating and paying for the maintenance of these companies, KLOTSMAN and SATER controlled the flow of money into and out of the foreign bank accounts opened in their names. CI-1 has reviewed some of the documents and has confirmed that they were among the documents either prepared and sent at the defendants' direction or received by them at White Rock.

15. The abandoned documents I have reviewed include the following: (a) correspondence concerning the creation of corporations and opening of bank accounts; (b) invoices reflecting the charges for creating the corporations, opening bank accounts and providing ancillary services; (c) instructions to the corporate services firms to wire large sums of money to various accounts in the United States, Israel and Switzerland, and confirmations of the transfers sent back to White Rock; and (d) correspondence stating the balances for certain accounts, including those for Suresteps, China Gaming and Ceiba. In addition, I found signature stamps for many of the shell corporations and their designated officers, which were used on correspondence sent by White Rock to Holland Intertrust or Intertrust Management.[2/]

---

Intertrust. The records indicate that Holland Intertrust established and serviced bank accounts for all three companies.

[2/] All or most of the stamps were in the names of designated officers of foreign companies created by Holland Intertrust or Intertrust Management. As reflected in many of the abandoned documents, such stamps were used to replicate signatures on wiring instructions and other correspondence.

16. A summary of selected documents illustrates that all the activities of Suresteps, China Gaming and Ceiba -- not merely the sales of stock -- were being controlled at White Rock. For example, in a Dec. 22, 1993 letter, a Holland Intertrust official (Robert Stroeve) advised "Mr. P. Stewart" that a bank account for Suresteps had been opened in the International Nederlanden Bank N.V. in Curacao, Netherlands Antilles. In a March 3, 1994 letter, Stroeve requested "Mr. P. Stewart" to transfer $6,000 to China Gaming's bank account -- opened at the same bank used for Suresteps -- in order to capitalize the company. In a March 17, 1995 letter to "Elliot Smith," Gregory Elias, an employee of Holland Intertrust, enclosed invoices for the costs of servicing China Gaming and Ceiba, noting that the bills would be paid out of their respective bank accounts. In a September 15, 1995 letter to "Mr. Paul Stewart," another employee of Holland Intertrust reported the account balances for Suresteps and another company it serviced.

17. Information from CI-1 and the abandoned documents confirm that the foreign companies and accounts serviced by Holland Intertrust and Intertrust Management were controlled by KLOTSMAN and SATER using the names "Elliot Smith" and "Paul Stewart." As noted, CI-1 saw that the only individuals who sent or received documents in these names were KLOTSMAN and SATER, and no one with these names worked at or for White Rock. Further, documents directed to "Paul Stewart" or "Elliot Smith" sometimes disclosed that they were really directed to KLOTSMAN or SATER.

For instance, an April 13, 1995 letter from Intertrust Management concerning foreign bank accounts was addressed to "Mr. Gene Klotsman/Mr. Paul Stewart/White Rock Partners." A May 5, 1995 letter from Intertrust Management was addressed to "Paul Stewart-White Rock Partners & Co., c/o J. Mariarty" -- the latter name a reference to KLOTSMAN's secretary at White Rock. In addition, sometimes KLOTSMAN and SATER sent correspondence regarding money transfers under their own names rather than "Elliot Smith" or "Paul Stewart." For example, in a handwritten Sept. 8, 1995 letter, KLOTSMAN directed a Holland Intertrust employee to wire $225,000 from one of the foreign corporations to his mother Irina Klotsman.[3/] Similarly, in an undated letter "Felix" directed a foreign corporation wire money to pay for certain trades in the stock of U.S. Bridge of N.Y., Inc., another company whose stock by White Rock brokers to the public.

     18. The abandoned records also show that SATER and KLOTSMAN directly received a substantial amount of the proceeds from stock sales by Suresteps, China Gaming and Ceiba. For example, in a January 24, 1995 letter to "Robert [Stroeve]," "Paul [Stewart]" asked Stroeve to wire about $1 million from the China Gaming account into accounts in Israel, New York and Switzerland, including $50,000 to the accounts of "Gene Klotsman"

---

[3/] CI-1 identified the signature on the Sept. 8, 1995 letter as that of KLOTSMAN. The letter did not include a name clearly printed or typed.

and "Felix Sater."[4/] The Jan. 24, 1995 fax explained that these $50,000 transfers were due the recipients for stock purchases on behalf of "Inversiones [Santa Catalina N.V.]," another foreign company created by Holland Intertrust, and that wire instructions for these recipients were on file from "the previous transfers of $100,000.00 each to these individuals." I have examined Chase Manhattan bank records for accounts maintained by KLOTSMAN and SATER, and these records confirm that the two men received more than $300,000 collectively in foreign wire transfers in December 1994 and January 1995.

### The Defendants' Securities Frauds

### The Holly Products Fraud Scheme

19. I have spoken with officials at the NASD and reviewed documents relating to an initial public offering ("IPO") of Holly Products stock underwritten by White Rock. A November 17, 1994 Prospectus for Holly Products convertible preferred stock stated that certain "Selling Securityholders" of Holly Products were simultaneously registering 4,000,000 common stock purchase warrants for offer and sale (the "Prospectus"). According to the Prospectus, Holly Products had sold these warrants to "six persons not affiliated with [Holly Products]" in a May 1994 private placement. The Prospectus further stated that the majority (2,400,000) of the warrants were "beneficial[ly]"

---

[4/] Two other recipients of $50,000 were Salvatore Lauria and Walter Durchhalter, both of whom were listed with the NASD as principals of White Rock.

14

owned by three listed "Selling Securityholders": Suresteps, China Gaming and Ceiba. The Prospectus provided an address and individual "beneficial owner[]" for the companies: Suresteps (Vincenza Buondonno), China Gaming (Peter Vishnevski), and Ceiba (Dimitry Belotserkovsky).[5]

20. I have reviewed brokerage account records for Suresteps and Ceiba. These accounts were maintained at White Rock, and KLOTSMAN was the listed broker. These records show that Suresteps sold at least $4 million of Holly Products warrants and stock from approximately December 1994 (the start of the initial public offering) through March 1995. Brokerage records also show that Ceiba sold at least $3.5 million of Holly Products stock and warrants from December 1994 to May 1995. As explained above, SATER and KLOTSMAN, using false names, then transferred these proceeds to themselves and others by means of a series of wire transfers through foreign and domestic bank accounts.

21. Notably, the Prospectus made no mention that two individuals affiliated with White Rock (the underwriter of the securities) -- KLOTSMAN and SATER -- actually arranged and paid for creation of Suresteps, China Gaming and Ceiba; controlled

---

[5] Among the abandoned documents I have found copies of Russian passports for two of the individuals listed as beneficial owners of the companies (Vishnevski and Belotserkovsky), and an Italian passport for Buondonno. I also found a signature stamp for Buondonno. The documents and account records I have obtained to date indicate that these individuals neither exercised control over nor received the financial benefit of the activities of the three companies they purportedly owned.

these companies' sales of Holly Products and other securities; and disposed of the proceeds of these sales by means of wire transfers to various third parties through various foreign and domestic bank accounts. Although the Prospectus did set forth in general terms the compensation paid to White Rock, no mention was made of the millions of dollars of proceeds from Holly Products stock sales received and otherwise disposed of by SATER and KLOTSMAN.

## Concealed Payments to Brokers

22. During the course of this investigation I have debriefed another confidential informant (CI-2), who has provided reliable information in the past. CI-2 has taken part in numerous "pump and dump" schemes similar to those conducted by KLOTSMAN and SATER and has pled guilty to fraud and money laundering charges pursuant to a cooperation agreement. As part of his stock frauds, CI-2 and individuals working for him regularly received payoffs for selling stock which were not disclosed to purchasers.

23. According to CI-2, he/she frequently spoke with SATER about the mechanisms for conducting stock fraud schemes. Among the topics they discussed was the use of foreign companies to launder the proceeds of stock sales and then to bring the money back into the United States to make concealed payments to the individuals who sold stock for them to the public. A co-conspirator in a fraud scheme told CI-2 that SATER used a businessman in the New York City diamond district (at or near

16

47th Street) to launder money with which he paid his stock salesmen.[6] In addition, SATER offered to have CI-2 and his/her workers sell another of the stocks for which White Rock did an IPO, Country World Casinos, Inc., but that CI-2 declined because he/she was busy selling other stocks fraudulently. Though they did not discuss the specific percentage of the payoff that CI-2 and his/her workers would receive, it was understood that CI-2 would not take part in selling stock without such a payoff.

24. I have debriefed another confidential informant (CI-3), who has provided reliable information in the past. CI-3 has taken part in numerous "pump and dump" schemes has pled guilty to fraud charges pursuant to a cooperation agreement. According to CI-3, a co-conspirator in a fraud scheme told CI-3 about SATER's illegal activities.[7] According to the co-conspirator, SATER worked at White Rock and was a partner of KLOTSMAN. SATER made payoffs in cash or securities to brokers who sold large amounts of the stock being hyped by White Rock. The co-conspirator also told CI-3 that SATER used one or more jewelers in the 47th Street area of Manhattan to launder profits from stock sales.

25. Other information obtained during the investigation corroborates SATER's and KLOTSMAN's reliance on one

---

[6] The co-conspirator has pled guilty to a fraud conspiracy charge in connection with the sale of securities; he is not cooperating with the government.

[7] This is the same co-conspirator who spoke to CI-2 about SATER's activities.

or more jewelers to launder profits. CI-1 recalls a jeweler by the name of Alex Paul who frequented White Rock though he was not in the securities business and, to his/her knowledge, was not a customer of the firm. I have confirmed that Alex Paul was a jeweler who worked in the area of 47th Street. In addition, bank records show a $10,000 check to Alex Paul written on the account of a successor company to White Rock signed by KLOTSMAN. A notation on the check indicates that the payment was for unspecified "consulting."

26. In addition, some of the abandoned documents show wire transfers of funds connected to one or more jewelers. In a Feb. 15, 1994 letter to Robert Stroeve, a manager at Holland Intertrust (Antilles) N.V., Stroeve was directed to make two large wire transfers totaling $450,000 from the bank account of Inversiones Santa Catalina N.V., one of the foreign shell companies opened at the defendants' direction, in order to "purchas[e] various lots of diamonds. . . ." One of the wire transfers, for $200,000, was to an Israeli bank account in the name "Faramarz, Broumandfar." In the abandoned documents, I found a business card for Mark Emanuel, "Diamonds, Fine Jewelry & Objects of Art," at 10 West 47th St., New York, New York. On the back of the card was Israeli bank and account information matching that in the Feb. 15, 1994 letter to Stroeve, including the name "Faramarz, Broumandfar."

27. Further confirming the defendants' control over the Inversiones Santa Catalina N.V. foreign account, I reviewed

another of the abandoned documents (undated), which directed Robert Stroeve to wire more than $64,000 from this account to a Chemical Bank account in Brooklyn "for the benefit of Ivena Klotsman." Irina Klotsman is the mother of defendant GENNADY KLOTSMAN. At the close of the note, the author requested that Stroeve confirm the wire transfer by fax to "Mr. Stewart." As explained above, Mr. Stewart was a name used by SATER in connection with his fraud schemes.

WHEREFORE, your deponent further respectfully requests that arrest warrants be issued for the defendants GENNADY KLOTSMAN, also known as "Paul Stewart" and "P. Stewart," and FELIX SATER, also known as "Elliot Smith" and "E. Smith," and that they be dealt with according to law.

LEO TADDEO
Special Agent
Federal Bureau of Investigation

Sworn to before me this
day of April, 1998

UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK



# FACSIMILE COVER SHEET

### ROBERT S. WOLF, P.C.
101 EAST 52ND STREET, NINTH FLOOR
NEW YORK, NEW YORK 10022
(212) 750-8686
FAX: (212) 980-5102

| | | | |
|---|---|---|---|
| **To:** | Amy Millard, Esq. | **Date:** | September 15, 1998 |
| **Fax #:** | (212) 949-8255 | **Pages:** | 19 including cover sheet |
| **From:** | Robert S. Wolf | | |
| **Subject:** | Complaint | | |

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS ATTORNEY PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPY OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.