```
 1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
 2
 3    --------------------------------X
                                      :
      UNITED STATES OF AMERICA,       :   CR-98-1101
 4                                    :
              v.                      :   U.S. Courthouse
 5                                    :   Brooklyn, New York
      JOHN DOE,                       :
 6                                    :
              Defendant.              :   TRANSCRIPT OF HEARING
 7                                    :   June 21, 2010
      --------------------------------X   10:30 a.m.
 8
      BEFORE:
 9           HONORABLE I. LEO GLASSER, U.S.D.J.
10
      APPEARANCES:
11
      For the Movant:          MORGAN LEWIS & BOCKIUS LLP
12                             101 Park Avenue
                               New York, New York 10178-0060
13                     BY:     KELLY A. MOORE, ESQ.
                               BRIAN A. HERMAN, ESQ.
14                             DAVID A. SNIDER, ESQ.

15    For the Respondent:      WILSON ELSER MOSKOWITZ EDELMAN
                                & DICKER LLP
16                             150 East 42nd Street
                               New York, New York 10017-5639
17                     BY:     RICHARD LERNER, ESQ.
                               LAUREN J. ROCKLIN, ESQ.
18
                               STAMOULIS & WEINBLATT LLC
19                             6 Denny Road - Suite 307
                               Wilmington, DE 19809
20                     BY:     STAMATIOS STAMOULIS, ESQ.

21
      Court Reporter:          Mickey Brymer, RPR
22                             Official Court Reporter
                               United States District Court
23                             225 Cadman Plaza East
                               Brooklyn, New York  11201
24                             (718) 613-2255

25         Proceedings recorded by mechanical stenography.
        Transcript produced by Computer-Assisted Transcription.
```

1    THE CLERK:  This is criminal cause for order to show

2   cause in docket number 98-CR-1101, U.S.A. versus Doe.

3   Counsel, please state your name for the record.

4    MS. MOORE:   Kelly Moore and Brian Herman from Morgan

5   Lewis for movant John Doe.

6    MR. LERNER:   Richard E. Lerner of Wilson Elser

7   Moskowitz Edelman and Dicker for nonparty respondent Frederick

8   M. Oberlander.

9    MR. STAMOULIS:   Stam Stamoulis on behalf of nonparty

10  respondents Jody Kriss and Michael Ejekam.

11    THE COURT:   Everybody is ready to proceed?

12    MS. MOORE:   Yes, your Honor.  Could I ask who the

13  gentlemen in the back row are?

14    MR. STAMOULIS:   He's my law partner.

15    AUDIENCE SPEAKER:  Good morning.

16    THE COURT:  Good morning.

17    MS. MOORE:  Your Honor, I would ask to proceed with

18  the testimony of Mr. Oberlander.

19    THE COURT:  I'm sorry.

20    MS. MOORE:   I would ask we proceed with the

21  testimony of Mr. Oberlander.

22    THE COURT:  Please.

23  F R E D E R I C K   M.   O B E R L A N D E R ,    called

24  as the witness herein, having been first duly sworn/affirmed,

25  testified as follows:

1    THE CLERK:   Could you please state and spell your

2  name for the record.

3    THE WITNESS:   Frederick M. Oberlander, O-b-e-r-l-

4  a-n-d-e-r.

5    THE COURT:   You my be seated.   Thank you.

6    All right, Ms. Moore.

7  DIRECT EXAMINATION

8  BY MS. MOORE:

9  Q.   Mr. Oberlander, what do you do for a living?

10  A.   I'm an attorney.

11  Q.   How long have you been practicing law?

12  A.   For a living, approximately seven years.

13  Q.   For how long have you had a law license?

14  A.   Ten years.

15  Q.   And what type of law do you practice?

16  A.   Mostly commercial law and primarily transactional,

17  financial and taxation, but I do general work.

18  Q.   Do you handle any criminal matters?

19  A.   No.

20  Q.   You're admitted in the State of New York; is that right?

21  A.   Yes.

22  Q.   You practice in both Federal and State Court?

23  A.   Recently I started practicing in Federal Court.   I was

24  admitted a few months ago in Southern District.

25  Q.   Are you admitted anywhere else other than New York?

1   A.    I was admitted pro hac in a couple of jurisdictions.  I

2   don't remember whether those expired or not.

3   Q.    Did that include Delaware?

4   A.    At one time.

5   Q.    Where is your practice located?

6   A.    In Montauk, New York.

7   Q.    That's where your office is located?

8         THE COURT:  Did you say Montauk?

9         THE WITNESS:  Yes, in the Hamptons.

10   Q.    What is the address of your office?

11   A.    The street address is 28 Sycamore Lane.

12   Q.    And is that a solo practice?

13   A.    It is.

14   Q.    Do you have any employees at all?

15   A.    Not full time, but I occasionally add staff depending on

16   needs.

17   Q.    Now, you filed a complaint in the Southern District of

18   New York captioned Jody Kriss, Michael Ejekam and Bayrock

19   Group versus Bayrock Group and various others; is that

20   correct?

21   A.    Yes, I did.

22   Q.    When did you file that complaint?

23   A.    I'm sorry, I didn't hear you.

24   Q.    When did you file that complaint?

25   A.    The 10th of May.

1 Q.    Around the same time you sent an email to Ron Kriss

2 attaching a copy of that complaint; is that correct?

3 A.    I believe I sent that on May 12th.

4 Q.    And was the version that you sent to Ron Kriss the same

5 version that you filed in the Southern District of New York?

6 A.    The version of the complaint itself was.

7 Q.    What was different?

8 A.    The exhibits to the complaint that I filed, which was

9 physically filed in New York and not by ECF, had only limited

10 excerpts from some of the materials that you referred to in

11 the order to show cause as the sealed and confidential

12 documents, but the file attachments on email that went to Ron

13 Kriss I believe had additional pages in the PDF files on some

14 of those documents.

15        MS. MOORE:    Your Honor, may I?

16        THE COURT:   Sure.

17 Q.    Mr. Oberlander, let me show you a copy of the version you

18 sent to Mr. Ron Kriss on May 12th.  Is that the copy you sent

19 to Ron Kriss?

20 A.    It appears to be, but it is hundreds of pages.  It would

21 be impossible for me to tell for sure just glancing at it.  It

22 does appear to be.

23        MS. MOORE:    Your Honor, I offer that.

24        THE COURT:   Is there any objection to that?

25        MR. LERNER:    No objection.

1      THE COURT:  Thank you.  It will be received as I

2  guess Plaintiff's 1.

3      Precisely what is that?  Would you identify that for

4  the record.

5      MS. MOORE:   Your Honor, Exhibit 1 is the SDNY

6  complaint captioned "Jody Kriss, et al. versus Bayrock

7  Group."

8      THE COURT:  Is that the document that you handed up,

9  somebody handed up to me?

10      MS. MOORE:   Yes, your Honor, that's Exhibit 1.

11      THE COURT:  Together with all the attachments?

12      MS. MOORE:   Correct.

13      MR. LERNER:   Your Honor, I think Ms. Moore may be

14  leading now with the topic.

15      THE COURT:  I'm having a little trouble hearing you,

16  Mr. Lerner.

17      MR. LERNER:   I think Ms. Moore may be leading into

18  areas of work product.  Now, the topic of this order to show

19  cause, as set forth in the order to show cause, is from whom

20  Mr. Oberlander received the purportedly sealed and

21  confidential documents and to whom he gave them, so, I would

22  like to object in advance to any questioning that may go to

23  why he did certain things and simply ask that the Court limit

24  it to what he did, not why he did it.

25      THE COURT:  Ms. Moore.

1      MS. MOORE:    Your Honor, I mean objections can be

2 made to the questions asked.  We believe the order to show

3 cause --

4      THE COURT:  This is in the nature of a motion in

5 limine.  To avoid constant objections and so on, if there's no

6 objection to what it is that Mr. Lerner is suggesting would be

7 appropriate, then we'll proceed accordingly.

8      MS. MOORE:    Your Honor, I do intend to inquire as to

9 what Mr. Oberlander knew and what his intent was specifically

10 with respect to sealed documents.

11      THE COURT:  What is the relevance of that insofar as

12 this order to show cause is concerned?  I understand the order

13 to show cause in this proceeding is addressed to where these

14 documents came from, how he obtained it and not what his

15 intent was.  I don't know what the relevance of that is.  It

16 seems to me your concern was the unauthorized or seemingly

17 apparently unauthorized use and possession of sealed

18 documents.

19      MS. MOORE:    That's correct, your Honor.  To the

20 extent Mr. Oberlander knew they were sealed and acted anyway,

21 we believe it is relevant to our application.

22      THE COURT:  What is your application beyond that?

23      MS. MOORE:    Eventually our application, your Honor,

24 would be probably attorney's fees and sanctions related to his

25 conduct which typically under the law follow the elements of

1 whether or not there was in fact civil contempt of a court

2 order.

3     THE COURT: Well, Ms. Moore, it would be perfectly

4 proper to ask whether Mr. Oberlander was aware of the fact

5 these documents were sealed. What his intent was I don't

6 think has any relevance to this proceeding. Why don't you

7 proceed.

8     MS. MOORE: Okay.

9 Q. Mr. Oberlander, attached as Exhibit A are two proffer

10 agreements, a cooperation agreement and a pretrial statement;

11 is that correct?

12 A. What you handed me you're referring to?

13 Q. Yes.

14 A. I think there's only one proffer agreement.

15 Q. Oh, two, I'm sorry, you're right. They are double-sided

16 pages and I didn't see that.

17     From whom did you obtain the documents that were

18 attached to the email you sent to Mr. Ron Kriss as Exhibits A

19 and C?

20 A. Joshua Bernstein.

21 Q. Who is Joshua Bernstein?

22 A. He was a client of mine at one time.

23 Q. In what matter did you represent him?

24 A. In an action he had against Bayrock Group LLC in White

25 Plains Supreme Court, New York.

Oberlander-direct/Moore

1  Q.  Was there an engagement letter for that representation?

2  A.  There was.

3  Q.  Did he pay you for your legal services?

4  A.  No, he did not.

5  Q.  Were you paid by anyone else in connection with your

6  legal services in that matter?

7  A.  No.

8  Q.  Did you enter an appearance on his behalf in that matter?

9  A.  No.

10  Q.  Who entered an appearance on his behalf in that matter?

11  A.  I really don't know.  I know he was represented at all

12  times by a gentleman I would refer to as lead counsel.  I had

13  no personal knowledge who put in an appearance for him.

14  Q.  But you had a separate engagement letter with him?

15  A.  Separate from what?

16  Q.  That other individual's.

17  A.  It was my own engagement letter.  I wrote it.

18  Q.  When did you stop representing Joshua Bernstein?

19  A.  April this year, 2010.

20  Q.  What date?

21  A.  I have to check.  Towards the end of the month.

22  Q.  And was the termination of your attorney-client

23  relationship memorialized in any way?

24  A.  There is -- there are emails that confirm that he is a

25  prior or past client for purposes of rules and privileges and

1  not a current client.

2  Q.    When did you obtain the Exhibits A and C to the SDNY

3  civil complaint from Josh Bernstein?

4  A.    It was the overnight of February 28th to March 1st.  It

5  was after midnight of February 28th, so that would be

6  technically March 1st this year.

7  Q.    And that was an overnight package?

8  A.    No.

9  Q.    How was it obtained?

10  A.    He handed them to me.

11  Q.    Where did he hand them to you?

12  A.    In his office.

13  Q.    Which is where?

14  A.    That particular office was in an apartment on the Upper

15  East Side.

16  Q.    Would the documents be part of a bigger group of

17  documents?

18  A.    He handed the documents to me in physical form and to my

19  recollection they were the only physical documents he handed

20  me.

21  Q.    What were the only physical documents he handed you?

22  A.    He handed me a proffer and a cooperation agreement and a

23  PSR.  And for avoidance of ambiguity as I'm not a criminal

24  lawyer, what he handed me had attached to the back of the

25  proffer what I understand to be or you referred to as a DOJ

1   financial statement, but I would not know that is considered

2   as part of a proffer or not.  Maybe attached to a cooperation

3   agreement.  To me there were three documents.

4   Q.   Did he give you any other documents relating to my client

5   John Doe's criminal case?

6   A.   No.

7   Q.   Did he give you a complaint that was filed in that case?

8   A.   Not at that time.  If you'll excuse me, for clarification

9   I assume you're asking what he handed me at that time on March

10  1st.

11  Q.   So, he handed you nothing else on March 1st?

12  A.   Not as related to the criminal matter, the CR matter,

13  what is it, 1101.

14  Q.   Did he provide you with a complaint in that case on some

15  other date?

16  A.   Yes, he did.

17  Q.   When did he provide you with a complaint in that case?

18  A.   I believe it was March 3rd.

19  Q.   Was that once again in person?

20  A.   No.

21  Q.   In what form did he provide you --

22          MR. LERNER:   I'll object to the questioning about

23  the complaint in another unrelated matter.

24          THE COURT:   I'm about to inquire about that,

25  Mr. Lerner.  Complaint in what proceeding?

1    MS. MOORE:    United States versus John Doe, your

2  Honor, sealed complaint.

3    MR. LERNER:    I'm sorry, I was confused.   I thought

4  you were refer -- Ms. Moore is referring to a different

5  document.   I withdraw my objection.

6    THE WITNESS:   Your Honor, may I just correct one

7  thing I said?

8    THE COURT:   Sure.

9    THE WITNESS:   To the best my recollection the

10  complaint was given to me-- I'm going on recollection -- on

11  March 3rd.  He sent me several documents and I'm certain the

12  complaint was there.

13    THE COURT:   Was that received by hand as well?

14    THE WITNESS:   No, no.   She asked me whether he ever

15  gave me a complaint and I'm saying I'm substantially certain

16  he did, and, if he did, it was in an email that was given to

17  me or I received on March 3rd.

18    THE COURT:   An email?

19    THE WITNESS:   It was attached to an email, yes.

20  Q.   In the email you received from him on March 3rd, did he

21  attach any other documents related to the criminal case

22  against my client in Federal Court in Brooklyn?

23  A.   The same ones he had given me physically on the first

24  were attached to that.

25  Q.   Was an indictment or information or draft information

1   attached as well?

2   A.   It may well have been, but I just simply don't recall.

3   It could very well have been, yes.

4   Q.   Have you in connection with this order to show cause gone

5   back and checked what was attached to that email?

6   A.   No.

7   Q.   So, as you sit here today, you don't know what else was

8   attached to that email?

9   A.   I answered you to the best of my knowledge.  I feel

10  substantially certain that a complaint was and that I don't

11  have any reason to doubt that the -- what you call an

12  information, I think, is that what you referred to it as?

13  Q.   A draft information I referred to it as.

14  A.   Draft information.  But I have no specific absolute

15  certain recall because those were not in the order to show

16  cause so I had no reason to check.

17  Q.   How many documents were attached to the March 3rd email?

18  A.   About four, five.

19  Q.   But you don't know what they were other than the

20  complaint and the one that was attached to the SDNY --

21  A.   As I continue to say, I know the same three he gave me

22  were attached to that email.  I'm reasonably certain the

23  complaint was attached to the email and I'm relatively certain

24  that the draft information was and I believe that's it, but it

25  is possible there may have been six -- four, five or six.

1   This is the best information I can give you from

2   recollection.   I certainly don't deny that it was attached.

3   Q.   The March 3rd email, was that simply an email from Josh

4   Bernstein to you with attachments or was it forwarding an

5   underlying email to which those documents had been attached?

6   A.   May I ask for clarification, please?

7   Q.   Absolutely.

8   A.   Do you mean was there any message inside or just --

9   Q.   No, I'm asking whether aside from the email that

10  Mr. Bernstein sent to you, whether or not he was forwarding

11  another email that had attached these documents?

12  A.   You mean did I receive a forwarded email?

13  Q.   Correct.

14  A.   That had been primarily addressed to someone else and I

15  was getting it forwarded?

16  Q.   Correct.

17  A.   That's not correct.   It was addressed to me.

18  Q.   And, so, it was just the email to you plus the

19  attachments; is that correct?

20  A.   It was the email was primarily addressed to me.   There

21  were other addressees.

22  Q.   Who else was the email addressed to?

23  A.   That would be Arnold Bernstein and Jerry, spelled

24  J-e-r-r-y, I don't recall the last name, who was the gentleman

25  I refer to as Josh's lead attorney in the White Plains case.

1       If I may, your Honor, for clarification, I'm saying I

2   didn't get forwarded somebody else's email.  The email was

3   addressed to three people and I was one of them.

4   Q.    Were there any CCs on that email?

5   A.    I don't recall.

6   Q.    In preparation for this hearing, you didn't review it?

7   A.    Probably a week or two, maybe three, when the order to

8   show cause came in to check the dates, I'm substantially

9   certain there were no cc's, but I will not say my memory is

10  infallible.  It would be highly unlikely there were any at all

11  other than the three of us.  I sincerely doubt there --

12  Q.    What did the email to you, Mr. Bernstein and other

13  lawyers say?

14  A.    The first sentence in the email said, as requested, here

15  are the Doe docs or the John docs.  There was an additional

16  sentence.  I'm not convinced revelation of that sentence is

17  within the very limited privilege waiver that Mr. Bernstein

18  gave me, so however you want to handle that, but I can't

19  testify to what else was in there.

20  Q.    Well, the email was addressed to Arnold Bernstein, who is

21  Mr. Bernstein's father, right, not his lawyer, correct?

22  A.    No, that is not correct.  He is always very much his

23  lawyer and always held himself out to me as his attorney and

24  Jerry as his lawyer.

25  Q.    In a recent conversation with us he did not hold himself

1  out to be his lawyer, but putting that aside I don't believe

2  you can waive attorney-client privilege in a limited fashion

3  and your recent June 14th letter, is it your position you are

4  not waiving it or it is not waived?

5  A.   My counsel would know.

6         MR. LERNER:   I spoke to Mr. Bernstein who stated to

7  me he waived his privilege with respect to how Mr. Oberlander

8  received the documents.  So, that was the scope of the

9  waiver.

10        MS. MOORE:   Your Honor, I don't believe there can be

11 partial attorney-client privilege waiver.  I believe once you

12 waive with respect to certain things, it is waived.  Certainly

13 what the email said is passing these documents on to

14 Mr. Oberlander falls even within the waiver that they seem to

15 have received.

16        THE WITNESS:   Your Honor, I understand I am the

17 witness but he was my former client.  May I address the Court

18 briefly?

19        THE COURT:   Why don't you let your attorney do that.

20        THE WITNESS:   Can I consult with him for a minute?

21        THE COURT:   Absolutely.  It is rather unorthodox to

22 have a witness represented by a lawyer also act as his own

23 attorney.

24        THE WITNESS:   There's nothing I'm going to say that's

25 secret.

1    THE COURT:  I don't know whether it is or isn't.  I

2   think you would be well advised to consult with your lawyer.

3        (Mr. Lerner and the witness confer.)

4        THE COURT:  Where were we?

5        MR. LERNER:   Your Honor, Mr. Bernstein in speaking

6   with me gave a limited waiver.  If that is to be interpreted

7   as a waiver for all purposes, then he gave no waiver at all,

8   so he can't -- Mr. Oberlander can't be asked further questions

9   regarding these conversations or communications with

10  Mr. Bernstein.

11       THE COURT:  Well, Ms. Moore, again, what is the

12  relevance of that question, or perhaps there's something I'm

13  missing?

14       My understanding was that the entire purpose or focus

15  of this proceeding from the very beginning that the order to

16  show cause was presented to me was a concern and a real

17  concern not only for your client but for the Court and the

18  integrity of the entire criminal proceeding as well as to how

19  documents which were clearly intended to remain sealed and

20  clearly intended not to be available for public distribution

21  or even public viewing by anybody unless by virtue of a court

22  order unsealing those documents.  So, the focus of this

23  proceeding, as I understand it, is how did those documents

24  which were sealed find its way into a complaint in a civil

25  action commenced in the Southern District of New York, how did

1  the persons who had possession of those documents, obviously

2  had possession of them, acquire them in some fashion because

3  they were attached to a complaint filed in the Southern

4  District?  How did those documents come into the possession of

5  the persons who attached them to a complaint?  That's the

6  concern which I believe was the focus of this proceeding and I

7  think that is what is at issue here.  How did you get them,

8  from whom, and then the question will be how did that person

9  get them and from whom.

10        If those documents were obtained in some fashion

11  other than by a voluntary delivery or disclosure of them by

12  Mr. Doe, then there is a very, very serious concern which this

13  Court has regarding that issue.

14        That is what is before me.  With respect to counsel

15  fees and all the rest of it, that's another matter.

16        MS. MOORE:   Fair enough, your Honor.

17  Q.   Mr. Oberlander, does the second sentence of the email

18  address how Mr. Bernstein obtained the documents?

19  A.   It does not.

20  Q.   Now, did he when he spoke to you either in person on

21  March 1st, or any other time, advise you of how he obtained

22  those documents?

23  A.   He did.

24  Q.   When did he advise you of how he obtained them?

25  A.   Every time, one time or you mean the first time, what?

Oberlander-direct/Moore

1  Q.   Let's start with the first time.

2  A.   The first time would be March 1st.

3  Q.   What did he say to you?

4  A.   He said Doe gave them to him but to be clear, the general

5  impression, because I can't recall the exact words, the

6  general impression was that Doe gave them many documents and

7  included among the documents were these.

8  Q.   Did he say whether or not Doe provided them in electronic

9  form or hard copy?

10  A.   Not at that time.

11  Q.   And did you credit his statement that Doe gave him these

12  documents?

13  A.   In the context of everything else that he told me during

14  the preparation of his White Plains case, yes, I did.

15  Q.   Why did he give you these documents?

16  A.   You have to ask him that.  They were unsolicited.  I

17  didn't say would you please give me these documents.  He

18  volunteered.

19  Q.   You described the first sentence of his email to be as

20  requested here are the documents.  What's the request you're

21  referring to?

22  A.   Because he gave them to me physically and I have a

23  scanner and I prefer to work with electronic records and I

24  probably March 1 or March 2 -- I mean I forgot which day it

25  was, asking if he could possibly send them to me in PDF form

1    and it would be easier for me.  It was here, I'm sending you

2    PDF files.

3    Q.   And, so, beyond the first conversation that he told you

4    Doe gave them to him, what other conversations have you had

5    with him describing how he obtained them?

6    A.    Indirectly through third party, during the preparation of

7    an affidavit for this proceeding, Mr. Bernstein from my

8    understanding and this, of course, is hearsay, my

9    understanding Mr. Bernstein clarified that Mr. Doe had given

10   him several disks containing files and that these were among

11   them, but, as I said, that was told to me by someone who

12   claims that he said it to him and I can't say whether or not

13   it is true.

14   Q.   Who was it that claims that was said to him?

15        MR. LERNER:    That would be Richard Lerner.

16   Mr. Bernstein said to me when we were having a conversation

17   that he thought he gave them to Mr. Oberlander on -- or he

18   obtained them on a computer disk from Mr. Doe.

19   Q.   And, so, Mr. Oberlander, is it your understanding

20   Mr. Bernstein thinks that's how he obtained them or he knows

21   that's how he obtained them?

22   A.   I have absolutely no idea what relative state of

23   confidence he has in his memory.

24   Q.   And the document that was forwarded to you, it was not

25   part of a disk, right, it was not part of a set of a bunch of

1 documents; what he sent to you were five documents relating to

2 a criminal matter, right?

3 A. He sent me to be specific five separate attachments to

4 one email. Whether and what degree an attachment is a

5 document in the context of your question I'm not certain.

6 Q. But it wasn't part of a bigger disk that contained a

7 whole bunch of documents; is that right?

8 A. There is no difference. He sent me an email. I'm not

9 following your question.

10 Q. My understanding is through a third party, namely,

11 Mr. Lerner, who had a connection with this hearing and advised

12 that Mr. Bernstein claims that my client gave him three disks

13 that contained a bunch of documents including these; is that

14 right?

15 A. No. First of all, nobody said there were three. I

16 believe we said it is a few and that's indeterminate. Yes, I

17 just answered that question. It is my understanding that

18 Mr. Bernstein has some degree of confidence, more than zero or

19 less than 100, that the physical means by which he obtained

20 them from Mr. Doe was on disks.

21 Q. But what you in turn received from Mr. Bernstein was not

22 the disk, you obtained the individual separate documents; is

23 that right?

24 A. I received -- are we talking about ever, on the 3rd, in

25 that email? What specifically are we talking about?

1  Q.  We're talking about March 1st, the 3rd or any other time

2  you may have received these documents.

3  A.  I only received them twice and as I testified on March

4  1st I was given three what I call documents.  That's the way I

5  testified.  They were three successive papers stapled

6  together.  So to me that's three documents.  Then, on March

7  3rd I got an email that had five attachments.  You can say an

8  attachment is a document, it is perfectly acceptable usage,

9  but the term document there doesn't necessarily refer to

10  document in any other context.

11        I'm telling you as honestly as I can I got four, five

12  or six attachments on that email.  If you want to refer to

13  attachment as a document, that's okay with me.

14  Q.  Did it ever occur to you that Mr. Bernstein had stolen

15  those files?

16  A.  Work product privilege.

17  Q.  You're asserting the work product privilege to answer

18  that question as to whether or not it ever occurred to you you

19  may have been obtaining stolen documents?

20  A.  Any thoughts I had about the preparation of his case or

21  his case including materials given to me by anybody are work

22  product.

23  Q.  I'm concerned with your state of mind.  Did you think you

24  were obtaining stolen documents?

25  A.  Work product exception.

1  Q.    You knew, did you not, that Mr. Bernstein upon being

2  fired from Bayrock had taken thousands of pages of documents

3  with him?

4          MR. LERNER:    Objection.

5          THE COURT:    I will allow it.

6  A.    I don't know any such thing.

7  Q.    You knew he was in possession at his home of thousands of

8  pages of documents of Bayrock; is that right?

9  A.    No.

10 Q.    Were you aware he was in possession of Bayrock documents

11 at his home?

12         MR. LERNER:    At what time, Ms. Moore?

13         MS. MOORE:    After he was fired from Bayrock.

14 A.    I'm sorry, I'm confused.  You're asking me if I'm aware

15 of what he possessed in his home on every day since the day he

16 was hired?

17 Q.    No.  On any day after he was fired are you aware that he

18 was in possession of documents of Bayrock's?

19 A.    If you can define, please, for me, clarify when you say

20 of Bay Rock's, are you specifically referring to documents by

21 which Bayrock would assert ownership of the intellectual

22 property of the contents.

23 Q.    Documents taken from the premises of Bayrock's offices is

24 what I mean by Bayrock documents.

25 A.    So, that would include his own personal property that he

1 took home with him.

2 Q. Excluding his own personal property.

3 A. Mr. Bernstein had documents in his office. I didn't read

4 them, I don't know what they were. I certainly have no

5 information as to what he did or didn't take.

6 Q. But you knew that he was fired, right?

7 A. He told me that he was fired, so I assume it is true.

8 Q. As a practicing attorney, you are aware when people are

9 fired they are typically not permitted to take documents and

10 property of their employer with them, right?

11 A. I'm sorry, I'm not aware of what's typical in the world.

12 Q. So, when you obtained these documents, cooperation

13 agreement, proffer agreement and a PSR, you had no concern

14 these documents were stolen?

15 A. Work product.

16 Q. Are you familiar with the declaration that Thomas Hylan

17 submitted to the Court in connection with your opposition to

18 this motion?

19 A. It's been a couple weeks since I've seen it, but, of

20 course, I did read it.

21 Q. By the way, does Mr. Hylan still represent you?

22    MR. LERNER: The law firm of Wilson Elser represents

23 Mr. Oberlander in this matter. Mr. Hylan is my partner.

24 Q. Did you draft the Hylan declaration?

25 A. Did I draft it?

1  Q.   Yes.

2          MR. LERNER:   Objection.

3          THE COURT:   Sustained.

4  Q.   Did you read it before it was filed?

5  A.   I'm sure I did.

6  Q.   Do you agree with its contents?

7          MR. LERNER:   Objection.

8          THE COURT:   Pardon.

9          MR. LERNER:   Objection as to relevance.

10         THE COURT:   Objection is sustained.

11         It would seem to me if Mr. Hylan was in effect the

12  agent of Mr. Oberlander and Mr. Oberlander had seen that

13  document, it seems to me 801(c) whatever subdivision in the

14  Federal Rules of Evidence might be applicable.

15         Why don't you move on.

16  Q.   Mr. Oberlander, if you knew at the time that that

17  declaration was filed that Mr. Bernstein said he got those

18  documents voluntarily from Mr. Doe, why is a good portion of

19  that declaration committed to an inquiry as to whether or not

20  my client had kept the documents under lock and key?

21  A.   You would have to ask Mr. Hylan. I'm sure he would make

22  the work product objection, if you did.

23  Q.   It is your testimony at the time that declaration was

24  filed you had a good faith belief Mr. Bernstein obtained the

25  documents legally?

1  A.   I told you that any belief or thoughts I had about the

2  documents with respect to what he said are work product.

3  Q.   There was a cross motion made in connection with your

4  opposition.   You submitted an affidavit in connection with

5  that and in that you say that you believe that permitted to

6  contact the client, who I assume is Mr. Bernstein, he would

7  submit an affidavit that described how he obtained the

8  documents; is that correct?

9  A.   Something like that.

10  Q.   That motion was granted by the court; is that right?

11  A.   So many words, yes.

12  Q.   And did you thereafter contact Mr. Bernstein?

13  A.   He --

14       MR. LERNER:   Your Honor, I contacted Mr. Bernstein.

15  I spoke with him about the issues.   He agreed to a, quote,

16  unquote, limited waiver to allow Mr. Oberlander to testify as

17  to his giving the documents to Mr. Oberlander.   I prepared an

18  affidavit based on what he had told me and then his father

19  intervened and said speak with me only, he's not submitting

20  any affidavits to the Court, he's represented by counsel.

21  Q.   In a follow-up letter to the Court in connection with

22  this matter, the other attorney, Mr. Lerner, submits a letter

23  on June 14th, and that letter very specifically says that you

24  obtained the documents from Mr. Bernstein and that

25  Mr. Bernstein told you he obtained them from Mr. Doe, but that

1   any statements in that letter are not yours.   Specifically

2   states the statements in the letter are not yours.

3        Why is that?

4   A.   You would have to ask the author of that letter.

5   Q.   You stand by the statements that you obtained from

6   Mr. Bernstein and Mr. Bernstein told you he obtained them --

7        MR. LERNER:   May I address it?

8   Q.   -- from Mr. Doe?

9        MR. LERNER:   May I address the Court as to why I

10  made certain statements or should we move on?

11       THE COURT:   It seems that question has been answered,

12  Ms. Moore.

13  Q.   Do you know who would have been given or provided any of

14  the documents you were given either on March 1st or that you

15  obtained on March 3rd, 2010?

16  A.   I'm sorry, I missed the first few words of the question.

17       THE COURT:   So did I.

18  Q.   To whom have you given or provided the documents that you

19  obtained on March 1st and March 3rd from Mr. Josh Bernstein?

20  A.   As to everything other than the documents you referred to

21  in the order to show cause as the sealed and confidential

22  documents, it is my recollection that I never gave them to

23  anyone.  So, as to the sealed and confidential, actually, let

24  me amend that, I apologize.  I believe I forwarded the email

25  intact to my attorneys, so my attorneys received everything

1   that was attached to that email.

2   Q.   Who are your attorneys?

3   A.   Wilson Elser.

4   Q.   When did you send it to them?

5       MR. LERNER:   I believe it was last Saturday.

6       THE COURT:   I'm sorry.

7       MR. LERNER:   I believe it was the Saturday before

8   this past Saturday.  I can check my Blackberry, if the Court

9   wants to know the precise date.

10  Q.   So, other than your attorneys, Wilson Elser, you did not

11  provide the March 3rd email in its entirety to anyone else; is

12  that correct?

13  A.   To the absolute best of my recollection, I did not

14  forward intact that email to anyone else.  That's to the best

15  of my recollection.  I could be mistaken.

16  Q.   Okay.

17       Now let's take it to the other documents, even if

18  they are not intact, any part of them.  The documents we

19  referred to as the sealed and confidential documents, to whom

20  have you provided those documents?

21  A.   The clerk of the Southern District, the cashier, the

22  in-take clerk, whatever her official title is who receives

23  physical filings was given the original complaint and attached

24  to there were I believe five pages from the PSR, the two

25  proffer agreements and the cooperation agreement, but not DOJ

Oberlander-direct/Moore

1   financial statement, and Mr. Kriss received those documents

2   electronically in the same form that Mr. -- I'm sorry, this is

3   a confusing answer.  Let me start it again.

4        Mr. Jody Kriss, my client, was given those documents

5   to the extent that they were given in the email to Ron Kriss.

6   In other words, as I testified, the attachments on the May 12

7   email to Ron Kriss had more pages in some of the sealed and

8   confidential documents, so those versions went to Ron Kriss on

9   May 12th at around 12:30 noon.  About an hour earlier I sent

10  the same email with slightly different text to John Elzufon,

11  who is an attorney representing Alex Solomon, one of the

12  defendants in the case, and I sent him the same attachments

13  Ron Kriss had.

14       Jody Kriss I believe was copied on one of those

15  emails and Stam Stamouilis, who is Mr. Kriss's attorney from

16  Delaware and local counsel for the prior Delaware matter,

17  received a copy of that email, and prior to that the only

18  other thing I can recall is that a couple of weeks before

19  filing the complaint I gave extracts of those documents

20  electronically to Mr. Kriss for his use and verification of

21  the complaint because he had to verify the complaint.

22       To the best of my knowledge, that's the absolute --

23  actually, no, let me just change that.  There was one other

24  person.  I believe I sent one or two of them to another

25  attorney sometime in March.

1  Q.  Who is that attorney?

2  A.  The gentleman's name is David Schlecker.

3  Q.  He is an attorney of yours?

4  A.  Yes.

5  Q.  Could you spell John Elzufon's last name for us, please?

6  A.  E-l-z-u-f-o-n.

7  Q.  And Mr. Schlecker's last name?

8  A.  S-c-h-l-e-c-k-e-r.

9  Q.  So, besides Jody Kriss, Ron Kriss, John Elzufon, Stam

10  Stamoulis, Wilson Elser, David Schlecker, is there anyone else

11  you know of to whom you sent any part or portion of the

12  documents we have been referring to as the sealed and

13  confidential documents or any other documents relating to

14  Mr. Doe's criminal file?

15  A.  I don't know what documents related to his criminal file

16  means.  To the best of my recollection there isn't anybody

17  else I sent them to.

18  Q.  To your knowledge, do you know whether or not any of the

19  other people you sent them to sent them further to anyone

20  else?

21  A.  I have no knowledge that they did, no.  I have no

22  knowledge, sorry.

23  Q.  Did they ever advise you that they had it?

24  A.  Not specifically.  I'm not -- no, not specifically,

25  nobody said to me we sent these down here to somebody else.

Oberlander-direct/Moore

1  No.

2  Q.   Not specifically did they say they had --

3  A.   Mr. Elzufon, who is an attorney representing one of the

4  defendants, Alex Solomon, told me that he contacted Alex

5  Solomon's insurance carrier, CNA, to advise them of what was

6  going on.  So, I suppose one could presume he sent some or all

7  up there.  I really don't know.  I never asked.  It is not

8  unreasonable to assume he might have.

9           May I add something, your Honor?

10          THE COURT:  Sure.

11          THE WITNESS:  I believe it was on the 13th that Judge

12  Buchwald directed me to forward to several people who received

13  the complaint with the attachments an order advising them they

14  were not to disseminate it.  So, presumably whatever would

15  have happened by the 13th.  Nobody has spoken to me since then

16  about any of this.

17  Q.   Did you follow Judge Buchwald's order and contact

18  everyone to whom you had sent it?

19  A.   Indeed I did.

20  Q.   Besides providing the actual documents, the ones referred

21  to as the sealed and confidential documents, did you discuss

22  the information contained in any of those documents with

23  anyone?

24  A.   Yes.

25  Q.   With whom did you discuss the information contained in

1  those documents?

2          MR. LERNER:  Objection.  This is beyond the scope of

3  the order to show cause.

4          THE COURT:  Sustained.

5  Q.   Who drafted the SDNY complaint?

6  A.   I did.

7          MR. LERNER:  Objection, that's also beyond the

8  scope.

9          THE COURT:  It is in the record.  It is part of the

10 evidence in this case.

11 Q.   Are you aware of who has reviewed that complaint?

12 A.   Would you be more precise about the phrase reviewed?

13 Q.   Read it.

14 A.   Mr. Kriss read it. .

15         THE COURT:  There are several Mr. Krisses.

16         THE WITNESS:   Referring to my client Jody Kriss.  I

17 apologize.

18 A.   My client read it, I read it and I need to request

19 clarification -- actually, no, I will answer it directly.  I

20 have been told by my lawyers at Wilson Elser that two of them

21 have read it and beyond that nobody told me that they read it

22 and furthermore whether they read it -- whether they read part

23 of it, it is unclear from your question what you're asking.

24 Q.   Did you know at the time you filed the complaint in the

25 Southern District of New York Mr. Doe's entire criminal case

1  was under seal in the Eastern District of New York?

2        MR. LERNER:   Objection.

3        THE COURT:   I will allow that.

4  A.   Truthfully, I don't know it now.  By that I don't mean to

5  contradict what the Court said.  I certainly respect the

6  Court.  And last week, if I'm not mistaken, the Court said and

7  I'll get the quote later on, I apologize to your Honor, that

8  there is no order.  At the beginning of the matter I had

9  everything filed in the case sealed.  Whatever the Court's

10  exact words were, certainly I was there, I heard that, I

11  assume it is true, and if that's knowledge, that's the first

12  time I ever had such knowledge.

13  Q.   That's the very first time you had knowledge?

14  A.   That's the very first knowledge -- first time, if it is

15  knowledge, that is the first time I had knowledge that the

16  entire record was sealed.

17  Q.   How about the exhibits that were attached to the SDNY

18  complaint, did you know that some of them were sealed?

19  A.   I still don't know that because when the Court said -- I

20  believe what the Court said last week in further comment was

21  that his Honor checked the computer files, found that the

22  general files, if I'm not mistaken, was marked sealed and his

23  Honor said that there were six documents listed without

24  description that were under seal and that he didn't look to

25  see what they were, but could if he wanted to.  My point being

1 that I actually have no knowledge that they're sealed.

2 Q.   Well, paragraph 96 of that complaint says because his

3 guilty plea to the criminal RICO proffer and cooperation

4 agreement were sealed.  When you drafted that portion, did you

5 know that they were sealed?

6 A.   I drafted more words after that.  You're moving them out

7 of context to distort the meaning.

8 Q.   Because his guilty plea to criminal RICO proffer and

9 cooperation agreement were sealed, as he was aiding the

10 prosecution of his Mafia and Russian organized crime

11 confederates, does that change your understanding of the

12 documents were sealed?

13 A.   Well, I know what I wrote.  Since it is not -- wait a

14 second.  I can check.  Can you hang on while I go look at

15 paragraph 96?

16 Q.   Absolutely.

17 A.   Please, since I'm confused, what is exactly your question

18 here?

19 Q.   When you wrote because the guilty plea to criminal RICO,

20 proffer and cooperation agreement were sealed, did you know

21 that those documents were sealed?

22 A.   I've already testified that I never have and still don't

23 know that they're sealed.

24 Q.   So, what is the meaning of that sentence when you say

25 were sealed?

1  A.   It means I'm alleging on behalf of my clients that we can

2  prove, should there be any fact at all, an ultimate fact that

3  they were sealed, that doesn't mean I know it to be true nor

4  are those my words.  I wrote them on behalf of my clients.

5  Q.   When you wrote that it is your testimony you were not

6  under the belief the documents were sealed?

7  A.   I already testified what I believe to be the state of the

8  world with respect to how I represent them and what I chose to

9  aver on their behalf as work product.  This complaint is

10  Mr. Kriss' statement that he believes the following to be true

11  by the requisite level of pleading confidence.  If I'm not

12  mistaken, is it Rule 11?  Whatever it is in Federal Court.  It

13  is not an ultimate fact.  Nothing in the complaint depends on

14  it.  It is not judicial admission, and, even if it were, it

15  isn't mine.

16  Q.   It is your client's?

17  A.   I said it is not judicial admission and, but, even if it

18  were, it is not mine.

19  Q.   You disagree with the statement that the criminal

20  complaint, the proffer and cooperation were sealed?

21  A.   I couldn't very well do that because that would require

22  my knowledge of whether they are sealed and I still don't know

23  whether they are sealed.

24  Q.   Mr. Oberlander, did you yourself ever make any attempt to

25  obtain any portion of the criminal file from the courthouse

1 here in the Eastern District of New York?

2 A.    Through my agent?

3 Q.    Through anyone.

4 A.    Yes.

5 Q.    And did you try to obtain any aspect of the criminal file

6 relating to my client in the document?

7 A.    I think it was the 10th was the date of the first hearing

8 here.

9 Q.    I'm sorry.

10 A.    It was the date of the first hearing here.  I believe

11 that is May 10th.

12         MR. LERNER:    June 11th.

13         THE WITNESS:  Oh, June 11th.  The date of the first

14 hearing.

15 Q.    But prior to filing the SDNY complaint, it is your

16 testimony you made no effort to actually obtain any portion of

17 the criminal case?

18 A.    That's correct.

19 Q.    Are you familiar with PACER?

20 A.    Oh, you mean the computer system?

21 Q.    Yes.

22 A.    I am.

23 Q.    Have you used it?

24 A.    Ever?

25 Q.    Yes.

1  A.    Yes.

2  Q.    Did you attempt to use it to obtain information related

3  to the criminal case against my client in the Eastern District

4  of New York?

5       MR. LERNER:   Objection.   The question is too broad.

6  If you're asking the attempted use to find out any information

7  about the case --

8       MS. MOORE:   I am.

9       MR. LERNER:   Are you able to answer that?

10      THE WITNESS:   Yes.

11      MR. LERNER:   Okay.

12 A.   Yes, I did.

13 Q.   And when did you do that?

14      THE COURT:   Is that when or why?

15      MS. MOORE:   When.

16 A.   I would have to check.   My guess would be around the

17 20th, 25th of May.   I really can't be certain.   It is

18 certainly easy enough to check.   It would be sometime after

19 filing the complaint.

20 Q.   You're certain you never checked prior to filing the

21 complaint?

22 A.   Virtually certain because my credit card that I gave

23 PACER to bill long ago changed the number and I never updated

24 it.   I have no recollection of logging onto PACER.   I have no

25 recollection of logging onto PACER for anything prior to that

1  time since 2008.

2  Q.   When you logged onto PACER in late May, what you pulled

3  up was a screen that says this case is under seal; is that

4  correct?

5  A.   Something like that, yes.

6  Q.   But as you sit here today it is still your testimony you

7  have no knowledge this case is under seal?

8  A.   I never testified to that.

9  Q.   What is the state of your knowledge as to whether or not

10  this case is under seal?

11  A.   That the Court said from the first date of the case, the

12  criminal matter, that he had all documents filed under seal

13  and I further testified that I have no knowledge that these

14  particular documents were filed under seal and I don't know

15  what the whole case under seal means, but I certainly respect

16  what the Court said a week ago and that's the sum total of my

17  knowledge.   I have absolutely no knowledge of what documents

18  are in fact filed under seal other than that I heard the Court

19  say there are six listed.   His Honor didn't know what they

20  were.

21  Q.   So, prior to filing the SDNY complaint you made no effort

22  whatsoever to verify the statement in the complaint that they

23  were under seal?

24  A.   I didn't say that.

25  Q.   Okay.

1     Did you make any attempt prior to filing the

2  complaint to verify whether the documents you were attaching

3  them to or any part of Mr. Doe's criminal case was under seal?

4  A.    The basis for the allegation in the complaint are

5  contemporaneous press accounts from 2007 and which reputable

6  reporters list some parts as being under seal.  I believe the

7  exact phrase, for example, from an article I think December

8  17th, 2000, in the New York Times, within a day or two of that

9  said that a federal complaint remains under seal.  Based on

10  that and press coverage of Mr. Doe, it was eminently

11  reasonable to allege that at the time Mr. Kriss was hired in

12  2003 those documents were under seal, but, as I said, that's

13  an averment or allegation on behalf of Mr. Kriss, who

14  presumably had come to that conclusion from his verification

15  of the complaint and it is a reasonable complaint he had.  I

16  have not testified as to mine.

17  Q.    My question, Mr. Oberlander, was prior to filing this

18  complaint did you make any effort to verify whether or not the

19  documents you were attaching thereto or any other part of my

20  client's criminal file were under seal?

21          MR. LERNER:   Objection, asked and answered.

22          THE COURT:  Answer it again, you can answer it.

23  A.    I referenced the press accounts.  That's how I verified

24  it.

25  Q.    Anything besides press accounts that you went to to

1   attempt to verify whether the documents you were attaching or

2   any part of the criminal case were under seal?

3   A.   Anything else I did, I don't recall specifically, no.

4   Q.   You just referenced a New York Times article which

5   specifically states a federal complaint brought against him,

6   meaning my client, in a 1998 money laundering stock

7   manipulation case was filed in secret and remains under seal;

8   is that right?

9   A.   The question is whether I referenced that article?  Yes,

10  I just did.

11  Q.   Did you read that article?

12  A.   Many times.

13  Q.   Did you read it with utmost care before filing the

14  complaint in the Southern District?

15          MR. LERNER:  Objection.

16          THE COURT:  Sustained.

17  Q.   Did you read it before filing the complaint in the

18  Southern District?

19  A.   I read it in 2007, when it first came out.  That was

20  before filing the complaint.

21  Q.   So, you knew certainly that as of December 2007, when

22  that article was written, the complaint was still under seal;

23  is that right?

24  A.   No.  I must have testified at least six times, I still

25  don't know that and anybody that would believe necessarily

Oberlander-direct/Moore

1  anything they would read in the newspaper like that I'm not

2  among the set of.  I continually told you that I do not know

3  what documents are under seal, never have known what documents

4  are under seal and the fact that the New York Times says that

5  one document is under seal is sufficient for purposes of the

6  well pled complaint, but does not make me know anything is the

7  case.

8          THE COURT:  May I for purposes of clarification?  You

9  testified that at some point you accessed or attempted to

10  access the file in this case via PACER.

11         THE WITNESS:  That's correct.

12         THE COURT:  I don't recall hearing and if it was

13  mentioned I missed it, what date was that?

14         THE WITNESS:  Sometime in the last few days of May,

15  May 20 or 25.  It may -- sometime between May 20 and June

16  10th.  I would have to check.  It was after filing the

17  complaint.  It was after the order to show cause was served.

18         THE COURT:  Thank you very much.

19  Q.    The criminal complaint referenced in the New York Times

20  article as being under seal, you made no independent effort to

21  obtain that; is that right?

22  A.    Independent of what?

23  Q.    Independent of receiving it from Joshua Bernstein.

24  A.    I testified that my attorneys attempted to access the

25  court file on June 11th, so presumably the answer is I did on

1  June 11th.

2  Q.   Any time prior to that?

3  A.   No.

4  Q.   You --

5  A.   Excuse me.  I went onto PACER.  Theoretically, if it had

6  been there and available, I guess that would be a constructive

7  attempt.  I'm not going to mislead.  Since nothing shows up

8  other than sealed --

9  Q.   You quote extensively from that complaint in your SDNY

10 complaint; is that right?

11       THE COURT:  Extensively from what?

12       MS. MOORE:   The criminal complaint.

13       MR. LERNER:   Objection.  This goes beyond the

14 scope.

15       THE COURT:  Mr. Lerner, that document is in

16 evidence.

17       MR. LERNER:   I understand, your Honor.

18       THE COURT:  If it is in evidence, it is in evidence

19 as to what it says and it is in evidence as to what it is that

20 may have been quoted.  It is part of the record.  It is a

21 rhetorical question.  It is a rhetorical one if it has been

22 quoted.  It is Mr. Oberlander's complaint.  I think the

23 assumption is a correct one, he quoted it, he signed the

24 complaint.

25 Q.   Mr. Oberlander, can you please turn to page 40 of that

1  complaint, paragraph 207.

2  A.   Yes.

3  Q.   The quote contained in paragraph 107 that is indeed from

4  the criminal complaint I have been referring to; is that

5  right?

6  A.   The complaint says it is.  I certainly wouldn't knowingly

7  misrepresent it.  Without the complaint in front of me, I have

8  to rely on what this says is right.  I wrote it; I assume it

9  is true.

10 Q.   Did you obtain that from the actual complaint, the

11 criminal complaint?

12 A.   I must have.  I mean if you're asking me do I recall

13 writing that paragraph 207, what day and time, no, but I must

14 have if this is in fact from the complaint.  If you don't show

15 me the complaint, I have to assume it speaks for itself.  If

16 you show me the complaint, then I will be able to tell you

17 whether I copied it.

18 Q.   Did you obtain the complaint from which you quoted from

19 Mr. Bernstein on March 3rd via email?

20 A.   Yes.  This must now mean what I assume was true is in

21 fact true.  It is one of the documents attached to the March

22 3rd email.

23 Q.   You did not attach that complaint as one of your exhibits

24 to the SDNY complaint.  Why not?

25 A.   Work product.

1    MR. LERNER:    Objection.

2  Q.    Was it because you knew it was under seal?

3    MR. LERNER:    Objection.

4    THE COURT:  I will allow it.

5  A.    No.

6  Q.    Was it because you knew it was stolen?

7    THE COURT:    Sustained.

8  Q.    Exhibit C to Movant's Exhibit 1 is a presentence report.

9  Did you read the entire presentence report before filing the

10  SDNY complaint?

11  A.    Yes.

12  Q.    Did you read the sentence on page two that reads, "It is

13  the policy of the federal judiciary and the Department of

14  Justice that further re-disclosure of the presentence

15  investigation report is prohibited without consent of the

16  sentencing judge"?

17  A.    I did.

18  Q.    What did you understand it to mean?

19  A.    That further disclosure by employees of the Bureau of

20  Prisons is against the policy of the judiciary and the Justice

21  Department without the consent of the sentencing judge.

22  Q.    So, you did not think that that sentence applied to your

23  disclosure of the PSR; is that your testimony?

24  A.    That's correct.

25  Q.    Did you make any attempt to obtain permission from the

Oberlander-direct/Moore

1    sentencing judge before filing the SDNY complaint?

2            MR. LERNER:   Objection.  He just answered.  It was

3    unnecessary.

4            THE COURT:   I think I can take judicial notice of the

5    fact, Ms. Moore, that no request was made of me by anybody

6    other than the Probation Department regarding this presentence

7    report.

8    Q.   Now, Mr. Oberlander, you cite an email to Ron Kriss on

9    May 12; is that correct?

10   A.   I may have sent more than one.

11   Q.   Let me show you what's been marked Movant's Exhibit 2.

12           MR. LERNER:   Your Honor, may I bring my client a cup

13   of water?

14           THE WITNESS:   Apparently I'm thirsty.

15           MR. LERNER:   Can we have the last question read

16   back?

17           MS. MOORE:   I think I just handed the witness an

18   exhibit.

19   Q.   Can you take a moment to review that exhibit, please?

20   A.   I did.

21   Q.   Is that in fact the email you sent to Ron Kriss on May

22   12?

23   A.   It looks like it.  I don't recall every word and how I

24   wrote it.

25           MR. LERNER:   Your Honor, I object.

1     THE COURT:  I don't know what it is.  Have you seen

2  the email?  Do you know what is being referred to?

3     MR. LERNER:  Yes.

4     THE COURT:  What is the objection?

5     MR. LERNER:  Objection is it has nothing to do with

6  to whom Mr. Oberlander forward the documents or how he

7  received them.  It is beyond the scope.

8     THE COURT:  May I see the email?

9     MS. MOORE:  I'm sorry, your Honor.  I thought I

10  handed it up.  It is Exhibit 2.

11     MS. MOORE:  If I may, your Honor?

12     THE COURT:  I have it.

13     MR. LERNER:  There's nothing in this email...

14     THE COURT:  Ms. Moore.

15     MS. MOORE:  Your Honor, the document is in fact

16  forwarding the complaint with the exhibits asking that it be

17  re-forwarded.  It mentions possibilities with respect to

18  filing under seal.  I believe it is clearly relevant to

19  whether or not this witness knew that the attachments were

20  under seal to begin with.

21     THE COURT:  I will allow it.  There are some portions

22  of it which may not have any relevance to this proceeding, but

23  certainly paragraphs A, B and C attached to the first

24  paragraph are perfectly relevant to this proceeding and

25  perhaps the last paragraph is as well.  I'll receive it as

1  Plaintiff's 2.  You can move on.

2        MS. MOORE:    Yes.

3  Q.   Mr. Oberlander, in this email you state there are three

4  objections I filed publicly today, I filed under seal.  I

5  arranged for an agreement with every defendant but Nixon

6  Peabody.

7        At the time you sent him the email you had already

8  filed it publicly, had you not?

9  A.   According to the court rules I had, but the -- yes.

10 According -- actually, seriously, I can't answer that only

11 because the terminology is confusing to me.  I had filed a

12 complaint already but it had not been public.

13 Q.   When you say you forwarded this to Julius, who is Julius?

14 A.   Ron Kriss would have understood that to be Julius

15 Schwartz.

16 Q.   Julius Schwartz is a principal of Bayrock?

17 A.   I have no idea what he is now, but at one time he was.

18 According to various testimony he gave title as executive vice

19 president, general counsel and considered himself de facto

20 chief executive officer of the company.

21 Q.   And he's a former law partner of Ron Kriss; is that

22 right?

23 A.   I think they called them shareholders, but, yes.

24 Q.   At the firm of Ackerman?

25 A.   Ackerman Senterfitt.

1  Q.   And in this email you basically say there's three options

2  or pay the money back now; is that right?

3  A.   No.

4  Q.   Give the money back and now it is over.   What is the

5  meaning of that?

6  A.   It means Julius Schwartz personally in conspiracy with

7  other people, including Mr. Doe, stole in cash equivalent

8  about eight million dollars from my clients in terms of the

9  value of the partnership interest, they converted about

10  $30 million, probably tens of millions of dollars, depending

11  on the analysis from the Treasuries of New York State, New

12  Jersey and the United States, and I don't know how many

13  millions from people they defrauded when they were buying

14  condominiums and that they had plenty of time to rectify their

15  theft, embezzlement, larceny, fraud and tax evasion.

16  Q.   If in response to this email they agreed to pay back

17  millions of dollars you said were owed, would you have not

18  filed the complaint?

19  A.   I believe I testified I already had.

20  Q.   Would you have not served it?  Would you have retracted

21  it?

22  A.   If all defendants settled?  I don't know who they is.

23  You said if they had paid.  Who is the they in your question?

24  Q.   Julius.

25  A.   What about it?

1  Q.   Well, the way I read this email, Mr. Oberlander, correct

2  me if I'm wrong, is that you're giving him three options in --

3  or demand for money.  You're saying I'll do this, this or this

4  unless you pay me the money back.

5       Am I reading that wrong?

6  A.   You are.

7  Q.   It was not your intent to make it a demand for money in

8  exchange for not filing it publicly?

9  A.   Of course it wasn't.

10 Q.   Explain to me the last paragraph.  I believe it is

11 possible to get this in under seal if Bayrock joins a joint

12 motion in Part One to seal the complaint pending redaction

13 agreement with the assignment judge.

14      What did you mean by that?

15 A.   What I meant by that is that this email was following up

16 on a telephone conversation I had with Mr. Kriss approximately

17 30 minutes earlier and during the course of that conversation

18 I informed Mr. Kriss that the best practices dictated that I

19 attempted to file the SDNY complaint under seal, which I had

20 attempted to do ex parte, and that I followed the procedures

21 to that and that the Part One Judge I was given to whom I

22 submitted a motion along with a brief in support of a motion

23 requesting a seal -- that would be Judge Kimball Wood --

24 declined without reason to seal it and because of the time it

25 took for her law clerks to go through everything and for her

1  to then decline to seal it, it ran past the closing date for

2  the time for the cashier which I had to come back and file in

3  the morning and drop off the copy and within 24 hours upload

4  it to PACER.

5  So, I told Mr. Kriss that since best practices

6  covering me as plaintiff's attorney would indicate that I

7  attempt to file the complaint under seal and since I had

8  already been turned down by a Part One Judge that had not got

9  a spun wheel yet and an assigned judge, it was my belief that

10  if at least one defendant, ideally more than one, would join

11  with me in a stipulated motion to file under seal it would

12  then be reasonable to go to a new Part One Judge without judge

13  shopping and say, your Honor, we would like this filed under

14  seal by stipulated agreement.

15  So, my purpose in contacting Ron Kriss was the same

16  purpose I had in contacting John Elzufon an hour earlier, at

17  10:30, I think, that morning, which was to say to them that I

18  wanted to file the complaint under seal for reasons listed in

19  the sealing motion and that I was turned down, but that I

20  believed if someone stood next to me from the defendant's side

21  with a stipulated request to file under seal that perhaps that

22  would work.

23  Q.   Mr. Oberlander, why did best practices dictate that you

24  file a civil RICO complaint under seal?

25  A.   For one thing these companies of Bayrock are a

1   partnership and the -- for tax purposes and the crux of the

2   complaint is that Mr. Doe, Julius Schwartz with the conspiracy

3   of professionals ran Bayrock through a pattern of rampant tax

4   evasion, tax fraud, money laundering, and when you play games

5   like that in a tax partnership you are propagating

6   consequences to every single one of the partners, including

7   the innocent minority partners, and it was my interpretation

8   that given the financial information that was in the complaint

9   even though nominally it would appear to be related to

10  Bayrock, it had sufficient impact on the tax partners of

11  Bayrock that it triggered, I think it's 21F, I'm not sure, of

12  the ECF filing that says while you don't have to file under

13  seal information, complaint or documents that contain the

14  following, you probably should, and, if I'm not mistaken, on

15  the list of those things that the court recommends attempted

16  to be filed under seal are documents containing personal

17  financial information.  That was one reason.

18  Q.   Were there any other reasons?

19  A.   Yes, there were.  There are emails in the complaint and

20  while I am certain that they are properly used and not subject

21  to objection and the reasons for that are stated in the moving

22  papers for filing under seal, I believe that best practices

23  requires in a case of this gravity that the opposing side in

24  the interest of justice be given a chance to examine the

25  complaint and see if they had, for example, privilege

1  objections, in which case there could be a period of maybe a

2  week or two while the complaint stayed under seal pending a

3  redaction agreement.  That's what I was explaining to

4  Mr. Kriss, that's what I was explaining to Mr. Elzufon and

5  that's what is in my moving papers to put it under seal and in

6  fact that's what Morris and Cohen, representing Mr. Schwartz,

7  and I believe although it should be impossible conflict, also

8  representing Bayrock Group, specifically requested of me

9  within days of filing if I would agree to redaction.  So,

10 apparently they have the same view of it as I do.

11        The third reason for wanting to file under seal is

12 because this is a derivative action and while there are about

13 five or six known equity class members that are represented by

14 Mr. Kriss since Bayrock must be assuming even a fraction of

15 these complaints, claims in the complaint are true.  Since

16 Bayrock must be and must have been for sometime insolvent,

17 there are a staggering number of creditors who have quasi

18 equity standing to participate in a derivative action as

19 beneficiaries and to the extent that filing the complaint

20 prior to giving a chance for redaction would destroy what was

21 left of the company based on public reaction to it the

22 interest of my own derivative, albeit unknown clients, the

23 better part of the -- it was to attempt to redact and preserve

24 value of the company so that people out in the world reading

25 this wouldn't shoot against it.

1  Q.   Were there any other reasons you made a motion to file it

2  under seal?

3  A.   Those were the three motions.

4  Q.   Does that motion exist in writing?

5  A.   Of course it does.

6  Q.   Do you still have a copy?

7  A.   Yes, I do.

8  Q.   Does that motion in any way contain any references to the

9  fact that there are sealed documents related to a criminal

10  case attached to the SDNY complaint?

11  A.   I'm virtually certain that it doesn't because 21F, in

12  fact, when you read it and it lists the documents -- rather,

13  the information which might give a reasonable attorney pause

14  to think about attempting to seal.  I believe the very last

15  one is if your document contains information about a

16  cooperation agreement with the government.  I presume from

17  reading that mine was not the only document ever filed that

18  contained a cooperation agreement that the government had.

19  Q.   I'm sorry, I'm confused and not familiar with 21F.  Does

20  21F permit you to file such a document or tell you to file it

21  under seal?

22  A.   Neither.  Actually, it simply says there's no restriction

23  whatsoever against filing it under seal, but you might want to

24  think about it.

25          THE COURT:  Excuse me.  What is 21F?

1      THE WITNESS:  I apologize, your Honor.  There are ECF

2   rules published by EDNY and SDNY, jointly electronic filing

3   rules, and they refer to filing of all documents, not merely

4   complaints, and I'm pretty certain, it is funny -- again I

5   apologize, but there are two sets of rules, two so I'm

6   assuming it is 21E and -- whatever they are they are back to

7   back.

8      One says if your document contains any of the

9   documents you may not file it electronically or I guess

10  without court order or court permission.  So, that would be

11  according to Ms. Moore's questions you are prohibited from in

12  the absence of extenuation filing.  Following that I think is

13  21F, which contains a list of items which if your document

14  contains them you are perfectly free to file under seal, but

15  if I can paraphrase you probably ought to think about it

16  before you do that and consider attempting getting it sealed.

17      THE COURT:  Among the documents listed are

18  cooperation agreements?

19      THE WITNESS:  Indeed.

20      THE COURT:  Yes?

21      THE WITNESS:  Honestly, yes.

22      THE COURT:  Presentence reports?

23      THE WITNESS:  No.

24      THE COURT:  Cooperation agreements?

25      THE WITNESS:  Two-word phrase cooperation agreement,

1  if it doesn't say that, it says something like -- evidence in

2  cooperation with the government.  May say cooperation

3  agreement.  Yes, it is very clear what it refers to.  It

4  does.

5          THE COURT:  Does it also refer to proffer agreements,

6  which are essentially almost synonymous with cooperation

7  agreements?

8          THE WITNESS:  No, it does not, no.

9          THE COURT:  You indicated earlier I believe you had

10  no idea, if I'm paraphrasing correctly, what a sealed case is,

11  what sealing encompasses and so on.  Do you recall that?

12          THE WITNESS:  No, I apologize.

13          THE COURT:  You never said anything like that?

14          THE WITNESS:  No, no.  The words are similar to what

15  I said, that I certainly would never have said more than I

16  mean to say, that I don't know what it means when a case is

17  put under seal.  Of course, I know what it means when a case

18  is put under seal.  I believe Ms. Moore was asking me what

19  documents I knew to be part of the sealed -- whatever you want

20  to call it.  There is a sealed, what is it, envelope?  However

21  your Honor wishes to refer to it.  Assume in an average case

22  there are some documents that are sealed and some that are

23  not.  In this case it may be all documents.

24          Ms. Moore has generally been asking me or in fact

25  entirely been asking me did you know this document was sealed,

Oberlander-direct/Moore

1  did you know that one and I said no, but if you're asking me

2  do I know what it means when a court orders a case sealed,

3  yes, of course I do and I apologize for any confusion.

4       THE COURT:  Do you understand that it means that the

5  case generically, meaning everything connected with that case,

6  is sealed?  The case is sealed, what does that mean?

7       THE WITNESS:  May I answer?  I would very much like

8  to answer that.

9       THE COURT:  By all means.

10       THE WITNESS:  All right.  In this particular case,

11  not having seen the sealing order, I certainly can't comment

12  on what any -- in general, my understanding is that when a

13  judge orders a case sealed that the order at a minimum directs

14  court personnel to remove the documents that are subject to

15  the sealing order from the publicly available file to keep

16  them sequestered somewhere, somewhere I guess in a safe of

17  some kind, to decline to release them to any member of the

18  public or anyone else asking for them who doesn't have a court

19  order and that a sealing order will typically, but not

20  necessarily, also include an order of the Court in the nature

21  of an injunction enjoining certain parties for that action

22  from disseminating some or all of the same documents.

23       That would be my generic understanding of what a

24  sealing order is.  It is not in rem, could not be in rem.  It

25  is directed to court personnel not to disclose and directed

1  sometimes but not all the times the parties not to disclose.

2  It specifically is not a gag order nor could it purport to be,

3  but again for clarity I don't know what the order says.

4       If I may, there is one case with which I'm familiar

5  that says it probably more eloquently than I can.  It is from

6  the Supreme Court of Kentucky.  It is in the June 14th letter

7  and it says that a sealing order of the type I described, what

8  we call generic in this question, is not to be interpreted to

9  be a global gag order, not to be interpreted as any form of

10  court order purporting to control the ability of somebody to

11  obtain the same information outside the court process.

12       THE COURT:  We're talking about two different things,

13  Mr. Oberlander.  If a case is declared to be a sealed case and

14  court personnel are instructed this case is to be kept under

15  seal, you understand that to mean that court personnel are

16  precluded from making any information pertaining to that case

17  available to anybody.  I don't know what the Kentucky court

18  was dealing with, nor do I particularly care, the fact of the

19  matter is that your understanding is correct, that when a case

20  is declared to be a case filed under seal it directs court

21  personnel that this case is not to be made available to

22  anybody except under court order, which means in effect that

23  it is globally unavailable to anybody unless a court orders

24  it, directs it to be unsealed.

25       So, when you went to PACER, whenever it is you did,

1   you saw this was a sealed case and when Mr. Lerner went to the

2   Clerk's office and requested to see the file, he was told, as

3   he told me in a letter addressed somewhere along in this case,

4   that the Court Clerk said, "Sorry, this case is under seal and

5   we cannot disclose anything about this case to you."  That is

6   what you were told or at least you told me that in the letter.

7           MR. LERNER:   My letter said I went to the Clerk's

8   office to obtain a copy of the sealing order.  I was unable to

9   obtain a copy of the sealing order.

10          THE COURT:  You were told even that's under seal.

11  They couldn't show you that?

12          MR. LERNER:    That is correct.

13          THE COURT:  Because it is the entire envelope under

14  seal in the vault of the Court together with everything else

15  that's filed.  Now, it is true there were six documents which

16  were also specifically marked under seal, but when the court

17  is authorized, a Judge of the court would be authorized to

18  access that sealed case, there are many entries which are

19  ministerial which the Court is told a letter has been sent or

20  whatever it is, an adjournment has been granted, but there are

21  some documents which are specifically filed under seal, so

22  even the Court can't look at it unless it makes a request to

23  see what that document is and asks the clerk, Clerk of the

24  Court, to open the vault and let me see what docket number 36

25  is.

1    In the course of the proceeding it may have some

2    specific value for the Court's information but it is globally

3    sealed.  It is not addressed to any particular person.  It

4    couldn't be.  The Court wouldn't know in advance who it is

5    that might want to look at this file.  The Clerk of the Court

6    is told this case is sealed and without permission of the

7    Court it shouldn't be disclosed to anybody.

8    Why don't you move on, Ms. Moore.

9  BY MS. MOORE:

10  Q.  Just to clarify, Mr. Oberlander, it is your understanding

11  when a document is under seal that doesn't happen on its own,

12  right, it is pursuant to court order?  Is it your

13  understanding the court needs to order a document to be under

14  seal?

15  A.  I would not technically -- because I believe once a court

16  orders generally documents filed it doesn't then order each

17  individual document.  You just -- as a matter of course as you

18  file it becomes sealed.  But generally at one time or another

19  somebody somewhere on behalf of the court with authority to do

20  so must have written that order directly to keep some or all

21  documents under seal in order for it to be true as a statement

22  that such and such a document is sealed.

23  Q.   It is not limited to court personnel.  Your order before

24  Judge Kimball Wood, you would understand it to mean you

25  couldn't further disseminate the document, could you, if it

1   had been signed?

2   A.   You mean the proposed order?

3   Q.   Yes.

4   A.   I have to look at it.  I drafted the thing quite some

5   time ago, but, yes, the object of the court order could

6   variably be any party over whom the Court at the time of the

7   order had personal jurisdiction sufficient to justify -- we

8   don't need to go into a constitutional Rule 65 speech.  You

9   understand.  We both understand.

10  Q.   But it is your testimony that no part of your application

11  before Judge Wood related to the fact that you were attaching

12  documents that were under seal in the Eastern District of New

13  York?

14  A.   I haven't seen it in a few weeks.  I truly don't recall

15  that I did that.  If I did, it is my memory error, but

16  certainly that sealing order -- I mean it is easily -- you

17  know, I can find it when I get back to my office, but to the

18  best of my recollection I believe that the motion said --

19  actually, it doesn't -- it could be read possibly like that

20  because it does refer to information that is privileged and

21  confidential.  Let's rephrase it.  I will not quote from

22  something not in front of me.

23       It would be impossible to read it that way.  I didn't

24  necessarily intend to write it that way.  I don't recall

25  specifying that there were documents in there that would be

1  under seal nor could I possibly have done so in any sense of

2  reality I have because I continue to testify that I still to

3  this day have absolutely no idea what documents are and aren't

4  under seal so I couldn't have said that, your Honor, meaning

5  whatever the Part One Judge says there are documents that are

6  under seal here because that would contradict what I'm

7  saying.  So --

8  Q.  Mr. Oberlander, how can you possibly still say that?

9  We've gone over the PACER report that says the case is under

10  seal repeatedly.  It is clear that every document connected

11  will be under seal.  How can you still sit there and say to

12  this day you don't know which documents are under seal or

13  aren't?

14  A.  Because I'm a mathematician, I'm an attorney, I listen to

15  your questions and those are the truthful, correct answers to

16  the way you're phrasing them.  I have no personal knowledge of

17  what documents are or are not sealed.  That would remain my

18  answer.

19  Q.  After Judge Wood denied your order, your application to

20  file the SDNY complaint and its attachment under seal, you

21  filed it anyway, didn't you?

22  A.  Yes.

23  Q.  You did so knowing it contained information that could

24  possibly endanger my client's life, did you not?

25       MR. LERNER:  Objection.

1    THE COURT: Sustained.

2  Q.   Well, based on the documents you attached you knew that

3  my client had cooperated against dangerous organized crime

4  defendants; is that correct?

5  A.   Documents attached to what?

6  Q.   To the complaint, the cooperation agreement and proffer

7  agreement attached to the complaint.

8  A.   I've continued to testify that anything I did or didn't

9  know is work product and that complaint represents the

10 allegations and averments of the clients that I represent.

11 Mr. Kriss, in principal, is the most aggrieved of all of

12 them.  Anything said in there cannot fairly be imputed to me.

13 It is, frankly, none of my business to believe or not

14 believe.  It is my business to advocate within the constraints

15 of Rule 11 foundation for pleading -- Rule 11 I think it is.

16 Q.   Mr. Oberlander, the Professional Rules of Conduct permit

17 you to waive work product and attorney-client privileges to

18 defend yourself against accusation of misconduct.  Let me make

19 it clear we are accusing you of misconduct in connection with

20 your actions in this case in filing these sealed documents and

21 doing so in a way that would endanger a man's life.

22      Do you wish to pursuant to the Rules of Professional

23 Conduct avail yourself of your ability to waive work product

24 to answer those questions?

25 A.   No.

1    MR. LERNER:    Objection.

2    THE WITNESS:    Are you going to object?

3    MR. LERNER:    I object.    It is beyond the scope of

4  this order to show cause.

5    THE COURT:    Overruled.

6    MR. LERNER:    If Ms. Moore wishes to refer this to a

7  disciplinary committee, as to which Mr. Oberlander is

8  admitted, that would be the proper forum for such

9  allegations.

10  Q.    Mr. Oberlander, are you going to stand by your answer

11  that the answer to my question is work product privilege?

12  A.    Which question?

13  Q.    The question as to whether or not you knew that by

14  attaching the cooperation agreement to a civil RICO complaint

15  in the Southern District would potentially endanger my

16  client's life.

17    MR. LERNER:    Objection.

18    THE COURT:    I sustained an objection.

19  Q.    Mr. Oberlander, if you would take a look, please, at

20  Exhibit A to Movant's Exhibit 1, which is in fact the

21  cooperation agreement and I would like to direct your

22  attention to paragraph ten of that agreement.

23  A.    Yes.

24  Q.    That paragraph references the Witness Protection

25  Program.    Did you read that paragraph prior to filing this

1   complaint?

2   A.    I did.

3   Q.    And you fancy yourself as somewhat of an authority in

4   criminal court; is that correct?

5   A.    No.   In fact, I told you I'm not a criminal lawyer.

6   Q.    Well, do you have any understanding whatsoever of when a

7   cooperation agreement might include provisions with respect to

8   Witness Security Program?

9   A.    Do I have any understanding of when it would include

10  one --

11  Q.    Yeah.

12  A.    Presumably when the parties negotiate it to include one.

13  Q.    Do you have an understanding of what that program is?

14  A.    From popular culture.

15  Q.    And you had no concern by attaching this cooperation

16  agreement, no concern whatsoever about doing that?

17  A.    Hypothetically I'm not waiving anything, but

18  hypothetically if I had my concerns it would have been limited

19  to the safety of Mr. Kriss, who Mr. Doe threatened with death,

20  would have been limited -- the answer to your question is

21  hypothetically if I had given it any thought the answer I

22  would have come up with would have been I'm not Mr. Doe's

23  guardian angel, I'm Mr. Kriss'.

24  Q.    When we first spoke to Judge Buchwald on May 13th, you

25  were represented on that telephone conversation by attorney

1  named David Lewis; is that correct?

2       MR. LERNER:  Objection.

3       THE COURT:  I think it is referred to in the papers

4  that have been submitted, Mr. Lerner.

5       THE WITNESS:  Does that mean answer?

6       THE COURT:  Yes.

7  A.  Yes, I was.

8  Q.  When did you retain Mr. Lewis to represent you in

9  connection with the matter before Judge Buchwald?

10 A.  Mr. Lewis and I have been friendly for 45 years.  I

11 originally began consulting him in this matter in 2000 and --

12 2009.  I don't have a formal retainer agreement or engagement

13 letter.  A relationship of almost half a century, sporadic.  I

14 just can't answer that, but the point is that Mr. Lewis has

15 been with me in this matter for well over a year before that

16 phone call.

17 Q.  He's not still with you, is he?

18      THE COURT:  Ms. Moore, we're going kind of far

19 afield.

20      MS. MOORE:  Okay, your Honor.

21      THE COURT:  Excuse me.  We're going a little bit far

22 afield.  Not a little, perhaps a little bit more than a little

23 far afield here with respect to what this proceeding is about,

24 as I understood it when the initial order to show cause was

25 presented to me.  So, why don't we just stick with that.

1    There are inferences which the Court can draw with

2 respect to what is specifically in the complaint and whether

3 Mr. Oberlander was aware of what it is he alleged in the

4 complaint.

5    MS. MOORE:   Yes, your Honor.

6    THE COURT:   That complaint specifically refers to

7 documents which were sealed.  Whether Mr. Oberlander

8 understood or didn't understand what that means or whether

9 that was his words or his client's words may be something for

10 me to deal with.

11    MS. MOORE:   Understood, your Honor.

12 Q.   Mr. Oberlander, Judge Buchwald did issue an order on May

13 13th ordering there be no further dissemination of the

14 complaint or the exhibits attached thereto.

15    Do you recall that order?

16 A.   I do.

17 Q.   And then the following day she issued another order, is

18 that correct, ordering that the entire complaint be placed

19 under seal and that it be redacted in a fashion to remove all

20 references to the sealed and confidential documents; is that

21 correct?

22 A.   No.  Not by my recollection, no.  That's distorted.

23 Q.   Why don't we take a look at that order.

24    MS. MOORE:   Exhibit 4, your Honor.

25 A.   If you're referring to sua sponte order of approximately

1  three o'clock that Friday, I --

2          THE COURT:  Exhibit what?

3          MS. MOORE:   Four, your Honor.

4          THE COURT:  Four?

5          MS. MOORE:   Yes, Judge.

6          MR. LERNER:   May I have a copy?

7          MR. SNIDER:   Of course.

8  Q.   Directing your attention to the second page.

9  A.   I understand.  I misunderstood your original question.

10  If I can correct my answer or you can rephrase?  I understand

11  what happened here.

12  Q.   Did you understand that Judge Buchwald on the 14th

13  ordered the entire complaint to be sealed and that it be

14  redacted to remove any references to the sealed documents and

15  the documents themselves?

16  A.   To be precise, she ordered the original complaint sealed,

17  it says pending further order of the Court and a redacted

18  version.  My misunderstanding of your prior question was that

19  I assumed originally it would refer to redacted version.  I

20  was confused.  Yes, we are in agreement that's what she

21  ordered except that her sealing order is pending further

22  instruction.

23  Q.   There was another order from Judge Glasser on May 18th

24  that also enjoined you from disseminating the sealed and

25  confidential materials and the information therein; is that

1  correct?

2  A.   I don't recall exactly what it said.  It was not served

3  on me personally, but I assume that's correct in sum and

4  substance.  You don't have to show it to me.  I will stipulate

5  to that.

6  Q.   Despite that, Mr. Oberlander, you intended to file

7  redacted versions of that complaint that in fact referenced

8  the information in those sealed documents; is that correct?

9  A.   I what?

10  Q.   You intended to file redacted versions of that complaint

11  that did reference the information that was in those sealed

12  materials; is that correct?

13  A.   I'm sorry, that's ridiculous.  You mean did I ever form

14  the intent to file a redacted version?  I formed the intent

15  the moment I received this order because I was told to.    I

16  held that intent all the way through until the time a few days

17  later when Mr. Lewis told me we may have a problem here

18  because this order may wind up in conflict with Judge

19  Glasser's order, so he would write to Judge Buchwald, which I

20  believe occurred that Tuesday or Wednesday following this and

21  he would write to Judge Buchwald and say maybe -- or maybe

22  call her and say maybe you ought to just stop any uploaded or

23  redacted version until Judge Glasser finishes what he's

24  doing.  And my recollection is that Judge Buchwald wrote back

25  and said I don't see why there would be confusion, but I

Oberlander-direct/Moore

1  certainly have no objection to extending my original

2  prohibition against uploading until Judge Glasser is done.  So

3  that to be absolutely clear here from the moment I received

4  notice of this order telling me to upload I had the intent to

5  do so and complying with it all the way through until the time

6  Judge Buchwald said never mind.

7  Q.    Let me back up a second, Mr. Oberlander.  The application

8  that Mr. Lewis actually made to Judge Buchwald stated Brian

9  Herman of Morgan Lewis in an email last night stated that

10  Judge Buchwald's and Judge Glasser's orders are much broader

11  than I understood them to be.  Further, Mr. Herman stated that

12  we will consider any reference to the exhibits or information

13  contained therein in any way to be a violation of the orders

14  and will seek immediate relief.

15         As a consequence, Judge Glasser's order is a change

16  in circumstances, such that complying with this court's order

17  to file a redacted complaint appears to violate a sealed order

18  of Judge Glasser.

19         The response to that, what Judge Buchwald actually

20  wrote was:  While I do not understand how you could have

21  interpreted my earlier orders to permit, quote, any reference

22  to the exhibits or information contained therein, I have no

23  objection to delaying the filing of a redacted complaint until

24  Judge Glasser rules on the sealed documents issue pending

25  before him.

1      My question, Mr. Oberlander, is prior to receiving

2 that letter from Judge Buchwald, it was in fact still your

3 intention to file a redacted version of the complaint that

4 would still reference the information that was contained in

5 the sealed documents; is that correct?

6 A.    Of course it is not.  That's offensive.  You're asking me

7 if I formed the intent to violate this order.  I did not ever.

8 Q.    Mr. Oberlander, there was a courthouse news article that

9 went out after Judge Buchwald resealed this entire complaint.

10 Did you speak to the reporter who wrote that article?

11 A.    Never.

12      THE COURT:  I think the court reporter would like to

13 rest her fingers for a few minutes.  Why don't we do that.

14      (Recess taken.)

15      THE COURT:  Are we ready to proceed?

16      MS. MOORE:    Yes, your Honor.

17      THE COURT:  Mr. Oberlander.

18      (The witness resumes the stand.)

19      THE COURT:  Ms. Moore.

20      MS. MOORE:    Thank you, your Honor.

21      THE COURT:  Before you proceed, Mr. Oberlander, my

22 law clerk advises in the first place we have no rule in the

23 Eastern District which resembles 21F, we have no Rule 21.

24      THE WITNESS:  It is not a local rule, it is an ECF

25 rule.

Oberlander-direct/Moore

1    THE COURT:  I thought I heard you say the Southern

2  and Eastern District Rule 21F.  If I misheard, I would

3  apologize to you.

4    THE WITNESS:  Not necessary.

5    THE COURT:  But we have pulled down "Electronic Case

6  Filing Rules and Instructions" --

7    THE WITNESS:  It should be in there.

8    THE COURT:  -- "of the United States District

9  Court for the Southern District of New York."  There is

10  no Rule 21F.

11    THE WITNESS:  I have the number wrong.

12    THE COURT:  Just bear with me.

13    There is a rule, it is 21.4.  Certain sensitive

14  personal information should not be included, such as social

15  security number, names of minor children, dates of birth,

16  financial account numbers, home addresses.

17    Question:  Is there other sensitive information that

18  I should consider redacting?  The answer is yes.  Caution

19  should be exercised when filing documents that contain the

20  following:  And among the list is information regarding an

21  individual's cooperation with the government.  It doesn't

22  refer to cooperation agreement.  Information regarding an

23  individual's cooperation with the government.

24    There is no 21F and this is the only reference in

25  this document which is "Electronic Case Filing Rules and

1  Instructions of the Southern District," August 1st, 2008

2  edition and apparently we have no comparable rules here.  But

3  it is information regarding an individual's cooperation with

4  the government, not restricted to a cooperation agreement.

5          Why don't you proceed, Ms. Moore.

6  BY MS. MOORE:

7  Q.  Mr. Oberlander, let me show you as a housekeeping matter

8  the version of the complaint that you offered, that you filed

9  in Southern District.

10         THE COURT:  I'm sharing this with Mr. Lerner.  He'll

11  share it with you, when he's finished.  Mr. Lerner, do you

12  want to look at this?  Do you have a copy of it?

13         MR. LERNER:   I will look at it after Ms. Moore looks

14  at it.

15         THE COURT:  It is 21.4, if it is the same document.

16         Go ahead, Ms. Moore.

17  Q.  Mr. Oberlander, I show you Exhibit 11, which is the

18  version of the complaint.

19         THE COURT:  I think the microphone has been turned

20  off.

21  Q.  I've handed you what is the version of the complaint that

22  was actually filed in the Southern District.  That's the

23  version that you signed; is that correct?

24  A.  If this is that version, I signed it.

25  Q.  Why don't you take a look, Mr. Oberlander.

1   A.    Yes.   It has my signature page on it.   It is illegible.

2   I certainly signed whatever I handed in.   If this is in, yes.

3   Q.    Did you personally type this document?

4   A.    I mean enter it on a computer.   Did I type it?

5   Q.    Yes.   Every word?   Including the words relating to the

6   documents that were sealed?

7   A.    You're asking me did I have anyone else other than me

8   physically at the keyboard?

9          MR. LERNER:   Objection, it has been asked and

10  answered.

11         THE COURT:   Sustained.

12  Q.    Mr. Oberlander, as you sit here today, what is your

13  current understanding of whether or not you can or should use

14  the proffer agreements, cooperation agreement, presentence

15  report, criminal complaint, information or any other documents

16  that relate to the criminal case against my client in the

17  Eastern District of New York?

18         MR. LERNER:   Objection, your Honor.   It is outside

19  the scope of the order to show cause.   It is also irrelevant.

20         MS. MOORE:   Your Honor, I believe it is directly

21  relevant to what relief the Court should grant going forward

22  and what the order needs to say for Mr. Oberlander to

23  understand that he should not be using these documents or the

24  information contained therein.

25         MR. LERNER:   The only relief that is --

1    THE COURT:  I believe, Mr. Lerner, that it is very,

2  very pertinent for the Court to know whether or not when

3  Mr. Oberlander filed this complaint in view of his testimony

4  that he was familiar with the ECF filing cautionary

5  instructions, that the question is appropriate and I will

6  permit him to answer it.

7    Do you want the question rephrased or reread,

8  Mr. Oberlander?

9    THE WITNESS:  If I ask what I'm confused -- may I

10  ask --

11    THE COURT:  Why don't we have Ms. Moore put the

12  question to you again.

13  Q.  Mr. Oberlander, as you sit there today, do you believe

14  that you in any way used the proffer agreements, cooperation

15  agreement, presentence report, complaint, information or draft

16  information or any other documents that were filed in

17  connection with the criminal case against my client in the

18  Eastern District of New York in any way, shape or form?

19    MR. LERNER:  Your Honor, I would just like to

20  clarify this, that there's presently an order to show cause

21  that bars him from doing just that.  So, if the question

22  presupposes there's no such order, I think that question can

23  be answered.

24    THE COURT:  I'm going to sustain an objection to

25  form.  It is not "did you."  At the time the complaint was

1  filed.

2  Q.   Did you understand at the time the complaint was filed

3  that you should not have used the proffer agreements, the

4  cooperation agreement, the presentence report, the criminal

5  complaint that is referenced in the complaint, did you

6  understand that you should not have used those documents in

7  connection with drafting and filing that complaint?

8  A.   Of course I wouldn't have understood that because that

9  isn't the law.  There is no proscription the way you said

10 there is.  You're asking me if I understood that I was legally

11 prohibited from doing what I did.  Of course I did not.  The

12 reason I did not is to the best of my understanding in no way,

13 manner, shape or form were there any court orders of any kind

14 with jurisdiction over me prohibiting it at the time I filed

15 the complaint.

16 Q.   At this time, as you now know that the entire criminal

17 matter is under seal, which includes the court appearances,

18 and the documents filed in connection therewith, what is your

19 understanding as to whether or not you have a legal right or

20 ability to use any of those documents or the information in

21 those documents in any way?

22 A.   My understanding -- assuming that the order to show cause

23 with the encapsulated temporary restraining order reevaporated

24 tomorrow and no other orders were issued that I'm aware of,

25 that I'm not aware of now and my understanding of my legal

1  right to, quote, use it, unquote -- first, for clarification,

2  may I presume by use you mean use the information, not just

3  the actual physical documents, is that what you meant by the

4  term use?

5  Q.   Yes.

6  A.   All right.  My understanding of my legal right would be

7  that I have the same right to speak or disseminate them

8  subject to any validly issued, served court order telling me

9  not to, and that I would have the right to object to such a

10  court order which, of course, I would respect to the extreme,

11  that there is no order in existence of any kind under Rule 65B

12  or any constitutional standard of due process, Fourteenth

13  Amendment, that restricts me from using them, the information

14  in it, and that there is no court order with which I could

15  have possibly been charged with -- it is coming out -- let me

16  rephrase that.

17       There are no court orders nor were there nor are

18  there now other than the temporary restraining order that

19  prohibits me from using the information I obtained.  That's my

20  legal right.  Otherwise, with respect to the information in

21  the PSR, I stand by what I just said, but it would be my

22  intention now to request formal permission to unseal certain

23  other documents which I presume are there and I would prefer

24  to use them.

25       So, if that's complex, I apologize, but my

1  understanding is that there is no nor has there ever been any

2  court order with any in personam effect over me regarding any

3  of those documents.

4  Q.    Mr. Oberlander, you understand now, certainly, that there

5  is a court order that places this entire case under seal, do

6  you not?

7  A.    I understand that that court order doesn't run in rem.

8  There is no such thing.  That has been the law in this Circuit

9  for almost 70 years.  Supreme Court upheld that court orders

10 and such things don't run in rem, they run in personam and

11 constitutionally cannot apply or restrain activities of

12 persons who are not either parties of that action or legally

13 identifiable.  That's Rule 65D, as well as the First

14 Amendment.

15        So, to the extent that I presume the Court certainly

16 did order the files sealed, that order and its in personam

17 effect does not touch me.  It certainly would touch me if I

18 obtained them from the court improperly and aided and abetted

19 a court order in breaking a seal, but none of that happened.

20 Q.    Doesn't the order apply to the documents themselves?

21 A.    Of course not.  There is no in rem court order.  They are

22 in personam court orders.  I can give you cases to that effect

23 in the 2d Circuit.

24 Q.    What is it going to take in the form of an order for you

25 to understand that you cannot use the documents you obtained

1 on March 3rd from Josh Bernstein --

2          MR. LERNER:    Objection.

3 Q.    -- or the information in them?

4          THE COURT:    The objection is sustained.

5          Ms. Moore.

6          MS. MOORE:    One more question, your Honor.

7 Q.    Mr. Oberlander, is it your position with respect to

8 whether or not you can or can't use documents ordered under

9 seal the same regardless of whether or not they were stolen?

10 A.    Are you asking me for a hypothetical legal opinion in my

11 capacity as an attorney on what the law would be?    My answer

12 would be that to the extent that the person receiving them

13 either, A, did not know that they were stolen; B, had no

14 reason to know; or, C, according to the latest Supreme Court

15 ruling actually did know, but was merely a passive recipient

16 of those documents.    There is a First Amendment and they may

17 be used certainly if they contain information in the public

18 interest.    And my understanding of such information pertains

19 to matters of criminal trials.    Is that the absolute foremost

20 heightened respected First Amendment right of access to

21 documents in criminal charges is to documents containing plea

22 agreements and sentencing arrangements.

23          MS. MOORE:    Your Honor, I have no further

24 questions.    I do have an application.    Mr. Oberlander

25 referenced a written motion he made to Judge Wood attempting

1 to seal the SDNY complaint and I would like a copy of that

2 written application.

3         I also question whether or not the email of March 3rd

4 that forwarded those -- the documents was in fact

5 attorney-client privilege.  I would ask that it perhaps be

6 provided to the Court in camera for inspection as to what that

7 sentence says and whether or not that is relevant to these

8 proceedings.

9         THE WITNESS:  I have no problem.

10        THE COURT:  All right.

11        MR. LERNER:   No objection.

12        THE COURT:  So ordered.

13        MR. LERNER:   May we forward the motion -- we'll

14 discuss the logistics of the in camera inspection after.

15        THE COURT:  Do you want to inquire, Mr. Lerner?

16        MR. LERNER:   Yes, your Honor.

17        MR. LERNER:   May I approach?

18        THE COURT:  Please.

19 CROSS-EXAMINATION

20 BY MR. LERNER:

21 Q.  Mr. Oberlander, these are the documents that were

22 attached to the email we have been discussing, the March 3rd

23 email.

24        MS. MOORE:   Can I have a copy, please?

25        THE WITNESS:  You can have these.  I've seen them

1  enough now.  At least for purposes of what's going on here, be

2  my guest.

3  Q.  Mr. Oberlander, could you recite for the court reporter

4  what's in the materials?

5        THE COURT:  Can we mark these for identification as

6  Defendant's A.

7        MR. LERNER:  Correct, yes, your Honor.

8        THE COURT:  I don't know how many documents there

9  are.

10        THE WITNESS:  There are three.

11        THE COURT:  I'm sorry.

12        THE WITNESS:  Three, your Honor.

13        THE COURT:  Including the cover page of the email.

14        THE WITNESS:  No, no, these are just documents.

15        THE COURT:  Three documents that will be marked

16  collectively as Defendant's Exhibit A.

17        Go ahead, please, proceed.

18  Q.  Mr. Oberlander, these documents, they include the

19  document labeled proffer agreement, cooperation agreement, and

20  what we have been referring to as the PSR or presentence

21  investigation report.  I would like to hand you first the

22  proffer agreement and ask you simply whether there's anything

23  on that document that indicates that it is subject to a

24  sealing order of any sort?

25  A.  There is not.

1  Q.   I would like to hand to you the document that is labeled

2  cooperation agreement and pose to you the same question.   Is

3  there anything that indicates on that that it is subject to a

4  sealing order of any sort?

5  A.   May I just clarify that attached to this is what

6  Ms. Moore considers a separate document which is a DOJ

7  statement.   These three documents are what Mr. Bernstein gave

8  me as he gave them to me.   So, to me these will always be

9  three.   To her these are four.   So, I should interpret your

10  question as to referring to both parts of this?

11  Q.   Yes, please.

12  A.   There is not, no.

13  Q.   And just for clarification, Mr. Oberlander, these are the

14  documents that Mr. Bernstein handed to you rather than emailed

15  to you?

16  A.   These are the documents he emailed to me that are

17  identical to the ones he handed to me.   The ones he handed to

18  me I have in Montauk and was not able to go back, but I

19  compared them before and they're identical.

20  Q.   I will hand you what we call PSR, presentence

21  investigation report, and ask you if there's anything in it

22  that indicates that it is subject to a sealing order?

23  A.   No.

24  Q.   I would like you to look at page two and ask you to read

25  the language of that that has been -- that Ms. Moore quoted

1 previously and read it in full, please.

2 A.    Read it all?

3 Q.    Into the record, yeah.

4 A.    "Restrictions on use and disclosure of presentence

5 investigation report."  That's bold faced.  "Disclosure of

6 this presentence investigation report to the Federal Bureau of

7 Prison and re-disclosure by the Bureau of Prisons is

8 authorized by the United States District Court solely to

9 assist administering the offender's prison sentence, i.e.,

10 classification, designation, programming, sentence

11 calculation, previous planning, escape apprehension, prison

12 disturbance, response, sentence, commutation or pardon and

13 other limited purposes, including deprivation proceedings and

14 federal investigations directly related to terrorist

15 activities.  If the presentence report is re-disclosed by the

16 Bureau of Prisons upon completion of its sentence

17 administration function the report must be returned to the

18 Bureau of Prisons or destroyed.

19        It is policy of the Federal Judiciary and the

20 Department of Justice that further re-disclosure of the

21 presentence investigation report is prohibited without the

22 consent of the sentencing judge.

23 Q.    Now, Mr. Oberlander, you did not receive this document

24 from the Bureau of Prison, did you?

25 A.    No.

1    MS. MOORE:    No further questions.

2    THE COURT:    Anything further?

3  REDIRECT EXAMINATION

4  BY MS. MOORE:

5  Q.    Mr. Oberlander, you just testified that the documents you

6  obtained in person on March 3rd were identical to the ones --

7  that you got by email March 3rd were identical to the ones on

8  March 1st?

9  A.    To the extent if comparing them casually would show

10 that.  I will not testify some letter didn't change somewhere,

11 but they appear to be in the --

12 Q.    My only question is I believe I understood your testimony

13 to be the March 3rd email also included a sealed criminal

14 complaint and a draft or final information; is that correct?

15 A.    No, because I never stipulated the criminal complaint was

16 sealed.  Only the New York Times seems to believe that.

17 Q.    You never believe anything you've read in the New York

18 Times, right?

19 A.    Well, I believe there is a Santa Claus, but that's the

20 Herald, isn't it?

21 Q.    It is.

22 A.    No, The Sun.  New York Sun.

23 Q.    My question, Mr. Oberlander, is I'm trying to get the

24 universe of documents that are in fact under seal in the

25 Eastern District that are in your possession.

1  Do you have a complaint captioned "United States

2  versus Klopsman (ph.) and Doe" in your possession?

3  A.   I have a complaint.  I don't stipulate it is sealed.  I

4  certainly have it.

5  Q.   Do you have an information, either final or draft form?

6  A.   Same answer, same comment.

7  Q.   Do you have any other documents that relate to a criminal

8  case that is filed in the Eastern District?

9  A.   Define what you mean by related.  Do you mean documents

10  the same time that might possibly be under seal as opposed to

11  an article in the Daily News?

12  Q.   Yes.

13  A.   Not to my knowledge, no.

14  MS. MOORE:   Your Honor, I ask the Court's temporary

15  retraining order be extended to include the documents we

16  previously didn't know Mr. Oberlander also had but which are

17  in fact also under seal.

18  THE WITNESS:  No problem.

19  MR. LERNER:   We have no objection to continuing the

20  TRO.

21  THE COURT:  So ordered.  I'll entertain an

22  application to enjoin permanently.  TROs are good for ten days

23  unless extended for another ten days.  It would seem to me an

24  application you might wish to be made is to enjoin the

25  dissemination of those documents permanently.

1     MR. LERNER:   We'll object to that, your Honor.  We

2   prefer to do it on papers.

3     THE COURT:   I conducted a hearing with respect to

4   those papers that have been filed under seal and I'm prepared

5   to entertain an application with respect to that.   The TROs

6   are good for only ten days, as a general rule.   Of course,

7   they could be extended continually.

8     MR. LERNER:   May I consult with my client?

9     THE COURT:   By all means.

10     (Pause in proceedings.)

11     MR. LERNER:   Yes, we object to a permanent

12   injunction with respect to these documents.   The evidence has

13   shown that Mr. Oberlander came into possession of the

14   documents lawfully.   It is unrebutted.   There is no showing he

15   secured them from theft.   He did not obtain them from the

16   court, he obtained them from Mr. Bernstein.   That's

17   unrebutted.

18     He stands in the same position as a newspaper may

19   receive confidential or privileged documents, similar

20   documents such as these.   He is entitled to the same First

21   Amendment protection as, for example, the New York Times or

22   the Washington Post in the reported cases involving such

23   issues.

24     I refer the Court to Washington Post against

25   Honorable Debra Robinson, 935 F. 2d 282, wherein it was held

that the Washington Post which had come into possession of,

quote, unquote, sealed documents and came into them without

obtaining them unlawfully from the Court could use them as it

sees fit.

We object more specifically particularly to the

sealing of the cooperation agreement and the proffer

agreement. There's nothing on the documents themselves to

indicate that they were under seal. I refer the Court to

Alamite (ph.), where the 2d Circuit held an order which is

global, globally enjoins parties is of no force and effect.

So, your Honor, subject -- we have stated our

objections. We rely on the argument set forth in our letter

of May 14th -- I'm sorry, June 14th. There's no order that

was binding upon Mr. Oberlander. To the extent it may be read

to be binding on the world, it is of no force and effect.

MS. MOORE: We obviously disagree. Whatever

Mr. Oberlander may have known or understood on May 10th, at

this point it couldn't be clearer that these documents are

under seal pursuant to court order. The Court went out of its

way to impress upon the respondents the seriousness of the

case.

At every stage of this proceeding they have continued

to assert their right to use the information and the sealed

documents despite now knowing in no uncertain terms that all

of this has been sealed and they used the attorney-client

1  privilege with respect to Mr. Bernstein as a shield and a
2  sword.  They initially said they couldn't contact him because
3  they misunderstood the court's order.  He said it was
4  attorney-client privilege.  Then they're saying Mr. Arnold
5  Bernstein represents him.
6        When we called Arnold Bernstein he said I don't
7  represent him, good luck to you finding him.  When asked
8  whether or not Mr. Oberlander understood or believed they
9  could have been stolen, he asserted work product privilege.
10  These documents were stolen from my client and they have
11  no right to be using them, especially knowing they were
12  sealed.
13        We think a permanent order enjoining them from using
14  documents and the information they improperly obtained by
15  getting those documents from Josh Bernstein is entirely
16  appropriate under these circumstances.
17        MR. LERNER:   Mr. Doe has not testified these
18  documents were stolen and the implication that they were
19  stolen is just about foundation.  I object to the
20  characterization.
21        THE COURT:  Let me clarify some things.  There is no
22  evidence other than the fact that Mr. Oberlander received
23  these documents from Mr. Bernstein.  Mr. Bernstein, according
24  to Mr. Oberlander, represented to him he got documents because
25  Mr. Doe gave them to him.  I haven't heard any evidence one

1  way or the other with respect to that information.

2       With respect to the presentence report, I am issuing

3  a permanent injunction that the information contained in that

4  presentence report is not to be disseminated.  It is not a

5  question as to whether Mr. Oberlander knew or didn't know

6  whether they were or weren't stolen.

7       Charmer Industries, in this Circuit, makes it

8  painfully clear that presentence reports are not to be

9  distributed or disseminated or disclosed to third parties.  To

10  the extent Mr. Oberlander has possession of the presentence

11  report, I'm enjoining Mr. Oberlander from disseminating any

12  information contained in that presentence report.  The order

13  with respect to presentence reports is not directed to any

14  individual, it is directed to the presentence report itself.

15  It is that document which from the point of view of the

16  integrity of the criminal proceeding, the veracity of the

17  information contained in presentence reports, the willingness

18  of persons to freely provide information which finds its way

19  into presentence reports and all the other reasons given by

20  the 2d Circuit in Charmer Industries which make it vital that

21  presentence reports remain in the file in terms of public

22  disclosure which is what I'm basing my injunction on.

23       With respect to the cooperation agreement and the

24  proffer agreement, there is no authority which I'm aware of

25  similar to Charmer Industries with respect to cooperation

1  agreements and presentence reports, although by implication a
2  presentence report contains an awful lot of information which
3  is gleaned from a cooperation agreement.

4  There's another significant consideration:  To the
5  extent that Mr. Oberlander knew, and he obviously knew what
6  sealing the document entails and what its implications are,
7  having made an application to have a document sealed in the
8  Southern District of New York, and in addition to which there
9  was reference made to what appears to be a nonexistent Rule
10  21F, but what he was referring to quite clearly is that
11  caution should be exercised when filing documents that contain
12  information regarding an individual's cooperation with the
13  government which would clearly include a cooperation agreement
14  and would clearly include a proffer agreement.

15  It is not an order, but it is an advice to
16  attorneys.  It may be that if Mr. Oberlander continues, given
17  the information he has with respect to the significance of a
18  cooperation agreement and a proffer agreement and any other
19  information pertaining to the defendant's cooperation with the
20  government and continues to ignore the advice to use caution
21  and not disseminate it, it may be some appropriate proceeding
22  with the grievance committee or some other such proceeding
23  might not be inappropriate.

24  I'm not enjoining it, but I am making it very plain
25  that to the extent that a lawyer knows that the documents in

1 his possession came from a file which was sealed and knows

2 that the information contained in those documents is

3 information which might place the life of another at risk and

4 knows that there is a Southern District notice regarding

5 privacy and public access and advising him to exercise caution

6 in disseminating information relating to a person's

7 cooperation with the government, to the extent he will choose

8 to ignore that caution and proceed to expand on what he

9 believes is his First Amendment or Fourteenth Amendment right,

10 it is a matter which he may wish to have tested in some other

11 forum administratively or otherwise.

12     To the extent that I haven't been asked yet, this was

13 a suggestion I made that an application to that extent may

14 wish to be made but it hadn't been I don't think -- maybe it

15 has been with respect to cooperation agreements and other

16 documents.

17     I am issuing an order with respect to that

18 presentence report and I'm relying on Charmer Industries with

19 respect to that.

20     Insofar as the cooperation agreement and the rest of

21 it is concerned, I think I've made my position perfectly

22 plain.

23     MS. MOORE:  Your Honor, a number of other documents

24 in Mr. Oberlander's and possibly his client's possession are

25 in fact under seal and I will put my client on the witness

1    stand and say they were stolen, but -- and under the

2    circumstances I would ask the Court to reconsider having those

3    documents returned to the Court or the U.S. Attorney's Office

4    so they can be made use of.

5            THE COURT:  Mr. Lerner, do you want to be heard on

6    that?

7            MR. LERNER:   Well, I have no objection to Mr. Doe

8    taking the stand.

9            THE COURT:  I'm not referring to Mr. Doe taking the

10   stand.  The question was an application to the Court to direct

11   that those documents be returned to the United States

12   Attorney's Office and to the Court to the extent that those

13   documents were obtained from a file which was marked under

14   seal and they were sealed documents which were not to be

15   disclosed absent a court order disclosing them.

16           MR. LERNER:   They were obtained lawfully from

17   Mr. Bernstein, therefore, we object.

18           MS. MOORE:   Your Honor, Mr. Bernstein did not obtain

19   them lawfully from my client.

20           THE COURT:  Excuse me, Ms. Moore.  Stop the back and

21   forth colloquy.

22           With respect to that I'll reserve.  I will entertain

23   a memorandum with respect to that and I will give both parties

24   an opportunity to do that.

25           With respect to the presentence report I have

1    absolutely no hesitation in enjoining any further

2    dissemination and I'll direct the presentence report to be

3    returned.  To the extent that you have that in your

4    possession, return it immediately --

5            THE WITNESS:  Absolutely.

6            THE COURT:  -- to the United States Attorney's

7    Office.

8            With respect to the cooperation agreement, proffer

9    agreement and any other document which you know was obtained

10   from a file which was marked under seal, I will entertain a

11   memorandum with respect to that and I'll reserve.

12           Are we finished?  Why don't you have Mr. Doe

13   testify.  I think that issue is very, very much at the core of

14   this proceeding.

15           In view of the fact it is five after one, why don't

16   we recess for lunch and resume at two o'clock.

17           Two o'clock.

18           (Lunch recess.)

19

20

21

22

23

24

25

1          A F T E R N O O N   S E S S I O N.

2          THE COURT:  Is everybody present?

3          MR. LERNER:   Your Honor, with the Court's permission

4    Mr. Oberlander has a correction to make in his testimony and

5    would he be permitted to correct something?

6          THE COURT:  By all means.

7          THE WITNESS:  Thank you.

8          THE COURT:  What would you like to correct,

9    Mr. Oberlander?

10         THE WITNESS:  I don't recall the phrasing of the

11   exact question, but Ms. Moore asked me what were the grounds

12   that I put in my motion to seal when I went in front of Judge

13   Wood and I believe she asked me on one or two occasions did I

14   include in my motion notice that there were documents that she

15   says are sealed.  We all understand what she means.  And the

16   answer I gave was that no, I didn't, or I don't recall, and

17   that's correct, but it is incomplete, because I refreshed my

18   memory and what actually happened when I went to Judge Wood's

19   chambers was that her law clerk first read everything and then

20   he came out and asked me to show him the complaint and I

21   generally did.  Then he took the petition in.  Judge Wood came

22   back awhile later and said she wants to see the complaint and

23   I picked it up and showed it to him and I said would you

24   please make sure and tell Judge Wood this is a RICO case and

25   that there are allegations of extreme criminal behavior here

1  and that there are documents in here relating to plea

2  agreements. I don't remember the exact phrase I used, but it

3  wasn't in the moving papers, but it was the equivalent of an

4  oral statement as to the law clerk. I didn't want to mislead

5  the Court.

6        My complete answer is the written moving papers did

7  not include to my recollection that -- one of the bases for

8  the request to seal was that there was a proffer or a

9  cooperation agreement or PSR, but it was my oral request that

10  the clerk convey to her such similar documents were there and

11  she should take that into her determination. That was it.

12  That's the only correction.

13        THE COURT: Did you want to inquire on that,

14  Ms. Moore?

15        MS. MOORE: No, your Honor.

16        THE COURT: Are you ready? Are you calling Mr. Doe?

17        MS. MOORE: I am, your Honor.

18  J O H N  D O E ,    called as the witness herein, having

19  been first duly sworn/affirmed, testified as follows:

20        THE CLERK: Would you please state and spell your

21  name for the record.

22        THE WITNESS: John Doe, J-o-h-n D-o-e.

23        THE COURT: Sir, be seated. Go ahead, Ms. Moore.

24  DIRECT EXAMINATION

25  BY MS. MOORE:

Doe-direct/Moore

1  Q.   Mr. Doe, did you ever keep any documents in your office

2  that were part of a sealed file at Eastern District of New

3  York, a criminal case captioned 98-CR-1101?

4  A.   Yes, I did.

5  Q.   And did you keep them in a file?

6  A.   Yes, I did.

7  Q.   Was that file marked in any way?

8  A.   Yes, it was.

9  Q.   How was it marked?

10 A.   Personal and confidential.

11 Q.   Where did you keep that file in your office?

12 A.   Bottom left-hand drawer of my desk.

13 Q.   Did you keep it locked?

14 A.   Most of the time, yes.

15 Q.   Were there ever times it was not locked?

16 A.   Yes, there were.

17 Q.   Like when?

18 A.   During the day, if I had to go to the restroom or if I

19 ran to a meeting in the next office or if I stepped out for

20 lunch.  I locked my desk when I went home at night, but

21 sometimes during the day it would be unlocked.

22 Q.   Did that file contain documents along the lines of

23 proffer agreements, cooperation agreement, presentence report

24 information, criminal complaint?

25 A.   Yes, it did.  I did not remember how many of the items

1  you just mentioned were in there.  It is possible all of them.

2  Q.   Way did you keep that file in your office?

3  A.   I was constantly speaking to my attorneys about my case

4  and I needed to have readily available files regarding that

5  case.

6  Q.   Did you also keep that file at your home?

7  A.   No, I did not.

8  Q.   Why not?

9  A.   I didn't want my family to see it.

10  Q.   Do you have children, Mr. Doe?

11  A.   Yes, I do.  I have three children.

12  Q.   Mr. Doe, who is Josh Bernstein?

13  A.   Josh Bernstein was an analyst who worked at Bayrock for

14  awhile.  I don't remember the exact dates of employment.

15  Q.   Was he fired?

16  A.   Yes, he was.

17  Q.   Why?

18  A.   He kept taking time off and kept submitting personal

19  expenses as business related expenses and eventually the

20  decision was made to terminate him.

21  Q.   Did you ever give Mr. Bernstein the file you just

22  described marked personal and confidential or any of the

23  documents in it that related to the criminal case

24  98-CR-1101?

25  A.   Absolutely not.

1  Q.   Is there any reason you would have given Mr. Bernstein,

2  an analyst at Bayrock, those documents?

3  A.   Absolutely not.

4  Q.   Did you consider those documents to be highly sensitive

5  and personal?

6  A.   Highly sensitive, personal and dangerous to myself and my

7  family.

8          MS. MOORE:   No further questions, your Honor.

9          THE COURT:   Mr. Lerner, do you wish to inquire?

10         MR. LERNER:   With the Court's permission,

11  Mr. Stamoulis is going to question the witness.

12         THE COURT:   Sure.

13  CROSS-EXAMINATION

14  BY MR. STAMOULIS:

15  Q.   Good afternoon, Mr. Doe.   My name is Stam Stamoulis.

16  I'm counsel to Jody Kriss and Michael Ejekam.

17         Do you know who Michael Ejekam is?

18  A.   Yes, I do.

19  Q.   What do you understand to be his relationship with

20  Bayrock?

21  A.   He's a friend of Jody's from college and he was sourcing

22  -- looking for deals to introduce to Bayrock.

23         THE COURT:   Mr. Stamoulis, just to avoid any

24  objections which are going to be made, confine yourself to the

25  direct, okay.   The only issue on direct examination is whether

1  or not Mr. Doe had given consent to anybody specifically.

2       MR. STAMOULIS:  Yes, your Honor.  I would like to

3  inquire of the witness whether my two clients were ever given

4  the file.

5       THE COURT:  Okay.  I anticipated, I saw Ms. Moore

6  about to get up and, so, I was anticipating what might be

7  unnecessary colloquy.

8  Q.  In your involvement with Mr. Ejekam, whatever that may

9  be, at Bayrock, did you ever have occasion to give him any

10  aspect of that file that you described as being kept in your

11  desk draw?

12  A.  No.

13  Q.  In your involvement with Mr. Kriss while at Bayrock, did

14  you ever have occasion to give Mr. Kriss any aspect of that

15  file that was kept in your desk drawer?

16  A.  No.

17  Q.  Did Mr. Ejekam or Mr. Kriss give you any reason to

18  believe that they personally acquired the contents of that

19  file at any time?

20  A.  No.

21  Q.  Did you ever inquire -- let me take a step back.

22       You said that Mr. Bernstein was an analyst?

23  A.  I believe that was his official title.

24  Q.  What did his job responsibilities entail?

25  A.  Generally, to do the financial modeling when we would

1   look for a deal. He would do the financial modeling on

2   certain things, he would do some follow-up phone calls,

3   follow-up letters, things of that nature. It was a real

4   estate development shop and basically assistance to myself

5   or Jody Kriss or any of the other people employed at Bay

6   Rock.

7   Q. Did any aspect of his responsibilities ever relate to

8   maintenance of data of Bayrock files?

9   A. He was probably the most technologically advanced of the

10  group, so from time to time I'm sure I've asked and I'm sure

11  members of the firm had asked him to do something to do with

12  their Blackberries or something to do with emails or

13  computers, yes.

14  Q. Do you remember the nature of any of those somethings

15  that you asked Mr. Bernstein to deal with with regard to

16  data?

17  A. I was deposed in a case where Mr. Bernstein is currently

18  suing Bayrock in White Plains and that same question was asked

19  of me and I believe we're speaking of the hard drive. If you

20  could clarify? I may have asked him other things from time to

21  time. If you'll refresh as to that?

22  Q. I'm not there yet. But, generally speaking, what was the

23  nature of the -- the specific nature of the projects that

24  Mr. Bernstein would be requested to do with regard to data at

25  Bayrock?

1  A.   In regard to a specific request I made of him we have a

2  server where all the emails and everybody's correspondence and

3  things of that -- files are stored.  Files are stored, things

4  of that nature, and I asked Josh Bernstein to buy a large

5  backup hard drive to make a backup of our files in case of a

6  crash, in case of a systems crash, so we could have a copy of

7  our files.

8  Q.   Did you ask Mr. Bernstein to keep that hard drive at his

9  home?

10  A.   Absolutely not.  In fact, I -- when Mr. Bernstein was

11  being asked to leave, I specifically remember myself and

12  Julius Schwartz asking him to return files and what later

13  came to be known is that there was a hard drive he never

14  returned.

15  Q.   Do you recall Mr. Bernstein purchasing that hard drive

16  out of his own personal funds?

17  A.   I don't remember the details.  I doubt Mr. Bernstein paid

18  for his own -- with his own funds.  He may have paid for it

19  and got reimbursed.  I'm sure he didn't pay for it from his

20  own funds without reimbursement.  Mr. Bernstein would like

21  reimbursement for everything, including water.

22  Q.   Do you know whether indeed he was reimbursed for

23  purchasing the external hard drive?

24         MS. MOORE:   Objection.

25         THE COURT:  You can answer.

1  A.    I'm not sure.  I don't remember.

2  Q.    These documents you maintained in your desk?

3  A.    Yes.

4  Q.    Did you ever have an electronic version of those

5  documents in your possession at any time?

6  A.    I may have had an electronic version of those documents.

7  My previous attorney in my case lived in Florida and it is

8  possible he emailed me or I emailed him those documents with

9  the caveat that obviously any communication between me and him

10  was always marked privileged and confidential.  It was between

11  me and my attorney and had nothing to do with Bayrock or any

12  type of real estate related deals.

13  Q.    Is it possible those electronic versions of the documents

14  made it onto the email server you asked Mr. Bernstein to copy

15  though this hard drive?

16  A.    Possible.

17  Q.    It is your sworn testimony that you did not ask

18  Mr. Bernstein to keep personal possession of that hard drive

19  and maintain it at his home for safekeeping?

20  A.    I don't believe I ever asked him to keep it at his home

21  for safekeeping.  I remember asking him to make a hard drive

22  backup and give it to me, if anything, not to keep for

23  himself.

24        MR. STAMOULIS:    I have no further questions, your

25  Honor.

Doe-cross/Lerner

1        THE COURT:  Thank you.  Mr. Lerner.

2 CROSS-EXAMINATION

3 BY MR. LERNER:

4 Q.   Mr. Doe, you have no reason to believe that Mr. Bernstein

5 told Mr. Oberlander that he stole documents from you, do you?

6 A.   I'm sorry, I don't understand the question.

7 Q.   Do you have any reason to believe Mr. Bernstein told

8 Mr. Oberlander that those documents were stolen?

9 A.   I don't know what he said to Mr. Oberlander.

10 Q.   Now --

11 A.   I'm sorry, no, I actually disagree with that.  I was

12 shown the transcript of -- Mr. Bernstein's transcript from

13 when he was deposed and he actually stated there, and

14 Mr. Oberlander was his attorney there or was sitting in on all

15 of his depositions where Mr. Bernstein said that he took

16 thousands of documents and brought them home.  Documents, not

17 emails or servers.  Physical documents he claimed he took and

18 brought home with him and kept there.

19        Mr. Oberlander should have easily understood he

20 wasn't asked to use his apartment as an off-site storage

21 facility for Bayrock.  Yes, he should have understood they

22 were stolen by Mr. Bernstein.

23 Q.   Aren't there emails from you to Mr. Bernstein discussing

24 him holding onto the documents at your request?

25 A.   I don't remember.  I don't remember having those emails

1  back and forth with Mr. Bernstein.

2  Q.   You would be surprised if there were such emails from

3  you?

4  A.   Depending on what they said.  I've asked Josh Bernstein

5  to make a backup.  I've asked Josh Bernstein.  There were many

6  times he held various documents in his possession and his

7  office.  He was an analyst.  I have never asked him to hold

8  personal documents of mine in his possession and I would be

9  extremely surprised if there was any emails or correspondence

10  between me and Mr. Bernstein asking him to hold my personal

11  privileged court documents.  Yes, I would be very surprised.

12  Q.   You said Mr. Bernstein is an analyst.  Wasn't his job

13  description to be a techie, somebody whose responsibility it

14  was to maintain backups?

15  A.   He did a bunch of tech related stuff around the office

16  from time to time.  He was the most technically capable.

17  Q.   At your direction?

18  A.   Either mine, his own or somebody else's direction.

19  Q.   Among the tasks that you directed him to undertake was

20  backing up emails and hard drives; isn't that correct?

21  A.   I asked him to buy a large hard drive and back up our

22  server which had a whole bunch of files on them, including

23  emails, yes.

24  Q.   You asked him to keep that backup drive at his home;

25  isn't that correct?

1   A.   I don't remember asking him to keep it at his home.

2   I remember when he was leaving I asked him to return

3   everything.

4   Q.   If you asked him, you understood he didn't have it on the

5   premises; isn't that correct?

6   A.   I didn't know what he has. He had an office. He had

7   things in his office and I don't know where he kept most of

8   those things.

9   Q.   You don't know if he had a backup hard drive in his

10   office versus at his home?

11   A.   No, I didn't. He may have had it at his home or in the

12   office. I don't remember which specifically. I remember

13   Julius Schwartz specifically asking him to return everything

14   that was work related. That was when he was terminated.

15   Q.   Can you describe for us your office? How is it locked?

16   Is it a corner office? If someone were to go into that office

17   during the daytime, would that person be seen by others?

18   A.   Not necessarily. It was -- if the door was closed you

19   wouldn't know who was inside.

20   Q.   Does it have windows, external windows --

21   A.   No.

22   Q.   -- so one side could be seen from a secretarial station?

23   A.   No. Door and wall.

24   Q.   So, you testified that you kept your office locked at

25   night.

1  A.   I kept my desk, not my office, because cleaning staff

2  would come onto the premises after we were all done.

3  Q.   So, if the documents were stolen, they were stolen during

4  the daytime; is that your testimony?

5  A.   I wouldn't know when they were stolen, if they were

6  stolen.  I know I didn't hand it to him in any way, shape or

7  form.

8  Q.   It could have been on an email server; isn't that

9  correct?

10  A.   It is possible, but I'm not 100 percent sure.

11  Q.   He was directed by you to keep backups of emails; isn't

12  that correct?

13  A.   He was directed to make a backup for me, not keep them.

14  Q.   It was not within his job description for which he was

15  hired to keep backups; isn't that correct?

16  A.   I'm sorry.  No, it was actually in his job description to

17  assist and help the members of Bayrock and the requests they

18  made of him which may have been whatever request they were

19  making of him.  In fact, many of the things he was creating

20  were in electronic form, so there may have been a time when he

21  was asked to do something in a tech capacity, yes.

22  Q.   You just referred to yourself as a member of Bayrock?

23  A.   I referred to myself -- yes, I was.

24          MS. MOORE:   Objection, your Honor.

25          THE COURT:   Overruled.

1  Q.   Please clarify, were you an owner of Bayrock?

2  A.   No.

3  Q.   What did you understand yourself to be when you referred

4  to yourself as a member of Bayrock?

5  A.   A member is one of the people who was at the firm.

6  Q.   Were you a partner?

7  A.   I was a partner in deals, yes.

8  Q.   What was the purpose of putting your personal emails on

9  the email of Bayrock; why did you do that?

10  A.   I don't believe I did, but in the course of sending and

11  receiving hundreds of emails that most people do in a week, is

12  it possible something may have made it in of a personal

13  nature?  Of course it is possible.  Was it my habit to use

14  Bayrock as my personal email?  No, it wasn't, but it is

15  possible it made it in there.

16        Again, I don't know the specifics.  I don't

17  understand the specifics that you're asking about, but, yes,

18  it is possible.

19  Q.   Do you know how to use a scanner?

20  A.   Yes, I do.

21  Q.   When you said you had these documents and referring to

22  the purportedly sealed and confidential documents --

23  A.   I didn't say they were sealed and confidential.  I said

24  the folder was marked personal and confidential.

25  Q.   Did you scan them in yourself or have someone else scan

1  them in?

2  A.    What do you mean?

3  Q.    You said you have them in electronic form?

4  A.    I didn't say -- I said may.  You said did you have them

5  in electronic form, or Mr. Stamoulis asked.  I said they may

6  have been.  My attorney was in Florida at the time and we may

7  have been communicating electrically.  It is possible.  I will

8  tell you I did not scan them in nor did I have anyone scan

9  them in.  If there was an electronic and written form, it

10 would have been from me printing them from an electronic form

11 but never scanning them into a scanner.

12 Q.    Why didn't you keep them in a locked safe?

13 A.    I did not have a safe.  I had a desk that was locked and

14 I believed that my desk was my desk and had personal things in

15 that desk.  I had pictures of my children which I believe

16 belong to me.  I kept my desk locked as often as possible, so

17 I didn't realize I had the need of a safe, especially in a

18 small office where pretty much everybody was very friendly.

19 It wasn't a large corporation with hundreds of people running

20 around.  I didn't think there was a need for a safe.

21       MR. LERNER:    Thank you.  No further questions.

22 REDIRECT EXAMINATION

23 BY MS. MOORE:

24 Q.    Mr. Doe, earlier today during the proceeding Mr. Lerner

25 represented in court that you had spoken to Mr. Bernstein and

Doe-direct/Moore

1 Mr. Bernstein had told him that these documents were part of

2 several disks that you had given him.

3     Did you ever give Mr. Josh Bernstein several disks

4 that contained these documents?

5 A.   I have never given Josh Bernstein disks, written

6 documents, electronic forms of anything to do with my case,

7 anything to do with the personal nature of my life, especially

8 things that I was afraid of, especially items and paperwork

9 which I believed to be very, very dangerous to my life and the

10 life of my children, my wife and my family.

11     Mr. Bernstein was one of amongst a few people working

12 at the firm and clearly he would be second-to-last person in

13 my life who I would give copies of documents like that to.

14     MS. MOORE:   No further questions.

15     THE COURT:   Anything further?

16     (No response.)

17     THE COURT:   Thank you.   You're excused.

18     Ms. Moore, do you have anything further?

19     MS. MOORE:   Your Honor, I believe respondent Jody

20 Kriss is here.   I would like to inquire of him if he's given

21 the documents to anyone else or knows anyone else may have

22 them.

23     MR. STAMOULIS:   No objection, your Honor.

24     THE COURT:   Ms. Moore, it is your case.

25 J O D Y     K R I S S     ,     called as the witness

1  herein, having been first duly sworn/affirmed, testified as

2  follows:

3      THE CLERK:   Would you please state and spell your

4  name for the record.

5      THE WITNESS:   Jody Kriss, K-r-i-s-s.

6      THE COURT:   Is that J-o-d-y?

7      THE WITNESS:   Yes.

8  DIRECT EXAMINATION

9  BY MS. MOORE:

10 Q.   Mr. Kriss, you've heard us referring to a number of

11 documents, including proffer agreements, a cooperation

12 agreement and a presentence report that were attached to a

13 version of a complaint that was emailed to your father on May

14 12th.

15      Are you familiar with this document?

16 A.   Yes.

17 Q.   When did you first see those documents?

18 A.   In connection with Mr. Oberlander sent them to me prior

19 to verifying the complaint.

20 Q.   Was that roughly early May or --

21 A.   Sounds right.

22 Q.   Have you provided those documents to anyone else?

23 A.   No.

24 Q.   Are you aware of anyone else who is in possession of

25 those documents beyond the individuals that Mr. Oberlander

1 mentioned earlier today?

2 A. I don't think so.

3 Q. Earlier Mr. Oberlander testified that the statement in

4 the complaint that those documents were sealed was your

5 statement, not his. You didn't draft that complaint I

6 realize, but you did verify it.

7       Did you know at the time the complaint was filed that

8 those documents were sealed?

9 A. No.

10 Q. Why did you verify a complaint that said they were sealed

11 if you had not in fact known that they were?

12       MR. STAMOULIS: Objection, your Honor.

13       THE COURT: Overruled.

14 A. Same answer Mr. Oberlander gave. I read about it, heard

15 about it, but didn't -- never saw anything that said that they

16 were.

17       THE COURT: Speak into the microphone, please.

18 A. Same answer Mr. Oberlander gave that I heard about it,

19 read about it, but hadn't personally seen anything to say they

20 were.

21 Q. So, you had no personal knowledge they were sealed, but

22 you believed they were sealed?

23 A. I think so.

24       MS. MOORE: No further questions, your Honor.

25       MR. STAMOULIS: No follow-up, your Honor.

1    THE COURT:  Mr. Lerner?

2    MR. LERNER:   No questions, your Honor.

3    THE COURT:  You're excused.  Thank you.

4    Anything further?

5    MS. MOORE:   Your Honor, I have been working with

6 Mr. Stamoulis on obtaining an affidavit from his client who's

7 in Africa.   I believe once I have the sworn affidavit that

8 states his other client never saw the version of the

9 complaint, never saw the attachments and never possessed them

10 and is not able to disseminate them any further and did not

11 know they were sealed, I believe there will be no further need

12 for his client's testimony.

13    His client is in Africa.   I'm waiting to get the

14 affidavit which I believe is on its way from Africa.

15    MR. STAMOULIS:   We sent it yesterday.  It is the sum

16 and substance.  He will sign it.  It is just a matter of

17 logistically getting it back.

18    MS. MOORE:   Your Honor, my only other application is

19 I would ask the TRO remain in place until we can file some

20 post-hearing briefs.

21    I would also ask the TRO be extended to two other

22 documents that are under seal in this District, the criminal

23 complaint Mr. Oberlander testified he obtained and what I

24 believe is a draft copy of an information that was also in

25 Mr. Doe's personal files.

1       I would further ask that my client's name, John Doe,

2   or any reference to him as John or Doe be replaced with John

3   Doe in this transcript and we would like an opportunity,

4   obviously, to brief our further application for an order

5   directing the return of all the documents that were taken from

6   Mr. Doe's personal files and an injunction preventing further

7   use and dissemination of the documents and the information

8   contained therein.

9       MR. LERNER:   We have no objection to continuance of

10  the TRO.  I think the Court already ruled on the PSR, so now

11  we're just discussing the cooperation agreement and proffer

12  agreement which are the subject of this order to show cause.

13  Subject to further briefing we will -- and the other documents

14  referred to by Ms. Moore, we would address these in further

15  briefing.  Of course, pending on the determination of the

16  Court, we'll not disseminate these documents in any way.

17      I would also like an opportunity -- your Honor, I

18  referred to in questioning Mr. Doe, I referred to some

19  emails.  I would like an opportunity to supplement these

20  briefings with emails that are referred to.  I don't have them

21  on hand, but I would ask for the opportunity to just submit

22  them to the Court.

23      MS. MOORE:   No objection to that, your Honor.  And

24  one other thing, your Honor --

25      THE COURT:  Excuse me.  These are emails from Mr. Doe

1   to Mr. Bernstein.

2           MS. MOORE:   Your Honor, to the extent that we're

3   asking the TRO be extended to the two other documents in the

4   complaint and the information, we've had trouble serving

5   Mr. Josh Bernstein.  We would ask to the extent respondents

6   have access to him, they let him know the order has been

7   extended to those documents as well.

8           MR. LERNER:   I have access to Mr. Arnold Bernstein

9   via email.  I think I also have access -- I think the email

10  that Mr. Arnold Bernstein sent to me may have John Bernstein

11  CC'ed.  That's how I could contact him.

12          If the Court wishes to enter an order directing he be

13  served or that I disclose the email address, I'll do that.

14          THE COURT:  By all means.

15          Anything further?

16          MS. MOORE:   No.

17          THE COURT:  Does anybody want to be heard further

18  with respect to what has transpired here this morning and part

19  of the afternoon?

20          MS. MOORE:   I do have one further inquiry.  As the

21  Court knows, there was a cross motion to be able to obtain the

22  affidavit of Mr. Bernstein.  I'm assuming no such affidavit is

23  going to be forthcoming and there will be no evidence from

24  Mr. Bernstein.

25          MR. LERNER:   As I indicated, I spoke with

1  Mr. Bernstein on the telephone. I communicated by Arnold

2  Bernstein and was told by Arnold Bernstein that Joshua

3  Bernstein isn't going to cooperate and he's represented by

4  counsel. I assumed that meant he was represented by Arnold

5  Bernstein. If I was mistaken in that regard, that would just

6  be cleared up I suppose when I give over Mr. Josh Bernstein's

7  email address to Ms. Moore.

8        THE COURT: Anything else?

9        MS. MOORE: No, your Honor.

10       THE COURT: Just so we're clear as to what I would

11  like to have some post-hearing briefs submitted on, I've ruled

12  with respect to the presentence report. With respect to the

13  other documents which were part of a file that was marked

14  sealed that was pursuant to a court order, the first question

15  is whether that order is on its face clear to the extent that

16  it says -- I'm sorry, I don't have the sealing envelope in

17  front of me -- maybe I do. Document placed in a sealed

18  envelope which provides it is ordered sealed and placed in the

19  Clerk's office may not be unsealed unless ordered by the

20  Court. Whether that order is an order which is clear enough

21  on its face with respect to documents which are sealed would

22  be enough to inform anybody coming into possession of such a

23  document that it is what it purports to be, namely, a sealed

24  document conveying with a very clear message that it is not to

25  be for public or general disclosure.

1      To the extent there's some question as to whether it
2   is an in rem or in personam order, I think the law is pretty
3   clear that an order of the Court, assuming one is aware of the
4   fact or should be aware of the fact that an order of the Court
5   has been issued, I believe there's authority for the
6   proposition that orders of the Court are to be obeyed and are
7   disobeyed at one's risk.  I think that is the essence of civil
8   disobedience which needs no further elaboration.  That's a
9   matter for post-hearing briefing.

10      Also, the extent to which the Court does have some
11  authority to enjoin the dissemination of documents such as
12  cooperation agreements, proffer agreements is the language of
13  that Southern District informational cite that says caution
14  should be exercised, not a sufficient basis upon which one may
15  enjoin for information regarding a person's cooperation with
16  the government, and the purpose of not disseminating or
17  exercising caution need not be elaborated on.

18      If you want a briefing schedule, I will be happy to
19  provide one.  Give me an indication as to how much time you
20  think you need.

21      MS. MOORE:  One week, your Honor.

22      THE COURT:  Mr. Lerner.

23      MR. LERNER:  We'll need additional time.  Can we
24  have two weeks to respond?

25      MS. MOORE:  Will there be simultaneous briefs, your

1    Honor?

2          THE COURT:  No.  I prefer you can submit your brief,

3    Mr. Lerner will be given an opportunity to reply.  I will give

4    him one week to respond.  I don't think there will be anything

5    to reply to.

6          Mr. Stamoulis, I don't think that you have a dog in

7    this fight.

8          MR. STAMOULIS:  Happily not, your Honor.

9          THE COURT:  All right.

10          MS. MOORE:  Your Honor, if we could just receive the

11    additional email you intended to submit to the Court so we

12    have it.

13          MR. LERNER:  Sure.

14          THE COURT:  All right.  I suppose a collateral

15    question --

16          MR. LERNER:  My client wishes to know whether these

17    proceedings today are sealed?

18          MS. MOORE:  Your Honor, all I ask is the name be

19    redacted to change to John Doe.

20          THE COURT:  Ms. Brymer, wherever the name of John or

21    Doe appears substitute John Doe for John Doe.

22          MS. MOORE:  Your Honor, given the history, I would

23    also ask everyone present in the courtroom be directed that

24    they not advise anyone the John Doe referenced in the document

25    is my client.

1    MR. LERNER:   That's fine.

2    THE COURT:  Ms. Moore, there is I think an extent

3    even to which the broad enormous powers of Federal Courts do

4    not extend and I think the limit to which you're requesting

5    that power be extended is beyond the borders of Federal Court

6    power, which is quite enormous, but if exercised carelessly

7    can be quite inappropriate.  I'm not directing the court or

8    the world at large with respect to this proceeding, John Doe

9    or everybody here.

10   It seems to me that in addition to purely legal

11   issues there are issues of professional responsibility which

12   are quite significant.  There may be some DR, disciplinary

13   rule, with respect to the obligation of attorneys regarding

14   the use of documents which are marked sealed, whatever they

15   may be.  Whether that would provide a basis for injunctive

16   relief or not I don't know.  It is a matter which may be

17   explored.  I suppose if one thinks imaginably one may think of

18   a lot of reasons why an order may or may not be issued

19   providing for injunctive or other relief.  With respect to the

20   last request you made it is denied.

21   Anything further?

22   (No response.)

23   THE COURT:  I'll see you -- or if you want oral

24   argument -- I guess you do.  So, one week for a briefing from

25   you, Ms. Moore, one week thereafter from you, and why don't we

1  set it down for further oral argument a week thereafter.

2  Whatever those dates are.

3          Can you give me some dates?  Today is the 21st.  So,

4  the 28th from you.  Seven days thereafter, what day is that?

5          THE CLERK:  The 5th, which is a holiday.

6          THE COURT:  6th of July, that's going to spoil

7  somebody's Fourth of July weekend.  We can extend it another

8  day or two.  Give me a number.

9          MR. LERNER:  July 9th, Friday.

10         THE COURT:  You've gotten the two weeks you asked me

11 for.

12         Do you want another week, Ms. Moore?

13         MS. MOORE:  No.

14         THE COURT:  Give me a date for oral argument.  28th

15 of June for Ms. Moore, July 9th for Mr. Lerner and give me an

16 oral argument date.  What day of the week is July 9th?

17         THE CLERK:  Friday.

18         THE COURT:  Why don't we put it down for oral

19 argument the following Friday, which would be the 16th of

20 July.  Okay.

21         Am I interfering with somebody's vacation?  July

22 16th.  Okay.  We're finished today.  Thank you very much.

23         MR. LERNER:  Your Honor, would it be possible to

24 make the oral argument on the Tuesday of the following week,

25 which would be the 20th?

1          THE COURT:   Is that date all right?

2          MS. MOORE:   Fine, your Honor.

3          THE CLERK:   10:30.

4          MR. LERNER:   10:30, your Honor.   Thank you.

5          (Proceedings concluded.)

I N D E X

F R E D E R I C K   M.   O B E R L A N D E R

DIRECT EXAMINATION

BY MS. MOORE:  ......................................... 3

Plaintiff's 1............................................ 6

Plaintiff's 2.......................................... 46

CROSS-EXAMINATION

BY MR. LERNER:  ....................................... 79

Defendant's A......................................... 80

REDIRECT EXAMINATION

BY MS. MOORE:......................................... 83

REDIRECT EXAMINATION

BY MS. MOORE:......................................... 83

J O H N   D O E

DIRECT EXAMINATION

BY MS. MOORE:  ....................................... 94

CROSS-EXAMINATION

BY MR. STAMOULIS:  ................................... 97

CROSS-EXAMINATION

BY MR. LERNER:  ..................................... 102

REDIRECT EXAMINATION

BY MS. MOORE:  ..................................... 107

J O D Y   K R I S S

DIRECT EXAMINATION

BY MS. MOORE:  ..................................... 109