**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**IN RE CIVIL CONTEMPT**

**12-MC-0557 (BMC)**
**16-MC-0706 (BMC)**

**DECLARATION AND ALLEGATIONS IN SUPPORT**

**MOTION OF RESPONDENT RICHARD E. LERNER**

**TO REQUEST THE RESIGNATION**
**OF THE "SPECIAL MASTER"**

-----

**AND FOR RELATED RELIEF**
**INCLUDING TO STAY PROCEEDINGS**

# BACKGROUND RECITATIONS

1.  Felix Sater has a long history of defrauding investors in business. In 1998 pursuant
    to an agreement to cooperate he and others, including Salvatore Lauria and Gen-
    nady Klotsman, pled guilty to RICO charges in non-public proceedings for presid-
    ing over "State Street," a/k/a "White Rock," an organized crime "pump-and-dump"
    stock-trading scheme that bilked hapless investors out of some $40 million in the
    mid-90s.

2.  In 2000, the government very publicly indicted 19 of his White Rock co-conspira-
    tors on RICO and securities fraud charges and in a global press release revealed his
    1998 conviction by plea, along with that of Lauria and Klotsman.

3.  By 2002 all of those co-defendants had learned of Sater's cooperation. Many filed
    or joined in motions for additional exculpatory material on "cooperating witnesses"
    Sater, Lauria, and Klotsman; many were present during open court discussions of
    Sater's status as a cooperator; and of course the transcripts of the recordings he had
    made were made available.

4.  Indeed, even today those co-conspirators, or their counsels, freely admit to the me-
    dia, such as the Associated Press, that all of them knew Sater had been cooperating.

5.  Moreover, much of that was publicly revealed. It was revealed by the government
    as far back as November 2000, which publicly filed documents in open court files
    in *U.S. v. Coppa*, the case of the 19 co-conspirators, calling Sater and Lauria coop-
    erating witnesses; and it was revealed by the government as recently as March
    2009, when it moved to unseal, and caused the unsealing of, Lauria's docket, 98-

CR-1102, on which was a letter from AUSA to Judge Glasser confirming that Sater and Lauria had pled guilty and were cooperating witnesses.

6. And of course, in 2002 Lauria published an autobiography describing his and Sater's and Klotsman's cooperation, which is still for sale on Amazon.

7. In that book, Lauria also tells how he himself told Daniel Persico, one of the 19 co-conspirators, that he (Lauria) had "flipped" and given Persico up to cut a deal.

8. He further describes how the FBI told him later that year, in 2000, that Persico may have made a threat against him, but how he was unconcerned.

9. To the extent this is true, it is corroborated by Lauria's testimony at his sentencing in 2004, where he explained to the judge that he had in the past been told of threats by Persico, though the FBI stated at the hearing that no, it had not told him, it had been Lauria who had told them, and there was no confirmation.

10. In any event, again, the fact of Sater's conviction had been *de facto* and *de jure* public property ever since the March 2, 2000 press release went around the world and the fact of his cooperation de facto and de jure public shortly thereafter when the filings on the *Coppa* docket confirming it began and with certainty by 2009 with the release of everything in the Lauria docket.

11. Therefore, when Sater was finally sentenced in October, 2009, none of those facts was secret anymore, and so, at least if one believes the sentencing judge, the Hon. I. Leo Glasser, Sater was sentenced in his courtroom at 10.30AM on October 23, 2009 in open court, as the transcripts confirm in his real name, and with details of his cooperation read aloud for all and anyone to hear, all of this thus becoming public property, if it wasn't already, by virtue of being read aloud in open court.

12.   That sentencing should have marked the end of Sater's business career and the possibility of restitution for the victims of his crimes.

13.   In fact, that press release nine years earlier should have marked those ends too.

14.   Not so. His entire criminal docket was concealed, leaving past victims and third parties unaware of his conviction and thus leaving those victims without the tens of millions in restitution orders they should have received.

15.   His sentencing records confirm he was not ordered to pay restitution, nor were his victims told of his open-court sentencing, though the law required it so that they could sue if they felt his sentence wasn't sufficient. The law also required the court to read aloud a statement of reasons for no restitution, but it did not. Interestingly, most of the *Coppa* defendants were sentenced to million dollar orders of restitution, including many who had reported directly to Sater, so there is no explanation for this.

16.    The press release was not findable online by normal searching until late 2010, and one would have to have known where to look on the *Coppa* and *Lauria* dockets to find public confirmation of his cooperation; thus while those facts were public facts and public property, they were not immediately findable.

17.   Aided by that *de facto* secrecy of his conviction, even before the *Coppa* case was over, Sater wasted little time in resuming his old tricks and defrauding new victims. By 2002, he had infiltrated and controlled Bayrock, a real estate venture with, once again, close ties to organized crime. Sater, and others at Bayrock conspiring with him, then used the firm to launder hundreds of millions of dollars, skim millions more in cash, and once again defraud his investors and business partners.

18. Among those partners was one Donald J. Trump, who lent his name and reputation to Bayrock projects financed by nearly a billion dollars of bank fraud, *infra*, in return for cash and interests in those ventures worth tens of millions of dollars at the time but who has since developed a curious amnesia about Sater, claiming not to be able to pick him out of a lineup when a few years ago he had given Sater an office near his in Trump Tower and a business card calling Sater a "senior adviser" to the Trump Organization and had no trouble picking Sater out of a crowd to honor him at a reception.

19. Oberlander was an attorney representing many victims of Sater's crimes when, in 2010, while preparing a civil RICO complaint against Sater and others complicit in his crimes at Bayrock, Oberlander was handed—unsolicited—a package of documents from a whistleblower, a former employee of Bayrock, which provided extensive information about Sater's earlier crimes and their concealment Those documents included a presentence report from the 1998 case in which acknowledged that, with the complicity of the judiciary and the government, Sater was hiding his previous guilty plea from his partners in Bayrock, clearly a "material" concealment since it resulted in hiding it from the banks which lent nearly a billion dollars to the firm not knowing it was a front for Sater's Russian organized crime and that, as happened, they would soon have to write off much of it.

20. In May 2010, Roe filed the RICO complaint on behalf of Doe's victims in U.S. District Court for the Southern District of New York, revealing the already-public facts of Sater's conviction and cooperation, with part of the PSR attached as an exhibit.

21. Instead of taking steps to help Sater's victims recover for their massive losses, two district courts quickly swung into action to squelch any public reference to the earlier criminal proceedings and to punish Oberlander for disclosing evidence of Doe's

crimes even though, again, the conviction was publicly released in 2000, the fact of cooperation was publicly released many times between 2000 and 2009, and the sentencing with its detailed narration of his cooperation was in open court in 2009.

22.    The SDNY court sealed the civil RICO complaint four days after it was filed. And the EDNY court in which Sater had been secretly prosecuted and convicted issued a temporary restraining order barring Oberlander from disseminating the PSR and other documents—even though Oberlander was not a party to that case, and even though the court could not identify any actual sealing or other order that would have applied to Oberlander. The court subsequently converted the TRO into a permanent injunction as to the PSR only, and in 2011 the Second Circuit affirmed.

23.    A year later, in 2012, on motion during the pendency of Oberlander's petition for writ of certiorari from those orders, the United States Supreme Court vitiated that injunction for the most part by permitting Oberlander to publicly reveal the content of the PSR that revealed prosecutorial and judicial misconduct, much of which information he had also used in the SDNY RICO complaint.

24.    Soon after, the trial court which had kept Sater's criminal case hidden for all those years despite the long public facts of his conviction and cooperation made public the docket and, a year after that, in 2013, almost everything that had been filed on it.

* * *

**Judge Glasser**

25.    On June 14, 2010, in a hearing sought by Sater to determine how Oberlander had obtained those documents, Judge Glasser stated, in open court, that he had never issued any sealing orders (see transcript of 6/14/10 proceedings, p.5, Judge Glasser:

"Now, with respect to your inquiries as to the [sealing] order which may have been issued, there is no formal order") and that there were no sealing orders directed at Mr. Oberlander (see transcript of 6/14/10 proceedings, p.9, Judge Glasser: "So when your letter asks me to show you what order is directed to Mr. Oberlander, there isn't any.")

26.   Yet in a so-called "scheduling order" dated March 23, 2011, issued *sua sponte* after filings had already been submitted to the Second Circuit as to his order prohibiting the dissemination of Sater's PSR (and a year before the Supreme Court's vitiation of it), Judge Glasser retroactively interpreted his non-existent sealing "order," and stated that Mr. Oberlander had "knowingly and intentionally flouted" the non-existent "order," which Judge Glasser had acknowledged did not even apply to him.[1]

27.   This was one of the first examples of retroactively fabricating court orders, setting in process a chain of fabrication and retroactive reinterpretation of orders.

28.   Well, it actually began earlier, inasmuch as Sater was sentenced on October 23, 2009, and Judge Glasser must have known he was presiding in open court, yet he commenced those proceedings in May/June 2010 and issued TRO's that had the effect of temporarily barring Oberlander from revealing that Sater was a convicted RICO fraudster. – And how could that have been lawful if Sater was sentenced in open court?

---

[1] The Second Circuit stated that it lacked jurisdiction to entertain an appeal from the March 23, 2011 finding, as it was in a mere scheduling order. Then, notwithstanding it would not entertain the appeal from the order because any findings therein were non-final, it purported to rely on the finding that Mr. Oberlander had "flouted" the order, which, again, Judge Glasser had acknowledged did not exist. Even worse, the Second Circuit claimed to have "independently" reviewed Judge Glasser's sealing order – an obvious fabrication, given that Judge Glasser acknowledged that there was none, which was re-confirmed when the docket was eventually unsealed.

29.    Before Oberlander even testified in front of Judge Glasser, the judge said that before he ruled on whether the whistleblower had obtained the documents legally, he would expect briefing on the matter. The briefing came in in November 2010 from Sater, then again in February 2012 when Judge Glasser requested it anew, but Judge Glasser never ruled on the question, which would have been irrelevant and dicta anyway insofar as the OTSC merely sought to know how the documents had "got loose."

30.    Nevertheless countless judges and attorneys continue to claim that Judge Glasser had found the documents were "stolen" notwithstanding this is contrary to the record.

31.    On June 21, 2010, Judge Glasser directed the falsification of the transcript of an open-court proceeding, directing the court reporter to change all instances of the name "Felix Sater" in the transcript to "John Doe"[2] Even though Oberlander and Lerner, and other members of the public were in that courtroom when the name "Sater" was used, and could not be barred from telling anyone outside that courtroom that Sater was questioned under oath and referred to therein by his true name.

32.    Notwithstanding his illegal directive that the transcript be altered, Judge Glasser acknowledged that even he lacked the power to enjoin anyone, such as Oberlander and Lerner, from telling anyone they wished what they heard and seen in that open court, that it was Felix Sater who testified, not some anonymous "John Doe" – and anyone in that courtroom could walk outside and tell anyone that Doe was Sater:

Mr. Lerner:    My client wishes to know whether these proceedings today are sealed?

---

[2] Oberlander and Lerner intend to file a motion before Judge Glasser to reform the transcript, so that the references to Felix Sater by his true name be restored.

| | |
|---|---|
| Ms. Moore: | Your Honor, all I ask is the name be redacted to change to John Doe. |
| The Court: | Ms. Brymer, wherever the name of John or Doe appears substitute John Doe. |
| Ms. Moore: | Your Honor, given the history, I would ask that everyone present in the courtroom be directed that they not advise anyone the John Doe referenced in the document is my client…. |
| The Court: | Ms. Moore, there is an extent even to which the broad enormous powers of Federal Courts do not extend and I think the limit to which you're requesting that power be extended is beyond the borders of Federal Court power, which is quite enormous, but if exercised carelessly can be quite inappropriate. I'm not directing the court or the world at large with respect to this proceeding, John Doe or everybody here. |

33. In other words, Felix Sater was seen by Oberlander and Lerner, and by other members of the public, and by Jody Kriss, Oberlander's client, testifying in open court on June 21, 2010, as "John Doe," often with his name used, and Oberlander and Kriss knew him on sight from prior dealings with him, and Judge Glasser, as he had to, thus acknowledged that no power could lawfully prevent them from going outside the court house and publishing that "Felix Sater" had just testified.

34. Yet Judge Cogan, *infra*, later issued a "finding" without hearing any evidence that Sater's name had never been used, though the transcript records Glasser's order to scrub it, and the another "finding" that the aforementioned non-existent order of Judge Glasser's impliedly made it illegal for Oberlander or Lerner to tell what they had seen in that open courtroom notwithstanding seventy years of precedent otherwise established by the U.S. Supreme Court in *Craig v. Harney*.

35. Next, for some reason, Judge Glasser only first "revealed" on March 13, 2013 (98-cr-1101, ECF 221) that Felix Sater had been sentenced in open court in October 2009, and he revealed it in a secret order that he said he even had "forgot" to docket but somehow managed to submit to the United States Supreme Court through the

Solicitor General, in a transparent attempt to influence the Supreme Court's deliberations on the petition for certiorari.

36. Indeed, it was the Solicitor General himself who gave Oberlander and Lerner that order, though he waited until days before the cert conference to submit it the Supreme Court, and only served it upon Oberlander and Lerner on the very day of the cert conference.

37. Until then, Oberlander and Lerner were threatened with contempt if they were to reveal that "Felix Sater" had been sentenced, as opposed to "John Doe."

38. Once again, there is no lawful basis on which to threaten someone with contempt for revealing what took place in open court, especially when years later it is revealed that real names, not pseudonyms, were used during that open-court proceeding.

39. The only plausible reason for maintaining those threats against Oberlander and Lerner would be to conceal from those with an interest in his sentencing that it had occurred and especially that it had occurred in open court.

40. For example, his sentencing, as has been held by Judge Schofield in *Gottdiener v. Sater*, marked the finality of his conviction, though he had pleaded guilty eleven years earlier. Thus it marked the beginning of a four-year period in which his victims could sue for damages in RICO, because the Private Securities Litigation Reform Act of 1995 required a final conviction before a civil suit could be brought. Concealing the sentencing would conceal the cause of action.

41.  Similarly, concealing the sentencing would keep victims from knowing that they had been deprived of their rights to participate therein and to sue for a restitution award.

42.  Any question of the overwhelming likelihood that these corrupt motives were indeed present should be put to bed by an email dated March 27, 2013 from then AUSA Todd Kaminsky demanding that we return the order, because, Kaminsky said, it was not intended by Glasser to be seen by us. Kaminsky's email stated, in pertinent part:

Dear Mr. Lerner and Mr. Oberlander:

During a telephone call with Mr. Oberlander, I was informed that during the litigation over your petition for certiorari, the Solicitor General's Office inadvertently sent you a sealed, exparte [sic] document issued by The Honorable I. Leo Glasser on March 13, 2013. As discussed, this document was sent to you in error and was not intended to be viewed by you, as Mr. Oberlander readily conceded that he understood during the telephone call. We request that you return the document, and any copies thereof, to the United States Attorney's Office for the Eastern District of New York (attn: Todd Kaminsky) as soon as possible."

43.  In other words, it was clearly Judge Glasser's specific intent, with the complicity of the Eastern District U.S. Attorney's office (thus implicating then United States Attorney for the Eastern District, now United States Attorney General Loretta Lynch) to tell the U.S. Supreme Court that Felix Sater had been sentenced in public while keeping that fact from the movants, and from the public, and from Sater's victims.

44.  Next, Circuit precedent holds that motions to unseal are to be taken up expeditiously. *Lugosch v. Pyramid Co*., 435 F.3d 110 (2d Cir. 2006). On March 17, 2011, Loretta Lynch, through AUSA Todd Kaminsky, moved to unseal the 98-cr-1101 docket.

45.   Yet, as was only revealed after the docket of 98-cr-1101 was finally, albeit inad-

vertently, unsealed in August 2012, that after the Second Circuit issued its June 29,

2011 order in *Roe v. United States* directing Judge Glasser to take up the March 17,

2011 motion to unseal, Loretta Lynch (through AUSA Todd Kaminsky) made a se-

cret *ex parte* application to withdraw that motion. (98-cr-1101 No. 120).

46.   Judge Glasser's secret order granting the motion stated:

FILED UNDER SEAL

ORDER

A letter motion, dated August 24, 2011, has been made by the government seeking
an Order that would permit it to withdraw an unsealing motion made on March 17,
2011, without prejudice and with leave to refile that motion at a later, unspecified
date.

SO ORDERED.

/s/ I. Leo Glasser

Sent by Fax to:
Todd Kaminsky, AUSA 718 254 6669
Michael Beys, Esq., 212 387 8229

47.   No compelling interest could have possibly been served by Judge Glasser's keeping

secret from the movants, the public, and Sater's victims that Loretta Lynch, through

AUSA Kaminsky, had secretly moved to withdraw her March 17, 2011 motion to

unseal the case, which motion, by virtue of the Second Circuit's June 29, 2011 deci-

sion in *Roe v. United States*, was a public fact.

48.   Then, in violation of the canons of attorney and judicial ethics, Judge Glasser, the

prosecutors and Sater's counsel engaged in secret *ex parte* proceedings to discuss

maintaining the secrecy. See, e.g., EDNY 98cr1101 docket entry of January 10,

2012:

"A Status Conference as to Felix Sater was held on 1/10/2012 before Senior Judge
I. Leo Glasser: AUSA Todd Kaminsky and Evan Norris appeared on behalf of the

Government. Michael Beys and Jason Berland appeared on behalf of John Doe. The Court directed the government and John Doe to provide a detailed chronological account with transcripts, of what the core issues involving this case and how it evolved into a First Amendment issue. The Court will issue an Order on Notice to Mr. Lerner directing the parties to brief the issues before the Court. The parties agreed to submit a Scheduling Order to the Court to be 'So Ordered'."

49. That is, Judge Glasser held an *ex parte* conference with Loretta Lynch's staff to discuss with Sater's counsel the core First Amendment issues raised by Oberlander and Lerner, and it is only because the clerk accidently made the docket public in August 2012 that such misconduct became known.[3]

50. If the "reason" for conducting that *ex parte* conference was concern for Sater's safety, it could only have been pretextual, given that Sater's identity, conviction, and cooperation had been made public a decade before, *supra*.

51. And indeed it was, because continuing on to this day every court involved has in lockstep adopted the canard that Sater's life would have been snuffed out if anyone knew he was, first, a convicted felon, then when that stopped working because the press release was turned over, if anyone knew he was a cooperator.

52. And, as noted, that was long before public, again at the government's hand, *supra*.

53. But, incredibly, when told that on the long-unsealed docket of Sater co-conspirator Salvatore Lauria was a letter dated April 29, 2002, which identified Felix Sater and Salvatore Lauria as convicted cooperators, despite the well established that once a fact is public it is futile, and thus unlawful, to gag (or seal) it, and once a document has been unsealed, even inadvertently, and placed on the public domain it is futile,

---

[3] This "inadvertence" was first reported Dan Wise. See https://wiselawny.word-press.com/2012/09/11/thejohndoebackstoryareportersdilemma/

and thus unlawful, indeed likely illegal, to reseal it, Ms. Lynch's office wrote to Judge Glasser to request that the letter be re-sealed.

54. And incredibly, though doing so would have been contrary to the Circuit's *Gambale*[4] decision, which holds that once information in a court docket becomes public, it can never be made un-public, Judge Glasser ordered it sealed, without even bothering to hear argument, such as that it is unlawful to reseal that which is public, or that sealing it on the Pacer site was futile since anyone could obtain it from the National Archives.

55. Not to be outdone, Judge Cogan then issued a ruling that because it had been re-sealed, even though Oberlander had downloaded it from public PACER files, he was enjoined from disseminating it, in repudiation of *BJF v. Florida Star*.

56. Then, when the 98-cr-1101 docket was made public, it revealed:

- No motion for a sealing order had ever been made; thus, the public was never given advance notice and an opportunity to object to sealing.

- No sealing order had ever been issued.

- No sealing order had ever been filed.

- Judge Glasser finally acknowledged in a secret order that Felix Sater was sentenced in public on October 23, 2009, yet the order so stating that Felix Sater was sentenced in public on that date remains to this day under seal.

- The district court has before it documentary proof that convicted co-conspirator Daniel Persico was told by the government during his prosecution that Sater was a witness against him, yet arguments and allegations have been made by Sater, through counsel, to district courts that Persico first learned of Sater's co-operation in 2011 through alleged disclosures by Oberlander and Lerner.

- Not one single requirement of the Mandatory Victim Restitution Act or the Crime Victims Rights Act had ever been complied with whatsoever.

---

[4] *Gambale v. Deutsche Bank*, 377 F.3d 133 (2d Cir. 2004).

57.   The unsealing of the 98-cr-1101 docket should have ended any pretext of justifica-
tion for continued secrecy, yet Judge Glasser, Judge Cogan and Second Circuit
judges have kept up the regime of secrecy, only backing off when faced with media
scrutiny.

### The Second Circuit

58.   As noted, the Second Circuit stated in its June 29, 2011 decision that it had con-
ducted its own "independent" review of Judge Glasser's sealing "orders." Yet the
docket, when it was finally unsealed, showed – as Judge Glasser acknowledged on
June 14, 2010, and at other times – that he had never ever issued a sealing order.
This means that the Second Circuit misrepresented the record, intentionally or neg-
ligently, when it said it had independently reviewed Judge Glasser's (nonexistent)
sealing orders.

59.   After a clerk's order having been issued at the Second Circuit directing submission
of the record on appeal to that court, Oberlander and Lerner wrote to Judge Glasser
demanding that he create docket. He failed to do so, notwithstanding that *Hartford
Courant v. Pellegrino*, 380 F.3d 83 (2004), requires that a docket be kept in all
cases, so that the public may exercise its supervision over the courts and so that ap-
pellate courts could tell if any sealing order had ever been issued. And the case ex-
pressly holds that docket sheets may not be kept from the public absent extraordi-
nary circumstances.

60.   Accordingly, Lerner filed a petition for writ of mandamus in behalf of Oberlander
with the Second Circuit asking that Glasser be ordered to make a docket.

61. By order dated February 14, 2011, the Second Circuit denied the motion, holding that the movants had failed to make the requisite showing for a mandamus, notwithstanding that the burden was on the court and the clerks to make a docket, and that the admitted absence of one was a self-evident self-proving truth.

62. In its February 14, 2011 order, the Second Circuit said that its reasons for denying the mandamus application might be explained in a further order. None was ever issued.

63. Thus the Second Circuit panel declined to follow its own Circuit precedent, which is prohibited, but in addition purported to independently review a non-existent sealing order, manifestly misrepresenting the record. Moreover, it turned out that there really had been a docket all along, but apparently Judge Glasser just chose not to submit it to the Circuit, and the docket confirmed, just as *Hartford Courant* had said a docket would confirm, that no sealing order had ever been issued.

64. On February 14, 2011, the Second Circuit began what would be a pattern of relying on unsworn statements of attorneys with no possible personal knowledge as part of a scheme to never have any factual hearings, after those before Glasser, at which we could discover the truth, and began making up "findings" with no evidence.

65. In this example, relying on mere argument and representation by Loretta Lynch's office, rather than facts brought forth in a hearing subject to the cross-examination engine of truth, the Second Circuit has ratified the U.S. Attorney's fraud, that Sater would be at risk if his conviction, let alone cooperation, were ever disclosed, ***not mentioning that both had been disclosed over a decade earlier***.

66. To be specific, AUSA Kaminsky stood before that court on February 14, 2011 and

said that unsealing of the Second Circuit docket would "pose a substantial probabil-

ity of prejudice to Doe's safety in this case." He added:

There are no current prosecutions that involve the necessary testimony or infor-
mation from Doe at this time. But there got to be a situation where ten years of con-
stant undercover work and arrests and indictments as well as convictions, some very
extensive, made as a result of his actions got to a point where it became too danger-
ous to allow a confirmation of his cooperation to be known.
                                    * * *
There have been public accounts. They have been extensive in terms of their allega-
tions, but they have been lacking in terms of their corroboration and the government
seal of approval, if you will. The government feels that is an important difference."
                                    * * *
The government feels at this time that the threats are still extensive enough that
even with that [December 17, 2007 New York Times] article it would be extremely
dangerous to have Mr. Doe's cooperation revealed."
                                    * * *
JUDGE POOLER: Do they know who the cooperator is?

MR. KAMINSKY: Your Honor, there are a number of different individuals whom
they may suspect. But Mr. Doe was, depending how one looks at it, fortunate to not
have to testify over his 11-year career as a cooperator and none of the individuals in
organized crime had ever received any, as far as the government knows, any official
acknowledgement of that cooperation.

67. All of this was a fraud, on Oberlander, Lerner, and the public for sure and on the

court perhaps, as Kaminsky was present at the October 23, 2009 sentencing of Felix

Sater, where his cooperation was "corroborated" and given "the government seal of

approval," once again, as Judge Glasser represented to the Supreme Court, in open

court.

68. Nor was it the worst example, for on or about June 25, 2011, Ms. Lynch's staff

wrote to the Second Circuit arguing that even though Judge Glasser had stated that

all his proceedings were in open court and that he would not and could not order an-

yone there not to reveal what had transpired, we must be ordered not to do so any-

way, and incredibly, without explanation, we were.

69.   The Second Circuit further falsified the record, saying that Judge Glasser had issued his injunction as to the PSR based upon a finding of a risk to Sater and wrongdoing by Oberlander. That was a fraud because Judge Glasser stated that the injunction was issued due solely due to the status of the PSR. (Indeed, he held the order to be in rem as to the PSR, and that it is a special kind of document as to which an in rem order could be issued, without regard to how someone comes into possession of it.) Judge Glasser issued the injunction before making any factual findings, in fact nine months before he purported to have "found" that Oberlander had "flouted" a non-existent but "implied" order. And thus the Second Circuit misrepresented the record when it referred to Judge Glasser's findings as a basis for the issuance of the injunction as to the PSR.

70.   The Second Circuit wrongfully avoided *de novo* First Amendment review by this retroactive misinterpretation that Judge Glasser had found wrongful conduct on the part of Oberlander as a basis for enjoining dissemination of the PSR. (In any event, this was vitiated by the Supreme Court, when it ordered that Oberlander and Lerner could publicly docket and disseminate a redacted petition for certiorari with information from Sater's PSR that revealed prosecutorial and judicial misconduct).

71.   And thanks to the U.S. Supreme Court, one can easily see that the Second Circuit misrepresented the facts when it said that the PSR contained no relevant information. The U.S. Supreme Court deemed the information sufficiently important that it should be released to the public on the grounds that it revealed prosecutorial and judicial misconduct.

**Judge Brian Cogan**

72.   On April 1, 2012, this court, after noting that even unconstitutional court orders must be obeyed, then proceeded to issue a never-ending stream of unconstitutional orders, first to shut Oberlander and Lerner up, then to punish them for having legally had the truth revealed despite that.

73.   For example, pursuant to multiple, formal, docketed, signed multi-party stipulations so-ordered by Judge Glasser, the parties agreed that during the pendency of appeals, the parties could keep copies of the documents at issue – *viz.*, the PSR, the cooperation agreement, criminal information, proffer, etc.

74.   Indeed, in October/November 2010, all TRO's having lapsed, Judge Glasser ordered further briefing on whether dissemination of those documents (other than the PSR) could be enjoined, let alone ordered returned.

75.   Yet on April 1, 2011, this court retroactively interpreted the transcript of proceedings before Judge Glasser on July 21, 2010 to contain somewhere, somehow, an order directing the return or destruction of them, insisting that it was perfectly clear that that was what Judge Glasser had "intended" (not that it matters, because orders are what they say, not what was meant), not explaining how that could be given that the attorneys in that courtroom became a signatory a month later on those stipulations, and the judge so-ordered them.

76.   Yet on January 6, 2016 (ECF 152, entered on 1/8/16), this court again retroactively interpreted the transcript of proceedings before Judge Glasser on July 20, 2010, this time determining that Judge Glasser's orders did ***not*** clearly require the return or destruction of all copies of documents.

77. Obviously, if Judge Glasser had ordered the return or destruction of the documents in July 2010, there would have been no need for the so-ordered stipulation, nor reason for further briefing of the issue in October/November 2010.

78. In point of fact, the open issue before Judge Glasser was what should be done with *copies* of the documents, and Judge Glasser never issued an order directing return or destruction of the *copies*, and thus, when his TRO expired, so too did any bar on their dissemination. (And obviously a TRO cannot constitute an order directing their return or destruction, as such would constitute an actual final injunction.)

79. Yet Judge Cogan threatened Oberlander with prison if he did not return or destroy those documents on the ground that Judge Glasser had ordered, or "intended," such.

80. Yet when Sater moved for contempt against Jody Kriss, after learning that Kriss had retained his copies (as he had had every right to do because of those stipulations), arguing that Judge Glasser had ordered the return or destruction of the documents, this court issued a secret order in January 2016, kept from Oberlander and Lerner until Jody Kriss moved to unseal it, that said that Judge Glasser hadn't actually ordered the return or destruction of the documents after all.

81. There was no reason to keep that January 6, 2016 order from Oberlander and Lerner, and that is absolute certainty, because a few months later after the AP had moved to unseal what was on his docket and Kriss had moved to unseal that order as well, Judge Cogan ordered that document unsealed to the public.

82. Other than, perhaps, that the court was embarrassed that it had so misinterpreted Judge Glasser's on-the-record ruminations.

---

83. Next, early in these proceedings, Judge Cogan decided not to create a separate docket, because otherwise he would have to make his own independent determinations as to whether documents should or shouldn't be under seal.

84. That is, Judge Cogan determined that because Judge Glasser's docket was sealed, though by no actual order, anything put on that docket would automatically be sealed.

85. Yet Judge Cogan never explained how a non-existent, undocketed, un-moved-for sealing "order" from 1998 could have had any bearing on what was happening in 2011 – 2016. By deferring to Judge Glasser's sealing regime, Judge Cogan abdicated his independent obligation to assure openness, which became even more obligatory when this was converted into a contempt proceeding, to which there is a First Amendment right of public access and a Sixth Amendment right to a public trial.

86. Then, in an order of June 21, 2016, Judge Cogan stated that that which is already public need not be unsealed, because it's already public. That turns unsealing doctrine on its head. What is public cannot be sealed. *Gambale*, *supra*. Not incidentally, it also subjects Oberlander and Lerner to prosecution, investigation, or suit should they disseminate such documents, because…

87. Judge Cogan opined that in his contempt charges against us, Sater had established "probable cause to prosecute" or "a prima facie case" on the charge that orders of the Second Circuit (which in any event bound Sater and the government as well) prohibited the dissemination of publicly available information if it was under seal

somewhere, notwithstanding its public provenance and notwithstanding that a generation of the law of futility in the context of the First Amendment makes that patently unconstitutional and quite arguably in excess of jurisdiction.

88. Concomitantly, Judge Cogan has allowed contempt charges to be maintained, indeed again finding them to state "probable cause" or be a "prima facie" case, against Oberlander and Sater for, *inter alia*, allegedly disseminating papers filed publicly at the U.S. Supreme Court (by order of that Court), documents obtained from the Congressional Record via a Government Printing Office website, documents available from the National Archives.

89. On May 10, 2016, this court stated that the unsealing of documents upon motion by the Associated Press would not allow Oberlander and Lerner to speak of them. That is, the court believes a gag order was selectively imposed upon movants Oberlander and Lerner, whilst anyone else in the world could speak of the unsealed documents, again in repudiation of First Amendment futility doctrine.

90. Judge Cogan has said that his new interpretation, that Oberlander and Lerner may not speak of documents released to the public or information available in public, is based upon some theory of "bootstrapping" which as near as it is understandable seems to mean that if Oberlander and Lerner had violated some order in making something public, even years later when it is public all over the world they may never, ever speak of it again.

91. Besides violating the elements of futility, this is quite remarkable since it constitutes a permanent loss of core civil constitutional rights, something that cannot even be imposed as a penal punishment.

92.  But it is not unique here, because Judge Cogan also admitted, by his unsealing of May 10, 2016, that he kept an entire docket of nearly 300 filings sealed for five years for no other reason than to enjoin Oberlander and Lerner, admitting on the record that he did so merely because Sater had established a "prima facie" case that there had been contempt so, Judge Cogan said, he "had" to have every filing on the docket kept under seal to prevent Oberlander and Lerner from filing things publicly that he felt shouldn't be filed.

93.  In sum, he constructed a global prior restraint on everything filed there, newspaper articles included, no matter how over-inclusive, based on a "prima facie" case yet with absolutely no findings whatsoever, by his own admission during that hearing.

94.  Moreover, the transcript of March 5, 2012 reveals that Judge Cogan even then had thought of creating a second, parallel docket on which to place filings that did not need to be sealed, creating the obvious question – Why, then, did 280 consecutive filings stay sealed for years and only become public, despite Oberlander and Lerner's motions to unseal, when global media moved to unseal?

95.  Judge Cogan apparently forgot that he had issued previous orders, the law of the case, that said that Oberlander and Lerner could use public information and documents; this is even more outrageous considering that the Second Circuit said the same thing in its June 29, 2011 order, especially mentioning that March 2, 2000 press release that announced Sater's conviction to the world as something Oberlander was free to use, yet Judge Cogan has again stated that Sater's charges of contempt for disseminating that press release show "probable cause" or state a "prima facie" case.

96.  Moreover, Sater's charges are unsupported by any proper affidavit, though Local Rule 83.6 requires one in a contempt motion and FRCP 83 prohibits a district court judge from purporting to waive local rules; Judge Cogan waived, or purported to waive, it anyway for Sater, and for years before March 2015 Sater flooded the court with contempt charges not supported by affidavits.

97.  Then there is the problem that Judge Cogan announces all these "theories" and "interpretations" in front of the same Assistant United States Attorneys he pressures into investigating Oberlander and Lerner, telegraphing that movants Oberlander and Lerner could be held in contempt for undermining court orders and bootstrapping from public information, because the court has blatantly criminalized their use of public information.

## CONCLUSION

I certify that all of the preceding is true and correct to the best of my knowledge subject to perjury as set forth in 28 U.S.C. § 1746 and that the attached are true and correct copies of that which they are represented to be.

/s/ Richard E. Lerner

122 W. 27th Street 10th Floor

New York, New York 10001