# EXHIBIT A

No. _____14-676_____

# In the Supreme Court of the United States

---

LORIENTON N.A. PALMER,
FREDERICK MARTIN OBERLANDER,

*Petitioners*,

v.

JOHN DOE 98-CR-01101, UNITED STATES OF AMERICA,

*Respondents*.

---

*On Petition for a Writ of Certiorari to the
United States Court of Appeals for the Second Circuit*

---

## PETITION FOR A WRIT OF CERTIORARI
## AND VOLUME 1 OF APPENDIX

---

Richard E. Lerner
*Counsel of Record*
The Law Office of Richard E. Lerner, P.C.
1375 Broadway, 3rd Floor
New York, New York 10018
Phone: 917.584.4864
Fax: 347.824.2006
richardlerner@msn.com

*Counsel for Petitioners*

---

Becker Gallagher · Cincinnati, OH · Washington, D.C. · 800.890.5001

i

# QUESTIONS PRESENTED

1. Despite this Court's holdings that the public has a first amendment right to access criminal trials, the Second Circuit uses a *cooperator exception* to allow closure without proof of necessity, the mere fact of cooperation sufficient. Does this violate the constitution?

2. In a circuit conflict, the Second Circuit uses this *cooperator exception* to allow blanket sealing of cases without individual particularized reviewable findings, while the Fourth Circuit has held blanket sealing unconstitutional. May a court seal entire cases and everything filed in them without particularized findings?

3. The Second Circuit uses this *cooperator exception* to defy victim rights and mandatory sentencing laws, letting convicted cooperator–defendants evade restitution by holding the fact of their cooperation justifies not telling victims of the case, yet claiming their secret sentencings are really public, which if true requires victim notification. Does this violate the constitution?

4. The Second Circuit uses this *cooperator exception* to defy the first amendment by letting courts enjoin third parties who learn of the secret case from telling anyone, even victims of ongoing crimes involved, even Congress, without evidentiary hearings or findings, or other due process. Does this violate the constitution?

5. The Second Circuit upheld the district court's rulings maintaining the sealing of documents by a non-precedential "summary order" it admitted violated its own precedents but applied nonetheless to this "special

ii

case." Does a federal appellate court violate the constitution when it purports to issue non-precedential orders; that is, does Article III require appellate courts to give precedential value to all their decisions?

iii

# TABLE OF CONTENTS

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . .  xi

DECISIONS BELOW . . . . . . . . . . . . . . . . . . . . . . .  1

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

CONSTITUTIONAL, STATUTORY, AND
REGULATORY PROVISIONS INVOLVED . . . . . .  2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . .  3

I.     Everything  Secret  Degenerates  –  –
       Especially the Administration of Justice  . . .  3

II.    The Boston U.S. Attorney's and FBI Offices
       Facilitated  and  Covered-Up  the  Crimes  of
       Racketeer Whitey Bulger Because He Was an
       Informant  . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

III.   The  Eastern  District  of  New  York  U.S.
       Attorney's  and  FBI  Offices  Facilitated  and
       Covered-Up  the  Crimes  of  Racketeer  Felix
       Sater, a Respondent Here, Because He Was
       a Cooperator – but Unlike the Bulger Case,
       Here,  the  Federal  Courts  Knowingly  Went
       Along, Ultimately Causing $1B of Injury  . . .  5

       A. Sater's 1990s racketeering and related
          proceedings, 1998 to 2001, by which time
          his conviction and cooperation had been
          made public by the government, court, et
          al  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

Case 1:16-mc-02636-AMD    Document 24-1    Filed 06/07/18    Page 6 of 51 PageID #: 3681

iv

      B.  Sater's all-new racketeering and related proceedings while cooperating or informing, from 2002 through 2009 . . . . 10

      C.  Sater's sentencing in 2009 . . . . . . . . . . 11

IV.    Petitioner Oberlander Discovers the Crimes and the Cover-Up and Sues to Stop Them . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

V.     Procedural History I . . . . . . . . . . . . . . . . . . . 20

VI.    Procedural History II . . . . . . . . . . . . . . . . . . 25

REASONS FOR GRANTING THE WRIT . . . . . . . 33

I.     The Integrity of the Federal Court System Depends on This Court's Confirming That Lower Courts May no More Defy Binding Precedent or Wrongfully Infringe Upon Fundamental Rights Than They May Defy Mandatory Sentencing or Similar Statutes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

II.    A lower federal court's core "inherent power" does not include the power to refuse to impose the lawful sentences Congress mandates, including restitution . . . . . . . . . 34

III.   Lower courts' "inherent power" cannot include the power to defy binding precedent; moreover, the issuance of a purported non-precedential "summary order" by a federal appeals court, as the Second Circuit issuance here, is unconstitutional . . . . . . . . . . . . . . . 36

v

IV.   Lower courts' "inherent power" cannot include the power to wrongfully infringe upon enumerated or unenumerated rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

APPENDIX

Appendix A        Summary Order in the United States Court of Appeals  for the Second Circuit
                  (June 5, 2014) . . . . . . . . . . . . . App. 1

Appendix B        Order in the United States District Court, Eastern District of New York
                  (May 17, 2013)  . . . . . . . . . . . . App. 7

Appendix C        Order in the United States District Court, Eastern District of New York
                  (May 15, 2013)  . . . . . . . . . . . App. 11

Appendix D        Order in the United States District Court, Eastern District of New York
                  (March 13, 2013) . . . . . . . . . . App. 15

Appendix E        Transcript of Sentencing Before the Honorable I. Leo Glasser United States District Senior Judge in the United States District Court, Eastern District of New York
                  (October 23, 2009) . . . . . . . . App. 18

vi

Appendix F       Excerpts of Docket Entries
                 U.S. District Court Southern District
                 of New York (Foley Square)
                 Criminal Docket for Case #:
                 1:94-cr-00248-CSH-1 . . . . . . App. 40

Appendix G       Constitutional,    Statutory and
                 Regulatory Provisions . . . . . App. 43

Appendix H       Letter from Jeffrey Lichtman to
                 Eric O. Corngold in No. 00 CR 196
                 (ILG)
                 (October 10, 2000) . . . . . . . . App. 66

Appendix I       Letter [Excerpt] from the U.S.
                 Department of Justice to Lawrence
                 Ray in No. 00-196 (ILG)
                 (November 20, 2001) . . . . . . App. 68

Appendix J       Transcript of Sentencing [Excerpt]
                 in the United States District Court
                 for the Eastern District of New
                 York in CR-98-1102
                 (February 5, 2004) . . . . . . . App. 71

Appendix K       Transcript of Proceedings [Excerpt]
                 in the United States District Court
                 for the Eastern District of New
                 York in 00-CR-1005 (NGG)
                 (June 20, 2006) . . . . . . . . . . App. 78

Appendix L       Transcript of Criminal Cause for
                 Sentencing [Excerpt] in the United
                 States District Court for the
                 Eastern District of New York in 04-
                 CR-234 (CBA)
                 (January 11, 2008) . . . . . . . . App. 81

vii

Appendix M    Transcript of Motion Hearing [Excerpt] in the United States District Court for the Eastern District of New York in 98-CR-1101 (June 14, 2010) . . . . . . . . . . App. 85

Appendix N    Transcript of Oral Argument [Excerpt] in the United States District Court for the Eastern District of New York in CV 98-1101 (July 20, 2010) . . . . . . . . . . App. 88

Appendix O    Letter from Morgan, Lewis & Bockius LLP to Judge Glasser in 98 CR 1101 (ILG) (August 12, 2010) . . . . . . . . App. 100

Appendix P    Letter (with attachment) from Morgan, Lewis & Bockius LLP to Judge Glasser in 98 CR 1101 (ILG) (August 12, 2010) . . . . . . . . App. 102

Appendix Q    Amendment to Stipulated Standstill Order in the United States District Court for the Eastern District of New York in 98 CR 1101 (ILG) (September 27, 2010) . . . . . App. 111

Appendix R    Letter from Morgan, Lewis & Bockius LLP to Judge Glasser in 98 CR 1101 (ILG) (November 16, 2010) . . . . . . App. 114

viii

Appendix S   Transcript of Proceedings [Excerpt] in the United States District Court for the Eastern District of New York in 03cr833 (November 17, 2010) . . . . . . App. 116

Appendix T   Brief for the United States [Excerpt] in the United States Court of Appeals for the Second Circuit, No. 11-1957, *United States of America v. Gushlak* (May 8, 2012) . . . . . . . . . . App. 124

Appendix U   Letter from the U.S. Department of Justice to Judge Glasser in No. 98 CR 1101 (ILG) (November 23, 2010) . . . . . . App. 127

Appendix V   Letter [Excerpt] from the U.S. Department of Justice to Judge Glasser in No. 98 CR 1101 (ILG) (March 17, 2011) . . . . . . . . . App. 129

Appendix W   Transcript of Proceedings [Excerpt] in the United States District Court for the Eastern District of New York in 98-CR-1101 (April 1, 2011) . . . . . . . . . . App. 133

Appendix X   Letter [Excerpt] from Wilson, Elser, Moskowitz, Edelman & Dicker LLP to Judge Cogan in No. 98 CR 1101 (ILG) (April 4, 2011) . . . . . . . . . . App. 138

ix

Appendix Y     Order in the United States District Court for the Eastern District of New York in 98-CR-1101 (April 4, 2011) . . . . . . . . . . App. 147

Appendix Z     Order in the United States District Court for the Eastern District of New York in 98-CR-1101 (January 26, 2012) . . . . . . . App. 149

Appendix AA     Letter [Excerpt] from the U.S. Department of Justice to Judge Glasser in No. 98 CR 1101 (ILG) (January 26, 2012) . . . . . . . App. 151

Appendix AB     Order in the United States District Court for the Eastern District of New York in 98-CR-1101 (February 2, 2012) . . . . . . . App. 153

Appendix AC     Letter from the Solicitor General to the Supreme Court of the United States (March 19, 2013) . . . . . . . . . App. 155

Appendix AD     Email from Todd Kaminsky (March 28, 2013) . . . . . . . . . App. 157

Appendix AE     Complaint [Excerpt] in the Supreme Court of the State of New York County of New York . App. 159

x

Appendix AF    Movant John Doe's Supplemental Memorandum of Law in Further Support of Permanent Injunction [Excerpt] in the United States District Court Eastern District of New York . . . . . . . . . . . . . . App. 164

Appendix AG    Public Records [Excerpt] in *U.S. v. Coppa* 00-CR-196 (EDNY) . App. 168

Appendix AH    The Scorpion and the Frog [Excerpt] . . . . . . . . . . . . . . . App. 178

**SEALED APPENDIX**

Appendix AI    Memorandum and Order in the United States District Court, Eastern District of New York (filed under seal) (March 14, 2013) . . . . . . . . . . App. 184

Appendix AJ    Letter [Excerpt] from Beys, Stein & Mobargha LLP to Judge Cogan (August 2, 2012) . . . . . . . . . . . . App. 203

Appendix AK    Transcript [Excerpt] in the United States Court of Appeals for the Second Circuit (February 14, 2011) . . . . . . App. 207

xi

# TABLE OF AUTHORITIES

## CASES

*ACLU v. Holder*,
  673 F.3d 245 (4th Cir. 2011) . . . . . . . . . . . . . . . 34

*Anastasoff v. United States*,
  223 F.3d 898, *vacated en banc*,
  215 F.3d 1024 (8th Cir. 2000) . . . . . . . . . . . . . . 36

*Caperton v. AT Massey Coal Co., Inc.*,
  556 U.S. 868 (2009) . . . . . . . . . . . . . . . . . . . . . . 6

*Dolan v. United States*,
  103 S.Ct. 2553 (2010) . . . . . . . . . . . . . . . . . . . . . 35

*Ex Parte United States*,
  242 U.S. 27 (1916) . . . . . . . . . . . . . . . . . . . . . . . 34

*U.S. v. Alcantara*,
  396 F.3d 189 (2d Cir. 2005) . . . . . . . . . . . . . . . . 18

*U.S. v. Salemme*,
  91 F.Supp.2d 141 (D.Mass. 1999) . . . . . . . . . . . . 5

*Withrow v. Larkin*,
  421 U.S. 35 (1975) . . . . . . . . . . . . . . . . . . . . . . . 6

## CONSTITUTION, STATUTES, AND REGULATIONS

U.S. Const. Art. III . . . . . . . . . . . . . . . . . . . . . . 2, 35

U.S. Const. amend. I . . . . . . . . . . . . . 2, 18, 22, 29, 36

U.S. Const. amend. VI . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1506 . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1964(d) . . . . . . . . . . . . . . . . . . . . . . 14

xii

18 U.S.C. § 3553(c) . . . . . . . . . . . . . . . . . . . . . . . 2, 18

18 U.S.C. § 3663 . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 3663A . . . . . . . . . . . . . . . . . . . . . . . 2, 35

18 U.S.C. § 3664 . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 3771 . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 3771(a) . . . . . . . . . . . . . . . . . . . . . . . 15

18 U.S.C. § 3771(a)(2) . . . . . . . . . . . . . . . . . . . . . 18

18 U.S.C. § 3771(b)(1) . . . . . . . . . . . . . . . . . . . . . 18

18 U.S.C. § 3771(d) . . . . . . . . . . . . . . . . . . . . . . . 14

28 U.S.C. § 1254(1) . . . . . . . . . . . . . . . . . . . . . . . . 1

28 CFR § 45.10 . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 CFR § 50.09 . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**RULES**

Fed. R. Crim P. 32 . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. Civ. P. 65(d) . . . . . . . . . . . . . . . . . . . . . . 2

**OTHER AUTHORITIES**

1

## DECISIONS BELOW

The Second Circuit published a Summary Order *sub nom In re Applications to Unseal 98-cr-1101 (ILG),* 568 Fed.Appx. 68, 2014 U.S. App. LEXIS 10436 (June 5, 2014) (App.1) The order of the district court from which the appeal was taken to the Second Circuit was issued on March 14, 2013 and possibly remains under seal, if it ever was lawfully sealed, though in any event certain information contained therein is public. The sealed order is submitted to this court in a separate sealed appendix. (App.AI at 184.)

## JURISDICTION

This appeal is from a final decision and order of the Second Circuit Court of Appeals upholding an order of a district court in the Eastern District of New York which declined to "unseal" certain documents.

This Second Circuit order was entered on June 5, 2014, and by order of this court on petitioners' motion, the time to file this petition was enlarged to run through and including November 3, 2014.

Statutory jurisdiction lies in 28 U.S.C. § 1254(1).

2

## CONSTITUTIONAL, STATUTORY, AND REGULATORY PROVISIONS INVOLVED

U.S. Constitution, Article III

U.S. Constitution, Amendment I

U.S. Constitution, Amendment VI

18 U.S.C. § 1506, "Theft or Alteration of Record or Process; False Bail"

18 U.S.C. § 3553(c), "Imposition of a Sentence"

18 U.S.C. § 3663, "Order of Restitution"

18 U.S.C. § 3663A, "Mandatory Restitution to Victims of Certain Crimes"

18 U.S.C. § 3664, "Procedure for Issuance and Enforcement of Order of Restitution"

18 U.S.C. § 3771, "The Crime Victims' Rights Act"

Federal Rule of Criminal Procedure 32, "Sentencing and Judgment"

Federal Rule of Civil Procedure 65(d), "Injunctions and Restraining Order"

28 CFR § 45.10, "Procedures to Promote Compliance with Crime Victims' Rights Obligations"

28 CFR § 50.9, "Policy with Regard to Open Judicial Proceedings"

3

## STATEMENT OF THE CASE

### I.    Everything Secret Degenerates – – <u>Especially</u> the Administration of Justice

The United States Court of Appeals for the Second Circuit and district courts within, in active concert with United States Attorneys, have created an unconstitutional regime of secret criminal cases, falsified dockets, illegal sentences, and prior restraints in the name of "protecting" the safety of cooperators.

If this writ is granted, petitioners will ask this Court use its supervisory powers to stop this defiance of the Constitution and statutes, not only with respect to the inferior courts involved, but also with respect to the practice of law conducted before those courts by the United States. Prosecutorial discretion and inherent judicial power are extraordinary, but not infinite, and not immune to the guarantees of enumerated and unenumerated rights. Such discretion and power may not be exercised corruptly, and as they have for too long, they must be reined in by this Court.

Petitioners begin their explanation of the case by analogizing it to the only thing like it in modern history, the Whitey Bulger scandal in Boston.

### II.    The Boston U.S. Attorney's and FBI Offices Facilitated and Covered-Up the Crimes of Racketeer Whitey Bulger Because He Was an Informant

In the 1970s, the Boston FBI office recruited local mobster Whitey Bulger and others as informants, beginning an infamous quarter-century partnership in corruption wherein they gave the FBI information

4

about organized crime and in return the FBI ignored their crimes, even their murders; allowed innocents to be convicted in their place, and told them of witnesses who might testify against them so the informants could have them killed and maintain their cover.

The corruption lasted to 1994, when a corrupt FBI agent warned Bulger and others that they'd been indicted on racketeering charges and Bulger became a fugitive from justice for twenty years until captured.

In 2003, the House Committee on Government Reform released the report of its investigation into the scandal, *Everything Secret Degenerates: The FBI Use of Murderers as Informants*. Among its conclusions:

- The FBI perjured, and obstructed state and local prosecutions, to help their informants.

- Persons as senior as the FBI Director knew.

- The FBI Office of Professional Responsibility lied when it said no favors had been given the informants and prevented the committee from obtaining information that proved the lie.

- The U.S. Attorney committed perjury, and admitted he'd been intimidated, threatened by the FBI if he interfered with these informants.

- The DOJ impeded the committee by withholding, editing, or claiming to have lost papers.

- In response to suits filed by the victims of these crimes, the DOJ used litigation tactics "contrary to respect for the rule of law."

5

*****

The August 19, 2014, headline in *Time's* movie section, reviewing a documentary on the scandal, was, *Who's the Bigger Criminal, Whitey Bulger or the FBI?*

*****

Notably, the report says of federal judge Mark Wolf, whose landmark decision in *U.S. v. Salemme*, 91 F.Supp.2d 141 (D.Mass. 1999), started the oversight process that led to the committee's investigation, "He is owed a significant debt of gratitude by everyone devoted to law enforcement in a democratic society."

**III.   The Eastern District of New York U.S. Attorney's and FBI Offices Facilitated and Covered-Up the Crimes of Racketeer Felix Sater, a Respondent Here, Because He Was a Cooperator – but Unlike the Bulger Case, Here, the Federal Courts Knowingly Went Along, Ultimately Causing $1B of Injury**

In this case, like Whitey Bulger, respondent Felix Sater, a career criminal and convicted racketeer, became a cooperating witness and an informant in the Eastern District of New York and in return was covertly, and illicitly, not only allowed to, but emboldened to, in fact facilitated in his efforts to, commit a billion dollars of continuing predicate crime during the ten years following his conviction.

And, like Bulger's case, when one of the petitioners, an attorney representing victims of those crimes, discovered the corruption and sought to expose it to bring Sater and those complicit with him to justice, the Department of Justice did all it could, no matter how

6

corrupt, to cover it up and silence him and his clients, actively working to prevent state, local, or private prosecution of Sater.

But there all further resemblance to Bulger ends, as there's no Judge Wolf here. To the contrary, to use the politic language of *Caperton*[1], the evidence would support the conclusion by an objective, well-informed observer to a constitutionally intolerable degree of confidence, that persons in the Department of Justice were aided and abetted in keeping its corruption secret by the collusion of Second Circuit district and appellate judges, themselves implicated *ab initio* because of the illegal concealment of Sater's criminal case and the illegal sentence he received, judges who, in creating or upholding a cooperator exception to the constitution, repudiated their oaths and abused the contempt power to silence those who would tell the truth, falsified judicial records, fabricated evidence, refused to afford due process, and ultimately perpetrated direct fraud not only on the institution of the court but on this Court itself.

**A. Sater's 1990s racketeering and related proceedings, 1998 to 2001, by which time his conviction and cooperation had been made public by the government, court, et al.**

Felix Sater has a long history of defrauding investors and partners in his business ventures. For

---

[1] *Caperton v. AT Massey Coal Co., Inc.*, 556 U.S. 868 (2009), quoting *Withrow v. Larkin*, 421 U.S. 35 (1975) ("probability of actual bias…[by]…judge…too high to be constitutionally tolerable").

7

example, in 1998 he pled guilty to racketeering for operating a "pump-and-dump" penny stock fraud in partnership with other Russian and La Cosa Nostra career criminals, bilking investors of at least $40,000,000.

That should have signaled the end of his business career and the possibility of restitution for the victims of his crimes. Not so. Because he agreed to cooperate, his entire criminal docket was not only "sealed," but "super-sealed," indeed illegally so, *infra*, leaving his victims and third parties unaware of his conviction.[2]

Apparently, from the time of his plea in 1998 through the end of 2001, Sater cooperated in the investigation, arrest, and prosecution of his co-conspirators in the stock fraud.[3]

While petitioners don't know the details of his cooperation (but take it on faith that there was at least some), one thing they do know, because it is a matter of public record, is that on and after March 2, 2000, by the deliberate action of the government, the fact of Sater's conviction, and that of several of his co-conspirators who also agreed to cooperate, like Sal Lauria, became

---

[2] This court's *Richmond* line of cases, with which familiarity is assumed, all require procedural and substantive formality before a proceeding or document in a criminal case may lawfully be closed to public access. The judge in Sater's criminal case stated on the record many times that he never signed a sealing order, (App.M at 86-87), as is confirmed by the record, see *U.S. v. Sater*, 98-CR-1101 (E.D.N.Y.) (Glasser, J.), as is the fact that no record findings capable of review to justify any such closure were made.

[3] All relevant process in relation to his co-conspirators took place *sub nom. U.S. v. Coppa*, 00-CR-196 (E.D.N.Y.) (Glasser, J.).

8

public property forever because Loretta Lynch, then E.D.N.Y. U.S. Attorneys, Lewis D. Schiliro, NYC FBI Assistant Director, Howard Safir, N.Y.P.D. Commissioner, issued a worldwide press release announcing the arrest of the *Coppa* defendants and disclosing that Sater, Lauria, et al. had already pled guilty to racketeering charges.[4]

Six months later, on September 13, 2000, the release was placed in the Congressional Record during House hearings, *Organized Crime on Wall Street*.

Arguably, there might be some debate whether the press release itself effectively revealed that Sater et al. were cooperating, for example given the fact that they'd already pled, but any ambiguity on that score went away within a year, because by 2001 the government, *Coppa* defense attorneys, and the presiding judge (Glasser, J.) had placed in the public files of the case, thus making it public property, any number of documents explicitly confirming Sater's cooperation.[5]

---

[4] The press release did travel around the world: "19 Charged in Stock Scheme Tied to Mob," *The New York Times*, March 3, 2000; "40M Stock Scam 19 Said to Have Ties to U.S., Russian Mobs Are Charged," *The New York Daily News*, March 2, 2000; "Borscht Boys & Goodfellas In $40M Stock Swindle: Feds," *The New York Post*, March 6, 2000 ; "Mob Influence Hit on Wall Street," *CNN Moneyline News Hour*, aired March 2, 2000; "19 Accused After $40M Stock Fraud," *The Manchester Guardian UK*.

[5] The public court files of the *Coppa* case, which have always been public (but which were hidden in the E.D.N.Y. for two years, *infra*) contain: (1) The government's witness list for the *Coppa* proceeding against Daniel Persico, a captain in the Colombo crime family, showing Sater set to testify as a government witness; (2) a memorandum in support of *Coppa* defendant Lev's request for

9

In short, by late 2001, anyone who cared to know, certainly including the *Coppa* defendants and their lawyers, knew Sater had pled and was cooperating, as the information was public property and publicly available – if you knew where to look.

Then why was there any legal basis to maintain the "sealing" (illegal concealment) of his entire criminal case (of course Sater had not yet been sentenced himself)? Petitioners do not know, for this point has never been answered despite their many times raising it throughout the years of litigation, but a good guess is that the FBI promised to do a favor for Sater after the 9/11 attacks, and making his criminal record disappear was the favor.[6]

---

additional information on "cooperating witnesses" Sater and other(s); (3) An objection by Lev's attorney, Jeffrey Lichtman, to information in Lev's PSR about his "threat" against Sater (see next); (4) said PSR, discussing Lev's threat; and excerpts from the website of Jeffrey Lichtman describing how he had Lev's charges reduced from racketeering to harassing a government witness (Sater) by showing that said witness was committing crimes of fraud during his cooperation. (App.AG at 168-178).

[6] In Lauria's 2003 autobiography *The Scorpion and the Frog*, he says he and Sater were resigned to imprisonment because their attempt at freedom, buying Stinger missiles from Afghanistan, had failed, but that right after 9/11 Sater called him excitedly to tell him that they were now going to be the FBI's new best friend because of Sater's Middle East contacts and that in return the FBI would "suppress" Sater (and Lauria's) connection to the *Coppa* case "as much as possible." (App.AH at 182-183).

10

### B. Sater's all-new racketeering and related proceedings while cooperating or informing, from 2002 through 2009

During the ensuing years of his cooperating and informing, while not yet sentenced for the stock racketeering so supposedly subject to incarceration and revocation of his cooperation agreement if he committed crime, Sater took advantage of the secrecy by resuming his old tricks and defrauding new victims.

By 2002, he had infiltrated and largely controlled Bayrock, a New York developer with ties to organized crime, in the next several years using it to launder hundreds of millions, skim and extort millions more, and again swindle his investors and partners, for example fraudulently inducing banks to lend hundreds of millions to Bayrock by concealment fraud (hiding the material fact of his conviction from them), threatening to kill anyone at the firm he thought knew of the crimes committed there and might report it.[7,8]

---

[7] At least three Bayrock persons, one former employee and two partners, have given sworn statements that Sater had threatened to kill them if they ever complained about or revealed anything Sater had been doing wrongfully at Bayrock.

[8] It should be noted for the record that, while the Sater press release was written up and publicized widely, oddly enough his name was not used in any of that coverage, and so even to this day searching on his name will not find it, except in the Congressional record, where of course one would have to know to look in the first place. Similarly, while the public *Coppa* records were always available, one would have to think to look there. Thus, it's understandable that many persons, including at Bayrock, would not know of his conviction, even though it was public property.

11

(By no means was Sater the only person committing crimes at Bayrock; Julius Schwarz, it's CEO and General Counsel, was responsible as well because he was aware of Sater's secret conviction yet hid it.)

Supposedly, after taking a fortune out of the firm, and arranging for much of it to be placed into trusts for his family to remove it from the reach of his victims (recall he had yet to be sentenced), Sater severed his ownership in and other ties to Bayrock in 2008.

### C. Sater's sentencing in 2009

Finally, on October 23, 2009, more than a decade after his guilty plea and long after his purported cooperation and informing had ended, Sater stood before federal district judge I. Leo Glasser in courtroom 8B of the Eastern District of New York to be sentenced.

It was over in less than an hour. Though Sater had faced nearly 20 years of confinement, Judge Glasser[9] imposed neither confinement nor probation. That, at least, was within his discretion.

But, though Sater had also faced mandatory forfeiture of $80,000,000, Judge Glasser imposed no forfeiture, only a fine of $25,000, and though Sater had further faced mandatory restitution of $40,000,000, Judge Glasser imposed no restitution at all, in sum

---

[9] Judge Glasser had years before gained notoriety for sentencing "Sammy the Bull" Gravano to 4½ years' time served as a reward for cooperating against John Gotti, suggesting the 19 mob hits Gravano had admitted couild be thought of as a public service.

12

letting Sater keep virtually all of the millions he'd admitted receiving from the criminal scheme[10].

The government might have been expected to complain about its loss of $79,975,000. But that was the last thing the government was going to do because the government had intentionally fouled the criminal information to which Sater had pled, making imposition of a forfeiture sentencing order, though mandatory, impossible, doing so to "protect" Sater from receiving a sentence mandated by Congress[11].

Those defrauded lenders might have been expected to complain, since during his allocution Sater admitted that he'd concealed his conviction from them because he knew they wouldn't have lent otherwise.[12] After all, most of the loans had been written off, many of the lenders had become insolvent, and not one would have lent a dime had they known the truth, as Sater had just admitted. But those complaints were never going to happen because even then the lenders still had no idea of his conviction, thus had no idea of his

---

[10] In his 2004 PSR, of which this Court allowed limited disclosure by its order of June 25, 2012 on docket 12-112, the Officer states that he did not ask Sater what he had done with the millions of dollars of proceeds of the stock fraud he had admitted receiving.

[11] The sentencing transcript says there was a bargained forefeiture order in the cooperation as to a house in Hampton Bays. The cooperation agreement does describe such a house but the public property records do not show a transfer occurred. In any event, whatever the truth, the house would have been worth perhaps $420,000, or 1/200th the mandatory forfeiture order.

[12] The sentencing transcript is in the Appendix. (App.E at 32).

13

sentencing, a situation everyone present in that courtroom had every reason to perpetuate forever.[13]

Probation wasn't going to say anything because five years before, in the 2004 PSR they'd prepared when Sater was first scheduled to be sentenced, fn.10, the officer who wrote it admitted he'd participated with the government in helping Sater conceal his conviction from Bayrock and his partners at the firm, thus facilitating and emboldening Sater's crimes, including the financial institution concealment fraud.

Thus, while the four FBI agents present, including Leo Taddeo -- who as former head of the E.D.N.Y. Russian organized crime squad and Sater's handler was well familiar with the crimes of Sater and his father, a Mogilevich crime syndicate boss[14] -- might have been expected to arrest Sater once they heard him confess bank fraud, that was the last thing they were going to do because it had been part of the government's deal with him to facilitate, and ignore, the crimes, and they would certainly have some explaining to do how this all happened under their noses.

---

[13] One should note Sater's allocution, where he complains that he had been trying to turn his life around but because the NY Times had "outed" him he had to leave "his" company (Bayrock) because the banks would now no longer lend. Does this sound like someone who expected that this would ever become public, or like someone who had been promised it would all stay secret forever?

[14] His father, Michael Sheferofsky, had his own criminal record and corresponding secret docket in the E.D.N.Y. see *infra*.

14

Accordingly, the E.D.N.Y. AUSA's present, Todd Kaminsky and Marshall Miller, who might have been expected to ask to adjourn to void Sater's plea agreement and ask his bail be revoked so he could be held in custody while they sought to indict him for the continuing racketeering he'd just admitted (participating in the operation of Bayrock through a pattern of bank fraud), weren't going to do anything because they, too, had compromised themselves by that arrangement to help him hide his conviction – a conviction that was already public property, remember.

The AUSA's had another reason to keep this all concealed, or rather 1,200 reasons, namely Sater's victims. Naturally all those victims of Sater's stock fraud, most of them elderly, some Holocaust survivors, would have been expected to raise hell about his minimal sentence and the nearly 15 years it took to get there, and would have been expected to sue for an order of restitution[15]. After all, at interest that $40,000,000 of mandatory restitution Sater should have been sentenced to would have grown to $120,000,000 by 2009.

Moreover, his liability to his victims in civil RICO wasn't actionable until his conviction became final on entry of a judgment and commitment order[16], and by 2009 with accretion, treble damages, and attorneys' fees, that liability likely exceeded $500,000,000.

---

[15] Victims may petition for restitution if denied same, or denied sufficient amounts thereof, at sentencing. 18 U.S.C. § 3771(d).

[16] 18 U.S.C. § 1964(d).

15

So indeed those victims might have been expected to make themselves heard vociferously, but that, too, was never going to happen because, like the banks, the victims had never been told of Sater's sentencing (or, for that matter, even the existence of his case).

However, unlike the banks, the victims were the express beneficiaries of a statutory right not only to be told of it, but to be invited to participate in it[17], and it was the duty of the very same AUSA's, Kaminksy and Miller, to make that happen. And rather inevitably, since there would have been little point in their saving Sater from tens of millions in mandatory forfeiture only to have him ordered to pay tens of millions in mandatory restitution, those AUSA's repudiated their duty and completely ignored the victims, not even bothering to find them beyond those on lists they already had from the NASD; that this was a repudiation of their duty there can be no doubt because AUSA Miller was at the time the E.D.N.Y. victims' rights compliance officer and so had to know perfectly well what his duties were to the victims – and to the law.[18]

Mr. Miller is now the fourth ranking official in the Department of Justice, Principal Deputy Assistant Attorney General for the Criminal Division to Leslie Caldwell, Assistant Attorney General for the Criminal Division, the third ranking official. Ordinarily one

---

[17] 18 U.S.C. § 3771(a).

[18] Remember, their duty is to seek out the victims, inform them of their rights, and see to it that they were treated with fairness and dignity. *Id.* Intentionally failing to notify them of an open court (public) sentencing proceeding is a serious transgression.

16

might wonder whether Ms. Caldwell knows that her assistant participated in this dishonor of the victims, and what that augurs for his fealty to victims' rights, rights of court access, and his respect for Congressional mandate in his current position, but this case long ago departed from the ordinary, and there is no need to wonder whether she knows, because she does.

Of that there is no doubt, because Ms. Caldwell, who at the time of Sater's plea bargain and conviction was herself an E.D.N.Y. AUSA and at the time of his 2009 sentencing was head of Morgan Lewis's criminal defense practice, was also right there in court at that sentencing, appearing as Sater's lead defense counsel.

One presumes Ms. Caldwell wouldn't have wanted this to see the light of day if, as seems quite likely, the fees Sater was paying her firm had to be traceable to money he'd taken from Bayrock[19], thus further traceable to the financing he'd procured by fraud, or to money he'd kept from his earlier racketeering and had been spared forfeiting; either way the money was proceeds of specified unlawful activity.

(That she knew their provenance is without doubt as well, because in March 2010, barely six months after his sentencing, Sater gave deposition testimony in which he said that Ms. Caldwell had advised him that he should refuse to testify whether he'd concealed any convictions while at Bayrock because if he admitted he

_____

[19] His 2004 PSR says Sater told his probation officer that he had a negative net worth, and the only source of income anyone is aware of over the ensuing years was from Bayrock.

17

had he'd be exposing himself to criminal liability[20]; unless she was corruptly advising him to take the fifth and so was guilty of obstruction, Ms. Caldwell was obviously well aware that her client had committed hundreds of millions of dollars of concealment fraud at Bayrock, just as he'd allocuted to at his sentencing.)

And finally, as to Ms. Caldwell, we must presume that she normally did not allow her cooperator clients to admit at their sentencing allocutions that they had used the secrecy of their dockets to perpetrate bank fraud while cooperating unless she knew in advance that no one would be surprised and no one would care.

And that suggests the question, Why let him admit it at all? If he's in open court, admitting his participation in a billion dollars of bank fraud, doesn't he risk having the banks go after him, or Bayrock?

But then of course he wasn't in open court. Even though the Second Circuit has held that there is a first

---

[20] "On the advice of counsel, I am not going to answer that question as I don't have to incriminate myself…On the advice of counsel, I won't answer past what I have already answered…My counsel is Leslie Caldwell from Morgan Lewis."

"Did she know you would be asked this question?"

"Yes."

"Did she advise you not to answer this question?"

"Yes."

"The grounds being again?"

"Not to incriminate myself…"

18

amendment public right of access to sentencings[21], and other laws and rules provide the same[22], nothing anywhere in the (now public) Sater docket shows there was any unsealing of the case before sentencing; quite the contrary. So surely, albeit illegally, his sentencing was not being held in public.

(Of course if it were in open court, the fact that the transcript shows his real name used throughout would eliminate any chance of his cooperation or his conviction remaining secret, as both were disclosed.)

Finally, there is the judge presiding (Glasser, J.). He, too, had a duty to the victims, or rather in his case to ensure that the government discharged its duty to them[23], and the transcript shows he did nothing about victims' rights whatsoever. At a minimum, this is consistent with a sealed, rather than public, sentencing proceeding, because even if illegally sealed it might at least explain why the victims hadn't been told of it[24].

## IV.  Petitioner Oberlander Discovers the Crimes and the Cover-Up and Sues to Stop Them

Petitioner Oberlander is a New York attorney who represents minority partners in Bayrock, one of them Bayrock's former Director of Finance, and also

---

[21] *U.S. v. Alcantara*, 396 F.3d 189 (2d. Cir. 2005).

[22] See, 18 U.S.C. § 3553(c) (court at time of sentencing shall state "in open court" its reasons for imposing the particular sentence).

[23] 18 U.S.C. § 3771(b)(1).

[24] 18 U.S.C. § 3771(a)(2).

19

represents victims of Sater's 1990s stock fraud. These partners engaged petitioner on suspicion they had been defrauded by other partners, including Sater and Schwarz. Subsequently, they directed him to sue.

When petitioner began drafting a RICO complaint in 2009, publicly available information showed Sater was "connected to" organized crime. For example, a 1998 *Business Week* article, and a 2007 *New York Times* article, discussed Sater's involvement in the aforementioned stock fraud. And it was widely believed that Sater had been only an "unindicted co-conspirator" who avoided prosecution by cooperating; he was indeed listed as an unindicted co-conspirator in the public *Coppa* docket.

There was, however, information from which one could infer Sater *had* been prosecuted. For example, a co-conspirator, Klotsman had told the *Times* Sater had pled guilty. And the *Times* quoted Sater's lawyer, who didn't deny it, but just challenged anyone to find it.

On March 1, 2010, these suspicions were confirmed when unexpectedly, and without solicitation, petitioner received documents from a whistleblower, a former employee of Bayrock, who found them on the Bayrock email servers during his prior work there.

The documents were Sater's criminal complaint, information, proffer, and cooperation agreement, all from 1998, and a PSR from 2004, all from his secret case, 98-CR-1101 E.D.N.Y., identifying Sater by his true name, confirming he had pled guilty to racketeering, and had been scheduled for sentencing in 2004.

20

Petitioner, concluding at least $750,000,000 of the firm's capital, had been procured with the fraudulent concealment of Sater's conviction, and that the firm's customers were being defrauded daily by sales of condominiums pursuant to false and misleading offerings, acted quickly.

On May 10, 2010, petitioner filed a civil RICO complaint, 10-CV-3959, S.D.N.Y., charging Sater and others with operating the firm through a pattern of crime, including excerpts from the documents. Within a day *Courthouse News* had the story and a copy of the complaint with the excerpts online, available for download. Additionally, upon receipt, the firm's general counsel disseminated the complaint to several named defendants and attorneys on May 12, 2010.

## V. Procedural History I

On May 18, Sater obtained an ex parte TRO from the same judge who had secretly tried him, (Glasser, J., E.D.N.Y.), enjoining dissemination of the documents and ordering a hearing to ascertain how petitioner got them, making petitioner a respondent in his secret criminal case, *U.S. v. Sater*, (recall he had been sentenced only a few months before).

On June 14, the second of four days of hearings, petitioner asked the court reveal any order purporting to seal anything, or bind him. ***Judge Glasser admitted "there is no formal order" and he couldn't "find any order signed by me, which directed that this file be sealed," and there was no indication in the first filing "or in any subsequent document that an application was made or request was made in that document to seal that***

21

***file." He further emphasized that there were no orders ever issued that bound petitioner and there were no sealing orders ever issued.*** (App.M at 85 *et seq.*).

On July 20, Judge Glasser issued a permanent injunction prohibiting dissemination of the PSR and stated that while one could infer that the former Bayrock employee who gave petitioner the documents "may" have stolen them he still wondered "[w]hat order of the Court was violated by that. ***Sater testified briefly, but neither he nor other witnesses spoke of any threat of harm they had encountered or had reason to believe they would encounter if anyone knew of Sater's role in the stock fraud, nor did anyone introduce non-parol evidence of it***.

Judge Glasser issued TRO's on the other documents, claiming to have found a risk of harm to Sater, but refused to state what that risk was or where he had obtained the evidence of it, and never put any of it on the record (we now know, because he had none).

Petitioner appealed, but it was delayed for months because Judge Glasser refused to send the notices to the Second Circuit, keeping them in chambers.

Finally, on their transmittal, the government moved to seal the appeal and, prior to any hearings or submissions, ***the Second Circuit issued sua sponte ex parte gag orders barring petitioner and his clients from revealing any documents filed in related cases in the Eastern or Southern Districts or the Second Circuit and expressly barred them from telling Congress what they had learned.***

22

At argument on the government's motion to seal, **AUSA Kaminsky said Sater's criminal case had been secret since inception**, (App.AL at 207 *et seq*.).

On questioning by the panel, Kaminsky said he believed there was a serious risk of harm to Sater if any of this got public.

Petitioner argued that none of these facts were in the record, so were only argument, and that the First Amendment required the appellate docket be public. The court conceded that media organizations could not have been enjoined had they come into possession of the documents at issue, and such appellate proceedings would be open, but petitioners could be gagged because they're not the media:

Judge Cabranes asked for assurance from the government that: "[W]e are not talking about preventing a news organization from publishing a matter of public concern or impinging on editorial discretion."

Judge Pooler responded to petitioner's First Amendment arguments with: "We are not dealing here with prior restraint of the press or media. That's what the Pentagon Papers case was about. [Newspapers have a special charge in publishing information for citizens. [Petitioner] doesn't have any charge in making this information available to citizens."

The court then issued a summary order, maintaining the appellate case under blanket seal, noting **"In light of the serious, indeed grave, concerns expressed by the United States regarding the possible consequences of unsealing these documents, and the absence of any sufficiently**

23

*persuasive    countervailing    considerations expressed by [petitioner]…"*

\*\*\*\*\*

The importance of the last pages to the maintenance of a court system built upon fundamental fairness and due process cannot be over-emphasized. Respectfully we ask the Court to consider the following:

- Judge Glasser issued a permanent injunction on dissemination without regard to the norms of procedural and substantive due process.

- AUSA Kaminsky sat through four days of district court hearings without introducing evidence or asking a witness about risk of harm…

- The Second Circuit blanket sealed an entire appeal, to this day maintaining hundreds of filings under seal, based on a record with no evidence of any risk or reason to believe there might be a risk based solely on Kaminsky's beliefs, which petitioner wasn't allowed to contest because it wasn't done at a hearing.

- ***The government had made the conviction public ten years before, by the press release, but Kaminsky was there perpetrating fraud on the institution of the court by lying, saying the government had not*** (petitioner hadn't yet found the press release).

- When petitioner found the press release after the hearing, and confronted Kaminsky with it, the government asked to unseal Sater's docket

24

by letter which admitted that the government had not had any evidence for over ten years that there had ever been any risk of harm or any impediment to recruiting cooperators, which meant ***Kaminsky knew he had no factual basis to be opining and arguing before the Second Circuit that there was grave, imminent risk and cooperator recruiting might be impaired***. (App.V at 130).

- ***Kaminsky had been at Sater's sentencing a year earlier and had heard him admit the bank fraud he perpetrated at Bayrock, and was in possession of a copy of petitioner's May 10, 2010 RICO complaint and knew it exposed the massive related crimes at Bayrock, yet if petitioner had not found the press release Kaminsky would have prevailed in arguing that Sater's hundreds of millions of concealment frauds could never be revealed because there might be a threat to him. Forgive us for thinking the threat would be a lot more to Kaminsky et al. for allowing Sater to commit the frauds at Bayrock.***

- ***Finally, the government, Sater, the court, all of them, knew there was a public Coppa file in Lee Summit Archives for ten years holding documents showing the public revelation of Sater's cooperation, not just conviction. Why weren't they admitting it? Presumably, they knew he wouldn't find it, because when petitioner began requesting it from Lee in November 2010, before the***

25

*Second Circuit hearing, he was told, and would be told for years, that it had been requested by, and then disappeared in, the E.D.N.Y., while the E.D.N.Y. professed to have no idea how they had misplaced it, maintaining this lie for two years until it turned up one day after Sater's docket had gone public.*

## VI.    Procedural History II

The Second Circuit eventually upheld the injunction on the PSR, and this Court denied cert, but not before granting petitioner's motion, see docket 12-112, to be allowed to disclose the contents of the PSR which he felt showed government and judicial misconduct.

While the initial disclosure was, as ordered, without use of Sater's name, the press interest even before this court's order granting the motion had motivated several persons, most prominently *The Miami Herald* and petitioner Palmer, a private citizen, to join in the attempt to unseal Sater's case, and after an accident in the E.D.N.Y. clerk's office that exposed the entire docket online for a week, Judge Glasser ruled he had no choice but to unseal it permanently.

Judge Glasser then proceeded to hold hearings on what documents on the docket would be unsealed and what would remain sealed, or "sealed," and those hearings concluded in late 2012.

At the beginning of those hearings, Judge Glasser ordered everyone but Sater and his counsel and the government removed from the courtroom, including movants (petitioners here), and announced that we petitioners were prohibited from introducing any

26

evidence into the unsealing proceedings, that he would rule based on his own knowledge of the case and what the government gave him and what Sater gave him, but would take evidence from no one else, even though petitioners here had authored almost 75% of all the documents in question during the prior years of litigation and so already had access to them anyway.

Then, when petitioners sought to introduce evidence by document, through motion for judicial notice, Judge Glasser threatened quasi-criminal sanctions for "vexatious litigation" and held the submissions out of order.

Petitioners then appealed from the unsealing order, as noted in the front of this petition, on the ground that the entire proceeding had been structurally defective because the failure to allow us to present evidence that there never had been any risk and that it had all been public for years anyway was Fifth Amendment structural error.

The Second Circuit in a summary order upheld Judge Glasser, held that even though we had not been permitted to introduce evidence we had "made our views known" [sic], whatever that means, and further held that even though Judge Glasser had made no record findings of risk (or anything else) capable of appellate review, merely listing "risk" conclusorily as his reason for each closure maintained, that because of the "gravity" of Sater's cooperation the binding precedent that there must be such express, reviewable evidentiary findings need not apply in this special case.

Petitioners seek cert therefrom.

27

## VII.   Procedural History II

In the interest of expedience, petitioners will accelerate the remainder of this petition to present the points in bullet point list format rather than text.

- On March 19, 2013, a few days before petitioner's prior petition was due to be conferenced, the Solicitor General forwarded a "sealed," secret, ex parte order of Judge Glasser's (App.AI at 184) to this Court which we had never seen and which was never docketed and which contained the statement (this is now a matter of public knowledge) that Sater had been sentenced in public, in other words in open court.

  In the prior pages, petitioners explained that it was inconceivable that it was taking place in open court because Sater was admitting a billion dollars of fraud while cooperating. Petitioners also explained that if in fact it was open court, then that meant that Judge Glasser, Kaminsky, and Miller had willfully and intentionally defied their statutory obligations to the victims. Yet there that order is.

  Regrettably, it appears that that much of it was a fraud directed at this Court, if so the first time in known history that a sitting federal judge perpetrated a fraud targeted at this very Court.

  Equally if not more regrettable is that the order also contains a ruling that one Danny Persico had threatened the life of Sater in an attack on Lauria soon after the unsealings began claiming that he only then knew who had informed on

28

him. Persico is a member of organized crime and was a co-conspirator of Sater and Lauria's in the stock fraud. But Persico is more than that. He is a childhood friend of Lauria's, and Lauria admits in his own book that he himself told Persico he informed on him and that while he seemed to take it well, the FBI told him later (this is 2002, remember) that Persico had been making threats against him, a story he repeated in his (Lauria's) own sentencing allocution before Judge Glasser in 2004.

Ordinarily, the ramifications of a sitting judge participating in the fabrication of evidence like this to justify the concealment he was responsible for would be unthinkable, but on May 15, 2011, Sater's lawyers wrote petitioner through counsel warning that they had an agreement with Judge Glasser that he would not take up any unsealing motion we made and would ignore our arguments if he did[25]. Both happened as they predicted, as noted already in the refusal to allow us to admit evidence and, as we mention in closing, with the ex parte, secret withdrawal of the government's March 17, 2011 letter motion to unseal, kept from us for six months.

---

[25] "Even if Judge Glasser decides to hold a hearing or oral argument to determine whether to unseal specific docket entries of Doe's criminal proceeding, he will do so without considering your arguments or appeals. If you believe you are driving the unsealing issue, you are mistaken."

29

And in view of the several ex parte merits conferences Judge Glasser ordered with the government and counsel for Sater, to petitioner's exclusions, and without petitioner's knowledge, all shown on the now unsealed docket of 98-CR-1101, who *wouldn't* believe this is all collusive, at best.[26]

- Under no circumstances is this petition a claim of error, and importantly we ask this Court to understand that this problem of illegally secret cooperator cases and cover-ups that make the Bulger case, at least in terms of dollars, look like an amateur operation is not limited to this one case.

- At approximately the same time that Sater was pleading guilty, three co-conspirators, Richard Appel, Sal Romano, and Myron Gushlak, were engaged in pump-and-dump fraud of their own, involving a penny stock controlled by Gushlak. As with Sater, they bribed brokers to push the

---

[26] A Status Conference as to Felix Sater was held on 1/10/2012 before Senior Judge I. Leo Glasser: AUSA Todd Kaminsky and Evan Norris appeared on behalf of the Government. Michael Beys and Jason Berland appeared on behalf of John Doe. The Court directed the government and John Doe to provide a detailed chronological account with transcripts, of what the core issues involving this case and how it evolved into a First Amendment issue. The Court will issue an Order on Notice to Mr. Lerner directing the parties to brief the issues before the Court. The parties agreed to submit a Scheduling Order to the Court to be "So Ordered." (Court Reporter Charleane Heading.) (Francis, Ogoro) (Entered: 01110/2012)

30

stock, in this case including brokers at a firm called Montrose.

Eventually all three were caught and pled out and became cooperators. That's not the interesting part. What's interesting is that they, each of them, openly admitted and stipulated that they were co-conspirators in the scheme. Accordingly, both for *Pinkerton* and restitution purposes they had to have exactly the same set of victims to whom they were liable.

When Romano came to be sentenced, the government told the E.D.N.Y. judge, Carol Amon, now chief judge of that district, that Romano had been a great cooperator and that sadly she could not order Romano to pay restitution because the government simply had no idea who they were. The government then asked her to issue a finding to that effect, which she did, thus for all practical purposes ending any ability to get Romano to pay restitution.

When Appel came to be sentenced, surprisingly enough all of a sudden the government knew who the victims were, and sought and obtained a $3,000,000 restitution order.

But when Gushlak came up for sentencing, his restitution order was for $17,000,000, on top of a $25,000,000 find. Why?

Because, as to restitution, the sentencing judge held that as Gushlak, Roman, and Appel had co-equal liability, and the government's expert for Gushlak's trial had calculated $17,000,000 as the aggregate loss for all of them, including all

31

the persons Appel had defrauded at Montrose to further the scheme even though Gushlak had never heard of them, Gushlak had to pay for all of it.

Of course this is correct, but that's not the point. The point is, the victim loss sheets, as the dockets reveal, were in the possession of FINRA (blue sheets), and it is not possible that they didn't exist and so the victims couldn't be found for "wonderful" cooperator Romano but could be found for the other two.

What's even more impressive is that the reason Gushlak was fined $25,000,000 and sentenced to may years' incarceration was that the judge denied him acceptance credit. Why? Because the government showed the judge that, just like Sater, Gushlak had used his secrecy to defraud investors, lenders and partners, just as Sater admitted doing at Bayrock.

It's very fascinating that what sends one man to prison becomes something that is not to be spoken about as to Sater, but petitioners will speak, for what it is, more evidence that Sater, like untold others, is benefiting from a covert, and corrupt, promise to keep him "safe."

- Finally we bring up two cases. One, Sheferofsky, is a criminal case in the E.D.N.Y. where the defendant admitted to running a scheme of attempted extortion and extortion for ten years. His entire docket was hidden for six years, with no evidence of formality observed, but importantly, when he got sentenced, the

32

government said there need be no restitution because the victims were dead, criminals, or unknown. The government had to know perfectly well that the statute provides that restitution is awardable to the representative of a victim, too. It's probably not irrelevant then to note that Sheferofsky is, or was, Sater's father, and the dates on the closures of his docket match the concealment of Sater's.

- The other is *United States v. Shereshevsky* (no relation), SDNY Docket No. 94-cr-248. On May 5, 1994, Shereshevsky was arraigned for bank fraud, pled not guilty and was released on bail. That was what the public docket reflected until, June 26, 2002. The docket reflects that on that date it was "entered" that eight years earlier, on May 5, 1994 (*viz.* the same date as the docketed not-guilty plea) Shereshevsky had actually pled guilty to bank fraud. The Southern District deliberately allowed false information to remain on the public docket for eight years, a fraud on the public.

Presumably, Shereshevsky was given the benefit of secrecy because he was a cooperator, and apparently got leniency – time served, two years supervised release, and a restitution order off $39,000. What did Shereshevsky do with himself while "cooperating" with the government? He perpetrated a multi-hundred million dollar WexTrust Ponzi scheme.

One of the judges who, apparently, actively falsified his docket, Michael Mukasey, went on to become the Attorney General. On September

33

24, 2001, he issued a "speedy trial" ruling on the docket, to keep up the false appearance that the defendant had actually pled not guilty. (App. F at 42).

## REASONS FOR GRANTING THE WRIT

**I.    The Integrity of the Federal Court System Depends on This Court's Confirming That Lower Courts May no More Defy Binding Precedent or Wrongfully Infringe Upon Fundamental Rights Than They May Defy Mandatory Sentencing or Similar Statutes**

The factual history of this case is complex, but the legal principles are not. Simply put, the Second Circuit courts have seceded from the (juridical) union to form their own state where the cooperator exception they have invented of whole cloth trumps everything else, including the enumerated and unenumerated fundamental rights of liberty. And that is something they cannot be permitted to do.

This case is not about judicial error. Indeed, taking the word "error" literally, there may well be none. What there is here, instead, is judicial *defiance*.

When a lower court decision conflicts with this court's binding precedent, ordinarily that's "mere" error and this court is not likely to grant a writ. But when the conflict is so outside the norm of judicial decision-making that it requires intervention and review by this court, that's cert-worthy. And where, as in this case as the record plainly shows, that great conflict, that great deviation from the norm, is an intentional, blatant disregard for that precedent then, petitioners submit, this Court is compelled to act.

34

## II.   A lower federal court's core "inherent power" does not include the power to refuse to impose the lawful sentences Congress mandates, including restitution

Of course, the lower federal courts have inherent powers. But, save for a "core" subset, have long been understood to be subject to Congressional override.[27] Even that "core" exception proves petitioner's point here, because while Congress cannot interfere with the ability of a lower court to decide a particular case, that limitation does not apply at all to the authority of Congress to set minimum sentences.

This Court held precisely, and unanimously, so a century ago in the *Killits* case, *Ex Parte United States*, 242 U.S. 27 (1916): When a federal court refuses to

---

[27] The Fourth Circuit explained in *ACLU v. Holder*, 673 F.3d 245 (4th Cir. 2011) [citations and explanations omitted, emph. add.]:

> The inherent power of…lower federal courts falls into three…categories…[F]irst…core Article III power…the ability of a lower federal court to decide a case over which it has jurisdiction…once Congress has established lower federal courts and provided jurisdiction over a given case, Congress may not interfere with such courts by dictating the result *in a particular case*…[S]econd…powers "necessary to the exercise of all others"…these…are deemed necessary to protect the efficient and orderly administration of justice and…command respect for the court's orders, judgments, procedures, and authority"…These…are subject to congressional regulation…[T]hird…"those reasonably useful to achieve justice"…Examples…"the power of a district court to appoint an auditor to aid in litigation involving a complex commercial matter"…Such are subject to congressional regulation…

35

impose a mandatory sentence, it violates the law and operates illegally. If there were any doubt that this applies to a mandatory order of restitution, this Court put that to rest in *Dolan v. United States*, 103 S.Ct. 2553 (2010), noting that when Congress said in the restitution statute that such an order must be imposed at sentencing notwithstanding any other provision of law, 18 U.S.C. § 3663A, Congress meant it.

What about cooperator safety? Every filing by respondent Sater and the government solemnly intones that warning, arguing that the courts must hide all this to keep Sater safe, even if, regrettably, he gets to keep all the money he stole.

The reply must be, Where in Article III are federal courts vested with police powers? Nowhere. And, petitioners aver it to be common knowledge that, were there even such a risk, the Federal Witness Protection program has never lost a participant.

And frankly, the mere idea is simply nonsensical that a felon like Felix Sater can assert a subjective fear, decline witness protection, and as a result then be allowed to evade restitution, keep the secret of his conviction, and commit concealment frauds, again by using that secrecy, and have the courts assert some inherent power to protect him by enjoining even his victims, those like petitioner's clients, who found out and would stop it.

36

### III. Lower courts' "inherent power" cannot include the power to defy binding precedent; moreover, the issuance of a purported non-precedential "summary order" by a federal appeals court, as the Second Circuit issuance here, is unconstitutional

An elegant argument proving these points is in *Anastasoff v. United States*, 223 F.3d 898, *vacated en banc*, 215 F.3d 1024 (8th Cir. 2000) wherein a panel of the Eighth Circuit, later reversed *en banc* held that a federal appellate court's issuance of non-precedential decisions (summary orders) is unconstitutional. Petitioners adopt it in its entirety.

### IV. Lower courts' "inherent power" cannot include the power to wrongfully infringe upon enumerated or unenumerated rights

This, of all, is completely self-evident. And therefore, petitioners submit respectfully, it was wrong to deny them due process for all these years, both procedural and, to the extent extant and not covered by first amendment or other provisions, unenumerated and thus substantive.

But as wrong as that was, and remains, it was even more wrong to do that to the confederates of these criminals, clueless as to the *Brady* violations that must be rampant with undisclosed deals, and above all else to the victims of these criminals, who have no voice save that which the courts and the government are tasked to give them. A mighty poor voice it is, indeed.

37

## CONCLUSION

For all the foregoing reasons, it is most respectfully requested that this petition for a writ of certiorari to the United States Court of Appeals for the Second Circuit be GRANTED.

Dated: November 3, 2014

Respectfully submitted,

Richard E. Lerner
   *Counsel of Record*
THE LAW OFFICE OF
   RICHARD E. LERNER, P.C.
1375 Broadway, 3rd Floor
New York, NY 10018
917.584.4864
347.824.2006  Fax
richardlerner@msn.com

*Counsel for Petitioners*