# EXHIBIT D

Lauria Sal

AV:JSS:jss
F. #1998R02283
LAURCOOP.AGR

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

SALVATORE LAURIA,

          Defendant.

- - - - - - - - - - - - - - - -X

COOPERATION AGREEMENT

98 CR 1102 (ILG)

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United States Attorney's Office for the Eastern District of New York (the "Office") and SAL LAURIA (the "defendant") agree to the following:

1. The defendant will waive indictment and plead guilty to an information to be filed in this district charging violation of 18 U.S.C. § 1962(c). The count carries the following statutory penalties:

*Racketeering Conspiracy!*

    a. Maximum term of imprisonment: 20 years (18 U.S.C. § 1963(a)).

    b. Minimum term of imprisonment: 0 years (18 U.S.C. § 1963(a)).

    c. Maximum supervised release term: 3 years, to follow any term of imprisonment; if a condition of release is violated, the defendant may be sentenced to up to 2 years without credit for pre-release imprisonment or time previously served on post-release supervision (18 U.S.C. §§ 3583 (b), (e)).

*Waive Indictment Plead to Information*

*JG May 22, 2018*

GOVERNMENT EXHIBIT
LAURIA 2
00 CR 1462(LG)

2

    d.   Maximum fine: 2 times the gross gain or gross loss, or $250,000, whichever is greater (18 U.S.C. § 3571(b) and (d)).

    e.   Restitution: $60 million approx. (18 U.S.C. § 3663).

    f.   $100 special assessment (18 U.S.C. § 3013).

    g.   Other penalties: possible deportation.

2.   The defendant's sentence is governed by the United States Sentencing Guidelines.  The Office will advise the Court and the Probation Department of information relevant to sentencing, including all criminal activity engaged in by the defendant, and such information will be used to calculate the Sentencing Guidelines range.  Based on information known to it now, the Office will not oppose a downward adjustment of three levels for acceptance of responsibility under U.S.S.G. § 3E1.1.

3.   The defendant will provide truthful, complete and accurate information and will cooperate fully with the Office. This cooperation will include, but is not limited to, the following:

    a.   The defendant agrees to be fully debriefed and to attend all meetings at which his presence is requested, concerning his participation in and knowledge of all criminal activities.

    b.   The defendant agrees to furnish to the Office all documents and other material that may be relevant to the investigation and that are in the defendant's possession or control and to participate in undercover activities pursuant to the specific instructions of law

enforcement agents or this Office.

c.   The defendant agrees not to reveal his cooperation, or any information derived therefrom, to any third party without prior consent of the Office.

d.   The defendant agrees to testify at any proceeding in the Eastern District of New York or elsewhere as requested by the Office.

e.   The defendant consents to adjournments of his sentence as requested by the Office.

f.   The defendant agrees to provide the Office with a financial statement making truthful and complete disclosure under oath concerning his financial worth, including all of his assets and income in his own name and in the name of other persons and entities.

g.   The defendant agrees to enter into the Consent Order annexed hereto. As set forth in the Consent Order, the terms of which are incorporated by reference herein, the defendant agrees to deposit $20,000, and the proceeds from the sale of certain real property, into an interest bearing account maintained by the Clerk, U.S. District Court, Eastern District of New York. All of the defendant's assets, including the funds deposited into the aforementioned account, may be applied to pay any fine and restitution to victims of the defendant's criminal activities, as ordered by the Court.

4.  The Office agrees that:

a.   Except as provided in paragraphs 1, 8, and 9, no criminal charges will be brought against the defendant for his heretofore disclosed participation in criminal activity involving fraudulent securities transactions, and the unlawful laundering and structuring of proceeds therefrom, from approximately March 1992 through October 13, 1998; false tax reporting and filings for the years 1990 through 1997 as a result of the

4

aforementioned <u>criminal activity</u>; <u>and threats</u>
<u>of violence in connection with securities</u>
<u>transactions from approximately October 1993</u>
<u>through September 1996.</u>

b.    <u>No statements made by the defendant during</u>
<u>the course of this cooperation will be used</u>
<u>against him</u> except as provided in paragraphs
2, 8, and 9.

5.    <u>The defendant agrees that the Office may meet with</u>

<u>and debrief him without the presence of counsel,</u> unless the

defendant specifically requests counsel's presence at such

debriefings and meetings.  Upon request of the defendant, the

Office will endeavor to provide advance notice to counsel of the

place and time of meetings and debriefings, it being understood

that the Office's ability to provide such notice will vary

according to time constraints and other circumstances.  The

Office may accommodate requests to alter the time and place of

such debriefings.  It is understood, however, that any

cancellations or reschedulings of debriefings or meetings

requested by the defendant that hinder the Office's ability to

prepare adequately for trials, hearings or other proceedings may

adversely affect the defendant's ability to provide substantial

assistance.  <u>Matters occurring at any meeting or debriefing</u> may

<u>be considered by the Office in determining whether the defendant</u>

<u>has provided substantial assistance or otherwise complied</u> with

<u>this agreement and may be considered by the Court in imposing</u>

<u>sentence regardless of whether counsel was present at the meeting</u>

or debriefing.

6.    If the Office determines that the defendant has
cooperated fully, provided substantial assistance to law
enforcement authorities and otherwise complied with the terms of
this agreement, the Office will file a motion pursuant to
U.S.S.G. § 5K1.1 with the sentencing Court setting forth the
nature and extent of his cooperation.  Such a motion will permit
the Court, in its discretion, to impose a sentence below the
applicable Sentencing Guidelines range.  In this connection, it
is understood that a good faith determination by the Office as to
whether the defendant has cooperated fully and provided
substantial assistance and has otherwise complied with the terms
of this agreement, and the Office's good faith assessment of the
value, truthfulness, completeness and accuracy of the
cooperation, shall be binding upon him.  The defendant agrees
that, in making this determination, the Office may consider facts
known to it at this time.  The Office will not recommend to the
Court a specific sentence to be imposed.  Further, the Office
cannot and does not make a promise or representation as to what
sentence will be imposed by the Court.

7.    The defendant agrees that with respect to all
charges referred to in paragraphs 1 and 4(a) he is not a
"prevailing party" within the meaning of the "Hyde Amendment,"
Section 617, P.L. 105-119 (Nov. 26, 1997), and will not file any

6

claim under that law. The defendant waives any right to additional disclosure from the government in connection with the guilty plea.

8.   The defendant must at all times give complete, truthful, and accurate information and testimony, and must not commit, or attempt to commit, any further crimes.  Should it be judged by the Office that the defendant has failed to cooperate fully, has intentionally given false, misleading or incomplete information or testimony, has committed or attempted to commit any further crimes, or has otherwise violated any provision of this agreement, the defendant will not be released from his plea of guilty or from the Consent Order but this Office will be released from its obligations under this agreement, including (a) not to oppose a downward adjustment of three levels for acceptance of responsibility described in paragraph 2 above, and (b) to file the motion described in paragraph 6 above.  The defendant will also be subject to prosecution for any federal criminal violation of which the Office has knowledge, including, but not limited to, the criminal activity described in paragraph 4 above, perjury and obstruction of justice.

9.   Any prosecution resulting from the defendant's failure to comply with the terms of this agreement may be premised upon:  (a) any statements made by the defendant to the Office or to other law enforcement agents on or after October 13,

1998; (b) any testimony given by him before any grand jury or
other tribunal, whether before or after the date this agreement
is signed by the defendant; and (c) any leads derived from such
statements or testimony. Prosecutions that are not time-barred
by the applicable statutes of limitation on the date this
agreement is signed may be commenced against the defendant in
accordance with this paragraph, notwithstanding the expiration of
the statutes of limitation between the signing of this agreement
and the commencement of any such prosecutions. Furthermore, the
defendant waives all claims under the United States Constitution,
Rule 11(e)(6) of the Federal Rules of Criminal Procedure, Rule
410 of the Federal Rules of Evidence, or any other federal
statute or rule, that statements made by him on or after October
13, 1998, or any leads derived therefrom, should be suppressed.

10. If the defendant requests, and in the Office's
judgment the request is reasonable, the Office will make
application and recommend that the defendant and, if appropriate,
other individuals be placed in the Witness Security Program, it
being understood that the Office has authority only to recommend
and that the final decision to place an applicant in the Witness
Security Program rests with the Department of Justice, which will
make its decision in accordance with applicable Departmental
regulations.

11. If the defendant requests, and in the Office's

judgment the request is reasonable, the Office will recommend to the Department of Justice that the defendant not be deported, it being understood that the Office has authority only to recommend and that the final decision whether to grant such relief rests with the Department of Justice, which will make its decision in accordance with applicable law.

12.   This agreement does not bind any federal, state, or local prosecuting authority other than the Office, and does not prohibit the Office from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the defendant.

13.  No promises, agreements or conditions have been entered into other than those set forth in this agreement, and none will be entered into unless memorialized in writing and signed by all parties.  This agreement supersedes any prior promises, agreements or conditions between the parties.  To become effective, this agreement must be signed by all signatories listed below.

Dated:  Brooklyn, New York
        December 10, 1998

ZACHARY W. CARTER
United States Attorney
Eastern District of New York

Agreed and consented to:

By:  _____
     Jonathan S. Sack
     Assistant United States Attorney

_____
Defendant

Approved by:

_____
Counsel to Defendant

Approved by:

_____
Andrew Weissmann
Supervising Assistant U.S. Attorney

AV:JSS:jss
F. #1998R02283
LAURREST.ORD

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

   - against -

SALVATORE LAURIA,

      Defendant.

- - - - - - - - - - - - - - - -X

CONSENT ORDER

98 CR 1102 (ILG)

Assd Recovery

WHEREAS, on December  , 1998 the defendant SALVATORE
LAURIA (the "defendant") entered into an agreement pursuant to
which he has entered a guilty plea to a Felony Information which
charged him with violating 18 U.S.C. § 1962(c); and

WHEREAS the defendant consents to enter into this
Consent Order as set forth herein pursuant to which certain
assets, and proceeds derived therefrom, will be used to pay any
fine and restitution to victims of the criminal activities set
forth in the aforementioned Felony Information;

IT IS HEREBY STIPULATED AND AGREED by and between
Zachary W. Carter, United States Attorney for the Eastern
District of New York, by Assistant U.S. Attorney Jonathan S. Sack
(the "Office"), and the defendant, as follows:

1.    The defendant agrees to provide the Office with a
financial statement making truthful and complete disclosure under
oath concerning his financial worth, including all of his assets

GOVERNMENT
EXHIBIT
LAURIA 3

and income in his own name and in the name of other persons and entities.

2.    The defendant agrees to deposit funds in the amount of $20,000 into an interest bearing account maintained by the Clerk, U.S. District Court, Eastern District of New York (the "Restitution Account") no later than 120 days after the date of this agreement.

3.    The defendant agrees to sell the following parcel of real property, subject to the Office's approval, and deposit the proceeds from this sale to the Restitution Account no later than 180 days after the date of this agreement:  2 Blueberry Court, Quogue, New York, held in the name of Hope Lauria.

4.    The defendant agrees that, upon request of the Office, he will provide truthful and complete information and assistance with respect to the identification and recovery of assets, including but not limited to (a) a vacant lot adjoining 2 Blueberry Court, Quogue, New York, held in the name of an off-shore company, Mountainlake Corporation, maintained by Intertrust, Geneva, Switzerland, and (b) a bank account in the name of an off-shore entity, Nelkie Family Trust, maintained by Intertrust, Geneva, Switzerland.

5.    The defendant need not relocate from his current residence on Forest Drive, Sands Point, New York.  However, if the defendant sells this residence, he may use the proceeds to

3

buy or lease another residence, with any and all remaining proceeds to be transferred to the aforementioned Restitution Account.

6.   The defendant waives any right to use this Consent Order in this or any related criminal action to assert any statutory or constitutional defenses, including but not limited to the defenses of double jeopardy of the Fifth Amendment and the excessive fines clause of the Eighth Amendment.

7.   The defendant acknowledges that pursuant to 18 U.S.C. §§ 3571, 3663 and 3663A, the Court may order the payment of a fine or restitution in amounts exceeding any funds deposited in the Restitution Account, and by taking into account all of the defendant's assets and income without limitation to the specific items set forth above.

8.   The Clerk of the Court, U.S. District Court, Eastern District of New York, shall establish the aforementioned Restitution Account.

4

9.    This Consent Order will be final and binding only upon this Consent Order being "So Ordered" by the Court.

Dated:    Brooklyn, New York
          December 10, 1998

                                    ZACHARY W. CARTER
                                    United States Attorney
                                    Eastern District of New York

Agreed and consented to:

                              By:   _____
                                    Jonathan S. Sack
                                    Assistant U.S. Attorney

_____
Defendant

Approved by:                        Approved by:

_____            _____
Counsel to Defendant                Supervising Asst. U.S. Attorney

SO ORDERED this      day
of December, 1998

_____
THE HONORABLE I. LEO GLASSER
UNITED STATES DISTRICT JUDGE

FD-302 (Rev. 10-6-95)

*Sater is circled* ◯

- 1 -

FEDERAL BUREAU OF INVESTIGATION

Date of transcription _____10/25/98_____

REDACTED

*college drug abuse*

SOURCE started using pot at age 10.  He smoked pot every day until his senior year in high school.  During his college years, SOURCE used alcohol, pot and cocaine on a regular basis.  SOURCE used cocaine almost every weekend during his college years.  SOURCE bought and sold cocaine to support his drug habit.  At age 23, SOURCE realized he was addicted to crack cocaine after he was pulled over and arrested for "operating a motor vehicle under the influence of a controlled substance." SOURCE obtained treatment and has been clean and sober since age 23.

Presently, SOURCE drinks socially.  SOURCE has not used cocaine except for one time since he obtained treatment at age 23.  SOURCE occasionally uses Valium because of the stress he experiences.  This Valium use occurred in 1996.

SOURCE advised that BOBBY TARANTOLA was "with" TEDDY PERSICO.  TARANTOLA tried to raise money with a "private placement" for his wife's beauty salon, PASQUALE'S DAY SALON.

RICK GALLO negotiated with the brokerage MONTROSE to obtain an equity share in exchange for GALLO's raising one and a half million dollars for the firm.  RICK GALLO is married to TARANTOLA's sister.

*Sept/98?*
*Branch of W. America May 27, 2018*

Approximately two months ago, SALVATORE LAURIA attended a meeting with DANIEL PERSICO, RICK GALLO, and BOBBY TARANTOLA. During this meeting, GALLO told LAURIA that PERSICO, GALLO and TARANTOLA had a "90-10" branch office of WEST AMERICA and that in that branch office they employed licensed and unlicensed brokers to sell "house" stock.  BOBBY TARANTOLA provided the financial backing for RICK GALLO.  GALLO, PERSICO, and TARANTOLA offered LAURIA employment at the firm as a consultant.  LAURIA told GALLO that he wanted $4,000.00 a month to help them find a suitable broker/dealer to merge with.

*not True*

GOVERNMENT
EXHIBIT
LAURIA'S
00 CR 196 (ILG)

Investigation on (10/19/98) at New York, New York

File # 270A-NY-269316    Date dictated (10/22/98)

by Leo Taddeo

270A-NY-269336



270A-NY-269336

REDACTED

270A-NY-269336



270A-NY-269336



Shortly after DOUKAS purchased the firm, LAURIA was injured in an automobile accident. For approximately one month, LAURIA did not work. After recovering from the accident, LAURIA began to work at the firm of FIRST METROPOLITAN.

FIRST METROPOLITAN was owned by SAL MORREALE, LOU SORRENTINO and JOSEPH ALIOATA. SAL MORREALE is LAURIA's cousin. While these individuals owned the firm on paper, KLOTSMAN actually raised $2.4 million to finance the firm. In return, LAURIA, SATER, and KLOTZMAN received 40 percent of the profits made from selling inside shares of stocks "produced" by KLOTSMAN, LAURIA, and SATER. LAURIA was on the FIRST METROPOLITAN premises daily and was able to bring his own brokers into the firm. These brokers knew that they would receive cash payments at FIRST METROPOLITAN. ALEKS PAUL laundered some of the cash used to pay brokers at FIRST METROPOLITAN.

The following stocks were issued at FIRST METROPOLITAN and sold by paying cash to the brokers:

TRANFORD INTERNATIONAL GROUP. CHARLIE XUE brought this deal to FIRST METROPOLITAN. The company was involved in manufacturing bath tubs. LAURIA, SATER, and KLOTSMAN held inside warrants but never got the opportunity to sell them. As a

270A-NY-269336

result, they never made any money on this deal.

The next deal done at FIRST METROPOLITAN was called T.T.R. INC. This company was based in Israel and was in the business of producing CD piracy protection software. LAURIA, KLOTSMAN, SATER and the owners of FIRST METROPOLITAN had an inside position of 600,000 shares. Again, LAURIA, KLOTSMAN and SATER did not make any money on the deal. The inside position was obtained by paying a $30,000.00 bribe to a lawyer for an improper opinion letter. This payment was made by GENE KLOTSMAN.

LAURIA, SATER, and KLOTSMAN also had an undisclosed interest in the brokerage firm of LEXINGTON CAPITAL GROUP. The individuals who appeared to own the firm on paper were VINCENT MARATATO (ph), DILAN GIOVANE (ph) and a third individual. These three individuals approached LAURIA through DANNY PERSICO and advised LAURIA that they wanted to start their own firm. These three individuals asked LAURIA to help them start the firm so LAURIA helped set up the firm's infrastructure while KLOTSMAN raised approximately $1.5 million. In return, KLOTSMAN, LAURIA, and SATER would received 40 percent of the profits from sales of stock at LEXINGTON CAPITAL. This 40 percent was limited to the profits of stock wherein the partners had an inside position. No deals were ever completed through LEXINGTON CAPITAL because this firm merged with FIRST HANOVER and FIRST METROPOLITAN.

SATER, LAURIA, and KLOTSMAN had an interest in FIRST HANOVER but KLOTSMAN stole a lead from the individuals who own the firm so they pulled out of the deal and sold back shares of HOLLY PRODUCTS to the detriment of LAURIA, SATER, and KLOTSMAN.

GARY FERONE was a broker at FIRST HANOVER who received cash for selling shares of COUNTRY WORLD CASINOS. FERONE worked at a mutual fund with HARVEY BLOCK so he could not take the COUNTRY WORLD stock directly. Instead, FERONE used SAL MARTARONO at FIRST HANOVER to do the trades for him. MARTARONO, in turn, took cash from LAURIA for selling shares of HOLLY PRODUCTS. SOURCE advised that LAURIA remained at FIRST METROPOLITAN until approximately January, 1997. During this time, LAURIA recruited brokers and helped with solving some of the "shorting" problems." LAURIA also looked for deals to push through FIRST METROPOLITAN.

In or around January 1997, LAURIA began to work for RAFAEL ROJAS. At the same time, SATER and KLOTSMAN were at 40 Wall Street setting up U.K. HYDE PARK. LAURIA was a full partner in U.K. HYDE PARK with 33 percent interest. LAURIA purchased this interest for $300,000.00. LAURIA and his partners intended to use U.K. HYDE PARK to conduct Reg D Deals but this firm never turned a profit.

270A-NY-269336

LAURIA met RAFAEL ROJAS through one of his clients. SATER and LAURIA asked ROJAS if he was interested in buying oil properties with reserves in Russia. Each of the three partners would put in $100,000.00 each to start the venture. SATER and LAURIA each put in $100,000.00 in an escrow account and traveled to Russia. ROJAS never put in his $100,000.00.

LAURIA's business relationship with ROJAS involved examining potential business deals and proposing them to ROJAS. LAURIA believed that ROJAS was a large scale businessman. LAURIA did not receive a salary from ROJAS but ROJAS agreed to allow LAURIA to share in the profits of future deals that he invested in. In the end, LAURIA could not close any deals with ROJAS.

LAURIA, however, entered into an arrangement with ROJAS whereby LAURIA would, in effect, launder $14 million for Italian Lire in Switzerland.

ROJAS supplied oil and other petroleum products to Cuba through nominee accounts in the Caribbean. IMAN IBOISE (ph), an individual who works in ROJAS' office, may be involved in arms dealing. ROJAS may be a front in the United States for fugitive MARK RITCH.

In January and February of 1997, LAURIA was in Russia. Upon his return, LAURIA went back to work for ROJAS at his New York Office. Shortly afterwards, in or around March of 1997, RICK GALLO approached LAURIA to open a broker/dealer under the WEST AMERICA brokerage firm outlined above.

While working with GALLO, LAURIA was approached by DAVID JACKARUSSO (ph), one of LAURIA's neighbors on Sands Point, Long Island. JACKARUSSO asked LAURIA to act as a consultant for his brokerage firm, MONTROSE. JACKARUSSO was having difficulty managing the firm and asked LAURIA to help him in some type of consulting arrangement. In addition to solving some of the management problems at MONTROSE, LAURIA tried to introduce RICK GALLO to a merger with MONTROSE. LAURIA approached attorney SCOTT ZEIGLER to prepare the merger papers. In the end, GALLO could not raise enough money to complete the merger and as a result, the merger never took place. JACKARUSSO eventually told GALLO to stay away from the firm because MONTROSE found another partner.

LAURIA was in Europe when the MONTROSE/GALLO merger deal fell through. LAURIA never received any compensation from JACKARUSSO for his consulting work at MONTROSE. LAURIA also planned to run a deal through MONTROSE but this deal never took place.

270A-NY-269336

During the six months that LAURIA was at FIRST
METROPOLITAN, LAURIA dealt with ALAN CHELLUM (ph) on a regular
basis.  LAURIA knew CHELLUM from WESTFIELD SECURITIES.  At the
time one of LAURIA's deals, "TTR", was being shorted by FIERO
BROTHERS.  In response, LAURIA approached DANIEL PERSICO to
assist in stopping the short sellers.  SATER, who had an interest
in the TTR deal, approached ERNEST MONTEVECCHI for assistance.
DANIEL PERSICO asked his half brother, SHAWN PERSICO, for help.
LAURIA and SATER both reached out for ALAN CHELLUM in stopping
the shorts by FIERO.

As a result of all the requests for assistance a
meeting was held at the Plaza Hotel in New York in the spring of
1997.  DANIEL PERSICO, SALVATORE LAURIA, FELIX SATER, and ALAN
CHELLUM attended this meeting and discussed the short selling
being conducted by the FIERO BROTHERS.  CHELLUM stated that he
would look into it.  The next day, CHELLUM told LAURIA and SATER
that the shorts were being conducted by JORDAN BELFORTE and that
FIERO was just executing the trades.  CHELLUM further told SATER
and LAURIA that FIERO had no interest in TTR.

A second meeting was held at the Plaza Hotel shortly
thereafter.  During this meeting, CHELLUM told LAURIA that FIRST
METROPOLITAN had to cover the short positions held by BELFORTE
and FIERO.  BELFORTE and FIERO wanted coverage for 50,000 short
shares of TTR at two (2) points below their purchase price.
This, in effect, was a $100,000.00 payment to BELFORTE.  LAURIA
counter-offered a plan where FIERRO would continue to short TTR
with shares that would ultimately be covered by a pending
registration.  In this deal LAURIA had a buyer for TTR shares in
the pending registration.  At the meeting, CHELLUM agreed to
LAURIA's proposal but ultimately played both sides to LAURIA's
detriment.

After the meeting, FIERO accumulated a short position
of approximately 2,000,000 shares of TTR.  The proposed
registration of additional shares was not completed and FIERO was
positioned to lose a large sum of money.  JOHN FIERRO approached
PHILIP ABRAMO, who in turn, sends "BIG LOU" to speak to SATER and
LAURIA.  BIG LOU told SATER and LAURIA that JOHN FIERO demanded
to be covered for his TTR shares and in addition, FIERO demanded
20 percent more as a payoff.

After several meetings, LAURIA and SATER came to the
conclusion that PERSICO could not help in this situation.  As a
result, LAURIA and SATER agreed to cover FIERO's shares and pay
him $250,000.00.  ALAN CHELLUM was paid approximately
$100,000.00.  After these payments, LAURIA and SATER paid another
$75,000.00 to PHILIP ABRAMO and BIG LOU.  These payments were
made in two (2) or three (3) installments dropped off at KATZ'S

270A-NY-269336

DELI in New York.  After these payments were made, FIERRO
continued to short  TTR and eventually killed the deal.

FD-302 (Rev. 10-6-95)

*Sater is circled* ◯

- 1 -

FEDERAL BUREAU OF INVESTIGATION

Date of transcription   10/25/98

# REDACTED

*college drug abuse* SOURCE started using pot at age 10. He smoked pot every day until his senior year in high school. During his college years, SOURCE used alcohol, pot and cocaine on a regular basis. SOURCE used cocaine almost every weekend during his college years. SOURCE bought and sold cocaine to support his drug habit. At age 23, SOURCE realized he was addicted to crack cocaine after he was pulled over and arrested for "operating a motor vehicle under the influence of a controlled substance." SOURCE obtained treatment and has been clean and sober since age 23.

Presently, SOURCE drinks socially. SOURCE has not used cocaine except for one time since he obtained treatment at age 23. SOURCE occasionally uses Valium because of the stress he experiences. This Valium use occurred in 1996.

SOURCE advised that BOBBY TARANTOLA was "with" TEDDY PERSICO. TARANTOLA tried to raise money with a "private placement" for his wife's beauty salon, PASQUALE'S DAY SALON.

RICK GALLO negotiated with the brokerage MONTROSE to obtain an equity share in exchange for GALLO's raising one and a half million dollars for the firm. RICK GALLO is married to TARANTOLA's sister.

*Sept/98?* Approximately two months ago, SALVATORE LAURIA attended a meeting with DANIEL PERSICO, RICK GALLO, and BOBBY TARANTOLA. During this meeting, GALLO told LAURIA that PERSICO, GALLO and TARANTOLA had a "90-10" branch office of WEST AMERICA and that in that branch office they employed licensed and unlicensed brokers *not true* to sell "house" stock. BOBBY TARANTOLA provided the financial *Branch of W. America* backing for RICK GALLO. GALLO, PERSICO, and TARANTOLA offered LAURIA employment at the firm as a consultant. LAURIA told GALLO *May 27, 2018* that he wanted $4,000.00 a month to help them find a suitable broker/dealer to merge with.

GOVERNMENT EXHIBIT
LAURIA 5
00 CR 196 (ILG)

Investigation on  (10/19/98)  at  New York, New York

File #  270A-NY-269376   Date dictated  (10/2?/98)

by  Leo Taddeo

270A-NY-269336



270A-NY-269336



270A-NY-269336



270A-NY-269336



Shortly after DOUKAS purchased the firm, LAURIA was injured in an automobile accident. For approximately one month, LAURIA did not work. After recovering from the accident, LAURIA began to work at the firm of FIRST METROPOLITAN.

FIRST METROPOLITAN was owned by SAL MORREALE, LOU SORRENTINO and JOSEPH ALIOATA. SAL MORREALE is LAURIA's cousin. While these individuals owned the firm on paper, KLOTSMAN actually raised $2.4 million to finance the firm. In return, LAURIA, SATER, and KLOTZMAN received 40 percent of the profits made from selling inside shares of stocks "produced" by KLOTSMAN, LAURIA, and SATER. LAURIA was on the FIRST METROPOLITAN premises daily and was able to bring his own brokers into the firm. These brokers knew that they would receive cash payments at FIRST METROPOLITAN. ALEKS PAUL laundered some of the cash used to pay brokers at FIRST METROPOLITAN.

The following stocks were issued at FIRST METROPOLITAN and sold by paying cash to the brokers:

TRANFORD INTERNATIONAL GROUP. CHARLIE XUE brought this deal to FIRST METROPOLITAN. The company was involved in manufacturing bath tubs. LAURIA, SATER, and KLOTSMAN held inside warrants but never got the opportunity to sell them. As a

270A-NY-269336

result, they never made any money on this deal.

The next deal done at FIRST METROPOLITAN was called
T.T.R. INC.  This company was based in Israel and was in the
business of producing CD piracy protection software.  LAURIA,
KLOTSMAN, (SATER) and the owners of FIRST METROPOLITAN had an
inside position of 600,000 shares.  Again, LAURIA, KLOTSMAN and
SATER did not make any money on the deal.  The inside position
was obtained by paying a $30,000.00 bribe to a lawyer for an
improper opinion letter.  This payment was made by GENE KLOTSMAN.

LAURIA, SATER, and KLOTSMAN also had an undisclosed
interest in the brokerage firm of LEXINGTON CAPITAL GROUP.  The
individuals who appeared to own the firm on paper were VINCENT
MARATATO (ph), DILAN GIOVANE (ph) and a third individual.  These
three individuals approached LAURIA through DANNY PERSICO and
advised LAURIA that they wanted to start their own firm.  These
three individuals asked LAURIA to help them start the firm so
LAURIA helped set up the firm's infrastructure while KLOTSMAN
raised approximately $1.5 million.  In return, KLOTSMAN, LAURIA,
and (SATER) would received 40 percent of the profits from sales of
stock at LEXINGTON CAPITAL.  This 40 percent was limited to the
profits of stock wherein the partners had an inside position.  No
deals were ever completed through LEXINGTON CAPITAL because this
firm merged with FIRST HANOVER and FIRST METROPOLITAN.

SATER, LAURIA, and KLOTSMAN had an interest in FIRST
HANOVER but KLOTSMAN stole a lead from the individuals who own
the firm so they pulled out of the deal and sold back shares of
HOLLY PRODUCTS to the detriment of LAURIA, SATER, and KLOTSMAN.

GARY FERONE was a broker at FIRST HANOVER who received
cash for selling shares of COUNTRY WORLD CASINOS.  FERONE worked
at a mutual fund with HARVEY BLOCK so he could not take the
COUNTRY WORLD stock directly.  Instead, FERONE used SAL MARTARONO
at FIRST HANOVER to do the trades for him.  MARTARONO, in turn,
took cash from LAURIA for selling shares of HOLLY PRODUCTS.
SOURCE advised that LAURIA remained at FIRST METROPOLITAN until
approximately January, 1997.  During this time, LAURIA recruited
brokers and helped with solving some of the "shorting" problems."
LAURIA also looked for deals to push through FIRST METROPOLITAN.

In or around January 1997, LAURIA began to work for
RAFAEL ROJAS.  At the same time, SATER and KLOTSMAN were at 40
Wall Street setting up U.K. HYDE PARK.  LAURIA was a full partner
in U.K. HYDE PARK with 33 percent interest.  LAURIA purchased
this interest for $300,000.00.  LAURIA and his partners intended
to use U.K. HYDE PARK to conduct Reg D Deals but this firm never
turned a profit.

270A-NY-269336

LAURIA met RAFAEL ROJAS through one of his clients. SATER and LAURIA asked ROJAS if he was interested in buying oil properties with reserves in Russia. Each of the three partners would put in $100,000.00 each to start the venture. SATER and LAURIA each put in $100,000.00 in an escrow account and traveled to Russia. ROJAS never put in his $100,000.00.

LAURIA's business relationship with ROJAS involved examining potential business deals and proposing them to ROJAS. LAURIA believed that ROJAS was a large scale businessman. LAURIA did not receive a salary from ROJAS but ROJAS agreed to allow LAURIA to share in the profits of future deals that he invested in. In the end, LAURIA could not close any deals with ROJAS.

LAURIA, however, entered into an arrangement with ROJAS whereby LAURIA would, in effect, launder $14 million for Italian Lire in Switzerland.

ROJAS supplied oil and other petroleum products to Cuba through nominee accounts in the Caribbean. IMAN IBOISE (ph), an individual who works in ROJAS' office, may be involved in arms dealing. ROJAS may be a front in the United States for fugitive MARK RITCH.

In January and February of 1997, LAURIA was in Russia. Upon his return, LAURIA went back to work for ROJAS at his New York Office. Shortly afterwards, in or around March of 1997, RICK GALLO approached LAURIA to open a broker/dealer under the WEST AMERICA brokerage firm outlined above.

While working with GALLO, LAURIA was approached by DAVID JACKARUSSO (ph), one of LAURIA's neighbors on Sands Point, Long Island. JACKARUSSO asked LAURIA to act as a consultant for his brokerage firm, MONTROSE. JACKARUSSO was having difficulty managing the firm and asked LAURIA to help him in some type of consulting arrangement. In addition to solving some of the management problems at MONTROSE, LAURIA tried to introduce RICK GALLO to a merger with MONTROSE. LAURIA approached attorney SCOTT ZEIGLER to prepare the merger papers. In the end, GALLO could not raise enough money to complete the merger and as a result, the merger never took place. JACKARUSSO eventually told GALLO to stay away from the firm because MONTROSE found another partner.

LAURIA was in Europe when the MONTROSE/GALLO merger deal fell through. LAURIA never received any compensation from JACKARUSSO for his consulting work at MONTROSE. LAURIA also planned to run a deal through MONTROSE but this deal never took place.

270A-NY-269336

During the six months that LAURIA was at FIRST METROPOLITAN, LAURIA dealt with ALAN CHELLUM (ph) on a regular basis. LAURIA knew CHELLUM from WESTFIELD SECURITIES. At the time one of LAURIA's deals, "TTR", was being shorted by FIERO BROTHERS. In response, LAURIA approached DANIEL PERSICO to assist in stopping the short sellers. SATER, who had an interest in the TTR deal, approached ERNEST MONTEVECCHI for assistance. DANIEL PERSICO asked his half brother, SHAWN PERSICO, for help. LAURIA and SATER both reached out for ALAN CHELLUM in stopping the shorts by FIERO.

As a result of all the requests for assistance a meeting was held at the Plaza Hotel in New York in the spring of 1997. DANIEL PERSICO, SALVATORE LAURIA, FELIX SATER and ALAN CHELLUM attended this meeting and discussed the short selling being conducted by the FIERO BROTHERS. CHELLUM stated that he would look into it. The next day, CHELLUM told LAURIA and SATER that the shorts were being conducted by JORDAN BELFORTE and that FIERO was just executing the trades. CHELLUM further told SATER and LAURIA that FIERO had no interest in TTR.

A second meeting was held at the Plaza Hotel shortly thereafter. During this meeting, CHELLUM told LAURIA that FIRST METROPOLITAN had to cover the short positions held by BELFORTE and FIERO. BELFORTE and FIERO wanted coverage for 50,000 short shares of TTR at two (2) points below their purchase price. This, in effect, was a $100,000.00 payment to BELFORTE. LAURIA counter-offered a plan where FIERRO would continue to short TTR with shares that would ultimately be covered by a pending registration. In this deal LAURIA had a buyer for TTR shares in the pending registration. At the meeting, CHELLUM agreed to LAURIA's proposal but ultimately played both sides to LAURIA's detriment.

After the meeting, FIERO accumulated a short position of approximately 2,000,000 shares of TTR. The proposed registration of additional shares was not completed and FIERO was positioned to lose a large sum of money. JOHN FIERRO approached PHILIP ABRAMO, who in turn, sends "BIG LOU" to speak to SATER and LAURIA. BIG LOU told SATER and LAURIA that JOHN FIERO demanded to be covered for his TTR shares and in addition, FIERO demanded 20 percent more as a payoff.

After several meetings, LAURIA and SATER came to the conclusion that PERSICO could not help in this situation. As a result, LAURIA and SATER agreed to cover FIERO's shares and pay him $250,000.00. ALAN CHELLUM was paid approximately $100,000.00. After these payments, LAURIA and SATER paid another $75,000.00 to PHILIP ABRAMO and BIG LOU. These payments were made in two (2) or three(3) installments dropped off at KATZ'S

270A-NY-269336

DELI in New York. After these payments were made, FIERRO
continued to short TTR and eventually killed the deal.