UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

In The Matter Of

FREDERICK M. OBERLANDER, an attorney
admitted to practice before this Court,

Index No. 16-mc-2637

Respondent.

-------------------------------------------------------------X

In The Matter Of

RICHARD E. LERNER, an attorney
admitted to practice before this Court,

Index No. 16-mc-2636

Respondent.

-------------------------------------------------------------X

## SUPPLEMENT TO EXPERT REPORT OF MARGARET C. TARKINGTON SUBMITTED ON BEHALF OF FREDERICK M. OBERLANDER AND RICHARD E. LERNER FILED UNDER SEAL

I. INTRODUCTION TO SUPPLEMENT

On September 6, 2017, I submitted an expert report ("2017 Report") after having reviewed the documents then available regarding the Statement of Charges (the "Charges") contained in the related Orders to Show Cause (OSCs) brought against Frederick M. Oberlander and Richard E. Lerner by the Committee on Grievances for the United States District Court for the Eastern District of New York (the "Committee"). Because of extraordinary circumstances—specifically the discovery of new, highly relevant information relating to the Charges—I am requesting this Committee accept and consider this Supplement to my Report.

1

On May 21, 2018, Joseph Giannini, unsolicited, called Richard Lerner to set up a meeting between Lerner, Oberlander and himself. Giannini—a Captain in the United States Marine Corp and former trainer of Navy Seals—became a member of the New York State Bar in 1974 and practiced criminal defense for 42 years. Importantly, beginning in 2000 through 2002, Giannini represented Daniel Persico Jr. in the *Coppa* case—the case in which Felix Sater, Salvatore Lauria, and Gennady Klotsman acted as cooperating witnesses against Persico. Mr. Giannini brought to light vital facts—with documentation—relevant to the Charges. These facts thoroughly belie claims of Felix Sater and his lawyers made both in their disciplinary complaints filed against Oberlander and Lerner and in statements made in filings before Judge Cogan. This Committee must review carefully the affidavit of Joseph Giannini and his supporting documentation—which affidavit has been filed and was accepted by the Court as a supplement to Lerner's Opposition on June 6, 2018, and I hereby request that it also be considered as an exhibit to this Expert Report Supplement filed on behalf of both Lerner and Oberlander. As demonstrated by Giannini's affidavit, the Committee must recognize that certain allegations made by Sater are provable fabrications. The relevance of Giannini's revelations are discussed below.

In addition to the Giannini affidavit, Oberlander and Lerner have recently been in contact with the National Archives and received a letter on June 8, 2018, from Stephanie Mark, the Supervisory Archives Specialist at the National Archives. The letter is attached hereto as Exhibit A. The letter explains that the files for the Klotsman, Sater, and Lauria criminal proceedings were sent to the National Archives, Lee's Summit Federal Record Center, from the Eastern District of New York (EDNY) in 2004. Critically, Mark confirms that ***these records arrived at the archives unsealed and "immediately available to the public."*** This revelation confirms that there really was "no sealing order" in Sater's case—as Judge Glasser had himself conceded at the June 14, 2010, hearing. The Sater files were requested to be returned to the EDNY on June 23, 2010, and have not subsequently been returned to the archives.

II. **Factual Significance**

**The Giannini Affidavit**

As explained in my 2017 Report, the Government had conceded in its March 17, 2011, letter motion to Judge Glasser that there was no risk of harm to Sater in revealing his identity. The

2

government stated: "The government has *no information that any person has sought to harm the defendant or his family* since the press release [of 2000—naming Sater by name and his crime] was issued, *nor that the government's ability to secure cooperation has been negatively affected.*" (2011.03.17 Government's Letter Motion to Unseal, at 2.) However—as also noted in the 2017 Report—on August 2, 2012, Sater's lawyers filed a letter with Judge Cogan asserting that Sater's life was being threatened because of the revelation of his identity. Sater and his lawyers alleged that Sater had been threatened by Daniel Persico Jr., one of the co-conspirators in the *Coppa* case against whom Sater testified. According to the letter, Daniel Persico beat up Salvatore Lauria on July 27, 2012, "in broad daylight, in front of several witnesses" and told Lauria to pass a message onto Sater that Persico was "gonna kill him" because Persico "did two years" in prison because of Sater. (2012.08.02 Letter, Beys to Cogan Re: Persico at 1-2.) The theory underlying the letter was that Oberlander had given materials to attorney Gerald Shargel, with whom Oberlander was consulting (a fact which Oberlander had disclosed to the Second Circuit in February 2011). Sater's lawyers alleged that *Shargel* had previously "*represented Persico in the case in which Doe cooperated.*" (*See id.* at 3.).

Sater and his lawyers have relentlessly pushed this Persico story—that Oberlander and Lerner disclosed material to Shargel (whom Sater asserted represented Persico in the *Coppa* case) and were thereby attempting to get Sater killed and/or were trying to coerce Sater into paying them an extortionate settlement by threatening (if payment was refused) to publicly reveal Sater's identity and his role as a cooperating witness to Persico and *Coppa* defendants, thus putting Sater's life in danger. For example, in a motion for contempt charges, Sater and his lawyers asserted:

> On July 27, 2012, Columbo-associate Danial Persico assaulted Mr. Sater's co-defendant Salvatore Lauria, a government cooperator, and threatened to kill Mr. Sater . . . We allege that this incident was the result of Oberlander and Lerner's illegal dissemination of sealed information to the press and their improper disclosures to attorney Gerald Shargel, who had represented Persico in the very case that Mr. Lauria and Mr. Sater cooperated with the government on. Specifically, in early February 2011, in the days leading up to the Second Circuit's oral arguments, when Oberlander and Lerner had been enjoined from disseminating sealed information to anyone outside their legal team, they attempted to retain Mr. Shargel in order to circumvent the injunction. There can be no doubt Oberlander and Lerner knew that Mr. Shargel was well-known to frequently represent reputed members of organized crime . . . There can also be no doubt Oberlander and Lerner knew of the Colombo's history of violence, and *it was precisely their plan to leak*

3

> ***Mr. Sater's sealed information to the organized crime community.* . . .[A] mafia-related act of violence against Mr. Sater or Mr. Lauria would motivate the law firms to settle even more so. We allege that this is precisely the reason Oberlander and Lerner improperly gave sealed information to Mr. Shargell [sic]. (2014.10.23 Beys Letter Motion for Contempt to Judge Cogan, attached as Exhibit F to Giannini Affidavit.)**

This theme—that Oberlander and Lerner were engaged in extortionate threatening of Sater's life by disclosing information to Persico and the other *Coppa* defendants against whom Sater acted as a cooperating witness—was also asserted in the Disciplinary Complaints filed against Oberlander and Lerner that gave rise to the Charges before the Committee. Thus, for example, the Disciplinary Complaints against Oberlander and Lerner assert:

- "Since 2010, Oberlander has been engaging in a relentless campaign to extort a settlement from Sater and others by publicly releasing documents that had been sealed by a federal court to protect Sater from life-threatening danger." (2014.06.09 Hinshaw & Culbertson Disciplinary Complaint Against Oberlander, at 1; see also 2014.07.23 Moses & Singer Disciplinar Complaint Against Lerner at 1.)
- "Oberlander knew that the PSR and the Cooperation Agreement had been sealed by order of the court in the Criminal Case, and that revealing them would put Sater's life in danger." (2014.06.09 Hinshaw & Culbertson Disciplinary Complaint Against Oberlander, at 4; *see also* 2014.07.23 Moses & Singer Disciplinar Complaint Against Lerner at 6.).

Yet the Giannini affidavit demonstrates that the entire Persico episode is a provable fabrication. First, Giannini testifies and provides documentation showing that he represented Daniel Persico in the *Coppa* case—and was Persico's sole attorney in that case. Thus, Shargel did *not* represent Persico in the matter. (*See* Giannini Aff. ¶ 7). Further, any revelation of information by Oberlander to Shargel could not have been leaked back to Persico. Second, and more importantly, Giannini testifies that both he and Persico knew—first through deduction and ultimately through disclosures from the government—that Lauria and Sater were cooperating witnesses against Persico. ***Indeed, they knew as of Persico's arraignment on March 2, 2000, and later were informed in open court*** (as confirmed by the transcript attached to Giannini's affidavit) ***that Sater was a cooperating witness who had agreed to testify against Persico and the Coppa defendants.*** For example, the February 2, 2001, transcript states: "Mr. Felix Sater, an unindicted co-conspirator and cooperator with the government, [is] an individual who is going to

4

testify." (Ex. B to Giannini Affidavit, at 26.) Thus, the story that Persico had only "found out" in 2012 that Sater and Lauria had flipped—allegedly because of Oberlander and Lerner's disclosure of information—is a provable fabrication. Persico and his lawyer had known that Sater was a cooperator from the time that Sater had been listed as an "unindicted coconspirator" in Persico's own indictment—a fact that was subsequently confirmed repeatedly to both of them by the government. Further, as Giannini explains in his affidavit, the documents prepared, filed, or given to Giannini by the government during the *Coppa* case were all "free of any protective or sealing order, or other restriction on their use." (Giannini Aff. ¶ 12)

Oberlander and Lerner are very fortunate that Giannini thought to contact them—because the docket sheet available on PACER today for the *Coppa* case is missing the header information for Daniel Persico that listed his attorney as Joseph Giannini. This information appears to have been scrubbed from PACER in recent years because the same PACER docket in 2010 contained the information for Defendant No. 3, Daniel Persico, and listed his attorney as Joseph Giannini. (*See* Giannini Aff. ¶17.) Thus, no one today can look at the PACER docket for the *Coppa* case and readily determine for themselves or prove that Gerald Shargel was *not* the attorney for Daniel Persico or that Joseph Giannini was in fact Persico's attorney. Persico has since died.

**The National Archives Letter**

On Friday, June 8, 2018, Oberlander and Lerner received a letter from Stephanie Mark, the Supervisory Archives Specialist of the National Archives and Records Administration in Lee's Summit Missouri. Ms. Mark provided information about three cases, the files of which had been sent to the National Archives Lee's Summit Federal Records Center: the Gennady Klotsman criminal case (98-CR-1069), Felix Sater's criminal case (98-CR-1101) and Salvatore Lauria's criminal case (98-CR-1102). Mark states that the files for all three of these cases were retired to the National Archives in August of 2004. Crucially, she explains that all three arrived at the archives and were "not sealed" but instead "were immediately available to the public." (*See* Ex. A, Mark Letter.) Mark explains that the files could have been sent sealed "whole box reference only," which would have made them unavailable to the public and effectively sealed. However, the files for the Klotsman, Sater, and Lauria cases were *not so sealed*—and thus became publicly available in August 2004. Mark explains that on June 23, 2010, Sater's file was

5

requested to be returned to the EDNY "and has not yet been returned to Lee's Summit Federal Records Center." (*See id.*)

This information is vitally significant. As explained in my Report, Judge Glasser had asserted in the June 14, 2010, and July 20, 2010, hearings that there was **"no formal [sealing] order"** in Sater's case, and that he could not find an application for sealing, **"[nor] have I been able to find any order signed by me which directed that this file be sealed."** (2010.06.14 Glasser Transcript 5:6-7, 5:24; 2010.07.20 Glasser Transcript 17:4-11.) In the July 20, 2010 transcript, Judge Glasser confirmed—as indicated in Mark's letter—that he had sent for the file to be returned from the National Archives. Glasser states that he ordered Sater's file from "Kansas City or wherever these files are shipped" as it "was no longer available in the courthouse." And that "*there is not any indication*" in the first filing "or in a subsequent document *that an application was made or request was made in that document to seal that file. Nor have I been able to find any order signed by me which directed that this file be sealed.*" (2010.07.20 Glasser Transcript 17:4-11.)

This information confirms that from August 2004 until recalled by Judge Glasser on June 23, 2010, the Sater criminal file was in fact public. While Sater's criminal case was apparently ultimately "hidden" without even a public record of a docket by the time Oberlander learned of it in 2010—Sater's case had not ever been properly sealed. There was no sealing order and his criminal file was sent by the EDNY to the National Archives unsealed and made immediately available to the public. Even if the Klotsman, Sater, and Lauria files were mistakenly sent to the archives unsealed and publicly accessible (which itself is highly unlikely as the clerk of the EDNY explained in verifying the accession numbers that the EDNY does *not* send sealed files to the archives at all—a policy that this Committee is certainly competent to verify), that does not change the fact that the Sater file was publicly available at the National Archives from August 2004 through June 23, 2010.

V. Supplemental Analysis

A. Disputed and Misstated Facts in the Charges

In my 2017 Report, I listed the following statements made in the Charges, among many others, as being misstated or disputed. With the new information contained in the Giannini

6

Affidavit and the Mark Letter, the following statements are clearly misstated and at the very least highly disputed (the numbering matches that in my 2017 Report, and the following are in addition to the misstatements and disputes listed in the 2017 Report).

1. "*After determining that Sater would be in danger* if his true identity were revealed, *Judge Glasser sealed the docket and filings in Sater's criminal case*, including a *Cooperation Agreement*, a United States Department of Justice Financial Statement, and a Pre-Sentence investigation Report (*the 'Sealed Materials.'*)" (Oberlander OSC p.2; Lerner OSC pg. 2)

    a. The fact that Sater's file (along with Klotsman's and Lauria's) was sent unsealed and immediately available to the public to the National Archives (*see* Ex. A, Mark Letter) belies the assertion that "Glasser sealed the docket and filings in Sater's criminal case," as well as the denomination of the Sater Criminal Documents as "Sealed Materials."

    b. Further, there is no demonstration "that Sater would be in danger if his true identity were revealed" through the Sater Criminal Documents. As Giannini's affidavit makes clear, Persico and the *Coppa* defendants were well aware that Sater was a cooperating witness who was testifying against them. The government conceded as much in its March 17, 2011, motion to unseal (stating that the government has "*no information that any person has sought to harm the defendant or his family* since the press release" of 2000—naming Sater by name and his crime). It was only with the 2012 manufacture of the Persico story that any assertion of life-threatening harm to Sater was seriously asserted. The Giannini affidavit completely debunks the Persico story and the alleged threat to Sater—Persico had known all along that Sater was a cooperating witness testifying against him.

3. "Despite the *respondent's [Oberlander's] knowledge of the confidential nature of the Sealed Materials*, the respondent publicly filed a civil RICO complaint" in the SDNY, "making the complaint available to the public for download through a paid online news service called *Courthouse News, in violation of the court's original sealing order*." (Oberlander OSC p. 3 ¶1)

a. Oberlander could not have acted "in violation of the court's original sealing order" because there wasn't one. Moreover, the EDNY had itself made the Sater file available to the public at the National Archives from 2004 until 2010.

6. "Since his discovery of the Sealed Materials, the respondent [Oberlander] has attempted to obtain a settlement from the defendants *by threatening public release of the Sealed Materials*" (Oberlander OSC p.2); "The respondent [Oberlander] *threatened public dissemination of the Sealed Materials* unless Defendants agreed to a monetary settlement" (Oberlander OSC 3, ¶ 3); "The respondent *repeatedly threatened the public dissemination of the Sealed Materials* unless Defendants agreed to a monetary settlement." (Oberlander OSC p.3 charge 3.); and "After discovering the Sealed Materials, Oberlander, who was represented by the respondent [Lerner] and was also his co-counsel, *attempted to obtain a settlement from Defendants by threatening public release of the Sealed Materials.* First the respondent [Lerner] represented Oberlander in the litigation concerning Oberlander's disclosure of the Sealed Materials. Then, the respondent [Lerner] ultimately decided to represent Kriss in the SDNY action, and *has since joined Oberlander in his efforts to obtain a settlement from Defendants by threatening the public dissemination of the Sealed Materials.*" (Lerner OSC p. 2-3)

15. "The respondent violated RPC 3.4 by *knowingly engaging in illegal conduct* by *contravening court orders, disclosing the Sealed Materials, and attempting to obtain a settlement by threatening further illegal conduct.*" (Oberlander OSC p. 6 basis for discipline 4; Lerner OSC p. 6 basis for discipline 6).

    a. As noted in the 2017 Report, the letters cited only threaten lawful and legal dissemination of the materials through court orders and lawful means. But additionally, the theme of these allegations is consonant with the Persico story—that Oberlander and Lerner were engaged in extortion by threatening dissemination of sealed information that would put Sater at risk. The Mark Letter affirms that the case was never properly sealed, but was sent unsealed to the National Archives and immediately available to the public. (*See* Ex. A, Mark Letter.) Thus, Oberlander and/or Lerner could not threaten dissemination of, or actually disclose, "sealed materials" where the materials had not actually been sealed by court order and were publicly available in the National Archives. The Giannini Affidavit additionally confirms that Persico and the *Coppa* defendants were well aware that Sater was a cooperating witness testifying against them, and thus disclosure of Sater's identity to them would not have put Sater's life at risk.

8

17. "The respondent *[Lerner]* agreed to represent Oberlander, <u>**with knowledge of and participation in** *Oberlander's intentions* to make *the Sealed Materials public.*</u>" (Lerner OSC p. 6 ¶ 7)
    a. In light of the fact that the Sater Criminal Documents were and had been publicly available at the National Archives since 2004, any intention to make the material public could not be improper—and the denomination of the materials as "Sealed Materials" is entirely undermined by both the Mark letter and Judge Glasser's concessions in the June and July 2010 hearings that there was no sealing order.

There are other statements throughout the Charges that are additionally implicated by the contents of the Giannini Affidavit and the Mark Letter. Indeed, the theory underlying the entirety of these proceedings—and the years of litigation leading up to them—is undermined by the Mark Letter. The Sater file was publicly available in the National Archives—and was sent there by the EDNY as such—since August 2004 until Glasser called them back on June 23, 2010.

**B. Supplemental Opinion and Analysis of Charges**

My opinion and analysis contained in my 2017 Report that the Charges should be dismissed is amplified by the Giannini Affidavit and the Mark Letter. For example, as discussed in Section V.B.1 of the 2017 Report, I note that Oberlander and Lerner are charged with violating Judge Glasser's "original sealing order." The Mark Letter confirms—along with Glasser's own statements from the June and July 2011 hearing—that there was no original sealing order and the case was sent unsealed to the National Archives. Thus, it is impossible for Oberlander and Lerner to have violated a non-existent order and they cannot be subject to discipline for allegedly doing so.

Additionally, the fact that the Sater file was publicly available from August 2004 until June 23, 2010, also implicates First Amendment rights to public access of records. The EDNY sent the Sater, Klotsman, and Lauria files to the National Archives unsealed and immediately available for public access. (*See* Mark Letter.) The Second Circuit has explained: "***We simply do not have the power***, even were we of the mind to use it if we had, ***to make what has thus become public private again.***" *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 144 (2004). The Court explained: "This is generally so when information that is supposed to be confidential—

whether it be settlement terms of a discrimination lawsuit or the secret to making the hydrogen bomb—is publicly disclosed. ***Once it is public it necessarily remains public***." *Id.* at 144 n. 12 (citations omitted). Further the Second Circuit in *Gambale* noted that it did not matter whether or not the making of something public was performed accidentally. In this case, even if the EDNY mistakenly sent the Klotsman, Sater, and Lauria files unsealed to the National Archives, that does not change the fact that the files have been public. As the *Gambale* Court concluded: "The genie is out of the bottle, *albeit because of what we consider to be the district court's error*. We have not the means to put the genie back." *Id.* at 144.

Of course, this implicates the entirety of this case—Oberlander and Lerner could not have committed professional misconduct by disclosing information in violation of a non-existent sealing order of a case publicly available in the National Archives.

The Giannini Affidavit demonstrates that Sater and his lawyers have submitted provable fabrications in their filings before the EDNY to paint a false story that Oberlander and Lerner were putting Sater's life in danger by revealing information to attorney Shargel, who in turn would (and allegedly did) reveal such to Persico. Yet, Shargel was not even the lawyer for Persico in the *Coppa* case—a fact that is no longer easily demonstrable from the PACER docket. Nevertheless, Giannini explains in his affidavit that he "stand[s] ready to testify" regarding these matters, and he provided documentary evidence demonstrating that Persico knew from the day of his arraignment—March 2, 2000—that Sater was a cooperating witness who would testify against him. As the 2017 Report details, the OSCs and Charges are chock-full of misstatements of fact and disputed facts—many of which are taken directly from Sater's Complaints against Oberlander and Lerner. The Giannini Affidavit is hard evidence of the fabrications undertaken to discredit Oberlander and Lerner and to manufacture a basis to pursue civil and criminal contempt and disciplinary charges against them. It is imperative that this Committee recognize such misstatements and fabrications—even where they made their way into the Charges. Further, should the Committee determine that it is inclined to pursue discipline, a full evidentiary hearing is essential.

*I thus reaffirm my opinion that all charges against Oberlander or Lerner should be dismissed.*

10

I state the foregoing under penalty of perjury, pursuant to 28 U.S.C. 1746, this 21st day of June, 2018.

/s/ Margaret C. Tarkington