UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

—————————————————————————————x

In The Matter Of,

RICHARD E. LERNER, an
attorney admitted to practice before this
Court,

                Respondent.

—————————————————————————————x

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★  AUG 1 3 2018  ★

BROOKLYN OFFICE

**<u>ORDER</u>**
16-MC-2636

      This matter comes before the Committee on Grievances for the United States District

Court for the Eastern District of New York to consider the imposition of discipline, pursuant to

Rule 1.5(b)(5) of the Local Rules of the United States District Courts for the Southern and

Eastern Districts of New York, against the respondent, Richard E. Lerner, an attorney admitted

to the bar of this Court.[1]  The Committee has considered the entire record, as well as the

voluminous submissions by the respondent and Professor Margaret Tarkington.[2]  For the reasons

discussed below, the Committee concludes that the respondent violated the following New York

Rules of Professional Conduct (the "Rules"):

    (1) Requirement to Withdraw (Rule 1.16(b));

    (2) Engaging in discourteous conduct (Rule 3.3(f)(2));

    (3) Engaging in illegal conduct (Rule 3.4(a)(6));

    (4) Violating the Rules of Professional Conduct (Rule 8.4(a));

    (5) Engaging in conduct prejudicial to the administration of justice (Rule 8.4(d)); and

---

[1] The Committee's findings on the charges against Frederick Oberlander, arising out of the same set of facts, are explained in a separate opinion.

[2] The respondent's submissions include a 42 page brief, a 107 page declaration, Oberlander's submission, and a supplemental affidavit.  He also relies on a 119 page report and supplemental report by Professor Margeret Tarkington.  The respondent filed more than 3,300 pages of exhibits.

1

(6) Engaging in conduct that adversely reflects on the lawyer's fitness as a lawyer (Rule 8.4(h)).

The Committee finds that the evidence does not support the charges with respect to Rules 1.16(a), 3.1 and 3.2. The Committee defers its ruling on the charge that the respondent knowingly engaged in illegal conduct in violation of Rule 3.4 by contravening court orders and disclosing sealed materials, because the respondent's conduct in connection with that charge is currently the subject of a criminal investigation. The Committee determines that the respondent's answer raises no issue requiring an evidentiary hearing, *see* Local Rule 1.5(d)(4), as the facts in the record underlying the Committee's findings are not in dispute.

For the reasons that follow, the Committee concludes that a six month suspension from the practice of law in this Court is appropriate. At the conclusion of the criminal proceedings, the Committee will consider if additional discipline is necessary on the charge that the respondent knowingly engaged in illegal conduct in violation of Rule 3.4 by contravening court orders and disclosing sealed materials.

## BACKGROUND

### I. Procedural History

This matter comes before the Committee on a disciplinary complaint dated June 9, 2014, which alleged that the respondent "engaged in a relentless campaign to extort a settlement . . . by publicly releasing documents that had been sealed by a federal court," and that in furtherance of that effort, the respondent "willfully and deliberately defied the orders of three different judges in the Southern and Eastern Districts of New York as well as the Second Circuit, and filed a slew of frivolous motions and lawsuit," and "repeatedly accused the courts of illegal and fraudulent conduct." (ECF No. 1.) The Committee ordered the respondent to show cause why it should not

impose discipline pursuant to Local Rule 1.5, and charged the respondent with violations of the following New York Rules of Professional Conduct:

1. Rule 1.16(a), "by agreeing to represent [Frederick M.] Oberlander, despite knowledge of Oberlander's intentions to obtain a settlement by threatening illegal conduct."

2. Rule 1.16(b), "by failing to terminate his representation of Oberlander when it became clear that further representation of Oberlander would result in a violation of the New York Rules of Professional Conduct."

3. Rule 3.1, "by filing multiple frivolous appeals and bringing frivolous lawsuits."

4. Rule 3.2, "by engaging in improper dilatory tactics."

5. Rule 3.3, "by engaging in undignified and discourteous conduct toward the courts."

6. Rule 3.4, "by knowingly engaging in illegal conduct by contravening court orders, disclosing the Sealed materials, and attempting to obtain a settlement by threatening further illegal conduct."

7. Rule 8.4(a), "by violating multiple New York Rules of Professional conduct."

8. Rule 8.4(h), "by engaging in conduct that adversely reflects on his fitness as a lawyer."

9. Rule 8.4(d), "by engaging in conduct that is prejudicial to the administration of justice."

(ECF Nos. 2, 3.) The respondent filed his response on September 6, 2017, incorporating by reference the report submitted by Professor Tarkington and the respondent's declaration filed the same day. (ECF No. 20 at 8.)

Pursuant to Local Rule 1.5(a), the Committee appointed James Wicks, Esq. to investigate the allegations against the respondent, to advise the Committee whether prosecution of disciplinary action is required, and, if directed, to prosecute grievance proceedings on behalf of the Committee. (ECF No. 22.)

## II.    Factual Background

In 1998, Felix Sater was prosecuted for his involvement in a "pump-and-dump" securities

fraud and money laundering scheme. (*See* ECF No. 12-1.)  On December 10, 1998, Sater

pleaded guilty before the Honorable I. Leo Glasser to an information charging him with violating

the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) ("RICO").  As

part of his plea, Sater entered into a cooperation agreement with the U.S. Attorney's Office for

the Eastern District of New York. (*See* ECF No. 12-6.)  Sater agreed to assist the government in

its investigation into others allegedly involved in the securities fraud scheme. (*See id.* at 2-3.)

Because of the sensitive nature of the information Sater was providing to the government

and the potential danger to Sater's life if his identity were revealed, Judge Glasser sealed the

action and its docket sheet. (*See* ECF No. 12-14; ECF No. 15-17 at 1-2.)[3]  The U.S. Attorney's

Office issued a press release in March 2000 that announced Sater's conviction and the indictment

of his co-defendants, but did not mention Sater's cooperation agreement with the government.

(*See* ECF No. 12-7.)

Sater continued to cooperate with the government for more than ten years. (*See* ECF No.

12-14.)  On October 23, 2009, he was sentenced and ordered to pay a $25,000 fine. (*Id.* at 24.)

Sater's criminal case remained sealed. (*Id.*)

In 2002, Sater joined Bayrock Group LLC, a real estate development firm. (*See* ECF No.

13-2 ¶ 22.)  Jody Kriss was the Director of Finance from 2003 to 2008, and Joshua Bernstein

was employed there from November 2006 to September 2008. (ECF No. 13-5 ¶ 12.)  Kriss hired

---

[3] Judge Glasser noted that even though a transcript of the December 10, 1998 hearing in which Sater pleaded guilty was no longer available, "the inescapable conclusion" drawn from the docket "is that given [Sater's] cooperation, the Government [had] made an oral application that the transcript of the proceeding be sealed, which the Court granted as essential to protect the safety of Sater and narrowly tailored to serve that interest." (ECF No. 15-17 at 1-2.)

Frederick Oberlander as his attorney in 2007, and introduced Oberlander to Bernstein. (*See* ECF No. 19 at 8.)

During his employment at Bayrock, Bernstein maintained a hard drive that contained copies of all Bayrock files from its servers. (ECF No. 13-10 at 100:4-7.) The files included emails and documents that Sater had sent to his attorney in connection with the criminal proceedings before Judge Glasser, including his cooperation agreement, a United States Department of Justice financial statement dated December 10, 1998, two proffer agreements, and a pre-sentence investigation report dated June 28, 2004 (collectively, the "Sealed Materials"). (*See id.* at 8:9-20; 10:22-11:3.)

Bernstein took the hard drive with him when Bayrock terminated him in September 2008. (*Id.* at 100:10-14; *see also* ECF No. 13-5 at 8.) Bayrock instructed Bernstein to return all company property, including the hard drive, but Bernstein kept it and the Sealed Materials. (*See* ECF No. 13-10 at 100:10-14.)

On or about March 1, 2010, Bernstein handed the Sealed Materials to Oberlander during a meeting at Bernstein's Manhattan apartment. (*See id.* at 10:2-11:3.) About two days later, Bernstein emailed the Sealed Materials, the criminal complaint from Sater's criminal proceeding, and a draft criminal information to Oberlander. (*Id.* at 12:9-24.)

In May 2010, Oberlander filed a civil RICO complaint against Sater and 29 other defendants in the United States District Court for the Southern District of New York on behalf of Kriss and another Bayrock member, Michael Ejekam, alleging that Sater and his former business associates, through the operation of Bayrock, engaged in a RICO conspiracy involving tax evasion, money laundering, embezzlement, and fraud. (ECF No. 13-2.) Oberlander attached portions of the Sealed Materials as exhibits to the complaint, including five pages from the PSR,

the proffer agreements, and the cooperation agreement. (*See* ECF No. 13-10 at 28:21-29:1.) The complaint also referred to information contained in the Sealed Materials, including details about Sater's cooperation with the government against certain members of organized crime. (*See, e.g.*, ECF No. 13-2 ¶¶ 96, 212, 218.) The case was originally assigned to the Honorable Naomi Reice Buchwald.[4] (*See Kriss et al. v. BayRock Group LLC et al.*, No. 10-CV-3959, ECF No. 2.)

On May 13, 2010, Sater's counsel informed Judge Buchwald that Oberlander had filed the complaint publicly, and that it had been uploaded by the online news service *Courthouse News* to its website.[5] (*See* ECF No. 13-5 at 10.) That same day, Judge Buchwald ordered that "no further dissemination of the complaint and exhibits thereto or the sealed information contained therein be made pending further order of the Court." (ECF No. 13-3 at 1.) Judge Buchwald also directed that Oberlander immediately inform any individuals who had received a copy of the complaint that they were not to disseminate the complaint or the Sealed Materials. (*Id.*) On May 14, 2010, Judge Buchwald ordered that the complaint be sealed pending further order of the court, and directed Oberlander to file a redacted version of the original complaint.[6] (ECF No. 13-4 at 2.)

On May 18, 2010, by way of an order to show cause, Sater filed a motion for a preliminary injunction before Judge Glasser, requesting that Oberlander and his clients be ordered to return the Sealed Materials to Sater. (ECF No. 13-5.) Sater also requested a hearing to determine how Oberlander had obtained the materials. (*Id.* at 1.) On the same day, Judge Glasser signed the order to show cause and issued a temporary restraining order restraining

---

[4] The case was reassigned to the Honorable Lorna G. Schofield in March of 2013. (*See Kriss et al. v. BayRock Group LLC et al.*, No. 10-CV-3959, ECF No. 31.)

[5] Oberlander had at this point retained an attorney, David Lewis. (ECF No. 13-5 at 10.)

[6] On March 1, 2018, the parties filed a stipulation of discontinuance with prejudice, dismissing the action and all claims therein. (*Kriss, et al. v. Bayrock Group LLC, et al.*, No. 13-CV-3905, ECF No. 542.)

Oberlander and his clients from disseminating the Sealed Materials pending a hearing on the motion. (*Id.* at 1-2.) Oberlander hired the respondent, then a partner at Wilson, Elser, Moskowitz, Edelman & Dicker LLP, to represent him in connection with the order to show cause before Judge Glasser. (ECF No. 19 at 10.)

The hearing was originally scheduled for June 11, 2010. (*See* ECF No. 13-6.) The respondent claimed there had been no prima facie showing that Sater had "protected the documents," a claim that Judge Glasser rejected. (*Id.* at 2:21-3:10, 4:6-5:8.) The respondent requested an adjournment because he was not ready to proceed; he claimed that he thought the May 18th restraining order kept him from speaking to his clients, Kriss and Ejekam. (*Id.* at 5:24-7:13.) Judge Glasser found his argument "specious" and "nothing more than stalling," but adjourned the hearing to June 14, 2010. (*Id.* at 8:17-9:11.)

At the June 14th hearing, Judge Glasser emphasized that Sater's case had been under seal since its inception, that the documents in the file stated explicitly that they were sealed, and that Oberlander was aware that the documents were sealed. (ECF No. 13-9 at 5:12-6:19, 8:1-4.) The respondent agreed with Judge Glasser that "there's an awful lot of information in [Sater's] cooperation agreement which is very sensitive." (*Id.* at 8:10-13.) Judge Glasser found that attaching the Sealed Materials to the Southern District complaint

> was a disclosure of information which was reckless and significantly endangered the life of the person to whom that information related and disturbed me no end because it behooved any lawyer—forgetting about a lawyer—anybody looking at a document which was clearly, clearly designed to be kept very confidential, to be very, very careful with not making that information and letting it float at large. I want to emphasize why it is that I have regarded and do regard this very seriously.

(*Id.* at 11:12-21.) The hearing was adjourned to June 21, 2010. (*Id.* at 15:6-11.)

At the June 21st hearing, Oberlander testified that Bernstein gave him a copy of the Sealed Materials on March 1, 2010, and also emailed them to him, together with the Southern

7

District complaint and a draft criminal information, two days later. (ECF No. 13-10 at 10:2-11:3, 12:9-24.) At that point, Oberlander knew that Bernstein had already been terminated from Bayrock. (*Id.* at 24:6-7.) Oberlander acknowledged alleging in the Southern District complaint that the proffer agreements and the cooperation agreement "were sealed," but nevertheless refused to admit that he knew they were sealed.[7] (*See* ECF No. 13-2 ¶ 96; ECF No. 13-10 at 34:2-35:15.) He also admitted seeing a 2007 New York Times article reporting that Sater's criminal complaint remained under seal. (ECF No. 13-10 at 40:4-20.) He made no additional attempts to determine whether the documents he received from Bernstein or the case docket were subject to existing seal orders. (*See* ECF No. 13-10 at 39:17-24.)

At several points, Oberlander invoked what he called the "work product privilege," (*see, e.g., id.* at 22:14-25, 25:23-26:2), and refused to acknowledge that he knew that Bernstein retained the Sealed Materials after his termination from the company. (*Id.* at 23:10-24:15.) He also refused to say whether he thought Bernstein stole the materials. (*Id.* at 24:12-15.) However, about three months before the June 21st hearing, Oberlander heard Bernstein testify at his deposition that he had retained "thousands of emails" and "hundreds of documents" from Bayrock after he was fired. (*See* ECF No. 13-5 at 8.)

Oberlander acknowledged sending the following email to Kriss' father, which he asked the elder Mr. Kriss to forward to Bayrock's General Counsel, Julius Schwarz:

> I recommend you forward this to Julius with the comment from me that there are three alternatives here:
>
>     (a) I file publicly today.
>     (b) I file under seal today.
>     (c) He arrange a tolling agreement with EVERY defendant but Nixon Peabody.

---

[7] He also acknowledged his awareness of a Southern District rule requiring that caution be exercised when filing information regarding an individual's cooperation with the government. (*See* ECF No. 13-10 at 50:23-51:17, 53:8-55:4, 70:21-72:4.)

> I don't care how many people he has to get on the phone and how fast he has to work. He had years to give back the money and now it's over. He can get Brian Halberg to help him.
> I believe it's possible to get this in under seal if Bayrock joins in a joint motion in part 1 to seal the complaint pending a redaction agreement with the assigned judge but there are never any guarantees.

(ECF No. 13-10 at 47:3-20; ECF No. 13-5 at 9.)

Sater also testified at the hearing. He said that he kept the Sealed Materials in a personal file, labeled "Personal and Confidential," in a locked drawer in his desk. (ECF No. 13-10 at 95:1-21.) He did not give the Sealed Materials to Bernstein, and had not scanned or asked anyone to scan the Sealed Materials. (*Id.* at 97:1-3, 107:7-11.)

Judge Glasser issued a permanent injunction prohibiting the dissemination of the PSR and its contents, and directed Oberlander to return the PSR to the U.S. Attorney's Office. (*Id.* at 88:2-4, 91:25-92:7.) Judge Glasser extended the temporary restraining order with respect to the remaining sealed materials and requested additional briefing on several issues, including whether he had the authority to enjoin the dissemination of those documents. (*Id.* at 114:10-115:17.) The respondent stated that he and Oberlander had "no objection to continuance of the TRO." (*Id.* at 112:9-10.) On July 9, 2010, the respondent appealed this order, as well as the May 18th restraining order, to the Second Circuit. (ECF No. 13-12.)

On July 16, 2010, as part of his response to the restraining order, Oberlander filed a signed declaration in which made the following accusations against Judge Glasser and the Eastern District of New York:

- Judge Glasser presided over a "star chamber" that issued a "patently unconstitutional prior restraint TRO." (ECF No. 13-13 ¶ 1.)

- Judge Glasser "unconstitutionally conceal[ed] the docket and surreptitiously dispens[ed] whatever justice, or lack thereof, as the Court sees fit." (*Id.* ¶ 3.)

9

- Judge Glasser "maintained a constitutionally illegal super-sealed docket system of private justice." (*Id.* ¶ 9.)

- "The court has concocted a system of private justice without public accountability." (*Id.* ¶ 4.)

- "This court . . . hides what it does, and no one can doubt the reason is pusillanimous fear." (*Id.* ¶ 11.)

- "This court would dole out First Amendment protection only to . . . favored speakers it fears are too big to gag." (*Id.*)

Oberlander vowed to move for "the unsealing of every secretly sealed docket in this court house." (*Id.* ¶ 17.) He signaled his intent to ignore the court's orders, declaring "I will not be silenced," and asserting that "there is nothing that the court can do to me." (*Id.* ¶¶ 4, 6.) He concluded by analogizing Judge Glasser to Senator Joseph McCarthy, in language borrowed almost verbatim from Joseph Welch's famous castigation of McCarthy: *"You have done enough. Have you no sense of decency, sir, at long last? Have you left no sense of decency?* For the only threat to our Union is that a judicial system would self-justify and rationalize how it could ever dare operate in secret." [8] (*Id.* ¶ 20 (emphasis in original).)

On July 20, 2010, Judge Glasser found that Oberlander knew that the documents were sealed before he filed them publicly. (ECF No. 13-17 at 18:18-19:8.) Judge Glasser also found that Bernstein had obtained the documents wrongfully, and that Oberlander had "documents which he knew or perhaps should have known may have been improperly obtained by Bernstein and passed onto him." (*Id.* at 18:18-22, 20:13-14.) Judge Glasser asked for additional briefing:

---

[8] The respondent attached Oberlander's submission to a declaration in opposition of the order to show cause before Judge Glasser. (*See* ECF No. 13-15.)

It may be that there is some ethical principle, which should have precluded Mr.
Oberlander from using those documents. Because the sensitivity of those documents
would have been apparent to any reasonable person, particularly one who is trained in the
law ostensibly. So the question is, yes, something bad was done, something very bad and
perhaps despicable by the use of those documents annexed to a complaint in the Southern
District, in a civil case, but the question is what order was violated?

(*Id.* at 20:15-24.)

Judge Glasser directed Oberlander to return the PSR—including all copies—and

prohibited its dissemination. (*Id.* at 26:1-27:1.) Despite Judge Glasser's explicit injunction in

his previous ruling, Oberlander had continued to maintain copies of the PSR, something that the

respondent attempted to justify by claiming that the order applied only to the "original" copy of

the PSR that Oberlander obtained from Bernstein. (*Id.* at 15:2-16:7.) Judge Glasser issued a

further TRO against the dissemination of any copies. (*Id.* at 26:18-27:15.) Judge Glasser

ordered additional briefing on the Sealed Materials, and extended the TRO pending his decision.

(*Id.*) The respondent appealed Judge Glasser's July 20th oral order on August 9, 2010. (ECF

No. 13-19.)

On July 27, 2010, with the respondent's consent, Judge Glasser extended the May 18th

restraining order until August 3, 2010. (*U.S. v. Sater*, No. 98-CR-1101, ECF No. 43.) He

extended it again, with the respondent's consent, to August 13, 2010. (*U.S. v. Sater*, No. 98-CR-

1101, ECF No. 178.)

On August 12, 2010, the parties formally stipulated to standstill agreement, which the

court so-ordered the same day. (ECF No. 13-20.) The agreement provided that pending a

settlement or issuance of an order granting or denying requested relief, Oberlander (and his

clients) could not disseminate the Sealed Materials or information contained therein, except for

purposes of pending appeals. (*Id.* at 3.) The standstill agreement was supposed to end on

11

September 27, 2010, but the parties agreed to extend it until January 14, 2011. (ECF No. 13-20 at 5; *U.S. v. Sater*, No. 98-CR-1101, ECF No. 44.)

In the meantime, Oberlander continued to demand money from Sater and the other defendants in the Southern District action before Judge Buchwald, and threatened to disseminate the sealed information if the Southern District defendants did not agree to a monetary settlement. (*See* ECF No. 13-22, 13-24.) On October 18, 2010, Oberlander wrote the following letter to Sater's counsel:

> [M]y clients are indifferent as to which Defendants write the checks, and if your client can get out of this without paying much, if anything, that's fine with them. They are also well aware that your client lacks the means to pay what is demanded, and thus are proposing he pay at least in very principal part with his cooperation, something he no doubt will understand. . . . [M]y clients . . . simply demand for [sic] what they are entitled to: one billion dimes. . . . At this time, plaintiffs will favorably consider settling the entirety of all claims known and unknown for their actual damages of $35,000,000. . . . It is the least amount which plaintiffs would be willing to accept for a quick settlement that avoids the dissemination.

(ECF No. 13-22 at 6, n.3.)

On November 9, 2010, Oberlander, on his own behalf and as counsel for Kriss and Ejekam, sent another letter to Sater's counsel terminating the standstill agreement effective November 16, 2010, and again threatening dissemination of the Sealed Materials:

> If you wish Mr. Sater's activities lawfully kept quiet to any extent, stand still, stop filing motions and get out of the way so Plaintiffs can try to resolve the case before everything uploads to PACER and goes public. The only way to try to prevent worldwide notoriety will be a globally stipulated sealed confidentiality order accompanying a global settlement.
>
> . . .
>
> If you don't stipulate I'll get it so ordered anyway because (as Judge Glasser himself pointed out) the issue of dissemination is moot, but you'll have wasted more time and be that much closer to the time when Judge Buchwald orders this public and your client finds this on the front pages everywhere including New York, Iceland, Turkey, and Kazakhstan, and all the other plaintiffs worldwide, including Glitnir (which already knows of the EDNY criminal matter from public filings but not yet about your client), join the party.

I can with confidence predict from the settlement discussions I've had that all the defendants will be delighted to keep this quiet . . . . If this case is not settled quickly, it will surely go viral. If you obstruct a settlement instead of helping get there, everything will go public with clockwork inevitability. This is not a threat, it is mathematics. And it is certain.

No power on this earth will much longer prevent as much lawful and legal worldwide dissemination of this Complaint and every document attached thereto or referenced therein as the public and press doing the dissemination think its value justifies. You already saw what *Courthouse News* thought of it, and everything else I file about Bayrock, entirely without my or my clients' involvement. Only a stipulated sealed confidential settlement agreement Plaintiffs find acceptable, executed very soon, can stop that.

. . .

Always remember, if I can't settle this in time now, you will have brought this about by your decisions, taking the tactical nuclear device I filed in SDNY and enhancing it beyond what even I could have, magnifying its yield to that of a strategic thermonuclear weapon by dragging in EDNY and that disaster. . . .

**Sign the litigation standstill and get out of the way**. You have seven days to seek further relief from Judge Glasser. If you do, if you don't standstill, if you continue to interfere with service or dissemination, if I see letters, motions, or anything else, I will instruct counsel to seek emergency relief. And I'll get it. And you'll get the inevitable, concomitant global public news and media coverage of everything everywhere.

. . .

Listen to me. I see legal ways out for your client which are in my clients' interests to facilitate. You won't see them. You need my help. Take it. Fast. Or Judge Buchwald will be presiding over World War III with coverage likely on the front page of the New York Law Journal.

(ECF No. 13-24 at 1-2 (emphasis in original).)

At a February 14, 2011 hearing before the Second Circuit,[9] the respondent admitted that Oberlander still had electronic copies of the PSR. (ECF No. 14-3 at 24:1-3.) The court promptly issued a summary order temporarily enjoining Oberlander and anyone acting in concert with him

---

[9] In addition to appealing the June 21st and July 20th orders, the respondent filed a petition for a writ of mandamus directing the district court to make public the docket in Sater's criminal proceedings before Judge Glasser. (ECF No. 14-1.) The government cross-moved for a temporary injunction, pending the disposition of the respondent's appeals, to restrain the respondent and Oberlander from threatening dissemination of the Sealed Materials. (*See* ECF No. 14-4 at 1.)

from distributing publicly or revealing in any way documents or contents thereof subject to sealing orders in the appellate proceedings or in any related proceedings before the Eastern and Southern Districts. (ECF No. 14-4.)

The Second Circuit also directed Chief Judge Raymond Dearie to assign a district judge "with the limited mandate of implementing and overseeing compliance with our orders and the orders previously entered by Judge Glasser." (*Id.* at 3.) The Second Circuit noted, "Of course, Judge Glasser, an experienced and able jurist who has shown admirable patience and forbearance in the face of extraordinary provocations, shall retain jurisdiction over the underlying (and long-lived) criminal proceeding involving [Sater]." (*Id.*) Judge Dearie referred the case to the Honorable Brian M. Cogan to enforce the Second Circuit's and the Eastern District's prior orders. (ECF No. 14-5.)

On March 17, 2011, after the U.S. Attorney's Office for the Eastern District of New York disclosed Sater's criminal conviction in a press release, the government moved to unseal the docket entries and documents in Sater's criminal proceeding that did not refer to Sater's cooperation with the government. (ECF No. 14-6 at 1, 5-7.) In a March 23, 2011 order, Judge Glasser directed Oberlander and Sater "to brief the issue of the Court's jurisdiction," and found that Oberlander had "knowingly and intentionally flouted a Court order" by "unilaterally deciding" to disclose information in Sater's sealed criminal proceedings. (ECF No. 14-7 at 4.) The respondent appealed this order on April 14, 2011. (ECF No. 14-17.)

Notwithstanding the Second Circuit's February 14th Summary Order, the respondent requested clarification from Judge Cogan about the extent to which Oberlander was permitted to disseminate certain information contained in the Sealed Materials, on the theory that the information was public knowledge. (*See* ECF No. 14-9 at 7:9-13.) Judge Cogan held a hearing

14

on April 1, 2011. (*See id.* at 1.) The respondent revealed that Oberlander had still not destroyed or returned electronic and paper copies of the original PSR and other Sealed Materials, in violation of Judge Glasser's July 20th order. (*See id.* at 11:5-12:5.) Judge Cogan rejected the respondent's argument that Judge Glasser had not actually ordered Oberlander to destroy or return copies. "No, it's absolutely clear on its face Judge Glasser intended you to destroy electronic copies and to return any photocopies." (*Id.* at 14:3-5.)

By oral order and subsequent written order on April 4, 2011, Judge Cogan directed Oberlander to destroy or return any remaining electronic or paper copies of the PSR and other Sealed Materials, without prejudice to his ability to get access to the documents if the Second Circuit vacated any of the various sealing orders. (*See id.* at 15:1-2; ECF No. 14-10.) Although he did not impose sanctions, Judge Cogan noted that "[i]t was plainly the intent of Judge Glasser to have [the Sealed Materials] destroyed or returned." (ECF No. 14-10.) The respondent appealed Judge Cogan's orders on April 5, 2011. (ECF No. 14-14.)

On May 13, 2011, Judge Cogan issued an additional written order denying the respondent's March 1st request to release the following information from the Sealed Materials: (1) Sater's identity in connection with the criminal proceedings; (2) the nature of the predicate acts underlying Sater's RICO conviction; and (3) Sater's sentence of probation and $25,000 fine. (ECF No. 14-21 at 3-4.) Judge Cogan observed that he had opined at the April 1st hearing that information "available to the public" was not covered by the Second Circuit's injunction, but had ruled that Oberlander could not "extrapolat[e] from sealed documents . . . [which] could easily be combined with and thereby tainted by [Oberlander]'s knowledge of non-public, sealed information." (*Id.* at 2.) Judge Cogan reviewed the specific information that Oberlander requested to release, and concluded that "[i]t seems obvious that [Oberlander] is seeking to

fatally undermine the purpose of the injunctions by publishing information that would render them ineffective." (*Id.* at 4.) The respondent appealed Judge Cogan's May 13th order on June 10, 2011. (ECF No. 14-24.)

On June 29, 2011, the Second Circuit issued a summary order on the respondent's six appeals. (ECF No. 14-27.) The court affirmed Judge Glasser's permanent injunction against dissemination of the PSR, and remanded that portion of the appeal that dealt with the other sealed documents to Judge Glasser for a final determination. (*Id.* at 1-2, 6.) The court observed that "the PSR is of dubious utility in the civil case except as a tool to intimidate and harass [Sater] by subjecting him to danger. Accordingly and in sum, disclosure of the report is not required to meet the ends of justice—indeed quite the opposite." (*Id.* at 5 (internal citation omitted).) The court warned the respondent "that the Court's patience has been exhausted by his filing of six separate notices of appeal regarding the same principal legal dispute—including the filing of an appeal from a March 23, 2011 scheduling order that obviously was not a final order nor subject to any of the exceptions in the 'final judgment rule.'" (*Id.* at 2, 6.) The court further ordered that "any further attempts to re-litigate the issues decided by this order, or other future filings of a frivolous nature, may result in sanctions . . . ." (*Id.*)

On February 5, 2012, the New York Times published an article entitled "By Revealing Man's Past, Lawyer Tests Court Secrecy," in which Oberlander revealed his identity and posed for a photograph with the respondent.[10] (*U.S. v. Sater*, No. 98-CR-1101, ECF No. 132-1.) Sater is identified in the article only as John Doe "[b]ecause of safety concerns raised in the case." (*Id.* at 2.) The article described the "secretive chaos" following Oberlander's filing of the Southern District complaint, referring to, among other events, Judge Buchwald's order, Judge Glasser's

---

[10] Oberlander's name had been substituted with Richard Roe in public filings and transcripts. (*U.S. v. Sater*, No. 98-CR-1101, ECF No. 132-1 at 1.)

hearings and orders, and the Second Circuit's review and orders. (*Id.*) Oberlander was quoted as saying that Sater's former employee told him to make the Sealed Materials public. (*Id.*) Oberlander also told the author that the court had kept Sater's criminal record a secret, and thus had prevented his victims from obtaining restitution. (*Id.* at 3.) The article also quotes a member of Oberlander's legal team, Paul Cassell, who lauded Oberlander for "challenging the power and ability of the courts to run a secret criminal docket." (*Id.* at 3.)

On February 10, 2012, Sater's counsel moved, by order to show cause, for civil contempt against the respondent and Oberlander on the grounds that Oberlander violated the Second Circuit's February 14, 2011 order by revealing his identity in the article. (ECF No. 15-3.) Judge Cogan signed the order to show cause, and scheduled a hearing for February 27, 2012. (ECF No. 15-4.)

The respondent and Oberlander filed a motion to quash or vacate the order to show cause. (ECF No. 15-5.) In their motion papers, the respondent and Oberlander made the following charges:

- "Judge Glasser and the Second Circuit have . . . hid[den] an entire covert justice system operation devoid of constitutional legitimacy." (*Id.* at 9.)

- The Second Circuit's orders were issued to conceal "systemic judicial and executive branch lawlessness" amounting to "sedition" and "such sedition constituting high crimes and misdemeanors, including the conspiracy to and actual accomplishment of the falsification of judicial records . . . ." (*Id.* at 8.)

- Someone named Salvatore Gieoeli was "publishing online allegations that the Eastern District makes illegal deals with cooperators which, inter alia, unlawfully evade restitution . . . ." (*Id.* at 12.)

17

- "Judge Glasser's long dead and illegally empty docket, is simply unsustainable as anything other than participation in the conspiracy of secret courts." (*Id.* at 15.)

- Judge Cogan's signing of the order to show cause was "illegal and unlawful." (*Id.* at 3.)

- Judge Cogan maintained an "inaccurate docket" in a totally unrelated matter and should recuse himself "from further involvement." (*Id.* at 4.)

- The Eastern District has taken "unlawful, and unethical measures" to cover up "illegal sentencing schemes." (*Id.*)

At the February 27, 2012 hearing, Judge Cogan announced that he was referring the matter to the U.S. Attorney's Office to determine whether to prosecute the respondent and Oberlander for criminal contempt.[11] (ECF No. 15-6 at 9:20-25.) The U.S. Attorney's Office for the Eastern District recused itself and referred the matter to the U.S. Attorney's Office for the Northern District of New York. (ECF No. 15-7.) That investigation is ongoing.

In May 2012, the respondent petitioned the United States Supreme Court for a writ of certiorari to review the Second Circuit's February 14, 2011 order. (ECF No. 15-9.) The respondent filed the petition under seal but moved that the petition be made available in redacted form. (ECF No. 15-8.) On June 25, 2012, the Supreme Court granted the respondent's motion, and ordered that Sater's name be redacted in the publicly-available petition. (*See* ECF No. 19 at 32-33.) The respondent filed the redacted petition publicly in July 2012. (*See id.* at 33.) On July 31, 2012, the Miami Herald published an article entitled "High court reveals secret deal of Trump developer's crimes;" the article named Sater, and appeared to reference information that had been redacted from the publicly filed petition. (*Id.* at 33-34.)

---

[11] Oberlander announced at the hearing that he was representing the respondent, and had gotten himself admitted to the Eastern District that same morning. (ECF No. 15-6 at 5:13-21.)

At some point in 2009, the docket sheet for Sater's criminal proceedings was inadvertently unsealed for several days and then re-sealed. (*See* ECF No. 15-17 at 3.). On August 27, 2012, Judge Glasser unsealed the docket sheet, but not the underlying documents, for Sater's criminal proceedings, because the sealed information had already been revealed publicly. (*Id.* at 5-6.) Judge Glasser explained that continued sealing of the docket sheet would be futile because "[t]he cat is out of the bag, the genie is out of the bottle." (*Id.* at 5, 6.) However, Judge Glasser ordered that the details of Sater's cooperation with the government, which had not been made public, remain sealed to protect Sater and maintain the secrecy of the government's "significant clandestine investigative activities." (ECF No. 16-3 at 8.)

The respondent and Oberlander filed a 742 page "Request for Judicial Notice" on October 23, 2012. (*See* ECF No. 15-19.) On November 13, 2012, Judge Glasser ordered the respondent and Oberlander to show cause why they should not be sanctioned for making a "vexatious" and "oppressive" filing that had "no relevance to the very discrete issue pending before the Court." (ECF No. 15-21 at 3-4.)

On November 19, 2012, Oberlander moved that Judge Glasser be disqualified; he asserted, among other things, that Judge Glasser, the U.S. Attorney's Office, and Sater's counsel were part of a "criminal conspiracy" to conceal Sater's conviction. (*See* ECF No. 15-22 at 2.) His motion included the following charges:

- Judge Glasser "failed to disqualify [himself] despite Congressional mandate [he] do so because of, respectively, [his] appearance of bias and lack of impartiality, palpably obvious to, let alone reasonably questioned by, an objective, informed observer . . . ." (*Id.*)

- Judge Glasser was involved in a "**criminal conspiracy with . . . Sater's lawyers**" to deprive Oberlander and his clients of their rights. (*Id.* (emphasis in original).)

- "**If it had been up to this court, no one would ever have know [sic] of the criminal corruption of the probation officer and DOJ . . . because this court gagged us from telling anyone without even hearing any argument as to prior restraint, core speech, or anything else. The First Amendment simply didn't exist in Brooklyn for this court.**" (*Id.* at 5 (emphasis in original).)

- "[I]f the court look [sic] carefully it will find—wait for it—that in 2008, Sater funded what we'll call an 'EDNY Special' family trust for, you guessed it, his wife and children by transferring his membership interests in Bayrock to the trust, which then flipped it right back to Bayrock for approximately $1,500,000; why be surprised, hiding wealth in trusts is the 'thing to do' among EDNY felons who want to evade all responsibility to their victims." (*Id.* at 6.)

- "**Attached hereto is the email cover letter from [Sater's attorneys] which says, in a nutshell, Mr. Oberlander, Mr. Lerner, take this offer, because this is rigged, don't you know if Judge Glasser ever does hold a hearing to decide whether to unseal any of the documents, he will ignore all your arguments, appeals, and evidence. You're doing exactly that, aren't you. Aren't you.**" (*Id.* at 10 (emphasis in original).)

- "Perhaps [Sater's attorneys] reached such an agreement with you to throw the case against us in one of the many secret ex parte proceedings we've just found out about. Perhaps they didn't. It doesn't matter, because if you wish to testify they did not, you are a fact witness and off the bench." (*Id.*)

- "[N]o sane person . . . would believe anything other than the *apparent* possibility of this court's active, collusive criminal participation in what our coming amendment hereto will detail more fully is enterprise corruption, including its cover-up, the only question how far and to what extent it suffuses the Eastern District and the former AUSA's there now in private practice. That's the test, whether there is apparent corruption based bias. Fail on that." (*Id.* (emphasis in original).)

- "That's the smoking gun which completes the portrait of a court *apparently* engaged in secret and collusive deals with Sater's lawyers to, just as they said, ignore all our argument, evidence, and appeals exactly the way it is doing, de facto, in terrorem, and de jure. That's the cause for you to step down. Forthwith." (*Id.* at 14 (emphasis in original).)

On December 13, 2012, the respondent and Oberlander filed a supplemental submission in response to Judge Glasser's November 19th order to show cause, including the following charges:

- "[W]e are building a record to show the U.S. Supreme Court that this court allowed Sater's crimes to be hidden from the general public and how it did so— and thereby allowed (indeed, emboldening) him to go forth and continue defrauding the general public in what must be called judicially created danger." (ECF No. 15-23 at 7.)

- "Even were we to confine ourselves to 'normal' sealing, this circuit long ago gave its backhand to the Constitution and concomitant requirements of 'normal' sealing in organized crime cases, and the Eastern District has just taken it farther into the

realms of lawlessness than anything we had dared to imagine. And we mean lawlessness." (*Id.* at 12.)

- "As to the sealing and closure, this hit its nadir (we hardly call it a zenith) of lawlessness with the Second Circuit's decision . . . wherein the court circumvented . . . the entire . . . line of constitutional access jurisprudence." (*Id.* at 13.)

- "And it appears to be the culture of the district to not recognize the public's rights . . . ." (*Id.* at 13-14.)

- "Perhaps—hypothetically of course—the secret papers this court is concealing reveal that Sater turned down WITSEC or other protection or relocation for a long time, even recently. Why then would this allow him to perpetrate concealment fraud, and why would the court allow any such concealment fraud to continue?" (*Id.* at 26.)

The respondent and Oberlander filed two new actions in 2013. (ECF Nos. 16-4, 16-6.) In the first action, *Estate of Ernest Gottdiener, et al. v. Sater, et al.*, No. 13-CV-1824 (LGS) (S.D.N.Y.), filed in March 2013, the respondent and Oberlander alleged RICO violations— specifically, that Oberlander and other plaintiffs had been defrauded because Sater's criminal case had been sealed illegally. (*See* ECF No. 16-4 at 5.) Judge Schofield granted Sater's motion to dismiss the action on March 19, 2014, (ECF No. 16-10), a decision that the Second Circuit affirmed. (ECF No. 17-6).

The respondent and Oberlander filed the second action, *Kriss, et al. v. Bayrock Group LLC, et al.,* No. 13-CV-3905 (LGS) (S.D.N.Y.),[12] in May 2013, and named the following individuals and entities as defendants: Sater's attorneys; one of the prosecutors in Sater's criminal case; law firms, including Akerman Senterfitt, Duval & Stachenfeld, Nixon Peabody, Satterlee Stephens Burke & Burke, and Morgan Lewis & Bockius; and Donald Trump, Ivanka Trump, and "Trump Does" 1-100, among others. (ECF No. 16-6 at 1.) The complaint accused these parties of participating in a massive civil RICO conspiracy and sought $1 billion in damages. (*See id.* at 2-4.) The respondent and Oberlander asserted more than 25 claims, including fraud, negligence, breach of fiduciary duty, defamation, breach of contract, unjust enrichment, interference with contract, and malicious prosecution. (*Id.* at 4.) The plaintiffs voluntarily dismissed the action on June 23, 2015. (*Kriss, et al. v. Bayrock Group LLC, et al.,* No. 13-CV-3905, ECF No. 124.)

On May 17, 2013, Sater's counsel filed an order to show cause seeking to hold the respondent and Oberlander in civil contempt of the Second Circuit's December 20, 2011 Mandate (the June 29, 2011 Summary Order) for filing the *Gottdiener* and *Kriss* actions in 2013. (*See* ECF No. 16-7 at 1.) On May 28, 2013, Judge Cogan denied the motion, finding that while the Second Circuit warned the respondent and Oberlander against "filing additional lawsuits in an attempt to re-litigate issues decided by its order, or other future filings of a frivolous nature," the Second Circuit did not prohibit such filings.[13] (ECF No. 16-7 at 2.)

---

[12] The respondent initially filed the action in the Supreme Court of the State of New York, County of New York, *Kriss, et al. v. Bayrock Group LLC, et al.,* No. 651715/2013. (ECF No. 16-6.) On June 7, 2013, the government removed the action to the Southern District. (*Kriss, et al. v. Bayrock Group LLC, et al.,* No. 13-CV-3905, ECF No. 1.)

[13] In a 2016 filing styled a motion to "Request the Resignation of the 'Special Master,'" the respondent made the following accusations:
- The Second Circuit's statement that it had undertaken an independent review was "an obvious fabrication." (ECF No. 17-15 at 7 n.1.)

On June 9, 2014, Sater's counsel filed this disciplinary complaint against the respondent, alleging, among other things, that the respondent "engag[ed] in a relentless campaign to extort a settlement from Sater and others by publicly releasing documents that had been sealed by a federal court to protect Sater from life-threatening danger." (ECF No. 1 at 1.) The complaint further alleges that the respondent "willfully and deliberately defied the orders of three different judges in the Southern and Eastern Districts of New York as well as the Second Circuit Court of Appeals, [] filed a slew of frivolous motions and lawsuits," "repeatedly accused the courts of illegal and fraudulent conduct[,] and intentionally violated their explicit and unambiguous orders." (*Id.*)

## DISCUSSION

The Committee issued an order to show cause charging the respondent with violations of Rules 1.16(a), 1.16(b), 3.1, 3.2, 3.3, 3.4, 8.4(a), 8.4(d), and 8.4(h) of the New York Rules of Professional Conduct. The respondent's response raises two procedural arguments: (1) the statute of limitations bars discipline for conduct that occurred prior to November 18, 2011, and (2) the Committee does not have jurisdiction over acts that occurred outside the Eastern District. The respondent also argues that his conduct was "guided by the good-faith belief that he was not enjoined from his conduct by any legally valid sealing order, and that his conduct was necessary

---

- Judge Glasser "directed the falsification of [a] transcript" by directing that Sater be referred to as "John Doe." (*Id.* ¶ 31.)
- Judge Glasser made an improper attempt to influence the Supreme Court. (*Id.* ¶ 35.)
- Judge Glasser violated "the canons of attorney and judicial ethics." (*Id.* ¶ 48.)
- Judge Glasser, Judge Cogan, and the Second Circuit judges have kept a "regime of secrecy, only backing off when faced with media scrutiny." (*Id.* ¶ 57.)
- "[T]he Second Circuit has ratified the U.S. Attorney's fraud." (*Id.* ¶ 65.)
- The Second Circuit "falsified" and "misrepresented" the record. (*Id.* ¶ 69.)
- Judge Cogan issued "a never-ending stream of unconstitutional orders, first to shut Oberlander and Lerner up, then to punish them for having legally revealed the truth." (*Id.* ¶ 72.)
- Judge Cogan pressured the U.S. Attorney's Office into investigating the respondent and Oberlander. (*Id.* ¶ 97.)

to protect significant Constitutional principles and the integrity of the justice system." (ECF No. 20 at 23.) In essence, his response appears to be that the Sealed Materials were not really sealed, and that his conduct was undertaken in good faith. The respondent also argues that his conduct is protected by the First Amendment. (*E.g.*, ECF No. 20 at 28, 33, 40-42.)

In accordance with the applicable legal standard and for the reasons set forth below, the Committee finds that the respondent violated Rules 1.16(b), 3.3(f)(2), 3.4(a)(6), 8.4(a), 8.4(d), and 8.4(h), and that the evidence does not support violations of Rules 1.16(a), 3.1 or 3.2. The Committee defers its ruling on the Rule 3.4 charge that the respondent knowingly engaged in illegal conduct by contravening court orders and disclosing sealed materials pending the outcome of the criminal proceedings.

## I.    Legal Standard

The Committee is authorized to discipline an attorney if, after notice and opportunity to respond, it finds by clear and convincing evidence that "[i]n connection with activities with this court," the attorney "engaged in conduct violative of the New York State Rules of Professional Conduct as adopted from time to time by the Appellate Divisions of the State of New York." Local Rule 1.5(b)(5). Discipline "may consist of a letter of reprimand or admonition, censure, suspension, or an order striking the name of the attorney from the roll of attorneys admitted to the bar of this Court." Local Rule 1.5(c)(1).

## II.    Procedural Defenses

### A.  Statutes of Limitations

The respondent argues that the Committee cannot discipline him for conduct that occurred before November 18, 2011, because of the five-year statute of limitations under 28

U.S.C. § 2462. (ECF No. 20 at 24-25.) Statutes of limitations do not apply to grievance proceedings before this Committee, so the Committee rejects this defense.

### 1. Statute of Limitations under 28 U.S.C. § 2462

Section 2462 of Title 28 of the U.S. Code provides in relevant part: "Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued . . . ." It is well-settled that § 2462 "applies only to actions brought by the United States" and *qui tam* actions in which there is no express limitations period. *U.S. v. Incorporated Village of Island Park*, 791 F. Supp. 354, 367 (E.D.N.Y. 1992) (quoting *Bertha Bldg. Corp. v. Nat'l Theatres Corp.*, 269 F.2d 785, 788-89 (2d Cir. 1959), *cert. denied*, 361 U.S. 960 (1960)); *see also 3BA Properties LLC v. Claunch*, No. 13-CV-979, 2013 WL 6000065 (W.D. Wash. 2013) (rejecting the contention that § 2462 applies to an action sounding in tort because § 2462 "applies only to actions on behalf of the United States and *qui tam* actions" (internal quotations and citation omitted)). This "catch-all" statute of limitations is generally applied only in proceedings involving federal agencies, like the Securities and Exchange Commission (*e.g., Kokech v. SEC*, 137 S. Ct. 1635 (2017); *SEC v. Straub*, 2016 WL 5793398 (S.D.N.Y. 2016)), the Environmental Protection Agency (*e.g., 3M Co. v. Browner*, 17 F.3d 1453 (D.C. Cir. 1994)), and the United States Patent and Trademark Office (*e.g., Sheinbein v. Dudas*, 465 F.3d 493 (Fed. Cir. 2006)).

The Committee has not found, and the respondent has not cited, a single reported case in which a federal district court grievance committee applied 28 U.S.C. § 2462 to an original attorney disciplinary proceeding.[14]

---

[14] The respondent's reliance on *Sheinbein v. Dudas*, 465 F.3d 493 (Fed. Cir. 2006), is misplaced. *Sheinbein*, a reciprocal disciplinary proceeding against an attorney licensed to practice before the United

## 2. Statute of Limitations under New York Law

The Local Rules provide that "in the absence of binding authority from the United States Supreme Court or the United States Court of Appeals for the Second Circuit, this Court, in the interests of comity and predictability, will give due regard to decisions of the New York Court of Appeals and other New York State courts, absent significant federal interests." Local Rule 1.5(b); *see also Bertha Bldg.*, 269 F.2d at 788-89 ("In the absence of an applicable federal statute of limitations, federal courts look to the statute of the forum.").

In New York, statutes of limitations do not apply to attorney disciplinary proceedings. *Matter of O'Hara*, 408 N.Y.S.2d 70 (1st Dep't 1978); *In re Mix*, 292 N.Y.S. 502 (4th Dep't 1937), *rev'd on other grounds*, 274 N.Y. 183, 8 N.E.2d 328 (1937); *In re Cohalan*, 271 N.Y.S. 76 (1st Dep't 1934); *In re Simpkins*, 155 N.Y.S. 521 (1st Dep't 1915). The American Bar Association Model Rules for Disciplinary Enforcement apply the same principle: "Statutes of limitation are wholly inappropriate in lawyer disciplinary proceedings [because] [c]onduct of a lawyer, no matter when it has occurred, is always relevant to the question of fitness to practice." ABA Model Rules for Disciplinary Enforcement, Rule 18, Commentary; Rule 32, Commentary ("Disciplin[ary] . . . proceedings serve to protect the public from lawyers who are unfit to

---

States Patent and Trademark Office ("USPTO"), does not stand for the proposition that § 2462 applies to attorney disciplinary proceedings in the federal courts. The Administrative Law Judge before whom the action was brought assumed that § 2462 applied to the disciplinary proceeding before it, but the Federal Circuit, in rejecting Sheinbein's argument, made clear that it was not deciding that 28 U.S.C. § 2462 applied to the proceeding. *See Sheinbein v. Dudas*, No. 05-CV-1460, 2005 U.S. Dist. LEXIS 43603, *4 (D.D.C. 2005 ("The ALJ . . . determined that the complaint had been timely filed within the five-year statute of limitations set forth in 28 U.S.C. § 2462, *if indeed § 2462 actually applied to the proceeding.*" (emphasis added)). Of course, even if the five-year statute of limitations applied to attorney disciplinary proceedings before the Committee—and it does not—the statute of limitations would "run[] from the commission of the last wrongful act" under the continuing violation doctrine. *Leonhard v. U.S.*, 633 F.2d 599, 613 (2d Cir. 1980); *see also Joghory v. New York State Dep't of Educ.*, 131 F.3d 326, 331-32 (2d Cir. 1997). The respondent's alleged violations continue until at least May 2013, so even under the respondent's theory, this action would be timely.

practice; they measure the lawyer's qualifications in light of certain conduct, rather than punish for specific transgressions. Misconduct by a lawyer whenever it occurs reflects upon the lawyer's fitness.").

Accordingly, the Committee concludes that neither 28 U.S.C. § 2462 nor any New York statute of limitations apply to this proceeding. Thus, the Committee considers all allegations against the respondent, regardless of when the underlying events occurred.

### B. Jurisdiction over Actions in Other Tribunals

The respondent argues that the Committee is limited to considering his behavior in the Eastern District, and cannot consider his conduct before other tribunals, including the Southern District of New York and the Second Circuit, because it did not occur "[i]n connection with activities in this Court." *See* Local Rule 1.5(b)(5). Local Rule 1.5(b)(5), which governs attorney disciplinary proceedings in this Court and the Southern District, authorizes the Committee to discipline an attorney after the attorney is given notice and an opportunity to respond, if it is found by clear and convincing evidence that, "[i]n connection with activities in this Court, any attorney is found to have engaged in conduct violative of the New York State Rules of Professional Conduct . . . ."

The respondent provides no authority for the proposition that Local Rule 1.5(b)(5) bars the Committee's consideration of conduct that occurred outside the Eastern District. Indeed, it is firmly established that the power to discipline attorneys is inherent in all federal courts and that "[t]his power reaches both conduct before the court and that beyond the court's confines." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-44 (1991).

All of the charged violations occurred in or arose out of proceedings in this District. The respondent is charged with: (i) assisting Oberlander in disseminating and threatening to

28

disseminate the Sealed Materials; (ii) violating Judge Glasser's July 20, 2010 order; and (iii) making baseless and disrespectful accusations against Judge Glasser, Judge Cogan, the entire Eastern District, and the Second Circuit. Furthermore, all of the respondent's conduct in the Southern District and Second Circuit is intimately connected to and arose out of the proceedings in this District.

Accordingly, the Committee has jurisdiction over the respondent's conduct.

### III.    Merits of the Charges

#### A.    *Requirement to Decline Representation (Rule 1.16(a))*

Rule 1.16(a) prohibits an attorney from accepting employment as counsel to a person if the attorney "knows or reasonably should know" that the person intends to "bring a legal action . . . merely for the purpose of harassing or maliciously injuring any person."

The Committee charged the respondent with violating Rule 1.16(a) "by agreeing to represent Oberlander despite knowledge of Oberlander's intentions to obtain a settlement by threatening illegal conduct." (ECF No. 3 at 5.) Specifically, the Committee charged the respondent with "threaten[ing] and assist[ing] Oberlander in threatening the public dissemination of the Sealed Materials unless the defendants agreed to a monetary settlement, despite knowledge that public dissemination of the Sealed Materials would violate multiple court orders." (*Id.* at 3.)

A violation under Rule 1.16(a) requires a showing by clear and convincing evidence that, at the time the respondent accepted employment as Oberlander's counsel, the respondent knew or should have known that Oberlander wished to assert claims against Sater and make a demand for the settlement of those claims on behalf of his clients for the sole purpose of harassing or maliciously injuring Sater. The difficulty here is ascertaining whether Oberlander's sole purpose

was malign; "[s]eldom do actions in litigation have only one purpose." Roy D. Simon and Nicole Hyland, Simon's New York Rules of Professional Conduct Annotated 937 (2017).

The Committee finds that there is little or no evidence in the record that the respondent knew or should have known when he accepted employment as Oberlander's counsel that Oberlander was motivated only by the desire to harass or injure Sater or anyone else, nor is there evidence that the respondent knew or should have known that Oberlander intended to send the October 18, 2010 and November 9, 2010 letters to Sater's counsel threatening dissemination of the Sealed Materials if Sater and the other Southern District defendants did not agree to a settlement.

Accordingly, the Committee finds that the respondent did not violate Rule 1.16(a).

### B. *Requirement to Withdraw (Rule 1.16(b))*

Rule 1.16(b) requires an attorney to withdraw from representing a client when the attorney "knows or reasonably should know that the representation will result in a violation of the[] Rules or of law," or the attorney "knows or reasonably should know that the client is bringing [a] legal action . . . merely for the purpose of harassing or maliciously injuring any person."

The Committee charged the respondent with violating Rule 1.16(b) "by failing to terminate his representation of Oberlander when it became clear that further representation of Oberlander would result in a violation of the [Rules]." (ECF No. 3 at 5.) Specifically, the Committee charged the respondent with "fail[ing] to withdraw from representing Oberlander when it became clear that Oberlander would continue to violate multiple court orders and the [Rules]," and "failed to withdraw from representing Oberlander when it became clear that

Oberlander was taking actions for the primary purpose of harassing or maliciously injuring the Defendants." (*Id.*)

One of the charges under Rule 1.16(b) requires that the respondent knew or reasonably should have known that Oberlander's conduct was undertaken merely for the purpose of harassing or maliciously injuring Sater. This is a high threshold: "If a lawyer merely 'believes' rather than 'knows' that continued representation will violate a rule, then withdrawal is permissive rather than mandatory." *See* Simon, *supra*, at 941.

However, the Committee finds that the respondent violated Rule 1.16(b) by failing to withdraw when he learned that Oberlander was extorting a settlement from the Southern District defendants: threatening to disseminate the Sealed Materials if they did not agree to his terms. The respondent knew or reasonably should have known that Oberlander's conduct would violate the Rules and New York law. *See, infra*, Section III.F. "[T]he review is not the reasonableness of the attorney's belief, but, rather whether a reasonable attorney, familiar with the Code and its ethical strictures, would have notice of what conduct is proscribed." *In re Cooperman*, 611 N.Y.S.2d 465, 469-70 (Ct. App. 1994). Once the respondent became aware of Oberlander's threats, he had an obligation to withdraw as counsel. *See, e.g.*, *Matter of Zimmerman*, 962 N.Y.S.2d 312 (2d Dep't 2013) (attorney violated Rule 1.16(b)(1) and (4) when he failed to withdraw from representation despite the fact that his client insisted on misappropriating escrow funds). The respondent not only failed to withdraw, he actively aided Oberlander. *See, infra*, Section III.F.

Accordingly, the Committee finds by clear and convincing evidence that the respondent violated Rule 1.16(b).

## C. Frivolous Conduct (Rule 3.1)

Rule 3.1 establishes the framework for professional discipline when an attorney asserts a meritless claim or contention. *In re Brizinova*, 565 B.R. 488, 499 (E.D.N.Y. 2017). In this context, "frivolous conduct includes circumstances 'where the lawyer knowingly advances a claim . . . that is unwarranted under existing law.'" *Pullman v. Alpha Media Publ'g, Inc.*, 2012 WL 3114939, at *4 (S.D.N.Y. Jul. 31, 2012) (quoting Rule 3.1).

The Committee considers whether the respondent violated Rule 3.1 by filing the *Gottdeiner* and *Kriss* actions in 2013, filing six separate notices of appeal about the same principal legal dispute, and filing an appeal from Judge Glasser's March 23, 2011 scheduling order, which was neither final nor subject to any exceptions to the final judgment rule.

The respondent argues that he had a good faith basis to believe that the *Gottdeiner* and *Kriss* actions filed in 2013 had merit, even though plaintiffs did not prevail in either action. The respondent also argues that he had "what [he] believed at the time was a rational, reasonable and good-faith basis to believe that [the March 23, 2011] order was subject to appeal . . . ." (ECF No. 18 ¶ 123.)

The Committee concludes that the evidence is insufficient to conclude that the filings violated Rule 3.1. While the judges before whom the respondent and Oberlander made the various filings observed that Oberlander intentionally flouted and ignored court orders, and some threatened to sanction the respondent, none of the judges actually did sanction him for filing frivolous law suits or appeals. *See, e.g.*, *Chambers*, 501 U.S. at 43 (courts have the inherent power to supervise and control their own proceedings and to sanction counsel or a litigant for bad-faith conduct); 28 U.S.C. § 1927; *see also Matter of Neroni*, 20 N.Y.S.3d 496 (4th Dep't 2015) (imposing discipline pursuant to Rule 3.1 where monetary sanctions had already been

imposed in underlying matters due to frivolous conduct); *Matter of Gurvey*, 958 N.Y.S.2d 5 (1st Dep't 2012). At both the district and circuit levels, the courts had the power to sanction the respondent for frivolous conduct but did not do so.

Without clear and convincing evidence of improper purpose or that the pleading was frivolous, it cannot be said that the respondent violated Rule 3.1. *See Sorenson v. Wolfson*, 683 Fed. App'x 33, 2017 U.S. App. LEXIS 4591, at *2, 6 (2d Cir. 2017) (affirming the trial court's decision not to impose sanctions for allegedly frivolous conduct under Rule 11, 28 U.S.C. § 1927, and the court's inherent powers because it was neither "patently clear that [the] claim ha[d] absolutely no chance of success under the existing precedents" nor was there "a finding of conduct constituting or akin to bad faith"); *Ctr. For Discovery, Inc. v. D.P.*, 2017 U.S. Dist. LEXIS 111627, at *25 (E.D.N.Y. Jul. 17, 2017) (sanctions may be imposed only if there is "*proof* of an improper purpose or an *unreasonable* belief that a claim has potential merit" (emphasis in original)).

Accordingly, the Committee finds that the respondent did not violate Rule 3.1.

### D. Dilatory Tactics (Rule 3.2)

Rule 3.2 provides that "[i]n representing a client, a lawyer shall not use means that have no substantial purpose other than to delay or prolong the proceeding or to cause needless expense." As long as a litigation tactic or strategy has at least one "substantial purpose" that is legitimate, the conduct will not violate Rule 3.2. The test is objective: whether a reasonable lawyer acting in good faith would regard the course of action as having some substantial purpose beyond delaying the action or imposing needless expense on the adversary.

The Committee considers whether the respondent violated Rule 3.2 by "engaging in improper dilatory tactics"—specifically, by filing the *Gottdeiner* and *Kriss* actions in 2013, and

numerous notices of appeal. Because the respondent filed the *Gottdeiner* and *Kriss* actions and the notices of appeal to seek redress of Oberlander's and his clients' grievances, and to raise and preserve their rights, it cannot be concluded on this record that these tactics had "no substantial purpose other than to delay or prolong the proceeding or to cause needless expense." *See* Rule 3.2.

Accordingly, the Committee finds that the respondent did not violate Rule 3.2.

### E. Discourteous Conduct (Rule 3.3(f)(2))

Rule 3.3(f)(2) prohibits attorneys appearing before a court from "engag[ing] in undignified or discourteous conduct." "Courts, counsel, and parties are entitled to expect that a threshold level of decorum will always apply in court proceedings." *In re Brizinova*, 565 B.R. 488, 501 (E.D.N.Y. 2017). Indeed, "[l]awyers, as officers of the court, must always be alert to the rule that zealous advocacy [on] behalf of a client can never excuse contumacious or disrespectful conduct." *Van Iderstine Co. v. RGJ Contracting Co., Inc.*, 480 F.2d 454, 455 (2d Cir. 1973). "Once a lawyer is admitted to the bar, although he does not surrender his freedom of expression, he must temper his criticisms in accordance with professional standards of conduct." *Stuart v. Kempthorne*, 2007 WL 2071605 at *3 (E.D.N.Y. 2007) (internal quotation marks omitted) (quoting *U.S. Dist. Court for the E. Dist. of Wash. V. Sandlin*, 12 F.3d 861, 866 (9th Cir. 1993)).

The conduct that forms the basis for this charge is the series of attacks on Judge Glasser and Judge Cogan, the Second Circuit, and the Eastern District, which the respondent either leveled himself or which he endorsed. Rule 3.3 does not bar attorneys from disagreeing, even vigorously, with a judge's ruling or from engaging in zealous advocacy on behalf of a client. It

requires, however, that attorneys do so within the bounds of legitimate advocacy. The respondent's conduct in this case far exceeded those bounds.

"[T]he rule is well settled that an attorney who engages in making false, scandalous, or other improper attacks upon a judicial officer is subject to discipline." *In re Bevans*, 233 N.Y.S. 439, 443 (3d Dep't 1929). "To make a public, false and malicious attack on a judicial officer is more than an offense against him individually; it is an offense against the dignity and integrity of the courts and our judicial system. It may bring discredit upon the administration of justice amongst citizens who have no way of determining the truth of the charges. It tends to impair the respect and authority of the court." *Id.* The *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), "actual malice" standard does not apply to disciplinary proceedings, because disciplinary proceedings safeguard professional conduct and preserve the orderly administration of the judicial system. *In re Holtzman*, 78 N.Y.2d 184, 188-89 (Ct. App. 1991). To hold otherwise "would immunize all accusations, however reckless or irresponsible, from censure as long as the attorney uttering them did not actually entertain serious doubts as to their truth." *Id.*

The respondent violated Rule 3.3 by making unfounded accusations against Judge Glasser, Judge Cogan, the Eastern District, and the Second Circuit. The respondent's and Oberlander's filings are replete with accusations of illegality, secrecy and even criminality, as demonstrated by just a sampling of their accusations against and characterizations of Judges Glasser and Cogan, the entire Eastern District, and the Second Circuit.

The respondent attached and adopted Oberlander's July 16, 2010 declaration, in which Oberlander characterized the Eastern District as a "star chamber," an oppressive medieval English court. (ECF No. 13-13 ¶ 1.) The respondent and Oberlander accused Judge Glasser and the Eastern District of "concoct[ing] a system of private justice without public accountability,"

declaring that "[t]his is not just constitutional amnesia," "[t]his is a constitutional crisis." (*Id.* ¶ 4.) They charged that Judge Glasser acted out of "pusillanimous fear," and in a blatant and outrageous comparison to Senator Joseph McCarthy, quoted Joseph Welch's famous rebuke, "Finally, I would ask of this court one question: *You have done enough. Have you no sense of decency sir, at long last? Have you left no sense of decency?* For the only threat to our Union is that a judicial system that would self-justify and nationalize how it could ever dare operate in secret." (*Id.* ¶¶ 11, 20 (emphasis in original).)

In his February 17, 2012 motion to quash an order to show cause signed by Judge Cogan, the respondent claimed that Judge Glasser and the Second Circuit "hid[] an entire covert justice system operating devoid of constitutional legitimacy[,] . . . including the disgrace of purporting" to block a U.S. citizen from "report[ing] judicial unlawfulness to Congress." (ECF No. 15-5 at 9.) The respondent accused Judge Cogan of "maintaining an inaccurate docket," and labeled his issuance of the order to show cause as "illegal and unlawful." (*Id.* at 3.) He claimed that Judge Glasser's "long dead and illegally empty docket is simply unsustainable as anything other than participation in the conspiracy of secret courts." (*Id.* at 15.) The respondent also alleged that the Eastern District took "unlawful and unethical measures to cover up . . . illegal sentencing schemes." (*Id.* at 4.) And he accused the Second Circuit of issuing orders evidencing "lawlessness" and "sedition," constituting a scheme to "defraud[] . . . victims of untold millions of dollars," and engaging in a "conspiracy to and actual accomplishment of the falsification of judicial records." (*Id.* at 8.)

The list goes on. The respondent accused the Second Circuit of giving "its backhand to the Constitution and concomitant requirements of 'normal' sealing in organized crime cases," and he charged the Eastern District with taking "it farther into the realms of lawlessness than

anything we dared to imagine. And we mean lawlessness." (ECF No. 15-23 at 12.) The respondent also claimed that the Eastern District does "not recognize the public's rights." (*Id.* at 13-14.)

The respondent's false and malicious attacks on this Court, the Second Circuit, Judge Cogan, and Judge Glasser are "an offense against the dignity and integrity of the courts and our judicial system." *See In re Bevans*, 233 N.Y.S. at 443.

Accordingly, the Committee finds by clear and convincing evidence that the respondent violated Rule 3.3(f)(2).

### F. Illegal Conduct (Rule 3.4(a)(6))

Rule 3.4(a)(6) prohibits attorneys from "knowingly engag[ing] in . . . illegal conduct or conduct contrary to these Rules." The Committee charged the respondent with violating this rule "by knowingly engaging in illegal conduct by contravening court orders, disclosing the Sealed Materials, and attempting to obtain a settlement by threatening further illegal conduct." (ECF No. 3 at 6.)

#### 1. Contravention of Court Orders and Disclosure of Sealed Materials

Whether the respondent contravened court orders and disclosed or assisted Oberlander in disclosing the Sealed Materials is currently the subject of ongoing criminal contempt proceedings. Although the record is clear that the respondent intentionally flouted and assisted Oberlander in violating multiple court orders, the Committee defers its ruling on this portion of the Rule 3.4 charge pending the outcome of the criminal proceedings.

#### 2. Attempting to Obtain a Settlement by Threatening Illegal Conduct

The New York Penal Code proscribes larceny by extortion: any act inducing another to deliver property by instilling a fear that, should the property not be surrendered, the actor will

take some action to harm the victim, including but not limited to: (1) accusing the victim of a crime; (2) exposing a secret that will harm the victim's reputation, career, and/or personal relationships, or otherwise subject the victim to hatred, contempt or ridicule. *See* N.Y. Penal Code § 155.05(2)(e). "A person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime." N.Y. Penal Code § 110.00.

The Committee finds that the respondent violated Rule 3.4(a)(6) when he knowingly assisted Oberlander in threatening to disseminate the Sealed Materials unless Sater and the other defendants in the Southern District action agreed to a monetary settlement. The evidence of this violation is evident from Oberlander's communications, of which the respondent concedes he was aware:

- "[M]y clients are indifferent as to which Defendants write the checks. . . . [They] simply demand for [sic] what they are entitled to: one billion dimes." (ECF No. 13-22 at 6.)

- "At this time, plaintiffs will favorably consider settling the entirety of all claims known and unknown for their actual damages of $35,000,000. . . . It is the least amount which plaintiffs would be willing to accept for a quick settlement that avoids the dissemination." (*Id.* at 6 n.3.)

- "If you wish Mr. Sater's activities lawfully kept quiet to any extent, stand still, stop filing motions and get out of the way so Plaintiffs can try to resolve the case before everything uploads to PACER and goes public." (ECF No. 13-24 at 1.)

- "The only way to try to prevent worldwide notoriety will be globally stipulated sealed confidentiality order accompanying a global settlement." (*Id.*)

- "If you don't stipulate I'll get it so ordered anyway . . . but you'll have wasted more time and be that much closer to the time when Judge Buchwald orders this public and your client finds this on the front pages everywhere including New York, Iceland, Turkey, and Kazakhstan, and all the other plaintiffs worldwide . . . ." (*Id.*)

- "If this case is not settled quickly, it will surely go viral. If you obstruct a settlement instead of helping get there, everything will go public with clockwork inevitability. This is not a threat, it is mathematics. And it is certain." (*Id.* at 2.)

- "No power on this earth will much longer prevent as much lawful and legal worldwide dissemination of this Complaint and every document attached thereto or referenced therein as the public and press doing the dissemination think its value justifies." (*Id.*)

- "You already saw what *Courthouse News* thought of it, and everything else I file about Bayrock, entirely without my or my clients' involvement. Only a stipulated sealed confidential settlement agreement Plaintiffs find acceptable, executed very soon, can stop that." (*Id.*)

- "Always remember, if I can't settle this in time now, you will have brought this about by your decisions, taking the tactical nuclear device I filed in SDNY and enhancing it beyond what even I could have, magnifying its yield to that of a strategic thermonuclear weapon by dragging in EDNY and that disaster. . . ." (*Id.*)

- "**Sign the litigation standstill and get out of the way**. . . . [I]f you don't standstill, if you continue to interfere with service or dissemination, if I see letters,

motions, or anything else, I will instruct counsel to seek emergency relief. And I'll get it. And you'll get the inevitable, concomitant global public news and media coverage of everything everywhere." (*Id.* (emphasis in original).)

- "Judge Buchwald will be presiding over World War III with coverage likely on the front page of the New York Law Journal." (*Id.*)

The record is clear that the respondent and Oberlander knew that public dissemination of obviously sensitive documents would not only violate explicit court orders, but would expose Sater to retaliation from individuals and organizations about whom he was providing information, as well as to public humiliation. Making such threats in the context of a settlement demand is improper. *See Morley v. Ciba-Geigy Corp.*, 66 F.3d 21 (2d Cir. 1995) (filing a supplemental complaint containing frivolous claims was "clearly an attempt to intimidate the defendant into a large settlement" and was therefore an "improper purpose" under Rule 11(b)(1)).

The respondent's knowledge that he was participating in illegal conduct is readily inferable from the circumstances. (*See* Rule 1.0(k).) Notably, the respondent does not claim ignorance of Oberlander's threatening letters, or say he did not assist Oberlander in sending the letters, in his submission. (*See* ECF No. 20 at 21, 27.) Rather, his defense is that he "had a good faith basis to believe that his and Oberlander's conduct was not in violation of legal ethics or law, and was not undertaken merely for purposes of harassment, but instead was undertaken in order to pursue legitimate grievances." (*Id.* at 27.) The Committee rejects this defense. Demanding settlement under threat of revealing information that will harm the subject is attempted larceny by extortion. The respondent, an experienced attorney, cannot credibly claim that he believed that these tactics were lawful.

Accordingly, the Committee finds by clear and convincing evidence that the respondent violated Rule 3.4(a)(6).

### G. *Violations of the Rules of Professional Conduct (Rule 8.4(a))*

Rule 8.4(a) prohibits attorneys from "violat[ing] or attempt[ing] to violate the Rules of Professional Conduct, knowingly assist[ing] or induc[ing] another to do so, or do[ing] so through the acts of another." By virtue of the respondent's violation of Rules 3.3(f)(2) and 3.4(a)(6), the respondent violated Rule 8.4(a).

### H. *Conduct Prejudicial to the Administration of Justice (Rule 8.4(d))*

Rule 8.4(d) prohibits attorneys from "engag[ing] in conduct that is prejudicial to the administration of justice."

The respondent's pattern of egregious conduct and his violation of multiple Rules demonstrates that he engaged in conduct that is prejudicial to the administration of justice. Because his misconduct is part of a "pattern" rather than an isolated incident, a harsher penalty is warranted. *See* Simon, *supra*, at 1950. His flagrant discourteous behavior in violation of Rule 3.3 provides sufficient grounds under the circumstances to find a violation of Rule 8.4(d). *See, e.g., In re Soares*, 947 N.Y.S.2d 233 (4th Dep't 2012) (strident and intemperate criticism of a judge violated Rule 8.4(d), notwithstanding counsel ultimately winning summary judgment on the case).

Accordingly, the Committee finds by clear and convincing evidence that the respondent violated Rule 8.4(d).

### I. *Conduct Reflecting Adversely on Lawyer's Fitness (Rule 8.4(h))*

Rule 8.4(h) prohibits attorneys from "engag[ing] in any other conduct that adversely reflects on the lawyer's fitness as a lawyer." This rule, described as "broad and vague," and the

"catch-all provision," is often not the sole basis for discipline, but rather "an add-on to other charges." *See* Simon, *supra*, at 1966.

The respondent's violations of multiple Rules and his pattern of misconduct as set forth above reflect negatively on his fitness as a lawyer in this Court. Accordingly, the Committee finds by clear and convincing evidence that the respondent violated Rule 8.4(h).

## IV.    Sanctions

The prospect of disciplining an attorney is a difficult task requiring much research and thought. In making this determination, the Committee has carefully reviewed the voluminous record of these proceedings and the respondent's submissions. In the heat of litigation and in the course of vigorous representation, lawyers may say or do things that they later regret. The respondent clearly regrets none of his conduct. Quite the contrary, he doubles down on his accusations, presumably because he is so certain of the correctness of his position. But confidence in one's cause does not give a lawyer license to say and do whatever he pleases; it does not permit him to threaten adversaries or to insult and demean judges who disagree with him.[15] Chief Judge Irving Kaufman observed, "Advocacy is an art in which the unrelenting pursuit of truth and the most thorough self-control must be delicately balanced," and "zealous advocacy . . . can never excuse contumacious or disrespectful conduct." *Van Iderstine*, 480 F.2d at 459.

The respondent's conduct toward Judge Glasser, Judge Cogan, the Eastern District, and the Second Circuit warrants a significant sanction. Accordingly, the respondent is hereby

---

[15] Notably, none of the judges before whom the respondent appeared dismissed his arguments out of hand, even after his and Oberlander's scurrilous attacks. All of them—Judge Cogan, the Second Circuit, and Judge Glasser—gave the respondent's arguments careful consideration. The most despicable attacks were aimed at Judge Glasser, who nevertheless treated the respondent with dignity and fairness. As the Second Circuit observed, "Judge Glasser, an experienced and able jurist . . . has shown admirable patience and forbearance in the face of extraordinary provocations . . . ." (ECF No. 14-4 at 3.)

suspended from the practice of law in this Court for six months commencing on September 1, 2018. The Committee will consider whether additional sanctions are necessary when the criminal proceedings are concluded.

## CONCLUSION

For the reasons discussed in this opinion, the Committee finds by clear and convincing evidence that the respondent violated Rules 1.16(b), 3.3(f)(2), 3.4(a)(6), 8.4(a), 8.4(d), and 8.4(h) of the New York Rules of Professional Conduct. The respondent is hereby suspended from the practice of law in this Court for six months commencing on September 1, 2018.

SO ORDERED.

s/Ann M. Donnelly
_____
Hon. Ann M. Donnelly, U.S.D.J.
Chair of the Committee on Grievances
For the United States District Court
Eastern District of New York

Dated: Brooklyn, New York
   August 13, 2018