**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA | 98 CR 1101 (ILG) |
| Plaintiffs, | |
| v. | |
| FELIX SATER aka FELIX SATTER, | |
| Defendant, | |

FREDERICK M. OBERLANDER, ESQ. et al.

Non-Party Respondents

### Declaration of Frederick M. Oberlander

I, Frederick M. Oberlander, declare under penalty of perjury, pursuant to 28 U.S.C. 1746, that the factual statements set forth herein are true, based upon my personal knowledge, and my knowledge derived from my review of the materials maintained by me for the prosecution of the matter of Kriss v. Bayrock, and the defense of myself in this proceeding as to which I am a non-party respondent.

### Introduction

1.      On May 18, 2010, in response to movant's *ex parte* petition, Exh. A, without notice and a hearing, this court, sitting as a star chamber, issued, undocketed and under seal, a patently unconstitutional prior restraint TRO against me and the co-respondents, enjoining us from disseminating truthful information, lawfully obtained, of public concern, *viz.* documents evidencing movant's federal racketeering conviction, plea

4062160.1

bargain and sentencing, portions of which respondents included in a civil racketeering complaint they filed against movant *et al.* on May 10, 2010 in the Southern District of New York.

2.      If this were the court's only transgression, I might have charitably considered it to be constitutional amnesia, and reacted with measured restraint.

3.      But this gag order was the least of it. I have discovered, and the documents reveal, that – despite thirty years of binding precedent – for over a decade this court has covertly maintained movant's criminal docket as a "super sealed" case, which is patently unconstitutional, and the court is unconstitutionally concealing the docket and surreptitiously dispensing whatever justice, or lack thereof, as the court sees fit.

4.      Since it was accompanied by the implied threat of criminal prosecution, I believe the gag order was meant to chill me into silence. I will not be silenced. The court has concocted a system of private justice without public accountability. This is not just constitutional amnesia. This is a constitutional crisis.

5.      With no evidentiary hearings, no on-the-record findings, no due process of any kind whatsoever, this court maintains that, somehow, revealing even one word contained in any one of these documents would be a clear and present danger to national security, basing this on facts that the court alone claims to know from extra-judicial sources, which facts it apparently refuses to share with the respondents.

2

4062160.1

6.     Interestingly, twelve years ago in November 1998, shortly after this court sealed the file on this action, *Business Week* got hold of the complaint – a plain vanilla criminal complaint charging the movant and co-defendant Gennady Klotsman with RICO violations, etc., and wrote about it, Exh. B. Notwithstanding that I stand in the same position as Business Week, and the article remains on its website, this court has not brought Business Week into these proceedings. Perhaps the court does not wish to pick a fight with someone who buys ink by the gallon. The Business Week article states that the criminal complaint came from a court file. So what is the court going to do about it? Nothing – because obviously there is nothing, constitutionally, that the court can do. And there is nothing that the court can do to me.

7.     Notwithstanding the court's feelings about national security, the Business Week article remains on the website – and has been there for years, apparently – and our Union stands as she stood, rock-bottomed and copper-sheathed, one and indivisible.

8.     Many other persons, law firms, insurance companies, etc. – for example McGraw Hill, Akerman Senterfitt, Wilson Elser, Morgan Lewis, Courthouse News, Nixon Peabody, Roberts & Holland, Duval & Stachenfeld, Salomon & Company, the Bayrock Organization, Zurich, and CIGNA – have had access to some or all of these documents. Yet the Union stands as she stood, rock-bottomed and copper-sheathed, one and indivisible. If disclosure of these documents are such a clear and present danger, why aren't we all dead yet?  More to the point, why hasn't the court held hearings 24x7,

3

4062160.1

haling all these persons before it; why out of all these persons are only these respondents singled out to be gagged? Surely if these documents contained hydrogen bomb secrets, the FBI would be all over this; why not now in this case?

9.      The answer is obvious. There is no threat to national security. The only threat is that the court feels that there has been an affront to its honor and the integrity of the process – yet the only threat is that this proceeding will reveal that the court has maintained a constitutionally illegal super-sealed docket system of private justice. Regrettably, this court's sense of super-patriotism may explain why it has allowed itself to be used by the movant as an instrument of, and shield against liability for, his past and ongoing crimes.

10.     The scope of the TRO is breathtaking, globally gagging everyone in the world, everywhere, who ever received these documents. But the TRO was undocketed and issued under seal, and only the respondents have been served. The court has ignored that others are within its scope, yet have not been placed on actual notice of these proceedings – viz., *Business Week,* and the defendants and their insurers in the *Kriss v. Bayrock* action –  so that they could know that while they went to sleep in America, they woke up in Amerika, secretly gagged.

11.     The signers of the Declaration of Independence who mutually pledged to each other their lives, their fortunes, and their sacred honor. They proclaimed this publicly. This court, however, hides what it does, and no one can doubt the reason is

4

4062160.1

pusillanimous fear. The court knows if it tries to gag *Business Week* or a law firm, they will respond not with measured restraint but with righteous constitutional outrage. The court perhaps did not expect that I would respond with indignation, or that I would write a declaration such as this. Nor did the court expect that in seeking to gag me, I would reveal that the court has selected who may speak the truth, and who may not, based on which speaker it thinks can't, or won't, fight back. This court would dole out First Amendment protection only to a favored speakers it fears are too big to gag. Well, your honor, I will not be gagged.

12.     Two hundred years ago in *Marbury v. Madison*, Justice Marshall said it is emphatically the province and duty of the judiciary to say what the law is. Today, this court would extend that to include the right to say who may speak about it and who may not. To this, I object.

13.     Similarly, two hundred years earlier, in *Dr. Bonham's Case*, Justice Coke invalidated a statute of Parliament enabling the London College of Physicians to levy fines against anyone who violated their rules, finding that their statutory powers violated "common right or reason" because "no person should be a judge in his own case." I agree.

14.     *This court has made this case its own*. No court may do that. Men have understood this not just for two hundred years, but for two thousand, from when Roman praetor Ulpian wrote,

4062160.1

Iudex tunc litem suam facere intellegitur, *cum dolo malo* in *fraudem* legis *sentientiam* dixerit dolo malo autem videtur hoc facere, si evidens arguatur eius vel inimicitia vel etiam sordes.

A judge makes the case his own when with wrongful intent, whether the bias be due to friendship, hatred, or corruption, he gives a fraudulent judgment.

15.     Times change. Technology changes. The evils that men do, do not. I well believe this court has departed from its duty to judge impartially and issued *fraudes sentientiae* – that is, judgments tainted or cheated of honest and impartial deliberation, *cum dolo malo.*

16.     This court must deem itself disqualified, because it is a witness to what it purportedly sealed and what its order stated, but will not reveal that order to me. Or this court will have to recuse itself, when I move on July 19th to unseal this case and all o fhte unconstitutionally sealed cases in this courthouse. This unconstitutional sealing process in this case, from its inception, is and has been not just a stain on the constitution and the judiciary, but invalid *ab initio*, and thus each and every item in the secret docket must be not only re-docketed in public, but released to the world immediately and in its entirety, with all deliberate speed.

17.     My application will be far broader than just seeking the unsealing of this one case. Under Second Circuit precedent, I may demand – and I will demand – the unsealing of every secretly sealed docket in this court house. Based upon representations by this court, I believe the court has admitted that this courthouse maintains a dual docket of "super sealed" cases, surreptitiously dispensing hidden process to favored defendants,

6

4062160.1

and so on July 19th I will move for the immediate release to the world of the nature and description of each and every such case, and the immediate reconstruction of public docket sheets in each and every such case, and their release as well.

18.     There is no possibility that this court can, let alone appear to, impartially sit in judgment of itself and its years of constitutional transgressions, and so it will have to recuse itself immediately.

19.     Moreover, by refusing to share its extra-judicial, non-evidentiary knowledge of what, if any, documents were ever sealed and not just unlawfully vaulted away out of sight, and in accordance with what orders or decrees, if any, and upon what constitutionally required hearings and findings, if any, and what corresponding decretory language exists, if any, all of which are matters of materially disputed fact, this court has disqualified itself.

20.     Finally, I would ask of this court one question: *You have done enough. Have you no sense of decency sir, at long last? Have you left no sense of decency?* For the only threat to our Union is that a judicial system that would self-justify and rationalize how it could ever dare operate in secret.

## Summary

21.     The movant's motion, brought by TRO did not seek, as requested relief, a **permanent** injunction against dissemination of the information contained in the documents at issue. It sought a **temporary** restraining order against the dissemination of purportedly sealed and confidential materials. The **permanent** relief sought was an order

7

directing the respondents to testify as to whom they got the documents from and who they gave them to. The TRO was itself an illegal prior restraint, in violation of the First Amendment. Nonetheless, I have testified as to how I got the documents, and to whom I gave them. So this entire star-chamber proceeding should now be ended. Case over.

22.     But somehow, this matter has been converted into a motion to restrain my free speech rights, via a request for a return of the purportedly sealed documents that were given to me, and a permanent injunction against my using any information that I obtained from them. Since it appears that the court wishes to go down this road, I will respond zealously, as it is my absolute right to do. My zeal will include, as noted above, a motion to unseal.

### The Documents

23.     The evidence has shown that in March 2010, I received unsolicited from Joshua Bernstein, then a client, five documents[1]: (i) a proffer; (ii) a cooperation agreement; (iii) a presentencing investigation report (PSR); (iv) a criminal complaint; and (v) a draft information (collectively, the "Documents"). I was given (i), (ii), and (iii) in both printed and electronic form, and (iv) and (v) in electronic form only.

24.     The documents are judicial documents related to or part of the federal charge, adjudication, and disposition of criminal racketeering charges brought against the

---

[1] In the form I received them from Bernstein, the cooperation agreement had appended to it a Department of Justice financial statement. So from my perspective there are five documents at issue, whereas from the movant's perspective there are six, since the movant considers the financial statement to be a separate document.

8

movant in 1998, the adjudication occurring before this same court and with this same case number, 98-CR-1101.

## The Return of the Documents

25.    Insofar as the "return" of those documents means the return of the original, printed versions that I was given, I have no objection to delivering them to the court to do with as the court sees fit. However, insofar as the "return" of those documents means the destruction of all copies thereof, physical or electronic, in my possession, I object on the grounds that such a "return" is a *de facto* prior restraint, as discussed immediately next.

## The Injunction

26.    A permanent injunction would continue the patently unconstitutional prior restraint under which this court placed the respondents on May 18, 2010. I object.

## There is a Presumptive Right of Access to Most Criminal Documents

27.    In this and the immediately following section, "Right of Access" refers only to the right of a person to obtain access from the court itself (or as the case may be, the executive branch).

28.    Respondents, and everyone else, enjoy presumptive First Amendment and common-law rights of access to court procedures and documents. The authority for this includes decisions of the United States Supreme Court and the Second Circuit Court of Appeals. It is well understood that the reason for these presumptive rights are the protection of society's interest in having its citizens able to see or learn for themselves

4062160.1

what goes on in their courts and engage in the marketplace of ideas by discussion of what they have seen or learned (and in the case of criminal proceedings to protect the defendant's rights to an open trial so he may feel safe that the court or prosecutors will not trample on his constitutional rights in secret).

29.     Yes, these presumptive rights of access are qualified, but that only means that they are not absolute and at times when a person seeks access to a court process or documents the court may engage in a balancing test, weighing these rights of access and society's interest in protecting them against the countervailing interest asserted by the person objecting to that access.

30.     In particular, when the court proceedings or documents in question are criminal in nature, the right of access is founded both in the First Amendment (and Sixth) and common law, and is of paramount societal importance, such that only a showing of a compelling interest can justify restricting it, and then only to the degree necessary.[2] Within this category of criminal proceedings or documents, the presumptive First Amendment and common-law rights of access are ranked according to the proceeding or document to which access is requested.

_____

[2] By contrast, in civil proceedings, in the case of garden-variety commercial documents exchanged during discovery, there is a common-law right of access, but it is less protected and thus more readily overcome by a showing of need to keep the documents from public view.

4062160.1

31.     In this circuit, the most open documents in criminal proceedings (that is, the documents to which the presumption of access is most protected and most strong) are docket sheets, for the obvious reason that without access to those docket sheets no one could know what other documents he might want to access. **This circuit has found an almost overwhelming First Amendment right of access to criminal dockets** (and, though not relevant to this case, has found the same right of access to civil dockets as well).

32.     Almost, if not as, subject to this presumptive right of access are those documents known as "judicial documents," which in this circuit means those documents which played a role in the adjudicative decision itself.

**There is no Presumptive Right of Access to Presentence Investigation Reports**

33.     Pursuant ot F.R.Crim.P 6, there is no presumptive right of access to grand jury minutes, while maintained under secrecy; however, even this secrecy is not absolute, and upon sufficient showing of need the public may be allowed access.

**34.**     Presentence investigation reports have also been historically not open from ready access, but the source of that protection is not statutory, as is the case with grand jury minutes, but by judicial common law, and again their secrecy is not absolute. Although not definitive or clear in its application, this court has said in dictum that it considers such reports to be similar in this sense to grand jury minutes.

11

4062160.1

### There Is a Presumptive Right of Access[3] to Most Criminal Judicial Records

35.     Respondents, like everyone else, enjoy presumptive First Amendment and common law rights of access to court procedures and documents. The authority for this includes decisions of the United States Supreme Court[4] and the Second Circuit Court of Appeals.[5]

36.     It is well understood that the *raison d'etre* of these presumptive rights is the protection of society's interest in having its citizens able to see or learn for themselves what goes on in their courts and to be able engage in the marketplace of ideas by discussion of what they have seen or learned [6] (and in the case of criminal proceedings also to protect the defendant's rights to an open trial so he may be safe that the court or prosecutors will not trample on his rights in secrecy).

---

[3] In this and the immediately following section concerning PSRs, "Right of Access" refers only to the right of a person to obtain access from the court itself (or as the case may be, the executive branch) when either is in possession "in the normal course", and not to any other right of access from any person other than the court or executive branch.

[4] *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980); *Press-Enterprise Co. v. Superior Court of California* 464 U.S. 501 (1984); *Press-Enterprise Co. v. Superior Court of California*, 478 U.S. 1 (1986).

[5] *Hartford Courant v. Pellegrino*, 380 F.3d83 (2004); *United States v. Amodeo*, 44 F.3d 141 (2d Cir. 1995).

[6] *Huminski v. Corsones*, 396 F.3d 53 (2d Cir. 2004).

4062160.1

37.     The right of access of an individual citizen, and his right to engage in that marketplace of ideas, is as strong, and as strongly protected, as is the right of access of the largest media outlet.[7]

38.     Yes, these presumptive rights of access are qualified, but that only means that they are not absolute and at times when a person seeks access to a court process or documents, the court may engage in a balancing test, weighing these rights of access and society's interest in protecting them against the countervailing interest asserted by the person objecting to that access.[8]

39.     In particular, when the court proceedings or documents in question are criminal in nature, the right of access is founded both in the First Amendment (and Sixth) and common law, and is of paramount societal importance, such that only a showing of a compelling interest can justify restricting it, and then only to the degree necessary.[9] (By contrast, in civil proceedings, in the case of garden variety commercial documents exchanged during discovery, there is a common law right of access, but it is less protected and thus more readily overcome by a showing of need to keep the documents from public view).

---

[7] *Id*. ("Rights accorded by the First Amendment provide quintessential protection for the individual.")

[8] *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980); *Press-Enterprise Co. v. Superior Court of California* 464 U.S. 501 (1984); *Press-Enterprise Co. v. Superior Court of California*, 478 U.S. 1 (1986).

[9] *Id.*

4062160.1

40.     Within this category of criminal proceedings or documents, the presumptive First Amendment and common law rights of access are ranked according to the proceeding or document to which access is requested.

41.     In this circuit, the most open documents in criminal proceedings (that is, the documents to which the presumption of access is most protected and most strong) are docket sheets, for the obvious reason that without access to those docket sheets no one could know what other documents he might want to access. This circuit has found an almost overwhelming First Amendment right of access to criminal dockets (and, though not relevant to this case, has found the same right of access to civil dockets as well), which may be restricted only upon a due process finding of compelling interest. [10] Almost, if not equally, open to access are those documents generally referred to for this purpose as "judicial records," which in this circuit means those documents which played a role in the adjudicative decision itself.[11]

### The Proffer, Cooperation, Complaint, and Information Are Criminal Judicial Records; They and the Information in Them Are Matters of Public Concern

42.     Within this category of criminal proceedings or documents, the presumptive First Amendment and common law rights of access are ranked according to the proceeding or document to which access is requested.

---

[10] *Hartford Courant v. Pellegrino*, 380 F.3d83 (2004).

[11] *United States v. Amodeo*, 44 F.3d 141 (2nd Cir. 1995). Respondents cite this case solely for the definition of judicial records, and not for any relevance to the issue(s) of prior restraint.

**--      Per Se**

43.      Given the abundant decisional law establishing the existence of First Amendment and common-law rights of access to these documents because of the fundamental, bedrock policy of allowing citizens to disseminate them throughout the marketplace of ideas, it is axiomatic that they are matters of public concern per se, given that their public concern is what creates these rights of access in the first place.

**--      In the Specific Facts of This Case**

44.      The record reflects that the movant is a violent recidivist felon with prior convictions for assault with a deadly weapon and for violation of federal racketeering law. On that basis alone the facts of his criminal racketeering adjudication in this court are matters of public concern. This isn't a parking ticket.

45.      Apparently, in spite of the massive racketeering scheme for which he was convicted in this court, the movant received no prison term and no order of restitution, even though he and his co-criminals, including Mafia and Mafiya mobsters, stole over $40,000,000. On that basis, these documents are matters of public concern, as sentencing dispositions always are.

46.      Even while awaiting sentencing, the movant began racketeering crimes at Bayrock, some of which relate back horizontally to the sentencing process itself. Specifically, movant began skimming almost $1,000,000 a year, year after year,

15

unreported, from Bayrock in 2003. On that basis, these documents are matters of public concern.

47.    ██████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
███████████

48.    Finally, in hearings before this court on June 21, 2010, in an episode not likely to wind up in her career highlights tape, counsel for the movant allowed him to take the stand. One can imagine how excited she, and movant, must have been to imagine how he would make a big splash. One can also imagine how he felt when he jumped off the high board only to realize moments later that the respondents had drained the water out of the pool. For movant perjured himself when he testified that he was a member

16

4062160.1

(owner) of Bayrock, and then backtracked and said he was not  – ███████████

████████████████████. He not only committed another predicate crime,

which the respondents will supplement to their SDNY RICO complaint, but did so within

10 years of the first such lie, and thus is now subject to racketeering liability for operating

an enterprise (courtroom 8B, EDNY) through a pattern of racketeering (perjury and

obstruction of justice). On that basis, these documents are matters of public concern.


**--      There Is a Non-Presumptive Right of Access to Presentence
        Investigation Reports**

49.      Pursuant to Fed. R. Crim. P. 6, there is no presumptive right of access to

grand jury minutes, while maintained under secrecy; however, even this secrecy is not

absolute, and upon sufficient showing of need the public may be allowed access, as

*Charmer* states. Presentence investigation reports have also been historically not open to

ready access, though the source of that protection is not statutory, with grand jury

minutes, but rather is decisional law, and again their secrecy is not absolute, and upon

sufficient showing of need the public may be allowed access, as *Charmer* states.

Although not definitive or clear in its application, this court has said in dictum that it

considers such reports to be similar in this sense to grand jury minutes.

50.      However, the fact that grand jury minutes and PSRs are not readily

accessible does not make them not matters of public concern. In this case, the PSR is a

matter of public concern for the reasons cited above; viz. it is the evidence that the

4062160.1

movant lied to the Probation Officer, a predicate racketeering crime, and that the Probation Officer failed to detect it, both of which are matters of public concern.

51.     *Charmer* never addressed First Amendment issues of free speech or prior restraint. There is however federal authority on that point, and therefore the respondents end this argument by citing appellate authority that, read with *New York Times* and *Bartnicki*, allows them to disseminate not only the four judicial records, but the PSR as well.

52.     In *United States v. Smith*, 123 F.3d 140 (3rd Cir. 1997), the court was faced with the question whether it could impose a prior restraint on a newspaper which had lawfully come into possession of a sentencing memorandum which contained grand jury material (it had been leaked by the executive branch). The court sealed the sentencing memorandum after the leak had been detected, on the ground that F.R.Crim.P 6(e) material was implicated, and ordered briefing on the extent to which the sentencing memorandum was sourced in secret grand jury material. The court held that the newspapers, which already had the sentencing memorandum and wanted access to those briefs and an associated hearing, shad no First Amendment right of access to those briefs or the associated hearing, but then observed as to the sentencing memorandum they already possessed, which contained much of the same material as would the briefs and the hearing:

> The order entered by the district court in this case cannot effectively bar
> further dissemination of any potential grand jury secrets by members of

18

the public who possess the sentencing memorandum. Nor could the court enter an order barring parties in possession of the sentencing memorandum from passing the memorandum onto other parties. Under prior restraint law, orders prohibiting the media from publishing information already in its possession are strongly disfavored. Although the district court could not prevent the newspapers from publishing the sentencing memorandum once they came into possession of it, the court properly prevented further government disclosures of theputative grand jury secrets contained in the sentencing memorandum to additional parties. Even if the dissemination by members of the public continues, the order barring further disclosure of any secret grand jury material will at least narrow that dissemination.

53.     The court so held even though it noted that the sentencing memorandum disclosed, and would disclose, certain sensitive information that Rule 32 required probation officers to exclude from PSRs and disclosed, or would disclose PSR material in violation of Rule 32(b)(6).

54.     This is a resounding trifecta of First Amendment freedom: The court held that newspapers and members of the public already in possession of a sentencing memorandum containing not only secret grand jury material but also PSR material and even material too sensitive for a PSR could not be enjoined from disseminating it at will because they enjoyed a First Amendment right to do so and could not be made to suffer prior restraint.

55.     Neither may respondents be enjoined, from disseminating the PSR or any

19

4062160.1

of the other Documents. This is still the United States of America, not Soviet Russia.[12]

Dated:       Suffolk County, New York
             July 16, 2010

_____

                                          Frederick M. Oberlander

_____

[12] This court should note that in *United States v. Watkins*, <u>623 F.Supp.2d 514</u>, SDNY, the court ruled that where a plaintiff in a civil case attempted to take a position in that case about his financial condition ten years earlier which was materially different from what he had told the Probation Officer and court at the time during his federal sentencing for a drug crime, as evidenced by the PSR, the revelation of that fraud was sufficient need under *Charmer* to justify unsealing the PSR sections that related to his financial condition and other records as well. Clearly, in this case movant is in worse position if he attempts to argue that his PSR should be protected (and this is beside the issue of prior restraint), because even if Respondents didn't already have the PSR *Watkins* would entitled them to get it on motion. Obviously, *Watkins* also confirms that the PSR in this case is a matter of public concern *for New York Times* and *Bartnicki* purposes.

4062160.1