UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

In the Matter of                                              Docket No.: 16–mc–2636

RICHARD E. LERNER, an attorney                                **Declaration of Respondent**
admitted to practice before this Court,                       **Richard E. Lerner**


                    Respondent.
--------------------------------------------------------------X

I, Richard E. Lerner, hereby certify the following to be true upon information and belief

and under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1.      I am the respondent in the above matter. I submit this declaration with exhibits,[1]

together with the accompanying Memorandum of Law, in opposition to the Order to Show Cause

with Statement of Charges issued by the Hon. Ann M. Donnelly, on behalf of the Committee on

Grievances for the United States District Court, Eastern District of New York, dated November

18, 2016. The matters herein are stated upon my own knowledge, except as to matters stated

upon information and/or belief, and as to those matters I believe them to be true.[2]

2.      I respectfully deny the conclusory allegations set forth in the Statement of

Charges that I, together with Frederick Oberlander, engaged in "a pattern and practice of conduct

that violated the Rules of Professional Conduct." Rather, I acted at all times in the good-faith

---

[1] Given the large number of exhibits to this submission, the exhibits to this declaration are identified by date, and uploaded in chronological order, using the year/month/date sequencing. Thus, *e.g.*, the letter of June 11, 2010 is uploaded as "*2010.06.11, Letter, Lerner to Glasser.*" In this manner, the grievance committee will be easily able to locate any document it wishes to refer to, while keeping the exhibits in logical sequence, and eliminating possible misidentification of documents by exhibit numbers. Docket sheets are dated according to the first docketed date; thus, Sater's docket sheet is identified as "*1998.12.03 Docket U.S. v. Sater 98-cr-1101.*"

[2] I hereby join with Frederick M. Oberlander, as to all arguments made by him in opposition to the charges against him. I also understand that Mr. Oberlander shall submit my declaration in opposition to the charges leveled against him.

belief that there was no valid sealing order, legally enforceable as a prior-restraint gag order during the time of any alleged violation, that enjoined Mr. Oberlander or me from disseminating certain documents and information about the criminal conduct of Felix Sater, an adverse party in civil litigation brought by Mr. Oberlander in behalf of his clients Jody Kriss and Chu'Di Ejekem, and respond to the specific accusations as set forth below.

### Educational Background and Work History

3.      After having completed my undergraduate degree at the State University of New York at Albany, where I studied Western philosophy, English Literature, and Chinese language, and after having studied at Fudan University in Shanghai, and the Taibei Language Institute in Taiwan, I commenced my legal education in 1986 at St. Johns University School of Law, and graduated in 1989. I was admitted to practice before the courts of the State of New York and Connecticut in December 1989, and have remained in good standing since then. Prior to Mr. Sater's charges against me, there have never been any grievance charges made against me by anyone.[3] I have been AV-rated by Martindale Hubbell for many years.

4.      In 1988, I was employed as a summer associate at the law firm of Wilson Elser Moskowitz Edelman & Dicker, where – having been recognized as a strong writer and researcher – I was asked to work on a case involving a charge of contempt by a federal judge. I continued to work on the case during my last year of law school, researching and assisting in the drafting of memoranda, motions and briefs to the Second Circuit and then the U.S. Supreme Court,

---

[3] About ten years ago, an attorney (Ms. Denise Luparello) accused me of having fabricated a document that withdrew certain of her client's claims, which document I had submitted in opposition or reply to a certain motion. A hearing was conducted in Bronx Supreme Court at which that attorney's predecessor counsel (Mr. Victor Serby) testified that he had in fact prepared and served the document that she had accused me of fabricating. Apparently, Ms. Luparello had not seen it in the file when Mr. Serby transferred it to her, and had not investigated the facts before making the charge against me.

including successful motions to stay the contempt penalties, and then a successful petition for certiorari. During my last year of law school and during my first year as an associate at Wilson Elser, I continued my research and drafting of briefs to the U.S. Supreme Court, and was the principal draftsman of the winning brief that was submitted to the U.S. Supreme Court. In its decision overturning the Second Circuit, the U.S. Supreme Court held that the district court had abused its power in holding our client in contempt. See *Spallone v. United States*, 93 U.S. 265 (1990).

5.       I have mainly been an appellate lawyer since then. At Wilson Elser, which I left in 2012, I was the co-chair of the firm's national appellate practice team, and have about 600 reported decisions to my name, many of which are considered leading cases.

6.       I am admitted to practice before the courts of the State of New York and the State of Connecticut, as well as the U.S. Supreme Court, the U.S. Court of Appeals for the Second Circuit, the U.S. Court of Appeals for the District of Columbia, the U.S. District Court for the Southern, Eastern and Western Districts of New York.

7.       In about 2005, I was appointed by the Appellate Division, First Department, to the Character and Fitness Committee, and have served since then, and am responsible for interviewing candidates for the bar to determine whether they may practice law in the State of New York.

8.       I have published about a dozen articles on legal issues in The New York Law Journal and other publications, and wrote a chapter of a book published by the American Bar Association. (See *2017.08.25, curriculum vitae*).

3

**Grievance Allegation #1**

"The respondent threatened and assisted Oberlander in threatening the public dissemination of the Sealed Materials unless the defendants agreed to a monetary settlement, despite knowledge that public dissemination of the Sealed Materials would violate multiple court orders. *See, e.g.,* October 18, 2010 Letter from Oberlander to Brian Herman ("Herman") (Exhibit F to July 23, 2014 Disciplinary Complaint); November 9, 2010 Letter from Oberlander to Herman (Exhibit G)."

**Response to Grievance Allegations #1**

9.     I have no recollection of having participated in the drafting of the October 18, 2010 and the November 9, 2010 letters to Mr. Herman, though I recall having read them before they were sent to him, and believed then, and certainly believe now, that there was a good-faith basis (subjectively and objectively) for the positions taken therein. (See *2010.10.18 Letter, Oberlander to Herman*, and *2010.11.09 Letter, Oberlander to Herman*).[4]

10.     At the time that the letters at issue were sent by Mr. Oberlander, he and I had a good-faith belief – subjectively and objectively – that the allegedly "Sealed Materials" were not sealed pursuant to a valid or enforceable court order, and that a sealing order does not constitute a prior restraint gag order. Thus, Grievance Allegation #1 is without premise. The bases for these beliefs are that:

11.     On June 11, 2010, I transmitted a letter to Judge Glasser requesting that the court provide a copy of any sealing order that was binding on Mr. Oberlander. (See *2010.06.11 Letter, Lerner to Glasser*). At the hearing on June 14, 2010, and again on July 20, 2010, Judge Glasser

---

[4] At the time the letters were sent, I was only counsel of record to Mr. Oberlander with respect to the proceedings before Judge Glasser; however, I recall reviewing the letters as a professional courtesy, since the letters contemplated a settlement with Sater that would end the proceedings in which I had been hired.

4

acknowledged that no such order exists. (See *2010.06.14 Glasser Transcript*, and *2010.07.20 Glasser Transcript*).[5]

12.     The docket sheet of 98-cr-1101 (see *1998.12.03, Sater 98-cr-1101 Docket*) shows that no "sealing order" was ever signed and docketed. Thus, at the time it is alleged that Mr. Oberlander and I violated a "sealing order," by threatening to disseminate "sealed materials," I had both a subjective and objective good-faith basis to believe that – since no sealing order was ever issued – there were no "sealed materials." [6]

13.     Moreover, even assuming an *oral* sealing order existed and that it is nonetheless deemed to have been a written, signed, and docketed sealing order, legal research conducted, both at the time and known to me generally, established my good-faith basis to believe that it

---

[5] See p.5 of June 14, 2010 transcript: "[T]here is no formal [sealing] order…." See p.17 of July 20, 2010 transcript. "There is not any indication in that document [*i.e.*, the criminal information] or in a subsequent document that an application was made or request was made in that document to seal the case…. [¶] Let us assume for the moment that an order was signed by me somewhere along the line, as it may have been, directing that the file in the case be sealed. That order is directed to whom? That order, it would appear, is directed to the clerk of the court who is informed that this document or this file is sealed and is not to be made available, except upon an order of the Court unsealing it."

[6] In July 2010, a federal judge ordered a document sealed, and after learning that a non-party had obtained it, the judge issued an order barring the non-party from disseminating it. *The non-party's attorney argued that his client was not bound by a sealing order in a case where he was not a party*. The judge *agreed* but said it didn't matter, because the court had ordered it sealed, and the court's interest in protecting the "integrity" of sealing justified enjoining the non-party, trumping any First Amendment right to disseminate it. The case was *POM Wonderful v. ALM Media*, from No. 2010 C.A. 005533 (D.C. Civil Division). Judge Judith Bartnoff, vacated her TRO within hours of receipt of an amicus filing in the D.C. Court of Appeals. The lawyer argued that a sealing order can't bind a non-party, the same arguments as I made, in behalf of Mr. Oberlander, to Judge Glasser and to the Second Circuit, that sealing orders only bind court personnel, and cannot bind a non-party, and cannot operate as a prior-restraint gag order.

Subsequently, in the *POM Wonderful* case, Judge Bartnoff ordered a sanctions hearing against POM Wonderful and its counsel, because (as it turned out) they had sought and obtained a sealing order from the judge even though the information had already been in the public domain. Here, the grievance committee should bear this in mind, because, as is demonstrated below, the information that the government, Mr. Sater's counsel, and the judges sought to seal and otherwise enjoin Mr. Oberlander and me from speaking of was public.

could not have been a valid, enforceable order, because it was not supported by record findings capable of appellate review. See, *e.g.*, *U.S. v. Alcantara*, 396 F.3d 189, 192 (2d Cir. 1989).[7]

14.    Also if, albeit oral, the "sealing order" is nonetheless deemed to have been an *injunctive* order, I had a good-faith basis to believe that it was of no force and effect *qua* injunctive order, because it would violate the form and content required by Rule 65, which provides, in pertinent part, that "an injunction shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." An injunctive order is "properly met by a written order, a document lacking here." *Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 104-06 (2d Cir. 2009).[8]

15.    The mere fact that Pacer or the court clerk might say that a case is sealed, generally, without there being a specific order indicating what documents fall within the ambit of

---

[7] See also *Ashcraft v. Conoco, Inc*., 218 F. 3d 288, 302-303 (4th Circuit 2000): "Since the mandatory procedures established by this court … for sealing court documents were not followed by the district court before it issued its … sealing order, **that order does not constitute a 'valid decree'**." (Emphasis added).

[8] As Judge Easterbrook, of the Seventh Circuit, stated in the *Bates v. Johnson*, 901 F.2d 1424, 1427-1428 (7th Cir., 1990), decision, which was cited approvingly for this proposition by the Second Circuit in *Garcia*, at p.104: (emphasis added)

> A judge who proclaims "I enjoin you" and does not follow up with an injunction has done nothing. Injunctions are not like Islamic divorces, accomplished by intoning a formula thrice in public. Fed.R.Civ.P. 65(d) provides that "[e]very order granting an injunction ... shall set forth the reasons for its issuance; shall be specific in terms; [and] shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained". No such "order" has been issued.

> When a judge does not record an injunction or declaratory judgment on a separate document, the defendant is under no judicial compulsion. As we said in Bethune, 863 F.2d at 527, an opinion or statement in court "is not itself an order to act or desist; it is a statement of reasons supporting the judgment. The command comes in the separate document entered under Fed.R.Civ.P. 58, which alone is enforceable. There must be a separate document, with a self-contained statement of what the court directs to be done. So if the opinion contains language awarding declaratory relief [or an injunction], but the judgment does not, the opinion has been reduced to dictum; only the judgment need be obeyed." At the moment, Illinois is under no decree. *It need not dance to the judge's tune.* Until the judge enters an injunction, Illinois may carry out its plans. Because the state is not under an enforceable constraint, there is nothing before us on appeal.

the seal does not provide sufficient notice of what actions are prohibited in connection therewith, so as to constitute a valid injunction, even if it could be said that an injunction "runs with" the seal, particularly since Judge Glasser acknowledged that fewer than half of the documents on the 98-cr-1101 docket were even "sealed." (See *2010.06.21 Glasser Transcript*).[9] "The normal standard of specificity is that the party enjoined must be able to ascertain from the four corners of the order precisely what acts are forbidden." *Sanders v. Air Line Pilots Ass'n, Int'l*, <u>473 F.2d 244, 247</u> (2d Cir.1972).[10]

16.     This is to say, inasmuch as there was no written, signed, and docketed sealing order, containing injunctive language ***within its four corners*** stating the specific acts sought to be enjoined, in the Fall of 2010, when the two letters that are the subject of this grievance allegation were issued, I had both a subjective and objective basis to believe that there could be no "fair" "enforcement" of the alleged, but ultimately non-existent, sealing order.

---

[9] At the hearing on June 21, 2010, at page 6, Judge Glasser acknowledged that more than half of the documents on the 98-cr-1101 docket were never sealed: "I looked down the docket sheet and I saw about six docket entries which said these documents have been docketed under seal. They were docket numbers five through eight, eleven, thirteen, sixteen and seventeen. Filed under seal." Thus, even if there had been an actual order sealing the docket in its entirety, made (as required by law) only after there had been a filing of a formal motion with notice to the public (as is also required by law), it was mathematically more probable than not that any particular document was not "sealed," inasmuch as Judge Glasser acknowledged that only "six" (actually eight, by his count) of seventeen documents placed on the docket were sealed. In light of the fact that a gag order cannot be issued without adversarial due process, with record findings made that are capable of appellate review, and in light of Rule 65's "four corners" requirement, it cannot be said that there was *any* gag order, because one could not look within the four corners of any "sealing order," and ascertain what documents could be freely disseminated, and what documents couldn't.

[10] For example, as the 98-cr-1101 docket was invisible to the public (and Mr. Oblerlander was a member of the public, after all), they could not have known whether they could freely disseminate and discuss documents 1, 2, 3, 4, 9, 10, 12, 14, & 15, because they could not look within the four corners of an unwritten order and determine that they were specifically enjoined from disseminating and discussing one or another of the documents.

17.     Thus, Mr. Oberlander and I, as his counsel, had a good-faith belief, both subjectively and objectively, that no oral order that might have been issued in 1998, or even a written order, could have been binding upon him, and me, in 2010 when documents allegedly from that 1998 case came into his possession.

18.     And the U.S. Supreme Court agrees. See *Chase National Bank v. City of Norwalk*, 291 U.S. 431 (1934) (citing *Alemite Manufacturing v. Staff*, 42 F.2d 832 (2d Cir. 1930)). Mr. Oberlander, and I, as his counsel, were not parties to the case of *U.S. v. Sater*, 98-cr-1101 when the alleged "oral" sealing order was issued. Rather, the parties to the action were the government and Felix Sater. Thus, based upon applicable case law, known to me the time (*i.e.*, U.S. Supreme Court and Second Circuit precedent), I had both a subjective and objective good-faith basis to believe that a court order can only bind parties and their privies. Obviously, neither Mr. Oberlander nor I were privies of the government or Mr. Sater. So quite obviously, neither of us could possibly have been bound by any "order" that Judge Glasser might have issued sealing the case, as Judge Glasser himself acknowledged at page 5 of the June 14, 2010 transcript.

19.     As such, the decretal language of the "sealing order," whatever it said, could not have expressly bound Mr. Oberlander (or me, as his counsel) because: (i) there was no sealing order; (ii) there is no decretal language in the order, for the simple reason that the order does not exist; (iii) because there is no decretal language, it cannot be said that the order was clear and unambiguous; (iv) even if it had decretal language, it could not have bound Mr. Oberlander, or any other non-party who was not in privity with the government or defendant Sater in the 98-cr-1101 action.

20.     In conclusion, it was subjectively and objectively reasonable to believe that one who comes into possession of documents outside of court process cannot be subject to a sealing order, much less prior-restraint gag order on their dissemination.

21.     In addition to all of the forgoing, in my mind at the time there was a rather obvious First Amendment impediment on the interpretation of a sealing order as a gag order, as the standard for the imposition of a prior restraint is virtually insurmountable, whereas the standard for lawfully obtaining a sealing order is relatively light.

22.     Indeed, according to a decision of the Supreme Court of Kentucky, a decision I was well aware of when I first appeared before Judge Glasser (and cited in papers submitted to him), "[a]n order sealing a record or part thereof should not be read as creating a prior restraint on publication of the contents of the sealed material, unless the order expressly says so." *Roman Catholic Diocese of Lexington v. Nobl*e, 92 S.W.3d 740, 741 (Ky. 2002).[11]

23.     Inasmuch as there is no U.S. Supreme Court or Second Circuit precedent to the contrary, I had a good-faith basis to believe that the positions taken by me were unassailably supported by existing law and that my position was legally tenable, that an alleged "sealing" order could not have served as a prior-restraint gag order on dissemination of documents allegedly placed under seal, especially as against a person who was not even a party to the proceeding when the document was allegedly placed under seal.

***24.     In addition to the foregoing, I had a good-faith basis to believe that several of the specific documents at issue were never ordered sealed, and that the other was already***

---

[11] See also *Matter of Braun v. City of New York*, Sup. Ct. NY County, Index No. 1504796/14, October 3, 2014 (2014 NY Slip Op 33816(U)) ([S]ealing does not amount to a 'gag order' issued by the federal court....").

*within the public domain, and thus, if it had ever been sealed, was no longer a "sealed"*

*document, inasmuch as it had been released to the public.*

25.     Although I was aware that pre-sentence reports are generally considered "confidential," in the layman's sense of that word,  I had a good-faith basis to believe that a pre-sentence report is not a "sealed" document because it is not a "court document." See *In re Siler*, 571 F.3d 604, 610 (6th Cir. 2009) (presentence reports are not court documents: they are documents prepared by and maintained by the U.S. Probation Office, and they are released to courts for the limited purpose of sentencing).[12] That is, they are not docketed, and therefore they are not subject to any sealing regime with respect to such document. The same is true of cooperation agreements, which are contracts between prosecutors and criminal defendants, and are not the type of document that would ordinarily be subject to a sealing order, as they are not ordinarily docketed with the court.[13]

26.     Similarly, I had a good-faith basis to believe that the "draft" criminal information that came into the possession of Mr. Oberlander was not a court document, and thus was not docketed, and thus was not sealed. Indeed, because it was labeled "DRAFT," it was subjectively

---

[12] At the February 14, 2011 oral argument before the Second Circuit, Judge Pooler agreed that a PSR is not a "sealed" document. As Judge Pooler stated, "The PSR's have their own sealing regimen that does not relate to any order of the court." [sic] (See *2011.02.14 Second Circuit oral argument*, p.30). Thus, Mr. Oberlander's use of the PSR in the drafting of the complaint in the Kriss v. Bayrock action, SDNY Docket 10-cv-3959, could not have been in violation of any "sealing order." Thus, any charge that is based upon the notion that there was a violation of a court order that sealed the PSR is manifestly without legal basis.

[13] The objective reasonableness of my understanding was subsequently confirmed by Judge Glasser himself, in his order of March 14, 2013, wherein he acknowledged (at p.5) that "[t]he cooperation agreement itself is not a judicial document." (See *2013.03.14 Glasser Order*). Ergo, it was not docketed, and thus was never ordered "sealed." That is, to the extent my belief that the non-sealed status of the cooperation agreement was merely a matter of subjective good faith, my subjective good faith was subsequently objectively confirmed by Judge Glasser himself, when he acknowledged that it was never even submitted into court.

reasonable to believe that the criminal information was never docketed, and thus was not subject to any unwritten, unsigned, undocketed sealing order. (See *1998.12.09 "Draft" Criminal Information*).[14]

27.     I also had an objective good-faith basis to believe that the criminal complaint was "public" as it had been leaked to the press by either the E.D.N.Y. U.S. Attorney's Office or the FBI to Business Week (now Bloomberg), based upon an article that I had read. See "The Case of the Gym Bag that Squealed: An Accidental Find in New York Tips the Feds to a Stock Scam," Gary Weiss, November 9, 1998.[15] (See also *1998.09.15 Criminal Complaint* against Sater, and please note that the allegations therein correspond to the Business Week article, thereby showing that matters alleged in the criminal complaint were within the public domain, and were, *ipso facto*, not "sealed."

28.     ***I had a good-faith basis to believe that the October 18 and November 9, 2010 letters to Mr. Herman were ethical.***

29.     Pre-existing Second Circuit authority clearly showed that it is entirely ethical for an attorney to threaten adverse publicity and to file an action in order to "persuade" an adverse

---

[14] The date of the draft document is estimated. When Judge Glasser finally allowed the items on the 98-cr-1101 docket to be made public, the docket showed that a criminal information, obviously not labeled "DRAFT," had been docketed, thus establishing that my *subjective* good-faith belief that the "DRAFT" version was not a sealed document (because it was never docketed) was *objectively* reasonable.

[15] Available at https://www.bloomberg.com/news/articles/1998-11-08/the-case-of-the-gym-bag-that-squealed. "According to a **sealed criminal complaint** filed with the U.S. District Court in Brooklyn **and obtained by BUSINESS WEEK**, the FBI maintains that the mini-storage document trove sets forth a tale of stock manipulation and money laundering. Allegedly involved are more than 30 foreign shell companies and bank accounts that, the complaint maintains, were used to launder the proceeds from illegal stock sales during 1994 and 1995. [¶] MONEY LAUNDERING. The feds are charging that the stock scheme involves two individuals--Gennady "Gene" Klotsman and Felix Sater--who they say ran a now-defunct micro-cap brokerage, White Rock Partners & Co., which later changed its name to State Street Capital Markets."

party to settle. See *Sussman v. Bank of Israel*, <u>56 F.3d 450</u> (2d Cir. 1995). Moreover, it has been held that the First Amendment protection applicable to protected government petitioning activity recognized pursuant to the *Noerr-Pennington* doctrine,[16] applies to pre-action letters threatening the filing of suit, so long as there is some merit to the claim. As such, I had a good-faith basis to believe that the *Noerr-Pennington* doctrine applies to demand letters, as it would be the natural consequence of the First Amendment right to petition for redress of grievances. See cases cited in the accompanying Memorandum of Law.

30.    Moreover, while it might be said that on the dates of the transmission of the letters to Mr. Herman, there was only a subjective good-faith basis to believe that the RICO complaint against Mr. Sater was meritorious, the subsequent ruling of Judge Lorna G. Schofield, upholding the claims against Mr. Sater establishes the objective good-faith reasonableness of the action, and thus the motives for sending the demand letters predicated thereon cannot be questioned. In the December 2, 2016 decision of Judge Lorna G. Schofield of the Southern District of New York, in the matter of *Kriss v. Bayrock*, Docket No. 10-cv-3959 (see *2016.12.02 Schofield Order Denying Motion to Dismiss RICO Complaint*), the court held that the allegations against Mr. Sater that his hiding of his 1998 RICO conviction from lenders, investors and partners stated a valid RICO claim, as did the claim that he had hid his ownership of Bayrock.

31.    Additionally, Judge Schofield found that a viable RICO cause of action was stated against those who knew of Mr. Sater's secret 1998 conviction, and his secret ownership of Bayrock, and helped him defraud lenders, investors and partners. Hence, there was nothing unethical about the threat of filing a meritorious RICO complaint, or the threat that the

---

[16] *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, <u>365 U.S. 127, 135</u> (1961); *United Mine Workers v. Pennington*, <u>381 U.S. 657, 670</u> (1965).

complaint, once public, would be widely disseminated, and in any event the proposed complaint attached to the letter to Mr. Herman showed the proposed redactions of the allegedly "sealed" information. (See *2010.10.18 Proposed Redacted Complaint, attached to Oberlander to Herman Letter*).

32.     I had a good-faith basis to believe that the October 18 and November 9, 2010 letters were not merely "threats" as characterized in Grievance Allegation #1, but statements of easily foreseeable fact, that once the complaint was publicly filed, it would become widely circulated.

33.     That is, having carefully read the original May 10, 2010 complaint (see *2010.05.10 SDNY Complaint*) that was prepared by Mr. Oberlander, and having discussed it with colleagues at Wilson Elser who had themselves read it carefully, I came to the conclusion (as did the other attorneys) that it contained well-stated facts, supported by documentary evidence[17] and likely irrefutable allegations of racketeering by virtue of, *e.g.*, (a) Mr. Sater's hiding of his conviction from banks, investors, and insurers, (b) Mr. Sater's hiding of his ownership of Bayrock Group, LLC from banks, investors, insurers and the IRS, and that (c) the law firms, accounting firms, and others who helped him hide his conviction and his ownership themselves engaged in RICO fraud, all predicated upon mail and wire fraud and tax fraud. Because of the identities of the defendants – such as Mr. Sater himself, and several white-shoe law firms – and given that Bayrock Group LLC had been partnered with the Trump Organization, it was my subjective good-faith belief that once the complaint became public, it would be widely read by attorneys, academics, the news media and the public.

---

[17] The complaint had a sworn verification by plaintiff Jody Kriss, and the detailed allegations were self-corroborated by the emails and other documents embedded into the complaint itself.

13

34.     Subsequent events have borne out my initial subjective impression and proved it to have been *objectively* correct by the following:

a)  Judge Schofield's decision sustained the complaint against the Rule 12(b)(6) motion to dismiss (*see 2016.12.02 Schofield Order upholding RICO claims*).

b)  Until May 31, 2016, the RICO complaint filed by Mr. Oberlander was under seal. That is, it was under seal for six years.

c)  On that date, Judge Schofield heard argument made in behalf of the Associated Press and The Telegraph, who argued that the May 10, 2010 RICO complaint prepared by Mr. Oberlander should be unsealed, as it had been leaked by Mr. Sater himself, when he filed it publicly in an Israeli court proceeding.

d)  In the letters, Mr. Oberlander stated that once that complaint was made public, it would make national news. As predicted, it did "go viral," so to speak, and tens of thousands of newspapers, journals, magazines, reporters, academics and lay bloggers have linked to it, quoted and paraphrased it, and used it as the basis for many thousands of articles.

35.     Neither the October 18, nor November 9, 2010 letters at issue had attached to them, any of the documents which are alleged to have been the subject of a "sealing order." Rather, all that was transmitted with those letters was a copy of the proposed amended complaint in the *Kriss v. Sater* action, which had been redacted to eliminate disclosure of the contents of the documents at issue. (See *2010.10.18 Proposed redacted SDNY sent to Herman on 10.18.10*). The letter of October 18, which attached the proposed redacted complaint, stated:

14

Plaintiffs have observed this [standstill] agreement in good faith. The attached redacted "complaint" is for immediate dissemination, not service, upon all defendants to incent them into settlement discussions without the necessity for blowing this all up publicly. First, allegations which quote from or describe the contents of the PSR, complaint, proffer, information, or cooperation agreement will be blacked out in standard redaction typeface. For your review, they are shown now as strike-through gray highlighted font.

While I was redacting it for this purpose, I took the opportunity to add additional allegations which well relate the human trafficking of minors and the bribery of Kazakh government officials to the racketeering. As you will see, they allege Bayrock or Arif or both owned most or all of Rixos, which along with the Savarona was the situs of the forced sexual servitude of the underage girls, reportedly videotaped; that Arif was known as part of the racketeering to embezzle money from Bayrock, such money itself the proceeds of racketeering crimes, to send to Fettah in Turkey in support of this, and that at least one Kazakh official received substantial money from Bayrock in 2007 for an ostensible "energy project" which disappeared off the face of the earth. The redacted version alleges this all relates per Daidone, and alleges violations of the Foreign Corrupt Practices Act which are either themselves RICO predicates or at least violate Travel Act predicates (in addition, of course, human trafficking and sexual exploitation of minors are RICO predicates, as are using vessels at sea for human servitude). These additions are in magenta highlight.[18]

36.     Thus, there was obviously no threat to disseminate "sealed" documents, even if it was conceded that there *were* sealed documents, which is not conceded, because they were not sealed, as demonstrated above, and even if it were conceded, *arguendo*, that any injunction could have barred their dissemination, which, again, is not conceded.

37.     In any event, as explained in more detail below, at the time the letters were transmitted I had a good-faith basis to believe that the threatened disclosure was to occur only

---

[18] Parenthetically, this last paragraph refers to the arrest of Tevfik Arif and many other Russian oligarchs, and government officials on the MV Savarona, the yacht launched in 1931, and built for President Attaturk of Turkey. Arif leased the yacht for the occasion. The government officials and the oligarchs who were on the yacht at the time it was raided were hustled out of the country after their arrest. Only two low-ranking individuals were convicted. For example, one of the two who was convicted of procuring the girls for prostitution was a chauffeur of the car that brought them from the airport to the Rixos hotel which was owned by Tevfik Arif, who had leased the yacht for the occasion.

after the TRO that had been extended by Judge Glasser on July 20, 2010 was to have expired, **as TRO's last only 14 days**.

38.    Federal Rule of Civil Procedure 65(b) provides, in pertinent part, "The [TRO] order expires at the time after entry – not to exceed 14 days – that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension. The reasons for an extension must be entered in the record."

39.    On the transcript of the July 20, 2010 proceedings, Judge Glasser continued the TRO on the dissemination of Sater's draft criminal information, cooperation agreement, proffer and criminal complaint pending further briefing on the First Amendment issues presented **for only ten days**. (*See 2010.07.20 Glasser Transcript*, at pp. 26-27). Thereafter, Sater's counsel and Mr. Oberlander entered into a standstill agreement, which was so-ordered by Judge Glasser on August 12, 2010. (See *2010.08 Letter, Moore to Glasser, with Standstill, so-ordered*). Pursuant to the stipulated standstill order, the documents at issue (including the PSR, the draft criminal information, the cooperation agreement, the proffer, and the complaint) would be kept by Mr. Oberlander and Mr. Lerner, pending a further order from the court and during the appellate process – *i.e.*, would not be destroyed or otherwise surrendered. The standstill agreement was extended in September. (See *2010.09.27 Amendment to Standstill Agreement, So Ordered Standstill Agreement*).

40.    By letter dated November 16, 2010, Mr. Sater's counsel notified the court of the cancellation of the stipulated standstill order, and that he would brief the issues, which were still to be determined by Judge Glasser, by November 24, 2010 as to whether Mr. Oberlander could be ordered to return or destroy all copies of the documents in his possession. (See *2010.11.16, Letter Moore to Glasser Re Cancellation of Standstill*). **The letter did not request an extension**

16

of the TRO, and there is no docketed motion, much less order, extending the TRO that had been issued on July 20, 2010, and extended twice by stipulation.

41.     Inasmuch as no motion was made to extend the TRO, and as there was no order issued extending the TRO within two weeks after notice of its cancellation was given, and as there was no statement of reasons set forth by Judge Glasser for extending the TRO, as required by Rule 65, *the TRO had expired*, **and by agreement of the parties, by the time further briefing on the issue of the TRO was due on November 24, 2010.** Thus, from that date on Mr. Oberlander and his clients, and I as Mr. Oberlander's counsel, were free to do with the documents as we pleased, as Rule 65 makes clear.

42.     There was no threat in the letters to Mr. Herman that the original PSR that was given to Mr. Oberlander would be disseminated (Mr. Oberlander had already turned that original in to the court, when it was marked as an exhibit during his testimony on June 21, 2010).[19] Thus, the subject letters were sent to Mr. Herman with the knowledge that TRO's evaporate if not extended by court order, but that, in any event, as a showing of good faith, Mr. Oberlander sent a proposed redacted complaint which indicated Mr. Oberlander's agreement (in his clients' behalf) to redact certain information objected to by Mr. Sater from the complaint. In other words, Mr. Oberlander's letter was not a threat at all, but an overture of conciliation.

43.     In any event, from a legal standpoint – black-letter law, indeed – there was a subjective and objective good-faith basis to believe, based upon the clear language of Rule 65,

---

[19] Also, as there had been no order directing Mr. Oberlander to destroy his electronic copies of the PSR, he was free to do with electronic copies as he wished, though he did purge them from his computer when Judge Cogan later ordered him to do so. However, as discussed below, the U.S. Supreme Court, overruling the Second Circuit, issued an order on June 25, 2012 allowing Mr. Oberlander to disseminate certain information from the PSR as he wished.

that two weeks after the cancellation of the standstill agreement, the documents and information that had hitherto been subject of a TRO could be made public lawfully.

44.     As such, there was nothing unethical about either the October 18, or November 9, 2010 letters. To the extent that they were interpreted by the recipient as a threat to disseminate information at a future date (*i.e.*, once the TRO expired), there was no impropriety. Upon reading the letters, along with the proposed redacted complaint that was included with it, the Grievance Committee will, no doubt, see that the information at issue was to be redacted – to be conciliatory – so there was obviously no threat that "sealed" information would be made public (and, again, there was no lawfully "sealed" information, much less a sealing order that could have possibly bound non-party Oberlander or his counsel). And finally, the letters make clear that Mr. Oberlander would do everything he could LAWFULLY do to make the information public. There was no threat that anything unlawful would be done. Mr. Oberlander threatened that he would use lawful means to make Mr. Sater's hidden criminal history public, and he did just as he promised, lawfully.

### Grievance Allegation #2

The respondent violated Judge Glasser's July 20, 2010 Order by failing to destroy or return certain electronic and paper copies of the original Pre-Sentencing Report and other Sealed Materials. *See* Judge Glasser's July 20, 2010 Order (Exhibit A); Transcript of April 1, 2011 hearing before the Honorable Brian M. Cogan, at 11:7-15:5 (Exhibit I); May 13, 2011 Order of Judge Cogan (Exhibit J).

### Response to Grievance Allegations #2

45.     As an initial matter, I repeat and incorporate herein all of the facts set forth in response to Grievance Allegation # 1 above, and, in particular, the facts, references to documentary evidence and arguments showing that there was no specific, proper order sealing

the documents at issue, or any written, signed and docketed order or directive that directed that the documents be destroyed or returned.

46.     In addition to the information previously set forth herein in response to Grievance Allegation # 1, showing the ineffectiveness of any oral order by Judge Glasser as an injunction as to Mr. Oberlander or me, the actions of the parties and the court immediately following the July 20, 2010 hearing, clearly show that there was neither an understanding, nor intent by either Mr. Oberlander or me to violate any court order. In that regard, shortly after the July 20, 2010 hearing, negotiations began between me and representatives of Mr. Sater toward resolving the dispute between the parties.

47.     In that regard, negotiations were had toward entering into the stipulated standstill order, to preserve the status quo (*i.e.*, my, Mr. Oberlander's and his clients' right to retain copies of the documents at issue pending either an agreement between the parties, or a further order of the court). In that regard, see the August 12, 2010 transmittal letter by adverse counsel, Kelly A. Moore to Judge Glasser (see *2010.08.12 Letter, Moore to Glasser, with Standstill, so-ordered*) forwarding the stipulated standstill order to him to be so ordered, a copy of the "so ordered" stipulated standstill order signed by Judge Glasser on August 12, 2010, and an amendment to the stipulated standstill order, which was so ordered by the Judge Glasser on September 27, 2010. (*2010.09.27 Amendment to Standstill Agreement, So Ordered*).

48.     The stipulated standstill order clearly contemplated that both Mr. Oberlander and his client Jody Kriss were in possession of copies of certain documents at issue, and that they contended that the existent court orders and relief requested by movant were invalid. Moreover, the clear purpose of the stipulated standstill order was to preserve the status quo. In that regard, in pertinent part, the stipulated standstill order provided:

19

WHEREAS, Frederick M. Oberlander, and Jody Kriss (together with Michael Ejekam, "Respondents"), but not Michael Ejekam, are in possession of papers (but not originals) or electronic copies of certain documents (the "documents") related to a certain criminal matter reference by Case No. 98 – CR – 1101 (of the "Criminal Matter")…

WHEREAS Respondents contend that the current orders and the Further Requested Relief are improper, violate certain constitutional rights, and are procedurally invalid…

1.      Stay of Proceedings in this Action; Status Quo Maintained:

(See *2010.08.12 Letter, Moore to Glasser, with Standstill, so-ordered*, at PDF pp. 2-3).

49.     Thus, as of August 12, 2010, and continuing thereafter until November 24, 2010, when Mr. Sater's counsel cancelled the stipulated standstill order, the parties had stipulated and judge Glasser had "so ordered" that the "status quo" be maintained – *i.e*., that whatever copies of documents were then in the possession of Mr. Oberlander and his client Jody Kriss were to be kept by them pending a further decision from the court, premised, at least in part, upon the contention that Judge Glasser's prior TRO and "injunction" were invalid.

50.     As such, it is respectfully submitted that Mr. Oberlander, his client, and I, had a good-faith basis to believe (especially, since there was no signed order directing otherwise, as required by Rule 65) that the documents at issue could be retained pending a further proper order by the court. But no proper written, signed and docketed order sealing the documents at issue or directing me or Mr. Oberlander to destroy or return them was ever issued by Judge Glasser.

51.      The proceedings held before Judge Glasser on July 20, 2010, and those held subsequently before Judge Cogan, were not to the contrary.

52.     On the transcript of the July 20, 2010 proceedings (see *2010.07.20 Glasser transcript*), Judge Glasser continued a TRO (though, again, he failed to reduce it to writing, so it was unenforceable). By definition, ***a TRO maintains the status quo***.

20

53.     Judge Glasser did not issue an injunctive order to destroy or return any documents, and as there was no written, signed or docketed order directed to me or to my client. As such, it was both subjectively and objectively reasonable for me to believe that there was no injunction directing me to return or destroy anything, as that would have granted "permanent" relief, rather than "temporary" – *i.e.*, TRO – relief.

54.     Similarly, Judge Glasser, neither orally nor in writing, directed Mr. Oberlander to destroy the documents. A TRO cannot possibly be an order to destroy, because an order to destroy is permanent. The following colloquy will establish that it was reasonable, subjectively

and objectively, to believe that at most a TRO had been issued, not an order to destroy documents or electronic copies of documents:

| | |
|---|---|
| MS. MOORE: | ... I think, as I understand his position, which I don't agree with, he's entitled to keep all copies of the documents, as long as he returned the originals, so, I believe, in his letter he states that if at the court proceeding he marked as exhibits the original versions of those documents, but his client has maintained both electronic and hard copies, so clearly the intent was not to give back, as Judge Jones ordered in Visa, all copies as well. It doesn't get the originals back and are free to disseminating copies. |
| THE COURT: | I think, I indicated Mr. Oberlander **should not do that**. I think it was in the form of an order and that order, I believe, if I have not done so, I am doing it now and if you want it in writing until I resolve this issue. |
| MR. LERNER: | You are issuing **a further TRO**? |
| THE COURT: | Yes, I am. |
| | I'm **issuing a further TRO** for the reasons that I have indicated. |
| | I think there is irreparable harm, which is imminent to Mr. John Doe, those documents contained information which is highly, highly sensitive and if disseminated it is discriminatively to a person that should not get the information. |
| | I think, it would put Mr. John Doe's safety at risk. The likelihood of success is or is not present. Again, if Charmer Industries is |

21

being read correctly by me and, I think, it is, I think, the burden **with respect to whether or not there is some need to maintain those documents or to keep them should be shifted to you. Until next week, okay.**

I do not think we need any further hearing. You will submit the briefs and I will make my determination. **The TRO is continued for another ten days.**

Is there anything further?

MS. MOORE:        No, your Honor.

THE COURT:        Thank you.

(See *2010.07.20 Glasser transcript*, pp 26-27) (emphasis added).

55.        An injunctive order is "properly met by a written order, a document lacking here." *Garcia, supra.* "The normal standard of specificity is that the party enjoined must be able to ascertain from the four corners of the order precisely what acts are forbidden." *Sanders*, *supra*.

56.        Thereafter, Sater's counsel and Mr. Oberlander entered into the aforementioned stipulated standstill order, so-ordered by Judge Glasser on August 12, 2010, as noted above. Thus, it was the understanding of the parties, and the court (inasmuch as Judge Glasser had so-ordered that stipulation), that all of the documents would be retained, and neither destroyed nor returned, pending or further order of the court.

57.        That is, there was, at most, a TRO, **and TRO's have a very short shelf life**.

58.        As previously indicated above, on November 16, 2010. Mr. Sater's counsel notified the court of the cancellation of the stipulated standstill order. (See *2010.11.16, Letter Moore to Glasser Re Cancellation of Standstill*). **The letter did not request an extension of the TRO,** and there was, thereafter, no docketed motion, much less written order, extending the TRO yet again. While a court might, arguably, have jurisdiction to issue a TRO to maintain the status quo pending the hearing and determination as to whether a party has a right to retain possession

22

of certain documents that were inarguably obtained outside of court process, I had a good-faith belief (subjectively and objectively) that a court lacks the jurisdiction to actually issue a permanent injunction directing their return or destruction, because that is exactly what the Second Circuit held in *Bridge CAT Scan Assoc. v. Technicare Corp.*, 710 F.2d 940 (2d Cir. 1983).

59.     Moreover, a proper understanding of the circumstances that led Judge Cogan on April 1, 2011 to conclude that Judge Glasser, had done so shows that Judge Cogan accepted an inaccurate recitation of the prior proceedings by AUSA Todd Kaminsky. In appearing before Judge Cogan on that date, Mr. Kaminsky misstated that Judge Glasser's TRO was a directive that the documents be destroyed. But that cannot have been true, because a TRO cannot be a directive to destroy documents: Destruction is forever. Judge Cogan, in reliance on such misstatement, ordered Mr. Oberlander to purge his computer, but (expressly) not his backups, of the documents.

60.     As noted above, on July 20, 2010 Judge Glasser stated that he was issuing a "TRO" as to the documents at issue. He did not issue a directive that electronic copies of documents be purged from the computers; he did not issue a written order, which would have been necessary for such an injunction to have been legally enforceable; he did not issue an extension of the TRO.

61.     Additionally, AUSA Todd Kaminsky was aware of the stipulated standstill order and amendment that were so-ordered in August and September that confirmed that Mr. Oberlander and I, as his counsel, had the right to maintain the documents for the appeal. (Mr. Kaminsky was cc'd on the correspondence to the court, though he was not a signatory to the stipulations). Mr. Kaminsky manifested his understanding that Mr. Oberlander and I had the

23

right to retain the electronic copies and other copies of the documents, as he wrote to Judge

Glasser on November 23, 2010 to request that he:

> [O]rder Mr. Oberlander to return the sealed documents in the above-captioned case and enjoin him from disseminating those documents. The Court should also direct that the docket in this case and all the sealed documents that are a part of it remain under seal.

(See *2010.11.23, Letter Kaminsky to Glasser,* arguing court has authority to order return of documents and gag order).

62.     Yet, notwithstanding that the government's (*i.e.*, AUSA Kaminsky's) motion to

direct the return of allegedly sealed documents was still pending before Judge Glasser on April 1,

2011, at the hearing before Judge Cogan on that date, AUSA Kaminsky misstated that the TRO

was actually an order to return or destroy, which, of course, is a legal impossibility, as a

"temporary" restraining order only maintains the status quo, ***and the status quo was that I***

***possessed those documents***. Any position otherwise would have rendered incomprehensible

AUSA Kaminsky's request that had been *sub judice* before Judge Glasser since November 23,

2010 that Judge Glasser order their return. Nonetheless, there was this colloquy at the April 1,

2011 hearing before Judge Cogan:

| | |
|---|---|
| MR. KAMINSKY: | Very briefly, The Second Circuit mandate does specifically entrust your Honor with enforcing the district court's orders. … One such order that still has not been complied with -- it is baffling -- they still maintain the very orders that are subject to the injunction and the TRO. … [A] litigant does not have the ability to say "I'm going to violate the order, hold on to this stuff and wait for the circuit to prove I'm right." He must hand over and/or place those documents in some type of transitory place and wait for the circuit to rule, but he still has them, in direct contravention of the court's order saying give them back, give them to the U.S. Attorney's Office. No one gave anything. |
| THE COURT: | The directive to give them back is in Judge Glasser's order, not the circuit, right? |
| MR. KAMINSKY: | Right. |

***

24

MR. KAMINSKY:   … [A]t the end of the July 20th proceeding, Mr. Doe's counsel at the time Ms. Moore, says specifically to Judge Glasser we would like you to include in the TRO copies of the documents because although Mr. Roe is telling you he's given them back to you, what good is that if he has the copies? The judge said I agree. Mr. Learner's response is are you issuing a further TRO? The judge says I am.

\*\*\*

MR. LERNER:   There's no specific directive by Judge Glasser to destroy the electronic copies of the document and there's been no dissemination of the document. Therefore, there's been no violation of any TRO and we would request further briefing before you wish to entertain this issue.

THE COURT:   No, it's absolutely clear on its face Judge Glasser intended you to destroy electronic copies and to return any photocopies. If that is not done by the end of Monday, I will hold your client in contempt.

THE COURT:   I think, for that reason, it's good enough for now to have no accessible copies from any desktop computer. The fact that they're in backup tapes, we might require a purging of those later, but we will not require it now, If they're on backup tapes, that's fine. I don't want anyone with access to the network that **your client** uses to be able to get into that network from a desktop or laptop computer and access those documents, but solely resident on the backup tapes.

(See *2011.04.01 Cogan transcript*, pp.11-16).

63.     Judge Cogan did not issue a written injunctive order, compliant with Rule 65, identifying what was enjoined. Therefore, I had a subjective and objective good-faith belief that his oral injunction was a nullity, as I was well aware of the Second Circuit's decision in *Garcia supra,* as well as the case cited authoritatively therein, *Bates v. Johnson*, 901 F.2d 1424, 1427-1428 (7th Cir. 1990), which rather colorfully stated that a party against whom an *oral "injunction"* [20] is directed "need not dance to the judge's tune."

---

[20] "Injunction" is in quotes, because, after all, an oral injunction isn't an injunction at all.

64.     Notwithstanding that the oral directive to Mr. Oberlander was not reduced to a writing that complied with Rule 65, Mr. Oberlander submitted an affidavit to Judge Cogan dated April 4, 2011, which stated that he had no hard copies of the documents, and that he had purged his computers to the best of his abilities. (See *2011.04.04, Letter Lerner to Cogan, enclosing Oberlander aff re destruction of documents*). Additionally, by separate letter to Judge Cogan dated April 4, 2011, I confirmed my understanding that I had the right to maintain my copies of the documents. (See *2011.04.05, Letter Lerner to Cogan (cc'd by email on April 5, 2011) confirming Lerner's right to retain documents*).

65.     Judge Cogan did not, upon receipt of Mr. Oberlander's affidavit or my letter, issue any follow-up directive or clarification to say that *I* also was required to return or destroy *my* copies. He thus established (post hoc) that – to the extent that my belief had perhaps previously only been in subjective good-faith that the oral orders of Judges Glasser and Cogan did not require that I destroy my copies or have my law firm purge its computers – my belief was objectively reasonable. That is, if I had been incorrect, surely Judge Cogan would have issued a follow-up directive upon receipt of that affidavit directing that *I* destroy *my* copies. He did no such thing.

66.     Moreover, I had a subjective and objective good-faith basis to believe that the *oral* directive[21] was to Mr. Oberlander only, that he purge **his** desktop computer of the documents at issue, but not the backups. Objectively, I would not have understood that Judge Cogan had ordered that I destroy my copies, because (i) Judge Cogan was, during the hearing

---

[21] Upon the binding precedent of *Garcia, supra*, I again note that the oral directive to Mr. Oberlander was a legal nullity, but note that he nonetheless confirmed his compliance with the oral directive by submitting the aforementioned affidavit of compliance.

holding and reading from my copy of the joint appendix for the appeal from Judge Glasser's

order as to the PSR, and that joint appendix contained the documents at issue – the PSR, the

cooperation agreement, the proffer, the draft criminal information, and the criminal complaint –

and yet he handed it right back to me. (See *2011.04.01 Cogan transcript*, p.7); (ii) Judge Cogan

stated that he would hold my client in contempt if *he* did not delete the electronic copies of the

documents from *his* computer; and, (iii) Judge Cogan referred to the network that my client

Oberlander used, not the network of my law firm (then Wilson, Elser, Moskowitz, Edelman &

Dicker).

67.     Additionally, in my letter of April 4, 2011 (but faxed and emailed on April 5th to

Judge Cogan) (see *2011.04.05, Letter Lerner to Cogan (cc'd by email on April 5, 2011)*

*confirming Lerner's right to retain documents*), I memorialized my understanding that I could

keep my copies of the documents. The letter stated, in pertinent part:

> As the Court is aware, Mr. Roe (Oberlander) has a pending appeal to the Second
> Circuit that is currently in the process of being briefed. A complete copy of the
> PSR that is a subject of your orders is contained in the Joint Appendix on file with
> the Court of Appeals, as are excerpts of the other documents at issue.
>
> While Mr. Roe (Oberlander) no longer has a copy of these documents, his counsel
> remain in possession of the Joint Appendix, and obviously copies of the
> documents are necessary to pursue Mr. Roe's appeal.
>
> We wish to confirm that the destruction directive that was issued against Mr. Roe
> (Oberlander) personally does not prohibit us from conferring with him about the
> contents of the disputed documents, or reviewing them with him in our office, in
> connection with drafting his brief or any other motion or other papers in
> connection therewith and in preparation for argument.
>
> I refer your honor to the parties' earlier standstill agreement, enclosed herewith,
> and "so ordered" by Judge Glasser on August 12, 2011. As the Second Circuit's
> order of February 14th contemplated that Your Honor would enforce existing
> orders, we bring to your attention that the so-ordered agreement makes clear that
> Mr. Roe (i) retains copies of the "Documents"; and (ii) may use them or the
> information they contain in his appeal. As your role is to enforce the existing
> orders, we ask that you clarify that we may use the documents at issue in
> preparing the appeal, and that we may consult with our client about the
> "Documents," including reviewing them, and the contents thereof, with him.

 (see *2011.04.05, Letter Lerner to Cogan (cc'd by email on April 5, 2011) confirming Lerner's right to retain documents*).

68.     Notwithstanding that the letter requested that it be publicly docketed, it was not – neither publicly nor even under seal. Judge Cogan, having been informed that I retained copies of the documents at issue, did not issue any directive *to me* that I return or destroy *my* copies forthwith. The letter was cc'd via email to Mr. Sater's counsel, and to AUSA Kaminsky, as well as co-counsel David Schulz (of the First Amendment law firm Levine, Sullivan, Koch & Schulz), who was a co-author with me on the appeal to the Second Circuit, and who also retained copies of the documents at issue, and was present during the oral argument on April 1, 2011. Although I cannot locate my email from Mr. Schulz, on or about that date, I conferred with him via email, and in response to my statement that I did not believe that Judge Cogan's directive required either of us to return or destroy our copies, Mr. Schulz responded "I agree."

69.     Judge Cogan's May 13, 2011 order did not direct me or my client to destroy documents. The subject of that order was as follows:

> This Memorandum Decision and Order addresses [Mr. Oberlander's] question as to whether he may disseminate information available in public records.… [¶] At the April 1 hearing, I opined that information available to the public was not covered by the Second Circuit's injunction, but emphasized that extrapolation from sealed documents would not be permitted because it could easily be combined with and thereby tainted by [Mr. Oberlander's] knowledge of non-public, sealed information. I suggested that insofar as [Mr. Oberlander] sought a more specific interpretation of the Second Circuit's orders, he might submit a chart that listed single sentence statements juxtaposed with their sources, which he has done. Doe [i.e., Sater] has objected to the use each of the three proposed statements, and I evaluate them in turn.

(See *2011.05.13 Cogan order*). [22]

---

[22] Notwithstanding, *e.g.*, that the never-sealed transcript dated June 11, 2010 of the proceedings before Judge Glasser in the 98-cr-1101 matter referred to Felix Sater by his true name (See *2010.06.11 Glasser transcript*), Judge Cogan's May 13, 2011 order stated that "Doe's name was intentionally never mentioned at the hearing." (See *2011.05.13 Cogan order*, p.3). He also stated that, notwithstanding that the transcript bears the docket number 98-cr-1101, that there is nothing that links Felix Sater, by name, to

70.     The mere reference in the May 13, 2011 decision to such documents having been enjoined elsewhere is of no legal import, because Rule 65(d)(1) says that an injunctive order must be self-contained. Rule 65 states, in pertinent part: "Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail – *and not by referring to the complaint or other document* – the act or acts restrained or required." (Emphasis added).

71.     Finally, in a subsequent order dated January 6, 2016, Judge Cogan confirmed that Judge Glasser's oral orders, which are the subject of the grievance allegations in this order to show cause, were not sufficiently clear as to provide a basis for finding that there was disobedience thereof in connection with a contempt application made against Jody Kriss by Mr. Sater's counsel. (See *2016.01.06 Cogan order, dismissing charges against Kriss*). If that was true in January 2016, then it should have been, and actually was, true in June of 2010, when

---

the 98-cr-1101 docket number, so that Sater's identity as the defendant named therein could not be stated publicly by Mr. Oberlander. (See *2011.05.13 Cogan order*, p.3). However, anyone who reads the June 11, 2010 transcript, which was never sealed, will see that "Sater" was mentioned throughout. Moreover, in any event, I state, emphatically, under penalty of perjury, that throughout the June 21, 2010 hearing, when Mr. Sater testified, and during colloquy, he was referred to by his true name. The courtroom was not sealed, and there were other individuals in the gallery who saw Mr. Sater, and recognized him, and heard him identified by his true name. As I recall, attorney Stam Stamoulis, Jody Kriss, and one Dina Lax, were in the courtroom. All of them, if called to testify, would I believe, state that they saw Sater sworn in as "Felix Sater," and that he was referred to throughout the proceeding by his true name.

Judge Cogan also stated that Sater could not be identified as having been finally sentenced on October 23, 2009, notwithstanding that it is flatly illegal to bar someone from revealing what happened in open court. Judge Glasser even acknowledged, as he had to acknowledge (for it is unlawful to sentence a defendant in a closed courtroom), that Sater was sentenced in open court. (See *2013.03.14 Glasser order, indicating Sater was sentenced in open court on October 23, 2009, docket entry 221*). (Mr. Oberlander's papers discuss this in the context of open court proceedings not personally witnessed; the result, not surprisingly, is the same, what is purposefully injected into open court is forever public property even as to those who were not present, could not fit thru the courtroom door, to see it there themselves.)

This is to say, the cumulative effect of all the foregoing was that it was in objective good faith to believe that Mr. Sater's name had, in fact, been revealed publicly by Judge Glasser himself, as it is flatly illegal to sentence someone in a sealed courtroom, so his identity as the named defendant in the 98-cr-1101 action *had to have been made public*. And again, Sater's name, in a proceeding bearing docket number 98-cr-1101, had been made public on June 11, 2010.

originally issued orally by Judge Glasser, and again, in 2011 when Judge Cogan issued his interpretations of Judge Glasser's orders.

72.     More particularly, in the January 6, 2016 order, Judge Cogan confirmed that Judge Glasser's orders at issue were not "clear and unambiguous," and thus could not provide a predicate for a finding of violations thereof. Judge Cogan stated, in pertinent part, as follows:

> On June 21, 2010, Judge Glasser issued a permanent injunction that the "information contained in that [PSR] is not to be disseminated . . . . The order with respect to PSRs is not directed to any individual, it is directed to the presentence report itself" ("June 2010 Order"). Judge Glasser also directed Oberlander to return the PSR to the U.S. Attorney's Office, ***and extended the TRO with respect to the other documents.*** (See *2016.01.06 Cogan order*, at p.2) (emphasis added).

> At a hearing in April 2011 on Oberlander's clarification request, I learned that Oberlander had not destroyed or returned certain electronic and paper copies of the original PSR and other sealed documents. I ordered Oberlander at the hearing to delete from his hard drive the documents subject to Judge Glasser's Orders and to return any photocopies of the documents in his possession. By subsequent sealed written order ("April 2011 Order"), I reaffirmed my oral ruling, and also stated that it was "plainly the intent of Judge Glasser to have those documents destroyed or returned. (See *2016.01.06 Cogan order*, at p.3).

> Similarly, I orally ordered Oberlander to delete from his hard drive the documents subject to Judge Glasser's Orders; my sealed written Order of April 2011 denied reconsideration of my oral ruling. Finally, the Second Circuit affirmed Judge Glasser's permanent injunction, noting that all legal conclusions applied to all appellants. None of these Orders expressly requires Kriss or anyone else in possession of the PSR or other Sealed and Confidential Materials to return or destroy all copies. (See *2016.01.06 Cogan order*, at p. 6).

> …. the Orders were not "clear and unambiguous" in terms of who was required to return or destroy those documents. A clear and unambiguous order is one that leaves "no uncertainty in the minds of those to whom it is addressed," and those addressed "must be able to ascertain from the four corners of the order precisely what acts are forbidden," *King*, 65 F.3d at 1058 (quotations and citations omitted). (See *2016.01.06 Cogan order*, at p. 7).

> None of Judge Glasser's Orders clearly require that every person return and/or destroy documents in his possession. Judge Glasser expressly enjoined the dissemination of the PSR and it expressly applied to anyone in possession of the information – ***but the requirement to return and/or destroy those documents was not "clear and unambiguous."*** The Second Circuit upheld this Order and noted its application to everyone. My April 2011 Orders were unambiguously directed

at respondent Oberlander). (See *2016.01.06 Cogan order*, at p.8) (emphasis added).

In this case, having already held that the Orders at issue are not clear and unambiguous as to their application to Kriss in returning and/or destroying the sealed and confidential material, ***I also find the terms of the Order were not "specific and definite" as to who must return or destroy the Sealed and Confidential Materials.*** (See *2016.01.06 Cogan order*, at p.9) (emphasis added).

73.     Accordingly, Judge Cogan's order of January 6, 2016 confirms that when judge Glasser made his June 21, 2010 order, on the record (that is, not in writing), there was, indeed, an objectively reasonable good-faith basis for me to have concluded that I was under no valid or enforceable directive (written, or even oral) to return or destroy my copies of the documents at issue.

### Grievance Allegation #3

The respondent violated multiple court orders, including the Second Circuit's February 14, 2011 Order, by revealing Oberlander's true name and identity to *The New York Times* and by disclosing Sater's true identity to the *Miami Herald,* and disclosing Sater's connection to the sealed EDNY criminal proceedings. *See* February 14, 2011 Second Circuit Order (Exhibit H); "Fraud Case Challenges Secrecy of Man's Past -- Criminal and Cooperating Witness," THE NEW YORK TIMES, Feb. 5, 2012; "High court reveals secret deal of Trump developer's crimes," THE MIAMI HERALD, July 31, 2012.

### Response to Grievance Allegation #3

74.     As an initial matter, I repeat and incorporate herein all of the facts set forth in response to Grievance Allegations # 1 and #2 above. In particular, the facts, references to documentary evidence and arguments showing that the documents at issue were not "sealed," and there was no specific, proper order sealing the documents at issue, pursuant to any written, signed and docketed order or directive that directed said documents be destroyed or returned.

75.     In point of fact, sometime after the June 29, 2011 decision had been made public by the Second Circuit, I learned through Mr. Oberlander that he had been approached in court by another attorney against whom he had been litigating – Robert W. Allen, Esq. of Gluck & Allen

31

in Tom's River, New Jersey – and addressed in the following fashion: "Hello, Mr. Roe." The attorney told Mr. Oberlander that when he read the June 29, 2011 decision, which was public, he immediately knew that Mr. Oberlander was "Roe." A search on Google will reveal that the decision, through no act of mine, was picked up and disseminated by blogs, including those actually directly related to that court itself, in particular a sentencing blog. Moreover, professor Tarkington explains that it was the Second Circuit itself that outed Roe, as well as Sater's counsels.

76.     I did not reveal "Roe's" identity to the New York Times or the Miami Herald in any way that would substantiate this allegation, in other words that by doing so I violated court orders[23]. In any event, there was no decretal language in the Second Circuit's February 14, 2011 order barring me from making such disclosure, had I done so.

77.     I verily expect that New York Times reporter Ben Weiser will confirm the foregoing if called to testify, and I respectfully request, if this matter is not dismissed, that a subpoena be issued forthwith directing Mr. Weiser to testify before the grievance committee.[24]

78.     In any event, Judge Cogan himself confirmed that there was no order barring the revelation that "Richard Roe" = "Frederick Oberlander," as he stated on the record on February

---

[23] This is to be interpreted as it reads; the allegation or charge is that "I violated court orders by revealing Oberlander's name" and this phrase reads "I did not violate court orders by revealing Oberlander's name." There are ongoing criminal investigations and I am entitled to, while in full candor as to my response, be circumspect.

[24] When the contempt proceedings were started by Mr. Sater, my law firm, Wilson Elser, submitted proposed subpoenas on March 12, 2012 to Judge Cogan in accordance with Judge Cogan's directive that any subpoenas be submitted to him in advance of service, to obtain the testimony of Mr. Weiser and others. However, as Judge Cogan never held an evidentiary hearing, and never issued any rulings, but instead closed the case, the subpoenas were never issued.

27, 2012 that there was no decretal language in the Second Circuit's order of February 14, 2011

that barred anyone from revealing that "Richard Roe" was "Frederick Oberlander."

> The only provision that's been pointed out to me as to which there may be a contempt is the second paragraph in the Court of Appeals summary order filed February 14th, 2011, which simply notes that the Court is referring to Richard Roe as Richard Roe because the disclosure of his true identity might lead to the improper disclosure of materials here at issue. [¶] *That is not a decretal paragraph;* it is simply a statement of the reason why the Court of Appeals is using a pseudonym.

(See *2012.02.27 Cogan transcript*, p. 8) (emphasis added).

79.     As for the Miami Herald, I did not reveal "John Doe's" true identity to be Felix

Sater to them in any way that would substantiate this allegation.[25] The Miami Herald published

its July 31, 2012 story after it had already moved to unseal Sater's secret "98-cr-1101" docket.

Upon information and belief, the Miami Herald was smart enough to figure out on its own that

"John Doe" was "Felix Sater." Indeed, Mr. Sallah states in the article that I declined to comment.

Therefore, respectfully, there is no basis to infer, or even insinuate that I was the source of "John

Doe's" identity, much less to bring grievance allegations against me based on that article. The

article itself shows that Mr. Sallah might well have learned of Sater's identity from Professor

Paul Cassell – if Mr. Sallah hadn't already figured out on his own that "John Doe" = "Felix

Sater," as the article states:

> Paul Cassell, a former federal judge who has brought the [Sater] case to the attention of Congress, said Glasser is … responsible for the controversy.
>
> By sealing the case and not ordering Sater to pay back his victims in the stock fraud case, "the [court] illegally gave away millions to a criminal," said Cassell, who joined an appeal of the case last year.

---

[25] This is to be interpreted as it reads; the allegation or charge is that "I violated court orders by revealing Oberlander's name" and this phrase reads "I did not violate court orders by revealing Oberlander's name." There are ongoing criminal investigations and I am entitled to, while in full candor as to my response, be circumspect.

80.     Another way that Mr. Sallah might have learned that "John Doe" was "Felix Sater" was by speaking with one Brian Vodicka, a resident of Texas who figured out on his own, and so stated in an affidavit that was filed with the court (see 98-cr-1101, Docket Entry 207-4), that he had figured out John Doe's true identity six months earlier, and gave his information to the Miami Herald. (See *2012.08.22 Vodicka affidavit*). Mr. Vodicka gave a detailed explanation as to how he figured out that Doe was Sater, and stated that he did so without the assistance of Mr. Oberlander or me.

81.     And he could have obtained Document 21 off the Lauria docket from the National Archives, like anyone else.

82.     Moreover, Mr. Sallah was clearly keeping an eye on the case. On February 17, 2012, *i.e.*, about ten days after Ben Weiser's New York Times article, he faxed a letter to Judge Glasser demanding that he unseal docket 98-cr-1101. (See *2012.12.17 Letter, Sallah to Glasser demanding unsealing of 98-cr-1101*). Judge Glasser treated the letter as a motion, and docketed it as such.

83.     On March 3, 2012, Mike Sallah published an article in the Miami Herald called "Donald Trump's Tower of Troubles," about the failed Fort Lauderdale project in which he partnered with Bayrock Group, LLC – *i.e.*, Felix Sater's company.

84.     By the time the New York Times and Miami Herald articles were published, that information was already properly public information, as Felix Sater was sentenced publicly in open court on October 23, 2009, on Docket 98-cr-1101, according to Judge Glasser's own order of March 14, 2013 (See *2013.03.14 Glasser order, indicating Sater was sentenced in open court*). In that order, Judge Glasser acknowledged that Felix Sater was sentenced in open court on October 23, 2009, under his real name. (Obviously, he had to have been sentenced in open

34

court, under his real name, because it is flatly illegal for a judge to sentence someone in secret. See 18 U.S.C. § 3553(c); *U.S. v. Alcantara*, 396 F.3d 189 (2d Cir. 2005)).

85.     The transcript of Sater's October 23, 2009 sentencing (see *2009.10.23 Sater sentencing transcript*) shows that he was identified by his true name at the sentencing. Therefore, the fact that Sater was sentenced in Judge Glasser's courtroom on October 23, 2009 under his real name was public information which could be reported by anyone, because, as the U.S. Supreme Court held in *Craig v. Harney*, 331 U.S. 367, 374 (1947), what transpires in an open courtroom "is public property," and no one may ever, ever, be made to answer for repeating outside of court what was stated inside that courtroom.

86.     Since Mr. Sater was, as Judge Glasser acknowledged, sentenced in open court under his true name, that fact was public information, and no one, myself included, may be called to answer for repeating what occurred in open court.[26] This is to say, I demur. I did not disclose Sater's true identity to the Miami Herald or the New York Times, ***but I had an absolute right to do so***, and I cannot be called to account in any forum, whether before the grievance committee or any other judicial proceeding. See *Craig v. Harney*, supra.

### Grievance Allegation #4

The respondent violated the Second Circuit's June 29, 2011 Order by filing two new frivolous actions in the United States District Court for the Southern District of New York, Case No. 13-CV-1824 (LGS) and Case No. 13-CV-3905 (LGS), despite the Second Circuit's order directing the respondent to refrain from frivolous filings. *See* June 29, 2011 Second Circuit Order (Exhibit O); Southern District of New York Docket Nos. 13-CV-1824 and 13-CV-3905.

---

[26] Additionally, at the hearing before Judge Glasser on June 11, 2010 – which was in open court – Mr. Sater was identified by his true name. Moreover, when Mr. Sater's attorney Kelly Moore requested on June 21, 2010 that Judge Glasser order those in the courtroom not to tell anyone that Felix Sater had testified, Judge Glasser stated that federal courts have enormous powers, but that is not a power that it has. (See *2010.06.21 Glasser transcript*, pp.116-117).

### Response to Grievance Allegations #4

87.     I repeat and incorporate herein all of the afore-stated facts and arguments.

88.     Neither the *Gottediener v. Sater* (13-cv- 1824) nor the *Kriss v. Bayrock* (*Kriss II*) (13-cv-3905) actions were frivolous, nor did any court ever find that either action was frivolous. Moreover, while I acknowledge that the Second Circuit Court of Appeals June 29, 2011 Summary Order, stated that "Richard Roe (Mr. Oberlander), is hereby warned that …" among other things, "other future filings of a frivolous nature, may result in sanctions, including the imposition of leave-to-file restrictions, requirements of notice to other federal courts, and monetary penalties," the court was clearly not referring to either of the two actions referenced above, which had not yet been filed. As such, said "warning" amounts to advice to obey the law in general, rather than a specific injunction, violation of which might justify disciplinary action. I repeat and incorporate herein all of the aforestated facts and arguments. Moreover, Judge Cogan already determined that the "warning" was non-decretal, and therefore denied Sater's motion to hold Mr. Oberlander and me in contempt for having brought the two lawsuits. In denying Sater's motion, Judge Cogan stated that the Second Circuit "only warned them against filing additional lawsuits in an attempt to re-litigate the issues decided by its order, or other future filings of a frivolous nature; the Second Circuit did not prohibit such filings in its December 20, 2011 Mandate. John Doe's motion is therefore denied." (See *2013.05.28 Cogan order denying motion for sanctions against Oberlander and Lerner*, p.2).

### A.     The *Gottdiener v. Sater*, Action Was Not Frivolous.

89.     The Gottdieners were not parties to the prior proceedings that were the subject of the 10-2905 proceedings, and had the constitutional right to retain attorneys of their choosing. As their attorneys, Mr. Oberlander and I had the ethical obligation and the right to assert any and all arguments in their behalf that were supported by the facts and the law, or a good-faith belief in

favor of the advancement of existing law or reversal of bad case law. While there was certainly overlap between arguments previously made in the 10-2905 proceedings, allegations that were repeated in the Gottdiener complaint cannot be deemed frivolous because the U.S. Supreme Court necessarily deemed the issues raised in the 10-2905 appeal to have been non-frivolous, by virtue of the Supreme Court's issuance of an order that vacated much of the June 29, 2011 order of the Second Circuit.[27] That is, I had a subjectively and objectively reasonable basis to believe that any arguments asserted in the Gottdiener action, to the extent that they may have previously been raised in the 10-2905 appeal, were well supported by existing law.

90.    Such arguments could, if the Gottdieners wished, include arguments that were previously made by the same attorneys, who, themselves had the obligation to advance those arguments, in order to preserve them for ultimate review by the U.S. Supreme Court.

91.    Notwithstanding the foregoing, the *Gottdiener* action did not raise the same substantive arguments as were previously raised in the 10-2905 appeal. The *Gottdiener* case raised RICO allegations, not First Amendment issues. (See *2013.08.02 Gottdiener amended complaint, with exhibits, uploaded as Parts 1 & 2).*

92.    I had a subjective and objective good faith basis to believe that the complaint and amended complaint interposed against defendants Felix Sater and Salvatore Lauria were

---

[27] The grievance committee will recall that the U.S. Supreme Court, although it did not ultimately grant certiorari, did grant enough relief to have essentially nullified much of the Second Circuit's decision – *viz.*, the U.S. Supreme Court granted me and my client Mr. Oberlander leave to publish facts contained in the PSR that evidenced governmental and prosecutorial misconduct. (See U.S. Supreme Court docket 12-112, and docket entries for May 10, 2012, June 25, 2010, and June 13, 2012). This itself established that the issues raised in the 10-2905 appeal were well stated. Additionally, the U.S. Supreme Court ordered the Solicitor General to respond to my petition for certiorari, which the U.S. Supreme Court only does, of course, if it finds the arguments raised in the petition to be meritorious. In any event, it would seem self-evident that this district court is in no position to decide whether issues presented to the U.S. Supreme Court were, or were not, meritorious.

meritorious. That belief was borne out by the fact that neither Sater nor Lauria, ever served a Rule 11 demand that the complaint be withdrawn, nor did they move for Rule 11 sanctions. Similarly, Judge Schofield did not find the complaint to be frivolous. (See *2014.03.19 Schofield decision dismissing Gottdiener complaint*). To the contrary, the complaint well alleged that the Gottdiener plaintiffs suffered millions of dollars of causal injury as the proximate result of securities frauds perpetrated by co-conspirator Alfred Palagonia, at the time he was stockbroker at D. H. Blair, from 1993 through 1998.

93.     By his guilty plea to a related indictment in *U.S. v. Coppa* et al., 00-CR-196 EDNY (Glasser, J.), Palagonia was convicted in 2002 on charges of securities fraud conspiracy and money laundering conspiracy. Palagonia committed these crimes, which are RICO predicate acts, in his capacity as a member of a RICO association-in-fact enterprise, the same enterprise that Sater and Lauria pled guilty to being members of. Indeed, the portions of the indictment to which Palagonia pleaded guilty allege that he was a member of the same association-in-fact that Sater and Lauria were members of. Put another way, as members of the same RICO enterprise as Palaagonia, defendants Sater and Lauria were obviously chargeable with knowledge – actual or implied – of its general goals to commit securities fraud and launder the profits, and with their agreement to conduct its operation through a pattern of crime.

94.     The co-conspirators' scienter was obvious because they did just that, facilitate it, by their own predicate acts of securities fraud at their own brokerage, State Street, and by other predicate acts, including bribes to other members, including Palagonia, to induce them to commit predicate acts of securities fraud at their firms. Indeed, in a deposition taken in 2011, Palagonia testified, *inter alia*, that he had pled guilty to pump-and-dump securities fraud, including as to US Bridge and Holly Products stocks, and that those two stocks were given him to pump by

Sater's and Lauria's company White Rock, which bribed him to pump them up, by fraudulently inducing his customers, including the Gottdiener plaintiffs to buy them.[28]

95.     By their guilty pleas to criminal informations, defendants Sater and Lauria were convicted in 1998 on racketeering charges. *U.S. v. Sater*, 98-CR-1101 EDNY; *U.S. v. Lauria*, 98-CR-1102 EDNY. Sater's conviction became final in 2009, Lauria's in 2004. Lauria's final conviction was unsealed in 2009, and thus suit was timely, under the PSLRA, as Judge Schofield found (on reconsideration), because it was brought within four years of when it was made public. The suit against Sater was timely because it was brought within four years of his final conviction, but, more importantly, within months of when his final conviction was made public (which occurred on March 14, 2013) by Judge Glasser. (See *2013.03.14 Glasser order*).

96.     The *Gottdiener* plaintiffs suffered causal injury by defendants Sater and Lauria's manipulation of the prices of two of the stocks that Palagonia fraudulently induced them to buy and hold, *viz*. U.S. Bridge and Holly Products. Plaintiffs alleged that even if defendants Sater and Lauria had never even heard of them, defendants Sater and Lauria were still liable for manipulating those prices in their capacities as members of that association-in-fact RICO enterprise, pursuant to a fraud-on-the-market theory.

97.     Per 18 USC §1964(c), anyone injured in property by violation of 18 USC §1962(c), which makes it illegal to operate an enterprise through a pattern of racketeering activity (crimes which are "predicate acts" as set forth in 18 USC §1961) may sue for treble the damages and legal fees, except no person may rely on any conduct actionable as fraud in the

---

[28] Palagonia testified, for example, "What I remember is striking a deal with Sal Lauria, who I believe was the owner of White Rock, or one of the partners at White Rock, that I was going to buy those two stocks, but I was not at the same time, or maybe it was, I don't remember, and that he would give me cash back for buying those stocks." (*2013.08.02 Gottdiener amended complaint (Part 2)*, at PDF p. 380).

purchase or sale of securities to establish said violation unless the defendant to be sued has been convicted in connection with the fraud, in which case a four year statute of limitations starts to run on the date when the conviction becomes final.

98.     By their own admissions, *i.e.*, by virtue of having pled guilty, defendants Sater and Lauria participated in the operation of an association-in-fact RICO enterprise. Whether or not Palagonia was a member of that enterprise, one of the predicate acts the defendants committed in the scope the operation of the enterprise was to bribe Palagonia, and other brokers, to perpetrate pump-and-dump securities fraud on his customers at D.H. Blair, and specifically bribed Palagonia to pump the shares that the Gottdiener plaintiffs purchased. As bribery is a predicate RICO act, defendants Sater and Lauria were liable for all the damages proximately flowing from those bribes, which would include the losses Palagonia caused.

99.     Likewise, defendants Sater and Lauria were liable to the *Gottdiener* plaintiffs pursuant to 18 USC §1964(c), which provides that anyone injured in his property by a violation of 18 USC §1962(d), which makes it illegal to conspire to operate an enterprise through a pattern of racketeering activity, may recover from each member of the association-in-fact RICO enterprise. This, by their pleas of guilty, included defendants Sater and Lauria.

100.    Accordingly, the *Gottdiener* plaintiffs well pled RICO conspiracy liability against defendants Sater and Lauria simply by alleging that, whether or not they were part of the same RICO enterprise as Palagonia, or indeed part of any RICO enterprise, they, at the very least, furthered Palagonia's crime by bribing him to pump up the U.S. Bridge and the Holly Products stocks.

101.    This is to say, the complaint pled, extraordinarily well, a RICO case against Mr. Sater and Mr. Lauria. Judge Schofield dismissed the complaint on a technicality because the

criminal informations against Sater and Lauria did not specifically identify the Gottdieners as victims, relying on a district court decision from Michigan, and disregarding the fact that criminal informations never identify all of the victims of a pump-and-dump stock fraud. [29]

### B.    The *Kriss II* Action Was Not Frivolous.

102.    There has never been a determination that the 13-cv-3905 *Kriss II* action was meritless, and as explained below, nor could there have been, since no complaint in the action was ever analyzed by any court. Rather, the *Kriss II* action was originally commenced by the filing of a Summons with Notice on May 10, 2013 in the Supreme Court of the State of New York, New York County (see *2013.05.10 Summons with Notice filed in state court*), and was removed to federal court by defendant Felix Sater. After plaintiff's motion to remand the case back to the state court was denied by Judge Schofield, the action was discontinued prior to the filing of a complaint, for reasons that will be explained further below.

103.    As outlined in the Summons with Notice, plaintiff had a meritorious action, and I believed, in good faith (subjectively and objectively), would have stated a meritorious claim. The Summons with Notice claimed, in pertinent part:

> Plaintiffs seek relief against those directly and vicariously responsible for the perpetration of perhaps a billion dollars or more of fraud based on the illegal concealment of Felix Sater's 1998 $40 million federal racketeering conviction, and subsequent 2009 sentencing….
>
> ***
>
> "Bayrock" … in the last ten years variously engaged in the businesses of financial institution fraud, tax fraud, partnership fraud, insurance fraud, litigation fraud, bankruptcy fraud, mail fraud, wire fraud, money laundering, human trafficking, child prostitution, statutory rape, and, on occasion, real estate.
>
> One of the overarching, dominant themes of those Bayrock lines of business has been the fraudulent concealment of the substantial degree to which it was owned directly or equitably by Felix Sater….

---

[29] In any event, this grievance committee lacks jurisdiction to even consider the issue, because the complaint at issue was filed in the Southern District of New York, not the Eastern District.

Another overarching, dominant theme of Bayrock's lines has been the fraudulent concealment of Felix Sater's conviction for racketeering, to which he secretly pled guilty in 1998, admitting to participating in the operation of a pump-and-dump stock fraud, along with members of Russian and Mafia organized crime, which defrauded investors, many of them senior citizens, including Holocaust survivors, of at a minimum $40,000,000, now in today's dollars some $150,000,000 of stolen wealth as measured by the "well managed account" theory.

The Estates of Ernest and Judit Gottdiener; Ervin Tausky, a natural person, and Suan Investments, a Gottdiener family holding company, are some of those victims, survivors of the Nazi extermination of the Jews of Hungary and federally protected crime victims of Mr. Sater' s racketeering, as such his creditors. They were defrauded of their rights to restitution and, because the government illegally concealed Sater's entire case, their rights to sue him. The Gottdieners claim damages for the fraud on them against everyone responsible for the 15-year delay and deprivation of their civil rights.

***

Plaintiffs seek relief against those directly and vicariously responsible for the fraud in the three years of litigation …, such litigation was in bad faith, purportedly to protect the safety of Sater by maintaining under legal seal and closure information of and concerning the nature and existence of his conviction, cooperation and sentence which had in fact been public for up to a decade…., such fraud actionable statutorily as well as at common law. *Inter alia,* insofar as they committed divers frauds and deceits in the context of those litigations, they are sued under Jud. Law §487.

104.    There has never been a determination that those claims were meritless, much less "frivolous." Rather, the action was withdrawn for the following reasons.

105.    Days before the complaint was to be filed, Sater emailed and faxed threats to various plaintiffs, and plaintiff Kriss's father, a partner at Stroock, Stroock & Lavan, and stating that he would act on those threats if the complaint were filed.

106.    Sater activated websites named, *e.g*., jodykrissthief.com and jodykriss.com, and many others, and sent emails to all of the attorneys at Jody Kriss's father's law firm Strook Strook & Lavan, claiming that the father (Ron Kriss) was a criminal who had taken control of Bayrock. The email of April 7, 2014 was apparently sent to every one of the 375 attorneys at Stroock. That's a key date for two reasons.

42

107.    First, it's the same day the complaint in the removed 13-cv-3905 action was due to be filed by order. Second, it's the same day plaintiff Ejekam became aware that he too was now a target of Sater, and that's extremely important because the transmission to Ejekam is a pure, direct criminal threat facially evidencing the *mens rea* of witness tampering and obstruction:

108.    On Saturday, April 5th, two days before the bulk emails to the Stroock attorneys, and two days before the complaint in the 13-cv-3905 case was scheduled for filing, the following email was sent to Chu'Di Ejekam. Though it bore the sender name "jkrissinfo@gmail.com," it obviously was not sent by co-plaintiff Jody Kriss, as the text of the email makes plain:

> **From:** Jody Info [mailto:jkrissinfo@gmail.com]
> **Sent:** 05 April 2014 17:02
> **To:** Michael Chu'di Ejekam
> **Subject:** Fwd: Jody Kriss
>
> **Dear Michael Chu'Di Ejekam,**
>
> **By Monday, Fred has to finalize this absurd extortion of a lawsuit against the largest people, companies and law firms in real estate.**
>
> **If on monday your name remains part of this extortion, you will only have yourself to blame.**
>
> **See your friend and co-plaintiffs' new lifetime online reality. If you choose to continue with this extortion, It will also be your new online reality for the rest of your life, you can explain to people why these companies owe you**
>
> **$1 BILLION DOLLARS.**
>
> **This is your one and only warning.**
>
> **www.jodykriss.net**

109.    But it wasn't sent to Mr. Ejekam alone. That email was simultaneously transmitted to numerous employees and senior officers in international offices of the private equity investment fund where Mr. Ejekam worked, including by unauthorized use of its internal email system. Mr. Ejekam advised that the sender had obtained the internal ID necessary to

cause his employer's own email system to rebroadcast the email internationally. Such broadcast caused severe professional problems for Mr. Ejekam, and, knowing that other Bayrock employees and partners had testified under oath that Sater had threatened to kill them if they told what they knew of his criminal conduct at Bayrock, Mr. Ejekam felt extremely threatened and vulnerable, and not only to having his reputation smeared and his livelihood destroyed if he continued in the 13-cv-3905 as a party, derivative party, or even "mere" witness, but felt that he and his family were in physical danger.

110.    Mr. Ejekam was well aware of the smear and threats to which co-plaintiff Jody Kriss was being subjected. Indeed, Sater also sent emails to Jody Kriss's current colleagues and customers. Sater had investigators call and visit Mr. Kriss's current colleagues and customers, telling them that Mr. Kriss was being investigated for various reasons.

111.    For example, Sater sent persons purporting to be private detectives – one of whom identified herself as having been directed by counsel Jason Berland, a partner of Mobargha and Beys who was representing Sater – swarmed through New York accosting Kriss's employees, partners, customers, and investors, often claiming to be public officials and telling each person that Kriss was "under investigation" in connection with this suit and he or she could be next.

112.    Websites in various permutations of Kriss's name have been published, repeating the libels, for example jodykrissthief.com, which was owned by Sater.

113.    Then anonymous advertisements appeared disparaging Kriss, for example in Real Estate Weekly, for which (as I was told by reporter Sarah Trefethen, now a reporter at the New York Post) the advertising copy was delivered by messenger in an unmarked, untraceable envelope with a bundle of cash for each weekly edition in which the advertisements appeared.

This was followed by anonymous mailings and emailings of combinations of those advertisements, plus press releases and lists of websites republishing the libels.

114.   Both Kriss and Ejekam felt that they were being intimidated as witnesses to the matters that were the subject of the 10-cv-3959 action and the 13-cv-3905 action. Therefore, on Monday, April 7th, Mr. Oberlander – having been instructed to do so by his clients – advised the court that his clients were being threatened, having faith that the court would take such claims seriously and order an immediate hearing, when coming from an officer of the court.

115.   Although the threats were brought to the attention of Judge Schofield, she declined to conduct a hearing, notwithstanding that case law had been brought to her honor's attention stating that when a party threatens witnesses, a federal judge *must* immediately cease the proceedings, and investigate those threats, and that if the judge fails to do so, she *must* be deemed to have abdicated her responsibility and removed from the case. See, *e.g.*, *Ty Inc. v. Softbelly's, Inc.*, 353 F.3d 528 (7th Cir. 2003); *Erickson v. Newmar Corp.*, 87 F.3d 298 (9th Cir. 1996). Judge Schofield deemed such case authority to be inapplicable because those cases did not concern events that occurred at the pleadings stage of the case.

116.   By letter dated February 14, 2015, the law firm of Simon & Partners, brought Sater's threats to the attention of the NYPD, attaching over a hundred pages of documentation, which I include with the exhibits. (See *2015.02.14 Package for law enforcement re Sater's threats*). Like Judge Schofield, the NYPD did nothing about Sater's threats, and so the threats continued.

117.   When further threats were again brought to the attention of the court, the magistrate stated that he felt that Mr. Sater was being "colossally stupid," but did nothing about

it. Rather, all that the court did was endorse a letter and make a docket entry on the 10-cv-3959

docket on April 22, 2016 stating:

> MEMO ENDORSEMENT on re: 347 Letter, filed by Michael Chu'Di Ejekam, Jody Kriss. ENDORSEMENT: I did not issue any 'order' during the conference on 10/6/15. I did say that the conduct then complained of, which I attributed to Mr. Sater, was colossally stupid. I continue to adhere to [that] view. I do not intend to take any action in response to this letter unless Judge Schofield otherwise directs. Finally, I take no position how as to what the appropriate scope of discovery in this matter will be. (Signed by Magistrate Judge Frank Maas on 4/21/2016) (cf) (Entered: 04/22/2016).

118.    Judge Schofield's failure to take action when the abuse and threats against the

plaintiffs were brought to the judge's attention weighed very heavily upon the Kriss plaintiffs,

who ultimately determined that it was not worth it to continue the action, and therefore filed

voluntary dismissals under rule 41, which Judge Schofield chose to convert into a dismissal with

prejudice. Be that as it may, there was no determination by any court that the action was

frivolous, nor could there have been, since no complaint detailing plaintiffs' allegations was ever

submitted to her for review.

## C.    An Order Warning "Richard Roe" to Refrain from "Future Filings of a Frivolous Nature" is not An Order Capable Enforcement.

119.    Manifestly, an attorney is always under an obligation to not make frivolous

filings, and thus general language in a court order, directed to a specific attorney warning him

not make future frivolous filings, has no injunctive effect. "[A]n injunction must be more

specific than a simple command that the defendant obey the law." *SC Johnson & Son v. Clorox

Co.*, 241 F. 3d 232 (2d Cir. 2001).

120.    As stated in *SEC v. Goble*, 682 F.3d 934, 949 (11th Cir. 2014), "an obey-the-law

injunction does little more than order the defendant to obey the law. We have repeatedly

questioned the enforceability of obey-the-law injunctions not only in the context of securities

cases but other cases as well." (See also *SEC v. Tourre*, <u>4 F. Supp. 3d 579</u> (SDNY 2014) (citing *SEC v. Goble*).

121.    The accusation here is not merely that I filed a frivolous pleading or pursued a frivolous claim, but that in so doing I violated an order of the Second Circuit Court of Appeals. First and foremost, the allegation is simply not true. Moreover, it is incomprehensible that I can be called upon to answer before the Grievance Committee for violation of that order, which contains no more than a general warning, rather than a specific mandate or directive, to obey the Rules of Professional Conduct. Finally, as noted above, Judge Cogan himself found that the "warning" was non-decretal. (See *2013.05.28 Cogan order denying motion for sanctions against Oberlander and Lerner*, p. 2).

122.    Accordingly, in all good faith (subjectively and objectively), I do not believe that the claims alleged in either of the two actions cited as the basis for the alleged violations claimed, were frivolous and certainly neither was held to be frivolous by the judge assigned to each matter. [30]

### Grievance Allegation #5

"The respondent filed frivolous Notices of Appeal with the Second Circuit, including an appeal from a scheduling order that was not a final order nor subject to any of the exceptions to the final judgment rule. *See* June 29, 2011 Second Circuit Order ("[i]t is ORDERED that appellant Richard Roe is hereby warned that the Court's patience has been exhausted by his filing of six separate notices of appeal regarding the same principal legal dispute-including the filing of an appeal from a March 23, 2011 scheduling order that obviously was not a final order nor subject to any of the exceptions to the 'final judgment rule,' see Part (iv), post-and that any further attempts to re-litigate the issues decided by this order, or other future filings of a frivolous nature, may result in sanctions."). (Exhibit 0)."

---

[30] In any event, this grievance committee lacks jurisdiction to even consider the issue, because the complaint at issue was filed in the Southern District of New York, not the Eastern District.

## Response to Grievance Allegations #5

123.    Although Judge Glasser's March 23, 2011 "scheduling order," obviously was not a "final order" for purposes of an appeal, nevertheless at the time of the service and filing of the specific notice of appeal referred to, I had, what I believed at the time was a rational, reasonable, and good-faith basis to believe that said order was subject to appeal and that noticing same was proper, for several reasons. The fact that the Second Circuit may have subsequently held otherwise, does not negate my *bona fides* at the time.

124.    First, because Judge Glasser's March 23, 2011 order cast opprobrium upon Mr. Oberlander, as it stated that he had "flouted" a sealing order, I believed it appealable for the reasons stated in *Cobell v. Norton*, 334 F.3d 1128 (DC Cir. 2003), a decision I had read before I filed the notice of appeal.

125.    In *Cobell v. Norton*, motions were brought seeking both civil and criminal contempt. The order to show cause issued thereafter ordered the respondents to show cause why they should not be held in *civil* contempt of court. No criminal contempt charges were pursued; however, an order was ultimately issued reprimanding the respondents. The court held that the entire proceeding had been criminal, not civil, ***because of the opprobrium cast upon the respondents by the court's reprimand***, making the entire proceeding *ab initio* criminal, and immediately appealable on an interlocutory basis. The *Cobell* court stated:

> The district court styled the contempt in which it held the appellants civil in nature. In this circuit an order holding a party in civil contempt in an on-going proceeding is not appealable as a final order. In contrast, criminal contempt judgments are immediately appealable pursuant to § 1291 because they result from a separate and independent proceeding ... to vindicate the authority of the court and are not a part of the original cause. As we explain below, the district court's findings of contempt are functionally criminal rather than civil in nature. Therefore, we have jurisdiction over this appeal from the contempt aspects of the Contempt Order.

*Id.,* [334 F.3d at 1140](internal quotes and citations omitted).

126.     Because of the statement in Judge Glasser's "scheduling order" that my client had "flouted" an order (even though Judge Glasser had previously acknowledged that *he had never even issued a sealing order*, and that such an order could not have bound Mr. Oberlander in any event, because he was not a party to the 98-cr-1101 case), I reasonably believed that the opprobrium cast upon my client triggered immediate appellate rights, because the damage, so to speak, was done. A judge's statement that an attorney "flouted" a court order, even a non-existent order, clearly would, in many minds, bring shame and scornful reproach upon him, triggering, I believed, the right of immediate appeal.

127.     Second, because Judge Glasser's "scheduling order" made entirely new findings to justify, *post hoc*, the injunction that he had issued nine months earlier on June 21, 2010 as to the PSR – an injunction that the judge had previously stated was made without regard to any act by my client (or by anyone else),[31] but instead was based upon the PSR itself, there was a good-faith basis to appeal because I believed that the order, in any event, would be prejudicial to my client if it were presented to that court. In point of fact, the triggering event for the notice of appeal was that the government attached a copy of the March 23, 2011 order in the appendix to

---

[31] "THE COURT: Let me clarify some things. There is no evidence other than the fact that Mr. Oberlander received these documents from Mr. Bernstein. Mr. Bernstein, according to Mr. Oberlander, represented to him he got documents because Mr. Doe gave them to him. ***I haven't heard any evidence one way or the other with respect to that information.*** [¶] With respect to the presentence report, I am issuing a permanent injunction that the information contained in that presentence report is not to be disseminated. ***It is not a question as to whether Mr. Oberlander knew or didn't know whether they were or weren't stolen.*** [¶] *Charmer Industries*, in this Circuit, makes it painfully clear that presentence reports are not to be distributed or disseminated or disclosed to third parties. To the extent Mr. Oberlander has possession of the presentence report, I'm enjoining Mr. Oberlander from disseminating any information contained in that presentence report. ***The order with respect to presentence reports is not directed to any individual, it is directed to the presentence report itself.***" See *2010.06.21, Transcript*, pp. 87-88 (emphasis added).

their April 11, 2011 appellee brief. The notice of appeal from the March 23rd order was therefore filed three days later, on April 14th, and, given the risk that the Second Circuit might deem the injunction that was issued in June 2010 to have been based upon the "finding" in March 2011 that Mr. Oberlander had "flouted" Judge Glasser's non-existent order, there was a subjective and objective good-faith basis to have believed that the filing of the notice of appeal was warranted and proper. See *Marathon Oil Co. v. United States,* 807 F. 2d 759, 764 (9th Cir. 1986) ("An order granting or refusing an injunction brings before the appellate court the entire order, not merely the propriety of injunctive relief, and we may decide the merits of the case and order dismissal of the action. As a general rule, however, we concern ourselves only with the order from which the appeal is taken, and review other issues only if they are inextricably bound up with the injunction.") (Citations, internal quotes and other punctuation omitted).

128. Third, I had a good-faith belief that the order raised important First Amendment issues, which I believed I had an obligation to bring to the Court of Appeals' attention: And it was no mere "scheduling order."[32] Rather, it was issued at a time when Judge Glasser had to have been aware that briefs were imminently due to be filed in the Second Circuit addressing the issue of whether anyone could be bound by an unwritten, undocketed sealing "order," which did not comply with Rule 65, and could not have applied to my client, because he was not a party to the 98-cr-1101 case. Judge Glasser stated in the order:

> Neither a case nor a filed document can be sealed without a court order, *United States v. Amodeo*, 44 F.3d 141, 147 (2d Cir. 1995); *R&G Mortgage Corp. v. Federal Home Loan Mortgage Corp.*, 584 F.3d 1, 12 (1st Cir. 2009), ***and it must be presumed***, therefore, that such an Order existed, explicitly or implicitly. In unilaterally deciding that such an order did not exist, or, if it did exist, it was binding on court personnel only; or in any event, he had a First Amendment right to publish that which was sealed, he knowingly and intentionally flouted a Court

---

[32] It did not merely say, *e.g.*, the government's papers are due on X date, defendant Sater's papers are due a week later, and non-party Oberlander's are due the following week.

order. It is a fundamental principle that court orders carry an initial presumption of validity and must be obeyed even if it is later shown to be erroneous. *McDonald v. Head Crim. Ct. Superior Officer*, <u>850 F.2d 121, 124</u> (2d Cir. 1988). If a person believes an order to be erroneous, he must establish that through established procedures and not by unilaterally deciding that it can be ignored. *Manness v. Meyers*, <u>419 U.S. 449, 458</u> ("We begin with the basic proposition that all orders and judgments of courts must be complied with promptly. If a person ... believes that order is incorrect, the remedy is to appeal, but absent any stay, he must comply with the order.") The procedure that Roe was required to have followed, given any one of his assumptions, was to move the Court for an Order unsealing the document providing the reasons and the authority for granting the relief sought.

The injunctions issued by the Court were deemed compelled by Roe's ignoring of the sealing directives; the danger to the life of John Doe by publishing the sealed matter and for his possession of and threatened publication of information in a presentence report which is not a Court document *In re Siler*, <u>571 F.3d 604, 610</u> (6th Cir. 2009); *United States v. Corbitt*, <u>879 F.2d 224, 239</u> (7th Cir. 1989); *United States v. McKnight*, <u>771 F.2d 388, 391</u> (8th Cir. 1985), and the confidentiality of which is sedulously guarded. *United States v. Charmer Industries*, <u>711 F.2d 1164</u> (2d Cir. 1983).

(See *2011.03.23 Glasser order*, pp. 4-5).

129.   The "scheduling order" thus had an *in terrorem* component, in that it indicated that a person – Mr. Oberlander or anyone else, for that matter, including the media – could be punished for not abiding by an unwritten, undocketed order "issued" in a case that he was not a party to, and that he must presume its existence. Thus, the "scheduling order" turned every sealing order, even if non-existent, into a prior restraint gag order, binding on the world, notwithstanding the absence of any indication on the face of the "order" what the person to be restrained could not publish, why he couldn't publish it, what grave imminent harm was to be prevented by enjoining publication, why there was no less restrictive means to avoid such imminent harm, all without prior notice and an opportunity to be heard, and thus completely unlawful. See *Carroll v. Princess Anne*, <u>393 U.S. 175</u> (1968) (there can be no prior restraint without advance notice and full adversarial First Amendment due process).

130.     In *Multimedia Holdings v. Circuit Court of Florida*, <u>544 US 1301</u> (On Application for Stay, 04A773 (2005) (Opinion in Chambers), a television station covering a state court criminal trial had obtained copies of grand jury minutes and was about to televise them when the presiding judge issued an order to the effect that anyone who published those minutes could face criminal contempt charges. Understandably feeling at risk if it published, but not wishing to abandon the story, the station appealed to the state appellate court, which declined to hear it, leaving the station with no further state court appeals.

131.     Accordingly, the station then chose to petition the US Supreme Court for a writ of certiorari, first applying to the circuit justice, Mr. Kennedy, for an emergency stay of the state court's order.

132.     Justice Kennedy, in a published, reasoned, opinion, denied the application, but not before stating that in other circumstances he might well have granted it. The opinion is significant for what it means about the appealability *vel non* of "informal" orders. Justice Kennedy wrote that even an informal government threat of prosecution for engaging in protected speech is sufficiently chilling as to be, in effect, a prior restraint, and is thus immediately appealable; all the more so when the governmental unit that issued the "informal threat" was a court.

133.     For the foregoing reasons, I had a subjective and objective good-faith belief that it was proper to serve the notice of appeal from the "scheduling order." Additionally, though I cannot locate contemporaneous notes, before I filed the notice of appeal I consulted with my co-counsel on the appeal, David Schulz and Paul Cassell, a former federal judge, who concurred that it was appropriate.

## Grievance Allegation #6

The respondent improperly engaged in undignified and discourteous conduct toward the courts by making unfounded accusations against Judge Glasser, Judge Cogan, the Eastern District and the Second Circuit. A non-exhaustive list of this conduct includes: …

### Response to Grievance Allegations #6 (Introduction)

134.   I repeat and incorporate herein all of the afore-stated facts and arguments.

135.   In *Ex Parte Steinman and Hensel*, 95 Pa. 220, 238-239 (1880), Pennsylvania's high court stated that it would be "monstrous" to suggest that attorneys, by virtue of their license to practice law, have less right to criticize judges than non-attorneys:

No class of the community ought to be allowed freer scope in expression or publication of opinions as *to the capacity, impartiality or integrity of judges* than members of the bar. They have the best opportunities of observing and forming a correct judgment. They are in constant attendance on the courts…. To say that an attorney can only act or speak on this subject under liability to be called to account and to be deprived of his profession and livelihood by the very judge or judges *whom he may consider it his duty to attack and expose*, is a position too monstrous to be entertained for a moment under our present system.

136.   Accordingly, I maintain that an attorney has an absolute right, indeed a duty to expose what he believes to be any improper conduct of any judge.

137.   Moreover, my conduct before Judge Glasser, Judge Cogan and the Court of Appeals afforded the bench all due respect and the decorum expected of an attorney admitted to practice before those courts. As an overview to this response to allegation #6, and each of its subparts which are addressed below, it is respectfully submitted that the arguments contained in the written submissions at issue, which are subject to rules requiring courtesy to a judge, must be viewed here in the context of the proceedings wherein the conduct occurred.

138.   From the perspective of myself and my client, the very issue before each of the courts involved in prior proceedings, was not merely the propriety of our conduct, but whether or not the conduct of the courts themselves was appropriate in treating the criminal prosecution of

Felix Sater, and virtually all documents relating thereto, as being sealed without a lawful and proper sealing order, and therefore not open to the scrutiny of the public and the legal community. Thus, from my perspective, my client and I had nowhere else but in our papers to "fearlessly" and "courageously" [33] exercise our right of free expression, and to lodge our critiques of doctrines and practices which we considered noxious to the Constitution and the rule of law.

139.    "Men are entitled to speak as they please on matters vital to them; errors in judgment or unsubstantiated opinions may be exposed, of course, but not through punishment for contempt for the expression. Under our system of government, counterargument and education are the weapons available to expose these matters, not abridgment of the rights of free speech and assembly." *Wood v. Georgia*, 370 U.S. 375, 389 (1962). In *Wood*, the Supreme Court reversed a finding of contempt against a sheriff who, in his personal capacity, had disseminated a press release, with the intent and knowledge that it would be made known to a grand jury in order to influence its deliberations, to bring to the grand jurors' attention what he believed to be corruption of certain judges. In reversing, the Court concluded, "[o]ur examination of the content of petitioner's statements and the circumstances under which they were published leads us to

---

[33] "The safeguarding of these rights [of free speech and expression] to the ends that men may speak as they think on matters vital to them and that falsehoods may be exposed through the processes of education and discussion is essential to free government. Those who won our independence had confidence in the power of free and fearless reasoning and communication of ideas to discover and spread political … truth. Noxious doctrines in those fields may be refuted and their evil averted by the courageous exercise of the right of free discussion. Abridgment of freedom of speech and of the press, however, impairs those opportunities for public education that are essential to effective exercise of the power of correcting error through the processes of popular government." *Thornhill v. Alabama*, 310 U.S. 88, 95 (1940). "It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion." *Id.*, at 97.

conclude that they did not present a danger to the administration of justice that should vitiate his freedom to express his opinions in the manner chosen." *Id.* at 395.

140.    The statements that are the subject of each of the subparts of allegation #6 are not of a kind that are beyond fair argument and comment upon the facts, by a zealous advocate, at least not under the New York Rules of Professional Conduct, which govern here. As such they are matters of opinion, rather than of fact and are not discourteous to the Court.

141.    Stating, for example, that Judge Glasser and other judges within the Second Circuit have unconstitutionally hidden cases from the public cannot be discourteous, and cannot be punishable in any forum, if it is either (1) true; or (2) likely enough true by a subjective standard under *Sullivan v. New York Times*; or even (3) likely enough true objectively.

142.    In the event that the statements are not deemed opinion, I respectfully demand an evidentiary hearing at which I may prove that the judges have indeed engaged in the pattern and practice of hiding criminal cases off the public docket, and by so doing have deprived crime victims of the restitution to which they are entitled under the Mandatory Victims Restitution Act, and the further rights to which they are entitled under the Crime Victims Rights Act, and have deprived the public of the information that is their "public property," under *Craig v. Harney*, *supra – viz.*, the information that defendants like Sater were convicted RICO fraudsters.

143.    At the hearing, I would expect to call several judges and attorneys who will confirm that entire prosecutions and sentencings are hidden from the public, using the "John Doe" artifice, and that crime victims are thereby deprived of the mandatory restitution to which they are entitled under the Mandatory Victims Restitution Act, and the rights to which they are entitled under the Crime Victims Rights Act. Such testimony will establish, objectively, that the statements that I made were true, or were sufficiently likely to be true.

144.    With these principles in mind, I most respectfully submit that the statements that are the subject of the disciplinary allegation are, manifestly, argument in the form of statements of opinion. Inasmuch as the facts upon which the opinions were predicated were set forth in the motion to quash, thus giving the reader – here, Judge Cogan – the ability to ascertain the bases for the opinions, they thus constitute protected First Amendment speech, and, *ipso fact*, protected First Amendment *petitioning*, which is even more protected than First Amendment *speech*. See *infra*.

145.    Therefore, the statements are: (i) appropriate as argument, given the issues in the case and the applicable circumstances; (ii) absolutely protected by the First Amendment's freedom-of-speech clause; and, (iii) even more strongly, more fundamentally, protected by the petition clause.

### Grievance Allegations #6 a-d
### (Concerning the Motion to Quash)

a.  Stating in motion practice that "[a]s it happens, what Judge Glasser and the Second Circuit have done, in concert with your own [Judge Cogan's] prior orders, is to hide an entire covert justice system operating devoid of constitutional legitimacy. It is so repellent to our Constitutional system that it is not merely invalid by reason of unconstitutionality. It and the orders attempting to conceal it (including the disgrace of purporting to order a United States citizen not to report judicial unlawfulness to Congress) are and were at all times jurisdictionally barred. No federal court may enjoin anyone from revealing its own misconduct, ever, such injunction again *pro tanto brutum fulmen*." February 17, 2012 Motion to Quash, at 9 (Exhibit K).

b.  Characterizing Judge Cogan's signing of the order to show cause as "illegal and unlawful," and accusing him of "maintaining an inaccurate docket" in another matter. *Id.*, at 3.

c.  Accusing the Eastern District of taking "unlawful and unethical measures to cover up ... illegal sentencing schemes," and the Second Circuit of orders evidencing "lawlessness" and "sedition" and constituting a scheme to "defraud[] ... victims of untold millions of dollars." *Id.*, at 4, 8.

56

      d.  Accusing Judge Glasser, Judge Cogan, and the Second Circuit of "hid[ing] an entire covert justice system operating devoid of constitutional legitimacy." *Id*., at 9.

### Response to Grievance Allegations #6 a-d

146.    I hereby incorporate my introductory remarks, as well as the responses to all the prior allegations, and provide these additional responses to subparts a through d of allegation #6, all of which concern the motion to quash the order to show cause that was signed by Judge Cogan.

147.    Respectfully, I had a good faith belief that the opinions referenced in Grievance Allegations #6 a-d, which come from a motion to quash, dated February 17, 2012, constituted fair comment, and as the facts serving as the bases for such opinions were set forth in the papers, only if there was a false statement of the facts, made without basis to believe that they were true, and those statements themselves discourteous to the court, could there be any finding that there was a violation of RPC Rule 3.3.

148.    And, respectfully, such opinions expressed in the motion to quash constituted not merely non-frivolous argument, but argument that comports with the duties of candor to the court and of zealous advocacy, which taken together, require telling the court that it has gone astray of constitutional and statutory law, and deep-seated principles of Anglo-American jurisprudence. My good-faith belief was, and remains, predicated upon my consideration and review of hundreds of years of Anglo-American jurisprudence and constitutional law, some of which will be set forth below.

149.    I believe logic dictates that I first address the concept of "sedition," referenced in Grievance Allegation #6 c. As stated in the addendum to the motion to quash (see *2012.02.17 Motion to quash contempt motion before Judge Cogan*, p. 17), the term "sedition" as utilized in

the motion to quash was intended to have the meaning applied that term by the Framers of the

Constitution, *i.e.*, conduct intended "to impede the operation of any law of the United States."

150.     I begin with the addendum to the motion to quash, and quote it at length, for if it

is correct, or if there was a good-faith basis to believe it to have been correct, then the other

statements for which I am called to respond must too be considered correct (and, even more

certainly, must be deemed non-frivolous, and in subjective and objective good faith). And as the

statements made were germane to the issues raised by the order to show cause signed by Judge

Cogan, and the motion to quash it, they cannot be deemed to have been discourteous: (emphasis

added; typographical and punctuation errors corrected)

> We use the term "sedition" with precision. It is correct, at least as would have
> been understood by the Framers, in the context of Article III, impeachment, and
> the period from 1769 through 1798.
>
> As defined in the Alien and Sedition Acts of July 14, 1798, entitled: "An act for
> the punishment of certain crimes against the United States," sedition includes:
>
> > *That if any persons shall unlawfully combine or conspire together, with
> > intent to oppose any measure or measures of the government of the United
> > States, which are or shall be directed by proper authority,* **or to impede
> > the operation of any law of the United States ... he or they shall be
> > deemed guilty of a high misdemeanor**....
>
> In today's usage this would be similar to conspiracy to obstruct; however, in the
> context in which we use it we disclaim this or any statutory criminal interpretation
> and use the term sedition in its context, by definition, of a *political* crime.
>
> As Blackstone understood the term "high misdemeanor" in his 1769 volume, and
> commented, ***it most typically referred to maladministration in official office***, and
> indeed had no commonly understood meaning in English criminal law at the time,
> outside of such wrongful acts of officials. ***Thus, we use it [i.e., the word
> "sedition"] accurately to describe a conspiracy to violate the mandatory
> sentencing laws of the United States*** (in the same way Suffolk was impeached in
> 1450 for repudiating victims' rights and restitution laws)[34] and – as did our

---

[34] The grievance committee will note that charge number 15 against the Duke of Suffolk was "Delaying
of justice in stopping the execution of writs of appeal of several women, for the deaths of their husbands."
That is, the widows had, essentially, sought restitution for the deaths of their husbands, but Suffolk
stopped the execution of their rights to such compensation. See *Precedents of Proceedings in the House
of Commons*, p.67 & fn. (Luke Hansard & Sons, 1818). See also *Index to the Rolls of Parliament*, p.599
(London 1832) (Strachey, Pridden & Upham, editors) ("Appeal instituted by a Widow against the

forebears – we call it "sedition," *per se* impeachable. Whether the acts comprising it are statutory or common-law crimes or not is of no concern to us.

Federal judges cannot operate in secret, alone or in combination with probation officers and officials of the Department of Justice, to evade mandatory restitution laws or any other mandatory sentencing laws. It's seditious.

Your honor understands the difference between motive and intent. Protecting personal safety (if a legitimate, non-pretextual concern) is an admirable motive. Doing so by concealing convictions, repudiating mandatory restitution sentencing laws, and also in this case concealing the victims' civil RICO choses in action which *per* 18 U.S.C. 1964 do not lie until entry of judgment (where, as here, the predicate acts may be dealt with as securities fraud) is evading the laws of Congress with the specific intent to cause an illegal result. That the result is illegal is made clear by *Ex Parte United States*, 242 US 27 (1916), a unanimous decision of the Supreme Court that when a judge violates a mandatory sentencing law he does so illegally and unlawfully, and no argument of inherent or implied authority will be heard. It is made illegal by *United States v. Dolan*, (2010), wherein the Supreme Court affirmed the Congressional mandate to sentence criminals to restitution is above any other law whatsoever.

Orders intended to restrain a citizen from revealing this are *per se* jurisdictionally barred, unless this court believes a court can *de facto* enjoin its own impeachment, self-evidently an act devoid of Article III authority, as impeachment is the ultimate political, thus non-justiciable, question. *See Nixon v. U.S.*, 506 US 224 (1993).

(see *2012.02.17 Motion to quash contempt motion before Judge Cogan*, p. 17).

151.    Respectfully, as the statements set forth in the motion to quash were well founded in fact, law, and inferences that ultimately were borne out by the evidence, not one of the statements for which I am called upon to answer in this grievance proceeding can be considered a discourtesy to the court. Moreover, I had a good-faith belief that it was a correct statement of the law that no court could enjoin a citizen from reporting its own misconduct to Congress based upon my study of Anglo-American jurisprudence.

152.    I reasonably believed then, and still believe, that either willfully or unwittingly, the acts of the courts and judges referenced in the motion to quash had the combined effect of

---

Murderers of her Husband, she obtains in case of her Death, that the Sons may follow up the same…. Inquest deterred through Threats and Fear to return their Verdict touching a Murder.")

permitting an unlawful obstruction of the judicial process, in the form of a constitutionally prohibited secret criminal docket as applied to Mr. Sater's criminal prosecution. That secret docket had the effect of depriving the victims of his illegal racketeering acts of their proper restitution.

153.    The First Amendment provides for our right to petition for redress of grievances, which, as the committee is aware, is even more protected than freedom of speech. See *Borough of Duryea v. Guarnieri*, <u>564 U.S. 379</u> (2011) (Scalia, concurring in judgment and partially dissenting). Thus, it was fair to say that no court (federal or state) may enjoin anyone from revealing its own misconduct, in the context of petitioning either a court or any other branch of government for a redress of grievances, and any such order must be seen as an empty threat.

154.    Now I ask the grievance committee to consider what I will call the "Rosenbaum Debacle."

155.    On May 14, 2002, former Chief Judge James M. Rosenbaum of the Minnesota District Court voluntarily appeared before the House Committee on the Judiciary to testify against a bill that sought to roll back a recent Guideline amendment that capped certain drug offense levels. Based on the judge's testimony, the next day Chairman Sensenbrenner sent Judge Rosenbaum a letter that included the request that the judge inform the Subcommittee of the pending sentence of Miguel Angel Larios-Verduzco, as well as other information.

156.    When Judge Rosenbaum balked, the Committee threatened him with a congressional subpoena, and in turn, through counsel the judge provided some records, but the Committee staff was required to trace the rest on its own. Based on this research, the Committee then wrote a scathing report (HR 107-769) that accused Judge Rosenbaum of a litany of misconduct including the following: (1) claiming that he had suggested that defendants were

being convicted based upon legally insufficient evidence; (2) providing false and inaccurate information about these case profiles; (3) generally being hostile to the Guidelines; and (4) <u>perhaps unlawfully closing a sentencing hearing</u>.

157.    Not long after HR 107-769 was released and impeachment warnings were floated to the press, Judge Rosenbaum unsealed the illegally sealed June 13, 2002 sentencing hearing. Congress then passed the Feeney Amendment to the PROTECT Act, as well as certain directives from the Attorney General, the net result of which was that by the end of 2003, <u>18 U.S.C. § 3553</u> had been amended to require every federal judge to not only state in open court the reasons for the imposition of a sentence, but also to require that every federal judge submit reports of sentencing dispositions to the Sentencing Commission. One year later Congress passed the Crime Victims Rights Act (CVRA), which changed federal law to give crime victims enhanced procedural rights and standing, including mandamus standing, the right to be heard at sentencing; and very substantially enhanced notification rights.

158.    Respectfully, inasmuch as the congressional subcommittee investigating Judge Rosenbaum found but a single instance of the judge's sealing of but one sentencing hearing to be evidence of judicial misconduct, it is certainly fair comment for an attorney to opine in court papers that similar acts by the judges before whom he had appeared had also engaged in improper conduct, such comparable acts being, for example:

- Judge Glasser's hiding of Sater's prosecution from the public, even after the "sealed" criminal complaint against him had been leaked to reporter Gary Weiss (see, "The Case of the Gym Bag that Squealed," Gary Weiss, BusinessWeek, Nov. 9, 1998),[35] whose article revealed the pump-and-dump RICO charges against Sater.

---

[35] https://www.bloomberg.com/news/articles/1998-11-08/the-case-of-the-gym-bag-that-squealed

- Judge Glasser's continued hiding of Sater's prosecution from the public through 2012, even though the fact that he had pled guilty to the RICO charges against him had been made public by Eastern District U.S. Attorney Loretta Lynch on March 2, 2000, which fact had been placed into the Congressional Record.[36]

- Judge Glasser's continued hiding of Sater's entire prosecution from the public, based upon his *post hoc* "findings" over a decade later – which "findings" were not based upon any evidentiary record whatsoever – that Mr. Sater might come to harm if the fact that he were a cooperator were to become known. Such "findings" were a fiction because Sater's nineteen co-conspirators against whom he had cooperated and provided information had been informed during the years 2000 to 2003 that Sater was a cooperator, so the "revelation" in 2010 and thereafter that he was a cooperator could not possibly have been a revelation at all.[37] Of course, the government had an obligation to tell Sater's co-conspirators that Sater was cooperating against them, under *Brady, Giglio & Jencks* doctrine.[38]

- Judge Glasser's failure to comply with mandatory sentencing law, in that Sater was not ordered to pay restitution, and there was no statement of reasons given for such failure to impose an award of restitution, hiding such failure from the public, and placing me and my client under threat of contempt if we were to reveal to the public that there was no award of "mandatory" restitution, nor notice to Sater's victims of their CVRA rights.

- Judge Glasser's failure to docket the occurrence of open court proceedings, and the transcripts of those open court hearings,[39] such as, *e.g.*, with respect to Sater's May 2010

---

[36] "Organized Crime on Wall Street," Hearing Before the Subcommittee on Finance and Hazardous Materials, Committee on Commerce, Sept. 13, 2000, PDF pages 198 et seq. (available at https://www.gpo.gov/fdsys/pkg/CHRG-106hhrg67115/pdf/CHRG-106hhrg67115.pdf ).

[37] Documents showing that the Sater's co-conspirators had been told that he was a cooperator were docketed in the 12-mc-150 by me, as part of a request to take judicial notice. The 12-mc-150 docket was created by Judge Glasser to address the media's, and others', motions to unseal Sater's 98-cr-1101 case. As Judge Glasser ruled that he would not allow testimony in opposition to continued sealing, I proffered the documentary evidence showing that Sater's co-conspirators were informed long ago that he was a cooperator, and thus the idea that they might come to harm if the fact of his cooperation were made public in 2012 was preposterous. In response to the filing, Judge Glasser issued an order to show cause for me to explain why I made such a voluminous filing. After I explained that they demonstrated that Sater's claims that he might come to harm were the co-defendants to learn of his cooperation were a sham, because they already knew, Judge Glasser dropped the matter.

[38] See *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. U.S.*, 405 U.S. 150 (1972); and 18 U.S.C. 3500 ("The Jencks Act").

[39] There were four on-the-record court hearings with respect to Sater's order to show cause. The transcripts were ordered, and provided, but they were never posted to Pacer, notwithstanding the EDNY's Rule:

Effective May 15, 2008, the Eastern District of New York, in accordance with Judicial Conference Policy and Federal Rule of Civil Procedure 5.2 and Federal Rule of Criminal Procedure 49.1, implemented the following policy regarding official court transcripts:

1. A transcript provided to the Court by a court reporter or transcriber will be available at

order to show cause which sought an order barring Mr. Oberlander and others from disseminating the allegedly "sealed and confidential" documents at issue, even though Judge Glasser acknowledged that what occurred at such open court proceedings was not, and could not be, subject to any gag order.

- Judge Glasser's sealing, without First Amendment due process, a document that was publicly available: A certain letter dated April 29, 2002 had been publicly docketed in the matter of *U.S. v. Lauria*, 98-cr-1102, and was publicly available on Pacer and from the National Archives. The letter stated that Lauria and Sater had pled guilty and were cooperating. Judge Glasser immediately granted, without taking any evidence, the government's *informal letter application* to seal the April 29, 2002 letter, without even awaiting opposition to the government's request. The Second Circuit held in *Gambale v. Deutsche Bank AG*, 377 F.3d 133 (2d Cir. 2004), that once a court document is made public, it cannot be re-sealed. [40] That is, that letter, though publicly available, had been put under seal, without a motion to seal having been filed, without notice to the public, without any evidentiary hearing, and without the judge having made any record findings capable of appellate review. The U.S. Supreme Court held in *Florida Star v. BJF*, 491 U.S. 524 (1989), that once a court document escapes the dominion and control of the court, there can be no restraint on its dissemination, nor punishment of one who disseminates it or the information in it. Nonetheless, the mere fact that Judge Glasser placed such publicly available letter "under seal" was used as a basis to threaten Mr. Oberlander and me with contempt, based upon the unconstitutional proposition that revealing anything under seal could be in violation of a court order, even if it had been lawfully obtained outside of court process from Pacer and the National Archives.

- Judge Cogan's failure to publicly docket documents on the 12-mc-557 docket, even where they were already in the public domain. In fact, Judge Cogan well understands that a document that is public cannot be placed under seal, inasmuch as the November 23, 2011 docket entry from a different case, *U.S. v. Curanovic et al.*, 08-cr-00240 (Cogan, J.), shows:

  > "ORDER re 1300 Letter. Counsel for Thomas Gioeli has filed a redacted version of Mr. Gioeli's 1292 opposition and the government has requested that he likewise file a redacted version of Mr. Gioeli's 1265 reply. Accordingly, the only documents that are still subject to sealing are the exhibits annexed to both documents. With one exception…I find that disseminating these statements to the public will endanger the safety of the witnesses. **One of the exhibits, however, is a publicly accessible news article. See Ex. N annexed to Mr. Gioeli's 1292 opposition. There are no grounds for sealing that Exhibit.** … [C]ounsel for

---

the Clerk's Office, for inspection only, for a period of 90 days after it is filed.…

3. After the 90–day period has ended, the transcript will be available for copying in the Clerk's Office and for download through PACER.…

[40] See also *United States v. Key*, EDNY Docket 98-cr-446 (Magistrate Mann, Order of Sept. 15, 2010): "Key offers no evidence that sealing now what has long been in the public record will prevent some enhanced risk of substantial prejudice to his or his family's safety."

> **Mr. Gioeli is Ordered to file an unredacted version of Exhibit N to his 1292 opposition.**" (Emphasis added.)

- As disclosed in the docket entry for January 10, 2012 (see *1998.12.03 Docket of U.S. v. Sater, 98-cr-1101*) Judge Glasser conducted an *ex parte* "status conference," without prior notice to me, as counsel for Mr. Oberlander, in which the judge discussed with the government and Sater's counsel the First Amendment issues raised by Mr. Oberlander. The docket entry states:

> "A Status Conference as to Felix Sater was held on 1/10/2012 before Senior Judge I. Leo Glasser: AUSA Todd Kaminsky and Evan Norris appeared on behalf of the Government. Michael Beys and Jason Berland appeared on behalf of John Doe. The Court directed the government and John Doe to provide a detailed chronological account with transcripts, of what the core issues involving this case and how it evolved into a First Amendment issue. The Court will issue an Order on Notice to Mr. Lerner directing the parties to brief the issues before the Court. The parties agreed to submit a Scheduling Order to the Court to be "So Ordered." (Court Reporter Charleane Heading.) (Francis, Ogoro) (Entered: 01/10/2012)"

159.     In response to Grievance Allegation #6 (b), asserting that I unprofessionally and discourteously stated that Judge Cogan had illegally and unlawfully signed an order to show cause that sought an order directing that Mr. Oberlander and I be held in civil contempt for allegedly violating a *pendente lite* order of the Second Circuit dated February 14, 2011,[41] it is respectfully submitted, such statement was neither disrespectful nor improper, but rather an attorney's fulfillment of his obligation of candor with the court and zealous advocacy on behalf of his client, and himself. Where, as was the case here, I had a reasonable basis to believe that Judge Cogan was acting beyond the scope of his authority, it was my obligation to tell him so, by informing him that signing the order show cause was, in fact, "illegal and unlawful."

160.     First, regardless of form, statutory and constitutional jurisdictional restrictions required the contempt petition to have been made directly to the Second Circuit, which is the court that issued the order that was alleged to have been violated. By express statutory

---

[41] The Second Circuit's order of February 14, 2011 was expressly *pendente lite*, and, as the case at the Second Circuit ended on December 20, 2011 with the issuance of its mandate, the *pendente lite* order expired.

restriction, Judge Cogan lacked the authority to sign that order to show cause because the underlying order that was allegedly violated was not *his* to vindicate. It belonged to another court, *the Second Circuit*.

161.    With the enactment of 18 U.S.C. § 401, Congress stripped lower courts of any authority they might have otherwise had to adjudicate a criminal contempt of the orders of any court but their own. This is jurisdictional. The Second Circuit could not have delegated to Judge Cogan the authority to sign that order to show cause, as Congress expressly forbad it. 18 U.S.C. § 401 provides: (emphasis added)

> A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, *and none other*, as—
>
> > (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
> >
> > (2) Misbehavior of any of its officers in their official transactions;
> >
> > (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

162.    Judge Cogan was therefore devoid of authority to execute the order to show cause, because, under the contempt statute, only the court that issues the order that has allegedly been violated – here, the Second Circuit – "*and none other*," has the authority to direct the alleged contemnor to respond to charges that he violated its order.

163.    Thus, I had a good faith objective basis to believe that Judge Cogan's signing of that order to show cause was without legal authority; *i.e.*, it was "illegal and unlawful." And I had the ethical obligation, as a zealous advocate with a duty of candor to the court, to say so.

164.    Second, the application for an order show cause was brought on by unsworn letter "motion," notwithstanding that Local Rule 83.6 required that the motion be supported by an ***affidavit***. As there was no affidavit, Judge Cogan's signing of that order to show cause, inasmuch

as it was not based upon any sworn evidence, was without authority; *i.e.*, it was "illegal and unlawful." Local Civil Rule 83.6, entitled "Contempt Proceedings in Civil Cases," provides: (emphasis added)

> (a) A proceeding to adjudicate a person in civil contempt ... shall be commenced by the service of a notice of motion or order to show cause. **The affidavit upon which such notice of motion or order to show cause is based shall set out with particularity the misconduct complained of**, the claim, if any, for damages occasioned thereby and such evidence as to the amount of damages as may be available to the moving party....

165.   Accordingly, inasmuch as Judge Cogan could not lawfully issue an order to show cause to vindicate the authority of another court, *viz.*, the Second Circuit, and could not lawfully sign an order to show cause that was not predicated upon proper evidence, I believed that I had a solid legal basis to state in the motion to quash that Judge Cogan's issuance of the order to show cause was "illegal and unlawful." Moreover, I rightfully believed that, as I had an ethical obligation of candor to the court, as well as an obligation to zealously represent my client, that I had the ethical obligation to say so.

166.   There is yet a third reason why the order to show cause was unlawful. By signing that order to show cause, Judge Cogan put himself in an untenable position. It is an open question whether, absent an express congressional grant of authority, a court of appeals has the authority to enforce its own orders by criminal contempt. Judge Cogan put himself, by signing that order to show cause, in the untenable position of adjudicating the scope of the Article III jurisdiction of a superior court. Respectfully, it is impossible and jurisdictionally barred, the functional equivalent of an appellate court certifying an interlocutory (or final) question of its own authority to a district court instead of to the U.S. Supreme Court. Judge Cogan was ordered

merely to "monitor compliance" with alleged sealing orders (whatever that means[42]), and had no authority to adjudicate contempt of any such orders.

167.     A district court judge could not possibly have the authority to preside, other than possibly as a fact-finding master, if at all, over a civil contempt proceeding which must inevitably adjudicate the validity, *including the constitutionality*, of orders of a superior court. That is an appellate function. Appellate orders don't get appealed down; they get appealed up.

168.     There is a fourth good-faith reason, objectively and subjectively, why the signing of that order to show cause was unlawful: A contempt proceeding is criminal rather than civil, regardless of nomenclature, if:

- The alleged contempt is backward looking. It is a completed act in the past (allegedly) violating a court order. It is not ongoing. It is not a continuing refusal to act.
- The petition requests sanctions.
- The alleged contempt cannot be purged and so the monetary relief requested cannot be avoided.

169.     Here, the unsworn letter application for contempt presented to Judge Cogan was backward-looking. It sought to punish rather than compel; there could be no purging, only punishment. Thus, it was in the nature of a request for the leveling of criminal charges against Mr. Oberlander and me, rather than civil claims.

170.     While there is no specific form requirement for a person, party or otherwise, to request that the court commence criminal contempt proceedings, *it is quite clear that the court*

---

[42] As noted, supra, without seeing the decretal language of any "sealing order," it is impossible to determine who is bound by it, and what acts are prohibited, and, if such "sealing order" does not comply with Rule 65, it cannot serve as an injunction. It is legally impossible to base a contempt proceeding on the violation of an unwritten order where the decretal language is not available. *U.S. v. Cooper*, 333 F.3d 161 (2d Cir. 2003).

**can only commence those proceedings pursuant to _Federal Rule of Criminal Procedure 42_, which, inter alia, requires that the charging instrument be read aloud in open court.** But Judge Cogan never read aloud any charges in open court. Therefore, the contempt proceeding instituted by Judge Cogan by order to show cause, which was under seal, was a nullity – *i.e.*, without authority, unlawful, and illegal – in my opinion (objectively and subjectively), based upon my study of the law.

171.    As for the portion of Grievance Allegation #6 (b), regarding Judge Cogan's maintenance of an improper docket in another case, I relied upon review of the docket and, in part, upon a news account, as my good-faith basis for that assertion. In 2010, the Huffington Post reported a rather unusual event that transpired in Judge Cogan's courtroom. See "Wiseguy Flips; Blunder by US Attorneys' Office Gives It Up."[43] According to the story, on December 1, 2010 mobster Sebastiano "Sebby" Saracino had pled guilty in open court before Judge Cogan to lying on his application for citizenship; Saracino was represented at the proceeding by a California attorney.

172.    As reported in the article, the next day, two reporters – John Marzulli from the Daily News, and Mitchell Maddux from the Post – saw a "John Doe" case with the same indictment number as Saracino's on Judge Cogan's daily docket. Marzulli and Maddux went to Judge Cogan's courtroom and saw the same California lawyer and the same prosecuting attorney from the day before. When Judge Cogan took the bench – apparently unaware that there were reporters in the courtroom – he announced that the government's motion to seal the proceedings was deficient. However, the prosecuting attorney approached for a sidebar, and Judge Cogan

---

[43] http://www.huffingtonpost.com/jerry-capeci/wiseguy-flips-blunder-by-_b_795495.html

then announced that the courtroom would be sealed, because if the proceedings were held in open court, the defendant and his family would be endangered.

173.    Judge Cogan's docket of the case shows only one plea date, December 1, 2010, for the case of *U.S. v. Saracino*, 10-cr-173, (see *2010.03.10 Saracino docket 10-cr-173*). I thus had a good-faith basis to believe, first, that Judge Cogan had kept an inaccurate docket, in that the second plea was not docketed. Nor was there any docketing of a motion to seal the courtroom. Yet the news accounts showed that Judge Cogan had entertained a motion to seal.

174.    I therefore also had a good-faith basis to believe that those proceedings were to be "public" only so long as no members of the public were actually present. As soon as the prosecutor brought to Judge Cogan's attention that there were reporters in the courtroom, he sealed the courtroom. If we give credence to the news accounts, then Judge Cogan violated the public's First Amendment rights, see *U.S. v. Alcantara*, 396 F.3d 189 (2005), as there was no prior notice that the courtroom would be sealed. I reasonably relied upon Daily News reporter John Marzulli as a reliable source of information, and the reasonableness of such reliance is borne out by the fact that he has recently become the spokesperson for the EDNY U.S. Attorney's Office.

175.    My assertions in legal argument that the courts, *i.e.*, the Second Circuit and the Eastern District, were illegally hiding cases, with the effect of depriving victims of restitution, as set out in Grievance Allegation #6 (c), were made in good faith based upon an objectively reasonable basis in fact, and were not unethical, but rather were within the scope of permissible good-faith advocacy.

176.    The victims of Sater, a convicted RICO fraudster, may never receive restitution, though restitution is mandatory under the federal Mandatory Victims Restitution Act, and though

he pled guilty to having defrauded investors of $40 million. This is because the judges of the Second Circuit and Eastern District of New York, and the prosecutors have created a set of circumstances which ensure that Sater will never face restitution. Rather, the judges and prosecutors, either knowingly or recklessly, allowed Sater to go on to engage in hundreds of millions of dollars of financial frauds, with impunity.

177. To prove the point, I am constrained to refresh the grievance committee's recollection as to First Amendment principles, as well as principles of sentencing law.

178. Judicial proceedings and documents are presumptively open under First Amendment and common-law principles.[44] The sentencing of a criminal defendant must be conducted in open court. 18 U.S.C. § 3553 (c) ("The court, at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence…."); *U.S. v. Alcantara*, 396 F.3d 189 (2d Cir. 2005). Enacted in 1996, the Mandatory Victims Restitution Act requires that criminal defendants sentenced for certain crimes be ordered to pay restitution to the victims, such as victims of RICO conspiracy frauds. See 18 U.S.C. § 3663A. Enacted in 2004, the Crime Victims Rights Act, 18 U.S.C. §3771, provides in section (b)(1):

> In any court proceeding involving an offense against a crime victim, the court shall ensure that the crime victim is afforded the rights described in subsection (a).[45] Before making a determination described in subsection (a)(3), the court shall make every effort to permit the fullest attendance possible by the victim and shall consider reasonable alternatives to the exclusion of the victim from

---

[44] See, *e.g.*, *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980); *In re New York Times Co.*, 828 F.2d 110, 114 (2d Cir. 1987).

[45] Among the rights included in subsection (a) are: "… (2) The right to reasonable, ***accurate***, and timely notice of any public court proceeding, or any parole proceeding, involving the crime …; (4) The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, …; (5) The reasonable right to confer with the attorney for the Government in the case; (6) The right to full and timely restitution as provided in law; (7) The right to proceedings free from unreasonable delay;…"

the criminal proceeding. The reasons for any decision denying relief under this chapter shall be clearly stated on the record.

179.    The word "mandatory" in the "*Mandatory* Victims Restitution Act" makes it unequivocal: The sentencing judge has an absolute duty to impose an order of restitution in favor of the victims. Indeed, when a federal judge refuses to impose a mandatory sentence he violates the law; it is flatly illegal**.** *Ex Parte United States*, 242 U.S. 27 (1916).

180.    *Ex Parte United States* is also known as the "*Killits*" case, named for the federal district judge involved. After the Supreme Court issued its decision in *Ex Parte United States*, Judge Killits defied the Supreme Court, and only relented when the Supreme Court issued an order to show cause why he shouldn't be held in contempt. Respectfully, it was my good faith belief that if the U.S. Supreme Court may threaten a judge with contempt for failing to impose a mandatory sentence, then I had an objectively and subjectively reasonable basis to assert that the failures of the judges of the Eastern District and the Second Circuit to impose orders of "mandatory" restitution – as required by ***mandatory*** sentencing law – and those courts' creation of a sealing regime that has allowed evasion of ***mandatory*** sentencing law, was and remains illegal.

181.    Indeed, in *Dolan v. United States*, 103 S.Ct. 2553 (2010), the Supreme Court put to rest any notion that restitution is discretionary, inasmuch as the statute states that restitution shall be imposed at sentencing *notwithstanding any other* provision of law, 18 U.S.C. §3663A.[46]

---

[46] The only exception is if the number of victims is so large or the calculation of losses would inordinately complicate the proceedings. 18 U.S.C. § 3663A(c)(3). (In *In re WR Huff Asset Management Co., LLC*, 409 F. 3d 555 (2d Cir. 2005), the court noted the means by which the government satisfied its duty to notify the tens of thousands of victims of the Rigas family's frauds.)

182.     Moreover, where two or three or more individuals plead guilty to the same RICO conspiracy, by virtue of *Pinkerton*, they are all jointly and severally liable to each other's victims. In business parlance, they each bought into the enterprise, and each share in the enterprise's liabilities.[47] Thus, it would be odd indeed if, for example, one were to find a case where defendants A, B, & C pled guilty to the same RICO conspiracy (that is, a conspiracy having the same victims), but where the court were to impose restitution in different amounts for different defendants, or to order restitution as to defendant A, but find it impracticable to order restitution as to defendants B and C.

183.     However, a review of certain dockets in the EDNY shows that the foregoing principles of law are all too frequently and routinely ignored, which serves as part of the objective basis for the opinions that I expressed regarding practices in the Second Circuit and the EDNY, that in my view illegally deprived crime victims of their rights to restitution.

184.     In that regard, the Pacer dockets of three related cases – *U.S. v. Gushlak* (EDNY Docket No. 03-cr-833; *U.S. v. Romano* (EDNY Docket No. 04-cr-234); *U.S. v. Appel* (EDNY Docket No. 04-cr-505) – demonstrate that there is a proclivity to disregard victims' rights in the EDNY. All three defendants – Gushlak, Romano and Appel – had pled guilty to the same RICO conspiracy,[48] so the victims were the same. When Mr. Romano came up for sentencing, the

---

[47] See *Pinkerton v. United States*, 328 U. S. 640, 646 (1946) ('And so long as the partnership in crime continues, the partners act for each other in carrying it forward'). If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators. As Justice Holmes observed: '[P]lainly a person may conspire for the commission of a crime by a third person.' *United States v. Holte*, 236 U. S. 140, 144 (1915). A person, moreover, may be liable for conspiracy even though he was incapable of committing the substantive offense." (Citations omitted).

[48] Affidavits were submitted by Romano and Appel in the Gushlak case attesting to their both having been co-conspirators as to the same RICO conspiracy. See EDNY Docket No. 03-cr-833, Docket Entry 70-1 and 70-3.

AUSA told the judge that there couldn't be restitution because no one knew who the victims were, "One of the problems because it was impractical if not impossible to find out who the victims were…" (See *2008.01.11, Romano sentencing transcript*, p. 38).[49] Appel was sentenced before a different judge, and on June 11, 2008 he was sentenced to pay $2.9 million in restitution,[50] which means that the AUSA had a victim list, and that it was *not* impracticable to order restitution. Gushlak was sentenced by yet another judge, who imposed a restitution order of $17 million, which also establishes that there must have been a victim list. In fact, the restitution order annexes a list of victims and losses. (See *2012.07.13, Gushlak restitution order and victim list*).[51]

185.     That is but one example of the bases for my objectively reasonable good-faith belief that there is a disregard for sentencing law within the EDNY. The Gushlak/Romano/Appel conspiracy was the same, so the victims were the same. Ergo, the losses were the same. And if there was a victim list as to Gushlak and Appel, there was a victim list as to Romano.

186.     But Romano was not ordered to pay "mandatory" restitution. Contrary to law – *viz.*, the MVRA and the CVRA – Romano was allowed to keep the money he stole. The AUSA told the court that there was no witness list, even though – as evidenced by the fact that the victim list was presented to the judges in the *Gushlak* and *Appel* matters – there actually *was* a victim list. I believe it is fair to infer from the sentencing transcript that it was because Romano was, as the AUSA called him, a "remarkable" cooperator that he was illegally allowed to keep the money he stole. (See See *2008.01.11, Romano sentencing transcript*, p.16).

---

[49] See also *2004.03.11, U.S. v. Romano docket, 04-cr-234.*

[50] See *2004.05.26, Appel docket, 04-cr-505.*

[51] See also *2003.07.17, Gushlak docket, 03-cr-833.*

187.    There is no provision in the MVRA or CVRA that says "remarkable" cooperators get to keep the money they stole. Respectfully, I submit that it is reasonable to infer that "good" cooperators are permitted – in violation of the MVRA and CVRA – to keep the money they stole in exchange for their cooperation. Yet this can only be accomplished if there is agreement – express or tacit – between the prosecutors and the courts, for the CVRA requires that the prosecutor notify the victims of open-court proceedings, and of their CVRA and MVRA rights, and under the CVRA *the judge is required to assure that the prosecutor comply with his CVRA obligations*.

188.    Apparently, Gushlak was merely a cooperator, but not a "remarkable" cooperator, so it was not hard for the government to find the list of *his* victims, though they were exactly the same as Romano's victims. Now consider the consequences of the EDNY's unlawful sealing regime: While Gushlak was cooperating and had a hidden plea,[52] he defrauded others, failing to tell investors that he had pled guilty to RICO fraud; *i.e.*, he was a convicted RICO fraudster. The Second Circuit noted in *U.S. v. Gushlak*, 495 Fed. Appx. 132, 2012 U.S. App. LEXIS 18691 (2d Cir. 2012), that "while sentencing was pending, Gushlak misrepresented to the public that he had never engaged in any criminal conduct. Gushlak contends that denial of acceptance of responsibility on these grounds was legally and factually erroneous. We disagree." Gushlak was only able to get away with such misrepresentations because he, like Sater, was afforded the luxury of a secret docket in the EDNY.

---

[52] Gushlak's docket was opened in 2003, but the first entry on the docket is the sentencing hearing held on November 17, 2010, seven years after the case was commenced. All that time, the public had no way to know that Gushlak had pled guilty to conspiracy to commit securities fraud.

189.    As noted above, criminal defendants must be sentenced in "open" court, and the

victims are entitled to "reasonable, accurate, and timely notice of any public court proceeding,"

18 U.S.C. §3771(a). Below is the notice that was given in advance of the sentencing of defendant

Sater in the 98-cr-1101 matter. In my opinion, such notice was neither reasonable nor accurate

and was meant, in effect, to keep the public from knowing that "Felix Sater" was to be

sentenced:

**United States District Court**
**Eastern District of New York**
**Judge GLASSER , I. LEO**
Friday, October 23, 2009
**Courtroom 8B S**

---

10:00 AM
Criminal Cause for Sentencing
**98cr01101**
*Deft.* - DOE JOHN
On Bond
*

190.    That was the public calendar notice that was presumably posted prior to Felix

Sater's sentencing on October 23, 2009 – eleven years after he was initially charged. Contrary to

the requirements of 18 U.S.C. §3771(a), that public calendar did not give "reasonable" and

"accurate" notice to Sater's victims, or to the public generally, that "Felix Sater" was to be

sentenced in public.[53]

191.    Moreover, just like Romano, Sater wasn't ordered to pay restitution, though

restitution is mandatory, and the government had the victims list.

---

[53] That notice was available via Google search until I pointed out to Judge Glasser that it was available. It
then was disappeared, along with all of the public calendars in the EDNY. They were all removed from
the public docket.

192.    Just like Romano, Gushlak, and Appel, in an unrelated conspiracy, Sater (EDNY

Docket No. 98-cr-1101), Salvatore Lauria (EDNY Docket No. 98-cr-1102), and Gennady

Klotsman (98-cr-313; 98-cr-1069; 02-cr-1313[54]), all pled guilty to the same RICO conspiracy,

according to the March 2, 2000 press release issued by EDNY U.S. Attorney Lynch.[55] Unlike

Sater and Lauria, however, Klotsman was sentenced to 71 months in prison, and was ordered to

pay $40 million in restitution by Judge Glasser. But Klotsman's criminal judgment and

sentencing transcript are not even a matter of public record. Mr. Klotsman's secret "U.S. v. John

Doe" 98-cr-1069 docket remains sealed,[56] even though the information is public. Indeed, it was

reported in the New York Times, in an article dated December 17, 2007, "Real Estate Executive

With Hand in Trump Projects Rose from Tangled Past."[57] [58]

193.    I point out the above, as well as the following, because Allegation # 6 (d) states

that I accused the Eastern District of using unlawful and unethical measures to cover up illegal

sentencing schemes.

---

[54] On March 13, 2015, in the matter of *Vodicka v United States*, EDNY Docket No. 15-mc-242, a miscellaneous matter which sought the unsealing of Klotsman's docket, the court issued an order directing the unsealing of Klotsman's 02-cr-1313 docket. ***Mr. Klotsman's secret "John Doe" docket, 98-cr-1069, remains, after some seventeen years, captioned "U.S. v. John Doe."***

[55] The press release may be found in the Congressional Record report entitled "Organized Crime on Wall Street," available at http://www.gpo.gov/fdsys/pkg/CHRG-106hhrg67115/pdf/CHRG-106hhrg67115.pdf (See, specifically, pdf page 199, at fn.2).

[56] The judgment on the docket was not unsealed until March 13, 2015, after it was made public on Klotsman's second docket, upon application of Mr. Vodicka.

[57] http://www.nytimes.com/2007/12/17/nyregion/17trump.html?pagewanted=print&_r=0

[58] Klotsman is currently spending ten years in a Russian penal colony for armed robbery of a jewelry store in Moscow. "How a Diamond Heist and Russian Gun Smuggling Lead to Donald Trump," Moscow Times, August 16, 2016. https://themoscowtimes.com/articles/a-diamond-heist-russian-gun-smuggling-and-donald-trump-55005

194.     It is contrary to our tradition of openness, and in violation of the public's First Amendment right to access to the courts, that a man – Gennady Klotsman – was sent to prison, yet no member of the public would even know it because his docket remained sealed. He could not have been sentenced in "open" court, if his docket was sealed. And his victims could not have been notified, if his docket was sealed. Nonetheless, the fact that restitution was imposed means that there was a victim list, and that it would not be unduly complicated to calculate the losses caused by Sater and Lauria in order to issue a restitution order.

195.     Noted defense attorney and professor of criminal law Gerald Shargel said this of the Second Circuit's regime of secrecy:

> In a system that celebrates transparency, I do not think that sealing is appropriate in the case of cooperators.… I cannot imagine that there can be a blanket rule where courts were permitted to make generalized findings that all records are sealed in the cases of cooperating witnesses. It would never pass constitutional muster.… We have open court proceedings in this country, and it cannot be a policy to take a particular class of defendants and say, in those cases, we are going to seal.[59]

196.     There is no readily available list of sealed cases and documents within the Second Circuit; therefore, I cannot present statistics, but only anecdotes. I submit that the anecdotes suggest that the problem is widespread, treated matter-of-factly, the way business is conducted within this circuit. It is so matter-of-fact that it is even discussed in open court, and thus provides further, after-the-fact support for my earlier statements that hiding criminal prosecutions is routine within the Second Circuit. For example, at the 2014 Southern District sentencing of

---

[59] *Panel Four: Cooperation and Plea Agreements—Professors & Practitioners*, The Honorable Steven Merryday, Caren Myers Morrison, Gerald Shargel, and Barbara Sale, 79 Fordham L. Rev. 65 (2011). Available at: http://ir.lawnet.fordham.edu/flr/vol79/iss1/4 , pp.69-70.

computer hacker Hector Monsegur, his defense counsel Peggy Cross-Goldenberg of Federal

Defenders of New York, stated on the record:

> [I]n many cases, because most cases are resolved with a guilty plea
> the cooperation is never publicly revealed and some sentencing
> proceedings and even some complete dockets remain under seal.
> This could have been such a case, because all of Mr. Monsegur's
> co-conspirators, all of the co-conspirators, pled guilty without a
> trial.[60]

197.    So too, in a recent opinion by Judge John Gleeson, he acknowledged that, at the

request of then United States Attorney Loretta Lynch, he facilitated the continued work as a

federal tax-return preparer of a felon he had secretly convicted of tax crime by, *inter alia*,

ordering that he could hide his conviction from his employers.[61] In other words, the public now

knows, because Judge Gleeson put it on the public record, that there is a secret case in the

Eastern District of New York wherein the DOJ asked for and received court leave to allow a

convicted tax preparer to continue to prepare taxes while defrauding clients by concealing the

material fact of his conviction.

198.    Respectfully, I had a good-faith basis to believe that the Second Circuit departed

from the Constitution and statutory law, in allowing the concealment of criminal cases, based

upon my review of some thirty years of case law and news reports, which I briefly summarize.

---

[60] http://cryptome.org/2014/05/monsegur-sentencing.htm. See pages 7-8.

[61] See *Jane Doe v. USA* 14-MC-1412 (JG), decision and order of May 21, 2015, available at
http://ccresourcecenter.org/wp-content/uploads/2015/05/Doe-v-US.pdf : "Yet last year the IRS recertified
a tax preparer despite its knowledge of his recent felony conviction in my courtroom for preparing a
fraudulent tax return for a major drug trafficker. In that case, the United States Attorney urged me to
allow the defendant to continue to work as a tax preparer without any notice to his clients of his recent
conviction for being a fraudulent tax preparer. The government's assertion in this case that the public
interest requires home health care agencies to know about Doe's minor criminal conduct in 1997 thus
rings somewhat hollow." In other words, the DOJ allowed a tax preparer to continue to prepare taxes (and
the judge illegally ratified it in a secret sentencing), just as Felix Sater, and other Eastern District of New
York cooperators, have been allowed to continue defrauding banks of over a billion dollars, and the
judges ratified it.

199.     Sometime within the last thirty years or so, the Second Circuit began to experiment with what I'll call "expedient constitutional analysis," an experiment authorized by no one, certainly not by the Framers or anything they imagined, an experiment characterized by a determination to do whatever the Department of Justice said was necessary to fight organized crime. Initially, this could be seen as far back as the 1970s, in decisions to allow anonymous juries.

200.     Although statistics are not available, as indicated by several commentators and by the anecdotes above, with convenient ease the EDNY and SDNY courts "disappeared" entire cases and dockets of cooperators, a practice which has existed for over 30 years. Interestingly, when this was first "outed," the DOJ claimed that no, not at all, it was not to protect cooperator safety that it was being done.[62]

201.     As to sealing and closure, this seems to have hit its nadir with the Second Circuit's decision in *U.S. v. Doe*, 63 F.3d 121 (2d Cir. 1995),[63] wherein the court circumvented *Richmond* and *Press-Enterprise* line of constitutional access jurisprudence.[64] *U.S. v. Doe* held that, yes, *Press-Enterprise* required detailed findings of compelling interest capable of appellate review before there could be closure of a proceeding to which there was a qualified First Amendment right of access, but then added, to paraphrase: Well, the Supreme Court never said

---

[62] "Secret Pleas Accepted by U.S. Attorney in City," *New York Times*, April 23, 1982; "Audit Criticizes U.S. Prosecutor on Secret Pleas," *New York Times*, July 4, 1983.

[63] It should come as no surprise that the Second Circuit's file of the *Doe* case, which the court clerk requisitioned for me from the archives, contains no appellate record or appendix and no briefs. There is no indication what district court the case had been brought from, no information as to whether the public had been given notice and an opportunity to be heard, no information as to what arguments were made for or against sealing, and no identification of the attorneys involved. The folder contained only the court's decision.

[64] *Richmond Newspapers v. Virginia*, 448 U. S. 555 (1980); *Press-Enterprise Co. v. Superior Court of Cal*, 464 U.S. 501 (1984); *Press-Enterprise II*, 478 U.S. 1 (1986).

whence those findings have to come, so as far as this circuit is concerned, it's okay by us if a defendant asks to hide his entire criminal case because he feels – subjectively – that he might be at risk. No corroboration is required in this circuit, even if it's all done in secret, so long as the government doesn't object. The very absence of any evidence of risk could be all the district judge needs to support a finding for the necessity of secrecy.[65]

202.    I respectfully submit that I thus had, and still have, a good-faith basis to believe, both objectively and subjectively, that the Second Circuit has used an artifice to circumvent the entire decade-long *Richmond* through *Press-Enterprise II* line of cases. This line of cases presupposes that there is someone speaking for the public.

203.    But with *U.S. v. Doe* sealing, there is no one in the courtroom speaking out for the public. No one can even object to sealing, if these "sealing" proceedings are not even publicly docketed. When a *Doe* sealing occurs, there is no one who knows about it to object, so no one is in the courtroom to speak for openness. And in none of these *Doe* sealings does there appear to be any court-ordered outside date by which the docket will be unsealed. So dockets remain hidden, possibly forever, depriving the public of the right and power to supervise the courts, in contravention of the Supreme Court's *Richmond* through *Press-Enterprise II* line of cases.

204.    Accordingly, I had (and still have) a good-faith belief, both objectively and subjectively, that such secrecy provides a convicted defendant with the opportunity for continued

---

[65] Here's how the Second Circuit actually phrased it: "[I]n some circumstances it might be within a district court's discretion to grant closure without evidence of a direct threat or other evidence corroborating a defendant's subjective fears. The problem of retaliatory acts against those producing adverse testimony is especially acute in the context of criminal organizations, such as the one in which Doe allegedly participated. Hence, a district court in such a case might attribute the lack of a direct threat to the very confidentiality that the defendant or witness seeks to preserve.… The district judge also might recognize that a direct threat may not always be forthcoming. In any event, the lack of a specific evidentiary configuration need not constrain the district court's discretion." 63 F.3d at 130.

deception and fraud, and deprives the public of their First Amendment rights to supervise their courts, and deprives victims of their MVRA and CVRA rights.

205.   Turning once again to the case involving Sater – that is, turning from general observations to the specific case – in the Second Circuit's June 29, 2011 decision in *Roe v. USA*, the court stated: "The remainder of this cause (Docket Nos. 10-2905-cr, 11-1666-cr) is REMANDED to the District Court (I. Leo Glasser, Judge) for proceedings consistent with this order and with instructions (i) to rule upon the government's unsealing motion of March 17, 2011 …." Now, the Second Circuit has made clear that such motions are to be taken up expeditiously. See *Lugosch v. Pyramid Co.*, 435 F.3d 110 (2d Cir. 2006) ("the district court erred not only in failing to make the specific, on-the-record findings required in order to justify its denial [of access to judicial documents] but also in failing to act expeditiously. … [¶] We take this opportunity to emphasize that the district court must make its findings quickly. Our public access cases and those in other circuits emphasize the importance of immediate access where a right to access is found.")

206.   Yet it was only revealed after the docket of 98-cr-1101 was finally – albeit *accidently* – unsealed in August 2012, that after the Second Circuit had issued its instructions to Judge Glasser to take up the March 17, 2011 motion to unseal, which must be taken up expeditiously according to *Lugosch*, the government made a secret *ex parte* application to

withdraw that motion. (See 98-cr-1101 Doc. No. 120). Judge Glasser's secret order of August

24, 2011 states:

> FILED UNDER SEAL
>
> ORDER
>
> A letter motion, dated August 24, 2011, has been made by the government seeking an Order that would permit it to withdraw an unsealing motion made on March 17, 2011, without prejudice and with leave to re-file that motion at a later, unspecified date.
>
> The motion is hereby granted.
>
> SO ORDERED.
>
> /s/ I. Leo Glasser
>
> Sent by Fax to:
>
> Todd Kaminsky, AUSA 718-254-6669
>
> Michael Beys, Esq., 212-387-8229

207.    Respectfully, no high compelling governmental interest was served by keeping

secret from me and my client that the government was withdrawing its motion to unseal the 98-

cr-1101 case, a motion that the Second Circuit had directed Judge Glasser to take up, and which

the government had advised the Second Circuit and the district court that it was ethically bound

to make.

208.    The "official" unsealing of the docket on August 27, 2012 following its accidental

unsealing a few weeks earlier should have ended any pretext of justification for continued

secrecy. It then became official that "Doe" is Sater. Yet the government continued, and still

continues, to repudiate its obligations to tell Sater's victims of their right to restitution, and that

they have been deprived of that and other rights.[66] And the district court and circuit court

---

[66] 18 U.S.C. 3771(a),(c)(1) (government must apprise victims).

continue to repudiate their obligation to ensure the government tells them.[67] They have the victims list, for it is the same as the list of Klotsman's victims.

209.    Even if Judge Glasser had thought that otherwise mandatory restitution was excused, the law was violated when the judge failed to assure that the DOJ tell the victims of their CVRA rights – their rights to come forward with their proof of loss, to be heard at sentencing, to petition for resentencing, and if necessary to seek mandamus from the Second Circuit. All those rights were given the victims by Congress in 2004 (and at least indirectly far before that, in the requirement that the Probation Office contact victims at least 60 days before sentencing to work with them to establish their losses for the court's use in sentencing). All those rights were denied Sater's victims by the district court in 2009 and are still being denied them today.[68]

210.    Respectfully, for the following reasons, I submit that I have a subjective and objective good-faith basis to believe that such secrecy not only deprives the public of their First Amendment rights to supervise the courts, and not only deprives victims of their MVRA and CVRA rights, but the secrecy ineluctably leads to structural error that should result in vacatur of sentences against co-conspirators, for failure to disclose information regarding cooperators:

211.    Typical cooperation agreements[69] stipulate that the defendant will have to make restitution and keep the government apprised of his assets. ███████████████████

---

[67] 18 U.S.C. 3771(b)(1),(c)(1) (court shall ensure rights afforded).

[68] See EDNY Docket No. 12-mc150, October 23, 2012 docket entry, showing that the DOJ had been telling Judge Glasser at least since 2002, if not earlier, of the names and addresses of *Coppa* (thus *Sater*) victims; so the victims are known, and the DOJ was and remains under a duty to inform them of their rights to *seek* restitution.

[69] Cooperation and proffer agreements are not court documents, and thus would not be made the subject of judicial sealing orders.

██████████████████████████████████████████████████ Thus, the ramifications of allowing him to keep the money he stole while accumulating further millions, and transferring them into trusts, are staggering.[70] The due process rights, even structural rights, of his co-defendants in the underlying and related cases were almost surely violated, and this case may be only one of many such. Each of those co-defendants may well have a right to seek vacatur of their pleas.

212.   That is, I respectfully submit that it was fair to state that the Second Circuit and the EDNY have unlawfully maintained such secrecy, inasmuch as such secrecy leads to structural due process violations of criminal defendants.

213.   In this regard, I assume familiarity with *Brady, Giglio,* and *Jencks*[71] – *viz.* the doctrine that a defendant's due process rights include the right to have impeachment material (plea bargains, promises of leniency, anything of value given in exchange for cooperation, in particular for testimony) disclosed in time to use it, even if not requested, and that failure to disclose may be grounds for reversal if prejudicial.

214.   I further assume familiarity with the doctrine that a defendant's due process rights also include the right to a trial presided over by a judge who has neither actual prejudice, bias, or conflict, or the appearance of such, that violation of this right is a structural deprivation of due process, prejudice presumed.[72] Indeed, the Supreme Court has recently ruled that a defendant's

---

[70] If Sater did indeed fail to keep the government apprised of his accumulation of assets, and also transferred millions of dollars in assets into trusts to avoid restitution, the EDNY should be summoning Sater for re-sentencing.

[71] *Brady v. Maryland,* 373 U.S. 83 (1963); *Giglio v. U.S.,* 405 U.S. 150 (1972); 18 U.S.C. 3500.

[72] A judge's involvement in a scheme of illegal sentencing is obviously necessary to its fulfillment: only a judge can impose sentence. Where, as here, the illegality is not extrinsic (e.g. the defendant bribes the prosecutor for a downward departure recommendation), but intrinsic (the sentence imposed is facially

due process rights include the right to a trial presided over by a judge as to whom there is not even the "unconstitutional probability of bias."[73]

215.    In 1998, a panel of the Tenth Circuit held in *U.S. v. Singleton*[74] that a prosecutor's promise of leniency for a cooperator's testimony violated federal law prohibiting giving anything of value in return for testimony.[75] The remedy was exclusion of the "purchased" testimony. The case, however, was reversed upon *en banc* review. Then scores of other district and appellate courts chimed in,[76] holding that when a prosecutor offers a plea bargain or leniency, while that's something of value, he hasn't violated the statute ***so long as what he offers is not illegal or ultra vires***. But, I respectfully submit, promising (whether expressly or with a nod and a wink[77]) a cooperator that he could keep the money he stole in exchange for cooperation must be illegal and ultra vires, because a sentence that does not include "mandatory" restitution is *per se* illegal and *ultra vires*, because "mandatory," as the U.S. Supreme Court held in *Dolan*, means just that.[78]

---

illegal), the judge's *mens rea* of involvement must be presumed. And leniency conferred under a plea agreement is subject to the approval of the district court. Fed R.Crim.P. 11.

[73] *Caperton v. A. T. Massey Coal Co.*, 556 U.S. 868 (2009).

[74] 144 F.3d 1343 (10th Cir. 1998), *rev'd en banc* 165 F.3d 1297.

[75] The case presupposed the absence of corruption. The statute, however, does not require corruptness, but only an "in return for" exchange. See 18 U.S.C. 201.

[76] *Courts Rush to Extinguish Singleton, but Are the Embers of the Panel's Decision Still Glowing?,* 27 Fl. St. L.Rev. 325 (1995).

[77] 18 U.S.C. 201(c)(2) criminalizes "directly or indirectly, giv[ing], offer[ing], or promis[ing] anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial…."

[78] Forfeiture is also mandatory, so long as it is asserted in the charging instrument. Thus, it is curious that Sater's and Lauria's 1998 criminal informations have no forfeiture charge, yet they are informations to which they pleaded guilty in RICO. For decades, the mandatory policy of the DOJ has been to include a forfeiture charge and immediate request upon plea for an interim preliminary order of forfeiture. It is most curious, because the 2000 *Coppa* indictment includes a forfeiture charge. I believe it is fair to infer that the prosecutors deliberately foul the charging instruments of cooperators, to leave out a claim for forfeiture, in exchange for their cooperation.

216.     I submit that I have a subjective and objective good-faith basis to infer (at the least, to the *Caperton* standard of unconstitutional probability) that Sater was offered, and accepted, illegal consideration for his cooperation; that is, he was allowed to keep the money he stole, notwithstanding that restitution was mandatory, in exchange for his cooperation. If so, the law was broken, because, as his now-public docket shows, he received an illegally lenient sentence.[79]

217.     I further submit that I have a subjective and objective good-faith basis to infer (again, at the least, to the *Caperton* standard of unconstitutional probability) that this is why Judge Glasser, the prosecutors and Mr. Sater's counsel engaged in secret *ex parte* court proceedings to discuss maintaining the secrecy, as demonstrated above. I submit that I have a subjective and objective good-faith basis to infer that the reason hitherto given for maintaining secrecy, Sater's safety, was pretextual, given that his identity and cooperation were made matters of public record a decade earlier.

218.     I further submit that I have a good-faith basis to believe that the absence of forfeiture claims in Sater's and Lauria's criminal informations were a backdoor way for the prosecutors to tell them they could keep the money they stole in exchange for their cooperation.[80] Now, if there were such an "understanding," then Mr. Sater's nineteen co-conspirators should have been so advised, as such would be damning impeachment material, as it would show Sater's and Lauria's motive to trump up the claims against the co-conspirators. But it is highly unlikely that the co-conspirators were told, given the lengths to which the government

---

[79] *U.S. v. Kinlock*, 174 F.3d 297 (2d Cir. 1999).

[80] Mr. Lauria's tell-all-account of his RICO conspiracy, *The Scorpion and the Frog*, discusses quite explicitly his illicit negotiations with the government about how much of the proceeds of his crimes he would get to keep if he were to cooperate.

and the courts have gone to prevent anyone from knowing that Mr. Sater was allowed to keep the money he stole.

219.     Accordingly, I respectfully submit that I have established that I had a good-faith basis, objectively and subjectively, to make the statements set forth in subparts *a* through *d* of allegation *6*.[81] However, if the charge against me is not dismissed based upon the foregoing, there will have to be an evidentiary hearing at which I will prove that my inferences were correct, and that will be done through calling the prosecutors and judges to testify, which the Supreme Court held I am entitled to do in *Dennis v. Sparks*, 449 U.S. 24 (1980).

### Grievance Allegations #6 e-i

e.  Characterizing the Eastern District as a "star chamber." July 16, 2010, Declaration of Frederick M. Oberlander, ¶ 1.

f.  Accusing Judge Glasser and the Eastern District of "concoct[ing] a system of private justice without public accountability. This is not just constitutional amnesia. This is a constitutional crisis." *Id*. ¶ 4.

g.  Characterizing Judge Glasser as acting out of "pusillanimous fear." *Id*. ¶ 11.

h.  Analogizing Judge Glasser and the Eastern District to Senator Joseph McCarthy. See *id*. ¶ 20 ("Finally, I would ask of this court one question: You have done enough. Have you no sense of decency sir, at long last? Have you left no sense of decency? For the only threat to our Union is that a judicial system that would self-justify and nationalize how it could ever dare operate in secret.")

i.  Asserting in motion papers that Judge Glasser "presides over this and related matters in violation of 28 U.S.C. § 455(a) and (b)(l), having failed to disqualify yourself despite Congressional mandate you do so because of, respectively, your appearance of bias and lack of impartiality, palpably obvious to, let alone reasonably questioned by, an objective, informed observer," and that "that observer cannot rationally conclude but that your honor appears to be in criminal conspiracy with at least[] Sater's lawyers, to deprive us and our clients of our rights." November 19, 2012 Omnibus Motion, at 2 (Exhibit K).

---

[81] I could present numerous other examples, but if the foregoing has not convinced the grievance committee that I had a good-faith basis (objectively and subjectively) for the statements made in subparts **a** through **d**, then it is unlikely that the further examples that I would present to the committee would change its mind.

**Response to Grievance Allegations #6 e-i**

220.     I hereby incorporate the responses to all the prior allegations, and provide these

additional responses to subparts *e* through *i* of allegation #6.

221.     In response to Grievance Allegations #6 *e*, *f*, *g*, & *i*, I would respectfully remind

the grievance committee that in dozens of cases the U.S. Supreme Court has referred to secret

court proceedings as "Star Chamber" proceedings. Surely, if the U.S. Supreme Court may use

such language to denigrate secret court proceedings, it cannot be found otherwise than that I had

a good-faith basis to assert the same, given all that is laid out above, factually, and what is

discussed hereinafter. I submit that Judge Black stated it best in *In re Oliver*, 333 U.S. 257

(1948), for he speaks not just to the evils of the star chamber, but to the effect of secrecy upon

judges:

> The traditional Anglo-American distrust for secret trials has been variously
> ascribed to the notorious use of this practice by the Spanish Inquisition, ***to the***
> ***excesses of the English Court of Star Chamber***, and to the French monarchy's
> abuse of the lettre de cachet. All of these institutions obviously symbolized a
> menace to liberty. In the hands of despotic groups each of them had become an
> instrument for the suppression of political and religious heresies in ruthless
> disregard of the right of an accused to a fair trial. Whatever other benefits ***the***
> ***guarantee to an accused that his trial be conducted in public*** *may confer upon*
> *our society, the guarantee* ***has always been recognized as a safeguard against***
> ***any attempt to employ our courts as instruments of persecution***. The knowledge
> that every criminal trial is subject to contemporaneous review in the forum of
> public opinion is an effective restraint on possible abuse of judicial power. One
> need not wholly agree with a statement made on the subject by Jeremy Bentham
> over 120 years ago to appreciate the fear of secret trials felt by him, his
> predecessors and contemporaries. Bentham said: "... suppose the proceedings to
> be completely secret, and the court, on the occasion, to consist of no more than a
> single judge, — that judge will be at once indolent and arbitrary: how corrupt so
> ever his inclination may be, it will find no check, at any rate no tolerably efficient
> check, to oppose it. ***Without publicity, all other checks are insufficient: in***
> ***comparison of publicity, all other checks are of small account. Recordation,***
> ***appeal, whatever other institutions might present themselves in the character of***
> ***checks, would be found to operate rather as cloaks than checks; as cloaks in***
> ***reality, as checks only in appearance***."

*Id*., 333 U.S. at 268 (emphasis added).

222.     Legitimate distrust also finds support in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 595 (1980): "Closed trials breed suspicion of prejudice and arbitrariness, which in turn spawns disrespect for law. Public access is essential, therefore, if trial adjudication is to achieve the objective of maintaining public confidence in the administration of justice." Respectfully, Supreme Court authority makes manifest that it is fair to argue that secrecy, such as I have demonstrated above, runs rampant within the Second Circuit, breeding suspicion of prejudice and arbitrariness, and "spawning" disrespect for the law.

223.     In light of the Supreme Court precedent, I had a good-faith basis, both objectively and subjectively, to state that a judge, here Judge Glasser, who figuratively, does not allow the daylight to shine in on his courtroom by maintaining a secret criminal docket as to the Sater case acts out of pusillanimous fear of that daylight that public access brings. This is supported by the fact that Judge Glasser did not unseal the documents in Sater's case until ten days before the U.S. Supreme Court was to rule on my petition for certiorari, and failed to even docket the motion to unseal until after the media intervened.

224.     I submit that an attorney is ethically obligated, by his duty of candor and zealous advocacy, to so state – without fear of retribution, whether by the judge or by grievance committee – that the administration of justice degenerates when conducted in secret.

225.     As for the analogy to the Army-McCarthy hearings, I would remind the grievance committee that those words were uttered by *attorney* Joseph Welch, while representing his client before Senator McCarthy's committee. In modern parlance, Mr. Welch was speaking truth to power, and no one would say that, as a member of the bar, he was required to speak in a more diplomatic manner. No, when an attorney and his client are faced with what they reasonably believe are egregious violations of their rights it is not that they "may" speak truth to power;

rather they must. Indeed, to preserve the record for ultimate appeal to the U.S. Supreme Court, the district court judge must be told the bases for the motion. See *Young v. United States ex rel. Vuitton et Fils SA*, 481 U.S. 787, 822 (1987) (concurrence).[82]

226. In *Caperton*, the Supreme Court held that there is structural error when there is an unconstitutionally high probability of bias, and thus the facts to support the claim of bias should, naturally, be set forth as strongly and clearly as possible, even, when necessary, by reference to "extreme facts." See *Caperton v. AT Massey Coal*, 556 U.S. 868 (2009). Thus, if an attorney believes that a judge is engaging in unlawful or unethical conduct, or acting *ultra vires*, or without authority, or arbitrarily and capriciously, the attorney has an ethical obligation to speak up. He has a right, after all, preserve the record for ultimate review by the U.S. Supreme Court.

227. The *Caperton* Court did not reprimand the attorney for having accused a judge of bias; rather, the *Caperton* Court made clear that it is perfectly proper to make such charges, in order to preserve the issue for review, for there is no way such alleged judicial misconduct could be brought up for review if it is not raised. Under *Caperton*, "extreme facts" are the touchstone. Thus, such facts must be set forth without fear, but with utter candor and zeal, and the papers submitted must set forth the bases for the opinions. In this case those papers were written even before Judge Glasser unsealed the 98-cr-1101 docket, and the documents on the docket.

228. The judicial and prosecutorial misconduct disclosed by that unsealing proved the validity of our suspicions. This is *some* of what is now known:

---

[82] Judge Scalia stated: "I can imagine no basis, except self-love, for limiting this extension of the necessity doctrine to the courts alone. And even if illogically limited to the courts it is pernicious enough. In light of the broad sweep of modern judicial decrees, which have the binding effect of laws for those to whom they apply, the notion of judges' in effect making the laws, prosecuting their violation, and sitting in judgment of those prosecutions, summons forth much more vividly than *Anderson* could ever have imagined the prospect of the most tyrannical licentiousness." (Citation and internal quote omitted).

- Though he acknowledged that he never issued a sealing order, on March 23, 2011, Judge Glasser issued an order stating that there was an implicit sealing order, and that Mr. Oberlander had "flouted" the order by determining that it could not bind him or his clients, even though the U.S. Supreme Court and Second Circuit have held that a court order does not bind non-parties.

- At the oral argument on February 14, 2011 before the Second Circuit, AUSA Kaminsky told the court that information regarding Sater's entire prosecution had been kept to a scant few individuals, and that if information were to get out about it, there's a good chance he or his family might get hurt. (See *2011.02.14 Second Circuit oral argument*, pp. 17-18).

- Shortly thereafter, we provided the March 2, 2000 press release (see *2000.03.02 EDNY press release, indicating Sater, Lauria and Klotsman pled guilty to RICO charges*) that is found in the Congressional Record to AUSA Kaminsky, and he then advised us, and then the Second Circuit that the U.S. Attorney's Office was ethically constrained to move to unseal the 98-cr-1101 docket.

- On March 17, 2011, AUSA Kaminsky filed the motion to unseal Sater's docket.

- In a May 18, 2011 email, Sater's attorney wrote to me, stating that we must settle on Sater's terms, because Judge Glasser would never listen to any evidence or argument we were to present. Mr. Sater's attorney stated:

  > "Frankly, this is more than fair for your client as he has reached the end of his litigation rope. ***Even if Judge Glasser decides to hold a hearing or oral argument to determine whether to unseal specific docket entries of Doe's criminal proceeding, he will do so without considering your arguments or appeals.*** If you believe you are driving the unsealing issue, you are mistaken."

  (See *2011.05.18 Sater's counsel's email advising that Glasser will disregard all evidence and argument*) (emphasis added)

- On May 19, 2011, Kaminsky wrote a secret letter to Glasser, which was not cc'd to me or to my client, but was recounted in a January 26, 2012 letter that has been unsealed (see *2012.01.26 Kaminsky letter, reciting earlier ex parte letters*). In the still secret May 19, 2011 letter, Kaminsky requested that the motion to unseal be stayed for 60 days. Judge Glasser granted the request, in an *ex parte* order, which is also recounted in the January 26, 2012 letter. We did not learn of the May 19, 2011 letter or secret order granting Kaminsky's *ex parte* request until the January 26, 2012 letter was unsealed on March 14, 2013 (about ten days before the U.S. Supreme Court was to rule on my petition for certiorari).

- On June 29, 2011, the Second Circuit decided the appeal as to the PSR, and directed Glasser to take up the March 17, 2011 motion to unseal Sater's case. However, unbeknownst to me and my client until the January 26, 2012 letter was unsealed, several months earlier, on August 2, 2011, in an *ex parte* letter to the Second Circuit (which neither my client nor I have seen), the U.S. Attorney asked the court to modify its order, to remove the directive that Judge Glasser take up the motion to unseal. And in response the Second Circuit issued a still secret *ex parte* order on August 17, 2011 denying the motion, but telling the U.S. Attorney's office to present the request to Judge Glasser, with

a request that Judge Glasser grant the motion to withdraw the motion to unseal. These facts are recounted in the now-public January 26, 2012 letter, which was unknown to me and my client until it was unsealed on March 14, 2013. The January 26, 2012 letter states:

> In its Summary Order June 29, 2011, the Second Circuit also remanded with instructions for this Court "to rule upon the government's unsealing motion of March 17, 2011." Subsequently, on August 2, 2011, the government moved, under seal and *ex parte* with respect to Roe, to modify the Summary Order to remove that instruction. In an order dated August 17, 2011, the Court of Appeals denied the motion without prejudice and stated that, for "[s]implicity of process, the Government is encouraged to seek to withdraw its motion in the District Court, reserving its right to re-file that motion at a later date." Thereafter, on August 24, 2011, in a sealed application filed with this Court *ex parte* with respect to Roe, the government moved to withdraw its March 17, 2011 unsealing motion. By order dated August 24, 2011, the Court granted the motion to withdraw without prejudice and with leave to re-file at a later date.

(See *2012.01.26 Kaminsky letter, reciting earlier ex parte letters*).

- Meanwhile, on January 10, 2012, as previously mentioned, Judge Glasser, the government and Sater's attorneys had a secret *ex parte* conference, to discuss the First Amendment issues raised by Oberlander. The docket entry reads as follows.

> 01/10/2012 A Status Conference as to Felix Sater was held on 1/10/2012 before Senior Judge I. Leo Glasser: AUSA Todd Kaminsky and Evan Norris appeared on behalf of the Government. Michael Beys and Jason Berland appeared on behalf of John Doe. The Court directed the government and John Doe to provide a detailed chronological account with transcripts, of what the core issues involving this case and how it evolved into a First Amendment issue. The Court will issue an Order on Notice to Mr. Lerner directing the parties to brief the issues before the Court. The parties agreed to submit a Scheduling Order to the Court to be "So Ordered." (Court Reporter Charleane Heading.) (Francis, Ogoro) (Entered: 01/10/2012)

(See *1998.12.03 Docket of U.S. v. Sater, 98-cr-1101*).

- Bear in mind that none of these *ex parte* events were known to me and my client until the 98-cr-1101 docket was accidentally unsealed in August 2012. Additionally, the contents of the secret letters and secret *ex parte* orders had not become known until Judge Glasser unsealed the documents themselves (a large number in redacted form) on March 14, 2013.

- And then by letter dated March 28, 2013, AUSA Kaminsky demanded return of a secret order that had been issued by Judge Glasser on March 14, 2013, which the Solicitor General of the United States provided to me. AUSA Kaminsky stated:

> During a telephone call with Mr. Oberlander, I was informed that during the litigation over your petition for certiorari, the Solicitor General's Office inadvertently sent you a sealed, *ex parte* document issued by The Honorable I. Leo Glasser on March 13, 2013. As discussed, this document was sent to you in error and was not intended to be viewed by you, as Mr. Oberlander readily conceded that he understood during the telephone call. We request that you return

the document, and any copies thereof, to the United States Attorney's Office for
the Eastern District of New York (attn: Todd Kaminsky) as soon as possible.

The document at issue and the information contained therein are subject to a valid
sealing order, as stated on the face of the document. We remind you of the Second
Circuit's order, issued on February 14, 2011, stating that you are "enjoined from
publicly distributing and revealing in any way, to any person, or in any court,
proceeding or forum . . . any documents or contents thereof subject to sealing
orders in Docket No. 10-2905-cr or in any related proceedings before the District
Court for the Eastern District of New York ...."

We appreciate your attention to our request.

Todd Kaminsky

Assistant United States Attorney…

(See *2013.03.28 email from Kaminsky demanding return of copy of document given me by
Solicitor General Verrilli*).

229.    While one might say that the facts speak for themselves, I am constrained to

comment: I had a good-faith basis to believe that Judge Glasser, the government and Sater's

counsel acted in concert to deprive my client, and me, as his counsel, of our First Amendment

rights, as they show:

- Sater's counsel said that Judge Glasser would never listen to any argument or evidence
  we presented, and he said that only one day before AUSA Kaminsky secretly asked
  Glasser to hold in abeyance the government's motion to unseal Sater's case.

- And then in August, the government secretly asked the Second Circuit to change its June
  29, 2011 decision to delete the directive that Judge Glasser take up the motion to unseal.

- Instead, of granting the relief, the Second Circuit essentially referred it to Judge Glasser,
  telling the government that it should ask Judge Glasser to allow the motion to be secretly
  withdrawn.

- Thereafter there was an ex parte conference, with no prior notice to me or my client, in
  which the First Amendment issues that we raised were discussed, and the government
  and Sater's counsel, without my involvement, were asked to provide the court with a
  chronology.

- Then, a secret order issued about a week before the U.S. Supreme Court was to rule on
  my petition for certiorari, and presumably the Solicitor General was "told" by AUSA
  Kaminsky by Loretta Lynch not to give me a copy of the order. (Presumably, the
  Solicitor General decided that that would have been unethical.)

230.     Now, the grievance committee should consider why AUSA did Kaminsky, Judge

Glasser and Sater's counsel wanted an order kept secret that stated that Sater had been sentenced

in open court. I respectfully submit that they wanted it kept secret because they could not explain

why Sater's victims were never told of their CVRA rights, if it was indeed, as is statutorily

required, the sentencing was conducted in open court.

231.     Accordingly, I submit that I had (and have) a reasonable objective good-faith

basis to believe that the statements for which I am now called to account before this grievance

committee, as set forth above, were not only fair comment, but were correct, and needed to be

said in order to show the "extreme facts" necessary for ultimate review by the U.S. Supreme

Court, under the *Caperton* standard.

232.     However, if the charges against me are not dismissed based upon the foregoing,

there will have to be an evidentiary hearing at which I will prove that my inferences were indeed

correct, and that will be done through calling the prosecutors and judges to testify, which the

Supreme Court held I am entitled to do, in *Dennis v. Sparks*, <u>449 U.S. 24</u> (1980).

### Grievance Allegation #7

The respondent agreed to represent Oberlander, with knowledge of and
participation in Oberlander's intentions to make the Sealed Materials public. See
Point (C)1, *supra*.

### Response to Grievance Allegation #7

233.     I repeat and incorporate herein all of the facts set forth in the above responses to

each of the Grievance Allegations, numbers 1 through 6.

234.     Rule of Professional Conduct 1.16 (a) only prohibits a lawyer from accepting

employment for client, "if the lawyer knows or reasonably should know that the person wishes to

(1) bring a legal action, conduct the defense or certain position… merely for the purpose of

harassing or maliciously injuring any person; or (2) present a claim or defense… that is not

warranted under existing law, unless it can be supported by a good-faith argument for an

extension, modification or reversal of existing law."

235.    When I agreed to represent Mr. Oberlander, it was my understanding of the law

that (a) a sealing order is not a prior-restraint gag order, (b) the documents at issue were not

"sealed" because there was no decretal language of any order that I had seen that said that they

were "sealed," (c) sealing orders, even when reduced to writing, can only affect the rights and

obligations of court personnel and the parties to the case at the time that the order was issued, (d)

neither Mr. Oberlander nor his clients were parties to the case of *U.S. v. Sater*, and thus could not

have been required to abide by any order in the case, and (e) Mr. Sater's and his clients' position

vis-à-vis the documents, and their right to use them was at least as strong as the media's right to

use them, had the documents come into their possession. Accordingly, as there was nothing to

suggest to me that Mr. Oberlander had done anything improper, but instead was acting at all

times ethically to advance his clients' interests, I believed that there was nothing that prevented

me from representing him.

236.    Second, Mr. Oberlander was acting as counsel for his clients; my role was to

make argument in support of Mr. Oberlander's right, as an attorney, to assert his clients' rights.

Respectfully, as Mr. Oberlander's attorney, it suffices that I had a good-faith reason to believe,

based either upon the facts or law, or a reasonable extension of existing law, that Mr. Oberlander

himself had a good-faith basis for the positions he had taken on behalf of his clients, as to which

he was then being called upon to account by the court.

237.    That is, based upon existing law and the facts, the positions that Mr. Oberlander

was taking in behalf of his clients, and the positions that I took as his advocate, were non-

frivolous. Rule 3.1 (a) and (b) are instructive, in that they indicate that a lawyer only engages in "frivolous" conduct, where he acts knowingly to advance a claim or defense that is unwarranted under existing law – that is, the conduct has no reasonable purpose other than to delay or prolong the resolution of litigation or serve merely to harass or maliciously injure another (*i.e.*, that is the exclusive purpose of the conduct); or, the lawyer knowingly asserts material factual statements that are false. I did none of these things.

238.    Although I believe I had the absolute right do so, I adamantly deny that I "agreed" to represent Mr. Oberlander, "with knowledge of and participation in Oberlander's intentions to make the Sealed Materials public," because there was a good-faith basis to believe that the documents were never properly "sealed" – and because I had no reason to believe that they were "sealed," since there is no "presumption" that documents are sealed (much less subject to a gag order). The Second Circuit held in *Hartford Courant* that without an open docket sheet no one can even know if a document has been sealed. "Without open docket sheets, a reviewing court cannot ascertain whether judicial sealing orders exist." *Hartford Courant v. Pellegrino*, 380 F.3d 83, 94 (2d Cir. 2004).

239.    The notion that an attorney may not represent someone who expresses an intention to make allegedly "sealed" materials public is anathema to our system of justice. Were an attorney to be barred from representing someone who wished to make information public, which his client believes is not properly subject to a sealing order, Floyd Abrams would have been unable to represent the New York Times in the *Pentagon Papers* case. What First Amendment lawyer would be able to represent any newspaper that might come into possession of allegedly sealed documents, if he knows that it is the intention of the newspaper to make those documents public?

240.   Assume, for sake of analysis that Business Week had come into possession of Sater's "sealed" criminal complaint? (In fact, it did.) Should Business Week's attorney be brought up on grievance charges for having advised Business Week, assuming he did so, that it could freely publish the allegations in that "sealed" complaint? Given *Florida Star v. BJF Florida Star v. BJF*, 491 U.S. 524 (1989), it is obvious that Business Week's attorney had an absolute good-faith basis to tell the company, "Publish! Business Week is not bound by a sealing order issued in a case that it is not even a party to!"

241.   That is precisely the issue here. Mr. Oberlander had it on absolutely good authority – *viz.*, U.S. Supreme Court and Second Circuit precedent – that, since he obtained the documents at issue outside of court process, no court could enjoin their use or dissemination. In fact, Judge Schofield ratified the position taken by Mr. Oberlander in his clients' behalf, when she ruled on February 1, 2016 that Oberlander had no obligation to return or destroy the documents at issue. (See *2016.02.01, Schofield order, holding Oberlander is free to use and disseminate the documents*).

242.   I maintain that I had an objective good-faith basis to believe that Mr. Oberlander could do with those documents as he wished, based upon my familiarity with the First Amendment to the Constitution – not just the free-speech provision, but also the petition clause – as well as my familiarity with *Florida Star v. BJF*, and case law interpreting the petition clause, and my familiarity with *Alemite* and *Chase National Bank*.

243.   Mr. Oberlander, and I – in Mr. Oberlander's behalf – had a good-faith basis to argue that the documents were never "sealed" pursuant to any written, signed and docketed court

order,[83] that there was no prior notice that any motion to seal would be taken up,[84] that there were no docketed findings capable of appellate review to support sealing,[85] that there was no decretal language making any such order prospectively binding as to documents that might later be filed in the case,[86] that there was no decretal language indicating that documents that might be

---

[83] See *Garcia v. Yonkers Sch. Dist*., 561 F.3d 97, 104-06 (2d Cir. 2009) (In the absence of a written, docketed order, there can be no finding that the order was "violated." An injunctive order is "properly met by a written order, a document lacking here.") Indeed, in the absence of a written order, one "need not dance to the judge's tune." *Bates v. Johnson*, 901 F.2d 1424, 1427-1428 (7th Cir., 1990) (cited approvingly by the Second Circuit in *Garcia*, at p. 104). See also *U.S. v. Cooper*, 353 F.3d 161 (2d Cir. 2003)

[84] See *U.S. v. Alcantara*, 396 F.3d 189, 192 (2d Cir. 2005) ("[T]wo decades ago, we established procedures for providing notice to the public that must be followed before closing a proceeding to which a First Amendment right of access attaches. To ensure that members of the public have notice that a motion to close the courtroom has been made, and have an opportunity to challenge the closure, a closure motion — whether made by a party or by the court sua sponte — must be docketed in the public docket files maintained in the court clerk's office. See *In re The Herald Co.*, 734 F.2d 93, 102-03 (2d Cir.1984).")

[85] See *U.S. v. Alcantara, supra*, which made clear, if it hadn't already been abundantly clear for some two decades, that in order to close a proceeding as to which the First Amendment right of access attaches, such as Felix Sater's entire criminal case, Judge Glasser was required to make specific, on-the-record findings demonstrating that sealing was essential to preserve higher values and was narrowly tailored. to serve that interest. Since there is no written, signed and docketed sealing order, there were no on-the-record findings capable of appellate review, as the U.S. Supreme Court required in *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1984) ("The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.")

[86] A blanket prospective sealing order could never be "narrowly" tailored, nor could there be on-the-record findings that such future filings must be sealed to preserve some higher value, because without knowing the contents of such future filings, there could not be the necessary weighing of the public's First Amendment right of access against the need for secrecy. Courts that have considered blanket seals have deemed them repugnant to the Constitution and common-law traditions of openness: See:

*Company Doe v. Public Citizen*, 749 F.3d 246 (4th Cir. 2014) ("This Court has, in the criminal context, reversed the sealing of docket sheets as overbroad and incompatible with the First Amendment presumptive right of access…. The Eleventh Circuit has squarely held that a district court's maintenance of a sealed docket sheet violates the public and press's First Amendment right of access to criminal proceedings, and the Second Circuit has extended the First Amendment right of public access to docket sheets for civil proceedings. … [¶] By sealing the entire docket sheet during the pendency of the litigation, as the district court permitted in this case, courts effectively shut out the public and the press from exercising their constitutional and common-law right of access…. But there is a more repugnant aspect to depriving the public and press access to docket sheets: no one can challenge closure of a document or proceeding that is itself a secret.").

*Sweeney v. Athens Regional Medical Center*, 917 F. 2d 1560, 1565 (11th Cir. 1990) ("We note … that … it is not likely that a blanket seal on the district court proceedings would withstand a challenge by a third party seeking access. [L]itigants do not have the right to agree to seal what were public records. The

filed later in Sater's case would be "sealed," that no such order could have been binding *contra mundum*,[87] that none of the documents were even marked "sealed," save for the criminal complaint, which (as previously noted) had been leaked in 1998 to Business Week (presumably by the DOJ or FBI), and thus was no longer "sealed," that it is not even relevant whether the documents were "sealed," because a sealing order is not a gag order unless there is decretal language in the order that makes it a gag order,[88] that any such prior restraint gag order could not

---

district court must keep in mind the rights of a third party — the public, if the public is to appreciate fully the often significant events at issue in public litigation and the workings of the legal system.")

*Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 946 (7th Cir. 1999). ("We do not suggest that all determinations of good cause must be made on a document-by-document basis. In a case with thousands of documents, such a requirement might impose an excessive burden on the district judge or magistrate judge. There is no objection to an order that allows the parties to keep their trade secrets (or some other properly demarcated category of legitimately confidential information) out of the public record, provided the judge (1) satisfies himself that the parties know what a trade secret is and are acting in good faith in deciding which parts of the record are trade secrets and (2) makes explicit that either party and any interested member of the public can challenge the secreting of particular documents. Such an order would be a far cry from the standardless, stipulated, permanent, frozen, overbroad blanket order that we have here.").

Globe Newspaper v. Pokaski, 868 F.2d 497, 510 (1st Cir. 1989) ("We conclude that a blanket restriction on access to the records of cases ending in an acquittal, a dismissal, a nolle prosequi, or a finding of no probable cause, is unconstitutional, even if access is not denied permanently.")

*Detroit Free Press v. Ashcroft*, 303 F.3d 681, 707 (6th Cir 2002) ("Finally, the blanket closure rule … is not narrowly tailored. The Government offers no persuasive argument as to why the Government's concerns cannot be addressed on a case-by-case basis.")

[87] The U.S. Supreme Court held in *Chase National Bank v. City of Norwalk*, 291 U.S. 431 (1934) (citing *Alemite Manufacturing v. Staff*, 42 F.2d 832 (2d Cir. 1930)), that an order can only be binding against a party or his confederates. That is, a court cannot be binding upon the world, "contra mundum," as Judge Hand stated in *Alemite*. In *Chase National Bank* (at 437), the Supreme Court stated, "To subject [non-party state officials] to such peril [of contempt] violates established principles of equity jurisdiction and procedure. … Those principles require that the clause be limited to confederates or associates of the defendant." Mr. Oberlander was neither a confederate nor associate of Felix Sater, obviously, and thus could not have been bound by any sealing order issued in Sater's case, even if it had expressly mentioned Mr. Oberlander by name.

[88] See *Matter of Braun v. City of New York*, Sup. Ct. NY County, Index No. 1504796/14, October 3, 2014 (2014 NY Slip Op 33816(U)) ([S]ealing does not amount to a 'gag order' issued by the federal court...."); *Roman Catholic Diocese of Lexington v. Noble*, 92 S.W.3d 740, 741 (2002 Ky.) ("An order sealing a record or part thereof should not be read as creating a prior restraint on publication of the contents of the sealed material, unless the order expressly says so.")

have been binding upon Mr. Oberlander had it expressly named him, because of the lack of First Amendment adversarial due process.[89]

244.   Thus, allegation #7 is without any foundation whatsoever. In the words of Judge Learned Hand, whatever Judge Glasser did, or thought he'd done, if he believed he had issued an order that could bind Mr. Oberlander, any such order was "*pro tanto brutum fulmen*," see *Alemite*, *supra*. That is, Mr. Oberlander and I had a good-faith basis to believe that he was not bound by any such order, as Judge Hand said, the court "is not vested with sovereign powers to declare conduct unlawful; its jurisdiction is limited to those over whom it gets personal service, and who therefore can have their day in court." *Id.* at 832. "**[T]he persons enjoined are free to ignore it.**" *Id.* at 832.

245.   That is clear Second Circuit authority, adopted by the U.S. Supreme Court, and every other court that has considered the issue, that supported Mr. Oberlander's and my good-faith belief that Mr. Oberlander was free to do with the documents at issue as he pleased. "Stated conversely," as the Eighth Circuit has said, "persons who are not parties to the injunction or in privity with them, and whose rights have not been adjudicated therein, are not bound by the decree and can not be held liable for acts done contrary thereto even though the decree assumes to bind them." *Kean v. Hurley*, 179 F.2d 888, 890 (8th Cir. 1950).

246.   As there was no order binding on Mr. Oberlander that barred him from using the documents in litigation, or telling any member of the public, the media or Congress their significance, I had a good-faith basis to believe that he was free to make the allegedly "sealed"

---

[89] *Carroll v. Princess Anne*, 393 U.S. 175 (1968) (there can be no prior restraint without advance notice and full adversarial First Amendment due process).

materials public, just as the Florida Star newspaper was free to make "sealed" materials public. See *Florida Star v. BJF*, 491 U.S. 524 (1989).

247.    Accordingly, I had (and have) an objective good-faith *belief*, upon which to advocate my client's position that neither the appellate court, nor any citizen, nor any attorney would be under an obligation to assume that a particular document is under seal, much less that any "sealing" order constitutes a prior restraint gag order, where there was no visible docket, nor court order that actually sealed it, nor any decretal language in any order that prior-restrained dissemination or discussion of any particular document without compliance with the First Amendment requirements set forth by the U.S. Supreme Court in *Carroll v. Princess Anne*.

248.    It was my belief that Mr. Oberlander's intent was, even after the issuance of the injunction as to the PSR, to use all *lawful* means to make the information in it public. I say this even though Mr. Oberlander's motives (and thus my advancement of those motives) cannot be questioned by the grievance committee, because the motives for making the information from Sater's PSR public in the cert petition could only be called into question if the petition itself were deemed a "sham," and only by the U.S. Supreme Court, which obviously has the authority to supervise the conduct of the attorneys who appear before it.

**Grievance Allegation #8**

The respondent failed to withdraw from representing Oberlander when it became clear that Oberlander would continue to violate multiple court orders and the New York Rules of Professional Conduct. See Points (C)l-3, *supra*.

**Response to Grievance Allegation #8**

249.    I repeat and incorporate herein all of the facts set forth in the above responses to each of the Grievance Allegations, numbers 1 through 7.

101

250.     RPC 1.16 (b), only requires a lawyer to withdraw from a representation of a client when: "(1) the lawyer knows or reasonably should know that that representation will result in a violation of these rules or of law… or, (4) the lawyer knows or reasonably should know that the client is bringing a legal action, conducting the defense, or asserting a position in the matter, or is otherwise having steps taken, merely for the purpose of harassing or maliciously injuring any person."

251.     I had a subjective and objective good-faith basis to believe throughout my representation of Mr. Oberlander that my representation would not result in a violation of the rules or the law, and always believed, and still believe, that Mr. Oberlander's actions were taken to lawfully advance *his* clients' interests, in both recovering money and preventing damage to their reputations that might result if it were to be suggested that they, Mr. Kriss and Mr. Ejekam, were knowing participants in the scheme to defraud banks and investors of hundreds of millions of dollars, by use of Mr. Sater's concealment of his $40 million guilty plea (and thus conviction by plea) to racketeering charges.

252.     It is not clear from Allegation #7 when in particular the grievance committee might believe that I should have considered seeking to withdraw from my representation of Mr. Oberlander. Perhaps it was before I filed the petition for certiorari with the U.S. Supreme Court, in which I brought to that Court's attention what my client maintained was an unconstitutional and illegal regime of secrecy within the Second Circuit, and specifically the Eastern District of New York.

253. Or perhaps the grievance committee believes that it was when I filed briefs with the Second Circuit, which briefs brought to that court's attention what my client believed to have been an unconstitutional and illegal regime of secrecy within the Second Circuit.[90]

254. Or perhaps the grievance committee believes that I should have withdrawn before filing papers with Judge Glasser in which I stated, *e.g.*, that there was no order that was binding on Mr. Oberlander or his clients with respect to the use and dissemination of documents obtained outside of court process.

255. As demonstrated by the responses to each of the preceding grievance allegations, I had an objectively reasonable belief that Mr. Oberlander, both individually and on behalf of his clients, had a good-faith basis, in fact and under the law, for each of the actions and positions taken, and that the "orders" purportedly violated were either not valid, or not binding upon him or his clients. Thus, none of the conditions or circumstances existed that might have, even arguably, required me, as an attorney representing Mr. Oberlander, to withdraw from his representation under the rules of professional conduct.

256. Turning to the petition for certiorari, that petition was filed in the furtherance of Mr. Oberlander's *lawful* objective – his objective to make the public aware of his position that there is an unconstitutional regime of secrecy within the Second Circuit, whereby cooperators are given special treatment, allowed to keep the money they've stolen in violation of the MVRA and CVRA, and that the public and crime victims are kept in the dark. In furtherance of that lawful

---

[90] It would be odd to think I could be called to account for the briefs filed with the Second Circuit, inasmuch as the co-signers of the brief – a noted First Amendment practitioner, David Schulz, and a former federal judge, Paul Cassell – have not been charged by the grievance committee. Surely, if the briefs were violative of rules of professional conduct, they too would have been haled before the grievance committee. Nonetheless, I will entertain the possibility that Allegation #7 requires that I respond to the notion that I should have withdrawn prior to filing the Second Circuit briefs.

objective, I prepared a petition for certiorari, which was submitted to the U.S. Supreme Court **UNDER SEAL** on May 10, 2012. (See *2012.05.10 Petition for certiorari in U.S. Supreme Court*).

257.    Then, in furtherance of my client's *lawful* objective, as to that "UNDER SEAL" submission, I *lawfully* requested the U.S. Supreme Court to unseal it. Specifically, I *lawfully* requested that the Supreme Court allow the public docketing of a redacted version of the sealed petition. That motion was unopposed by the government and Sater. That motion explained what information in the PSR should be made public, and why – specifically, information evidencing judicial and prosecutorial misconduct. (See *2012.05.10 Motion in U.S. Supreme Court (unredacted) to publicly file cert petition*).

258.    As that motion was *lawfully* submitted to the U. S. Supreme Court, which granted permission for public filing of the redacted certiorari petition, and allowed information from the PSR to be publicly disseminated, to the extent that such information was contained in the petition, this grievance committee should not second-guess that submission by suggesting that I might have had a duty to withdraw as Mr. Oberlander's counsel before submitting it.

259.    Additionally, as noted above, the U.S. Supreme Court conducted a review of the proposed redacted submission before it was made public, and then, after its review, allowed it to be publicly docketed – and then docketed an on-the-record ruling stating that I had complied

with the U.S. Supreme Court's order directing the public docketing of a redacted petition for certiorari. The U.S. Supreme Court docket for this case, Docket No. 12-112, states:

Jun 25 2012    The motion (11M122) for leave to file a petition for a writ of certiorari under seal with redacted copies for the public record is granted on condition that petitioners provide a redacted motion and petition that remove any appended item containing a party's true name[91] and any reference to such item within 30 days.

Jul 13 2012    Petitioners complied with order of June 25, 2012.

260.    So, respectfully, I had no duty to withdraw from representing Mr. Oberlander prior to filing the petition for certiorari. Notwithstanding the notion that the PSR was a "sealed" document (it was not, as the 98-cr-1101 docket now reveals, inasmuch as there is no sealing order, nor was the PSR ever even docketed, so was never subject to any kind of judicial order sealing it, see *Siler*, *supra*, (noting that a PSR is not a court document)), the information in the PSR was *lawfully* made public, and therefore there is no basis for the grievance allegation that I assisted Mr. Oberlander with respect to his intent to make "sealed" information public or with respect to some undefined intent to violate undifferentiated court "orders."

261.    The hitherto hidden information from the PSR was made public in support of a petition for certiorari that the U.S. Supreme Court manifestly deemed non-frivolous, inasmuch as it issued an order directing the government and Mr. Sater to respond to the allegations, and which the Supreme Court itself ordered public.

262.    Perhaps if Judge Glasser hadn't made public 80% of documents on Sater's docket twelve days before the U.S. Supreme Court was to decide the petition for certiorari, and hadn't

---

[91] Though the petition for certiorari identified Sater as "John Doe," it was quite obvious to anyone who did even the slightest investigation that Sater was "John Doe." After all, the petition indicated that the appeal was taken from the Second Circuit's June 29, 2011 decision, which decision revealed enough information that anyone with a pulse could (and did) figure out that Sater was "John Doe."

issued an order stating that Mr. Sater was sentenced in open court on October 23, 2009, the petition for certiorari would have been granted. But the fact that that pendency of the petition for certiorari forced open the Sater docket means that Mr. Oberlander prevailed, and no one should be haled before a grievance committee to answer for having successfully advanced his client's interests in ending court secrecy.

263.     Respectfully, Allegation #7 cannot be responded to any further, inasmuch as it presupposes that Mr. Oberlander violated court orders, but fails to identify the decretal language of any order that was violated. Should the grievance committee provide me with such decretal language, and present a factual recitation showing that Mr. Oberlander violated the decretal language of any such order, and that such order remained in force at the time of the alleged violation, I will of course respond.

264.     But I will remind the grievance committee that Judge Glasser did not issue a sealing order, and that no such sealing order could have constituted a gag order or bound Mr. Oberlander. And I will remind the grievance committee that the TRO that was in force until November 24, 2010 expired because there was no motion to extend it, and no written order that complied with Rule 65(b) that extended it. And, finally, the Second Circuit's *pendente lite* injunction of February 10, 2011 expired with the issuance of its mandate on December 20, 2011. A "pendente lite" injunction obviously is not intended to last forever.

## Grievance Allegation #9

The respondent failed to withdraw from representing Oberlander when it became clear that Oberlander was taking actions for the primary purpose of harassing or maliciously injuring the Defendants. *See* Points (C) 1-4, *supra*.

## Response to Grievance Allegation #9

265.     I repeat and incorporate herein all of the facts set forth in the above responses to each of the Grievance Allegations, numbers 1 through 8.

266.     As demonstrated above, I had an objective good-faith belief throughout my representation of Mr. Oberlander that the primary purpose of the pleadings, affidavits, letters etc., that he filed or sent was to obtain monetary recovery and certain declaratory relief for his clients, premised upon a valid cause of action on their behalf. As has been demonstrated above, there has been no finding by any court that any of the lawsuits that he filed were, objectively, baseless shams, his motives may not be questioned, as the *Noerr-Pennington* doctrine makes clear.

267.     Thus, the allegation is without foundation, as, objectively, it never became clear to me that Mr. Oberlander's "primary" purpose was to "harass" or "maliciously" injure the defendants.

Dated: August 18, 2017
　　　　New York, New York

Under penalty of perjury,
pursuant to 28 U.S.C. § 1746:

_____
　　　　　　Richard E. Lerner