UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

In The Matter Of

FREDERICK M. OBERLANDER, an attorney
admitted to practice before this Court,

                                                                 Index No. 16-mc-2637

      Respondent.


-----------------------------------------------------------------X


In The Matter Of

RICHARD E. LERNER, an attorney
admitted to practice before this Court,

                                                                 Index No. 16-mc-2636

      Respondent.


-----------------------------------------------------------------X

## EXPERT REPORT OF MARGARET C. TARKINGTON
## SUBMITTED ON BEHALF OF
## FREDERICK M. OBERLANDER AND RICHARD E. LERNER
## FILED UNDER SEAL


**I.    INTRODUCTION**

      This proceeding is unusual, and unusually significant, in manifold ways. For the past

decade, my research and writing has focused on attorney disciplinary proceedings where the

discipline threatened or imposed implicates the First Amendment rights of lawyers—including

rights of speech, association, and petitioning. My work is centered in protecting the exercise of

attorney First Amendment rights when those rights are essential to protect the integrity of court

processes. Most cases implicate only one of these rights or even one slice of one of these

rights—and I have reviewed hundreds of such cases across the United States (state and federal).

1

In contrast, the related Orders to Show Cause (OSCs) brought against Frederick M. Oberlander and Richard E. Lerner by the Committee on Grievances for the United States District Court for the Eastern District of New York (the "Committee") directly undercut all three core First Amendment rights—speech, association, and petition.

But the unconstitutionality of imposing discipline is not the only major deficiency with the Statement of Charges (the "Charges") contained in the OSCs. The Charges are also flawed on other grounds, which require their dismissal, or at the very least a full evidentiary hearing. First, and foremost, the facts alleged in the Charges are in large part erroneous—many of the key facts stated in the OSCs are either misstated or seriously disputed. Indeed, the factual bases for the charges are belied by the documentary evidence of the underlying proceedings—let alone what testimonial evidence would show at an evidentiary hearing. Consequently, to assist the Committee in understanding the facts and the documentary evidence essential to the proper and just disposition of this case, I have prepared a statement of the facts and evidence pertaining to the charges at issue. *See infra*, Part IV. I have additionally included a section identifying the disputed and misstated facts in the Charges. *See infra*, Part V.A.1. Because the case is complex, the factual statement is relatively lengthy, but it clarifies and catalogs the complex proceedings and voluminous documents attending these charges. A just and fair disposition of the charges requires that this Committee take the time to review the factual section carefully—and to recognize that because the Charges contain so many disputed allegations, if the Committee decides to proceed, it must hold an evidentiary hearing prior to imposing discipline.

Second, a great number of the charges are time barred. As discussed *infra*, Part V.A.2, under 28 U.S.C. § 2462, the Committee was required to commence this action within five years from the accrual of any charge. Thus, 28 U.S.C. §2624 bars this Committee from considering any conduct of Oberlander or Lerner that occurred prior to November 18, 2011—five years prior to the bringing of the Charges through the OSCs on November 18, 2016. In my Conclusions section below, *infra* Part VI, I have compiled a chart that identifies, among other deficiencies, whether each Charge is time barred.

Third, as discussed *infra* Part V.A.3, EDNY Local Rule 1.5(b)(5) limits this Committee's jurisdiction to adjudicate charges in original proceedings to attorney conduct *"in connection with activities in this Court."* Several of the Charges deal with conduct or activities that were *not*

done in the Eastern District and did *not* involve court orders of the Eastern District. These Charges include the filing of the *Kriss II* case in New York state court, the filing of notices of appeals to the Second Circuit, the filing of the *Gottdiener* case in the Southern District of New York (SDNY), and the alleged violation of court orders of both the Second Circuit and SDNY. This Committee is not authorized by Local Rule 1.5 to impose discipline for such activities in an original action (as opposed to reciprocal discipline). Additionally, federal court discipline for a state court filing (*Kriss II*) is itself fraught with jurisdictional and federalism problems—aside from the contours of Local Rule 1.5.

While jurisdiction and statute of limitations problems may seem technical, this case is far from one that should be dismissed merely on procedural deficiencies. Again, the Charges alleged are of particular substantive and constitutional import both as to our overall justice system and as to current political issues facing our nation. The related OSCs against Oberlander and Lerner cast into relief the importance of protecting certain First Amendment rights of lawyers to the protection of the integrity of the judicial system itself. That is not hyperbole—for at issue in this case is whether attorneys can bring to light, condemn, and seek to remedy the apparent subversion of judicial processes, including specific processes established by Congress and even the Constitution itself. If attorneys, who have sworn a solemn oath to uphold the Constitution and are thus officers of the court—officers of this system of justice with an avowed "special responsibility to the quality of justice"—can be and are punished for revealing, decrying, and seeking relief from judicial deficiencies, then the underlying integrity of the judicial system becomes ethereal.

Thus, at its core, this case is about preserving the *actual* (as opposed to perceived) integrity of judicial processes and the United States Justice System—which can only be done by preserving attorneys' interrelated First Amendment rights of petition, speech, and association to raise (1) the undermining of court access, open courts, and public trial rights (and the democratic purposes underlying open courts and public trials) and (2) the rights of clients to bring to light and obtain relief from abusive, partial, incompetent, or erring judges.  There are two related ways in which punishing attorneys for raising such concerns undermines the actual integrity of the judiciary: (1) if attorneys cannot reveal such problems, then the problems remain hidden and unremedied, making way for judicial unlawfulness or corruption to commence, persist, and

grow; and (2) the judiciary can only perform its role through cases and controversies brought to it by attorneys—and thus if attorneys cannot raise such issues, then the judiciary is powerless to address and remedy them.

Moreover, the foremost purpose underlying the First Amendment is the checking value—the value that speech has to check abuse of government power.[1] Without First Amendment rights to discuss and raise colorable claims implicating judicial behavior, attorneys cannot check judicial power. There is not any other group of people who have the legal knowledge, training and exposure to the judiciary who can perform this checking function. Abuse of power, neglect, incompetence, partiality, or other problems with the judiciary can only be brought to light by attorneys. Further, the OSCs additionally implicate the related checking power of the public at the heart of open courts and public criminal trials in the United States justice system. Open courts are *the primary check* on judicial power in our constitutional system. If attorneys cannot raise issues regarding judges flouting open courts, public trials (including sentencing), and victim rights, then these issues *will not be able to be raised* and the public will be denied their ability to check judicial power through public open court proceedings.

Because Lerner is specifically being charged in these proceedings not solely with his own conduct but primarily for representing Oberlander, this case raises yet another unusual, but imperative, issue—the right of attorneys who are engaged in checking judicial power to representation under the First, Fifth and Sixth Amendments of the Constitution and the concomitant First Amendment association right of other attorneys to fully and vigorously represent them.

Finally, although ***not*** a basis for my analysis or opinions in this Report, this proceeding also has acute real-world political impact—touching all three branches of the federal government—which recommend the Committee's careful consideration. This case involves a federal judge avoiding congressionally mandated and constitutional processes by sentencing Felix Sater without identifying victims or imposing restitution as Congress has required, and doing so in proceedings that were hidden from the public without a docket, a sealing order, or other compliance with requisite closure processes. When Oberlander was tipped off about this

---

[1] Vincent Blasi, *The Checking Value in First Amendment Theory*, 1977 Am. B. Found. Res. J. 521 (1977).

and recognized its relevance to massive fraud by the real estate development firm Bayrock (of which Sater was a member) occurring in major real estate ventures such as Trump SoHo—the federal judiciary then gagged Oberlander, forbidding him from saying anything about Sater or his conviction to anyone—including specifically forbidding him from telling Congress. In response, Oberlander, with Lerner as counsel, litigated and appealed, obtaining partial relief after appealing to the United States Supreme Court—including, ultimately, the unsealing of much of Sater's case.

      As it has turned out, one of Sater's business partners, Donald J. Trump, subsequently became President of the United States. And, as revealed just last week (August 27, 2017) in reputable media reports across the country, Sater was still doing business deals with Trump through November 2015 and purportedly sent emails to Trump's personal lawyer trying to broker not only a business deal for the building of a Trump Tower in Moscow, but also brokering the United States election with Russia (Sater's emails said: "Our boy can become president of the USA and we can engineer it," and "I will get all of Putin's team to buy in on this, I will manage this process").[2] As a nation, all eyes are on President Trump's connection to Russia—and, specifically, the public, the press, Congress, and even Special Counsel Robert Mueller himself are now looking at Trump SoHo, Sater, and Bayrock—they are a key to the Russian ties of the current President of the United States.[3] *The* rationale (although constitutionally insufficient[4]) for punishing attorney speech regarding the judiciary is the purported need to preserve the public's *perception* of judicial integrity. It would *not* seem to preserve or help the public's perception of judicial integrity if the federal judiciary—through this Committee—sanctioned with discipline, suspension, or disbarment the very people responsible for bringing to light Sater's criminal conduct and massive fraud in connection with Bayrock, Trump SoHo, and

---

[2] *See* Mark Apuzzo & Maggie Haberman, *Trump Associate Boasted That Moscow Business Deal 'Will Get Donald Elected,'* THE NEW YORK TIMES, 28 Aug. 2017, *available at* https://www.nytimes.com/2017/08/28/us/politics/trump-tower-putin-felix-sater.html?mcubz=0.; Ruth Marcus, *The Deal Trump Wanted with Russia*, THE WASHINGTON POST, 1 Sep. 2017, available at: https://www.washingtonpost.com/opinions/the-deal-trump-wanted-with-russia/2017/09/01/5771e096-8f56-11e7-91d5-ab4e4bb76a3a_story.html?utm_term=.10aafe045eef.

[3] Craig Unger, *Why Robert Mueller has Trump SoHo in His Sights*, VANITY FAIR, 13 August 2017, available at https://www.vanityfair.com/news/2017/08/why-robert-mueller-has-trump-soho-in-his-sights; Natasha Bertrand, *Mueller has Expanded the Russia Probe to include Trump's Business Dealings—Here's What He's Looking At*, BUSINESS INSIDER, 20 July, 2017, *available at* http://www.businessinsider.com/mueller-russia-investigation-trump-business-follow-money-2017-7.

[4] *See infra* note 23 and accompanying text.

other Trump properties. Particularly, when Oberlander's and Lerner's actions, as shown below, are constitutionally protected by the First Amendment rights of petition, speech, and association.

## II.  BIOGRAPHY, CREDENTIALS, & COMPENSATION

Margaret Tarkington is a Professor of Law at Indiana University McKinney School of Law. She teaches Professional Responsibility, Civil Procedure, Federal Courts, and a Constitutional Law seminar entitled Attorney Regulation and the First Amendment. She has taught Professional Responsibility and Civil Procedure for a decade. Tarkington is currently serving as the chair-elect of the Professional Responsibility Section of the American Association of Law Schools, which section has approximately 800 professor members.

Professor Tarkington's scholarly work addresses the intersection of lawyer regulation, the First Amendment, and the overall administration of justice. Her research in this area has been published in top-tier law reviews, including the GEORGETOWN LAW JOURNAL, the BOSTON COLLEGE LAW REVIEW, the UC DAVIS LAW REVIEW, the BRIGHAM YOUNG UNIVERSITY LAW REVIEW, the UTAH LAW REVIEW, the FLORIDA LAW REVIEW, and the REVIEW OF LITIGATION. She is currently writing a book, IN SEARCH OF THE FIRST AMENDMENT RIGHTS OF LAWYERS, which is under contract with Cambridge University Press (forthcoming 2018), and she just completed a Professional Responsibility textbook, PROFESSIONAL RESPONSIBILITY IN FOCUS (Wolters Kluwer—Aspen Casebook Series, under contract, forthcoming Fall 2017) (with JOHN P. SAHL, R. MICHAEL CASSIDY, & BENJAMIN P. COOPER), A full list of Tarkington's publications and presentations are listed in her CV, which is attached hereto in Appendix 1.

Each of Tarkington's research projects regarding attorney First Amendment rights addresses an area where failure to protect attorney speech, petition, or association rights undermines the role of the lawyer in protecting due process, the concomitant rights of individuals, and the integrity of court processes. Her work bridges specialties in constitutional law, lawyer regulation, and procedure—harnessing the First Amendment as a means to protect the validity of government, and especially judicial, processes. Tarkington's work is cited in major treatises, including the ANNOTATED MODEL RULES OF PROFESSIONAL CONDUCT, CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE, FEDERAL PRACTICE AND PROCEDURE, CRIMINAL PROCEDURE, and CRIMINAL DEFENSE ETHICS: LAW AND LIABILITY. Tarkington has presented her research to hundreds of academics and legal professionals at symposia,

conferences, CLEs, and invited talks. She has presented her work at UCLA Law School, Fordham University School of Law, the University of Georgia School of Law, The University of London, Washington and Lee School of Law, University of Illinois Urbana-Champaign, and Indiana University Maurer School of Law, among others.

Tarkington has served as an expert witness and has consulted on disciplinary proceedings brought against attorneys for their speech. She has informally consulted or acted as a non-testifying expert in cases in Indiana, Ohio, and Kentucky. In 2011, she provided expert testimony via affidavit in the related cases, *The Florida Bar v. Agustin Rafael Benitez*, case no. SC10-2160, and *The Florida Bar v. Daniel Wayne Perry*, case no. SC10-2159. Tarkington has <u>not</u> offered expert testimony at trial or deposition in the last four years.

Prior to joining the Indiana University McKinney faculty in 2011, Professor Tarkington taught for four years at the J. Reuben Clark Law School, Brigham Young University, in Provo, Utah. In 2010-2011, she was a Visiting Associate Professor of Law at the University of Cincinnati College of Law.

Tarkington graduated summa cum laude from BYU's J. Reuben Clark Law School and was member of the Order of the Coif. After graduating, she clerked for Judge Kenneth F. Ripple, United States Court of Appeals for the Seventh Circuit, in South Bend, Indiana. Although she does not currently practice law, she previously practiced commercial litigation and was admitted to the New York, Indiana, and Utah State Bars.

The terms of compensation for testimony and the creation of this report are as follows: Tarkington is being paid at the rate of $425.00 per hour for analysis, document review, and for preparation of this report, with an hourly rate of $550 per hour for any testimony she may offer in either a deposition or hearing. She will be paid at a rate of $200 per hour for necessary travel time pursuant to providing such testimony, as well as reimbursement of all travel-related costs.

### III. DOCUMENTS AND EVIDENCE REVIEWED IN PREPARATION FOR THIS REPORT:

This case implicates seven years of current litigation history, as well as criminal cases that span back to 1998. While I have not reviewed each and every filing in each of the underlying controversies related to the Orders to Show Cause, I have reviewed thousands of pages of documents and court filings to gain an understanding of what occurred and of the pertinent facts

as to each of the charges raised in the Orders to Show Cause. I have also reviewed the Declaration of Richard Lerner. Appendix 2 provides a list of the documents that I reviewed on which to base my opinion and prepare this report.

## IV.   THE FACTS

In addition to reviewing the declaration of Richard E. Lerner, Esq., I have independently reviewed the documents listed in Appendix 2. The following is a statement of the facts pertinent to my analysis and on which I relied in forming my ultimate opinions and conclusions. Of course, as indicated by the list of documents in Appendix 2, I know and am aware of many more facts and factual issues surrounding the years of litigation involved than those contained in this statement and which I took into account. The statement is also focused on the timeframe relevant to the Charges—thus not addressing proceedings prior to the charges or subsequent thereto unless important to understanding the whole. This statement and clarification of the pertinent facts surrounding the charges is essential to provide the groundwork for my opinions and conclusions.

### A.  Background

In 1998, Felix Sater pled guilty in the Eastern District of New York (EDNY) to racketeering, along with Salvatore Lauria and Gene Klotsman for a "pump and dump" securities fraud scheme—costing victims at least $40,000,000. Sater, Lauia, and Klotsman became cooperators, agreeing to offer testimony against 19 other co-conspirators who were indicted for conspiring in the same racketeering scheme under the case name *U.S. v. Coppa* (00-Cr-196) [hereinafter *Coppa*]. Germane here, Sater's entire criminal case (98-Cr-1101) was "super sealed" or "blanket sealed" without compliance with the requisite procedures for closing a criminal case and without the issuance of a formal sealing order—in plain terms, Sater's criminal case was simply hidden from the public without so much as a docket or a sealing order to show for it.

While cooperating with the government, Sater became a member of Bayrock, a real-estate development firm. Sater skimmed nearly a million dollars a year from Bayrock and continued to engage in the same kind of fraudulent racketeering conduct for which he had previously been indicted. Sater was sentenced for his 1998 plea on October 23, 2009. ██████████ ████████████████████████████████████████████████████████████ ████████████████████████████. Despite the Mandatory Victim Restitution Act (MVRA) and the Crime Victims Rights Act (CVRA), which required mandatory victim identification and restitution, no vicitms of Sater's $40 million dollar fraud were identified and no order of restitution was made. Sater received a sentence of probation and a $25,000 fine. However, his case was still entirely hidden by the "blanket sealing"—so none of his victims could have known about the sentencing or their rights to restitution.

### B.  The SDNY Complaint (*Kriss I*)

In 2007, attorney Frederick M. Oberlander was hired by Jody Kriss, a member of Bayrock to represent him. Kriss introduced Oberlander to Joshua Bernstein, a former employee of Bayrock.

One night—March 1, 2010—Bernstein handed Oberlander an envelope, which contained a few key documents. Oberlander did not ask for these documents—Bernstein's giving of them was entirely unsolicited. (2010.06.21 Glasser Transcript at 10:9-15:3, 19:15-18.) In the envelope were physical copies of documents from Sater's criminal case, specifically a proffer with a DOJ financial statement, a cooperation agreement, and a Presentence Investigation Report (PSR). A couple days later, Bernstein emailed Oberlander electronic copies of the same documents, plus the criminal complaint in Sater's case and a draft information. (*Id.*) These documents (the proffer with the DOJ financial statement, the cooperation agreement, the PSR, the criminal complaint and the draft information) are hereinafter referred to collectively as the Sater Criminal Documents.

On May 10, 2014, Oberlander filed a complaint (hereinafter the *Kriss I* complaint) in the Southern District of New York (SDNY) on behalf of Kriss and another Bayrock member, Michael Ejekam, against the remaining members of Bayrock—Tevfik Arif, Julius Schwarz, and Felix Sater—and derivatively against Bayrock. The complaint alleged that Bayrock was "substantially and covertly mob-owned and operated," and that "Arif, Sater, and Schwarz operated it for years through a pattern of continuous, related crimes, including mail, wire, and bank fraud; tax evasion; money laundering; conspiracy; bribery; and embezzlement." (2010.05.10 Original SDNY Complaint; *Kriss v. Bayrock* ¶ 4.) The complaint also brought claims against others, including accountants and attorneys who allegedly assisted Arif, Schwarz, and Sater in carrying out these frauds and crimes. The 785-paragraph, 164-page complaint exhaustively and painstakingly laid out massive fraud and money laundering (and tax fraud and evasion) as to major real estate developments involving Bayrock, including Trump SoHo, Trump International, Trump Camelback, Trump Beach Club, and Waterpointe.

Anyone who reads the entire complaint will be awestruck by the level of fraud, money laundering, and tax evasion that the complaint persuasively pieces together at the hands of Bayrock—through Arif, Schwarz, Sater and others. Investors, business partners, and other victims (including the IRS) are shown to have been cheated out of tens and even hundreds of millions of dollars.

The complaint also alleged, based on the Sater Criminal Documents, that Sater fraudulently concealed his prior RICO conviction and his actual ownership interest in Bayrock to defraud investors, lenders, partners, ███████████████████████████████████████████. (2010.05.10 Original SDNY Complaint; *Kriss v. Bayrock* at ¶¶ 199-251.) The *Kriss I* complaint quoted from Sater's criminal complaint and quoted substantial portions of six paragraphs of the PSR, ████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

9

████████████████████████████████ Attached to the complaint as exhibits were five pages from the PSR, the proffer, and the cooperation agreement (but not the DOJ financial statement). (2010.06.21 Glasser Transcript 28:29:1.)

Oberlander attempted to file the *Kriss I* complaint in the SDNY under seal, but his application to file it under seal was denied, so Oberlander filed it on the public docket, and it was assigned to Judge Naomi Reice Buchwald. (2010.06.21 Glasser Transcript 49:15-50:14.) On May 13, 2010, Judge Buchwald ordered that the complaint be sealed and also ordered Oberlander to contact "all persons who have received a copy of the complaint and inform them of this Court's order that there be no further dissemination of the complaint and exhibits thereto or the sealed information contained therein pending further order of the Court." (2010.05.13 Buchwald Order.) Oberlander complied with that order and contacted those who had received the complaint (2010.06.21 Glasser Transcript 31:17-19.) A *Courthouse News* article reported the filing of the *Kriss I* complaint, yet, as Oberlander testified, he "never" spoke to the reporter who wrote that article. (*Id.* at 70:8-11.)

### C. Judge Glasser and the EDNY

Sater, represented by Kelly Moore of Morgan, Lewis, and Bockius, moved for an Order to Show Cause in the Eastern District of New York (EDNY) before Judge I. Leo Glasser, who was the judge who had presided over Sater's secret criminal case (98-Cr-1101). On May 18, 2010, Judge Glasser granted the motion and issued an Order to Show Cause (OSC) on that same docket (98-Cr-1101) against Frederick Oberlander, Jody Kriss, and Michael Ejekam requiring them to appear before him and "give evidence as to how they obtained" the allegedly "Sealed and Confidential Materials" and to whom the materials had been given, and to show cause why they should not be required to return the materials immediately to Sater. (2010.05.18 OTSC with TRO signed by Glasser.) The allegedly "Sealed and Confidential Materials" included the cooperation agreement, a DOJ financial statement, the PSR, and the proffer. (*Id.*) Glasser also entered a Temporary Restraining Order enjoining Oberlander, Kriss, and Ejekam from disseminating the materials. (*Id.*)

On June 11, 2010, Glasser held an initial hearing on the OSC. Notably, attorney Richard Lerner, from the law firm, Wilson, Elser, Moskowitz, Edelman & Dicker LLP ["Wilson Elser"], had been retained by Oberlander to represent him in the OSC matter. Glasser indicated at the June 11 hearing that "[t]here was an order that I issued with respect to those documents." (2010.06.11 Glasser Transcript 5:10-11.) After the hearing, Lerner went to the Office of the District Court Clerk and requested a copy of the sealing order in the case and was told he "could not even see the sealing order." (2010.06.11 Letter, Lerner to Glasser at 1.) Lerner filed a letter with the court that day asking the court to provide him with a copy of the sealing order so that he could "ascertain which terms of the order Mr. Oberlander is alleged to have violated." (*Id.*).

On June 14, 2010, Glasser held another hearing, at which he responded to Lerner's request to see the sealing order at issue. Glasser explained unabashedly: "***[T]here is no formal order***." (2010.06.14 Glasser Transcript 5:6-7, 5:24.) Glasser further indicated his belief that orders are "not issued by virtually any judge in this courthouse with respect to sealing." (*Id.* at 5:6-9.)

10

Glasser said that "from the very first document that was filed" in Sater's case, the filing method "clearly indicat[ed] a sealed case"—which meant the party filing would submit the filing in a white envelope that says "ordered sealed" (without an order, mind you) and then that document "may not be unsealed unless ordered by the court." (*Id.* at 5:12-17; *see also* 2010.06.21 Glasser Transcript 58:13-25.) Glasser further explained that "to the extent that I agree that it should be filed under seal ***I tacitly, implicitly ordered it.***" (2010.06.14 Glasser Transcript 7:1-3.) Thus "[t]his case was filed under seal from the day it came into this courthouse. You can't look at the docket sheet on ECF because it's sealed. I can look at it because I'm an exception. So . . . I looked at that docket sheet on Friday and the first thing I saw was United States vs. John Doe, sealed case in bold capital letters." (2010.06.14 Glasser Transcript 6:13-19.) Glasser concluded: "So ***there is no formal order*** and to the extent that you want to know what that order said and to whom it was addressed it's a request which has no merit." (*Id.* at 5:24-6:1.)

Glasser went on to opine that the fact that the case was "sealed" (even without any order sealing it) was sufficient to bind Oberlander—despite the fact that ***"there isn't any" "order [that] is directed to Mr. Oberlander."*** (2010.06.14 Glasser Transcript 9:2-3.) Glasser opined that "no order [] needs to be addressed to Mr. Oberlander" (*id.* at 8:2-3), because "[i]t's a document which is placed under seal" (*id.* at 6:3-4). Glasser subsequently explained his view that in a sealed case, filings and documents are "globally sealed" and "not addressed to any particular person." (2010.06.21 Glasser Transcript 59:1-4.) In scheduling a subsequent evidentiary hearing, Glasser stated that the OSC proceedings against Oberlander were being held in open court: ***"There's nothing about these proceedings I don't believe that requires the record of these proceedings to be sealed."*** (2010.06.14 Glasser Transcript 15:21-23.) Moore indicated as her only concern the use of Sater's actual name, and she asked the court "if we can substitute John Doe for his name throughout"—if "we can possibly redact it or change it to make sure it's John Doe." The Court then "[s]o ordered." (*Id.* at 15:24-16:7.)

On June 21, 2010, Glasser held the evidentiary hearing regarding Oberlander's obtaining of the Sater Criminal Documents. Oberlander, Kriss and Sater all testified at the hearing. Oberlander testified that Bernstein handed the documents, unsolicited, to Oberlander on March 1, 2010, and emailed him electronic copies (plus Sater's criminal complaint) on March 3. (2010.06.21 Glasser Transcript at 10:9-15:3, 19:15-18.) Oberlander testified that Bernstein cc'd the email to another attorney and Bernstein's father (also an attorney), both of whom currently represented Bernstein. Oberlander further testified that Bernstein had told him that Sater had given the Sater Criminal Documents to Bernstein, along with many other documents. (*Id.* at 18:17-19:14.) More specifically, Oberlander testified that it was his understanding that Sater had given Bernstein "several disks containing files and that these were among them." (*Id.* at 20:9-11.) Oberlander testified that there was nothing on any of the Sater Criminal Documents stating or indicating that they were subject to a sealing order or otherwise under seal. (*Id.* at 80:21-81:23.) And while the PSR indicated that it was the "policy" of the federal judiciary, the DOJ and the Federal Bureau of Prisons not to redisclose PSRs, it said nothing about it being under seal or subject to a sealing order. (*Id.* at 81:20-82:25.) Finally, Oberlander testified regarding his compliance with Judge Buchwald's orders, namely, that he had contacted those in receipt of the *Kriss I* complaint (*id.* at 31:17-19) and that he obtained an abeyance of her order to file a redacted complaint (*id.* at

68:13-70:7). Indeed, Oberlander testified that he intended to file a redacted complaint beginning "the moment I received this order [from Buchwald] because I was told to" and he "held that intent all the way through until the time a few days later" when he obtained an abeyance and extension from her to when Judge Glasser concluded the EDNY proceedings. (*Id.* at 68:13-69:6.)

At the conclusion of Oberlander's testimony, Judge Glasser stated: "***There is no evidence other than the fact that Mr. Oberlander received these documents from Mr. Bernstein.*** Mr. Bernstein, according to Mr. Oberlander, ***represented to him he got the documents because Mr. Doe [Sater] gave them to him.***" (2010.06.21 Glasser Transcript at 87:21-88:1.) Nevertheless, Glasser immediately issued ***an oral "permanent injunction" with respect to the PSR***, explaining "that the information contained in that presentence report is not to be disseminated." (*Id.* at 88:2-88:4.) Glasser again emphasized that his order was based on his reading of the *Charmer Industries* case, and was ***not*** based on "***whether Mr. Oberlander knew or didn't know whether they were or weren't stolen***." (*Id.* at 88:4-9; 88:19-22.) The order specifically gagged Oberlander, as Glasser said, "I'm enjoining Mr. Oberlander ***from disseminating any information contained in that presentence report***." (*Id.* at 88:11-12.) However, Glasser went on to opine that "[t]he order with respect to presentence reports is not directed to any individual, it is directed to the presentence report itself" and it was "vital that presentence reports remain in the file in terms of public disclosure." (*Id.* at 88:12-88.) Thus, Glasser indicated that the injunction was (and the non-existent sealing order had been) globally enforceable, and that no person could divulge information contained in a presentence report—even if he obtained it from an extrajudicial source, as happened in Oberlander's case.

Glasser did not stop with permanently enjoining dissemination of the PSR and gagging Oberlander as to any information contained therein. He then addressed his view as to the proffer and cooperation agreement, saying that while what he said was "not an order" he was giving "advice to attorneys" and specifically to Mr. Oberlander "to use caution and not disseminate it." (2010.06.21 Glasser Transcript at 89:15-24.) Glasser warned Mr. Oberlander that if he ignored that advice he may be sanctioned through a grievance or other punitive proceeding. (*Id.* at 89:15-90:11.) Thus Glasser made no order, but threatened Oberlander with punishment if Oberlander violated his non-order "advice." Glasser then ordered that Oberlander return the PSR to the US Attorney's Office immediately, ***but reserved the question as to whether he needed to return any of the other Sater Criminal Documents until further briefing.*** (*Id.* at 91:25-92:11). Oberlander returned the PSR to the court, pursuant to court directives. (*See* 2011.04.01 Cogan Transcript at 13.)

Sater testified at the hearing (*after* the issuance of the permanent injunction) stating that he kept a hard copy of the Sater Criminal Documents in his desk in a file marked "Personal and confidential." He said he never gave Bernstein the documents directly (2010.06.21 Glasser Transcript at 95:1-96:25), but he also testified that he asked Bernstein to purchase a backup hard drive and to make a backup of the Bayrock files, and that he may "have had an electronic version of those documents"—the Sater Criminal Documents (*id.* 100:1-101:16). As to the safety of Sater, there was no evidence presented about any safety risk to Sater. Sater stated that he

considered the documents "Highly sensitive, personal and dangerous to myself and my family," but he never even alluded to any threats of physical danger or risk to safety. (*Id.* at 97:4-7).

Judge Glasser continued the TRO—prohibiting dissemination of any information from any of the Sater Criminal Documents—until after such "post-hearing briefs" were filed. (2010.06.21 Glasser Transcript at 111:18-20.) Glasser indicated that the hearing was not sealed, but agreed to Moore's request that the transcript be altered so that "wherever the name of John of Doe appears substitute 'John Doe' for 'John Doe.'" (*Id.* at 116:16-21.) Of course before the transcript was so altered it read, substitute "John Doe" for "Felix Sater." Nevertheless, the OSC and all of these hearings were being conducted as part of Sater's criminal case—using the same docket number (98-Cr-1101)—which was "super sealed" and not publicly docketed at all. Thus despite saying the proceedings were not "sealed," the filings and hearings of the proceedings were not available on a public docket.

On July 16, 2010, Lerner filed an "Opposition to All Relief in the OTSC," asserting Oberlander's First Amendment rights. Attached thereto was a declaration of Oberlander in which he objected to the court's original May 18, 2010, TRO that had been continuously extended and that enjoined him from disseminating any information in the Sater Criminal Documents. (2010.07.16 Oberlander Declaration, attached as exhibit to Lerner Declaration in Opposition to All Relief.) In the declaration, Oberlander stated that the TRO was "a patently unconstitutional prior restraint" that enjoined him "from disseminating truthful information, lawfully obtained, of public concern," and that the court had issued it "without notice and a hearing," "undocketed and under seal," and based on an ex parte petition from Sater's lawyers. (*Id.* at ¶ 1.) Oberlander characterized the court in proceeding in such a manner as "sitting as a star chamber." (*Id.*) Oberlander's declaration uses some strident language in the introductory 20 paragraphs— including quoting the words of Joseph N. Welch to Joseph McCarthy, "You have done enough. Have you no sense of decency sir, at long last?" (*id.* at ¶ 20) and contrasting the signers of the Declaration of Independence, whom he says made their proclamation "publicly," with "[t]his court," which "hides what it does," out of "pusillanimous fear" (*id.* at ¶4-5). Yet Oberlander's declaration is aimed at challenging Judge Glasser's constitutional authority (1) to adjudicate criminal cases, like Sater's, in a "super sealed" manner where the entire case is hidden from public view, including the docket itself; (2) to hide such cases without the issuance of a formal order, a hearing, or findings; (3) to issue prior restraints against persons who learn about such a hidden case or obtain possession of documents from such a case outside of court processes (in Oberlander's case as a passive recipient of documents)—prohibiting such persons from disseminating any information contained in the hidden documents or case and threatening them with contempt or other sanctions for violating the prior restraints; and (4) issuing such prior restraint without "on-the-record findings" in proceedings that are themselves conducted as part of the undocketed, sealed, case (98-Cr-1101) that is hidden from public view. Thus Oberlander contended that by conducting proceedings hidden from public view and thus in secret (secret proceedings being a hallmark of the historic Star Chamber, which is why he analogized to it), the "court has concocted a system of private justice without public accountability," which he says is "constitutional crisis." (*Id.* at ¶ 4.) He also stated that it is a "threat to our Union" to have "a

judicial system that would self-justify and rationalize how it could ever dare operate in secret." (*Id.* at ¶ 20.)

On July 20, 2010, Glasser held another hearing. Glasser explained that he had ordered the file for Sater's case from "Kansas City or wherever these files are shipped" as it "was no longer available in the courthouse." And that "*there is not any indication*" in the first filing "or in a subsequent document *that an application was made or request was made in that document to seal that file. Nor have I been able to find any order signed by me which directed that this file be sealed*." (2010.07.20 Glasser Transcript 17:4-11.) Glasser then went on to opine, if there had been an order, who is it directed to? "Who is bound by it? *That order, it would appear, is directed to the clerk of the court who is informed that this document or this file is sealed and is not to be made available, except upon an order of the Court unsealing it.*" (*Id.* at 17:18-24.) Despite making these concessions, at the end of the July 20, 2010, hearing, nevertheless, Glasser indicated that he was issuing "a further TRO." (*Id.* at 26:21.) The entire record regarding the issuance of this "TRO" reads:

MS. MOORE: Your Honor, in light of Mr. Lerner's last submission, I would seek **clarification** *with respect to the PSR* that it's clear—

THE COURT: Before you get to that. Am I correct that the documents, at least Mr. Lerner's last submission says this whole *proceeding now is moot because the documents have been surrendered*, turned over to you, is that correct.?

MS. MOORE: Not that I know of. I think, as I understand his position, which I don't agree with, he's entitled to keep all copies of the documents, as long as he returned the originals, so I believe, in his letter he states that *if* at the court proceeding he marked as exhibits the original versions of those document**s**, but his client has maintained both electronic and hard copies, so clearly the intent was not to give back, as Judge Jones ordered in *Visa*, all copies as well. It doesn't get the original back and **are free to** *disseminating* copies.

THE COURT: I think I indicated Mr, Oberlander should not do **that**. I think it was in the form of an order, and that order, I believe, if I have not done so, I am doing it now and if you want it in writing until I resolve this issue.

MR. LERNER: You are issuing **a further TRO?**

THE COURT: Yes, I am. *I'm issuing a further TRO* for the reasons that I have indicated.

I think there is irreparable harm, which is imminent to Mr. John Doe, those documents contained information which is highly, highly sensitive and *if disseminated* it is discriminatively to a person that should not get the information.

I think, it would put Mr. John Doe's safety at risk. The likelihood of success is or is not present. Again, if *Charmer Industries* is being read correctly by me and, I think, it is, I

14

think, ***the burden with respect to whether or not there is some need to maintain those documents or to keep them should be shifted to you***. Until next week, okay.

I do not think we need any further hearing. You will submit the briefs and I will make my determination. ***The TRO is continued for another ten days.*** (*Id.* at 25:25-27:13)

Now the big question is what exactly did Judge Glasser order, if anything, in that "further TRO"? The only thing Glasser actually says is "I think I indicated Mr. Oberlander should not do *that*." But what is "that"? The word "that" is a far cry from unambiguous decretal language. It certainly refers back to what Ms. Moore was saying, but is Glasser referring to "disseminating copies"— the very last words spoken by Moore and thus the grammatical referent to Glasser's word "that"? Or is Glasser referring to Moore's broader question about if Oberlander returned the originals, would the proceeding be moot or would Oberlander also need to return all copies and not disseminate them to moot the proceedings. If referring to that larger context (which itself was stated as a hypothetical—***if*** Oberlander returned all the originals but not the copies), then is Glasser indicating that Oberlander cannot keep copies of the Sater Criminal Documents once Glasser orders them to be returned—the only one of which that had at that point been ordered returned being the PSR? Indeed, Moore opens the dialogue by stating she wants to "**seek clarification *with respect to the PSR.***" (*Id.* at 26:1.) It's anyone's guess. But Moore's own construction of the TRO as of November 2010 is that "the Court also **issued a further TRO against the <u>dissemination</u> of any *<u>copies</u> of the PSR.***" (2010.11.24 Moore Memo of Law at 8.)

However, what is clear from that colloquy is that Glasser shifted the burden of proof from Sater and the government to justify injunctive relief to Oberlander to prove ***"whether or not there is some need to maintain those documents or to keep them."*** (2010.07.20 Glasser Transcript 27:8-10.) As Glasser had explained just moments before the above colloquy, even though normally the burden is on the movant to show their entitlement to injunctive relief, yet "where the presentence report is the document at issue, ***the burden should be upon . . . the person who has that presentence report to establish an overriding need for the use or possession of that document***. The burden should be **on the other side**, **not on the movant**, but ***[on] the person*** [that the movant is] ***seeking to be enjoined***." (*Id.* at 24:12-18)

On August 12, 2010, Judge Glasser signed a stipulated "standstill order," temporarily staying the adjudication while the parties considered settlement. The opening recital of the standstill order states: "Whereas Frederick M. Oberlander and Jody Kriss . . . ***are in possession of paper (but not originals) or electronic copies of certain documents*** ('the Documents') related to a certain criminal matter"—Sater's case. (2010.08.12 Letter, Moore to Glasser, with Standstill, so-ordered at 1.) Thus it was clear that despite whatever Judge Glasser had seemed to indicate at the July 2010 hearing, nevertheless, in the August 12 order signed by Glasser, it specifically allowed Oberlander to retain possession of paper and electronic copies of the Sater Criminal Documents as of August 12, 2010. The standstill agreement also states that Oberlander and Kriss "may not disseminate the Documents or information obtained therefrom except as may be required for purposes of Respondents' pending appeal" to the Second Circuit. (*See id.*, at 2) Pursuant to an amendment to the standstill order, signed by Judge Glasser on September 27, 2010, the standstill

order was extended until January 14, 2011, unless terminated by a party prior thereto. (2010.09.27 Amendment to Standstill.)

On October 18, 2010, Oberlander sent a letter in contemplation of settlement to Sater's lawyer, Brian Herman at Morgan Lewis. (2010.10.18 Letter Oberlander to Herman.) Attached to the letter was a redacted complaint that could be disseminated to all defendants to facilitate settlement. Redacted from the complaint were all "allegations which quote from or describe the contents of the PSR, complaint, proffer, information, or cooperation agreement." (*See id.* at 2; *see also* 2010.10.18 Proposed Redacted SDNY Complaint.). ***Thus Oberlander did not disclose anything from the Sater Criminal Documents, nor does he threaten to do so (indeed, he proposed a complaint that omitted materials from them)***. Oberlander does caution, in the letter, that if settlement is not reached, there will be "public notoriety and the unstoppable national and international scandal that will result." (2010.10.18 Letter, Oberlander to Herman at 1.) Yet the public notoriety and scandal will <u>not be</u> the disclosure of contents of the Sater Criminal Documents (which Oberlander omitted in the proposed redacted complaint). Oberlander takes pains to detail in the letter that he can still allege the fact of Sater's conviction from public sources—"without reference to the PSR" and "without violating any existing or possible court order or standstill agreement." (*Id.* at 3.).

On November 9, 2010, Oberlander sent Herman another letter in contemplation of settlement. In that letter, Oberlander states, "If you wish Mr. Sater's activities lawfully kept quiet to any extent, stand still, stop filing motions and get out of the way so Plaintiffs can try to resolve the case before everything uploads to PACER and goes public. The only way to try to prevent worldwide notoriety will be a globally stipulated sealed confidentiality order accompanying a global settlement." (2010.11.09 Letter, Oberlander to Herman at 1.) Oberlander also predicts that if there is not a settlement, eventually "***Judge Buchwald [will] order[] this public*** and your ***client finds this on the front pages everywhere.***" (*Id.*). Importantly, Oberlander anticipates the following:

> If this case is not settled quickly, it will surely go viral. If you obstruct a settlement instead of helping get there, everything will go public with clockwork inevitability. *This is not a threat*, it is mathematics. And it is certain. No power on this earth will much longer prevent ***as much <u>lawful and legal</u> worldwide dissemination*** of this Complaint and every document attached thereto or referenced therein ***as the public and the press <u>doing the dissemination</u> think its value justifies***. You already saw what *Courthouse News* thought of it, and everything else I file about Bayrock, ***<u>entirely without my or my clients' involvement</u>***. Only a stipulated sealed confidential settlement agreement Plaintiffs find acceptable, executed very soon, can stop that.

(*Id.* at 2.) Oberlander's letter indicates that the public notoriety will arise from the massive financial fraud alleged in the Complaint involving major real estate developments. Thus Oberlander explains: "You say his safety is threatened. My clients are not endangering it. They are endangering his economics. Ask the Sapirs and iStar how happy they'll be when Trump SoHo sales are shut down, the money refunded, and the offering plan voided .. . ." (*Id.*).

16

The standstill agreement was terminated effective November 17, 2010—with briefing resuming before Judge Glasser as of 24 November 2010. (2010.11.16 Letter, Moore to Glasser.) On November 23, 2010, Todd Kaminsky, on behalf of Loretta Lynch and the government sent a letter brief under seal discussing whether the Court *has authority to order Oberlander "to return the sealed documents in his possession."* (2010.11.23 Letter, Kaminsky to Glasser at 1.) In addition to demonstrating that everyone understood that Oberlander maintained copies of the sealed documents pursuant to the standstill order, the government's letter brief also maintains that *Oberlander "__cannot be prevented from telling others about what he learned__ from the documents."* (*Id.* at 4, n. 4) Moore, on behalf of Sater, similarly filed a brief on November 23, 2010, asking the court to "order the destruction or return of the sealed and confidential documents and any copies or excerpts therefrom," similarly demonstrating her understanding that the court had not previously ordered as much. (2010.11.24 Moore Memo of Law at 11.) Indeed, Moore noted her understanding that on July 20, 2010, the Court had only "**issued a further TRO against the __dissemination__ of any __copies__ of the PSR.**" (11.24.10 Moore Memo of Law at 8).

On March 23, 2011, Judge Glasser issued an order that is captioned a "Scheduling Order," In the scheduling order, Glasser noted that Oberlander had filed a Notice of Appeal from the oral permanent injunction, the May 28, 2010, TRO, and the July 20, 2010, "further TRO." (2011.03.23 Glasser "Scheduling Order" at 2.) The Court noted that that on February 4, 2011, Oberlander had filed a demand that Glasser "immediately docket all events that have occurred in this case from its inception," and that the government in a letter dated March 17, 2011, responded by analyzing the public right of access and agreeing in part with Oberlander, moving to unseal or partially unseal portions of the Sater docket. (*Id.* at 1.) Importantly, in the Government's March 17, 2011, letter motion, the Government noted that "*on March 2, 2000, the government, in a press release* announcing the indictment of 19 other defendants on RICO charges, __referred to the defendant by his real name and stated that he had been convicted of related crimes.__ This *press release was reprinted in the Congressional Record, where it can be located today, __both online and in hard copy__*." (2011.03.17 Government's Letter Motion to Unseal, page 2.) Consequently, and after analyzing the law regarding sealing, the government asserted:

> Accordingly, *the following entries and documents should be unsealed*: 1) *__the docket itself__* should be unsealed as a necessary prerequisite to the disclosure of all other items listed below; 2) *the defendant's name* on the docket sheet should be changed from John Doe to Felix Sater; 3) *the fact of the defendant's conviction*, including the date of his guilty plea, the crime to which he pleaded guilty and the criminal information should all be unsealed. These entries and items do not mention the defendant's cooperation and reveal little more than that which was previously revealed in the press release. In addition, *the public docket should reflect the date of the defendant's sentencing and the sentence issued by the Court*. (*Id.* at 5)

Additionally, the government conceded the lack of actual threat of harm to Sater in that motion, stating:

17

The government has **no information that any person has sought to harm the defendant or his family** since the press release [of 2000—naming Sater by name and his crime] was issued, **nor that the government's ability to secure cooperation has been negatively affected**. (*Id.* at 5.)

In the March 23, 2011, "Scheduling Order," Glasser took a detour from the task of scheduling to retreat from his prior clear statements in the June and July 2010 hearings that there was no sealing order in the case; instead, Glasser reasoned backwards to retroactively create such an order. He first stated that because the docket is "plainly marked 'Sealed Case,'" that renders "[a]ll filings in that case [] thereafter sealed." (2011.03.23 Glasser "Scheduling Order" at 3.) Glasser further maintained: "***Neither a case nor a filed document can be sealed without a court order . . . and it must be presumed, therefore that such an Order existed, explicitly or implicitly***." (*Id.* at 4.) It is imperative that the flawed reasoning of that statement not escape anyone—so I am pausing in my narrative to reinforce it. Glasser's concoction of an order from the legal requirement that an order is required to seal cases is the equivalent of saying: Citizens cannot be deprived of life, liberty, or property without due process of law. Thus if you have been deprived of life, liberty, or property, then it must be presumed (without even looking at the facts) that you have been afforded due process, explicitly or implicitly. If such flawed reasoning worked, for example, then there would never be violations of constitutional rights by government actors because the law requires that the Constitution be complied with (and so we must presume that it in fact was complied with, either explicitly or implicitly).

Glasser's retroactive assertions continued: "In **unilaterally deciding that such an order did not exist**, **or**, if it did exist, it was binding on court personal only; **or** in any event, he had a First Amendment right to publish that which was sealed, **[Oberlander] knowingly and intentionally flouted a Court order."** (2011.03.23 Glasser "Scheduling Order" at 4.) Notably, again, this is **a court order that Glasser had just retroactively presumed into existence earlier in the same paragraph** and had previously repeatedly asserted himself "that such an order did not exist." (Thus Oberlander had not "unilaterally decid[ed]" that such an order did not exist—Glasser had expressly told him at the June and July 2010 hearings that such an order did not exist.) Glasser further buttressed the record for appeal, stating that "[t]he injunctions issued by the Court were deemed compelled by Roe's ignoring of the sealing directives; the danger to the life of John Doe by publishing the sealed matter and for his possession of and threatened publication of information in a presentence report." (*Id.* at 4.) In the very last sentence of the order, Glasser requested that the parties brief the issue of the court's continued jurisdiction to adjudicate Oberlander's February demand or the government's March motion to unseal pending Oberlander's interlocutory appeal to the Second Circuit. The final sentence is the only part of Glasser's order that "schedules" anything, and it only schedules one date, inviting parties to brief one issue. (*See id.* at 5.)

### D. The Second Circuit Appeal

As noted, on July 9, 2010, Lerner had filed on behalf of Oberlander a Notice of Appeal to the Second Circuit, appealing from the May 18, 2010, TRO "which—by operation of law—**may have converted to a preliminary injunction** at or after any of the hearings which were held"

18

and (2) the "**oral order**, stated on the record on June 21, 2010, **that issued a permanent injunction** as to a certain presentencing report." (2010.07.09 Notice of Appeal.) Lerner subsequently filed Notices of Appeal as to the July 20 Further TRO and the March 23, 2011, "scheduling order." (*See* 2010.08.09 Notice of Appeal & 2011.04.14 Notice of Appeal.) On January 26, 2010, the government moved for a temporary stay of the unsealing of the appellate docket and "of the materials placed under seal by Judge Glasser *pending the appeal of this matter*." The reason for making such a motion was that the appellate court clerk told them that unless someone moved to keep materials sealed on appeal, the materials would be unsealed. (2011.02.14 Second Circuit Oral Argument Transcript 40:13-41:3.) While the government moved to keep everything sealed, Oberlander sought a writ of mandamus to the Second Circuit to direct the district court *"to prepare and publish"* the docket in the case. (2011.02.07 Petition for Mandamus.) Indeed, as Sater's docket would later reveal after being unsealed in August 2012, Judge Glasser *had only contemporaneously docketed twelve* (even on the sealed docket) *of the 63 entries now showing on that docket* as having occurred between Sater's filing of the May 18, 2010, motion leading to the OSC against Oberlander and the February 2011 certification of a record on appeal for the Second Circuit. *Thirty-nine* of the 63 entries *were "entered" on the sealed docket on or around February 2, 2011*, as Glasser was preparing a record on appeal. Another *twelve entries were docketed 18 months later in August 2012*, around the time the docket was unsealed. (*See* 1998.12.03 Docket of 98-Cr-1101, entries between 05/18/2010 and 02/02/2011.)

The Second Circuit consolidated Oberlander's appeals and heard oral argument on February 14, 2011, regarding the government's motion and the writ of mandamus for unsealing the docket. Prior to the hearing, on February 10, the Second Circuit issued an order addressing preliminary issues that had arisen in motions, including a motion from Oberlander to have an open courtroom for the hearing. The Court "temporarily enjoined" all parties from disseminating "any documents *filed in this appeal*" or filed in the EDNY or the SDNY actions to anyone other than "to those persons directly involved in the parties' legal representation." (2011.02.10 Second Circuit Order at 2, ¶ 4.) The Court then stated:

> To the extent that respondent appellant Richard Roe and his counsel 'believe [they have] always been and always [will] be free *to distribute [the Court's] order[s] and the filings* in this appeal . . *to Congress* and the public . . . and the media . . . *they are mistaken*." (*Id.*).

At the February 14, 2011, hearing, Kaminsky explained that the proceedings before Glasser on the "Eastern District docket" (98-Cr-1101), including the proceedings against Oberlander, were *"completely under seal"*—"[t]here are *no accessible documents* at this time." (2011.02.14 Second Circuit Oral Argument Transcript 12:2-4.) He also told the Second Circuit that Oberlander retained the documents other than the PSR and that Judge Glasser had **not adjudicated anything regarding the return of those documents**. First, Kaminsky agreed that Judge Glasser had "only issued a permanent injunction with respect to the [PSR]" and then *when asked about the non-PSR Sater Criminal documents*, Kaminsky stated:

They *remain in the possession of Richard Roe*. I believe the copies of these documents remain in the possession of Mr. Roe . . . . *Judge Glasser <u>has currently not reviewed them, has not resolved that issue</u>*. It was clear to Judge Glasser that the PSR, according to <u>Charmer</u> was a clear issue of law where the document had to be returned by Mr. Roe, *but he asked for briefing <u>on what powers he had to ask for documents to be returned that were taken</u>*. The issue there was, your Honor, who did the original sealing order apply to, and if Mr. Roe was not a party to that original proceeding did Judge Glasser have the authority to enjoin him. (2011.02.14 Second Circuit Oral Argument Transcript 20:5-25.)

Judge Cabranes then specifically asked, "And that matter is still before Judge Glasser?" to which Kaminsky replied, "That's correct." (*Id.* at 21:3-5.) Kaminsky also represented that Sater's status as a cooperator was unknown to his co-conspirators: "Mr. Doe was . . . fortunate to not have to testify over his 11-year career as a cooperator and *none of the individuals in organized crime had <u>ever</u> received any*, as far as the government knows, *any official acknowledgement of that cooperation*." (*Id.* at 18:1-7.)

At the conclusion of the hearing, the Second Circuit denied Oberlander's writ and granted the government's motion for "*a temporary injunction, pending the disposition of <u>this appeal</u>*," issuing a summary order. (2011.02.14 Second Circuit Pendente Lite Order, at 1.) The Court reviewed the order in the hearing after a recess. Judge Cabranes explained: "Page 2 of course is a *description of past proceedings*." (2011.02.14 Second Circuit Transcript at 36:25.) In reciting the background on page 2 of the original order,[5] the Summary Order stated:

> Richard Roe ("Roe") is an attorney at law whose identity is known to all participants in this litigation and who has been given the name "Richard Roe" as a legal placeholder because the disclosure of his true identity in this litigation context may, *for the time being*, lead to the improper disclosure of the materials at issue here. (2011.02.14 Second Circuit Pendente Lite Order, at 1.)

The Court then issued an "injunction *pendente lite*," (*id.* at 1), specifically:

> We hereby ORDER that **ALL PARTIES**, THEIR OFFICERS, AGENTS, SERVANTS, EMPLOYEES, AND ATTORNEYS, AND ALL OTHER PERSONS WHO ARE IN ACTIVE CONCERT OR PARTICIPATION WITH THEM, *see* <u>Fed. R. Civ. P. 65(d)(2)</u>, are **TEMPORARILY**—AND WITHOUT PREJUDICE to any claims or arguments that may be asserted by the parties on the merits of these appeals or on the orders in effect during the consideration of the appeals—***ENJOINED from publicly distributing or revealing in any way, to any person, or in any court, proceeding or forum***, except to those persons directly involved in the parties' own legal representation, ***any documents or contents thereof*** subject to sealing orders in Docket No. 10-2905-cr or in any related

---

[5] The exhibit included for this Committee is a copy of the order as available through Google Scholar. It has different pagination, so this recital occurs on page 1 (as there is no cover page). The original copies are very difficult to read, but the recital occurs on page 2 in the original.

proceedings before the District Courts for the Eastern District of New York and Southern District of New York. (*Id.* at 2-3.)

The Second Circuit further remanded the case "during the panel's consideration and adjudication of the pending appeal" to the EDNY "with instructions to the Chief Judge of that Court to assign a United States District Judge from that Court with the limited mandate of implementing and overseeing compliance with our orders and the orders previously entered by Judge Glasser." (*See id.* at 3.) The special master appointed to serve in this role was Judge Brian M. Cogan of the EDNY.

### E. Special Master Judge Cogan

On April 1, 2011, Judge Cogan heard various motions by the parties, including a clarifying question from Oberlander as to whether he could disseminate documents and information that is already in the public domain. Judge Cogan did not directly answer the question but said that Oberlander could get "preclearance of exactly what it is you're going to say" and himself "suggest[e]d" that Oberlander "submit a chart" with "a left column of single-sentenced statements" and "a right column of where those statements are in the public domain." (2011.04.01 Cogan Transcript at 8:1-8.)

At the end of the April 1, 2011, hearing, Mr. Kaminsky on behalf of the government argued that Oberlander had previously been ordered to return the originals and destroy all "copies of the document**s**"—apparently extending to *all* of the Sater Criminal Documents (not solely the PSR)—based on Glasser's statements at the end of the July 20, 2010, hearing. (2011.04.01 Cogan Transcript at 12:14-13:1.) Kaminsky elaborated:

> He [Oberlander] must hand over and/or place *those document**s*** in some type of transitory place and wait for the circuit to rule, but *he still has them*, in direct contravention of the *court's order saying give them back*, *give them* to the U.S. Attorney's Office. No one gave anything. (*Id.* at 11:15-22.)

Lerner responded by arguing that *the original PSR had been returned to the court per the court's order*, and that "[t]here's no specific directive by Judge Glasser to destroy the electronic copies of the document *and there's been no dissemination of the document*." (*Id.* at 13:23-25.) Judge Cogan determined that the July 20, 2010, transcript was "absolutely clear on its face Judge Glasser intended you to destroy electronic copies and to return any photocopies. If that is not done by the end of Monday [April 4, 2011], I will hold your client in contempt." (*Id.* at 14:3-6.) On April 4, 2011, Judge Cogan issued a written order to the same effect, denying Oberlander's motion for reconsideration. (2011.04.04 Cogan Order Denying Reconsideration.) The motion for reconsideration explained the post-July 20, 2010 history that clearly indicated everyone's understanding—including Glasser's—that Oberlander maintained copies of the Sater Criminal Documents, specifically, Glasser's signed August 2010 standstill order, and requests from both the government and Sater in November 2010 to Glasser asking him to order Oberlander to return or destroy the Sater Criminal Documents, including all copies. (See 2011.04.04 Letter Motion for Reconsideration.)

21

Indeed, recall that at the Second Circuit Oral Argument, Kaminsky—the very person who argued to Cogan on April 1, 2011, that Glasser had ordered the return and destruction of all of the documents and copies on July 20, 2010—told Judge Cabranes that the non-PSR Sater Criminal Documents *"remain in the possession of Richard Roe" and that "Judge Glasser <u>has currently not reviewed them</u>, <u>has not resolved that issue</u>"* and had asked for briefing *"on what powers he had <u>to ask for documents to be returned</u>."* (2011.02.14 Second Circuit Oral Argument Transcript 20:5-25.). Indeed, on November 23, 2010, Kaminsky had filed such a brief under seal with Glasser, which opens:

> The government writes with respect to *whether the Court has the authority to order Frederick Oberlander <u>to return the sealed documents in his possession</u>* in the above-captioned case and to enjoin him from disseminating those documents. . . . Moreover, *such an order is necessary* . . . ." (2010.11.23 Letter, Kaminsky to Glasser at 1.)

Entering such an order would not be "necessary" if it had already taken place on July 20, 2010, as to all of the Sater Criminal Documents. The letter demonstrates repeatedly that Kaminsky knew on November 23, 2010, both (1) that Oberlander retained possession of those documents—as had been ordered in the August 2010 standstill order; and (2) that the court had NOT already made any order to return them. Other examples from the letter include the following:

- "Therefore, under the All Writs Act *the Court <u>can and should</u> order that Mr. Oberlander return the sealed documents in his possession* . . . " (*Id.* at 2.)
- "Public Policy Requires *Ordering* Mr. Oberlander to Return the Documents" (*Id.* at 4)
- "The Court *<u>should</u> use its inherent powers to demand the return of the documents* and enjoin their dissemination." (*Id.*)
- "For the foregoing reasons, *the Court <u>should</u> order Mr. Oberlander to return the sealed documents* . . . ." (*Id.* at 6.)

The letter goes on to indicate the rationale underlying Kaminsky's evident interest in getting all of the Sater Criminal Documents returned with copies destroyed: "[S]ince [Oberlander] *cannot be prevented from telling others about what he learned* from the documents, it has been the experience of many in law enforcement that *documentary proof in support of such accusations is far more powerful* and therefore far more threatening to informants and cooperators." (*Id.* at 4 n.4.)

Pursuant to Cogan's April 1st and 4th orders, Oberlander timely filed a declaration on April 4, 2011, *attesting that he "ha[s] no further printed copies of the five documents* in question in my possession," that "printed copies of the documents in question are being submitted to this court with this declaration" so they could be returned if Oberlander prevailed on appeal, and that *"I have deleted the electronic copies of these documents from all of my computers on which they were stored" and "from the online accessible offsite automated file backup service."* (2011.04.04 Letter, Lerner to Cogan enclosing Oberlander Aff. ¶¶ 4-5.) Lerner additionally filed on Oberlander's behalf a letter to Judge Cogan that same day, citing to the August 12, 2011, standstill order signed by Glasser that stated that Oberlander retained copies of the documents and that his counsel could use them in preparing his appeal. Notably, the PSR was already

22

contained in the Joint Appendix filed with the Second Circuit, as well as excerpts from others of the Sater Criminal Documents. Lerner wrote to "confirm that the destruction directive" did not prohibit Oberlander's counsel from using the documents in connection with the appeal and consulting with Oberlander about them. (*See* 2011.04.04 Confirmation to Cogan.)

On April 14, 2011, Lerner on behalf of Oberlander filed a letter outlining three simple statements to ask for preclearance to state them, pursuant to Cogan's suggestion. (*See* 2011.04.14 Letter to Cogan re: Public Sources.) First, that 98-CR-1101 is Sater's criminal case and Sater is John Doe (based on a prior PACER caption with it listed as Felix Sater, a 1998 *Business Week* article, and the 2010 hearings in the EDNY, which Glasser had said were in open court). Second, the basic fact that Sater pled guilty to and was convicted of violating RICO for securities fraud (based on the 2000 press release issued by the EDNY U.S. attorney and published in the Congressional record that names Sater and provides that information, and a letter publicly docketed in a related criminal case containing that information regarding Sater). Third, that Sater was sentenced on October 23, 2009, to probation and a $25,000 fine (based on the fact that the sentence was handed down in open court and the terms of his sentence must be public as a matter of law). (*See id.*) On May 13, 2011, Cogan issued a decision holding that Oberlander "may not issue any of the three statements." (2011.05.13 Cogan Order at 4.)

Oberlander appealed to the Second Circuit both Cogan's April 2011 order and injunction to destroy his electronic copies of the Sater Criminal Documents, and the May 2011 decision that Oberlander could not make any of the statements in reliance on their being already in the public domain. (*See* 2011.04.05 Notice of Appeal filed by Lerner; 2011.06.10 Notice of Appeal filed by Selmeci.) The Second Circuit joined these two appeals into the consolidated appeal already pending before it.

### F. The Second Circuit Appeal Continued

In the appeal proper, Oberlander was *represented not only by Richard Lerner, but also by David Shultz—a renowned First Amendment lawyer—and Paul G. Cassell—a highly respected Professor of Law and a former United States District Court judge*. Oberlander's brief not only discussed the nonexistent sealing order, the illegality of any prior restraint (especially a prior restraint as to true information of public concern), the existence of public record regarding much of these materials, but also the consequences to victims where criminal cases are hidden from them, as was done in Sater's case. (2011.03.28 Lerner, Shultz, Cassell Appellate Brief.) The Mandatory Victim Restitution Act (MVRA), enacted in 1996, mandated that restitution be ordered at Sater's sentencing. Further, the Crime Victims Rights Act (CVRA), enacted in 2004 was applicable at Sater's sentencing and mandated that the DOJ notify Sater's victims of their rights to full and timely restitution and to be heard at his sentencing. Further, the CVRA requires the presiding federal judge to ensure the DOJ's compliance. (*See id.* at 36-37.) Yet no order of restitution was made in Sater's case, and no victims were identified or notified. Indeed, even people who knew they were victims could not protect their own rights. Sater was purportedly sentenced in open court—as the government contended in its briefing to the Second Circuit—but because the sentencing "was listed on the court calendar as *United States v. John Doe*," it made it impossible for victims to know of their rights to restitution and other remedies against Sater. (*Id.*

23

at 17.) Oberlander also noted in his Reply Brief that TROs are only valid for 14 days, unless renewed, and while they were renewed or stipulated to at most through the standstill agreement, they had not been renewed since that time. Thus the TROs must either have become appealable preliminary injunctions, or they remained TROs but have expired. (2011.04.18 Lerner, Shulz Cassell Reply Brief at 26.) The Reply Brief also noted that the August 9, 2010, Notice of Appeal as to the July 20 "Further TRO" had been "sequestered in Judge Glasser's chambers since August" and had only been given to "the Second Circuit within the last few days." (*Id.* at 27.)

The Government filed a response brief, but Sater did not file anything. In the government's brief, the government asserted that "*[s]ince the case's inception in 1998, the docket sheet, along with all of the documents filed therein, has been sealed.*" (2011 Government Second Circuit Brief at 4.) Nevertheless, the government also stated that *Sater's sentencing "was listed on the court calendar as United States v. John Doe, but the courthouse was open for the proceeding.*" (*Id.* at 5.) Yet the government conceded that "*the docket does not reflect any letter filed in support of sealing or any written order sealing the case*"—nevertheless, the government speculated that it "appears likely" a party had made an application for sealing. (Which surmise still does not create *an order.*) (*Id.* at 4.) Additionally, because the appeal ultimately included the issue of Cogan's orders, Todd Kaminsky on behalf of Loretta Lynch and the government, filed a letter brief into the Second Circuit arguing that Cogan had correctly prohibited Oberlander from making the three statements. The letter argued that "the case has been titled 'John Doe' from its inception, and due to the fact that the case has remained under seal since that time *members of the public have been unable to access the docket or learn about any events or filings associated with it.*" (2011.06.23 Letter of Kaminsky at 1.) Kaminsky and Lynch also opine that even though the June 21, 2010, hearing "was open to the public" and thus **held in open court**, yet the identity of Sater and the information revealed therein *were still under seal because "the case was sealed as a whole."* (*Id.* at 2.) In support of this argument they noted that Glasser had *ordered the altering of the transcript*, replacing "Felix Sater" with "John Doe" throughout. (*Id.*)

In like matter, the government argued in its response brief: "The government is *not arguing* that, *had Roe been present at an open court* proceeding *he should not have been able to recount what he witnessed* (*assuming no sealing order was in effect covering that hearing*)." (Response Brief at 54-55 n.23.) In other words, in both the Kaminsky/Lynch letter and the government's brief, they indicated that a court could proceed "in open court" that somehow could still be hidden from public view by sealing the case "as a whole." Additionally, the government's response also agreed that Sater's name and conviction had been revealed in the government's March 2000 Press Release and that in the *Coppa* docket—the case in which Sater cooperated and testified against his co-conspirators—the government had provided to at least one of the accused material regarding Sater as a testifying witness, pursuant to 18 U.S.C. § 3500. (*Id.* at 6 & n.5.)

On June 29, 2011, the Second Circuit issued its decision by way of summary order. The Second Circuit ruled against Oberlander without even *analyzing* the issues surrounding (1) the lack of an actual sealing order, (2) whether a prior restraint was justified, or (3) the serious victims rights issues (indeed, neither the words "prior restraint" nor "victim" are found in the Second Circuit's order and the court never even makes mention of the fact that no sealing order has been docketed

24

or even located—a fact agreed to by both Oberlander and the government). The Second Circuit also indicated that Glasser had made findings, that in fact Glasser never made. For example, the Second Circuit said that Glasser made "factual findings" that "Roe's clients had 'wrongfully taken' and had 'no legal right to those documents.'" (2011.06.29 Second Circuit Order at 3.) In fact, the statements that the Second Circuit quoted as "factual findings" were taken from a hypothetical that Glasser posed in the July 20, 2010, hearing. Glasser said:

> Now, what happened, ***assuming*** that the documents were in John Doe's cabinet or in this desk, as they had a perfect right to be, they were his documents, and ***the documents were then wrongfully taken by Mr. Bernstein***. Mr. Bernstein is a converter, Mr. Bernstein has no title to those documents, ***no legal right to those documents,*** to that tangible document whether it would be a piece of paper, whether it be a gold ring . . . Mr. Oberlander even if he were an innocent purchaser for value, would not have acquired title to those documents because Mr. Bernstein had no title to give him. If requests were made of Mr. Oberlander to return those documents and Mr. Oberlander refused, it may be that an action for conversion may be available against Mr. Oberlander . . . (2010.07.20 Glasser Transcript at 19:11-20:10.)

Glasser ends the hypothetical by asking "***but the question is what order was violated?"*** (*Id.* at 20:23-24.) Notably, the Second Circuit could, relying on this same paragraph, equally have said that Glasser "found" that Oberlander was "an innocent purchaser for value"—which is just a variant of the hypothetical that Glasser posed. Indeed, the overall issue that Glasser is trying to work through is whether a court order had been violated regardless of the facts surrounding Bernstein's obtaining of the documents. The point of the quoted portion from the hypothetical was that *if* the documents were stolen, then maybe they could sue Oberlander or Bernstein for conversion if Oberlander refused to return them—but what court order would have been violated under that scenario? Indeed, on the previous page of the transcript, Glasser is working through the same issue and poses a different hypothetical (with the same introductory word "assume"): "Assume that John Doe [Sater] decided to make the cooperation agreement, the proffer agreement available to a third-party, would an order have been violated?" (*Id.* at 18:13-16.) (Recall that what Glasser had actually stated when he issued the permanent injunction on June 21, 2010, was that he was issuing the injunction based on his reading of *Charmer Industries* regardless of "***whether Mr. Oberlander*** <u>***knew or didn't know***</u> ***whether*** <u>***they were or weren't stolen***</u>," noting that "*[t]here is no evidence other than the fact that Mr. Oberlander received these documents from Mr. Bernstein*" who had "***represented to [Oberlander] he got the documents because Mr. Doe [Sater] gave them to him.***" (2010.06.21 Glasser Transcript at 88:4-9; 88:19-22; 87:21-88:1.))

In upholding Glasser's permanent injunction, the Second Circuit relied on two basic "findings" made by Judge Glasser, and which the Second Circuit said "were not clearly erroneous"—indicating that they engaged in appellate review of each of these facts. (2011.06.29 Second Circuit Order at 4.) First, the Second Circuit stated that Glasser "explicitly entered a finding that releasing proof of Doe's cooperation would cause him irreparable harm and would put his safety at risk." (*Id.*) As the Second Circuit cites, Glasser did state, when orally issuing the July 20,

2010, "further TRO," "I think there is irreparable harm, which is imminent to Mr. John Doe . . . I think, it would put Mr. John Doe's safety at risk." (2010.07.20 Glasser Transcript at 26:25-27:5.) Second, the Second Circuit also stated that Glasser "found" "that Roe had determined unilaterally that he was entitled to publicly disclose the report" and "found" "intentional defiance of a sealing order by Roe." (*Id.*) Of course, this "finding" is taken from the statement made in Glasser's March 23, 2011, "Scheduling Order" (nine months after the issuance of the permanent injunction on June 21, 2010) that, "[i]n unilaterally deciding that such an order did not exist, or, if it did exist, it was binding on court personal only; or in any event, he had a First Amendment right to publish that which was sealed, [Oberlander] knowingly and intentionally flouted a Court order." (2011.03.23 Glasser "Scheduling Order"). In sum, the Second Circuit upheld Glasser's June 21, 2000, oral permanent injunction based on Glasser's statements made (1) in issuing the July 20, 2010, TRO and (2) in the March 23, 2011, "Scheduling Order." Based on these statements, the Second Circuit applied the standard in *Charmer Industries* and affirmed that "disclosure of the PSR is not 'required to meet the ends of justice.'" (2011.06.29 Second Circuit Order at 4-5.)

The Second Circuit then summarily dismissed Oberlander's other, related appeals, stating that *while it could exercise pendent jurisdiction over the appeals of the TROs, it <u>declined to do so</u>*. This is remarkable given that the court had just purported to review (exercising its jurisdiction by finding "no clear error") and relied upon "findings" made specifically in issuing one of those TROs, and at the same time declined to exercise appellate jurisdiction. (And moreover failed to even address the arguments that the TROs must have expired or, alternatively must have become preliminary injunctions appealable as of right.) Similarly, the Second Circuit dismissed Oberlander's appeal of the March 23, 2011 "Scheduling Order," although noting that Oberlander was appealing from that order "insofar as it reflects Judge Glasser's factual finding that Oberlander 'knowingly and intentionally flouted' a court order." (*Id.* at 5.) Again, the Second Circuit had just reviewed and relied on that very finding from the "Scheduling Order" in upholding the June 21, 2010, permanent injunction against Oberlander. Yet, the court then dismissed the appeal from that order, stating: "**We do not have jurisdiction over Roe's claim** because the March 23, 2011, scheduling order was not a final order pursuant to 28 U.S.C. § 1291, nor are any of the exceptions to the 'final judgment rule' applicable in the circumstances presented."

In other words, the Second Circuit dismissed the appeals as to the TROs and the "Scheduling Order"—refusing to exercise jurisdiction over either—but at the same time, the Second Circuit relied on Glasser's statements from the July 20, 2010, TRO and the March 23, 2011, "Scheduling Order" to uphold Glasser's June 21, 2010, permanent injunction. How can a federal appellate court *both review those findings* (and conclude they were "not clearly erroneous") to uphold Glasser's injunction *and simultaneously declare that it lacked jurisdiction to review those same findings*, dismissing the appeals over the TRO and "Scheduling Order" in which the findings were made? Of course, if the Court lacked and/or declined jurisdiction to review those findings, it cannot also have jurisdiction to use them to uphold the permanent injunction.

26

The Second Circuit went one step further and chastised Oberlander for bringing the appeals of the various TROs and the scheduling order (despite having relied on them in their decision), stating:

> It is ORDERED that appellant Richard Roe is hereby **warned** that the Court's patience has been exhausted by his filing of six separate notices of appeal regarding the same principal legal dispute—including the filing of an appeal from a March 23, 2011, scheduling order that obviously was not a final order nor subject to any of the exceptions to the 'final judgment rule,' . . and that any further attempts to re-litigate the issues decided by this order, or other future filings of a frivolous nature, may result in sanctions, including the imposition of leave-to-file restrictions, requirements of notice to other federal courts, and monetary penalties. (2011.06.29 Second Circuit Order at 2.)

The Second Circuit dismissed Oberlander's appeals from Cogan's April 1 and 4, 2011, orders because Oberlander did not address them in his April 18, 2011, reply brief or request supplemental briefing, so he "waived his right to challenge Judge Cogan's orders" regarding the destruction of the electronic and hard copies of all of the Sater Criminal Documents. (2011.06.29 Second Circuit Order at 5.) The Second Circuit affirmed the May 13, 2011, order of Judge Cogan prohibiting Oberlander from making the three specific statements, stating, "[u]pon our own independent review, we agree with Judge Cogan that Roe's proposed disclosures would have violated our temporary injunction of February 14, 2011, and the sealing orders of Judge Glasser." (*Id.*)

The Second Circuit also ordered "that Judge Cogan shall retain jurisdiction for the limited purpose of enforcing our February 14, 2011, mandate—that is, to ensure the parties' compliance with the orders of this Court and any that have been or may hereafter be entered by Judge Glasser." (*Id.* at 6.) The panel also asserted that it would have jurisdiction "over any appeals from any orders or judgments entered by Judge Cogan" and any further appeals from the District Court. (*Id.*)

Finally, the Second Circuit remanded to Glasser:

> (i) to rule upon the government's unsealing motion of March 17, 2011; (ii) to issue a final determination regarding whether the dissemination of the other (non-PSR) sealed documents in John Doe's criminal case, particularly those that refer to Doe's cooperation should be enjoined, and (iii) in the event that a final determination regarding the dissemination of the other sealed documents does not result in an injunction against the dissemination of documents referring to Doe's cooperation, to enter an order temporarily staying the usealing of any documents referring to Doe's cooperation pending an appeal by the government to our Court . . . . (2011.06.29 Second Circuit Order at 6.)

The mandate issued from the Second Circuit on December 20, 2011. (2011.12.20 Second Circuit Mandate.) The appellate mandate formally ends the appeal—relinquishing the jurisdiction of the Court of Appeals. Thus the Second Circuit's ***"temporary injunction, pending the disposition of this appeal,"*** was extinguished on the issuing of the formal mandate. (2011.02.14 Second Circuit Pendente Lite Order, at 1.)

On January 26, 2012, Kaminsky wrote a letter to Judge Glasser that was filed "under seal and ex parte as to Richard Roe," that requested a briefing schedule to comply with the Second Circuit's mandate. However, Kaminsky noted that the court no longer needed to comply with the first item in the mandate—ruling upon the government's March 17, 2011, motion to unseal. Kaminsky explained that after the June 29, 2011, summary order was issued, the government "moved, under seal and *ex parte with respect to Roe*, to modify the Summary Order to remove that instruction." (2012.01.26 Kaminsky Letter at 9.) The Second Circuit denied the government's request, but instructed them to move to withdraw that motion before Judge Glasser, reserving the right to refile at a later date. On August 24, 2011, the government had moved (under seal and *ex parte* to Oberlander) to withdraw the March 17, 2011, unsealing motion, which the court granted the same day, and which the government informed the Second Circuit regarding, "again under seal and ex parte with respect to Roe." (*Id.*) Thus "the only issue that remains to be decided following remand is whether a permanent injunction should issue with respect to the Other Sealed and Confidential Documents"—i.e., the non-PSR Sater Criminal Documents. (*Id.* at 10.) The letter closes requesting that the letter be filed under seal "for the same reasons previously explained in the *government's sealed and ex parte motions dated May 19, 2011, July 13, 2011, August 18, 2011, August 24, 2011, September 29, 2011 and November 23, 2011.*" (*Id.* at 11.) As Sater's docket sheet would reflect when unsealed in August 2012, Glasser, the government, and Sater's lawyers had many *ex parte* communications as to Oberlander and Lerner, including meetings, and including *ex parte* contacts that were ordered by Glasser. (*See, e.g.*, 1998.12.03 Docket of 98-Cr-1101, docket entries 112, 115, 116, 117, 118, 119, 195, 120, 196, 121, 197, 122, 127, 200.)[6] On January 10, 2012, for example, Judge Glasser held an ex parte status conference with Kaminsky and Norris for the government, and Beys and Berland on behalf of Sater. At the conference, *Glasser "directed <u>the government</u> and <u>John Doe</u> to provide a detailed chronological account with transcripts of what the core issues involving this case and how it evolved into a First Amendment issue."* (*See, e.g.*, 1998.12.03 Docket of 98-Cr-1101, 01/10/2012 Status Conference.) The Court indicated it would subsequently "issue an Order on Notice to Mr. Lerner directing the parties to brief the issues." (*Id.*)

### G. Judge Cogan and the Contempt Order to Show Cause

Judge Cogan continued as the Special Master of the Second Circuit to ensure compliance with Glasser's orders and those of the Second Circuit. On February 5, 2012, the *New York Times* published an article by Benjamin Weiser, *By Revealing Man's Past, Lawyer Tests Court Secrecy.*[7] The article does not reveal any information from the PSR or other sealed documents, nor does it reveal Sater's identity—instead always referring to him as Doe and without personal

---

[6] If one looks at the docket entries for the *ex parte* motions listed in Kaminsky's letter, those entries in turn reference other related ex parte communications, conferences, etc. It is from that exercise that I created this list. However, this is not an exhaustive list of *ex parte* communications, just those that are obvious from referencing Kaminsky's list. Indeed, one of Kaminsky's *ex parte* motions that he lists in the letter (September 29, 2011) is not docketed at all.

[7] *See* Benajamin Weiser, *By Revealing Man's Past, Lawyer Tests Court Secrecy*, NEW YORK TIMES, 5 Feb 2012, available at http://www.nytimes.com/2012/02/06/nyregion/fraud-case-challenges-secrecy-of-mans-past-as-criminal-and-cooperating-witness.html?mcubz=0.

identifying information. The article includes quotes from Oberlander, David Schulz, and Paul Cassell (Oberlander's counsel in the Second Circuit). The article reveals that Richard Roe is Frederick Oberlander and includes a photograph of Oberlander and Lerner. In his declaration, Lerner denies being the source of Weiser's knowledge that Roe was Oberlander. There are several possible sources for Weiser's knowledge. The first source is the Second Circuit's publicly available June 29, 2011, Summary Order itself, which states as to the background facts: "On May 10, 2010, Richard Roe publicly filed a civil RICO complaint against John Doe ("Doe") and other defendants in the United States District Court for the Southern District of New York (Naomi Reice Buchwald, *Judge*)." (2011.06.29 Second Circuit Order at 2.) Of course, although the complaint itself was under seal, the *Kriss I* action was still docketed in the SDNY and still listed Frederick M. Oberlander as the attorney. Thus anyone could look up and see what civil RICO case was filed on that day before Judge Buchwald with a sealed complaint and see that Frederick Oberlander is listed as counsel. Further, counsel for Sater filed a letter motion dated August 11, 2011, in *Kriss I* before Judge Buchwald that was publicly docketed and that referred to Oberlander as "Richard Roe" throughout (again, Oberlander was named as counsel for plaintiffs in *Kriss I* under his actual name). The letter motion further stated that "Roe" was subject to the Second Circuit's June 29, 2011, order. (2011.08.11 Letter Mobargha to Buchwald at 1.) Thus Sater's counsel made a publicly available filing linking Oberlander and *Kriss I* to the pseudonymous Richard Roe in John Doe's criminal proceeding and Second Circuit appeal.

Nevertheless, after the *New York Times* article was published, on February 10, 2012, Sater's counsel moved via unsworn letter before Judge Cogan to hold Oberlander and Lerner in contempt for revealing that Oberlander was Richard Roe. (2012.02.10 Application to Judge Cogan for Contempt.) Cogan issued an order to show cause why Oberlander and Lerner should not be held in civil contempt for violating the Second Circuit's February 14, 2011, summary order. (2012.02.15 OTSC Signed by Cogan.) On February 17, 2012, Lerner and Oberlander filed a Motion to Quash Cogan's Order to Show Cause. (2012.02.17 Motion to Quash Contempt.)

Lerner and Oberlander argued in their Motion to Quash that the Order to Show Cause and application for civil contempt was flawed. First, they argued that under Local Civil Rule 83.6, Sater's lawyers were required to move for civil contempt by means of affidavit, and could not do so with an unsworn letter and, thus, the order should be quashed for that reason alone. (2012.02.17 Motion to Quash Contempt at 4-5.). Second, they pointed out that it was Sater's lawyers in their publicly filed letter to Buchwald and the Second Circuit's summary order that revealed that Roe was Oberlander. Indeed, Sater had filed a related proceeding before Judge Buchwald where he identified Oberlander by name as the person to whom Bernstein gave the Sater Criminal Documents. (*Id.* at 7 & n.2) Third, Lerner and Oberlander argued that Cogan did not have authority, as a special master, to adjudicate criminal contempt of a Second Circuit order as 18 U.S.C. §401 limits the jurisdiction of courts adjudicating contempt to contempt of the adjudicating court's own orders "and none other." (*Id.* at 8-9.) Further, Oberlander and Lerner demanded full criminal due process in such case, including an open court with a separate docket. (*Id.* at 14.)

Nevertheless, if the contempt were civil, the invalidity of the allegedly-violated order would be a defense to contempt, and Oberlander and Lerner asserted their intent to "defend vigorously" on the grounds that the orders issued (gagging Oberlander) were unconstitutional. (2012.02.17 Motion to Quash Contempt at 8.) They argued that the hiding of entire criminal cases, like Sater's, is unconstitutional and unlawfully evades Congressional sentencing laws like the MVRA and the CVRA, relying on the United States Supreme Court's case, *Ex Parte United States*, 242 U.S. 27 (1916), for the proposition that the judiciary is required to follow sentencing laws, and *Dolan v. United States*, 590 U.S. 605 (2010), for the proposition "that the obligation to impose a sentence of restitution is paramount." (2012.02.17 Motion to Quash Contempt at 8.) Further, they argued that such problems are compounded by Glasser's and the Second Circuit's injunctions against Oberlander to not reveal any of this information—even to Congress. (*Id.* at 9.) Indeed, the Second Circuit in fact told Oberlander that he could ***not*** report to Congress Glasser's failure to order restitution and to comply with mandatory Congressional sentencing laws. (*See* 2011.02.10 Second Circuit Order at 2, ¶ 4.) Oberlander was threatened with contempt if he revealed anything regarding Sater's hidden case (and, in fact, Cogan had now issued an order to show cause for why Oberlander shouldn't be held in contempt for allegedly revealing *his own name*). It is in this context, that Oberlander and Lerner submitted:

> As it happens, what Judge Glasser and the Second Circuit have done, in concert with your own [Cogan's] prior orders, is to hide an entire covert justice system operating devoid of constitutional legitimacy. It is so repellent to our Constitutional system that it is not merely invalid by reason of unconstitutionality. It and the orders attempting to conceal it (including the disgrace of purporting to order a United States citizen not to report judicial unlawfulness to Congress) are and were at all times jurisdictionally barred. No federal court may enjoin anyone from revealing its own misconduct, ever, such injunction again *pro tanto brutum fulmen*. (2012.02.17 Motion to Quash Contempt at 9.)

Oberlander and Lerner relied for the proposition that federal courts "may not enjoin anyone from revealing its own misconduct" in part on *Nixon v. United States*, 506 U.S. 224 (1993), which held that impeachment is a nonjusticiable political question. (2012.02.17 Motion to Quash Contempt at 17.) And, of course, it is an inherent conflict for a judge (or anyone with power) to examine—and potentially silence—her own critics.

The Motion to Quash condemns "the unlawful and unethical measures taken to cover up the illegal sentencing schemes in the Eastern District." (*Id.* at 4.) Noting that the hiding of criminal cases and denial of restitution to victims had not happened solely in the Sater case and appeared to be systemic, they pointed out that Judge Cogan had himself presided over similar cases where he maintained an "apparently incomplete" and "inaccurate docket"—specifically citing case number 10-cr-00173, involving cooperator Sebastiano Saracino, "where a motion to close a courtroom was made and discussed in public proceedings on December 2, 2010," but was "never docketed upon your honor's ejection from the courtroom of reporters." (*Id.* at 4, 12.)

The Motion calls the hidden sentencing of cooperators and failure to award restitution "lawless" and "seditious"; yet the Motion is clear to define sedition to mean "maladministration in official office," as Blackstone defined it. Further, the Motion articulates precisely the alleged

maladministration that Oberlander and Lerner assert: "Federal judges **cannot operate in secret** or in combination with probation officers and officials of the Department of Justice, **to evade mandatory restitution laws or any other mandatory sentencing laws. It's seditious**." (2012.02.17 Motion to Quash Contempt at 17.)

At the February 27, 2012, hearing on Cogan's order to show cause, Lerner asked that the matter be on the Court's public schedule, that it and any further proceedings "be publicly documented" and "take place in an open courtroom. Cogan responded: "I have not sealed this courtroom. Is it anyone's understanding that this transcript is sealed? Your request is denied as moot." (2012.02.27 Cogan Transcript at 11:7-13.) Yet, the proceeding was taking place on Sater's "blanket sealed" 98-Cr-1101 docket that was hidden from the public—and, indeed, Oberlander had previously been informed by Cogan and the Second Circuit he could not repeat information that occurred in open court on that docket. (*See* 2011.05.13 Cogan Order at 3 (holding that Oberlander could not repeat information from "unsealed hearing" where Sater testified because that prohibition "is **implicit based on the sealing of the case as a whole**").[8]

At the hearing, Cogan expressed doubt as to whether Oberlander's revelation that he was Roe— even if he did so reveal—was a contempt of any court order:

> The only provision that's been pointed out to me as to which there may be a contempt is the second paragraph in the Court of Appeals summary order filed February 14th, 2011, which simply notes that the Court is referring to Richard Roe as Richard Roe because the disclosure of his true identity might lead to the improper disclosure of materials here at issue.
>
> That is not a decretal paragraph; it is simply a statement of the reason why the Court of Appeals is using a pseudonym. . . .
>
>  . . . I've only been pointed to that first recital paragraph in the Second Circuit's order. And as I say, it is not a decretal paragraph. (2012.02.27 Cogan Transcript 8:13-9:11.)[9]

Nevertheless, Cogan said he would "refer the matter for criminal prosecution to the United States Attorney" for them to determine "whether a contempt of the injunctive provisions themselves,

---

[8] Cogan's order was affirmed by the Second Circuit. Recall that Kaminsky and Lynch had argued to the Second Circuit that Oberlander could not repeat what he witnessed or heard at Glasser's June 21, 2010, hearing that "was open to the public" and thus **held in open court**, yet the identity of Sater and the information revealed therein **were still under seal because "the case was sealed as a whole."** (2011.06.23 Letter of Kaminsky at 2.)

[9] In an unsealing hearing on May 10, 2016, Judge Cogan stated that "[t]he Second Circuit, . . . enjoined Mr. Oberlander from even using his own name in these proceedings." (2016.05.10 Cogan Transcript at 7:21-25.) Mr. Lerner then asked the court to "make a correction." (*Id.* 14: 4-5.) In the subsequent colloquy, Judge Cogan retracted that:

> THE COURT: What did I state today that was mistaken?
> MR. LERNER: That Richard Roe could not identify himself publicly.
> THE COURT: Yes, that was mistaken. I thought I corrected that. You are correct, thank you.
> MR. LERNER: Your honor [previously] stated it was not a decretal paragraph. It's simply a statement of a reason why the Court of Appeals is using a pseudonym.
> THE COURT: Thank you, Mr. Lerner. (2016.05.10 Cogan Transcript 14:4-15:12.)

not mere background recitals, has occurred." (*Id.* at 9:20-25.) Despite the referral, neither Oberlander nor Lerner have been prosecuted.

Sater's lawyers repeatedly asserted that news stories were instigated by Oberlander and Lerner in violation of court orders, seeking contempt charges against them for various articles that were published, including articles published in the *Miami Herald*. An extensive affidavit from ***Brian Vodicka*** attested that he ***was the source for the Miami Herald's articles*** and that ***he had figured out for himself from public sources that Felix Sater was John Doe*** (after having suffered a financial loss of nearly a million dollars himself as a victim of fraud involving Bayrock). (2012.08.22 Vodicka Affidavit, especially ¶ 2.)

Indeed, on August 2, 2012, Sater's lawyers filed a letter with Judge Cogan to supplement their order to show cause for civil contempt. In the letter, they alleged that Sater had been threatened by Daniel Persico, one of the co-conspirators in the *Coppa* case against whom Sater testified. According to the letter, Daniel Persico beat up Salvatore Lauria on July 27, 2012, "in broad daylight, in front of several witnesses" and told Lauria to pass a message onto Sater that Periscio was "gonna kill him" because Persico "did two years" in prison because of Sater. (2012.08.02 Letter, Beys to Cogan Re: Persico at 1-2.) The theory underlying the letter was that Oberlander had given materials to attorney Gerald Shargell, with whom Oberlander was consulting (which Oberlander had disclosed to the Second Circuit in February 2011). Sater's lawyers alleged that Shargell had previously "represented Persico in the case in which Doe cooperated." (*See id.* at 3.) Noticeably, for this theory to work, Shargell would have had to breach his duty of confidentiality and disclose to Persico that Sater was a cooperator. Further, Shargell (or Persico) waited at least 18 months to do anything about it. But, most importantly, after receiving this letter, Cogan contacted the government about the threat, and Cogan received a letter from Kaminsky stating that "Agents discussed security matters with Lauria and, separately, with Doe. For the time being ***both men have made clear that they are not seeking to be relocated or otherwise seeking protection for themselves or their families***." (2012.08.06 Letter Kaminsky to Cogan at 1.) Further, as shown below, filings from the *Coppa* docket reveal that the defendants against whom Sater testified, including Persico, knew of Sater's identity at the time of their convictions.

In February 2012, the *Miami Herald* moved to unseal the docket and the contents of the docket in the Sater case. Other citizen and media interests joined their motion.

### H. The U.S. Supreme Court and the Unsealing of Sater's Docket

At the Second Circuit's February 14, 2011, hearing, the court had explained that "parties hereto are always free to seek review of our orders from the Supreme Court of the United States," but "any and all papers filed in the Supreme Court referring to matters or documents subject to extant sealing orders shall be filed in the Supreme Court under seal." (2011.02.14 Second Circuit Oral Argument Transcript 10:6-13.) Importantly, the Supreme Court does not have a secret docket—one cannot successfully file a sealed certiorari petition merely by denominating it "under seal." Thus Lerner, on behalf of Oberlander, initially attempted to file a cert petition under seal, which the Court accepted but with the direction that Lerner file (1) a motion to file the cert petition under seal and (2) a redacted petition that could be filed publicly. On June 25,

2012, the Supreme Court granted Lerner's "Motion to Order the Docketing and Public Availability of the Petition for Writ of Certiorari in Redacted Form as Provided Herewith."

Lerner's motion expressly told the Supreme Court that the Second Circuit had ordered that any appeal be filed under seal, that Lerner and Oberlander had attempted to file the cert petition under seal, but that the Court "directed him to file this motion and redacted petition" for public filing. (2012.05.10 Motion to U.S. Supreme Court at 2, ¶ 4.) The motion then specifically enumerated for the Supreme Court all information and categories of information that were *not* redacted in the proposed redacted petition. Paragraph 11 of the motion argued that information from the PSR had *not* been redacted and should *not* be redacted because "the PSR contains information of public concern—viz. evidence of prosecutorial and judicial misconduct," which "has not been redacted." (*Id.* at 4, ¶ 11.) The motion then lists a specific example:



In explaining the public interest in allowing the cert petition with this information from the PSR to be filed publicly, Lerner's Motion to Order a Public Redacted Cert Petition argued that "maximum access to the petition is compelled to further the ends of justice and the expressly mandated intent of Congress"—citing the interest of the public, of victims, of investment protection organizations, of advocates of government transparency and integrity, of free speech advocates, and the Media. (*Id.* at 6-12.) The Supreme Court **granted this motion—allowing the publication of information that the U.S. Supreme Court knew came from the PSR,** although requiring that Sater's actual name be redacted and "John Doe" used in its place.

Over the course of the following month, Lerner worked with a clerk at the Supreme Court to ensure that the redactions conformed with the Supreme Court's order and intentions. The Redacted Cert Petition became publicly available in July 2012. The lawyers for both the government and Sater were served with the motions and the proposed Redacted Cert Petition— and neither made any objection to its being filed or to the redactions that were made (and were not made) therein. Amici filed in support of Oberlander's petition for writ of certiorari, including the Reporter's Committee for Freedom of the Press and the National Organization for Victim Assistance. *See, generally*, Docket for Roe v. U.S., Case no. 12-112, available at: https://www.supremecourt.gov/search.aspx?filename=/docketfiles/12-112.htm.

After the Redacted Cert Petition was publicly filed by order of the Supreme Court in July 2012, the *Miami Herald* ran another article, titled "High court reveals secret deal of Trump developer's

33

crimes." *The Miami Herald*, July 31, 2012.[10] The article discusses the information from the public Redacted Cert Petition (hence the title, "***High court reveals*** secret deal"), and *The Miami Herald*, thanks to Vodicka, had already determined that John Doe was Sater, as noted above. Notably, in this Committee's OSC against Oberlander and Lerner, it cites this article as demonstrating a charge against them for violating the Second Circuit's February 14, 2011, "pendente lite" order enjoining them from revealing information. Obviously, the Second Circuit's mandate had issued in December 2011, ***so the appeal was no longer pending in July 2012***, and thus the Second Circuit's "***temporary injunction, pending the disposition of this appeal***" had expired on its own accord. (*See* 2011.02.14 Second Circuit Pendente Lite Order, at 1; 2011.12.20 Second Circuit Mandate.) More importantly, *the Miami Herald* article repeats information directly from the Redacted Cert Petition (and from Paul Cassell), but ***not*** from Oberlander or Lerner. Indeed the article itself states: "Richard Lerner, the lawyer who filed the petition, declined comment." Obviously, yet critically, despite what Glasser or the Second Circuit had previously ordered and whether such orders were valid or still binding, the Supreme Court has the absolute authority to control its own filing and docket, including what is publicly published there and what remains sealed. As the article's title claimed, it was the "High court" which ordered that Sater's secret deal be "revealed."

Recall that Glasser still had before him the motions of the *Miami Herald* and other media interests to unseal the docket and the contents thereof, filed in February 2012. In early August 2012, in Glasser's own words, there was "an unfortunate series of events in the office of the Clerk of Court," specifically:

> [T]he docket sheet of 98-Cr. 1101—which revealed Doe's identity and the fact of his conviction and cooperation—was inadvertently unsealed for several days and then subsequently resealed. During the period in which it was publicly available, several members of the media, Lexis, Westlaw, and others accessed it. Copies of the docket sheet remain available on Lexis and Westlaw today. (2012.08.27 Glasser Order Unsealing Docket, at 3-4.)

Glasser scheduled and held a public hearing on the unsealing of the docket, which was held August 22, 2012. The accidental public availability of the docket contained docket entries for numerous *ex parte* communications, motions, and hearings—of which Oberlander and Lerner had not been previously aware. Thus, on the eve of the hearing, Oberlander moved for Glasser to recuse himself. (*See* 2012.08.21 Oberlander Letter Motion to Glasser, at 1.) Oberlander cited both the ex parte communications and an email from Nader Mobargha (Sater's attorney) from May 18, 2011 [Hereinafter "Mobargha Settlement Email"]. The email from Mobargha argued that Oberlander needed to settle "as he has reached the end of his litigation rope," warning: ***"Even if Judge Glasser decides to hold a hearing or oral argument to determine whether to unseal specific docket entries of Doe's criminal proceeding he will do so without considering your arguments or appeals.*** If you believe you are driving the unsealing issue, ***you are mistaken.***" (2011.05.18 Sater's Counsel's Email.) The docket entries showing numerous *ex parte*

---

[10] Michael Sallah, *High court reveals secret deal of Trump developer's crimes.* THE MIAMI HERALD, July 31, 2012, available at http://www.miamiherald.com/latest-news/article1941682.html.

filings and proceedings seemed to support Mobargha's claim that Oberlander and Lerner didn't know what was actually going on and that, by proceeding *ex parte*, Glasser was acting "without considering" their arguments. The next day, at the public hearing, Glasser denied Oberlander's motion to recuse without comment. (2012.08.22 Glasser Transcript at 4:11-13.)

At the hearing and in stark contrast to Glasser's prior adjudications regarding sealed documents in June and July 2010, Glasser correctly stated that the government has the burden of proof to "maintain the sealing" and must show "compelling interests which override [the] First Amendment and common law right of access." (2012.08.22 Glasser Transcript at 18:1-9 & 21:14-21.) Further, Glasser indicated in talking to Kaminsky on behalf of the government, "that the underlying consideration for sealing the case initially and maintaining the sealing of that case thereafter, was to ***protect the identity of . . . John Doe and the fact that John Doe was a cooperator . . . . Those were the only considerations which warranted the sealing of that case.***" (*Id.* at 22:11-16.)

On August 27, 2012, Judge Glasser issued an order unsealing the docket sheet in Sater's criminal case (98-Cr-1101). Glasser explained that "[a]ny balancing of the interests here, [] would be academic as the information the Government and Doe seek to maintain sealed has already been publicly revealed; the cat is out of the bag, the genie is out of the bottle. Doe's identity and the fact of his conviction was publicly revealed by the Government in a press release, and the docket sheet revealing Doe's identity, conviction, and cooperation is accessible on Westlaw and Lexis." (2012.08.27 Glasser Order Unsealing Docket, at 5.)

Further, Glasser explained that the Second Circuit had previously ***held "that a court lacks power to seal information that, although once sealed, has been publicly revealed"*** (*Id.* at 5.) and that ***"[o]nce it is public, it necessarily remains public."*** (Id. at 6.) Thus Glasser held that "because any continued sealing of the docket sheet of 98 Cr. 1101 would be futile, the movants' motion to unseal that docket sheet is hereby granted." (*Id.*) Glasser then scheduled a hearing for October 2, 2012 (it later was rescheduled to October 9) to determine whether documents filed in Sater's criminal case should also be unsealed. Again, contrary to his June and July 2010 adjudication and orders, Glasser correctly held, "The Government and Doe will bear the burden of establishing that there are compelling interests that override the qualified First Amendment and common law rights of access." (*Id.* at 7.)

On October 9, 2012, Lerner, Oberlander and members of the media arrived for the hearing, only to have Glasser order everyone (other than the government and Sater) out of the court and have the courtroom closed for the hearing—not even allowing Oberlander and Lerner to appear or make argument as to unsealing documents. ThompsonReuters, who was one of the media interests who came for the hearing, thereafter filed a letter motion with the court, stating that it "formally object[s] to the barring of our journalists from the October 09, 2012, 2:30 pm motion hearing and to request access to the transcript of said hearing and that all future hearings for the case referenced above be open." (2012.10.12 Reuters Letter Objecting.)

Without others to counter their presentation, Sater's lawyer were allowed to argue ex parte in a closed courtroom that sealing was necessary to protect Sater's safety—the only interest still at

stake, according to Glasser at the August 22 hearing. Oberlander and Lerner were unable to present evidence—for example, if Sater's lawyers argued again that Persico had threatened Sater's life—to rebut arguments that Sater's crimes and cooperation had been unknown to his co-conspirators, like Persico. Further, Oberlander and Lerner wanted to present evidence showing that the fact that Sater was a cooperator was a matter of public record, for example in various filings on the *Coppa* docket. Consequently, on October 23, Oberlander and Lerner filed a Request for Judicial Notice, asking the court to take notice pursuant to FRE 201 of certain documents (15 court filings, and two congressional hearings) and two facts, to assist the court in determining the unsealing motion. (2012.10.23 Request for Judicial Notice at 1-2.) The two facts asserted were (1) that the proffer and cooperation agreements were not ever filed and docketed, so could not have been sealed; and (2) that the Executive Office of the U.S. Attorney had disqualified the EDNY U.S. Attorney's office from handling the criminal contempt investigation against Lerner and Oberlander. (*Id.* at 2.) On page 2 of the four-page request proper, Oberlander and Lerner provided a chart of all of the attached documents (which were tabbed and bates-numbered) explaining the significance of each document to the case and the unsealing issue before the court. (*Id.*) For example, Ex. A contained a "3500 letter from AUSA Pitofsky" to defendant Ray "stating the government will call Sater as a cooperating witness." Ex. H is an "open-court hearing" with all *Coppa* defendants and counsel present, including Persico, where it is stated, "Mr. *Felix Sater, an unindicted co-conspirator and cooperator* with the government, an individual *who is going to testify*." (*Id.*) And Ex. J is the "AUSA Corngold's *government witness list for U.S. v. Persico, noting Felix Sater*." (*Id.*) Each entry on the table for the 15 judicial filings is like this—specifically describing how the exhibit relates to Sater and/or the unsealing motion.

Additionally, the two congressional hearings addressed the "Fairness in Sentencing Act" and "Organized Crime on Wall Street." (*See id.*) The "Organized Crime on Wall Street" hearings contained the March 2, 2000, press release from the U.S. Attorney's Office for the EDNY, that revealed Sater's RICO conviction, stating: "As alleged in the indictment, *the schemes were led by defendant* John Doukas and Walter Durchalter, *together with* Gennady Klotsman, Salvatore Lauria and *Felix Sater*, who collectively controlled White Rock and State Street"—with a footnote, stating "Klotsman, Lauria and *Sater have previously pleaded guilty to RICO charges* in connection with their activities at White Rock and State Street." (*See* ORGANIZED CRIME ON WALL STREET, House Hearing, Sept. 13, 2000, at 195 & n.2, *available at* https://www.gpo.gov/fdsys/pkg/CHRG-106hhrg67115/pdf/CHRG-106hhrg67115.pdf.) Obviously, the Congressional Hearing, published in the Congressional Record and available online, demonstrated that **Sater's name and conviction was already publicly available**. And as Glasser had just held in his August 12, 2012, order, *"a court lacks power to seal information that, although once sealed, has been publicly revealed"*—and *"[o]nce it is public, it necessarily remains public."* (2012.08.27 Glasser Order Unsealing Docket, at 5-6.)

On November 8, 2012, having received no objection to their Request for Judicial Notice, Oberlander and Lerner moved Glasser to order "forthwith that judicial notice has been taken and made part of the record or that an immediate public hearing be set wherein we may proffer each document for entry into evidence on the record." (2012.11.08 Joint Request for Entry of Notice

at 2.) They noted that "*[t]he self-authenticating documents confirm that it became a matter of public record that Mr. Sater was identified and disclosed by the government as a government informant and cooperating witness almost a decade ago*." (*Id.*)

Judge Glasser responded on November 13, 2012, in a rather unexpected manner: he issued an order to show cause as to "why sanctions should not be imposed" under 28 U.S.C. § 1927 for filing "the vexatious, oppressive 'Request for Judicial Notice.'" (2012.11.13 Glasser Order at 4.) Glasser recited that the *"first hearing" regarding the unsealing of the documents "was held on October 9, 2012, in a courtroom closed to the public and the press,"* followed by a second sealed hearing on October 23, with more to follow—yet, "the only issue for determination pending before the Court is the propriety of keeping documents sealed." (*Id.* at 1.) Glasser noted that the Request for Judicial Notice, had attached to it "17 exhibits totaling 742 pages" (yet Glasser also noted that 594 pages of those pages were the two Congressional Reports). (*Id.* at 2.) Glasser characterized the judicial records as "bespeak[ing] an indifference to their irrelevance to the discrete pending issue of document sealing" and summarized their contents as: "a presentence report of another defendant (Ex. F); a letter from yet another defendant objecting to statements in his" PSR (Ex. E); and "assorted letters from defense counsel and Assistant United States Attorneys in other criminal cases." (*Id.* at 2.) Yet, as concisely stated in the chart contained in Oberlander's and Lerner's Request for Judicial Notice, both Exhibits E and F dealt with objections to/or statements in *Coppa* defendant PSRs that said that their guilty pleas were the reason "Sater was not called as [a] witness!" in their cases and noting that *Sater "'was a witness against many other defendants who ultimately pled guilty*.'" (2012.10.23 Request for Judicial Notice at 2.) Thus the purpose of including Exhibits E & F was patently to show that the *Coppa* defendants (which included Persico) already knew that Sater was a testifying witness against them at the time of their convictions.

Glasser denied the Request on the grounds of irrelevance and then issued the order that Oberlander and Lerner show cause as to why they should not be sanctioned under 28 U.S.C. § 1927, which requires "actions are so completely without merit as to require the conclusion that they must have been taken for some improper purpose." (2012.11.13 Glasser Order at 3.) He went on to opine that he could perhaps sanction them using his inherent powers for filing something that "was without colorable basis, asserted in bad faith for improper purposes" as the Request had "no relevance to the very discrete issue pending before the Court." (*Id.* at 3-4.)

On November 19, 2012, Oberlander filed on behalf of intervenor Lorienton Palmer (thus, this was *not* filed by Lerner) an Omnibus Motion where Oberlander reviewed the recently uncovered docketed ex parte communications (and asked for a disclosure of all ex parte communications), the Mobargha Settlement Email stating that Glasser would adjudicate unsealing docket entries "without considering your arguments or appeals," the closing of the unsealing hearings, the history of the prior restraint/gag orders, the initial "sealing" without orders, and stated:

> The same accumulation of events also makes inarguable that your honor presides over this and related matters in violation of 28 U.S.C. §455(a) and (b)(1), having failed to disqualify yourself despite Congressional mandate you do so because of, respectively, [1] your appearance of bias and lack of impartiality, palpably obvious to, let alone

reasonably questioned by, an objective, informed observer; and (2) your knowledge of disputed evidentiary facts you obtained outside this proceeding, or *ex parte*, a fortiori facts which you have wrongfully withheld from us.

Now, given what must appear to that objective observer to be intentionally chilling, retributive, *in terrorem* threats to sanction us for exercising our First and Fifth Amendment rights—rights no court may deny—to introduce relevant evidence in support of meritorious argument and in particular in light of the documentary evidence we now proffer, that observer cannot rationally conclude but that your honor ***appears to be*** in criminal conspiracy with at least Nader Mobargha and Michael Beys, Sater's lawyers, to deprive us and our clients of our rights. (2012.11.19 Omnibus Motion at 2.)

Later in the Motion, Oberlander clarified: "We respectfully alert the court that we are scrupulously adhering to the standards of §455(a) and requesting you step down because of the ***appearance of bias and prejudice*** founded in corruption and criminal conspiracy. ***We are not here accusing the court of actually engaging in corruption and criminal conspiracy.***" (*Id.* at 11, fn 6.)

A hearing on the § 1927 sanctions show cause order was held on November 19, 2012, and the Court allowed supplemental briefing. Lerner and Oberlander filed a Joint Supplemental Submission with Respect to Issues Raised at Oral Argument. The Joint Supplemental Submission outlined Oberlander's and Lerner's substantive objections to Glasser's §1927 show cause order, including asserting the relevance of the judicial documents attached in the Request for Judicial Notice to unsealing issues before Glasser, such as:

[T]he documents proffered on October 23rd are highly disprobative of the in camera argument that there is a risk to [Sater's] safety. The documents demonstrate, irrebutably, that it has been known to his co-conspirators for over a decade that he was a government informant. That he has not come to harm, notwithstanding his co-conspirators have known since as early as 2000 that he was a government informant, belies any argument that Sater and the government might be making in camera that there is a risk to Sater's safety. (2012.12.13 Response to Glasser's OTSC at 8.)

They also asserted that the documents specifically refuted Persico's claims to have recently learned (allegedly through Shargell, who had consulted with Oberlander on the case) that Sater cooperated against him. (*See, e.g.*, *id.* 7, 19). Additionally, they noted that sanctions under § 1927 require **both an objective showing of absolutely no legal merit and subjective bad faith in the filings**—neither of which had been or could be shown for the Request for Judicial Notice—and demanded full due process rights in making any such determination. Judge Glasser ultimately never ruled on his own show cause order, and never imposed sanctions under §1927 or otherwise for the filing of the Request for Judicial Notice. (*Id.* at 9-10.)

Meanwhile, as to the writ for certiorari, on September 20, 2012, the U.S. Supreme Court requested that the government file a response to Oberlander's Cert Petition. On February 21, 2013, the Solicitor General's office filed a response, the leading argument thereof was that Oberlander's appeal had been largely mooted by Glasser's unsealing of Sater's docket.

38

Paul Clement, former Solicitor General of the United States, and Lerner represented Oberlander in filing a reply brief on March 5, 2013, asserting the arguments and interests not addressed by the unsealing of the docket. Clement argued that despite the complex history of the case, it involved simple legal principles, namely: that the Supreme Court has "repeatedly held that when a tipper provides information to a tippee about a matter of public importance, the tippee has an unqualified First Amendment right to publish that information, even if the tipper acquired the information through unlawful means." (2013.03.05 Paul Clement and Lerner Reply at 2.) He continued:

> Put simply, a federal court has prohibited Roe from disclosing truthful information about a prominent businessman's criminal wrongdoing. The courts below *have not only sanctioned an entirely secret criminal proceeding, but have treated the secret proceeding as a self-executing injunction against the world that precludes Roe from disclosing it* as part of an effort to vindicate his clients' rights through civil litigation. And the government considers Roe's actions as tantamount to contempt, even though *it cannot identify any court order that Roe actually violated*. Roe was not even a party to the secret criminal proceedings and did nothing more than what lawyers are supposed to do when they uncover evidence of misconduct.

> This is all *a remarkable, flagrant affront to the First Amendment's guarantee of the freedom of expression*, and a stark departure from this Court's longstanding jurisprudence. (*Id.* at 2-3.)

On March 19, 2013, just three days before the Supreme Court had scheduled consideration of Oberlander's petition, the Solicitor General sent a letter to the United States Supreme Court, which had attached to it two orders from Glasser. One dated March 13, 2013, which unsealed a large portion of the filings on Sater's criminal docket, and the other dated March 14, 2013, which was an *ex parte* order (excluded Oberlander and Lerner) that unsealed certain documents, but also ordered that certain documents should be and remain sealed in their entirety or with redactions. In the March 13 order, Glasser said that *he had held a hearing on unsealing on October 9, 2012, "the hearing itself open to the public."* (2013.03.13 Glasser Order at 1.) He then stated that after consideration he "declared the proceedings to be closed and the courtroom to be vacated," but that he had properly placed the burden on the government and Sater "to establish that there were compelling interests that superseded the general common law and qualified First Amendment right of access to those documents." (*Id.* at 2.) In the sealed and ex parte March 14 order, Glasser stated that *Sater had been sentenced "in an open courtroom."* (*Id.* at 6.) *Glasser also agreed that the proffer and cooperation agreements were not under court seal.* He noted that *a proffer "is never filed"*—and *thus is not under seal of the court.* (*Id.* at 5 n.2.) Similarly, Glasser said of cooperation agreements that they often are not filed with the court, but that had Sater's cooperation agreement been filed, the court could have sealed it—but given that "the fact of cooperation has been public knowledge for some time," "[s]ealing the document would not serve any compelling interest." (*Id.* at 6.) Glasser retained under seal the PSR and various documents (in whole or redacted) that referred to the contents of the PSR or the details of Sater's cooperation—or that were sealed by the Second Circuit. (*Id.* at 8-11.)

39

The Supreme Court denied Oberlander's Petition for Certiorari on March 25, 2013.

## I. The *Kriss II* and *Gottdiener* Cases

On May 10, 2013, Oberlander and Lerner filed a Summons with Notice in the Supreme Court of the State of New York on behalf of Kriss, Ejekam, and other victims that they had since identified, namely the Estates of Ernest and Judit Gottdeiner, Ervin Tausky, and Suan Investments, against Bayrock Group, Arif, Schwarz, Sater, and others related to Bayrock, as well as Sater's lawyers who had worked to keep Sater's conviction hidden, including Kelly Moore, Nader Mobargha, and Michael Beys, Asssitant U.S. Attorney Todd Kaminsky, and then, finally, CIM, ISTAR Financial, Donald Trump, and related entities. (*See* 2013.05.10 Summons with Notice.) This case will be referred to as the *Kriss II* case. The *Kriss II* Summons with Notice laid out that the plaintiffs had been defrauded because Sater's entire criminal case had been illegally sealed. The *Kriss II* Notice explained:

> Plaintiffs seek relief against those directly and vicariously responsible for the fraud in the three years of ligitation . . . [which] litigation was in bad faith, purportedly to protect the safety of Sater by maintaining under legal seal and closure information of and concerning the nature and existence of his conviction, cooperation and sentence, which had in fact been public for up to a decade, as was known to those defendants involved, where there was no actual threat and in fact presentation of evidence of actual threat later claimed was a pure fraud on the court including by subornation, such fraud actionable statutorily as well as at common law. (*Id.* at 3.)

On July 30, 2013, Oberlander and Lerner also filed a lawsuit in Southern District of New York against Felix Sater and Salvatore Lauria for racketeering in conspiracy with Alfred Palagonia on behalf of victims, Ernest and Judit Gottdiener—holocaust survivors who were cheated out of over seven million dollars. (*See* 2013.08.02 *Gottdiener* Amended Complaint Parts 1 & 2.) Ernest and Judit Gottdiener, and Judit's brother, Ervin Tausky, had invested with Palagonia, a broker at D. H. Blair. Palagonia fraudulently induced the Gottdieners and Tausky to purchase stocks that Palagonia was being paid to push. Indeed, Sater and Lauria were paying Palagonia to "pump and dump" specific stocks. Sater, Lauria, and Palagonia all pled guilty to and were convicted of racketeering, all admitting that they were part of a racketeering enterprise that defrauded customers. As the complaint alleged, Sater and Lauria had admitted that in addition to defrauding their own customers "they also paid Palagonia to fraudulently induce his customers at Blair as part of his securities frauds and racketeering to buy the same stocks, further pumping up the price." (*See* 2013.08.02 *Gottdiener* Amended Complaint Parts 1, page 1 ¶3.) Palagonia had paid restitution as part of his conviction to his victims, including to the Gottdieners, but Sater and Lauria paid no restitution to their victims as part of their criminal sentencing. Further, the civil RICO four year statute of limitations had not run as to Sater (because he was not actually sentenced until October 2009); and the complaint alleged that the statute should be equitably tolled as to Lauria, who was convicted in 2004, but whose conviction had been entirely hidden from the public until March 22, 2009, making it so that victims could not sue (as they were unaware of the conviction) within the statute of limitations period. (*Id.* at 6, ¶31.) Thus, the estate of the Gottdieners (the Gottdieners had both died as of 2010) and Tausky asserted liability as Sater's and Lauria's victims under both substantive RICO (because Sater and Lauria "in the course of their [own] racketeering committed the predicate crimes of aiding and abetting and

40

knowingly facilitating Palagonia's securities frauds"); and conspiracy RICO (because Sater and Lauria "knowingly facilitated Palagonia's racketeering"). (*Id.* at 1, ¶¶5-6.) While the RICO statute generally prohibits civil RICO actions based on predicate acts of securities fraud, nevertheless, that statutory restriction expressly does not apply "to an action against any person that is criminally convicted in connection with the [securities] fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final." (*Id.* at 5, ¶23.)

The *Gottdiener* complaint is 32 pages proper with 168 paragraphs and attaches the sentencing, indictments, and other related public criminal documents as to Lauria, Palagonia, and Sater. (*See* 2013.08.02 *Gottdiener* Amended Complaint Parts 1 & 2.)

Both the *Kriss II* and *Gottdiener* cases were ultimately dismissed. The *Kriss II* case was removed to federal court—the Southern District of New York—and voluntarily dismissed via Federal Rule of Civil Procedure (FRCP) 41, which the court converted to an involuntary dismissal with prejudice. (2015.07.13 Notice of Voluntary Dismissal.) The *Gottdiener* complaint was dismissed for failure to plead the case with particularity under FRCP 9, since it alleged fraud,[11] which dismissal the Second Circuit upheld. (2014.03.19 Schofield Opinion and Order dismissing *Gottdiener*.) Oberlander and Lerner were not given an opportunity after the district court made that determination to replead the case to cure that deficiency.[12] (*Id.* at 25.) There was never an adjudication or holding that either *Kriss II* or *Gottdiener* was frivolous or in violation of Rule 11.

On May 17, 2013, Sater moved before Judge Cogan for an Order to Show Cause as to why Oberlander and Lerner shouldn't be held in contempt for violating the Second Circuit's order "for filing two allegedly frivolous actions within the last two months." (2013.05.28 Cogan Order Denying Sanctions at 1.) Judge Cogan construed the Second Circuit's "February 14, 2011 mandate" thus:

> Although the Second Circuit *enjoined Oberlander and Lerner from further disclosing sealed information*, it *only warned them against filing additional lawsuits* in an attempt to re-litigate the issues decided by its order, *or other future filings of a frivolous nature*; the Second Circuit *did not prohibit such filings* in its December 20, 2011 Mandate. John Doe's motion is therefore denied. (*Id.*, at 2.)

In November 2016, Sater brought suit in New York State Court against Oberlander, Lerner, Kriss, and Ejekam, for malicious prosecution and abuse of process for the filing of the *Kriss II* and *Gottdiener* cases. On September 5, 2017, Judge Erika Edwards granted the motions of Kriss and Ejekam to dismiss Sater's lawsuit for failure to state a claim. (2017.09.05 New York Supreme Court Dismissal Order.)

---

[11] Judge Schofield alternatively dismissed the complaint on legal bases regarding the reach of civil RICO after the Supreme Court's decision in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994) and the enactment of the PSLRA. (*See* 2014.03.19 Schofield Opinion and Order dismissing *Gottdiener* at 13-17, 21-22.) However, the Second Circuit upheld the dismissal merely on the failure to plead with particularity, failing to specifically address the substantive RICO questions in light of *Central Bank* and the PSLRA. (*See* 2015.06.25 Second Circuit *Gottdiener* Order).

[12] The stated reason that Schofield denied Oberlander and Lerner the opportunity to replead was that even if they repled, they could not cure the two substantive problems arising out of Central Bank and the PSLRA. (2014.03.19 Schofield Opinion and Order dismissing *Gottdiener* at 25.) However, the Second Circuit did not specifically address either of those substantive issues.

### J.  SDNY *Kriss I* filing and Motion to Dismiss

When Judge Buchwald ordered the sealing of the *Kriss I* complaint on May 14, 2010, she also ordered that "a redacted version of the original complaint, redacting any sealed documents" or references thereto "be filed with the Clerk of the Court by May 19, 2010." (2010.05.14 Buchwald Order.) By letter order dated May 19, 2010, Judge Buchwald "delay[ed] the filing of a redacted complaint until Judge Glasser rules on the sealed document issue pending before him." (*See* May 19, 2010 Buchwald letter, attached as Ex. 6 to 2010.11.24 Snider Affirmation.) Oberlander gained continuing extensions on her order to file a redacted complaint while issues surrounding the Sater Criminal Documents were being adjudicated in the Eastern District of New York. For example, on August 11, 2011, Sater's counsel, Nadar Mobargha, wrote a letter motion to Judge Buchwald in the Southern District of New York, ***requesting "the Court [to] impose a deadline on when Roe must file a redacted complaint.***" (2011.08.11 Letter Mobargha to Buchwald.) Judge Buchwald, simply signed the letter under her handwritten order: "Application ***denied*** without prejudice. So Ordered. 8/25/11." (*Id.*) If the Court had already ordered Oberlander to file the complaint by May 19, 2010, there is no reason that Mobargha would have filed this motion with Judge Buchwald, nor would she deny it. When Judge Engelmayer took over the case, Sater's attorneys moved the Court to provide no further enlargements of time for Oberlander to serve the complaint. The Judge denied the motion on January 27, 2011, noting that Glasser was still adjudicating "a pending motion to unseal portions of a criminal docket." (2012.01.27 Engelmayer Order Denying Beys Motion.)

Indeed, on December 2, 2016, Judge Schofield (who had been assigned to the case instead of Judge Buchwald) refused to dismiss the complaint on several bases. (2016.12.02 Schofield Order upholding RICO claims.) Notably, the court denied a motion to dismiss for failure to state a claim under Rule 12(b)(6), and additionally denied dismissal for failure to timely serve the original complaint, holding that "Timely service was [] made" and "good cause having been shown" for the repeated extensions that were given. (*See id.* at 23-24.) As Schofield explains:

> Here, the Court ordered that the OC [original complaint] not be further disseminated after May 14, 2010, ***and extended the time for service—"good cause having been shown"—several times, ultimately through April 1, 2013. On April 1, 2013, the Court received the FAC [First Amended Complaint]*** and ordered that it be distributed to Sater and the Bayrock Defendants . . . ." (*Id.* at 23.)

The *Kriss I* case is still pending, although with different plaintiffs' counsel—Oberlander is no longer representing Kriss or any of the other Plaintiffs in that action.

### V.  ANALYSIS

#### A.  Threshold Problems

As will be discussed below in the section, Substantive Opinion and Analysis of Charges, *see infra* Parts V.B, it is my opinion that all of the charges against Oberlander and Lerner should be dismissed. Additionally, there are independent reasons why many of the charges should be dropped or that require the holding of an evidentiary hearing pursuant to EDNY Local Rule 1.5.

These additional reasons fortify my opinion that Oberlander and Lerner should not be disciplined, and at the very least must be afforded a full evidentiary hearing before any discipline can be imposed. The bases for dismissing each charge is summarized in a chart in Part VI below.

### 1. Disputed and Misstated Facts in the Charges

Based on my independent review of the records in the relevant proceedings, the documents listed in Appendix 2, the Specification of Charges in the Orders to Show Cause are chock-full of disputed or misstated facts, which I will list here followed by a brief explanation as to the dispute or misstatement:

1. "***After determining that Sater would be in danger*** if his true identity were revealed, ***Judge Glasser sealed the docket and filings in Sater's criminal case***, including a ***Cooperation Agreement***, a United States Department of Justice Financial Statement, and a Pre-Sentence investigation Report (***the 'Sealed Materials.'***)" (Oberlander OSC p.2; Lerner OSC pg. 2)

    a. As noted, *supra* pages 11 & 14, Judge Glasser stated that there was **"no formal [sealing] order"** in the case, and that he could not find an application for sealing, **"[nor] have I been able to find any order signed by me which directed that this file be sealed."** (2010.06.14 Glasser Transcript 5:6-7, 5:24; 2010.07.20 Glasser Transcript 17:4-11.) Thus it is contrary to Glasser's own statements for the OSCs to say that "*[a]fter determining that Sater would be in danger* if his true identity were revealed, ***Judge Glasser sealed the docket and filings in Sater's criminal case***," or even to denominate the Sater Criminal Documents as "Sealed Materials" because no sealing order was ever produced and Glasser stated that one didn't exist. In light of that fact, it is absolutely disputed (and contrary to the existing evidence) that Glasser in fact "sealed" the docket and filings via judicial order, or that he only "sealed" the docket and filings "[a]fter determining that Sater would be in danger if his true identity were revealed." There is absolutely ***no evidence*** that Glasser made any determinations at all before "sealing" the case without an order. Finally, as Glasser himself recognized, the proffer was never filed and so would not ever have been sealed by the court, and he said the same was likely true of the cooperation agreement. (2013.03.13 Glasser Order at 5-6 & n.2.)

43

2. "During the course of the respondent's representation of Kriss and Bernstein, ***the respondent [Oberlander] obtained Bayrock's back-up hard drive, which contained the Sealed Materials.*** (Oberlander OSC p.2: Lerner OSC p. 2)

   a. As noted, the testimony offered to Glasser was that Oberlander obtained the Sater Criminal Documents when Bernstein, unsolicited, handed him an envelope containing hard copies of three of them, and then received the other documents two days later from Bernstein via email. Although the evidence indicates that Bernstein may have gotten those copies via a back-up hard drive that Bayrock had asked Bernstein to make, Oberlander has unequivocally testified that he was physically handed the documents—unsolicited and in hard copy form—by Bernstein. (2010.06.21 Glasser Transcript at 10:9-15:3, 19:15-18.)

3. "Despite the ***respondent's [Oberlander's] knowledge of the confidential nature of the Sealed Materials***, the respondent publicly filed a civil RICO complaint" in the SDNY, "making the complaint available to the public for download through a paid online news service called *Courthouse News*, ***in violation of the court's original sealing order***." (Oberlander OSC p. 3 ¶1)

   a. Oberlander could ***not*** have acted "in violation of the court's original sealing ***order***." As noted above, Glasser openly stated that there was *no such order*—or even a docket entry or an application for such an order. (2010.06.14 Glasser Transcript 5:6-7, 5:24; 2010.07.20 Glasser Transcript 17:4-11.)

   b. Oberlander testified he "never" spoke to the *Courthouse News* reporter who wrote that article. (2010.06.21 Glasser Transcript 70:8-11.) Thus there is no evidence that Oberlander "made it available to the public for download through a paid online news service called *Courthouse News*." *Courthouse News* took that action on its own.

4. "The respondent [Oberlander] ***violated an SDNY court order directing the respondent to file a redacted version of the SDNY Complaint***, without any Sealed Materials or reference to the Sealed Materials . . . ***Order dated May 14, 2010***." (Oberlander OSC p. 3 ¶2)

   a. As noted, *supra* pages 11-12, Oberlander testified at the June 2010 hearing that he had intended to comply with Buchwald's order to file a redacted complaint until he obtained an abeyance and extension from her. He obtained that abeyance of

Buchwald's order, and was given an extension until Glasser had adjudicated the issues surrounding the Sater Criminal Documents. Indeed, Sater's lawyers in August 2011, moved Judge Buchwald to order Oberlander to file a redacted complaint—a request which Buchwald denied (showing that Buchwald recognized and Sater's attorney's were fully aware that the original May 14, 2010, order had been placed in abeyance and was not operative). Judge Engelmayer similarly denied Sater's counsel's motion to order Oberlander to file a complaint. As Judge Schofield ultimately held, Oberlander had repeatedly shown "good cause" for consecutive, court-granted, extensions from the original May 14, 2010, order through the filing of the First Amended Complaint in 2013.

b.  This charge does not merely contain a disputed fact—the charge is a misstatement of fact and of the record. The record is clear that there was an abeyance, that Oberlander showed good cause for extensions, and ultimately the Complaint was determined to be timely filed.

5.  "The respondent [Oberlander and Lerner] *violated Judge Glasser's July 20, 2010 Order by failing to destroy or return certain electronic and paper copies of the original Pre-Sentencing Report <u>and other Sealed Materials</u>*." (Oberlander OSC p. 3 ¶5; Lerner OSC p.3 ¶3)

a.  As explained above, *see supra* pages 14-15, whatever, *if anything*, Judge Glasser's colloquy with Moore and Lerner at the end of the July 20, 2010, hearing stands for, the idea that it constituted *an order "to destroy or return certain electronic and paper copies" of all of the Sater Criminal Documents* (or as the charge says the PSR "and other Sealed Materials") *<u>is repeatedly and thoroughly belied</u>* by Glasser's August 12, 2010, standstill order itself, as well as the repeated requests by both the government and Sater asking the court to adjudicate and order Oberlander to return and destroy the non-PSR Sater Criminal Documents. *See supra* pages 15, 22.

b.  Second, it is a disputed fact that Glasser entered an enforceable order **at all** on July 20, 2010, as discussed below, *infra* pages 64-65. Although he agrees, when asked, that he is issuing a further TRO, he never issued a written order, and colloquy from the transcript has zero decretal language from Judge Glasser as to what precisely he is ordering. Further, even assuming Glasser issued such an

45

enforceable order on July 20, that order would have been superseded by his subsequent signing on August 12, 2010, of the standstill order stating that Oberlander would retain possession of the Sater Criminal Documents while the parties negotiated a possible settlement. (2010.08.12 Letter, Moore to Glasser, with Standstill, so-ordered at 1.)

    c.   Third, as soon as Cogan actually made such an order that Oberlander must destroy all copies, both hard and electronic, of the Sater Criminal Documents by April 4, 2011, Oberlander timely complied with that order. (2011.04.04 Letter, Lerner to Cogan enclosing Oberlander Aff ¶¶ 4-5.)

6.   "Since his discovery of the Sealed Materials, the respondent [Oberlander] has attempted to obtain a settlement from the defendants *by threatening public release of the Sealed Materials*" (Oberlander OSC p.2); "The respondent [Oberlander] *threatened public dissemination of the Sealed Materials* unless Defendants agreed to a monetary settlement" (Oberlander OSC 3, ¶ 3); "The respondent *repeatedly threatened the public dissemination of the Sealed Materials* unless Defendants agreed to a monetary settlement." (Oberlander OSC p.3 charge 3.); and "After discovering the Sealed Materials, Oberlander, who was represented by the respondent [Lerner] and was also his co-counsel, *attempted to obtain a settlement from Defendants by threatening public release of the Sealed Materials.* First the respondent [Lerner] represented Oberlander in the litigation concerning Oberlander's disclosure of the Sealed Materials. Then, the respondent [Lerner] ultimately decided to represent Kriss in the SDNY action, and *has since joined Oberlander in his efforts to obtain a settlement from Defendants by threatening the public dissemination of the Sealed Materials.*" (Lerner OSC p. 2-3)

    a.   The Oberlander and Lerner OSCs cite solely to the two letters Oberlander sent to Brian Herman at Morgan Lewis on October 18 and November 9, 2010, in support of each of the above charges. As noted, *supra* page 16, Oberlander does not threaten in the October 18 letter to disclose anything from the Sater Criminal Documents—indeed, in the October 18 letter, he attaches a proposed complaint that redacts all "allegations which quote from or describe the contents of the PSR, complaint, proffer, information, or cooperation agreement." (2010.10.18 Letter Oberlander to Herman at 2.) In the November 9th letter, Oberlander predicted that "*Judge Buchwald [will] order[] this public*" (2010.11.09 Letter, Oberlander to Herman at 1), and also predicts (but expressly does not threaten--"[t]his is not a

threat") "as much *lawful and legal* worldwide dissemination . . . *as the public and the press <u>doing the dissemination</u> think its value justifies*" (*id.* at 2).

    b.   Additionally, as to Lerner's OSC, Lerner certainly had **not** "decided to represent Kriss in the SDNY action and . . . *since* joined Oberlander in his efforts" at the time when Oberlander wrote the two 2010 letters to Herman. In 2010, when the letters were written, Lerner was clearly not representing Kriss nor "joining" in Oberlander's efforts on the SDNY action. Throughout 2010 and 2011, Lerner was employed by Wilson Elser and was involved in the case in his capacity as counsel for Oberlander in defending the OSC before Judge Glasser.

7.   "The respondent *[Lerner] threatened and assisted Oberlander in threatening the public dissemination of the Sealed Materials* unless the defendants agreed to a monetary settlement, despite *knowledge that public dissemination of the Sealed Materials would violate multiple court orders. See, e.g.*, October 18, 2010 Letter from Oberlander to Brian Herman ("Herman") (Exhibit F to July 23, 2014 Disciplinary Complaint); Nobember 9, 2010 Letter from Oberlander to Herman (Exhibit G)." (Lerner OSC p.3 ¶1)

    a.   As noted in the preceding point, and *supra* page 16, Oberlander didn't threaten to himself publicize the Sater Criminal Documents. Rather, Oberlander predicted that without settlement the complaint would ultimately be unsealed *by court order* (which it ultimately was after *Sater*—not Oberlander—disclosed the complaint by filing it in a case in Israel). The fact that Oberlander predicted it would be Judge Buchwald who would order it unsealed is immaterial. The point is that Oberlander was not threatening to publicize it other than by operation of law—he predicted that *it would ultimately be unsealed <u>lawfully, by court order, and then the press and the public would publicize</u>* it as they deemed it to be of public interest.

    b.   In light of that point, it is impossible that *Lerner had "knowledge* that public dissemination of the Sealed Materials *would violate multiple court orders*." Again, the settlement letter forecasts "lawful" publicity *by court order*—and not *in violation* of any court order (let alone "multiple court orders").

    c.   Moreover, Lerner's "**knowledge**" at the time that Oberlander sent the letters *is a question of fact*. New York Rule of Professional Conduct (NYRPC) 1.0(k), states: "'Knowingly,' 'known,' 'know,' or 'knows' denotes *actual knowledge of the fact in question*." Lerner states in his Declaration that he "believed then, and

47

certainly believe[s] now, that there was a good-faith basis" for the positions taken in the letters. Thus it is absolutely disputed that Lerner "knew," as alleged, that dissemination "would violate multiple court orders," requiring an evidentiary hearing.

d.  Finally, what "multiple court orders" would be violated by disseminating the Sater Criminal Documents in October and November 2010? At the time of the writing of the letters, the only "orders" are (1) the standstill order, by which there is an agreement to not disseminate the Sater Criminal Documents while discussing settlement—but the standstill is freely terminable by either party; and (2) Glasser's oral permanent injunction prohibiting dissemination of the PSR. There doesn't appear to be any order that would prohibit the dissemination of the non-PSR Sater Criminal Documents should the standstill order be terminated by Oberlander (as the TROs outside of their extension via the standstill order would have expired, and Glasser said there was no order sealing the case, *see* above).

8.  The respondent *violated multiple court orders, including the Second Circuit's February 14, 2011 Order*, by *revealing* the respondent's [Oberlander's] true name and identity to *The New York Times*, **disclosing Sater's true identity to** *the Miami Herald* and *disclosing Sater's connection to the sealed EDNY criminal proceedings. See* . . . "Fraud Case Challenges Secrecy of Man's Past as Criminal and Cooperating Witness," The New York times, Feb. 5, 2012; **"High court reveals secret deal of Trump developer's crimes."** The Miami Herald, July 31, 2012." (Oberlander OSC p. 3 ¶ 5; Lerner OSC p.3 ¶ 3.)

a.  It is disputed that the "revelation" of Oberlander's identity would "*violate[] multiple court orders, including the Second Circuit's February 14, 2011 Order*. First, as noted, the Second Circuit's order did *not* enjoin Oberlander from revealing his name or identity. The part of the order regarding the use of the pseudonym Roe is not an order. It is a background recital, not decretal language, as Cogan stated at the February 27, 2012, hearing. *See supra* at 31.

b.  The *Second Circuit's February 14, 2011, "temporary injunction pending appeal" expired with the issuing of the mandate on December 20, 2011.* Thus it would be impossible for a statement made in February 2012 (revealing either Oberlander's or Sater's identity) to be in violation of that order. Nor could it be in violation of other court orders (the charge says it "*violated multiple court*

48

*orders*"). The only other "orders" in place at that time were (1) the permanent injunction as to dissemination of the PSR; and (2) the alleged "sealing" of Sater's case, as to which there was ***never an order***. Certainly revealing Oberlander's own name could not be a violation of either.

c. If the *New York Times* reporter had already ascertained that Oberlander was Richard Roe then neither Lerner nor Oberlander can possibly be charged with ***"revealing"*** that to the *New York Times*—even if there was an order prohibiting as much (which there wasn't). There were already public sources (a letter publicly filed by Sater's attorneys and the Second Circuit's summary order) that disclosed that Oberlander was Roe. (*See supra* page 29).

d. The OSCs contain no evidence that Oberlander or Lerner revealed to the *Miami Herald* that Sater was John Doe or disclosed Sater's "connection to the sealed EDNY criminal proceedings." This is a disputed question of fact, requiring an evidentiary hearing. Indeed, Brian Vodicka testified that he was the source for the *Miami Herald* and had figured out on his own that Sater was John Doe from public sources.

e. Sater had already been identified by name in the government's own press release in 2000, which was published in the Congressional Record and available online. *See supra*, page 36.

f. It cannot be that Oberlander's and Lerner's public filing of the Public Redacted Cert Petition—which petition was the source for the *Miami Herald* article listed in both OSCs, "High court reveals secret deal of Trump developer's crimes"—and ***which petition was publicly filed per the order of the United States Supreme Court*** is a violation of any court order of a lower court.

9. "The respondent ***violated the Second Circuit's June 29, 2011 Order*** by filing ***two new frivolous actions*** in the United States District Court for the Southern District of New York, Case No. 13-CV-1824(LGS) and Case No. 13-CV-3905 (LGS), despite the Second Circuit's order ***directing the respondent to refrain from frivolous filings***." (Oberlander OSC p.3 ¶ 6; Lerner OSC p.3 ¶ 4).

a. It is absolutely disputed that either *Kriss II* or *Gottdiener* were "frivolous actions." No court ever determined that either was frivolous or in violation of Rule 11.

b. However, a previous court ***did adjudicate, and *<u>expressly found</u>*, that **<u>neither the filing of *Kriss II* nor *Gottdiener* were in violation of the Second Circuit's order</u>**. Judge Cogan denied Sater's motion for sanctions after the filing of *Kriss II* and *Gottdiener*, explaining that the Second Circuit "***<u>only warned them</u> against filing additional lawsuits . . . or other future filings of a frivolous nature***; the Second Circuit ***<u>did not prohibit such filings</u>***." (2013.5.28 Cogan Order Denying Sanctions at 2.)

c. Thus it is also disputed that the Second Circuit ordered Oberlander not to file any new cases, *see infra* page 68. As Cogan held, the Second Circuit's order is a ***warning*** that any future frivolous filings "may result in sanctions, ***including the imposition of leave-to-file restrictions***." However, the Second Circuit ***never imposed*** any "leave-to-file restrictions" or other sanctions on Oberlander—and thus Oberlander's filing of cases (even if they had, *arguendo*, been frivolous) could not ***be in violation of that order***.

d. The *Kriss II* case was ***not*** filed in the Southern District of New York. It was filed in New York state court and removed by the defendants to the SDNY. (*See* 2013.05.10 Summons with Notice *Kriss II*.)

10. "The respondent[s] filed ***frivolous*** Notices of Appeal with the Second Circuit, including an appeal from a scheduling order that was not a final order nor subject to any of the exceptions to the final judgment rule." (Oberlander OSC p. 3-4 ¶7; Lerner OSC p. 3 ¶ 5)

a. The Second Circuit did not find that the Notices of Appeal were "frivolous." The Court said it was "exhausted" by the filing of six separate notices of appeal for the same principal dispute. It is disputed that any of these appeals were frivolous, as addressed below, *infra* at pages 77-84.

11. "The respondent [Oberlander] knowingly asserted ***frivolous arguments at hearings and in motion practice***. . . . For example, in the *Estate of Ernest Gottdiener* . . . the Honorable Lorna Schofield ***dismissed the plaintiff's entire action on the defendants' motion to dismiss***, noting the weaknesses of the plaintiff's claims and arguments." (Oberlander OSC p.4 ¶8)

a. This is an extremely odd charge. The charge itself says Oberlander "knowingly asserted ***frivolous*** arguments *at hearings and in motion practice*." Then, the only piece of evidence listed as supporting this charge is that Oberlander filed a

complaint in the *Gottdiener* case that was dismissed for failure to plead with particularity. Whether or not a complaint satisfies FRCP 9 pleading with particularity has absolutely no relevance to determining whether a person has, as the charge alleges, asserted "***frivolous* arguments *at hearings and in motion practice***"—which leaves the charge with absolutely no evidence cited in support of it.

12. "The respondent [Lerner] violated RPC 3.1 by filing multiple **frivolous appeals** and bringing **frivolous lawsuits**," (Lerner OSC p. 5 basis for discipline 3) and "The respondent [Oberlander] violated RPC 3.1 by filing multiple **frivolous appeals** and bringing **frivolous lawsuits**, and asserting **frivolous arguments at hearings**." (Oberlander OSC pg. 5, basis for discipline 1)

   a. Again, it is absolutely disputed that Lerner and Oberlander made "frivolous" filings, including the various notices of appeal and the *Kriss II* and *Gottdiener* actions, which will be discussed in my opinion section below, *see infra* pages 77-88.

   b. Further, the OSC accuses Oberlander of "asserting frivolous arguments at hearings," but no facts or specific instances of such conduct are stated. The Committee must identify specific instances supporting such a charge and provide Oberlander with an opportunity to respond and demonstrate that the arguments were not frivolous.

13. "The respondent [Oberlander] violated RPC 3.2 by **engaging in improper dilatory tactics,**" citing *only* the Second Circuit's order regarding the filing of "six separate notices of appeal" and "The respondent [Lerner] violated RPC 3.2 **by engaging in improper dilatory tactics**," citing *only* the Second Circuit's order regarding the filing of "six separate notices of appeal" and the *filing* of the *Kriss II* and *Gottdiener* actions. (Oberlander OSC p.6, basis for discipline 2) (Lerner OSC p. 5, basis for discipline 4).

   a. Given that Oberlander had a clear right to appeal the permanent injunction—so there was an interlocutory trip to the Second Circuit regardless—and that the Second Circuit consolidated the appeals into one adjudication and could have heard all of them pursuant to its pendent appellate jurisdiction, it is disputed that the filing of the appeals was "dilatory," as discussed *infra*, pages 77-84.

   b. The filing of the *Kriss II* and *Gottdiener* actions is only listed as being a "dilatory" tactic in Lerner's OSC. But if Oberlander and Lerner had a colorable basis on which to file the *Kriss II* and *Gottdiener* actions on behalf of their clients

51

(which were causes of action on behalf of new plaintiffs—the Gottdieners and Tausky—against additional defendants), then it cannot be "dilatory" to file them.

14. "The respondent improperly ***engaged in undignified and discourteous conduct*** toward the courts ***by making*** **unfounded** **accusations** against Judge Glasser, Judge Cogan, the Eastern District and the Second Circuit" (Oberlander p. 4 ¶ 9; Lerner p. 4 ¶ 6); and "The responded violated RPC 3.3 by engaging in undignified and discourteous conduct toward the courts." (Oberlander OSC p. 6 basis for discipline 3; Lerner OSC p. 5-6 basis for discipline 5)

    a.  While some of the language that Oberlander used was strident, it is absolutely a disputed question of fact that he "***engaged in undignified and discourteous conduct*** toward the courts ***by making*** **unfounded** accusations" against various judges. Indeed, the overarching "themes" of the statements Oberlander made is that certain judges (or courts) acted in ways that were unconstitutional, illegal, in secret (operating a "covert justice system" and one "without public accountability"), ex parte, in conspiracy with Sater's lawyers, without an accurate docket, which resulted in illegal sentences and bereft victims, etc. In many cases, statements to that effect would be extraordinary and (hopefully) entirely unfounded. But not in this case. Oberlander found himself in a case where (1) Sater's criminal case, docket and all, was completely hidden by the court, which the presiding judge stated was done without a court order; (2) cooperating defendants were sentenced in disregard of Congress's mandatory sentencing laws; (3) unwritten prior restraints and temporary injunctions prohibiting speech were orally imposed on Oberlander and extended, by threatening civil and criminal contempt prosecution, long after they had actually expired; (4) the judge heard (and even invited) motions and arguments *ex parte* as to Oberlander and Lerner and/or in a closed courtroom from which they were expelled; and (5) the OSC proceeding brought against Oberlander was also secret and not publicly docketed. In these circumstances, the statements Oberlander made are **not "unfounded"**— ***at the very least there is a significant dispute of fact*** as to whether they are unfounded and an evidentiary hearing is required.

15. "The respondent violated RPC 3.4 by ***knowingly*** **engaging in** **illegal conduct** by ***contravening court orders, disclosing the Sealed Materials, and attempting to obtain a***

*settlement by threatening further illegal conduct.*" (Oberlander OSC p. 6 basis for discipline 4; Lerner OSC p. 6 basis for discipline 6)

a. Again, whether or not Oberlander or Lerner did anything "knowingly"—an element of violating the quoted portion of Rule 3.4—*is a question of fact* that would require an evidentiary hearing. Under NYRPC 1.0 "knowingly," as used in the Rules "*denotes actual knowledge of the fact in question.*" And it is actually disputed that Oberlander or Lerner "knowingly"—meaning they had "actual knowledge" that they—engaged in "illegal conduct."

b. First, they did ***not*** knowingly engage in illegal conduct *"by contravening court orders."* As shown, *infra* at pages 66-69, it is disputed that Oberlander and Lerner violated *any* enforceable orders as set forth in the OSC. The orders they allegedly violated were not enforceable (being non-existent, having lapsed, failing to have enforceable decretal language, etc.) or in fact were complied with.

c. Second, they did ***not*** knowingly engage in illegal conduct *"by disclosing the Sealed Materials."* First of all, there is no ascertainable evidence of a court order sealing the Sater Criminal Documents (and Glasser states repeatedly that there wasn't one). So it is disputed that the Sater Criminal Documents were "sealed materials," meaning that they were subject to a valid sealing order. And seeing how the entire case was hidden without a sealing order, Oberlander could not have knowingly engaged in illegal conduct by filing the complaint—because there was no order against him (or a sealing order at all as to anyone) that would make his action "illegal." Notably, after Buchwald sealed the complaint and Judge Glasser enjoined Oberlander from disseminating the Sater Criminal Documents, Oberlander and Lerner complied with those orders. They did not disseminate any of the Sater Criminal Documents or information therefrom—with the one exception of the publication of material in the Redacted Cert Petition, which they did by order of the U.S. Supreme Court, which absolutely had the authority to vitiate the orders of lower courts and order the dissemination of materials. Thus, Oberlander and Lerner could not have "knowingly" engaged in "illegal conduct" by "disclosing" information that the U.S. Supreme Court ordered them to disclose.

53

d.  Third, they did **<u>not</u>** "knowingly" engage in "illegal conduct" by "***attempting to obtain a settlement by threatening further illegal conduct.***" Indeed, as noted above, *supra* page 16, Oberlander expressly warned that there would be "as much <u>***lawful and legal***</u> worldwide dissemination . . . *as the public and the press <u>doing the dissemination</u> think its value justifies*." Further, he predicted that *the Complaint and exhibits* **would ultimately be unsealed <u>by court order</u>**. To the extent there was any threat, Oberlander threatened "legal conduct"—unsealing by court order and then dissemination not by him, but by the public and press.

16. "The respondent [Lerner] violated RPC 1.16(a) by agreeing to represent Oberlander, ***despite knowledge of Oberlander's intentions to obtain a settlement by threatening illegal conduct***." (Lerner OSC p. 6 basis for discipline 6)

   a.  As just noted, Oberlander did not try to obtain a settlement by "threatening illegal conduct—instead he threatened (or more accurately predicted) publicity flowing from **"*lawful and legal*" means**, such as the **unsealing of the complaint by court order**. Thus Lerner could **not** have "knowledge" of Oberlander's **alleged (but actually non-existent) "intentions to obtain a settlement by threatening illegal conduct.**"

   b.  Again, this charge relies on Lerner's "knowledge," of Oberlander's alleged intentions, which again, "knowledge" under the NYRPC Rule 1.0, is defined as ***requiring "actual knowledge"—which is a question of fact requiring a hearing***.

17. "The respondent *[Lerner] agreed to represent Oberlander*, <u>**with knowledge of and participation in** *Oberlander's intentions*</u> to make the Sealed Materials public." (Lerner OSC p. 6 ¶ 7)

   a.  Yet again, this charge relies on Lerner's "knowledge," of Oberlander's alleged intentions, which again, "knowledge" under the NYRPC Rule 1.0, is defined as requiring "actual knowledge"—which is a question of fact requiring a hearing.

   b.  Further, Oberlander would have to *have* the intention (and have that intention be unlawful) for Lerner to be charged on the basis of having knowledge of that intention. As noted, Oberlander predicted dissemination by "lawful and legal" means, including by court order in the settlement letters. There is no evidence that Oberlander intended to use any illegal means to disseminate any part of the Sater Criminal Documents.

54

    c. As discussed, *infra* at pages 107-08, it absolutely would ***not*** be a violation of the Rules of Professional Conduct, nor is be improper or illegal in any way to ***intend to <u>lawfully</u> make information public through court processes and pursuant to the public's First Amendment right of access—especially as to materials that actually had been hidden from the public unlawfully*** (without adherence to required processes for closure).

    d. It borders on bizarre to allege that Lerner "***agreed to represent Oberlander***" "***<u>with knowledge of</u> and <u>participation in</u> Oberlander's** [alleged] **<u>intentions</u> to make the Sealed Materials public.***" There is absolutely zero evidence that Lerner "agreed" to defend Oberlander against Glasser's OSC in the EDNY because Lerner "knew" about and wanted "to participate in" disclosing the Sater Criminal Documents. Rather, the evidence indicates that Lerner worked for an insurance defense firm, Wilson Elser, and was retained by Oberlander to defend him in the OSC brought in the EDNY. ***Other strikingly reputable lawyers*** joined in the representation of Oberlander at various points in this controversy, ***including Paul Clement, Paul Cassell, David Schulz, and Jeffrey Hoffman.*** The evidence shows that Lerner diligently defended Oberlander before Glasser, the Second Circuit, and the U.S. Supreme Court—often as co-counsel with these other attorneys of exceptional reputation.

18. "The respondent [Lerner] failed to withdraw from representing Oberlander ***when it became clear that Oberlander would continue to violate multiple court orders and the New York Rules of Professional Conduct***. *See* Points (C)1-3, *supra*." (Lerner OSC p. 6 ¶ 8); and "The respondent [Lerner] violated RPC 1.16(b) by **failing to terminate his representation of Oberlander** ***when it became clear*** that further representation of Oberlander would result in a violation of the New York Rules of Professional Conduct. *See* Points (C)7-9, *supra*." (Lerner OSC 5, basis for discipline 2)

    a. First, this charge is problematic because it fails to allege (in either time or events) "***<u>when</u> [it was that] it <u>became clear</u>***" to Lerner that "Oberlander [allegedly] would continue to violate multiple court orders" and the NYRPCs. Nor does it identify which "court orders" or NYRPC Oberlander allegedly was "continuing" to violate. The citations to Points (C)1-3 and (C)7-9 hardly help because they regard:

- the settlement letters, which only threatened lawful and legal dissemination;

- the alleged failure to destroy the Sater Criminal Documents per Glasser's alleged July 20th directive—which alleged "order", as noted above, is utterly belied (or superseded) by Glasser's subsequent August 12, 2010, standstill order that Oberlander retains possession of them. After ordered by Cogan on April 1, 2011, to destroy the Sater Criminal Documents, Oberlander timely complied (so how is Lerner charged with knowing that Oberlander is "continuing" to violate court orders when Oberlander overtly and timely complied with them?)

- Oberlander's alleged "revelation" of his name to the *New York Times* in alleged violation of an expired temporary injunction pending appeal—problematic on numerous fronts, *see infra* at 65-68.

- And points 7-9 themselves only add Point (C)4, which is the filing of the *Kriss II* and *Gottdiener* cases, allegedly in violation of the Second Circuit's **warning**—a warning that did not impose sanctions or order leave-to-file restrictions. Moreover, Cogan expressly held that neither the filing of *Kriss II* nor *Gottdiener* violated that order. (2013.5.15 Cogan Order Denying Sanctions at 2 and fn 1.)

b. Again, **Lerner's knowledge** (the point at which "it became clear" to Lerner) **is a question of fact—as is Oberlander's alleged "intention"** to "continue to violate" court orders and the NYRPC—and requires an evidentiary hearing.

c. Of course for Lerner to be required to withdraw once it became clear to him that Oberlander was determined to continue to violate court orders and the NYRPC—then it must also be shown that Oberlander did in fact "continue[] to violate multiple court orders" and the NYRPC—an allegation as to which there is not evidence specified and which, again, is a highly disputed question of fact, requiring an evidentiary hearing.

19. "The respondent [Lerner] failed to withdraw from representing Oberlander **when it became clear** that **Oberlander was taking actions for the primary purpose of harassing or maliciously injuring the Defendants**. *See* Points (C)1-4, *supra*."

56

a. It is absolutely disputed and a question of fact—and indeed, there isn't even any allegation in Oberlander's OSC—that Oberlander "was taking actions *for the primary purpose of harassing or maliciously injuring the Defendants.*" And having just reviewed the contents of Points (C)1-4 in the prior paragraph, there is nothing in them that supports the allegation that Oberlander did take actions "for the primary purpose of harassing or maliciously injuring the Defendants." An evidentiary hearing is required.

b. On top of that, the charge actually regards Lerner's "knowledge" of Oberlander's alleged "purposes," which again, would require actual knowledge and is a question of fact, requiring an evidentiary hearing.

2. **Statute of Limitations**

28 U.S.C. § 2462 provides that "an action, suit *or proceeding for the enforcement of any civil fine, penalty*, or forfeiture, pecuniary *or otherwise*, **shall not be entertained unless commenced within five years from the date when the claim first accrued**." In *Kokesh v. S.E.C*, 137 S.Ct. 1635, (2017), the Supreme Court held that the five-year limitations period applies if the federal government is bringing an action or proceeding that "qualifies as either a fine, penalty, or forfeiture." The Supreme Court explained:

A "penalty" is a "punishment, whether corporal or pecuniary, imposed and enforced by the State, for a crime or offen[s]e against its laws." . . . This definition gives rise to two principles. First, whether a sanction represents a penalty turns in part on "whether the wrong sought to be redressed *is a wrong to the public*, or a wrong to the individual." . . . "[P]enal laws, strictly and properly, are those imposing punishment for *an offense committed against the State*." . . . Second, a pecuniary sanction operates as a penalty only if it is sought "*for the purpose of punishment, and to deter others from offending in like manner*"—as opposed to compensating a victim for his loss.

Attorney discipline falls under the definition of penalty here. It is penal, as it is imposed as a punishment for an offense *against the state*, and any ultimate discipline imposed is "for the purpose of punishment, and to deter others from offending in like manner."

Indeed, in *Sheinbein v. Dudas*, 465 F.3d 493 (Fed. Cir. 2006), the Federal Circuit applied the statute in a case involving the exclusion of an attorney from practice before the United States Patent and Trademark Office ("USPTO"). Sheinbein had previously been admitted to practice

57

before the USPTO, but then was disbarred in Maryland and the District of Columbia. The USPTO instituted a reciprocal disciplinary proceeding against Sheinbein. Sheinbein argued that § 2624 applied and barred discipline as the conduct for which he had been disbarred had occurred more than five years before the USPTO instituted the disciplinary proceedings. The Federal Circuit agreed that § 2624 applied, explaining that "[a] claim normally accrues when the factual and legal prerequisites for filing suit are in place." *Id.* at 496. Yet, in *Sheinbein*, the basis for the reciprocal proceeding was Sheinbein's disbarment in other jurisdictions, a charge that could not be brought against him until he had been disbarred. Thus the Federal Circuit found the USPTO's disciplinary action to be timely because it was brought within five years of his disbarment in the other jurisdictions, even though it had not been brought within five years of the underlying conduct.

But here, the action against Oberlander and Lerner is not reciprocal, but is an original action charging them with misconduct directly for the underlying conduct. Under § 2624, this Committee is barred from imposing discipline for actions taken over five years before the committee instituted these related proceedings on November 18, 2016. *See, e.g., H.P. Lambert Co. v. Secretary of the Treasur*y, 354 F.2d 819 (1st Cir. 1965) (holding that Secretary of Treasury incorrectly failed to apply five-year statute of limitations when revoking a broker's license, by incorrectly examining conduct covering prior eight years, and remanding with instructions to *only consider conduct within the five-year limitations period*). Thus, **28 U.S.C. § 2624 bars this committee from considering any conduct of Oberlander or Lerner that occurred prior to November 18, 2011.** Although the following Charges are therefore time barred, I am still providing a substantive opinion as to each Charge in case the statute of limitations is for any reason found inapplicable.

**Time-barred charges:**

**Oberlander OSC: Paragraphs 1, 2, 3, 4, 7, 9.e-9.h**

**Lerner OSC: Paragraphs 1, 2, 5, 6.e-6.h**

In my Conclusions section below, *infra* Part VI, I have compiled a chart as to each of the Charges brought against Oberlander and Lerner, summarizing the deficiencies with that particular charge, including whether the Charge is time barred.

**3.** **Jurisdiction of this Committee of the EDNY over Conduct Occurring in the SDNY, New York State Court, or the Second Circuit**

The imposition of attorney discipline by federal courts is principally reciprocal discipline. Primary adjudication of disciplinary proceedings resides with the state courts. Nevertheless, Article III federal courts have inherent powers to discipline attorneys—concomitant to their inherent power to admit lawyers to practice before that particular federal court. *See In re Snyder,* 472 U.S. 634, 643 (1985). Pursuant to EDNY Local Civil Rule 1.5, this Committee and the Eastern District have authority to impose discipline on certain grounds. These grounds are listed out in Local Rule 1.5(b). Notably, the charges in this case involve an original (rather than reciprocal) disciplinary proceeding and can only fall within Rule 1.5(b)(5), which authorizes discipline only if the Committee finds "by clear and convincing evidence" that "*[i]n connection with activities in this Court,* any attorney is found to have engaged in conduct violative of the New York State Rules of Professional Conduct . . . ."

Several of the charges in the OSCs deal with conduct or activities that were ***not*** done "in this Court." Indeed, the activities did *not* occur before the Eastern District and did *not* involve the court orders of the Eastern District. Thus, for example, there are several charges in both Lerner and Oberlander's OSCs regarding filing the "six separate notices of appeal" in the Second Circuit, and then allegedly violating the Second Circuit's warning not to make frivolous filings. Does Local Rule 1.5(b) provide the EDNY with authority to sit in discipline of Oberlander and Lerner in an original action (not reciprocal) for either (1) filings and conduct that occurred in other courts (the filing of notices of appeals to the Second Circuit, the state-court filing of the *Kriss II* case, the SDNY filing of the *Gottdiener* case); or (2) for alleged violations of orders of other courts (the Second Circuit or the SDNY) where *neither* the order nor the alleged conduct violating the order occurred before the EDNY?

Particularly problematic is the charge that *the filing* of *Kriss II* and the *Gottdiener* cases violated an order of the Second Circuit. The order alleged to be violated was not issued from this Court; and neither case was filed in the Eastern District. Further, the meaning of the Second Circuit's order is ambiguous—it most naturally is read to refer only to *further* filings of appeals in the Court of Appeals (as filing appeals is what is directly referenced). Yet, the charge as to Oberlander's and Lerner's alleged violation of the Second Circuit's order is the filing of two new causes of action, made on behalf of different clients (the Gottdieners and Tausky—who were not

59

parties to *Kriss I*—yet were victimized by Sater). Moreover, the filing of *Kriss II* occurred in New York state court—and the jurisdictional and federalism issues attendant with a federal court punishing the filing of a state court action would recommend caution. *See, e.g., Edwards v. General Motors Corp*, 153 F.3d 242 (5th Cir. 1998) (refusing to impose Rule 11 sanctions for state court filings made prior to removal to federal court, as such sanctions were only appropriate for post-removal filings); *In re Martin-Trigona*, 737 F.2d 1254, 1262-63 (2006) (holding that district court erred in entering leave-to-file restrictions as to state court actions; could only order restrictions as to federal court actions); 28 U.S.C. § 2283 (Anti-Injunction Act, which prohibits federal courts from enjoining state actions outside of narrow exceptions)

### B. Substantive Opinion and Analysis of Charges

The Charges brought against Oberlander and Lerner can be categorized into four basic areas, each of which implicates significant constitutional and/or procedural bars against imposing discipline:

(1) Attorney Obligation of Obedience to and Judicial Procedure in Issuing Court Orders
(2) Right to Petition for Grievances (including filing cases and appeals, and writing demand letters)
(3) First Amendment Rights to Check Judicial Conduct and Power
(4) Freedom of Association and Right to Counsel under the Fifth and Sixth Amendments

I will review the charges in each of the areas listed above in turn. Additionally, the OSCs also bring charges under "catch-all" provisions, specifically alleging that Oberlander and Lerner violated NYRPC 8.4(a), (d), and (h) by allegedly "violating multiple Rules of Professional Conduct," "engaging in conduct that is prejudicial to the administration of justice," and "engaging in conduct that adversely reflects on his fitness as a lawyer." Importantly, because each of these charges is supported by a citation to the prior paragraphs of the Charges—"Points (C)1-9"—if there is no basis on which to discipline Oberlander and Lerner for misconduct based on those prior paragraphs (C)1-9, then there is no basis for discipline under the catchall provisions either. Moreover, as noted below, where Oberlander and Lerner's actions are protected from discipline by their First Amendment or other constitutional rights, this Committee cannot avoid those constitutional constraints by imposing discipline through a catch-all rule. Thus, for example, because the filing of the *Gottdiener* complaint is protected by the First Amendment's Petition Clause from discipline—that means it is protected from discipline

whether the discipline was based on NYRPC 3.1, or 8.4. As the Supreme Court stated in *NAACP v. Button*, states cannot evade the constitution by labeling attorney discipline under a different rule. *See NAACP v. Button*, <u>371 U.S. 415, 429</u> (1963).

### 1. Attorney Obligation of Obedience to and Judicial Procedure in Issuing Court Orders

Generally attorneys have an obligation to obey court orders—just as everyone else does. As the Second Circuit has explained:

> Under the collateral bar doctrine, a party may not challenge a district court's order by violating it. Instead, he must move to vacate or modify the order, or seek relief in this Court. If he fails to do either, ignores the order, and is held in contempt, he may not challenge the order unless it was transparently invalid or exceeded the district court's jurisdiction.

Thus Oberlander (and Lerner) had an obligation to obey court orders. Nevertheless that obligation is directly tied to the judiciary in fact entering court orders, that have not lapsed, that have actual decretal enforceable language, and that are made within the court's equity and personal jurisdiction. If the judiciary fails to adhere to these essential prerequisites in issuing court orders, then the attorney cannot be disciplined or held in contempt for violating the alleged orders. The charges in this case aptly illustrate that point.

In the OSCs, Oberlander and/or Lerner are alleged to have engaged in misconduct by violating five court orders (plus other unspecified "multiple court orders,") specifically, as the OSCs allege:

(1) <u>Judge Glasser's alleged "original sealing order,"</u> which Oberlander allegedly violated by publicly filing *Kriss I* in the SDNY. (Oberlander OSC at 3, ¶1.)

(2) <u>Judge Buchwald's May 14, 2010, order</u> that Oberlander "file a redacted version of the SDNY Complaint." (Oberlander OSC at 3, ¶2.)

(3) <u>Judge Glasser's alleged July 20, 2010 Order</u> "by failing to destroy or return certain electronic and paper copies of the original Pre-Sentencing Report and other Sealed Materials." (Oberlander OSC at 3, ¶4; Lerner OSC at 3, ¶2.)

(4) <u>The Second Circuit's February 14, 2011, Order</u>—as well as unidentified "multiple court orders," by revealing Oberlander's "true name and identity to *The New York Times*, disclosing Sater's true identity to the *Miami Herald* and disclosing Sater's

61

connection to the sealed EDNY criminal proceedings. (Oberlander OSC at 3, ¶5; Lerner OSC at 3, ¶3.)

(5) The Second Circuit's June 29, 2011 Order by filing two new allegedly frivolous actions (*Kriss II* and *Gottdiener*) "despite the Second Circuit's order directing the respondent to refrain from frivolous filings." (Oberlander OSC at 3, ¶6; Lerner OSC at 3, ¶4.)

(6) Undisclosed "multiple court orders" that allegedly would have been violated had Oberlander disseminated (which he did not) the Sater Criminal Documents at the time Oberlander sent the settlement letters to Mr. Herman; or that Oberlander allegedly was "continu[ing] to violate" and thus required Lerner's withdrawal. (Lerner OSC at 3, ¶¶1 & 8.)

Taking these in turn.

### The "Original Sealing Order"

As to the "original sealing order," Glasser stated himself that there was **"no formal [sealing] order"** in the case, and that he could not find an application for sealing, **"[nor] have I been able to find any order signed by me which directed that this file be sealed."** (2010.06.14 Glasser Transcript 5:6-7, 5:24; 2010.07.20 Glasser Transcript 17:4-11.) Thus there are only two ways about it: either the case was somehow "sealed" without an order (in which case there's still *no order* for Oberlander to violate) or the case *was not ever sealed,* as there was no order. Either way there is <u>**no** "original sealing **order**"</u> for Oberlander to have violated.

The lack of an order is dispositive. An order cannot be presumed into existence, as Glasser attempted to do in the March 23, 2011, "Scheduling Order." As will be discussed more below, "A district court may punish for disobedience of an order *only if the order is clear and unambiguous*" such that the enjoined person "*can ascertain from the four corners of the order* precisely what acts are forbidden." *Fonar Corp. v. Deccaid Services, Inc.*, 983 F.2d 427, 429 (2d Cir. 1993). It would be impossible to examine the "four corners" of an order that neither the enjoined person nor the issuing court has ever seen, that the court cannot produce, and for which there is not even a docket entry.

Moreover, had there been such an order, the court had no personal jurisdiction over Oberlander at the time of the alleged "sealing" of the case, which itself provides an exception to the collateral bar rule. The idea expressed by Glasser that sealing orders are "not addressed to any particular person," but that in a sealed case, filings and documents are *"globally sealed,"* basically as to everyone in the world—is contrary to the jurisdiction and power of Article III courts. Orders are not self-executing against any who may come into contact with the subject matter. In *Alemite Mfg. Corp. v. Staff*, <u>42 F.2d 832, 832-33</u> (1930), Judge Learned Hand explained:

> <u>**[N]o court can make a decree**</u> which will bind any one <u>**but a party**</u>; a court of equity is as much so limited as a court of law; *it cannot lawfully enjoin the world at large, no matter how broadly it words its decree*. If it assumes to do so, the decree is *pro tanto brutum fulmen*, and *the persons enjoined are free to ignore it*."

Why is this so? Because federal courts are limited in their Article III jurisdiction to hear *cases and controversies* and only as to people over whom they have *personal jurisdiction* in the matter. Thus as Learned Hand observed, courts are "*not vested with sovereign powers to declare conduct unlawful*; its *jurisdiction is limited to those over whom it gets personal service*, and who therefore can have their day in court." *See also People of New York v. Operation Rescue Nation*, <u>80 F.3d 64</u> (2d Cir. 1996) (explaining the "well-established principle that, in exercising its equitable powers, *a court 'cannot lawfully enjoin the world at large.'"*).

**Judge Buchwald's May 14, 2010, Order**

As noted above, this charge is a flat misstatement of both the facts and record. Oberlander obtained an abeyance of Buchwald's order, and was given an extension until Glasser had adjudicated the issues surrounding the Sater Criminal Documents. Indeed, Sater's lawyers in August 2011, moved Judge Buchwald to order Oberlander to file a redacted complaint; a request which Buchwald denied. And, ultimately, as Judge Schofield held, Oberlander obtained consecutive court-granted extensions having repeatedly shown "good cause" through the filing of the First Amended Complaint in 2013. *See supra* page 42.

**Judge Glasser's July 20, 2010 "Further TRO"**

Oberlander and Lerner are each charged with allegedly violating this order "by failing to destroy or return certain electronic and paper copies of the original Pre-Sentencing Report and other

Sealed Materials." As noted, *supra*, it is entirely disputed what, if anything Glasser ordered at the end of the July 20, 2010, hearing. The whole colloquy is set out above, *supra* pages 14-15. The allegation set out in the OSCs that the colloquy constituted ***an order "to destroy or return certain electronic and paper copies" of all of the Sater Criminal Documents*** is repeatedly and thoroughly belied by Glasser's August 12, 2010, standstill order that states that Oberlander is retaining copies of the documents, Kaminksy's representations to the Second Circuit that Oberlander retains them and Glasser has yet to adjudicate that issue, and the repeated requests by both the government and Sater asking the court to adjudicate and order Oberlander to return and destroy the non-PSR Sater Criminal Documents. *See supra* pages 15, 19-22.

All Glasser actually says is: "Mr, Oberlander should not do **that**" and then he agrees that he is therefore issuing "a further TRO." It is not clear at all what "that" refers to. Was Glasser referring to "disseminating copies"—the very last words spoken by Moore and thus the grammatical referent to Glasser's word "that"? If so, Oberlander didn't disseminate any copies of the PSR or any of the other Sater Criminal Documents, and thus he didn't violate the order. Indeed, that is precisely what Sater's counsel understood the colloquy and order to require. In November 2010, Moore explained that on July 20, 2010, the Court had "**issued a further TRO against the dissemination of any *copies* of the PSR.**" (11.24.10 Moore Memo of Law at 8). This construction also comports with the entire idea of a TRO—TRO's are intended "to preserve an existing situation in *status quo*" until a matter can be heard as to whether there should be an injunction ordered. *See Garcia*, 561 F.3d at 107. How could an order to destroy anything be a TRO or preserve the status quo, rather than being a mandatory (and permanent) injunction?

Nevertheless, and critically, whatever Glasser's word "that" refers to, it most assuredly did not create an enforceable order—and the EDNY cannot punish Oberlander or Lerner for alleged disobedience to it. The Second Circuit has said "A district court may punish for disobedience of an order ***only if the order is clear and unambiguous***." *Fonar Corp. v. Deccaid Services, Inc.*, 983 F.2d 427, 429 (2d Cir. 1993). Thus Federal Rule of Civil Procedure 65(d) requires that:

> Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and ***not* by referring to the complaint or other document**—the act or acts restrained or required.

Notably, Glasser referred to the prior statements made by Moore rather than "describing in reasonable detail . . . the acts restrained or required." The Second Circuit held that the requirements of Rule 65(d) are "satisfied only if the enjoined party can ascertain from the four corners of the order precisely what acts are forbidden." *Fonar Corp.*, 983 F.2d at 429 (1993). The Supreme Court has explained, "One basic principle built into Rule 65 is that *those against whom an injunction is issued **should receive fair and precisely drawn notice of what the injunction actually prohibits***." *Granny Goose Foods v. Brotherhood of Teamsters*, 415 U.S. 423, 444-45 (1974). Thus, in *Garcia v. Yonkers*, where a district court judge mused on the record, indicating that he would grant a preliminary injunction, but never actually issued a written order and without clear statements on the record as to the issuance or scope of the injunction, the Second Circuit held that "no preliminary injunction was entered in this case." 561 F.3d 97, 106 (2d Cir. 2009). The Second Circuit explained that "[r]equirements for the form and content of preliminary injunctions and *temporary restraining orders are properly met by a written order*, a document lacking here." *Id.* at 105. Quoting the Seventh Circuit, the *Garcia* court said *"Oral statements are <u>not injunctions</u>." Id.* The directive from Glasser, incorporating/referencing Moore's prior statements did not comply with Rule 65(d), is entirely vague with no decretal language, and thus is not an enforceable order that Oberlander or Lerner can be disciplined for allegedly disobeying.

Finally, it bears repeating that as soon as Cogan actually made such an order (on April 1, 2011) that Oberlander must destroy all copies of the Sater Criminal Documents by April 4, 2011, Oberlander timely complied with that order. On April 4, 2011, he filed an affidavit attesting to his compliance. (2011.04.04 Letter, Lerner to Cogan enclosing Oberlander Aff. ¶¶ 4-5.).

### The Second Circuit's February 14, 2011, Order

The Second Circuit did in fact issue an order on February 14, 2011. The court stated that it was granting the government's motion for a *"temporary injunction, pending the disposition of <u>this appeal</u>"* (2011.02.14 Second Circuit Pendente Lite Order, at 1.) It then entered the following "injunction *pendent lite*":

> We hereby ORDER that ALL PARTIES, THEIR OFFICERS, AGENTS, SERVANTS, EMPLOYEES, AND ATTORNEYS, AND ALL OTHER PERSONS WHO ARE IN ACTIVE CONCERT OR PARTICIPATION WITH THEM, *see* Fed. R. Civ. P. 65(d)(2),

are ***TEMPORARILY***—AND WITHOUT PREJUDICE to any claims or arguments that may be asserted by the parties on the merits of these appeals or on the orders in effect during the consideration of the appeals—***ENJOINED from publicly distributing or revealing in any way, to any person, or in any court, proceeding or forum***, except to those persons directly involved in the parties' own legal representation, ***any documents or contents thereof subject to sealing orders*** in Docket No. 10-2905-cr ***or in any related proceedings before the District Courts for the Eastern District of New York and Southern District of New York***.

The Second Circuit issued its mandate on December 20, 2011. (2011.12.20 Second Circuit Mandate.) The appellate mandate formally ends the appeal—relinquishing the jurisdiction of the Court of Appeals. Thus the Second Circuit's ***"temporary injunction, pending the disposition of this appeal,"*** was extinguished on the issuing of the formal mandate.

Oberlander and Lerner are both charged with violating the Second Circuit's February 14, 2011, temporary injunction pending appeal by allegedly (1) "revealing" Oberlander's identity **in February 2012** to the *New York Times*; and (2) "disclosing Sater's true identity to the *Miami Herald* and disclosing Sater's connection to the sealed EDNY criminal proceedings," citing the article *"High court reveals secret deal of Trump developer's crimes." The Miami Herald*, **July 31, 2012**." (Oberlander OSC p. 3 ¶ 5; Lerner OSC p.3 ¶ 3.)

Notably, the appellate mandate had issued on December 20, 2011. Thus even if they had revealed information in February and July 2012 in contravention of the Second Circuit's ***injunction pending appeal***, that injunction had ***long-since lapsed*** with the formal ending of the appeal.[13]

---

[13] Importantly, if somehow the Second Circuit's injunction "pending appeal" **did not expire** with the issuance of the formal mandate, then **when else would it ever expire?** Is it then somehow still in force and now a permanent injunction despite saying "pendent lite" and the all-caps word TEMPORARILY expressly stated in the order proper? Notably, **the injunction pending appeal <u>did not just enjoin Oberlander</u>**, but also enjoined "ALL PARTIES, THEIR OFFICERS, AGENTS, SERVANTS, EMPLOYEES, AND ALL OTHER PERSONS WHO ARE IN ACTIVE CONCERT OR PARTICIPATION WITH THEM," <u>**which would include the federal government**</u> (a party to the proceeding) and all of the federal government's "officers, agents, servants employees, and attorneys," as well as Sater himself and his attorneys from "publicly distributing or revealing in any way, to any person, or in any court, proceeding or forum . . . any documents or contents thereof subject to sealing orders" in the Second Circuit, the EDNY, or the SDNY. ***Given the national interest as to Russia and President Trump***—and most recently, *Russia, Sater, and President Trump* with the revelation that emails from Sater indicate he was assisting Trump in his dealings in Russia during the election—***are the U.S. government and all of its employees, officers, and attorneys enjoined from saying anything about Sater's conviction, his cooperation, or his subsequent business dealings with Bayrock as alleged in* Kriss I?** *Are they enjoined from telling Mueller? Congress? See supra* notes 2-3.

Second, even if the February 2011 Second Circuit injunction pending appeal had not lapsed, it did *not* prohibit Oberlander from revealing his own name. The words of the injunction are set out very clearly, that what is enjoined is *"publicly distributing or revealing in any way, to any person, or in any court, proceeding or forum . . . any documents or contents thereof subject to sealing orders* in Docket No. 10-2905-cr *or in any related proceedings* before the District Courts for the Eastern District of New York and Southern District of New York." The fact the Oberlander is Roe is not a "document or content thereof" subject to sealing orders. The Second Circuit's order included a background recital explaining the use of the name Roe "as a legal placeholder because the disclosure of his true identity in this litigation context may, *for the time being*, lead to the improper disclosure of the materials at issue here." (2011.02.14 Second Circuit Pendente Lite Order, at 1.) The injunction (which, again, had lapsed) does not prohibit Oberlander from revealing he is Roe—but just from revealing the *contents of sealed documents*. As the Second Circuit held, an enjoined party must be able to "ascertain from the four corners of the order *precisely what acts are forbidden.*" *Fonar Corp.*, 983 F.2d at 429. Revealing that Oberlander is Roe is not precisely set out as a forbidden act in the Second Circuit's order—and no other orders existed that purported to prohibit the revealing of his name either. (Additionally, as noted above, there is a significant factual issue as to who actually *revealed* that Oberlander is Roe as, according to Lerner, he did not reveal it to the reporter, and that information was easily discernable from both the Second Circuit's Summary Order of June 29, 2011, and a letter publicly docketed by Sater's counsel. *See supra*, at 28-29.)

As to the *Miami Herald*, it is worth noting again that it is absolutely disputed that Oberlander or Lerner ever told the *Miami Herald* that Sater was John Doe or explained Sater's "connection to the sealed EDNY criminal proceedings"—particularly since Brian Vodicka testified that he was the source for the *Miami Herald*. Further, the *Miami Herald* article listed in the OSCs merely recounts what is stated in Oberlander's and Lerner's Public Redacted Cert Petition—which petition *was publicly filed per the order of the United States Supreme Court, which Court had been informed of the lower court orders prohibiting disclosure and nevertheless ordered disclosure and public filing* of the Public Redacted Cert Petition. The Supreme Court certainly has the power to vitiate a sealing or nondissemination order of a lower court by ordering those materials publicly filed on its docket. Oberlander and Lerner cannot be disciplined for *complying with the order* of the United States Supreme Court.

**The Second Circuit's June 29, 2011, Order**

The OSCs charge that Oberlander and Lerner violated the Second Circuit's June 29, 2011, order by filing two new allegedly frivolous actions (*Kriss II* and *Gottdiener*) "despite the Second Circuit's order directing the respondent to refrain from frivolous filings." The Second Circuit's June 29, 2011 Order states:

> It is ORDERED that appellant Richard Roe is hereby ***warned*** that the Court's patience has been exhausted by his filing of six separate notices of appeal regarding the same principal legal dispute—including the filing of an appeal from a March 23, 2011, scheduling order that obviously was not a final order nor subject to any of the exceptions to the 'final judgment rule,' . . and that any further attempts to re-litigate the issues decided by this order, or other future filings of a frivolous nature, ***may result in sanctions, including the imposition of leave-to-file restrictions, requirements of notice to other federal courts, and monetary penalties***. (2011.06.29 Second Circuit Order at 2.)

Notably, the Second Circuit's order is a ***warning*** that any "future filings of a frivolous nature ***may*** result in sanctions, ***including the imposition of leave-to-file restrictions,*** *requirements of notice to other federal courts, and monetary penalties*." However, the Second Circuit ***never imposed any such sanctions*** or "leave-to-file restrictions." Indeed, Judge Cogan in fact adjudicated this precise issue, and adopted that construction of the order, holding that the Second Circuit "***only warned them against filing additional lawsuits*** . . . ***or other future filings of a frivolous nature***; the Second Circuit ***did not prohibit such filings***." (2013.05.28 Cogan Order Denying Sanctions at 2.) Consequently, ***Judge Cogan expressly found***, that ***neither the filing of Kriss II nor Gottdiener were in violation of the Second Circuit's order***. (*See id.* at 1-2 & n.1.)

Additionally, it is not clear that the Second Circuit was ever even talking about filing new cases. From the context (filing six notices of appeal), it appears that the order regards filing further notices of appeal with the Second Circuit (the court issuing the order). This warning does not clearly address the filing of new cases—particularly on behalf of new clients (the Gottdieners and Tausky). And "[a] district court may punish for disobedience of an order ***only if the order is clear and unambiguous***." *Fonar Corp.* 983 F.2d at 429. Finally, the *Kriss II* case was not even filed in federal court. It was filed in state court and removed by the defendants. Certainly it would be striking if the Second Circuit was prohibiting allegedly frivolous filings in state court.

**"Multiple Court Orders"**

In both OSCs there are allegations that Oberlander and Lerner have violated unidentified "multiple court orders." Each of the orders actually identified in the OSCs are addressed above. None of them provides a basis for discipline. As a basic tenet of due process, Oberlander and Lerner must be notified of the charges so they can respond. If there are other "orders" that the Committee alleges that Oberlander or Lerner violated, they must identify those orders and provide Oberlander and Lerner an opportunity to respond.

Overall, the orders listed in the OSC do not create a basis for disciplining either Lerner or Oberlander for violation thereof. The orders were complied with (Buchwald's order), are nonexistent (the original sealing order), had lapsed before the date of alleged violation (the second Circuit's injunction pending appeal), do not unambiguously prohibit the conduct alleged to constitute a violation (both of the Second Circuit's orders) or are ambiguous oral musings that cannot constitute an enforceable injunction and were superseded by the court's subsequent order (the July 20 "further TRO").

*It is my opinion that all of the charges dealing with Oberlander's or Lerner's alleged violation of court orders should be dismissed and no discipline can be based thereon. None of the orders—whether actual or alleged—creates a basis for charging either with violation thereof under the facts in issue.*

### 2. Right to Petition for Grievances

Oberlander's and Lerner's First Amendment right to petition for redress of grievances protects their non-baseless filings and Oberlander's demand letters from professional discipline. A review of the First Amendment's Petition Clause is essential to understand why this is so.

In the very context of professional discipline of lawyers, the Supreme Court recognized: "[A]bstract discussion is *not* the only species of communication which the Constitution protects"; rather, the First Amendment also protects "*vigorous advocacy*, certainly of lawful ends, against governmental intrusion"—and specifically the amendment protects "*litigation*, . . . [as] *a form of political expression*." *NAACP v. Button*, 371 U.S. 415, 429 (1963). Thus, in *Button*, the Supreme Court held that Virginia could not redefine its professional responsibility regulations in such a way as to prohibit the NAACP's solicitation and instigation of

desegregation lawsuits. In so holding, the Court relied on the bundle of cognate First Amendment rights of "speech, petition, [and] assembly" at stake in the case—First Amendment rights of both the attorneys and their clients "to petition for the redress of grievances" as well as the regulated attorneys' rights to engage in "political expression and association."[14] In recognizing that the Petition Clause protected the NAACP attorneys from regulation or discipline by the Virginia Bar for instituting litigation, the *Button* Court cited to the *Noerr* case, *Eastern R. Persidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138 (1961), which ultimately stood alongside *Pennington* as the cornerstone decisions giving rise to the *Noerr-Pennington* doctrine. *See Button*, at 430-31; *United Mine Workers v. Pennington*, 381 U.S. 657 (1965).

According to the *Noerr-Pennington* doctrine, under the Petition Clause of the First Amendment, a civil litigant cannot be sanctioned or punished for bringing a non-baseless claim in court—unless the lawsuit is a mere "sham." Furthermore, an improper motive will not divest a non-baseless claim of Petition Clause protection. That is, a company with a non-frivolous claim against a competitor has a right to petition the courts for redress of grievances and cannot be punished for filing the claim under the federal antitrust laws even if they had an improper motive.

For example, in *Professional Real Estate Investors, Inc., v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993), Columbia Pictures sued Professional Real Estate Investors for copyright infringement. Professional Real Estate Investors then counterclaimed that Columbia Pictures' copyright claim was a "sham that cloaked underlying acts of monopolization and conspiracy to restrain trade" in violation of the antitrust laws. *Id.* at 52. Columbia Pictures' *claim for copyright infringement was ultimately unsuccessful*. Nevertheless, the Court held that Columbia *had a right to pursue the claim under the Petition Clause*—even though the claim was unsuccessful—and thus could not be punished for filing the lawsuit under federal antitrust laws. Indeed, the Court held that in order to be liable under the antitrust laws for pursuing litigation against a competitor, the claims asserted must be "objectively baseless." *Id.* at 60. That is, under the Petition Clause, in order for someone to be punished for filing civil claims, ***the claims must be "so baseless that no reasonable litigant could realistically expect to secure favorable relief."***

---

[14] The *Button* Court emphasized that the racial setting of the lawsuit was "irrelevant to the ground of our decision" and that the First Amendment protections recognized by the Court would apply equally in other circumstances. *See Button*, at 371 U.S. at 444.

*Id.* at 62. The Supreme Court explained: "*Only if challenged litigation is **objectively meritless*** may a court examine the litigant's subjective motivation" to determine if there is an improper purpose in filing the case. *Id.* at 60. On the flip side, an attorney or litigant is required to have "**no more than a reasonable belief** that there is a chance *that a claim may be held valid* upon adjudication" to obtain protection under the Petition Clause from being punished for instituting civil proceedings. *Id.* at 62–63.

In like manner, in *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731 (1983), the Supreme Court held that, under the Petition Clause, the filing of a civil lawsuit cannot be an unfair labor practice in violation of the NLRA unless the claim is "baseless." The Court explained that "if there is *any realistic chance* that **the plaintiff's legal theory <u>might be</u> adopted**," then the claims are protected by the Petition Clause and the litigation cannot be enjoined. *Id.*

Importantly, "[a]lthough the *Noerr-Pennington* doctrine initially arose in the antitrust field, the courts have expanded it to protect First Amendment petitioning of the government from claims brought under Federal and State law." *Alfred Weissman Real Estate, Inc. v. Big V. Supermarkets, Inc.*, 268 A.D. 2d 101, 107 (NY Sup. Ct. 2d Dept. 2000). Since, as in *Professional Real Estate Investors* and *Bill Johnson's Restaurant*, Congress and government agencies like the NLRB are prohibited by the Petition Clause from punishing litigants who bring civil law claims unless the claims are objectively baseless, state and federal judiciaries (which are bound by the Petition Clause) also cannot punish the bringing of claims that are not objectively baseless.

Indeed, it bears repeating that the Supreme Court in *Button* relied on *Noerr* in protecting attorneys from professional discipline in filing cases. Thus, ***the Petition Clause of the First Amendment protects attorneys from professional discipline for filing of a lawsuit unless the lawsuit is "objectively baseless."*** As will be discussed more fully below, in *Legal Services Corporation v. Velazquez*, 531 U.S. 533 (2001), the Supreme Court also recognized an attorney's own First Amendment right to make relevant claims and arguments in court proceedings on behalf of a client. The *Velazquez* Court noted that attorneys' First Amendment rights are essential, not only to the vindication of their clients' rights, but also to the proper functioning of the judiciary itself. The Court explained that attorneys engage in "speech and expression **upon which the courts must depend** for the proper exercise of the judicial power." *Velazquez*, 531

71

U.S. 533, 545 (2001). The same would certainly be true of petitioning through filing lawsuits—the federal judiciary has no power to act unless there is a case or controversy filed before it. (See U.S. Const. Art. III § 2.) The extent to which lawyers can be prohibited from bringing colorable claims to the judiciary through filing complaints, the power of the judiciary to adjudicate such claims is lost.

Notably, even if the Petition right were considered the client's, the attorney would have a concomitant right to invoke the client's right because a litigant's right to petition through litigation is effectively meaningless if it does not protect petitioning through counsel. *See, e.g., Freeman v. Lasky, Haas, and Cohler*, 410 F.3d 1180, 1186) (9th Cir. 2005) (holding that "*Noerr-Pennington* immunity ***is not limited to [protecting] lawyers***: The First Amendment petition right *belongs to the defendants* in the original case, *through their* employees, *law firms and lawyers*, as their agents in that litigation, get to benefit as well."). Attorneys are essential to providing clients with effective access to the judiciary and to petition the judiciary for relief—for "[t]he right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." *Powell v. Alabama*, 287 U.S. 45, 68-69 (1932).

Because the Petition Clause protects the attorney's petitioning of the judiciary as a government entity, it applies not only to the filing of lawsuits, but also to the filing of notices of appeal (as long as not objectively baseless). The Second Circuit has also expressly noted that the Petition Clause and *Noerr-Pennington* doctrine protect certain activities incident to filing lawsuits, including writing and sending demand letters and settlement offers. *See, e.g., Primetime 24 Joint Venture v. Nat'l Broadcasting Co., Inc.*, 219 F.3d 92, 100 (2d Cir. 2000) ("Courts have extended *Noerr-Pennington* to encompass concerted efforts incident to litigation, such as prelitigation 'threat letters' . . . and settlement offers."); *Matsushita Electronic Corp. v. Loral Corp.*, 974 F. Supp. 345, 359 (1997) (holding that Petition Clause "protects those acts reasonably and normally attendant upon effective litigation," including demand letters even though no lawsuit was ever filed because the underlying threatened lawsuit "itself was not sham litigation").

The charges against Oberlander and Lerner include several charges that implicate the protection of the Petition Clause. Specifically:

1. **Oberlander's sending of the settlement letters to Mr. Herman in 2010.**
*See* Oberlander OSC p. 6 basis for discipline 4 and Lerner OSC p. 6 basis for discipline 6 (charging Oberlander and Lerner with violating NYRPC 3.4 by "knowingly engaging in illegal conduct by . . . *attempting to obtain a settlement by threatening further illegal conduct*"); Lerner OSC p. 6 basis for discipline 1 (charging Lerner with violating NYRPC 1.16(a) "by agreeing to represent Oberlander, *despite knowledge of Oberlander's intentions to obtain a settlement by threatening illegal conduct*"); Oberlander OSC p.3 ¶3 (alleging that Oberlander threatened public dissemination unless Defendants agreed to a monetary settlement"); Lerner OSC p.3 ¶1 (alleging that Lerner "threatened and assisted Oberlander in threatening" public dissemination "unless the defendants agreed to a monetary settlement").

2. **Oberlander's alleged improper purposes in filing the May 14, 2010, RICO lawsuit in the SDNY and sending the demand letters.** *See* Lerner OSC, p.5 ¶9 ("The respondent [Lerner] failed to withdraw from representing Oberlander *when it became clear* that *Oberlander was taking actions for the primary purpose of harassing or maliciously injuring the Defendants. See* Points (C)1-4, *supra*.")

3. **The allegedly frivolous (or dilatory) filing of the "six separate notices of appeal," including the notice of the appeal from Glasser's March 23, 2011, scheduling order.**
*See* Lerner OSC p. 5 basis for discipline 3 ("The respondent [Lerner] violated RPC 3.1 by *filing multiple frivolous appeals*"); Oberlander OSC pg. 5, basis for discipline 1 ("The respondent [Oberlander] violated RPC 3.1 by *filing multiple frivolous appeals*); Oberlander OSC p. 5, basis for discipline 4 ("The respondent [Oberlander] violated RPC 3.2 by *engaging in improper dilatory tactics,*" citing the Second Circuit's order regarding the filing of "six separate notices of appeal"; Oberlander OSC p. 3-4 ¶7 and Lerner OSC p. 3 ¶ 5 ("The respondent[s] filed ***frivolous*** Notices of Appeal with the Second Circuit, including an appeal from a scheduling order that was not a final order nor subject to any of the exceptions to the final judgment rule.")

4. **The allegedly frivolous filing of the *Kriss II* and *Gottdiener* actions.**
*See* Lerner OSC pg. 5, basis for discipline 3 (charging Lerner with violating NYRPC 3.1 by "*bringing frivolous lawsuits*"; Oberlander OSC pg. 5, basis for discipline 1

73

(charging Oberlander with violating NYRPC 3.1 by "*bringing frivolous lawsuits*" and "asserting frivolous arguments at hearings," citing the dismissal of the *Gottdiener* case); Oberlander OSC pg. 5, basis for discipline 4 (charging Oberlander with violating NYRPC 3.2 by engaging in improper dilatory tactics," citing *only* the Second Circuit's order regarding the filing of "six separate notices of appeal" and the filing of the *Gottdiener* and *Kriss II* actions); Oberlander OSC p.3 ¶ 6 and Lerner OSC p.3 ¶ 4 (alleging that Oberlander and Lerner "violated the Second Circuit's June 29, 2011 Order by filing *two new frivolous actions* in the United States District Court for the Southern District of New York, Case No. 13-CV-1824(LGS) and Case No. 13-CV-3905 (LGS), despite the Second Circuit's order *directing the respondent to refrain from frivolous filings*."); Oberlander OSC p.4 ¶8 (alleging that Oberlander knowingly asserted *frivolous arguments at hearings and in motion practice*" and providing as the only evidence thereof the dismissal of the *Gottdiener* case).

Taking these in Turn.

### The Settlement Letters and Oberlander's Alleged Improper Purposes for *Kriss I*

As noted above, the First Amendment right to Petition protects settlement letters and demand letters as an "incident" of litigation. In *Matsushita Electronic Corp. v. Loral Corp.*, 974 F. Supp. 345, 359 (S.D.N.Y. 1997), the Southern District of New York held that demand letters were protected even when no lawsuit was filed because the underlying threatened lawsuit "itself was not sham litigation." In order for litigation to be a sham, again, it must be objectively baseless, and as the Supreme Court held, in order for someone to be punished for filing civil claims, the claims must be *"so baseless that no reasonable litigant could realistically expect to secure favorable relief." Professional Real Estate Investors, Inc.,* 508 U.S. at 62, The *Kriss I* complaint is patently **not** objectively baseless—it is anything *but* "sham" litigation. The complaint painstakingly and exhaustively sets out massive financial fraud depriving the plaintiffs and others of tens of millions of dollars. Further, the *Kriss I* complaint is still pending, having survived a motion to dismiss under Rule 12(b)(6), and showing it is sufficiently grounded in law and fact to proceed to the merits. Thus, the filing of *Kriss I* is protected petitioning, along with demand and settlement letters incident to it. Under *Noerr-Pennington*, such protection comes

regardless of subjective purposes—which are only analyzed after a case is found to be "objectively meritless."

Nevertheless, Oberlander's purposes were not improper. Instructive is the Second Circuit's case, *Sussman v. Bank of Israel*, 56 F.3d 450 (1995). In 1985, the North American Bank Ltd., (NAB), an Israeli bank, failed after "years of fraud, embezzlement, and mismanagement." The Bank of Israel obtained the appointment of an official receiver to liquidate NAB, and the Receiver brought a lawsuit in Israel naming shareholders and nominal directors Sussman and Guilden (both of whom resided in the US), as well as other defendants. Sussman and Guilden hired attorney Lewin to represent them. Lewin drafted a complaint to be filed in New York, naming as defendants, the Bank of Israel, the Israeli Ministry of Finance, officers of the Bank of Israel, and others. Before filing the complaint, Lewin sent letters to Israeli government officials, "including then-Prime Minister Yitzchak Shamir, then-Minister of Finance Yitzchak Moda'I, and Bank of Israel Governor Michael Bruno." The letter warned them of the intent to file the suit and proposed settlement terms. It also warned that "*[i]f this controversy erupts into public view* with the filing of our lawsuit . . . *[it] will seriously damage foreign investment in Israel* in the future." The letter continued:

> Our clients have heretofore been reluctant to take the step of filing suit because *a full airing of this outrageous conduct by the Government of Israel will surely deter many potential foreign investors* who might otherwise be interested in lending financial resources to Israel. (*Id.* at 453)

The parties did not settle, and the case was brought in New York, where it was dismissed on the ground of forum non conveniens—to be refiled in Israel. The district court then issued sanctions under FRCP 11 and the court's inherent powers based on "the manifestly improper purpose" evident by the demand letters, specifically that the lawsuit was "designed to force the withdrawal of the Israeli action by *threatening the Israeli government with negative publicity that would result in 'economic damage to Israel.'*" *Id.* at 455. Further, the district court found that "Mr. Lewin's 'prediction' of adverse publicity 'came to pass with Mr. Lewin as a participant.'" *Id.*

The Second Circuit reversed the sanctions. The Second Circuit found that for a nonfrivolous complaint, it was *not* an improper purpose "to exert[] pressure on defendants through the generation of adverse and economically disadvantageous publicity." *Id.* at 459. The court explained: "Mere warnings by a party of its intention to assert nonfrivolous claims *with*

*predictions of those claims' likely public reception are not improper.*" *Id.* Although the court did not directly cite to the Petition Clause or the *Noerr-Pennington* doctrine, the Second Circuit alluded to the importance of protecting petitioning in the filing of complaints, agreeing with other courts for the proposition:

> [W]hatever the analysis applicable to motions and other papers filed after the commencement of the litigation, ***special care must be taken to avoid penalizing the filing of a nonfrivolous complaint***, for otherwise a plaintiff who has a valid claim may lose his right 'to vindicate his rights in court.' *Id.* at 458.

The Second Circuit defined "frivolous," for purposes of a complaint, as "patently clear that a claim has ***absolutely no chance of success***." *Id.* at 457. Thus even though the complaint had been dismissed (for forum non conveniens), the Court held that Sussman and Guilden were protected in both filing the complaint and in making their demand threatening publicity (and even participating in that publicity) that would financially harm the Israeli government.

In like manner, it was "not improper" for Oberlander, like the *Sussman* lawyer, to make "***predictions of those claims' likely public reception.***" *See id.* at 459. As noted in the fact section above, Oberlander predicted that "***Judge Buchwald [will] order[] this public***" (2010.11.09 Letter, Oberlander to Herman at 1), and also predicted "as much ***lawful and legal*** worldwide dissemination . . . ***as the public and the press <u>doing the dissemination</u> think its value justifies***" (*id.* at 2),  Oberlander did not predict or threaten unlawful dissemination, but only "lawful and legal" dissemination. He does not, as incorrectly alleged and charged in the OSCs, threaten any "illegal" conduct or dissemination. And according to *Sussman*, Oberlander also did not exhibit an improper purpose by predicting damaging publicity if settlement was not reached. Thus, although NYRPC 3.1 indicates that attorney conduct can be frivolous if "the conduct has no reasonable purpose other than to delay or prolong the resolution of litigation, . . . or serves merely to harass or maliciously injure another."[15] Nevertheless, under *Sussman*, Oberlander's alleged purpose of threatening publicity to induce settlement would ***not*** be improper.

---

[15] As noted, under *Noerr-Pennington* and the Second Circuit in *Sussman*, it is not appropriate to even examine improper purpose in filing a complaint unless and until it has been shown that a complaint is objectively baseless. The fact that NYRPC 3.1 seems to allow conduct to be found frivolous based solely on improper purpose could be explained by the fact that the rule applies to all attorney "conduct" and not just the bringing of claims. Nevertheless commentators have opined that it would be unconstitutional—in violation of the Petition Clause—to punish an attorney under Rule 3.1 or FRCP 11 for an improper purpose in bringing a claim if the claim is not itself utterly devoid of merit. *See* Carol Rice Andrews, *The First Amendment Problem with the Motive Restrictions in the*

Thus, the Petition Clause protects Oberlander's October 18 and November 9, 2010, demand letters to Herman. The *Kriss I* complaint is nonfrivolous—which alone is sufficient to end the matter. The *Noerr-Pennington* doctrine is clear that examination of subjective purpose does not come unless or until a case is found to be objectively meritless. *See, e.g., Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 701 F. Supp. 2d 568 (S.D.N.Y. 2010) ("Denying [Petition Clause] protection to any viable lawsuit, initiated even for allegedly improper reasons, would unnecessarily undermine First Amendment Principles.") The Second Circuit in *Sussman* agreed—again, while not expressly citing *Noerr-Pennington* or the Petition Clause: "A determination of **improper purpose** *must be supported by a determination of frivolousness* when **a complaint** is at issue." (*Sussman*, 56 F.3d at 459.) Nevertheless, Oberlander's alleged purpose of threatening publicity to induce settlement would not be improper.

*It is my opinion that all of the charges dealing with Oberlander's sending of the settlement letters, Lerner's alleged knowledge thereof, or any alleged improper purpose in filing* Kriss I *should be dismissed and no discipline can constitutionally be based thereon as it is protected by the First Amendment Petition Clause.*

### The Allegedly Frivolous Six Notices of Appeal

The right to Petition—which is based in the concept of access to government entities who can provide relief—includes the right to file appeals. An appellant is petitioning the court of appeals for redress from an order of a lower court. In this case, Oberlander and Lerner are charged with having engaged in misconduct by filing allegedly "frivolous appeals," based on the Second Circuit's "warning" expressing its "exhaust[ion]" with their "filing of six separate notices of appeal regarding the same principal legal dispute—including the filing of an appeal from a March 23, 2011, scheduling order that obviously was not a final order nor subject to any of the exceptions to the 'final judgment rule." Further, both OSCs include in the basis for discipline an alleged violation of NYRPC 3.1 for *"filing multiple frivolous appeals."*

---

*Rules of Professional Conduct*, 24 J. LEGAL PROF. 13, 71 (2000) ("[T]he Petition Clause overrides motive restrictions to the extent that they limit the ability to file a civil suit based on motive alone and not the merit of the underlying claim."). ***Obviously, because the First Amendment protects the filing of a non-baseless lawsuit regardless of motive, the rules of professional conduct cannot threaten punishment or prohibit it constitutionally.*** Nevertheless, because *Kriss I* is neither without merit nor brought for an improper purpose, there is no violation of Rule 3.1 regardless of how it is construed.

Yet, none of the notices of appeal is "objectively baseless," as required by *Noerr-Pennington* to punish the bringing of it. Indeed, each of the notices has a coloarable basis in fact and law underlying it, and while the Second Circuit expressed its "exhaust[ion]" with the separate notices, the Court did not specifically find that pursuing any of the appeals—let alone all of them—was frivolous (although indicating that the appeal from the March 23, 2011, "scheduling order" was unwarranted by saying that it "obviously was not a final order nor subject to any of the exceptions to the 'final judgment rule'"). In examining what, if any of the appeals, could be considered punishable as "frivolous" or "objectively meritless" under the Petition Clause, it is important to review each of the "six separate notices of appeal." Six notices of appeal were filed, but only 5 were filed by Oberlander and Lerner (one was filed on July 9, 2010 by attorney Stamatious Stamoulis on behalf of Kriss and Ejekam—*See* 2010.7.9 Stamoulis Notice of Appeal[16]), plus Oberlander and Lerner filed a Petition for a Writ of Mandamus, seeking the public docketing of Sater's criminal case:

(1) July 9, 2010, Notice of Appeal from (1) the **May 18, 2010, TRO** "which—by operation of law—**may have converted to a preliminary injunction** at or after any of the hearings which were held on June 11, 14, and 21, 2010" and (2) the "**oral order**, stated on the record on June 21, 2010, **that issued a permanent injunction** as to a certain presentencing report."

(2) August 9, 2010, Notice of Appeal from "that **aspect of the July 20, 2010, order** of the Honorable District Judge Israel Leo Glasser **which issued a TRO against him.**"

(3) February 7, 2011, *Petition for a Writ of Mandamus Directing the District Court to Prepare and Publish a Docket* and comply with the Mandatory Victims Rights Act

(4) April 5, 2011, Notice of Appeal from "**the April 1, 2011, oral order** of the Honorable District Judge Brian Cogan, and the written order of April 4, 2011, **which directed that Richard Roe destroy his electronic and hard copies of certain documents.**"

(5) April 14, 2011, Notice of Appeal from **"the March 23, 2011, 'Scheduling Order'** of the Honorable District Judge I. Leo Glasser, *to the extent that such order constitutes a prior restraint on Richard Roe's First Amendment rights and is otherwise unfounded in fact and law*."

---

[16] Obviously, neither Oberlander nor Lerner can be punished for the filing of a Notice of Appeal by a different attorney on behalf of a separate party.

(6) June 10, 2011, Notice of Appeal from "**the May 13, 2011, order issued by the Honorable District Judge Brian M. Cogan**" (denying Oberlander's right to issue three statements based on public documents)

Of those six, Oberlander had an absolute right to appeal from (1), (4), and (6) above—the issuance of a permanent injunction gives an appeal as of right under 28 U.S.C. § 1292(a)(1) and the rulings of Judge Cogan acting as a Special Master of the Second Circuit. As to the two appeals from Judge Cogan, the Second Circuit's employment of a Special Master resulted in a situation where any objections or appeals from his rulings *had to be made* to the Second Circuit (and not to Judge Glasser). The Second Circuit, in issuing its June 29, 2011, summary order addressed these three appeals as appeals over which it had appellate jurisdiction.

As to the TROs ((part of 1) and (2) in the list above), the Court declined to hear the appeals, and stated that it lacked appellate jurisdiction as to the March "Scheduling Order," (5). As is clear from the first Notice of Appeal (July 9, 2010), Oberlander and Lerner were filing the appeal on the basis that the TROs "by operation of law—**may have converted to a preliminary injunction** at or after any of the hearings." Indeed, Second Circuit law is clear that if a TRO extends past the 28-day time limit imposed by Rule 65 and a hearing regarding the TRO has been held, then the TRO is considered to be converted to a preliminary injunction and gives rise to an appeal as of right. *See, e.g., In re Crawford*, 133 F. Supp. 2d 249, 256 (W.D.N.Y. 2001) ("The Supreme Court and the appellate courts have held that where, as here, *a district court expressly extends a TRO issued after notice and a hearing beyond the statutory 20-day limit in Rule 65(b), the TRO* does not cease to exist after the 20 days have expired, but instead *becomes an enforceable preliminary injunction subject to appellate review*."); *Pan American World Airways, Inc. v. Flight Engineers' International Ass'n*, 306 F.2d 840, 843 (2d Cir. 1962) ("*the continuation of the temporary restraining order beyond the period of statutory authorization*, having, as it does, the same practical effect as the issuance of a preliminary injunction *is appealable within the meaning and intent of 28 U.S.C. § 1292(a)(1)*"); *New York Telephone Co. v. Communications Workers of America*, 445 F.2d 39, 46 (2d Cir. 1971) (holding that even "*consent* to the temporary restraining order's indefinite extension *changed that order into a preliminary injunction*" opening the way for an appeal under 1292(a)(1)). Notably, this is

*precisely* what Oberlander and Lerner stated in the July 9, 2010, Notice—that they were appealing to the extent the TROs had become by operation of law preliminary injunctions.

Consequently, it was ***not*** frivolous—nor objectively baseless—for them to file an appeal from the TROs, which had extended far beyond the 28-day time limit.[17] Indeed, it would have been risky to *not* appeal from the TROs. Courts in the Second Circuit have held that where a court extends a TRO beyond the statutorily-authorized time frame, the litigants should not assume that it is still a TRO that has now lapsed (and thus the litigant is free to ignore it), but instead should file an appeal as it may have been converted to a preliminary injunction.

In *Crawford*, litigants were held in criminal contempt for violating a "TRO" after it had been extended by the court beyond the statutory time limit. The Court held that "***the proper course of conduct*** for defendants was ***to treat the TRO as an erroneously granted preliminary injunction and to appeal it***. They were not free to violate it under the theory that it expired after 20 days." *Crawford*, 133 F. Supp 2d at 259. Similarly here, it was "the proper course" for Oberlander and Lerner to appeal Judge Glasser's TROs. Ultimately, the Second Circuit held that the May 18 and July 20, 2010 orders were ***non-appealable TROs*** as opposed to appealable-as-of-right preliminary injunctions (and thus the TROs ***must*** have lapsed—as "[t]here is no statutory authority for the indefinite, successive extensions of temporary restraining orders," *Pan Am*, 306 F.2d at 842). Nevertheless, the fact the Second Circuit rejected the proposition that the orders were preliminary injunctions (but instead were TROs, which lapsed) does not render the appeal of the TROs frivolous or objectively baseless. Prior litigants in the Second Circuit have paid dearly (with criminal contempt) for not seeking an appeal of a TRO that had been extended beyond the 28 day period in contravention of Rule 65.

Moreover, ***even with the Second Circuit's construction of the orders as TROs***, the Second Circuit ***could have heard the appeals*** as to the TROs ***as pendent to the appeal of the permanent injunction***. The Court itself recognized this, stating in its summary order, that it expressly "declined" to "exercise pendent jurisdiction." (2011.06.29 Summary Order at 7.) Indeed, the Second Circuit has held that "where our jurisdiction is properly founded upon the district court's ruling on a preliminary injunction under 28 U.S.C. § 1292(a)(1), ***our review***

---

[17] FRCP 65 was amended in 2009, changing the outside time limit to 28 days (14 days with one renewal) rather than 20 days.

80

extends *to all matters inextricably bound up* with the preliminary injunction" and that appellate jurisdiction exists *"where review of a jurisdictionally insufficient issue is necessary to ensure meaningful review of a jurisdictionally sufficient one."* Lamar Advertising of Penn, v. Town of Orchard Park, 356 F.3d 365, (2d Cir. 2004). Thus, because the Second Circuit had jurisdiction pursuant to 1291(a)(1) as to the permanent injunction, it also had jurisdiction over "jurisdictionally insufficient issues" the consideration of which were "inextricably bound up with" or "necessary to ensure meaningful review" of the injunction entered. *See also* Federal Practice and Procedure Jurisdiction § 3921.1—Interlocutory Injunction Appeals—Scope of the Appeal ("Review properly extends to *all matters* inextricably bound up with the injunction decision"; indeed, "the scope of review *may extend further to allow disposition of all matters appropriately raised by the record* . . . Jurisdiction of the interlocutory appeal is in large measure *jurisdiction to deal with all aspects of the case that have been sufficiently illuminated to enable decision by the court of appeals* without further trial court development"; and noting that "Interlocutory orders with respect to *permanent injunctions*, appealable under 1292(a)(1), provide *frequent* occasions for review of the merits").

As noted, *supra* pages 25-26, the Second Circuit actually relied on Glasser's statements made in the March 23, 2011, "Scheduling Order" and the July 20, 2010, TRO to uphold Glasser's issuance of the permanent injunction (over which there was an appeal as of right). Consequently, what occurred as to both the March 23 "Scheduling Order" and the July 20 TRO were clearly "inextricably intertwined" with the Second Circuit's adjudication of Glasser's issuance of the permanent injunction—and thus the Second Circuit *could have exercised pendent appellate jurisdiction over the appeals as to the March 23 "Scheduling Order"* and the July 20 TRO (the August 9, 2010, and April 14, 2011 Notices of Appeal—numbers (2) and (5) in the above list). The March 23 "Scheduling Order" did not need to be appealable as of right or fall within an exception to the final judgment rule for the Second Circuit to consider it on appeal—it just needed to be inextricably intertwined with the issues that the Second Circuit already had appellate jurisdiction over and was considering—which it was. Thus, despite the Second Circuit's statement regarding the lack of jurisdiction over the March 23 "Scheduling Order," it was *not* frivolous or objectively baseless for Oberlander and Lerner to bring an appeal from it because the Court could have exercised its pendent appellate jurisdiction to consider it in connection with the appeal of the permanent injunction. Similarly, since the Second Circuit

81

clearly had jurisdiction to hear the appeal from Cogan's April 1 and 4, 2011, orders, the Second Circuit would also have pendant appellate jurisdiction over the July 20, 2014, TRO upon which the April 1 and 4, 2011, order to destroy Oberlander's copies of the documents was purportedly based.

Importantly, all of Oberlander's appeals were consolidated. Thus the Second Circuit heard all five of the actual Notices of Appeal (everything but the mandamus) *in one appeal*— and the mandamus was heard in conjunction with it. One of the benefits repeatedly noted by courts and commentators of the use and exercise of pendent appellate jurisdiction of the Courts of Appeals is that it conserves both party and judicial resources and effort. If an appeal to the Second Circuit was already being brought (which it was, as Glasser entered a permanent injunction against Oberlander), it was *efficient* to bring all related matters to the Court of Appeals for its determination at that same time, consolidated into one appeal. *See, e.g., LamarAdvertising*, 356 F.3d at 372 (stating that it was "surely in the interest of judicial economy" to consider issues inextricably intertwined with the preliminary injunction rather than wait for a later appeal to do so); Federal Practice and Procedure, Jurisdiction § 3921.1 (noting that without pendent appellate jurisdiction for interlocutory injunctive appeals it "frequently would require wasted litigation without any offsetting advantage in economy of appellate effort or uninterrupted trial court proceedings."). NYRPC 3.2 prohibits attorneys from "us[ing] means that have no substantial purpose *other than to delay or prolong the proceeding or to cause needless expense*." The bringing of these appeals at the same time, which were consolidated into one appeal, was *efficient*, not dilatory. The separate notices did not produce any delay in the adjudication of the appeal—the Second Circuit adhered to an expedited briefing schedule that was not postponed by the multiple Notices. The appeals also did not bring about six separate interruptions into the district court's ability to adjudicate the case, but only one such interruption—placing as much of their controversy before the Second Circuit at once as possible.

*Consequently, it is my opinion that the charges brought against both Oberlander and Lerner for allegedly violating NYRPC 3.2 for "engaging in dilatory conduct" by filing multiple notices of appeal to the Second Circuit should be dismissed and do not form a valid basis for discipline.*

Finally, Oberlander and Lerner additionally filed a Petition for a Writ of Mandamus seeking that Judge Glasser be ordered to prepare and publish a docket for Sater's criminal case. The 2010 proceedings brought against Oberlander in the EDNY had been adjudicated on Sater's criminal docket number—98-Cr-1101, which was undocketed and "blanket sealed" (without an order) from the public as a whole. It was the docket number for the order to show cause against Oberlander and all of the hearings and proceedings from which they were appealing. In fact, when Oberlander and Lerner filed their appeal, the clerk of the Second Circuit wrote them stating that as appellants, they were required to provide "certified copies of the docket entries" regarding which they sought appeal. But there was no docket for 98-Cr-1101. Oberlander and Lerner asked Judge Glasser to docket the case for the appeal, which he did not do. All of this is set out in the Petition for Writ of Mandamus. (See 2011.2.7 Petition for Writ of Mandamus) The Petition was based on the law set forth by the Supreme Court in *Press-Enterprise* and the Second Circuit in *Hartford Courant* and *Alcantara*. The Second Circuit had held in *Hartford Courant* that there is a ***First Amendment right of access to docket sheets***—in part because the "inaccessibility of docket sheets *may thwart appellate or collateral review* of the underlying sealing decisions" because "a reviewing court cannot ascertain whether judicial sealing orders exist." *Hartford Courant*, 380 F.3d at 93-94. Further, in *Alcantara*, the Second Circuit held that before sealing a criminal sentencing—or any other part of a criminal case to which there is s First Amendment right of access—there had to be ***public notice*** of a closure motion, which "must be ***docketed in the public docket*** files maintained in the court clerk's office," public opportunity to challenge the closure, and if ordering closure, the court has to make "findings on the record demonstrating the need for the exclusion." *U.S. v. Alcantara*, 396 F.3d 189, 191-92 (2d Cir. 2005).

In light of these precedents and the fact that Oberlander and Lerner were seeking to file an appeal from an undocketed "blanket sealed" case (where there had been no public notice, opportunity to object, or even order sealing the case) the Petition for Writ of Mandamus was patently colorable. It was neither frivolous nor objectively baseless for them to seek docketing of the case in accordance with clear Second Circuit and Supreme Court precedent and in light of the facts before them.

Finally, it cannot go without saying, that the overall point of the combined Notices of Appeal was to seek relief ***from a prior restraint on pure speech***. Oberlander had been enjoined

from disseminating information that he had received, unsolicited. Initially the prior restraint was issued as a TRO—and then the TRO was extended time and again. The Supreme Court's case law is *patently clear* that *prior restraints are "presumptively unconstitutional"*—"the most serious and the *least tolerable infringement* on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 558-59 (1976). "In its near *two centuries of existence, the Supreme Court has never upheld a prior restraint on pure speech*." *Matter of Providence Journal*, 820 F.3d 1342, 1348 (1st Cir. 1986). Further, "the protection against prior restraint carries particular force in the reporting of criminal proceedings." *U.S. v. Quattrone*, 402 F.3d 304 (2d Cir. 2005). Oberlander was prohibited from reporting anything regarding Sater's criminal case to anyone— even Congress. It is unfathomable that disciplinary charges could be warranted against Oberlander or Lerner for seeking (urgently and emphatically) to appeal and overturn the issuance of a prior restraint. Their appeals were in no way frivolous. They steadfastly and sincerely sought appellate review. Oberlander obtained representation in the Second Circuit not only from Lerner, but also from renowned First Amendment lawyer, David Shultz and Professor of Law, Paul Cassell. When they lost at the Second Circuit, they petitioned for a Writ of Certiorari at the U.S. Supreme Court. *The Supreme Court ordered that a Redacted Cert Petition be publicly docketed (vitiating in part the orders and permanent injunction of the lower courts) and ordered a response from the government.* Former Solicitor General Paul Clement wrote a Reply brief on behalf of Oberlander. Respected Amici submitted briefs in support of Oberlander. Despite the denial of certiorari, that denial only came after the Supreme Court was advised that Glasser had ordered the docket unsealed (as Oberlander and Lerner had sought in the Petition for Writ of Mandamus) along with the unsealing of many of the docket entries in 98-Cr-1101. These are not the earmarks of a frivolous or baseless appeal or of attorneys acting with dilatory or otherwise improper purposes.

*It is my opinion that neither Lerner nor Oberlander should be disciplined for allegedly filing frivolous notices of appeal in alleged violation of either the Second Circuit's warning or NYRPC 3.1. The appeals were more than just colorable—they had substantial merit both as to law and fact. Oberlander and Lerner succeeded in obtaining partial relief, including the public docketing of 98-Cr-1101 and many of its contents. Further, the filing of the appeals was protected as First Amendment petitioning. The Petition Clause protects the ability of a litigant and his lawyer to seek appellate relief from a judicially-ordered prior restraint on pure speech.*

**The Filing of *Kriss II* and *Gottdiener***

Oberlander and Lerner are charged with violating the Second Circuit's June 29, 2011, order and NYRPC 3.1 for filing two allegedly frivolous civil actions—*Kriss II* and *Gottdiener*.

As noted *supra*, pages 68-69, it is not clear that the Second Circuit's warning even addressed the filing of new civil actions involving additional plaintiffs and defendants. Further, the Second Circuit expressly did ***not*** impose "leave-to-file restrictions," but just warned Oberlander that it may do so at a future time. Thus, any filings by Oberlander or Lerner are not in "violation" of the order, because the order is merely a warning, threatening leave-to-file restrictions that were never imposed. That is how Cogan interpreted the Second Circuit's order when declining Sater's request to hold Oberlander and Lerner in contempt for filing *Kriss II* and *Gottdiener*. (2013.05.28 Cogan Order Denying Sanctions at 1.) Sater also brought suit in New York State Court for malicious prosecution and abuse of process, arguing that both *Kriss II* and *Gottdiener* "were frivolous" and filed to harass him—claims which were dismissed yesterday on motions by Kriss and Ejekam. (2017.09.05 New York Supreme Court Dismissal Order at 2.)

Regardless, the filing of both the *Kriss II* case and the *Gottdiener* case are protected by Oberlander and Lerner's Petition Right, in conjunction with the petition rights of their clients. Under *Noerr-Pennington* and in accordance with the Second Circuit's decision in *Sussman*, discussed at length above, Oberlander and Lerner cannot be punished for filing a lawsuit (the quintessential act of petitioning the judiciary for redress of grievances) unless the complaint is "objectively baseless"—and a court cannot even consider whether there was an improper purpose unless and until the complaint is shown to be "objectively baseless."[18]

The fact of the matter is that Sater didn't pay restitution to his victims. He didn't pay restitution to the Gottdieners or to Tausky. The reason Sater didn't pay restitution is because the court didn't comply with the CVRA or the MVRA. Further, by "blanket sealing" the case (without an order), the case was hidden from Sater's victims, which enabled Sater to defraud others of millions of dollars more, including Kriss. The *Kriss II* and *Gottdiener* cases are aimed

---

[18] As noted above, under *Noerr Pennington* and according to the Second Circuit in *Sussman*, it is not appropriate to even examine improper purpose in the filing a complaint unless and until it has been shown that a complaint is objectively baseless. ***Obviously, because the First Amendment protects the filing of a non-baseless lawsuit regardless of motive, the rules of professional conduct cannot threaten punishment or prohibit it constitutionally.*** See *supra* note 15.

at requiring Sater (and others, such as Lauria in *Gottdiener* and those who helped hide his conviction in *Kriss II*) to pay the restitution Sater should have paid and was required to pay pursuant to Congressional mandate. The cases undertake differing legal theories to arrive at this same end. As set out in the Summons and Complaint filed in New York State Court, *Kriss II* asserted that the plaintiffs had been defrauded by the continuous hiding of Sater's entire criminal case—including since the filing of *Kriss I*. The *Gottdiener* case alleged that Sater and Lauria should be liable in RICO after having been convicted of (but not paying restitution for) paying Palagonia (a stock broker at DH Blair) to fraudulently "pump and dump" their stocks. Palagonia, in turn, fraudulently induced the Gottdieners and Tausky to purchase the stocks that Sater and Lauria were paying Palagonia to push. Sater, Lauria, and Palagonia all pled guilty to and were convicted of racketeering based on these securities frauds. Thus, the estate of the Gottdieners and Tausky asserted liability as Sater's and Lauria's victims under both substantive RICO (because Sater and Lauria "in the course of their [own] racketeering committed the predicate crimes of aiding and abetting and knowingly facilitating Palagonia's securities frauds"); and conspiracy RICO (because Sater and Lauria "knowingly facilitated Palagonia's racketeering"). (*See* 2013.08.02 *Gottdiener* Amended Complaint Parts 1, page 1 ¶¶4-6.)

As stated in the *Gottdienter* complaint, the *Gottdiener* case is unusual in asserting Sater's and Lauria's liability "not as primary actors" in defrauding the Gottdieners and Tausky, "but secondary actors aiding and abetting and conspiring to commit the securities frauds done to them by a non-party primary actor"—the non-party primary actor being Palagonia who had paid restitution to the Gottdieners as part of his criminal sentencing. (*Id.* at ¶8.) But the fact that a case is unusual does not make it frivolous. NYRPC 3.1 and FRCP 11 both expressly provide that attorneys can (and should) make "good faith argument[s] for an extension, modification, or reversal of existing law." In *Gottdiener*, Oberlander and Lerner were not arguing for a reversal of existing law, but merely a recognition that Sater and Lauria could be liable under RICO as secondary actors—where they had been convicted of the securities frauds (thus avoiding the PSLRA problem), but where they had not directly defrauded Gottdieners and Tausky themselves, but had secondarily defrauded them by paying Palagonia to defraud his customers (which Palagonia did, and amongst his defrauded customers were the Gottdieners and Tausky).

The fact that the *Gottdiener* case was dismissed does not mean that it was "objectively baseless" and thus not entitled to protection as First Amendment petitioning under *Noerr Pennington*. For example, in *Movers & Warehousemen's Ass'n v. Long Island Moving & Storage Ass'n*, 1999 WL 1243054, (EDNY 1999) [*Movers*], this court held that a complaint was protected under *Noerr-Pennington* and that Rule 11 sanctions were inapplicable even though the court dismissed the complaint, denied the plaintiff the opportunity to amend on the basis of futility, and said of the complaint: "While plaintiff's complaint adequately states the elements of the statute, plaintiff has not alleged a set of facts from which this court could infer viability of plaintiff's legal claim." *See Movers* at *4. Similarly, here, paragraph 8 of the statement of charges against Oberlander reviews the alleged "weaknesses" of the *Gottdiener* complaint, stating that it failed to allege specific stock transfers in detail, "use[d] the passive voice and avoid[ed] identifying the actor in the sentence," and "obscures the allegations by using the term "White Rock Partners," defined as Defendants Sater, Lauria and others, rather than referring to Sater and Lauria by name." Although not my primary point, it is worth noting that Oberlander's use of the term "White Rock Partners" and the "passive voice" allegations regarding them were lifted out of the *Coppa* indictment of Palagonia—allegations that were sufficient to criminally indict each individual despite passive voice and referring to them collectively as partners. (Compare *Gottdiener* complaint at ¶118 with *Coppa* indictment at ¶¶2-3). Nevertheless, the point is that the charge against Oberlander in paragraph 8 sounds in insufficiently pleading the allegations in the *Gottdiener* complaint by not setting out specific stock transfers or identifying specific actors in the transactions—and those are the reasons that Judge Schofield dismissed the complaint for failure to plead with particularity.

Similarly, in *Movers*, the court stated that the "[p]laintiff has rested on no more than conclusory allegations based on the statutory language," dismissed the complaint, and denied the plaintiff's motion to amend the complaint as futile (*Movers*, at *5, *9) Nevertheless, the *Movers* court held that the complaint was **not** "objectively baseless" or "sham" litigation under *Noerr-Pennington* "in the sense that no reasonable litigant would realistically expect success on the merits." *Id.* at *6. The court noted that the "claims alleged [are] 'insufficient,' not groundless or objectively baseless" and thus were protected by the Petition Clause pursuant to *Noerr-Pennington*. The *Movers* court went on to examine the Defendant's motion for Rule 11 sanctions—which is relevant here because Oberlander and Lerner have also been charged with

violating NYRPC 3.1 for filing *Gottdiener* and *Kriss II*, and as the ABA has explained, "Rule 3.1 parallels and can be analyzed in tandem with Rule 11 of the Federal Rules of Civil Procedure." *ABA, Annotated Model Rules of Professional Conduct*. As to Rule 11, the *Movers* court stated, quoting the Second Circuit:

> "[I]n imposing Rule 11 Sanctions, the court is to avoid hindsight and **resolve all doubts in favor of the signer** . . . Rule 11 is violated only when ***it is patently clear that a claim has absolutely no chance of success***. . . . Failure to prevail on the merits does not require, or imply the imposition of sanctions." Rule 11 is "not intended to stifle the enthusiasm or chill the creativity that is the very lifeblood of the law."

*Movers*, at \*7-\*8 (quoting *Oliveri v. Thompson*, <u>803 F.2d 1265, 1275</u> (2d Cir. 1986) and *Eastway Contr. Co. v. City of New York*, <u>762 F.2d 243, 254</u> (2d Cir 1985)). The court went on to explain: "That the plaintiff's claims do not survive a motion to dismiss render[s] them neither frivolous nor necessarily untrue; they are merely insufficiently alleged." *Movers*, at \*8. Thus "[s]ince all doubts are to be resolved in favor of the signer of the complaint, it cannot be said that the claims were, as a matter of law, frivolous, nor that they patently had no chance of success." *Id*.

The same is true of the filing of the *Gottdiener* and *Kriss II* cases, which are protected petitioning. Both were aimed at obtaining legal redress for Sater's victims after Sater had not been sentenced to pay restitution pursuant to mandatory sentencing statutes, the MVRA and the CVRA. That is not frivolous—it is not a sham—and thus it is protected petitioning. Indeed, "[a] 'sham' situation involves a *defendant whose activities* **are not genuinely aimed at procuring favorable governmental action at all**, <u>***not one who genuinely seeks to achieve his governmental result***</u>, but does so through improper means." *Alfred Weissman Real Estate*, <u>268 A.D. 2d at 654</u>. There is no question that Oberlander and Lerner were "genuinely seeking" to obtain a government result: specifically, judicially-ordered compensation for victims—the Gottdieners and Tausky—who had been defrauded through Sater's (and Lauria's and Palagonia's) crimes. Further, if this court is inclined to find that either *Gottdiener* or *Kriss II* is frivolous, that is a factual issue in dispute and requires an evidentiary hearing.

*It is my opinion that neither Oberlander nor Lerner should be disciplined for the filing of* Kriss II *or* Gottdiener *in alleged violation of either the Second Circuit's warning or NYRPC 3.1. The cases—seeking compensation to victims of financial crime after the perpetrators were*

convicted but not ordered to pay restitution—were not "objectively baseless" and thus protected by the First Amendment Petition Clause and were not frivolous under NYRPC 3.1.

### 3. First Amendment Rights to Check Judicial Conduct and Power

Oberlander and Lerner are charged with violating Rule 3.3(f) of the NYRPC, which prohibits an attorney when "appearing as a lawyer before a tribunal" from engaging in "undignified or discourteous conduct." The charge (paragraph 9 in Oberlander's OSC and paragraph 6 in Lerner's OSC) alleges that they "engaged in undignified and discourteous conduct *toward the courts by making __unfounded accusations__* against Judge Glasser, Judge Cogan, the Eastern District and the Second Circuit." Notably, NYRPC 3.3 does not define "undignified or discourteous conduct" and says nothing regarding making statements regarding the judiciary.[19] The NYRPC that in fact deals with punishing speech critical of the judiciary is NYRPC 8.2, which states: "A lawyer shall not __*knowingly*__ make __*a false* statement *of fact*__ concerning the qualifications, conduct or integrity of a judge."

In April 2009, the New York Courts adopted the New York Rules of Professional Conduct—abrogating and replacing the prior New York Code of Professional Responsibility. Notably, in adopting the Model Rules of Professional Conduct, New York did not adopt a verbatim version of the ABA's Model Rule 8.2.[20] The very specific language of NYRPC 8.2 is not accidental—it is couched in language that protects the lawyer's essential First Amendment rights to make statements regarding the qualifications, conduct or integrity of a judge. Moreover, the Committee cannot avoid these constitutional requirements merely by proceeding against Oberlander and Lerner under Rule 3.3.

A little history is required to understand the First Amendment constraints limiting the punishment of attorney speech regarding the judiciary.

In *New York Times v. Sullivan*, the Supreme Court held that the First Amendment "prohibits a public official from recovering damages for a defamatory falsehood . . . unless he proves that *the statement was made with 'actual malice'*—that is, *with knowledge that it was*

---

[19] The prior New York Code of Professional Conduct had prohibited "undignified or discourteous conduct which is degrading to a tribunal"—but when New York adopted the Rules of Professional Conduct in April 2009, it removed the phrase "which is degrading to a tribunal."

[20] Model Rule 8.2 states: "A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge."

*false or with reckless disregard of whether it was false or not.*" 376 U.S. 254, 279-80 (1964). Shortly thereafter, in *Garrison v. Louisiana,* 379 U.S. 64 (1964), the Supreme Court overturned the conviction of a district attorney for criminal defamation after the attorney held a press conference during which he attributed "a large backlog of pending criminal cases to the inefficiency, laziness, and excessive vacations" of particular judges and mused about possible "racketeer influences on our eight vacation-minded judges." It was in this context—where an attorney had accused judges of being under "racketeer influence"—that the Supreme Court emphasized the importance in a self-governing nation of free debate regarding public officials (*including* the judiciary). Thus the Court held that "*only* those **false statements** made with **the high degree of awareness of their probable falsity** demanded by *New York Times v. Sullivan* may be the subject of *either civil or criminal sanctions.*" *Id.* at 74. The *Sullivan* standard (also known as the "actual malice" standard) for determining whether a statement is made with reckless disregard as to truth or falsity has been extensively litigated and is determined by examining the speaker's subjective intent, which requires "that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Further, under the standard articulated in *Garrison* and *Sullivan*, the entity imposing sanctions for speech regarding a public official (here, the EDNY Committee) must prove the falsity of the speech. This is so because "[t]ruth may not be the subject of either civil or criminal sanctions," *Garrison*, 379 U.S. 64, 74 (1964), and because speakers will be chilled even though a statement "is believed to be true and even though it is in fact true, because of doubt whether it can be proved." *Sullivan*, 376 U.S. at 279.

After *Garrison*, the ABA drafted the Model Rules of Professional Conduct to adopt the Sullivan constitutional standard and safeguard the First Amendment rights of lawyers to speak about the judiciary without fear of discipline. Indeed, in the proposed final draft of the current language for Rule 8.2, the drafters cited both *Sullivan* and *Garrison* in providing the legal background for the rule, explaining that "[t]he Supreme Court has held **that false statements about public officials may be punished <u>only</u> if the speaker acts with knowledge that the**

***statement is 'false or with reckless disregard of whether it is false or not'***" and that "Rule 8.2 is consistent with that limitation." [21]

Despite *Sullivan* and *Garrison*—and the ABA's intentional adoption of the *Sullivan* standard into Model Rule 8.2—many courts in the United States interpreted Rule 8.2 to create a standard different from *Sullivan* and *Garrison*. Courts interpreted a rule that expressly prohibited lawyers from making "a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge" to mean that lawyers could only make statements about judges that were "objectively reasonable." Lawyers were required to either (1) have "an objectively reasonable factual basis for making the statements" or (2) to make a statement that a "reasonable attorney, considered in light of all his professional functions, would make in the same or similar circumstances." In *In re Holtzman*, 577 N.E.2d 30, 34 (N.Y. 1991), the New York Court of Appeals followed this trend, rejecting *Sullivan's* subjective "actual malice" standard and instead adopting "an objective standard of what a reasonable attorney would do in similar circumstances."

Nevertheless, other courts, most notably the Ninth Circuit in the very influential case, *Standing Comm. on Discipline for the U.S. Dist. Ct. for the Cent. Dist. of Cal. v. Yagman*, 55 F.3d 1430, 1437, 1440 (9th Cir. 1995), protected attorney speech regarding the judiciary—even in spite of employing an "objective standard." In *Yagman*, the Ninth Circuit employed a reasonable attorney standard (rather than a subjective actual malice standard), yet explained that "***Attorneys who make statements impugning the integrity of a judge*** are, however, ***entitled to other First Amendment protections***," specifically (1) attorneys could only be sanctioned for statements regarding the judiciary "if their statements are false; truth is an absolute defense;" (2) "the disciplinary body bears the burden of proving falsity"; (3) the statements must be "capable of being proved true or false: statements of opinion are protected by the First Amendment unless they 'imply a false assertion of fact'" and "statements of 'rhetorical hyperbole aren't sanctionable, nor are statements that use language in a loose, figurative sense." *See id.* at 1438.

---

[21] *See* MODEL RULES OF PROF'L CONDUCT R. 8.2 legal background at 206 (Proposed Final Draft 1981). The drafters also state that "[t]he critical factors in constitutional analysis are the statement's falsity and the individual's knowledge concerning its falsity at the time of the utterance," again citing *Garrison*. *Id.*

In 2009, New York abrogated *Holtzman* by adopting the current NYRPC 8.2. Departing from the language used in the Model Rule 8.2 ("***a statement*** the lawyer knows to be false ***or with reckless disregard as to its truth or falsity*** concerning the qualifications or integrity of a judge") that had been interpreted by courts to require a showing of objective reasonableness, New York instead adopted the current NYRPC 8.2, which states: "A lawyer shall not **_knowingly_** make ***a false*** statement ***of fact*** concerning the qualifications, conduct or integrity of a judge."

New York's departure from the Model Rule is very significant. Abrogating *Holtzman*, the NYRPC requires that the lawyer act "knowingly," and knowingly is defined in NYRPC 1.0 as requiring ***"actual knowledge of the fact in question."*** Actual knowledge, of course, is subjective not objective. Second, the current New York rule requires that the statements be false in order for the attorney to be punished—thus the disciplinary commission or committee has the burden, as it does with every element of a disciplinary violation, to prove that the statement is false. Third, statements of opinion or rhetorical hyperbole do not violate the rule—only "false statements ***of fact***" can be punished under the New York rule. In sum, the adoption of the NYRPC 8.2 is extremely significant as it adopts (1) a subjective standard; (2) statements must be false with the burden to prove falsity on the disciplinary authority; and (3) that only statements of fact can be punished. These changes accord both with the requirements of *Sullivan* and *Garrison*, as well as with *Yagman's* recognition of additional First Amendment protections.

Although the charges brought against Oberlander and Lerner are *not* brought under Rule 8.2, but under Rule 3.3 (and also other catch-all provisions, including engaging in conduct that adversely reflects on fitness as a lawyer or conduct prejudicial to the administration of justice), it is crucial that the Committee recognize that constitutional constraints that have been incorporated into NYRPC 8.2 cannot be avoided merely by charging discipline under another rule. The importance of the discussion above regarding Rule 8.2 is the abrogation of *Holtzman*. Yet because the First Amendment jealously protects speech regarding public officials, including the judiciary, the restrictions apply regardless of the specific rule employed by the Committee— whether it be called "discourteous conduct" or "statements regarding the qualifications, conduct, or integrity of a judge," or "conduct prejudicial to the administration of justice." For example, in *Button*, Virginia argued that it was *not* prohibiting speech, association, or petitioning, but instead was just prohibiting "solicitation," to which the Supreme Court responded: "[A] state cannot

foreclose the exercise of constitutional rights *by mere labels*." *Button*, <u>371 U.S. at 429</u>. Labeling discipline under 3.3 rather than 8.2 cannot avoid the constitutional requirements attendant to punishing speech regarding public officials, which are now incorporated into NYRPC 8.2.

Another important aspect of this case is the fact that the statements are made in court filings. In *Legal Services Corporation v. Velazquez*, <u>531 U.S. 533, 545</u> (2001), the Supreme Court recognized a free speech right belonging to attorneys to express and raise arguments in court proceedings and filings. *Velazquez* involved restrictions placed on attorneys who accepted funds from the congressionally-created Legal Services Corporation (the "LSC"). At issue were congressionally-imposed restrictions on recipients of LSC funds, specifically prohibiting attorneys from providing any representation that "involves an effort to amend or otherwise challenge existing welfare laws," including challenges as to their validity or constitutionality. *Id.* at 537. The United States Supreme Court struck down the regulations as violative of the First Amendment to the United States Constitution, explaining that the restrictions were:

> inconsistent with the proposition that attorneys *should present <u>all</u> the reasonable and well-grounded arguments necessary for proper resolution of the case*. By seeking to *prohibit the analysis of certain legal issues* and *to truncate presentation to the courts*, the enactment under review *prohibits speech and expression upon which the courts must depend* for *the proper exercise of the judicial power*.

*Velazquez*, <u>531 U.S. at 545</u>. The *Velazquez* Court further stated that Congress had designed the restriction "to *insulate* current welfare laws *from constitutional and certain other legal challenges*," which the Court held "implicat[ed] central First Amendment concerns." *Id.* at 547. Thus Congress *could not* "impose rules and conditions which in effect *insulate its own laws from legitimate judicial challenge*," nor could it "*exclude from litigation those arguments and theories Congress finds unacceptable* but which by their nature are within the province of the courts to consider." *Id.* at 548, 547. The Supreme Court concluded: "*The Constitution does not permit the Government to confine litigants and their attorneys* in this manner." *Id.* at 548.

Applying these principles from *Velazquez* to the suppression or punishment of speech critical of the judiciary made in court filings, courts should *not* be able to "impose rules . . . which in effect *insulate [judicial actions] from legitimate judicial challenge*" and "*exclude from litigation those arguments and theories [that the judiciary] finds unacceptable* [or insulting] but which by their nature are within the province of the courts to consider." *Id.* at 545.

93

Threat of professional discipline for impugning judicial integrity can foreclose and certainly chills "analysis of certain legal issues," encouraging attorneys to "truncate [their] presentation to the courts" when raising arguments regarding judicial abuse, corruption, incompetence or bias, thereby denying attorneys and their clients their constitutionally protected "speech and expression." *Id.* at 545, 547–48.

Attorneys are "officers of the court"—officers of the judiciary—because the judiciary is the branch of government constitutionally designed to provide remedies and punishment for law violation and legal injury. But the judiciary cannot perform this function on its own. Indeed, the judiciary only has power to the extent that cases and controversies are brought before it, properly invoking its jurisdiction. Lawyers are officers of the court because attorneys file cases, invoking the court's jurisdiction and ***enabling the judiciary to exercise its governmental powers*** as the third branch of government. The judiciary is absolutely powerless—it cannot protect or enforce rights; it cannot check the use government power (including its own)—without attorneys who bring cases before it.[22] Thus, the great irony underlying the punishment and suppression of attorney speech critical of the judiciary is that the rationale for such punishment is to preserve public confidence in the judiciary and thereby allegedly protect judicial power (a government interest that the Supreme Court has repeatedly afforded zero weight[23]). Yet silencing attorneys who are acting as attorneys actually *limits the judiciary's own power*. To the extent that lawyers are and can be silenced in what they are allowed to present to courts, courts lose power to address those problems. Thus, the only path of safety for preserving the proper functioning *of the*

---

[22] In theory individuals—but not business entities—could still bring cases pro se, but it is a fact that attorneys are essential to the meaningful invocation of court processes to vindicate legal rights.

[23] In *Bridges v. California*, the Supreme Court analyzed the validity of a California court's contempt citation against a newspaper and a non-attorney individual for publications about a pending case. One of the justifications proffered by California was the possibility that the publications might create disrespect for the judiciary. The Court gave that interest precisely zero weight and eloquently explained:

> ***The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion.*** For it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions. ***And an enforced silence***, however limited, solely ***in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt*** much more than it would enhance respect.

Similarly, in *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 842 (1978), the Supreme Court explained: "*[S]peech cannot be punished* when the purpose is simply to protect the court as a mystical entity or the judges as individuals or as anointed priests set apart from the community and *spared the criticism to which in a democracy other public servants are exposed*." The Supreme Court's **flat denial of *any validity* in repressing speech solely to preserve the perceived integrity of the judiciary** in both *Landmark Communications* and *Bridges* directly contradicts the core rationale for punishing attorney speech critical of the judiciary.

94

*judicial power* is for attorneys to have protectable speech, association, and petition rights to raise all colorable claims on behalf of clients in protecting client life, liberty, and property—even where those claims involve assertions of judicial corruption, abuse, incompetence, bias, or the appearance of bias.

Further, the fear of public reaction to information or public displeasure with governmental officials cannot constitutionally support suppression of speech—absent incitement to imminent lawless action. *Brandenburg v. Ohio*, 395 U.S. 444 (1969). In Justice Brandeis's words, "Fear of serious injury cannot alone justify suppression of free speech and assembly. Men feared witches and burnt women. It is the function of speech to free men from the bondage of irrational fears." *Whitney v. California*, 274 U.S. 357 (1927) (Brandeis, J., concurring). Under the First Amendment, the theoretical fear (and one actually entirely hypothesized and unsupported by any evidence) that allowing criticism of judges by lawyers might undermine the public's *perception* of judicial integrity, which might in turn lead to disenchantment with judicial power or the rule of law *cannot* support suppression of speech. The public absolutely has a right to ***know*** about the ***actual integrity*** of the judiciary (not just an inflated, one-sided, censored view). Indeed, punishing attorney speech critical of the judiciary, while allowing speech that speaks favorably of the judiciary, is not only content-based discrimination, it is viewpoint-based discrimination (as to core political speech regarding public officials[24]), which the First Amendment Speech Clause flatly condemns.[25]

Further, because most attorneys do not and will not risk punishment—including risking loss of their license and thus their livelihood—attorneys will ***not*** report judicial misconduct, but will (and do) turn a blind eye. Because attorneys are chilled (and often frozen) from revealing such problems, the problems remain hidden and unremedied, making way for judicial unlawfulness or corruption to commence, persist, and grow. Thus, the punishment and threatened punishment of attorney speech regarding judicial integrity undermines ***the actual integrity of the***

---

[24] The Supreme Court has confirmed that speech regarding the judiciary is core protected political speech regarding public officials. *See, e.g., Landmark Commc'ns*, 435 U.S. at 830, 841-42 ("***The operations of the courts and the judicial conduct of judges are matters of utmost public concern***" and speech regarding grievance proceedings brought against judges "served those interests in public scrutiny and discussion of governmental affairs *which the First Amendment was adopted to protect*.""); Republican Party v. White, 536 U.S. 765, 775, 775 (2002) (speech about views of judicial candidates "at the core of our First Amendment freedoms—speech about the qualifications of candidates for public office").

[25] *See, e.g.,* R.A.V. v. City of St. Paul, 505 U.S. 377, 430 ("Viewpoint discrimination is censorship in its purest form.")

*judiciary* by keeping problems hidden and therefore unremedied. Again, "the path of safety" for preserving the actual integrity of the judiciary is *not* to artificially inflate public opinion by suppressing lawyer speech critical of the judiciary, but is instead, as Justice Brandeis counseled, "to discuss freely supposed grievances and proposed remedies"—to allow speech and then address problems with judicial integrity, including any incompetence, abuse, weakness, wrongdoing or even corruption.[26]

Importantly, courts can protect their justifiable interests in ensuring that assertions regarding the judiciary that are made in court filings have a legal and factual basis. Courts already have content-neutral rules and tools, including, for example, Rule 11 sanctions, to deal with problems of irrelevancy, lack of factual and legal basis, courtroom order, etc. It is equally important to the proper functioning of the judiciary and fair resolution of cases that assertions made in court proceedings regarding non-judicial actors have a basis in fact and are relevant. In imposing sanctions or discipline under such content-neutral rules and standards it is appropriate to require the attorneys to recite the factual and legal bases for their allegations. Importantly, the standard to be used for evaluating statements regarding the judiciary must be the same standard as that used for evaluating the factual and legal sufficiency of statements regarding non-judicial actors. Otherwise, what is being protected is not the legitimate need in legal proceedings for sufficient legal and factual basis, but is merely the protection of judicial reputation.

Which brings us to the facts of this case. Oberlander and Lerner have been charged with violating Rule 3.3 by making "***by making* <u>unfounded</u> accusations** against Judge Glasser, Judge Cogan, the Eastern District and the Second Circuit." Notably, as discussed above, under *Sullivan*, *Garrison*, *Yagman*, and New York law (as expressed in NYRPC 8.2), the First Amendment requires that this Committee prove by clear and convincing evidence that the statements are in fact false. (And even if that were not so, the Committee would still have the burden under their own Local Rule 1.5 to show by clear and convincing evidence that the statements are "unfounded" as charged.) Moreover, statements of rhetorical hyperbole or opinion cannot be punished, but only false statements of fact. Like rhetorical hyperbole and opinion, legal argument also cannot be proven to be either true or false. Thus Oberlander and Lerner should not be

---

[26] Whitney v. California, <u>274 U.S. 357</u> (1927), Brandeis, J., concurring (*"the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies"*).

punished for making legal arguments (such as asserting that some judicial action was "unconstitutional") but only for false statements of fact. Further, whether any of these statements is "unfounded" is absolutely a question of fact that Oberlander and Lerner dispute, and should the Committee decide to proceed in pursuing these charges, they must be afforded an evidentiary hearing to show the foundation for each statement. But even before an evidentiary hearing, the record that I independently reviewed demonstrates that these statements are not "unfounded" and, indeed, have a reasonable basis in fact and thus cannot constitutionally be the subject of discipline (even under an objective reasonableness standard, let alone the constitutional *Sullivan* standard requiring subjective knowledge regarding probable falsity).

**The alleged "unfounded accusations" can be categorized thus:**

(1) ***Statements objecting to—as illegal and unconstitutional—the secrecy of court proceedings, including the "blanket sealing" or hiding of Sater's case and other criminal cases from the public view***, the failure to maintain a public docket for certain criminal matters, and accusations that the court has thereby "concoct[ed] a system of private justice without public accountability," and "hid[den] an entire covert justice system operating devoid of constitutional legitimacy," which Oberlander characterizes as "seditious," "illegal," "unconstitutional," or "a star chamber."

    a. Even though the Committee has the burden to prove falsity, the statements are *not* "unfounded," as alleged, but the record shows them to have a reasonable basis in fact and thus cannot be punished in accordance with the First Amendment. The fact is that Sater's criminal case was hidden—by being "blanket sealed" without an order. Further, sealing a case, including a criminal sentencing, without notice or an order or findings is "illegal," as established by Second Circuit caselaw, *See U.S. v. Alcantara*, 396 F.3d 189, at 191-92. Similarly, *Alcantara* and *Hartford Courant* establish that the federal courts are required to maintain criminal cases on a public docket—even if they intend to seal them, they must still maintain a public docket noting the sealing order. In *Hartford Courant*, the Second Circuit decried the maintaining of a "dual docketing system" with a public and a sealed docket, stating that having such "violate[s] the public's First Amendment right of

access by rendering it impossible for anyone to exercise that right." <u>380 F.3d at 96</u>.

b.   As to sedition, Oberlander did not use the term "sedition" without context, but defined it to mean "maladministration in official office," as Blackstone defined it. Further, Oberlander and Lerner articulate precisely the alleged maladministration at issue: "Federal judges ***cannot operate in secret*** or in combination with probation officers and officials of the Department of Justice, ***to evade mandatory restitution laws or any other mandatory sentencing laws. It's seditious***." (2012.02.17 Motion to Quash Contempt at 17.)

c.   Additionally, as to alleging that Cogan kept an "inaccurate docket," the docket under which Oberlander was brought into the EDNY with Glasser's OSC was not only inaccurate, it was non-existent publicly. It was entirely hidden and not available to the public throughout the proceedings against Oberlander, which ultimately led to Oberlander's petition for mandamus. Further, Cogan then initially proceeded under that same hidden docket that was originally Sater's criminal case, 98-Cr-1101. Oberlander also argued that in case number 10-cr-00173, involving cooperator Sebastiano Saracino, "where a motion to close a courtroom was made and discussed in public proceedings on December 2, 2010," but was "never docketed upon your honor's ejection from the courtroom of reporters." That was the basis for his allegation that Cogan kept an inaccurate docket.

d.   The use of the term "a star chamber" is both opinion and rhetorical hyperbole not capable of being proven true or false. But even this characterization is *not* "unfounded." ***A legacy of the historical Star Chamber was operating in secret***— and courts operating in secret is exactly what Oberlander and Lerner were objecting to. *See, e.g., In re Oliver*, <u>333 U.S. 257, 268-69</u> & n.22 (1948) ("[T]he traditional ***Anglo-American distrust for secret trials*** has been variously ***ascribed to the notorious use of this practice*** by the Spanish Inquisition, to the excesses of ***the English Court of Star Chamber***, and to the French monarchy's abuse of the lettre de cachet.")

98

(2) ***Statements that the courts failed to comply with Congressional mandatory sentencing laws***, such as the MVRA and the CVRA, resulting in victims not receiving restitution as mandated by statute, "cover[ing] up . . . illegal sentencing schemes," and calling such "unlawful," "illegal," "lawless" "unethical," "judicial misconduct," and "sedition"

    a.  Again, even though the Committee has the burden to prove falsity, these statements are *not* "unfounded" as charged, but instead the record shows them to have a reasonable basis in fact. The fact of the matter is that *cooperators like Sater and Lauria were not required to pay restitution*, that such was in contravention of mandatory sentencing laws, that those "illegal sentences" were then "covered up" by being "super sealed."

    b.  The only statements left are that such was "unethical," "misconduct," and "seditious." But Oberlander's opinion that it is "unethical" is not capable of being proven false (and certainly *not* unfounded—failing to award mandatory restitution to victims and allowing swindlers to keep it can be fairly characterized as unethical). Again, as to sedition, Oberlander did not use the term "sedition" without context, but defined it to mean "maladministration in official office," as Blackstone defined it. Further, Oberlander and Lerner articulate precisely the alleged maladministration at issue: "Federal judges ***cannot operate in secret*** or in combination with probation officers and officials of the Department of Justice, ***to evade mandatory restitution laws or any other mandatory sentencing laws. It's seditious***." (2012.02.17 Motion to Quash Contempt at 17.)

    c.  As to misconduct, what Oberlander said was "No federal court may enjoin anyone from revealing its own misconduct, ever"—This is legal argument about the validity of a prior restraint and is stated in the abstract as a principle. Further, to the extent it implies there was misconduct here, that refers to the prior sentence about Oberlander being gagged from telling Congress about the judiciary's failure to comply with mandatory sentencing laws—an allegation which is *not* "unfounded" in this case, as discussed above.

(3) ***Statements objecting to the prior restraint orders prohibiting Oberlander from telling anyone***, even Congress about Sater's conviction or the terms of his sentence without mandatory restitution, and statements that it was "illegal" and "unlawful" to

issue the order to show cause to enforce such a prior restraint on Oberlander for allegedly revealing his own name to the *New York Times.*

a. Again, even though the Committee has the burden to prove falsity, these statements are *not* "unfounded" as charged, but instead the record shows them to have a reasonable basis in fact. Given that prior restraints are "presumptively invalid" and are the "least tolerable" restraint on speech, it cannot be "unfounded" to state that creating or enforcing one is "illegal" or "unlawful."

(4) ***Statements that Judge Glasser was required to recuse himself*** because Glasser's "appearance of bias and lack of impartiality, [is] palpably obvious to, let alone reasonably questioned by, an objective, informed observer" and that "the observer cannot rationally conclude but that your honor appears to be in criminal conspiracy with at least Sater's lawyers, to deprive us and our clients of our rights."

a. Although this statement would surely seem to be out of line in most other cases, (and again, emphasizing that the Committee has the burden to prove falsity), even these statements in the context that led to them are *not* "unfounded" as charged, but instead the record shows them to have a reasonable basis in fact. The context in which this was stated is (1) the Sater criminal docket 98-Cr-1101 had just been unsealed and showed repeated ex parte communications between Judge Glasser and the government and Sater's lawyers, one or more of which were initiated by Judge Glasser himself; (2) Judge Glasser had closed the courtroom, excluding Oberlander, Lerner, and the press, from participating or making arguments in the hearing regarding unsealing docket entries; (3) when Oberlander and Lerner attempted to introduce evidence for the court to consider about the lack of risk to Sater via Request for Judicial Notice –which avenue they used precisely because they had been excluded from the hearing—Judge Glasser responded by threatening them with sanctions under § 1927; (4) the Mobargha Settlement Email from Sater's lawyers advised Oberlander and Lerner to settle because they were "mistaken," didn't know what was really going on, and that Judge Glasser would act as to any unsealing without considering their arguments (statements that seemed to be confirmed by Glasser's ex parte communications and hearings); (5) that hiding Sater's RICO conviction from banks and investors in Bayrock's

developments is bank fraud, and thus criminal; and (6) Oberlander clarified later in the same papers: "We respectfully alert the court that we are scrupulously adhering to the standards of §455(a) and requesting you step down because of the ***appearance of bias and prejudice*** founded in corruption and criminal conspiracy. ***We are not here accusing the court of actually engaging in corruption and criminal conspiracy.***" (2012.11.19 Omnibus Motion at 11, fn 6.)

(5) ***Statements of rhetorical hyperbole***, including (a) that unlike the signers of the Declaration of Independence who publicly proclaimed their actions, Glasser's court "hides what it does" out of "pusillanimous fear" and (2) the quotation Joseph N. Welch to Joseph McCarthy, "You have done enough. Have you no sense of decency sir, at long last? Have you left no sense of decency?"

    a. These are statements of rhetorical hyperbole—or "statements that use language in a loose, figurative sense," *see Yagman*, <u>55 F.3d at 1438</u>—not capable of being proven true or false and protected from punishment by the First Amendment. How can the Committee prove "false" that adjudicating cases in secret is done out of pusillanimous fear, and a query to Glasser, Have you no decency?

    b. Even taking the quotation as charged in the OSCs as "analogizing Judge Glasser and the Eastern District to Senator Joseph McCarthy," Oberlander didn't actually say that Glasser or the Eastern District was like (or unlike) Joseph McCarthy. Indeed, the quotation from Welch represented the turning point in McCarthyism—the point at which people undertook self-reflection in supporting that trend and turned away from it. The quote can be read as imploring Glasser to take the same route—don't hide cases without orders anymore, start awarding restitution to victims in compliance with Congressional sentencing laws, don't continue to hide this case or Sater's conviction, etc. *Cf. Hartford Courant*, <u>380 F.3d at 86</u> (noting that discovery of state court judicial practice of not docketing cases that were "sealed" without proper processes "led to . . . considerable self-examination by the Connecticut judiciary").

This technical parsing of the speech for which Oberlander and Lerner are being threatened with discipline is important to show that the statements are not in violation of Rule 3.3 as charged as being "unfounded"; and are in fact protected by their First Amendment Speech

101

rights in accordance with *Sullivan, Garrison, Velazquez*, *Yagman*, and NYRPC 8.2, as noted above. Further, the Committee must specifically identify to Oberlander and Lerner each and every statement for which they may be punished with an opportunity to respond because, as demonstrated by this technical parsing, even as statements that on their face and out of context would appear "unfounded" or "false," the record refutes that characterization and instead supports a reasonable basis in fact. Thus, despite the fact that both OSCs purport to contain only "a non-exhaustive list" of the statements for which Oberlander and Lerner are being charged with misconduct, it would be an affront to both Due Process and the First Amendment to fail to notify them of each and every statement for which charges are brought. This is particularly so as truth is an absolute defense and the bar has the burden to prove falsity—thus they must have the opportunity to respond and show evidence upon which such statements are based, and under *Sullivan* they must have subjective belief in its falsity (and even under the flawed "objectively reasonable" approach, they cannot constitutionally be disciplined if they had a reasonable basis in fact—and must have the opportunity to show they had one).

Nevertheless, the technical parsing (while essential to showing that their speech is protected) takes away from the vital overall picture of the context of the speech at issue here and the importance of allowing attorneys to engage in such speech. This is a case where federal courts were operating in secret, hiding entire criminal cases from public view without entering sealing orders or publicly docketing the case. Further, the criminal cases hidden were those of cooperators whose sentences did not include restitution despite Congressional mandate that the sentences identify the victims and order restitution. Moreover, by hiding the cases, victims were unable to seek restitution on their own and, at least in Sater's case, Sater was then enabled to engage in further fraud, by defrauding banks, business partners, investors, the IRS, and others by virtue of hiding his prior conviction while acting as a member of Bayrock undertaking major real estate developments, including Trump properties. And if all that wasn't enough, when Oberlander was "tipped off" about this and sought to disclose it, he was himself gagged with prior restraints, ordered to return and destroy the documentation—which orders he obeyed—and now is facing these disciplinary charges.

The standards in *Garrison* and *Sullivan* are not happenstance or merely theoretical. They were created for a purpose—a purpose that is eminently important in this case—the preservation

of our democratic institutions and processes. *Sullivan* and *Garrison* embraced the democratic theory of the First Amendment propounded by Alexander Meiklejohn.[27] Specifically, in order for "We the People" to perform our democratic functions of self-government we must know what government officials are doing so that we can make informed decisions in voting or employing other democratic correctives (including seeking Congressional relief as to the behavior of appointed government officials). Suppressing attorney speech regarding the judiciary deprives the citizen of the ability to self-govern in that the public loses its right to receive that information. The Supreme Court has recognized that the right to free speech creates a reciprocal right to receive information, including information from attorneys.[28] Government-coerced public ignorance regarding the qualifications of public officials is antithetical to democracy and deprives the American people, who possess the ultimate sovereignty over government, of the ability to exercise their power to respond to or correct government abuses. As Madison explained, and the Supreme Court reiterated in *Sullivan*, under our system of government "the **censorial power is in the people over the Government**, and **not in the Government over the people**"[29]—not even in the judiciary over attorneys.

In like manner, Vincent Blasi, has shown that "the checking value" of free speech "was uppermost in the minds of the persons who drafted and ratified the First Amendment."[30] The checking value is "*the value that free speech*, a free press, and free assembly **can serve in checking the abuse of power by public officials**."[31] Of course speech regarding the judiciary from attorneys—the only class of people with the training and exposure to offer effective criticism—is essential to check judicial power. Where a judiciary is not elected, as with the federal judiciary and some state judiciaries, the checking value maintains its importance and is even strengthened. The very lack of public power to directly check judicial power through

---

[27] ALEXANDER MEIKLEJOHN, FREE SPEECH AND ITS RELATION TO SELF-GOVERNMENT (1948).

[28] Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, 425 U.S. 748, 756–57 (1976); Bates v. State Bar of Ariz., 433 U.S. 350, 365–66, 372–76, 384 (1977).

[29] New York Times v. Sullivan, 376 U.S. 254 (1964)

[30] *See* Blasi, *supra* note 1; *see also id.* at 538 ("There can be no doubt, however, that one of the most important values attributed to a free press by eighteenth-century political thinkers was that of checking the inherent tendency of government officials to abuse the power entrusted to them. Insofar as the views prevalent at the time of adoption have relevance to contemporary interpretation, the checking value rests on a most impressive foundation.").

[31] Blasi, *supra* note 1, at 527.

election intensifies the need for free speech regarding wrongdoing or incompetence so the public can call upon other governmental powers to perform their checking functions. As Cass Sunstein has stated, "There can be little doubt that suppression by the government of political ideas that it disapproved, or found threatening, was *the central motivation for the [speech] clause*. **The worst examples of unacceptable censorship** involve **efforts by government to insulate itself from criticism**."[32]

Judicial punishment through discipline (here the EDNY) of speech exposing unlawful actions by one or more of its judges (here, concealing criminal cases without an order or docketing and defying Congressional mandatory criminal restitution), would constitute precisely that kind of unacceptable censorship. It is essential to maintain the **actual integrity of the judiciary** that judicial abuse, incompetence or unlawfulness be checked. Oberlander and Lerner therefore must have the right to engage in this kind of speech to check judicial power. Further, they must be able to do it **in court filings**—so that the judiciary can address it and take self-corrective measures. That is the added importance of the *Velazquez* decision—attorneys must and do have a speech right to raise these arguments in court proceedings in order **to invoke judicial power to fix problems with judicial integrity or incompetence**, either in that specific case or on appeal. Indeed, in this case, ultimately Oberlander and Lerner obtained partial success with the unsealing of Sater's docket and many of the items thereon. And this was obtained because they persisted in raising their arguments to the Supreme Court—with Glasser unsealing and sending the unsealing orders to the Supreme Court immediately prior to the conferencing as to whether to grant certiorari.

But in this case, the checking value goes considerably further, because the conduct that Oberlander and Lerner primarily objected to was the secrecy of proceedings without undertaking the requisite court processes or docketing for closing cases, which was followed by prior restraints placed on them forbidding them from saying anything about it. Stifling or punishing attorney speech regarding unlawful "sealing" of cases and keeping cases off public dockets not only keeps the public from being able to evaluate the qualifications, conduct, and integrity of the judiciary who engages in such conduct—as is the public's absolute right. It additionally keeps

---

[32] Cass R. Sunstein, *Free Speech Now*, 59 U. CHI. L. REV. 255, 305 (1992) (emphasis added).

hidden those unlawfully "sealed" and undocketed cases—thereby removing the most essential public check on judicial power—the open court.

As the Supreme Court explained in *Richmond Newspapers v. Virginia*, <u>448 U.S. 555, 569</u> (1980) "the value in *open justice*" is not just "therapeutic" but *is "the keystone"*—for "*[w]ithout publicity, all other checks are insufficient*: all other checks are of small account." Indeed, "*[t]he open trial* . . . plays *as important a role in the administration of justice today* as it did for centuries before our separation from England. The *value of openness* lies in the fact *that people* not actually attending trials *can have confidence that standards of fairness are being observed*, <u>**the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known**</u>. Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Press-Enterprise  Co. v. Superior Court*, <u>464 U.S. 501, 508</u> (1984) (*Press-Enterprise I*).

And this is precisely why it is problematic to have secret criminal cases that are not even publicly docketed. It is apparent that in at least Sater's case "standards of fairness" and "established procedures" regarding notifying victims and awarding restitution pursuant to Congressional mandate were *not* "followed" and such "deviations" did *not* "become known"— that is, until a tipper gave Oberlander the documents from Sater's criminal case. In *Press Enterprise II*, the Court held that the First Amendment right of access extends to sentencing proceedings, which "have historically been open to the public" and that "public access serves the important function of discouraging either the prosecutor or the court from engaging in arbitrary or wrongful conduct," for "[t]he *presence of the public operates to check any temptation that might be felt by either the prosecutor or the court* to obtain a guilty plea by coercion or trick, or to seek or impose an arbitrary or disproportionate sentence"—or in this case, to disregard Congressionally mandated sentencing. *See Press-Enterprise Co. v. Superior Court*, <u>478 U.S. 1, 13</u> (1986) (*Press-Enterprise II*). Further the Second Circuit has agreed, expressly noting that *public sentencing proceedings* "are also extremely valuable *to victims of crimes*, to family members of victims, and to members of the community in which the crime occurred." *Alcantara*, <u>396 F.3d at 198</u>.

Because open courts are *the check* on judicial power, "[a] trial is **a public event**. ***What transpires in the court room is public property*** . . . Those who see and hear what transpired can report it with impunity. There is ***no special perquisite of the judiciary* *which enables it***, as distinguished from other institutions of democratic government ***to suppress, edit, or censor events which transpire in proceedings before it.***" *Craig v. Harney*, <u>331 U.S. 367, 374</u> (1947). To protect open courts—*the* essential check on judicial power—attorneys must have protectable free speech rights to raise—both inside and outside of court proceedings—unlawful closure, hiding, or sealing of cases.

*It is my opinion that neither Oberlander nor Lerner should be disciplined for allegedly making "unfounded accusations" against members of the judiciary in alleged violation of NYRPC 3.3(f). The statements were not unfounded, but had a reasonable basis in fact. Moreover, speech regarding public officials, including the judiciary, is core protected speech under the First Amendment and is therefore protected by* Sullivan, Garrison, *and progeny. Thus should the Committee be inclined to pursue punishment for their statements critical of the judiciary, the Committee bears the burden of proving the falsity of the statements and of proving Oberlander's and Lerner's state of mind as to probable falsity. The First Amendment's Speech Clause protects Oberlander's and Lerner's right to check judicial power and preserve open court processes through their speech both in and out of court.*

### 4. <u>Freedom of Association and Right to Counsel under the Fifth and Sixth Amendments</u>

In the Order to Show Cause against Lerner, he is charged specifically for undertaking the representation of Oberlander and also for not withdrawing from that representation. These charges sound in alleged violation of NYRPC 1.16. But, again, Lerner's representation of Oberlander is protected by Lerner's and Oberlander's First Amendment rights of association and in Oberlander's Fifth and Sixth Amendment rights to counsel.

Pertinent to these charges, under NYRPC 1.16, an attorney is required to withdraw from a representation if either:

(b)(1) the lawyer ***knows or reasonably should know*** that the representation **will** ***result in a violation of these Rules or of law***; . . . or (4) the lawyer knows or reasonably should know that ***the client is*** bringing the legal action, conducting the defense, or ***asserting a***

106

> *position in the matter, or is otherwise having steps taken, <u>merely for the purpose of harassing or maliciously injuring</u> any person*.

Notably, the comment to NYRPC 1.16 clarifies: "*A lawyer ordinarily* **must decline or withdraw from representation under paragraph** . . . **(b)(1) or (b)(4), as the case may be, <u>if the client demands</u> that <u>*the lawyer engage in conduct*</u> *that is illegal* or that violates these Rules or other law**."

Lerner's OSC charges that NYRPC 1.16 required Lerner's withdrawal because he allegedly knew:

- Of Oberlander's alleged intentions "to obtain settlement by threatening illegal conduct,"
  - o This basis is entirely undermined by the section *supra*, pages 74-77, that show that Oberlander didn't "threaten[] illegal conduct," but instead threatened "lawful and legal" dissemination; and that the demand letters are constitutionally protected petitioning under *Noerr-Pennington* and *Sussman*. Thus Lerner, by reading Oberlander's letters, could only have knowledge of Oberlander's intentions to threaten "lawful and legal" dissemination—which is *not* in violation of the rule and does not mandate withdrawal or declination.

- Of Oberlander's alleged intentions and "to make the Sealed Materials public"
  - o This basis is entirely flawed because it implies that somehow an intention "to make the sealed materials public" is necessarily equated with unlawful conduct or conduct in violation of the NYRPCs. But, as shown above, the materials were never even "sealed" pursuant to requisite closure processes or even a sealing order—the entire case being hidden in contravention to established court processes protecting the public's First Amendment rights to court access and to our system of open courts. And ultimately, Oberlander, with Lerner's assistance, was able to bring about the unsealing of Sater's criminal docket and many of the items on that docket and the United States Supreme Court ordering public the parts of the PSR as redacted in the Redacted Cert Petition. Thus, as "threatened" in the settlement letters to Herman, Oberlander sought "lawful and legal" dissemination, which was ultimately obtained through appeals and court orders. But it absolutely is *not* a violation of the Rules of Professional Conduct, nor does it trigger mandatory withdrawal under Rule 1.16, ***to assist a client to lawfully***

107

> *unseal information that actually had been hidden from the public unlawfully* (without adherence to required processes for closure).

- "That Oberlander was taking actions for the primary purpose of harassing or maliciously injuring the Defendants"
    - Oberlander was not even charged with "taking actions for the primary purpose of harassing or maliciously injuring the Defendants" and the only alleged improper purposes indicated in Lerner's OSC are the two alleged immediately above this— that Oberlander sought a monetary settlement predicting publicity that would result without a settlement (not illegal, and not an improper purpose but instead protected First Amendment petitioning), and that Oberlander sought to unseal the Sater Criminal Documents (again, not illegal, not improper, not done merely to harass or maliciously injure anyone, but done to uncover hundreds of millions of dollars of fraud being perpetrated by a man who was hiding his conviction and defrauding banks, investors, business partners, and others—and ultimately attained in part through court orders in recognition of the public's First Amendment rights to court access).
    - Notably, the charge indicates that Lerner is required to withdraw if Oberlander's "primary purpose" was "harassing or maliciously injuring" someone. But the rule only requires withdrawal if the client is taking an action "***merely* for the purpose of harassing or maliciously injuring any person**." The "merely" is important because it indicates that there is no other proper purpose—the ***only*** purpose for the action is to harass and injure.
- That "Oberlander would *continue* to violate multiple court orders and the NYRPCs"
    - What orders would or was Oberlander allegedly "continuing" to violate? What rules of professional conduct? Oberlander consistently complied with court orders that were unambiguous—for example, destroying all copies of the Sater Criminal Documents once Cogan issued an actual order that he do so. He also complied with Glasser's TROs not to disseminate materials. He complied with Buchwald's order to file a redacted complaint—and obtained abeyances, showing good cause therefor, until he was able to comply.
- That "further representation of Oberlander would result in a violation of the NYRPC,"

o   As reviewed throughout this report, none of the NYRPC were violated by
Lerner's representation of Oberlander. As the comment to NYRPC elucidates,
mandatory withdrawal is appropriate in situations where **"the client demands
that _the lawyer engage in conduct_ that is illegal or that violates these Rules or
other law**."

It is not surprising that the NYRPC require withdrawal by the attorney only in situations
where **"the client demands that _the lawyer engage in conduct_ _that is illegal_ or that violates
these Rules or other law**." That is so because to have a rule that provided otherwise would
unconstitutionally infringe on the attorney's and the client's First Amendment right to associate
with each other for the purpose of pursuing legal ends, and it would undermine the client's
constitutional rights to counsel. Under the First Amendment right of association—consistent with
the NYRPC 1.16 comment—in order to prohibit or punish membership, association, or
affiliation with another person or organization, it must be demonstrated that the associating
person both (1) knows of the illegal activities and (2) has "the 'specific intent' to further the
illegal aims." _See, e.g._, _Elfbrandt v. Russell_, 384 U.S. 11, 17-19 (1966). The Charges regarding
Lerner's representation of Oberlander fall woefully below these requirements. As reviewed
above, there is no evidence that Oberlander was engaged in illegal activities, nor that Lerner
knew of them and had the specific intent to further them.

The punishment of attorney association with an unpopular or disfavored client (historical
examples exist as to representation of terrorist groups, communists, organized labor, civil rights
groups and immigrants) has significant negative consequences. It denies the affected client not
only of their rights to counsel, but also of access to law itself, of the ability to obtain advice of
counsel on how to conform with legal requirements, and of the ability to effectively obtain
redress through court processes and First Amendment petitioning. It also unconstitutionally
imposes "guilt by association"—the attorney is punished for associating with an unfavored or
seemingly "guilty" client. But that concept—not only barred by the First Amendment right of
association which establishes that "guilt is personal" and not by association, _see, e.g., Scales v._

*United States*, 367 U.S. 203, 224-25 (1961)[33]—is entirely antithetical to the constitutional role of and right to a lawyer that is a cornerstone of American law.

In *NAACP v. Button*, Virginia changed its solicitation laws precisely to undermine the ability of NAACP lawyers to associate with and obtain clients for desegregation cases. The *Button* Court held that the Constitution protected the ***attorney's right to associate with a client for "vigorous advocacy . . . of lawful ends***."

Here, Lerner has a protected right to associate with Oberlander to "vigorously advocate" towards "lawful ends"—and they did just that. The NYRPC does not prohibit that association nor mandate its termination—and discipline should not be imposed for Lerner's association as counsel for Oberlander. Lerner's association right is undergirded by Oberlander's Fifth Amendment due process right to retain hired legal counsel in civil proceedings, *see Potashnick v. Port City Constr. Co.*, 609 F.2d 1101, 1104 (5th Cir. 1980), which is in addition to a client's Fifth and Sixth Amendment rights to counsel in criminal proceedings. The Supreme Court explained that it "would be a denial of a hearing, and therefore of due process" if civil or criminal litigants were prohibited from obtaining and employing attorneys to represent their interests. *See also* Powell v. Alabama, 287 U.S. 45, 69 (1932). If Lerner can be punished for even undertaking the representation of Oberlander at the outset of the case—as the charges appear to allege—that would constitute a very serious encroachment on Oberlander's right to counsel, especially in a proceeding where he was brought into the EDNY defending an Order to Show Cause directed at him as a non-party. The constitution protects both his right to counsel and Lerner's right to provide it.

*It is my opinion that charges alleging that Lerner acted in violation of NYRPC 1.16 and was required to decline or withdraw from representation of Oberlander should be dismissed. Neither Lerner nor Oberlander engaged in conduct that would trigger mandatory withdrawal under NYRPC 1.16(b)—both acting lawfully and in accordance with the rules. Further, the*

---

[33]Under the First Amendment right of association, in order to prohibit or punish membership, association, or affiliation with another person or organization, it must be demonstrated that the associating person both (1) knows of the illegal activities and (2) has "the 'specific intent' to further the illegal aims." *See, e.g., Elfbrandt v. Russell*, 384 U.S. 11, 17-19 (1966).

*constitutional rights of association and to legal counsel protect Lerner's representation of Oberlander from punishment.*

## VI.  CONCLUSIONS

To assist the Committee, I am stating my Opinions as general formal conclusions and then as applied to each specific charge against Oberlander and Lerner in the form of a chart.

**Formal Conclusions:**

- *It is my opinion that* **any and all charges based on conduct occurring prior to November 18, 2011, are time barred pursuant to** *28 U.S.C. §2624* **and should be dismissed**. *See supra* Part V.A.2.

- *It is my opinion that Local Rule 1.5 only provides this Committee with authority to impose discipline for conduct occurring in connection with activities in the Eastern District.* **All charges regarding conduct occurring in other courts (such as New York state court, the Second Circuit, or the SDNY) and relating to orders of other courts (such as the Second Circuit or the SDNY) should be dismissed.** *See supra* Part V.A.3.

- *It is my opinion that* **all of the charges dealing with Oberlander's or Lerner's alleged violation of court orders should be dismissed and no discipline can be based thereon.** *None of the orders—whether actual or alleged—creates a basis for charging either with violation thereof under the facts in issue. See supra* Part V.B.1.

- *It is my opinion that* **all of the charges dealing with Oberlander's sending of the settlement letters, Lerner's alleged knowledge thereof, or any alleged improper purpose in filing** **Kriss I** **should be dismissed and no discipline can constitutionally be based thereon** *as it is protected by* *the First Amendment Petition Clause*. *See supra* pgs 74-77.

- *It is my opinion that* **all of the charges brought against both Oberlander and Lerner for allegedly violating NYRPC 3.2 for "engaging in dilatory conduct"** *by filing multiple notices of appeal to the Second Circuit or for filing the* Kriss II *or* Gottdiener *cases* **do not form a valid basis for discipline and should be dismissed.** *See supra* pgs 77-82.

- *It is my opinion* **that neither Lerner nor Oberlander should be disciplined for allegedly filing frivolous notices of appeal in alleged violation of either the Second Circuit's warning or NYRPC 3.1.** *The appeals were more than just colorable—they had substantial merit both as to law and fact. Oberlander and Lerner succeeded in obtaining*

*partial relief, including the public docketing of 98-Cr-1101 and many of its contents.*
**_Further, the filing of the appeals was protected as First Amendment petitioning._** *The Petition Clause protects the ability of a litigant and his lawyer to seek appellate relief from a judicially-ordered prior restraint on pure speech. See supra pgs 77-84.*

- *It is my opinion that **neither Oberlander nor Lerner should be disciplined for the filing of** Kriss II **or** Gottdiener **in alleged violation of either the Second Circuit's warning or NYRPC 3.1.** The cases—seeking compensation to victims of financial crime after the perpetrators were convicted but not ordered to pay restitution—were not "objectively baseless" and thus **_protected by the First Amendment Petition Clause_** and were not frivolous under NYRPC 3.1. See supra pgs 85-89.*

- *It is my opinion that **neither Oberlander nor Lerner should be disciplined for allegedly making "unfounded accusations" against members of the judiciary in alleged violation of NYRPC 3.3(f).** The statements were not unfounded, but had a reasonable basis in fact. Moreover, speech regarding public officials, including the judiciary, is core protected speech under the First Amendment and is therefore protected by* Sullivan, Garrison*, and progeny. Thus should the Committee be inclined to pursue punishment for their statements critical of the judiciary, the Committee bears the burden of proving the falsity of the statements and of proving Oberlander's and Lerner's state of mind as to probable falsity. **_The First Amendment's Speech Clause protects Oberlander's and Lerner's right to check judicial power and preserve open court processes through their speech both in and out of court._** See supra pgs 89-106.*

- *It is my opinion that **charges alleging that Lerner acted in violation of NYRPC 1.16 and was required to decline or withdraw from representation of Oberlander should be dismissed.** Neither Lerner nor Oberlander engaged in conduct that would trigger mandatory withdrawal under NYRPC 1.16(b)—both acting lawfully and in accordance with the rules. **_Further, the constitutional rights of association and to legal counsel protect Lerner's representation of Oberlander from punishment._** See supra pgs 106-110.*

- *It is my opinion that where Oberlander and Lerner's actions are protected from discipline by the First Amendment or other constitutional rights, **this Committee cannot**

*avoid those constitutional constraints by imposing discipline through a catch-all rule.*

*See supra* pgs 60-61.

## Conclusions Applied to Specific Charges:

| Charge: | **Oberlander Charge, pg 3 ¶ 1** |
|---------|----------------------------------|
| Text: | 1. Despite the respondent's knowledge of the confidential nature of the Sealed Materials, the respondent publicly filed a civil RICO complaint in the Southern District of New York, annexing the Sealed Materials as exhibits to the complaint and making the complaint available to the public for download through a paid online news service called *Courthouse News*, in violation of the court's original sealing order. *See Kriss, et al. v. Bayrock Group, LLC*, et al., Case No. 10-cv-3959 (S.D.N.Y.), docket entry 1 (Complaint). |
| Opinion Summary: | • Time barred<br>• Factually disputed<br>• Alleged court order is non-existent—cannot form basis for discipline |
|  |  |
| **Charge:** | **Oberlander Charge, pg 3, ¶2** |
| Text: | 2. The respondent violated an SDNY court order directing the respondent to file a redacted version of the SDNY Complaint, without any Sealed Materials or reference to the Sealed Materials. *See Kriss, et al. v. Bayrock Group, LLC*, et al., Case No. 1 O-cv- 3959 (S.D.N.Y.), Order dated May 14, 2010. |
| Opinion Summary: | • Time barred<br>• Factually disputed<br>• Alleged court order was not violated; abeyance obtained and order complied with |
|  |  |
| **Charge:** | **Oberlander Charge, pg 3, ¶3; &<br>Lerner Charge, pg 3, ¶ 1 (slightly different wording)** |
| Text: | 3. The respondent repeatedly threatened the public dissemination of the Sealed Materials unless Defendants agreed to a monetary settlement. See, e.g., October 18, 2010 Letter from Oberlander to Brian Herman ("Herman") (Exhibit G to June 9, 2014 Disciplinary Complaint)2; November 9, 2010 Letter from Oberlander to Herman (Exhibit H). |
| Opinion Summary: | • Time barred<br>• Factually disputed<br>• Protected by First Amendment Right to Petition |
|  |  |
| **Charge:** | **Oberlander Charge, pg 3, ¶4; &<br>Lerner Charge, pg 3, ¶2** |
| Text: | 4. The respondent violated Judge Glasser's July 20, 2010 Order by failing to destroy or return certain electronic and paper copies of the original Pre-Sentencing Report and other Sealed Materials. *See* Judge Glasser's July 20, 2010 Order (Exhibit A); Transcript of April 1, 2011 hearing before the Honorable Brian M. Cogan, at 11 :7-15:5 (Exhibit K); May 13, 2011 Order of Judge Cogan (Exhibit L). |
| Opinion Summary: | • Time barred<br>• Factually disputed<br>• Alleged court order is unenforceable, containing no unambiguous decretal language, and violates FRCP 65(d)'s requirements |

| Charge: | **Oberlander Charge pg 3 ¶5; &**<br>**Lerner Charge, pg 3 ¶3** |
|---|---|
| Text: | 5. The respondent violated multiple court orders, including the Second Circuit's February 14, 2011 Order, by revealing the respondent's true name and identity to The New York Times, disclosing Sater's true identity to the Miami Herald and disclosing Sater's connection to the sealed EDNY criminal proceedings. See February 14, 2011 Second Circuit Order (Exhibit I); "Fraud Case Challenges Secrecy of Man's Past as Criminal and Cooperating Witness," THE NEW YORK TIMES, Feb. 5, 2012; "High court reveals secret deal of Trump developer's crimes," THE MIAMI HERALD, July 31, 2012. |
| Opinion Summary: | • Jurisdiction defect—neither the order issued nor the alleged violation occurred in EDNY proceedings.<br>• Factually disputed<br>• Second Circuit order (injunction pending appeal) had expired with the issuing of the formal mandate on December 20, 2011.<br>• Other alleged "multiple court orders" must be identified to respondents with opportunity to respond to comport with basic notice and due process |

| Charge: | **Oberlander Charge pg 3, ¶ 6; &**<br>**Lerner Charge pg 3 ¶4** |
|---|---|
| Text: | 6. The respondent violated the Second Circuit's June 29, 2011 Order by filing two new frivolous actions in the United States District Court for the Southern District of New York, Case No. 13-CV-1824 (LGS) and Case No. 13-CV-3905 (LGS), despite the Second Circuit's order directing the respondent to refrain from frivolous filings. *See* June 29, 2011 Second Circuit Order (Exhibit M); Southern District of New York Docket Nos. 13-CV-1824 and 13-CV-3905. |
| Opinion Summary: | • Jurisdiction defect—neither the order issued nor the alleged violation occurred in EDNY proceedings.<br>• Jurisdiction defect—federal court power to punish filing of case in state court (*Kriss II*)<br>• Factually disputed<br>• Judge Cogan previously held that filing *Kriss II* and *Gottdiener* did not violate the Second Circuit's June 29, 2011, order<br>• Filing of *Kriss II* and *Gottdiener* was protected by First Amendment Petition Clause |

| Charge: | **Oberlander Charge pg 3-4, ¶ 7; &**<br>**Lerner Charge pg 3-4, ¶5** |
|---|---|
| Text: | 7. The respondent filed frivolous Notices of Appeal with the Second Circuit, including an appeal from a scheduling order that was not a final order nor subject to any of the exceptions to the final judgment rule. *See* June 29, 2011 Second Circuit Order ("[I]t is ORDERED that appellant Richard Roe is hereby warned that the Court's patience has been exhausted by his filing of six separate notices of appeal regarding the same principal legal dispute-including the filing of an appeal from a March 23, 2011, scheduling order that obviously was not a final order nor subject to any of the exceptions to the 'final judgment rule,' see Part (iv), post-and that any further attempts to re-litigate the issues decided by this order, or other future filings of a frivolous nature, may result in sanctions.") (Exhibit M). |
| Opinion Summary: | • Time barred<br>• Jurisdiction defect—neither the order issued nor the alleged violation occurred in EDNY proceedings.<br>• Factually disputed<br>• Filing of Notices of Appeal was protected by the First Amendment Petition Clause |

114

| Charge: | **Oberlander Charge pg 4, ¶8** |
|---|---|
| Text: | 8. The respondent knowingly asserted frivolous arguments at hearings and in motion practice.<br><br>a. For example, in the *Estate of Ernest Gottdiener, et al. v. Sater,* 13-cv-1824 (S.D.N.Y.), the Honorable Loma Schofield dismissed the plaintiffs entire action on the defendants' motion to dismiss, noting the weaknesses of the plaintiff's claims and arguments. *See* ECF 12, at ("Nothing except surmise connects Defendants' criminal convictions with Palagonia or Plaintiffs."); *id.,* at 17-18 ("The Complaint fails to detail how Palagonia allegedly defrauded Plaintiffs. It does not allege, for any particular stock, which of the Plaintiffs bought it, on what date, what misrepresentations or omissions Palagonia made to induce that purchase, whether that Plaintiff was fraudulently induced to continue to hold that stock, or what misstatement or omission was made at the time."); *id.,* at 18 ("[T]he complaint obscures the allegations by using the term 'White Rock Partners,' defined as Defendants Sater, Lauria *and others,* rather than referring to Sater and Lauria by name or as Defendants. Some allegations use the passive voice and avoid identifying the actor in the sentence. Others refer vaguely to unnamed stocks and customers. Still other allegations use the sentence or paragraph structure to separate Defendants from the wrongdoing."); *id.,* at 19 ("To the extent that these suggestive statements can be considered allegations, they are belied by the attachments to the Complaint."); *id.,* at 20 ("The Complaint also relies on Defendants' guilty pleas, but overstates what they represent."); *see also* ECF 52, Second Circuit Mandate affirming Judge Schofield's dismissal. |
| Opinion Summary: | • Jurisdiction defect—neither the order issued nor the alleged violation occurred in EDNY proceedings.<br>• Factually disputed<br>• Filing of *Gottdiener* was protected by the First Amendment Petition Clause<br>• Other alleged specific instances of Rule violations must be identified to respondents with opportunity to respond to comport with basic notice and due process |

| Charge: | **Oberlander Charge pg 4-5, ¶9; & Lerner Charge pg 4-5, ¶6** |
|---|---|
| Text: | 9. The respondent improperly engaged in undignified and discourteous conduct toward the courts by making unfounded accusations against Judge Glasser, Judge Cogan, the Eastern District and the Second Circuit. A non-exhaustive list of this conduct includes:<br><br>a. Stating in motion practice that "[a]s it happens, what Judge Glasser and the Second Circuit have done, in concert with your own [Judge Cogan's] prior orders, is to hide an entire covert justice system operating devoid of constitutional legitimacy. It is so repellent to our Constitutional system that it· is not merely invalid by reason of unconstitutionality. It and the orders attempting to conceal it (including the disgrace of purporting to order a United States citizen not to report judicial unlawfulness to Congress) are and were at all times jurisdictionally barred. No federal court may enjoin anyone from revealing its own misconduct, ever, such injunction again *pro tanto brutum julmen."* February 17, 2012 Motion to Quash, at 9 (Ex. N).<br>b. Characterizing Judge Cogan's signing of the order to show cause as "illegal and unlawful," and accusing him of "maintaining an inaccurate docket" in another matter. *Id.,* at 3.<br>c. Accusing the Eastern District of taking "unlawful and unethical measures to cover up . . . illegal sentencing schemes," and the Second Circuit of orders evidencing "lawlessness" and "sedition" and constituting a scheme to "defraud[] ... victims of untold millions of dollars." *Id.,* at 4, 8.<br>d. Accusing Judge Glasser, Judge Cogan, and the Second Circuit of "hid[ing] an entire covert justice system operating devoid of constitutional legitimacy." *Id.,* at 9.<br>e. Characterizing the Eastern District as a "star chamber." July 16, 2010, Declaration of Frederick M. Oberlander, ¶ 1 (Exhibit F).<br>f. Accusing Judge Glasser of acting out of "pusillanimous fear." Id.¶ 11.<br>g. Accusing Judge Glasser and the Eastern District of "concoct[ing] a system of private justice without public accountability. This is not just constitutional amnesia. This is a constitutional crisis." Id.¶ 4.<br>h. Analogizing Judge Glasser and the Eastern District to Senator Joseph McCarthy. *See id.* ¶ 20 ("Finally, I would ask of this court one question: You have done enough. Have you no sense of decency sir, at long |

| | |
|---|---|
| | last? Have you left no sense of decency? For the only threat to our Union is that a judicial system that would self-justify and rationalize how it could ever dare operate in secret.")<br><br>i. Asserting in motion papers that Judge Glasser "presides over this and related matters in violation of 28 U.S.C. § 455(a) and (b)(1), having failed to disqualify yourself despite Congressional mandate you do so because of, respectively, your appearance of bias and lack of impartiality, palpably obvious to, let alone reasonably questioned by, an objective, informed observer," and that "that observer cannot rationally conclude but that your honor appears to be in criminal conspiracy with at least [] Sater' s lawyers, to deprive us and our clients of our rights." November 19, 2012 Omnibus Motion by the Respondent (Ex. Q). |
| Opinion Summary: | • Partially time barred (statements made in July 16, 2010, declaration are time barred)<br>• Factually disputed<br>• Statements protected by First Amendment Speech Clause—in combination with Petition Clause |
| | |
| **Charge:** | **Oberlander Basis for Discipline 1, page 5-6; &**<br>**Lerner Basis for Discipline 3, page 5 (slightly different wording)** |
| Text: | 1. The respondent violated RPC 3 .1, by filing multiple frivolous appeals and bringing frivolous lawsuits, and asserting frivolous arguments at hearings. *See* June 29, 2011 Second Circuit Order; Southern District of New York Docket Nos. 13-CV-1824 and 13-CV-3905; *see also* Points C(6-8), *supra.* |
| Opinion Summary: | • Partially time barred<br>• Jurisdiction defect—appeals and lawsuits identified were **_not_** brought in EDNY proceedings<br>• Jurisdiction defect—federal court power to punish filing state court lawsuit (*Kriss II*)<br>• Factually disputed<br>• Protected by First Amendment Petition and Speech Clauses |
| | |
| **Charge:** | **Oberlander Basis for Discipline 2, page 6; &**<br>**Lerner Basis for Discipline 4, page 5 (slightly different wording)** |
| Text: | 2. The respondent violated RPC 3 .2, by engaging in improper dilatory tactics. *See* June 29, 2011 Second Circuit Order ("[I]t is ORDERED that appellant Richard Roe is hereby warned that the Court's patience has been exhausted by his filing of six separate notice of appeal regarding the same principal legal dispute-including the filing of an appeal from a March 23, 2011 scheduling order that obviously was not a final order nor subject to any of the exceptions to the 'final judgment rule,' see Part (iv), post-and that any further attempts to re-litigate the issues decided by this order, or other future filings of a frivolous nature, may result in sanctions."). (Exhibit O.) |
| Opinion Summary: | • Time barred<br>• Jurisdiction defect—appeals identified were **_not_** brought in EDNY proceedings<br>• Factually disputed<br>• Protected by First Amendment Petition Clause |
| | |
| **Charge:** | **Oberlander Basis for Discipline 3, page 6; &**<br>**Lerner Basis for Discipline 5, page 5-6** |
| Text: | 3. The respondent violated RPC 3.3, by engaging in undignified and discourteous conduct toward the courts. *See* Point C(9), *supra.* |
| Opinion Summary: | • Partially time barred<br>• Factually disputed<br>• Protected by First Amendment Speech Clause |

| Charge: | **Oberlander Basis for Discipline 4, page 6; &** <br> **Lerner Basis for Discipline 6, page 6** |
|---|---|
| Text: | 4. The respondent violated RPC 3.4, by knowingly engaging in illegal conduct by contravening court orders, disclosing the Sealed Materials, and attempting to obtain a settlement by threatening further illegal conduct. *See* Points C(l-4), *supra*. |
| Opinion Summary: | <ul><li>Time barred</li><li>Factually disputed</li><li>Demand letter protected by First Amendment Petition Clause</li><li>Court orders were complied with or not enforceable because nonexistent or are lacking unambiguous decretal language and violated FRCP 65(d)</li></ul> |

| Charge: | **Oberlander Bases for Discipline 5-7 page 6 &** <br> **Lerner Bases for Discipline 7-9, page 6** |
|---|---|
| Text: | 5. The respondent violated RPC 8.4(a), by violating multiple Rules of Professional Conduct. See Points C( 1-9), *supra*. <br> 6. The respondent violated RPC 8.4(h), by engaging in conduct that adversely reflects on his fitness as a lawyer. See, e.g., Points C(l-9), *supra*. <br> 7. The respondent violated RPC 8.4( d), by engaging in conduct that is prejudicial to the administration of justice. See Points C(l-9), *supra*. |
| Opinion Summary: | <ul><li>Partially time barred as based on "Points C(1-9)," most of which are time barred.</li><li>Factual disputes as to "Points C(1-9)."</li><li>Cannot use labels to avoid constitutional requirements—thus if underlying conduct protected by First Amendment rights of petition, speech, or association, conduct cannot be sanctioned under a catch-all rule either.</li></ul> |

| Charge: | **Lerner Charge pg 5, ¶7** |
|---|---|
| Text: | 7. The respondent agreed to represent Oberlander, with knowledge of and participation in Oberlander's intentions to make the Sealed Materials public. *See* Point (C)l, *supra*. |
| Opinion Summary: | <ul><li>Time barred</li><li>Factually disputed</li><li>Writing of demand letter in "Point (C)1" is protected by First Amendment Petition Clause</li><li>Association with Oberlander protected by Lerner's First Amendment right of association, and Oberlander's Fifth and Sixth Amendment rights to counsel</li></ul> |

| Charge: | **Lerner Charge pg 5, ¶8** |
|---|---|
| Text: | 8. The respondent failed to withdraw from representing Oberlander when it became clear that Oberlander would continue to violate multiple court orders and the New York Rules of Professional Conduct. *See* Points (C)l-3, *supra*. |
| Opinion Summary: | <ul><li>At least partially time barred to extent Points (C)1-3 occurred prior to November 18, 2011</li><li>Factually disputed</li><li>Court orders identified in Points (C)1-3 were unenforceable as having expired or are lacking unambiguous decretal language and violate FRCP 65</li><li>Association with Oberlander protected by Lerner's First Amendment right of association, and Oberlander's Fifth and Sixth Amendment rights to counsel</li></ul> |

117

| Charge: | Lerner Charge pg 5, ¶9 |
|---|---|
| Text: | 9. The respondent failed to withdraw from representing Oberlander when it became clear that Oberlander was taking actions for the primary purpose of harassing or maliciously injuring the Defendants. *See* Points (C)l-4, *supra.* |
| Opinion Summary: | <ul><li>At least partially time barred to extent Points (C)1-4 occurred prior to November 18, 2011</li><li>Factually disputed</li><li>Jurisdictional defect to the extent Points (C)1-4 deal with lawsuits that were ***not*** filed in the EDNY</li><li>Jurisdictional defect as Point (C)4 raising federal court punishment of lawsuit filed in state court</li><li>Orders referenced in Points (C)2-3 are unenforceable as expired or are lacking unambiguous decretal language and violate FRCP 65</li><li>Demand letter protected by First Amendment Petition Clause</li><li>Filing of *Kriss II* and *Gottdiener* lawsuits protected by First Amendment Petition Clause</li><li>Association with Oberlander protected by Lerner's First Amendment right of association, and Oberlander's Fifth and Sixth Amendment rights to counsel</li></ul> |
| Charge: | Lerner Basis for Discipline 1, page 5 |
| Text: | 1. The respondent violated RPC l.16(a), by agreeing to represent Oberlander, despite knowledge of Oberlander's intentions to obtain a settlement by threatening illegal conduct. *See* Point (C)l, *supra.* |
| Opinion Summary: | <ul><li>Time barred</li><li>Factually disputed</li><li>Demand letter protected by First Amendment Petition Clause</li><li>Association with Oberlander protected by Lerner's First Amendment right of association, and Oberlander's Fifth and Sixth Amendment rights to counsel</li></ul> |
| Charge: | Lerner Basis for Discipline 1, page 5 |
| Text: | 2. The respondent violated RPC 1.16(b), by failing to terminate his representation of Oberlander when it became clear that further representation of Oberlander would result in a violation of the New York Rules of Professional Conduct. *See* Points (C)7-9, *supra.* |
| Opinion Summary: | <ul><li>Partially time barred, as Points (C)7-9 in turn reference Points (C)1-4, some of which occurred prior to November 18, 2011</li><li>Jurisdictional defect to the extent Points (C)1-4 concern lawsuits ***not*** filed in EDNY</li><li>Jurisdictional defect as Point (C)4 raises federal court punishment of lawsuit filed in state court</li><li>Factually disputed</li><li>Orders referenced in Points (C)2-3 are unenforceable as expired or are lacking unambiguous decretal language and violate FRCP 65</li><li>Demand letter protected by First Amendment Petition Clause</li><li>Filing of *Kriss II* and *Gottdiener* lawsuits protected by First Amendment Petition Clause</li><li>Association with Oberlander protected by Lerner's First Amendment right of association, and Oberlander's Fifth and Sixth Amendment rights to counsel</li></ul> |

I state the foregoing under penalty of perjury, pursuant to 28 U.S.C. 1746, this 6th day of September, 2017.

/s/ Margaret C. Tarkington

Appendix 1

# MARGARET C. TARKINGTON

•509 N. Walnut St., Batesville, Indiana 47006     •(812) 933-5818 or (812) 717-0344     •mtarking@iupui.edu

## ACADEMIC EMPLOYMENT

**Indiana University Robert H. McKinney School of Law**
*Professor of Law, 2014-Present*
*Associate Professor of Law, 2011–2014*
- Courses: Professional Responsibility, Seminar in Constitutional Law: The First Amendment and Attorney Regulation, Civil Procedure, Federal Courts, and Conflict of Laws
- IUPUI Trustees' Teaching Award, Spring 2015
- Selected as Hooding Professor by Class of 2015

**J. Reuben Clark Law School, Brigham Young University**
*Associate Professor of Law, Fall 2008–August 2011*
*Visiting Assistant Professor of Law, Fall 2006–Winter 2008*
- Courses: Professional Responsibility, Federal Courts, Civil Procedure, and Torts
- Student Bar Association Professor of the Year for First Year Courses, 2006–2007
- Recipient of "Restore Integrity Award" from POPULAR, June 2010

**University of Cincinnati College of Law**
*Visiting Associate Professor of Law, Fall 2010–Spring 2011*
- Courses: Legal Ethics, Civil Procedure I, Constitutional Law II, Torts

## PUBLICATIONS

IN SEARCH OF THE FIRST AMENDMENT RIGHTS OF LAWYERS (Cambridge University Press, under contract, forthcoming 2018).

PROFESSIONAL RESPONSIBILITY IN FOCUS (Wolters Kluwer—Aspen Casebook Series, under contract, forthcoming 2017) (with R. MICHAEL CASSIDY, JOHN P. SAHL & BENJAMIN P. COOPER).

*Lost in the Compromise: Free Speech, Criminal Justice, and Attorney Pretrial Publicity,* 66 FLORIDA LAW REVIEW 1873 (2014).

*Freedom of Attorney-Client Association,* 2012 UTAH LAW REVIEW 1071.

*A First Amendment Theory for Protecting Attorney Speech,* 45 UC DAVIS LAW REVIEW 27 (2012).

*Attorney Speech and the Right to an Impartial Adjudicator,* 30 REVIEW OF LITIGATION 849 (2011).

*Government Speech and the Publicly Employed Attorney*, 2010 BYU LAW REVIEW, no. 6, 2175.

*A Free Speech Right to Impugn Judicial Integrity in Court Proceedings*, 51 BOSTON COLLEGE LAW REVIEW 363 (2010).

*The Truth Be Damned: The First Amendment, Attorney Speech, and Judicial Reputation,* 97 GEORGETOWN LAW JOURNAL 1567 (2009).

*Rejecting the Touchstone: Complete Preemption and Congressional Intent after* Beneficial National Bank v. Anderson, 59 SOUTH CAROLINA LAW REVIEW 225 (2008).

*Must a Court Establish Personal Jurisdiction Prior to Dismissing a Case on the Ground of* Forum Non Conveniens*?*, 34 PREVIEW OF THE UNITED STATES SUPREME COURT CASES, no. 4, 194 (2007).

*Should the Rule in* Blakely *Be Applied Retroactively in Habeas Corpus Proceedings?*, 34 Preview of
the United States Supreme Court Cases, no. 2, 92 (2006).

*Abridging the Freedom of Non-English Speech: English-Only Legislation and the Free Speech Rights of
Government Employees,* 2001 BYU Law Review, no. 4, 1641.

## Presentations

*Of Hobbes and Locke: Conceptualizing Attorneys' First Amendment Rights as Officers of the Court and
Delegates of State Power*, Legal Ethics Schmooze, UCLA School of Law, Los Angeles, California,
July 21, 2017

*Indiana's Professional Conduct Rule 8.4(g): Interpretation and First Amendment Concerns*, ICLEF,
*RFRA Claims, What are the Issues?* Indianapolis, Indiana, May 18, 2017

Moderator and Speaker, *Approaching Free Speech and Lawyer Regulation*, International Legal Ethics
Conference VII, Fordham University School of Law, New York, New York, July 15, 2016

Panelist, *Uncivil Speech and the First Amendment*, Indiana University McKinney School of Law, Indiana,
Indianapolis, March 25, 2014

Panelist, *Who Are They to Judge?—Ethical and Professionalism Issues Facing the Bench*, University of
Georgia Law School Symposium, Athens, Georgia, February 21, 2014

*Biting the Hand: Professionalism, Punishment, and Attorney Speech*
•Presented to the Federalist Society, Indianapolis Lawyers Chapter, Indianapolis, Indiana, December
13, 2013

*Lost in the Compromise: Free Speech, Criminal Justice, and Attorney Pretrial Publicity*
•Presented to the Indiana University Maurer School of Law faculty, Bloomington, Indiana,
January 24, 2014
•Presented at the Legal Ethics Scholars Roundtable, Fordham University School of Law, New York,
New York, October 7, 2013

*Freedom of Attorney-Client Association*
•Presented to the University of Illinois Law School faculty, Champaign, Illinois, October 25, 2012
•Presented at the Big Ten Untenured Conference, Indiana University Maurer School of Law,
Bloomington, Indiana, August 3, 2011

*Attorney Speech and the Right to an Impartial Adjudicator*
•Invited to present at the AALS Section on Litigation Program, *Current Issues in Judicial
Disqualification*, AALS Annual Meeting, San Francisco, California, January 7, 2011

*Preserving the Role of the Attorney through the Protection of Attorney Speech*
•Presented at the University of London's Institute of Advanced Legal Studies conference, *Regulating
and Deregulating Lawyers in the 21st Century,* London, England, June 3, 2010

*Impugning Judicial Integrity: A Guide for Attorneys*
•Presented at the Annual State and Local Government Conference, Provo, Utah, March 19, 2010

*Government Speech and the Publicly Employed Attorney*
•Presented at the BYU Law Review Symposium, *The Emerging Complexities of Government Speech,*
Provo, Utah, March 11, 2010

*A Free Speech Right to Impugn Judicial Integrity in Court Proceedings*
  •Presented to the Washington & Lee Law School faculty, Lexington, Virginia, November 16, 2009
  •Presented at the Rocky Mountain Junior Scholars Forum, BYU, Provo, Utah, September 25, 2009

Panelist, *Corporations, Courtrooms & and Constitution: Shades of Gray in the World of Legal Ethics*, Mississippi College Law Review Symposium, Jackson, Mississippi, February 25, 2009

*The Enforcement of Decorum: Civility, Justice, and the First Amendment*
  •Presented at the 25th Annual State and Local Government Conference, Provo, Utah, March 29, 2007

*Rejecting the Touchstone: Complete Preemption and Congressional Intent after* Beneficial National Bank v. Anderson
  •Presented at the Texas Junior Legal Scholars Conference, Fort Worth, Texas, August 10–11, 2007

## PROFESSIONAL ASSOCIATIONS

**AALS Professional Responsibility Section**
  •Chair-Elect, 2017-2018
  •Treasurer, 2015–2016
  •Executive Committee Member, 2011–2014
      -Proposed and helped develop the topic for the 2012 Professional Responsibility Section Program, *Does the First Amendment Protect Attorney Advice, Assistance, and Representation?*
      -Served on Subcommittee to plan Section event for 2014 Annual Meeting
  •Section Newsletter Editor, 2010–present
      -Each Spring and Fall, solicited submissions for, edited, and circulated the section Professional Responsibility Newsletter, which includes substantive articles, a 50-state and federal survey of updates in lawyer regulation, announcements of upcoming conferences, summaries of recent conferences, and a scholarship update, among other material
  •Authored "MRPC 8.2: A Trap for Lawyers" in Spring 2011 Professional Responsibility Newsletter

**American Bar Association**
  •Member, Center for Professional Responsibility

**AALS Civil Procedure Section**
  •Authored "New Books of Interest" in 2009 Civil Procedure Section Newsletter
  •Participated in discussions and planning of 2010 Civil Procedure Section Program

## EDUCATION

**J. Reuben Clark Law School, Brigham Young University**
*Juris Doctor, summa cum laude, April 2002*
  •Order of the Coif
  •Class Rank: 2/172
  •Executive Editor, Law Review
  •J. Reuben Clark Award for academic excellence, integrity and service, 2000 & 2002
  •Edwin S. Hinckley Scholar
  •International Moot Court Team, 2000–2001
  •SBA 2L Class Representative, 2000-2001
  •Executive Board Member, Public Interest Law Foundation, 1999–2000

**Brigham Young University**
*Bachelor of Arts, summa cum laude and University Honors, April 1999*
- Major: History; Major GPA: 4.0; Cumulative GPA: 3.99
- Valedictorian for Department of History, 1999
- Convocation speaker for the College of Family, Home, and Social Sciences, 1999
- Outstanding Undergraduate History Student, 1998
- Golden Key Senior Scholarship Award, 1998
- Karl G. Maeser Scholar, 1997–1998
- Willard J. Snow Award for Best Undergraduate Paper in Western History, 1998
- 1998 Research and Creative Activities Award
- University Scholarship 1994–1997

## EMPLOYMENT EXPERIENCE

**Wood Crapo, Salt Lake City, Utah**
*Associate & Of Counsel, July 2004–July 2006; Summer Associate, May–June 2000*

**Sommer Barnard, Indianapolis, Indiana**
*Associate, September 2003–June 2004*

**Judge Kenneth F. Ripple, United States Court of Appeals for the Seventh Circuit, South Bend, Indiana**
*Law Clerk, August 2002–August 2003*

**Cravath, Swaine & Moore, New York, New York**
*Summer Associate, April–June 2002*

**Paul, Weiss, Rifkind, Wharton & Garrison, New York, New York**
*Summer Associate, May–August 2001*

## ADMISSIONS

**New York State Bar** (Admitted January 29, 2003)

**Indiana State Bar** (Admitted October 20, 2003; Inactive Status)

**Utah State Bar** (Admitted May 24, 2005; Inactive Status)

Appendix 2

## DOCUMENTS REVIEWED IN PREPARATION OF REPORT[*]

1998.09.15   Criminal Complaint against Sater

1998.10.02   Proffer Agreement

1998.10.29   Proffer Agreement

1998.12.03   Docket of U.S. v. Sater, 98-cv-1101

1998.12.09   "Draft" Criminal Information

1998.12.10   Sater's Cooperation Agreement

2000.03.02   EDNY Press Release, indicating Sater, Lauria and Klotsman pled guilty to RICO
charges

2002.04.29   Lauria letter, obtained from National Archives

2003.07.17   Gushlak docket, 03-cr-833

2004.03.11   U.S. v. Romano docket, 04-cr-234

2004.05.26   Appel docket, 04-cr-505

2008.01.11   Romano sentencing transcript

2009.10.23   Sater sentencing transcript

2010.03.10   Saracino docket 10-cr-173

2010.05.10   Orignial SDNY Complaint; Kriss v. Bayrock

2010.05.13   Buchwald Order

2010.05.14   Buchwald Order

2010.05.18   OTSC with TRO signed by Glasser; movant Sater, Kelly Moore

2010.05.19   Buchwald Abeyance Delaying Filing of Redacted Compalint

2010.06.11   Glasser Transcript

---

[*] I have attempted to compile the documents that I reviewed in creating my Report. To the extent I may have
omitted any, it was an unintentional error.

2010.06.11   Letter, Lerner to Glasser,

2010.06.14   Glasser Transcript

2010.06.21   Glasser Transcript

2010.07.09   Notice of Appeal filed by Lerner in behalf of Oberlander

2010.07.11   Notice of Appeal filed by Stamoulis in behalf of Kriss & Ejekam

2010.07.16   Lerner Opposition to All Relief in the OSC, with Oberlander Declaration attached

2010.07.16   Declaration of Frederick M. Oberlander

2010.07.20   Glasser Transcript

2010.08.06   Moore Request for Clarification

2010.08.09   Notice of Appeal filed by Lerner for Oberlander

2010.08.12   Letter, Moore to Glasser, with Standstill, so-ordered

2010.09.27   Amendment to Standstill Agreement, So Ordered by Glasser

2010.10.18   Letter, Oberlander to Herman, attaching Proposed Redacted Complaint

2010.10.18   Proposed Redacted *Kriss I* Complaint, Sent to Herman

2010.11.09   Letter, Oberlander to Herman

2010.11.16   Letter, Moore to Glasser Re Cancellation of Standstill

2010.11.23   Letter, Kaminsky to Glasser

2010.11.24   Moore Memo of Law

2010.11.24   Snider aff in support of request for order directing return of documents and copies, with Ex. 6 Buchwald abeyance order

2011.02.07   Petition for Writ of Mandamus submitted to Second Circuit

2011.02.10   Second Circuit order to not tell Congress, etc.

2011.02.14   Second Circuit oral argument

2011.02.14   Second Circuit pendente lite order

2011.03.17   Government's Letter Motion to Unseal Sater Case

2011.03.23   Glasser Scheduling Order

2011.03.28   Lerner, Shultz Cassell Appellate Brief Second Circuit

2011.04.01   Cogan Transcript

2011.04.04   Letter Lerner to Cogan, enclosing Oberlander aff re destruction of documents

2011.04.04   Cogan order denying reconsideration

2011.04.04   Confirmation to Cogan that FMO can see the documents to assist with appeal

2011.04.04   Letter motion for reconsideration of order directing FMO to return or destroy Documents

2011.04.05   Notice of appeal filed by Lerner for Oberlander

2011.04.05   Letter Lerner to Cogan (cc'd by email on April 5, 2011) confirming Lerner's right to retain documents

2011.04.11   Government Appellate Brief

2011.04.14   Notice of Appeal filed by Lerner in behalf of Oberlander

2011.04.14   Letter to Cogan re: public sources

2011.04.18   Lerner, Schulz, Cassell Reply Brief

2011.05.13   Cogan Order

2011.05.18   Sater's counsel's email advising that Glasser will disregard all evidence and argument

2011.05.19   Lerner Letter to Second Circuit Re: Cogan's May 13 Order

2011.06.10   Notice of appeal filed by Selmeci for Oberlander

2011.06.21   Lerner Letter to Second Circuit

2011.06.23   Letter of Kaminsky

2011.06.29   Second Circuit order re: PSR (LexisNexis version)

2011.08.11   Letter Mobargha to Buchwald, identifying Richard Roe as the plaintiff's attorney

| 2011.12.20 | Second Circuit mandate |
|---|---|
| 2012.01.26 | Kaminsky letter, reciting earlier ex parte letters |
| 2012.01.27 | Engelmayer Order Denying Sater's Motion |
| 2012.02.10 | Application to Judge Cogan for Contempt |
| 2012.02.15 | OSC Signed by Cogan |
| 2012.02.17 | Motion to Quash Contempt before Judge Cogan |
| 2012.02.24 | Memorandum in support of recusal |
| 2012.02.24 | Notice of motion for recusal of Judge Glasser |
| 2012.02.27 | Cogan transcript |
| 2012.03.02 | Glasser order denying recusal |
| 2012.03.26 | Letter USAO to Cogan |
| 2012.05.10 | Motion in U.S. Supreme Court (unredacted) to publicly file cert petition |
| 2012.05.10 | Petition for certiorari in U.S. Supreme Court (Part 1) |
| 2012.05.10 | Petition for certiorari in U.S. Supreme Court (Part 2) |
| 2012.07.13 | Gushlak Restitution Order and Victim List |
| 2012.08.02 | Letter, Sater's Counsel Re: Persico Threat |
| 2012.08.06 | Letter, Kaminsky to Cogan that Sater does not want FBI protection |
| 2012.08.21 | Letter, Oberlander to Glasser Asking to Recuse |
| 2012.08.22 | Glasser Hearing on Sealing |
| 2012.08.22 | Vodicka affidavit |
| 2012.08.27 | Glasser Order Unsealing Docket |
| 2012.10.12 | Reuters letter objecting to being tossed from courtroom |
| 2012.10.23 | Request for Judicial Notice |

2012.11.08   Joint Request for Entry of Notice

2012.11.13   Glasser OSC as to Why Not Impose Sanctions

2012.11.19   Omnibus Motion Filed in Response to Glasser's OSC as to Why Not Impose
             Sanctions

2012.12.13   Response to Glasser's OSC for sanctions for Request for Judicial Notice

2012.12.17   Letter Sallah to Glasser Demanding Unsealing of 98-cr-1101

2013.03.05   Paul Clement & Richard Lerner's reply brief to U.S. Supreme Court

2013.03.13   Glasser Order Re: Unsealing Provided to Supreme Court 1

2013.03.14   Glasser Order Re: Unsealing Provided to Supreme Court 2

2013.03.18   Gottdiener Complaint

2013.03.28   Email from Kaminsky Demanding Return of Documents given Lerner by Solicitor
             General Verrilli

2013.05.10   Summons with Notice filed in State Court

2013.05.28   Cogan order Denying Motion for Sanctions against Oberlander and Lerner

2013.08.02   *Gottdiener* amended Complaint (Part 1)

2013.08.02   *Gottdiener* amended Complaint (Part 2)

2014.03.19   Schofield Opinion and Order dismissing *Gottdiener* Complaint

2014.05.12   Schofield Opinion and Order Granting Reconsideration as to Statute of Limitations

2014.05.29   Memorandum and Order of Magistrate Maas

2014.06.05   Second Circuit Order

2014.06.09   Disciplinary Complaint against Frederick M. Oberlander & Exhibits Thereto

2014.07.23   Disciplinary Complaint against Richard E. Lerner

2015.01.14   Report and Recommendation of Magistrate Maas

2015.02.14   Package for Law Enforcement re Sater's Threats

2015.03.20   Robert Wolf Declaration in Support of OSC and Exhibits thereto

2015.03.23   Schofield Order Adopting Maas R&R

2015.04.28   Threat Letter Sent to Rabbi Tausky by Sater's counsel

2015.04.30   Order of Magistrate Maas (vacated by Schofield)

2015.06.23   Notice of Voluntary Dismissal, *Kriss v. Bayrock* (Kriss II)

2015.06.25   Second Circuit *Gottdiener* Order

2015.06.30   Cogan transcript

2015.07.13   Notice of Voluntary Dismissal, Kriss v. Bayrock (Kriss II)

2015.11.10   Cogan Transcript

2015.11.16   Schofield Order

2016.01.06   Cogan order, dismissing charges against Kriss

2016.02.01   Order of Judge Schofield, Vacating Magistrate's Order

2016.05.10   Cogan Transcript

2016.06.21   Cogan Order

2016.07.08   Declaration and allegations in support of recusal motion

2016.11.18   EDNY Grievance Committee OSC as to Frederick M. Oberlander

2016.11.18   EDNY Grievance Committee OSC as to Richard E. Lerner

2016.12.02   Schofield Order upholding RICO claims

2017.09.05   New York Supreme Court Dismissal Order

Docket for *Roe v. U.S.*, Case no. 12-112, (United States Supreme Court) available at: https://www.supremecourt.gov/search.aspx?filename=/docketfiles/12-112.htm.

ORGANIZED CRIME ON WALL STREET, House Hearing, Sept. 13, 2000, at 195 & n.2, *available at* https://www.gpo.gov/fdsys/pkg/CHRG-106hhrg67115/pdf/CHRG-106hhrg67115.pdf.
Benjamin Weiser, *By Revealing Man's Past, Lawyer Tests Court Secrecy*, NEW YORK TIMES, 5 Feb 2012, available at http://www.nytimes.com/2012/02/06/nyregion/fraud-case-challenges-secrecy-of-mans-past-as-criminal-and-cooperating-witness.html?mcubz=0.

Michael Sallah, *High court reveals secret deal of Trump developer's crimes.* THE MIAMI HERALD, July 31, 2012, available at http://www.miamiherald.com/latest-news/article1941682.html.

Miscellaneous filings from the *Coppa* Docket, 00-Cr-196
Miscellaneous filings and transcripts from *In re Public Docket*, 1:17-mc-01302-PKC (EDNY)
Miscellaneous filings in Second Circuit Docket Nos. 10-2905 & 11-475
Miscellaneous filings from *People of the State of New York v. Bayrock*, No. 15-1245 (NY Supreme Court)